## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEAGUE OF WOMEN VOTERS OF THE
UNITED STATES, *et al.*,

     Plaintiffs,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

     Defendants.

Case No. 25-cv-3501

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A STAY UNDER 5 U.S.C. § 705 AND
## A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ..........................................................................................................................5

I. Legal Framework....................................................................................................................5

II. Factual Background................................................................................................................8

    A. The Trump administration prioritizes government-wide data consolidation......................8

    B. Defendants unlawfully transform USCIS's SAVE system into a national citizenship data
    bank that pools unreliable SSA data, which states are using to purge voter rolls and open
    criminal investigations ..........................................................................................................9

        1. The prior SAVE system's limited authorized scope and functionality..........................10

        2. Defendants "overhaul" SAVE by transforming it into an interagency system that
        directly queries SSA databases and allows bulk searches of millions of Americans'
        sensitive data ..........................................................................................................13

        3. The overhauled SAVE system utilizes unreliable SSA citizenship data ......................16

        4. States' use of the overhauled SAVE system threatens to disenfranchise eligible voters
        in impending elections and subject them to unwarranted criminal investigations ............17

LEGAL STANDARD..................................................................................................................20

ARGUMENT ..............................................................................................................................20

I. Plaintiffs are likely to succeed on the merits ........................................................................20

    A. Plaintiffs have standing ....................................................................................................21

    B. Defendants' overhaul of the SAVE system violated the APA..........................................22

        1. Defendants' decision to overhaul the SAVE system is final agency action reviewable
        under the APA..........................................................................................................22

        2. The overhauled SAVE system is an interagency "national data bank" prohibited by the
        Privacy Act..........................................................................................................23

        3. Defendants violated the Privacy Act's SORN and notice-and-comment requirements in
        overhauling SAVE ..........................................................................................................25

        4. Defendants unlawfully withheld agency action in overhauling SAVE ........................26

        5. Defendants' overhaul of SAVE was arbitrary and capricious ......................................27

    C. Alternatively, Plaintiffs are entitled to mandamus relief ..................................................32

    D. Defendants' overhaul of the SAVE system was *ultra vires*................................................32

i

E. Defendants' overhaul of the SAVE system violated the separation of powers...................33

II. The overhauled SAVE system irreparably harms Plaintiffs. .....................................................34

A. Irreparable injuries to the Proposed PI Class Representatives and members of LWVVA and LWVLA .........................................................................................................................34

B. Irreparable injuries to the League Plaintiffs .......................................................................43

III. The balance of equities and public interest weigh in favor of injunctive relief......................44

CONCLUSION.............................................................................................................................45

## TABLE OF AUTHORITIES[*]

**Cases**

*Am. Fed'n of Lab. & Cong. of Indus. Orgs ("AFL-CIO") v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) ........................................................................21, 23

*Am. Hosp. Ass'n v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016) ............................................................................32, 33

*Am. Pub. Gas Ass'n v. Dep't of Energy*,
72 F.4th 1324 (D.C. Cir. 2023) ...................................................................................32

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ...................................................................................32

*Babamuradova v. Blinken*,
633 F. Supp. 3d 1 (D.D.C. 2022) ...............................................................................32

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................................................................................................23

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020) .....................................................................................28

*Campaign Legal Ctr. v. FEC*,
31 F.4th 781 (D.C. Cir. 2022) ....................................................................................22

*Carey v. Wis. Elec. Comm'n*,
624 F. Supp. 3d 1020 (W.D. Wis. 2022) ...................................................................35

*Cell Assocs., Inc. v. Nat'l Insts. Of Health*,
579 F.2d 1155 (9th Cir. 1978) ....................................................................................23

*Citizens for Resp. & Ethics in Washington v. OMB*,
2025 WL 2025114 (D.D.C. July 21, 2025) ...........................................................41, 44

*Citizens for Resp. & Ethics in Washington v. U.S. DOGE Serv.*,
769 F. Supp. 3d 8 (D.D.C. 2025) ...........................................................................42, 44

*D.C. v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) ...............................................................................20

*Dalton v. Specter*,
511 U.S. 462 (1994) ....................................................................................................34

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........................................................................................................28

*Doe v. Chao*,
540 U.S. 614 (2004) ....................................................................................................23

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) .................................................................................23

---

[*] Authorities marked with an asterisk are those on which counsel chiefly relies.

*DOJ v. Reps. Comm. For Freedom of Press*,
    489 U.S. 749 (1989) ................................................................................................. 6

*Drs. for Am. v. OPM*,
    766 F. Supp. 3d 39 (D.D.C. 2025) ................................................................... 41, 44

*Dunlap v. Pres. Advisory Comm'n on Election Integrity*,
    286 F. Supp. 3d 96 (D.D.C. 2017) ........................................................................ 44

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) .............................................................................. 35

*Friends of Animals v. Jewell*,
    824 F.3d 1033 (D.C. Cir. 2016) ............................................................................ 22

*Ga. Coal. for the People's Agenda, Inc. v. Kemp*,
    347 F. Supp. 3d 1251 (N.D. Ga. 2018) ................................................................. 35

*Gill v. Whitford*,
    585 U.S. 48 (2018) ................................................................................................ 21

*Glob. Health Council v. Trump*,
    2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ................................................. 33, 34

*Judge Rotenberg Educ. Ctr. v. FDA*,
    3 F.4th 390 (D.C. Cir. 2021) ................................................................................ 34

*League of United Latin Am. Citizens v. EOP*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ............................................................ 21, 34, 45

*League of Women Voters of N.C. v. N. Carolina*,
    769 F.3d 224 (4th Cir. 2014) ........................................................................... 35, 36

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................ 34, 35, 43, 45

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ............................................................................................. 33

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ............................................................................................. 27

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
    785 F. Supp. 3d 68 (D. Md. 2025) ................................................. 42, 43, 44, 45

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ............................................................................ 22

*Mi Familia Vota v. Fontes*,
    129 F.4th 691 (9th Cir. 2025) ........................................................................ 21, 29

*Mi Familia Vota v. Fontes*,
    719 F. Supp. 3d 929 (D. Ariz. 2024) .................................................................... 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................... 28, 30

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ........................................................................42

*Nat'l Ass'n of Postal Supervisors v. USPS*,
    26 F.4th 960 (D.C. Cir. 2022) ............................................................................33

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................20

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................................27, 32

*Payne Enters. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) ...........................................................................42

*Pharm. Rsch. & Mfrs. of Am. v. HHS*,
    43 F. Supp. 3d 28 (D.D.C. 2014) .......................................................................13

*Protect Democracy Project, Inc. v. DOJ*,
    498 F. Supp. 3d 132 (D.D.C. 2020) ...................................................................44

*Richardson v. Trump*,
    496 F. Supp. 3d 165 (D.D.C. 2020) ..............................................................21, 35

*South Carolina v. United States*,
    907 F.3d 742 (4th Cir. 2018) .............................................................................27

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ............................................................................................22

*Susman Godfrey LLP v. EOP*,
    2025 WL 1779830 (D.D.C. June 27, 2025) ......................................................34

*Texas Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) .....................................................................42

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................................................21

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) .............................................................................21

*Venetian Casino Resort, LLC v. EEOC*,
    530 F.3d 925 (D.C. Cir. 2008) ...........................................................................23

*Williams v. Harry's Nurses Registry, Inc.*,
    2025 WL 842041 (2d Cir. Mar. 18, 2025) .........................................................40

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................20

**Statutes**

*5 U.S.C.
  § 552a(a)(5) ................................................................................................6
  § 552a(c) ...................................................................................................42
  § 552a(d) ..................................................................................................42
  § 552a(e) .............................................................................................. *passim*
  § 552a(g) ..................................................................................................23
  § 552a(j) ...................................................................................................27
  § 552a(v)(1) ................................................................................................7
  § 552a note ........................................................................................... *passim*
  § 552a(o) ..........................................................................................6, 8, 24
  § 704 .........................................................................................................22
  § 705 ...........................................................................................4, 20, 45
  § 706(1) ...............................................................................................27, 33
  § 706(2) ....................................................................................................32
  § 706(2)(A) .......................................................................................24, 25, 28
  § 706(2)(C) ...............................................................................................25
  § 706(2)(D) .........................................................................................25, 27

28 U.S.C. § 1361 ................................................................................................32

44 U.S.C.
  § 208(b)(2)(B)(ii)(V) ......................................................................................11
  § 3501 note .................................................................................................11

*Privacy Act of 1974 § 2(b) 88 Stat. 1896 (1974) .......................................................5

Pub. L. No. 100-503, § 9, 102 Stat. 2507 (1988) ..............................................1, 6, 24

Pub. L. No. 107-347, § 208(b)(1)(A) (2002) .............................................................11

Pub. L. No. 107-347, § 208(b)(1)(B) (2002) .............................................................11

Va. Code Ann.
  § 24.2-404(A)(4) .....................................................................................19, 37
  § 24.2-404(E) .............................................................................................19

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ................................................................................34

**Other Authorities**

66 Fed. Reg. 46812 (Sept. 7, 2001) .........................................................................2

67 Fed. Reg. 64134 (Oct. 17, 2002) .........................................................................2

72 Fed. Reg. 17569 (Apr. 9, 2007) ..........................................................................2

73 Fed. Reg. 10793 (Feb. 28, 2008) .........................................................................2

73 Fed. Reg. 75445 (Dec. 11, 2008) .........................................................................2

77 Fed. Reg. 47415 (Aug. 8, 2012) ..........................................................................2

81 Fed. Reg. 78619 (Nov. 8, 2016) ..........................................................................2

*85 Fed. Reg. 31798 (May 27, 2020) ...............................................................2, 11, 12

90 Fed. Reg. 8441 (Jan. 29, 2025) .........................................................................8

*90 Fed. Reg. 10025 (Feb. 20, 2025) ..........................................................12, 15, 25

90 Fed. Reg. 13681 (Mar. 25, 2025).......................................................................9

90 Fed. Reg. 14005 (Mar. 28, 2025).....................................................................9, 10

A.P. Dillon, *State Board of Elections tables SAVE invitation*, North State Journal
(Sept. 4, 2025)......................................................................................................15

Dep't of Gov't Efficiency (@DOGE), X (June 20, 2025, 11:24 AM) .......................19

*DHS, *Privacy Impact Assessment for the Systematic Alien Verification
Entitlements Progr*, DHS Ref. No. DHS/USCIS/PIA-006(c) (June 30, 2020)...........10, 11, 12

Election Fraud Map, Explore the Data, The Heritage Foundation (last accessed
Oct. 6, 2025) ........................................................................................................31

*Eligible Voters at Risk: Examining Changes to USCIS's Save System*, Fair
Elections Ctr. Issue Brief (July 2025)...............................................................10, 11

Exec. Order No. 14,248 .........................................................................................14

H.R. Rep. No. 93-1416 (1974)..................................................................................6

Jordyn Bradley, *Nearly Every US State Has Lost Social Security Field-Office Staff
This Year*, Investopedia (Aug. 11, 2025) ................................................................36

*Jude Joffe-Block and Miles Parks, *33 million voters have been run through a
Trump administration citizenship check*, NPR (Sept. 10, 2025).................................15, 17, 18

Jude Joffe-Block and Miles Parks, *The Trump administration is building a
national citizenship data system*, NPR (June 29, 2025) ..........................................16

La. Sec'y of State, *Get Election Information*...........................................................20

Lafayette Par. Clerk of Court, *2025 Lafayette Par. Elections* ...................................20

*Letter Agreement Providing for Information Sharing Between DHS, USCIS, and
SSA Regarding Citizenship (May 15, 2025) .........................................3, 15, 24, 25

*Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023) ................. *passim*

Louisiana Secretary of State (@Louisiana_sos), X (May 23, 2025, 9:45 AM)...........................18

MOA between the DHS, USCIS and the Virginia State Board of Elections (March
20, 2014) ..............................................................................................................19

Natalia Contreras, *As Texas Embraces Federal Immigration Database to Verify
Voter Citizenship, Some Experts are Worried*, The Texas Tribune (July 22,
2025) ....................................................................................................................19

National Conf. of State Legislatures, *2026 State Primary Election Dates*, (Sept.
26, 2025) ..............................................................................................................20

Off. of Mgmt. & Budget Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act* (2016)................................7, 8, 26

Press Release, *After Gaining Access to SAVE Database, Secretary Nelson Refers Potential Noncitizen Voting Cases for Investigation*, Texas Sec'y of State (June 5, 2025)...........................................................................................................18

Press Release, *Attorney General Ken Paxton Opens Investigations into 33 Noncitizens for Illegally Voting in the 2024 Election*, Att'y Gen. of Texas (June 17, 2025)..........................................................................................................19

*Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database*, DHS (April 22, 2025) ...........................................2, 13, 30

Press Release, *Louisiana First State to Utilize New Voter List Maintenance Database*, Louisiana Secretary of State (May 21, 2025).......................................18

*Press Release, *USCIS Deploys Common Sense Tools to Verify Voters*, USCIS (May 22, 2025).....................................................................................2, 13, 30, 38

*Review of Allegations of Noncitizen Registrants and Voters*, Ctr. for Election Innovation & Rsch. (July 2025).....................................................................31

S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 .....................................1, 6, 8

Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, Office of Homeland Security Statistics (Sept. 2024)....................................16

*SAVE User Reference Guide*, 10.1 Bulk Upload File Management (July 16, 2025)....................40

Source Book on Privacy at 5 (1976), https://perma.cc/9W9F-R5ZL .............................................1

SSA Off. of the Inspector Gen., No. A-08-06-26100, *Congressional Response Report: Accuracy of the Social Security Administration's Numident File* 13 (Dec. 18, 2008) ................................................................................................17, 29

SSA, *Social Security Performance* (last updated Sept. 4, 2025) ...................................................16

SSA, *What the Federal Government Shutdown Means to You*, Social Security Matters Blog (Oct. 1, 2025) ................................................................................36

Texas Sec'y of State, *Important Election Dates*.........................................................................20

U.S. Census Bureau, *Nativity and Citizenship Status in the United States* (accessed Sept. 23, 2025)...........................................................................................16

U.S. Dep't of Just., Overview of the Privacy Act of 1974 (2020 ed.) ............................................5

U.S. Gov't Accountability Off., Rep. No. GAO-17-204, *Immigration Status Verification for Benefits: Actions Needed to Improve Effectiveness and Oversight* (Mar. 2017) ..............................................................................................37, 38

U.S. S. Comm. on Homeland Sec. & Gov't Affairs, *Unchecked and Unaccountable: How DOGE Jeopardizes Americans' Data Without Regard for Law and Congress*, Minority Staff Report (Sept. 2025) ...................................................40

USCIS, *SAVE Optimization for Voter Verification* (July 23, 2025) .........................................17, 39

USCIS, *SAVE Optimization: SAVE Enhances the Bulk Upload Process* (July 21, 2025) .....................................................................................................................................40

USCIS, *SAVE User Reference Guide* Ch. 1.4 (June 4, 2025)........................................................25

USCIS, *SAVE User Reference Guide* (July 16, 2025) .................................................................38

USCIS, *Tutorial: Introduction to SAVE and the Verification Process for SAVE Users* (July 17, 2025).......................................................................................14, 15

USCIS, *Tutorial: Introduction to SAVE and the Verification Process for SAVE Users* (July 17, 2025).......................................................................................24

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Aug. 27, 2025) .....................................................................................................14

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Jan. 24, 2025).............................................................................................13, 14

USCIS, *Voter Verification Agency Sample MOA Draft* (June 9, 2025) ........................................20

USCIS, *Voter Verification Agency Sample MOA Draft* (June 9, 2025) ........................................38

USCIS, *Voter Verification Bulk Uploaded* ................................................................................17

Va. Dep't of Elections, *Upcoming Electio* ................................................................................20

Va. Exec. Order 53 (Sept. 12, 2025)........................................................................................19

Wesley Muller, *Louisiana election investigation finds 79 noncitizens have voted since 1980s,* Louisiana Illuminator (Sept. 4, 2025) .......................................18, 31

*Westat Report to DHS, *Evaluation of the Accuracy of E-Verify Findings* (July 2012) .........................................................................................................29, 30, 38

## INTRODUCTION

This suit challenges the Trump administration's illegal and secretive consolidation of millions of Americans' sensitive personal data across government agencies into centralized data systems at the Department of Homeland Security ("DHS"). Half a century ago, following unprecedented executive branch abuse of Americans' personal data, Congress enacted the Privacy Act specifically to prevent the government from creating such interagency systems in order to "protect[] our liberties" from "1984- or Russian-style totalitarianism."[1] Now, Defendants are flouting the Act's prohibitions by pooling Americans' sensitive information into "national data bank[s] that combine[], merge[], or link[] information on individuals maintained in systems of records by other Federal agencies." Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514 (1988), *codified at* 5 U.S.C. § 552a note. Defendants have also run roughshod over numerous guardrails of the Privacy Act and Administrative Procedure Act ("APA"): they have created and revised existing "systems of records" without publishing mandatory information about the changes, without following notice-and-comment procedures, without assessing privacy and security risks, and without reasoned decisionmaking. Plaintiffs in this case include a proposed class of millions of American citizens and permanent residents whose records have been unlawfully pooled into new or revised centralized records systems at DHS, as well as organizations whose members and missions are harmed by Defendants' attempts to ignore the laws protecting Americans' privacy.

While Plaintiffs' Complaint challenges a broader set of Defendants' unlawful data consolidation, Plaintiffs here seek emergency relief concerning one particularly harmful and urgent facet of Defendants' conduct: their overhaul of the Systematic Alien Verification for

---

[1] S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 5 (1976),  https://perma.cc/9W9F-R5ZL ("Privacy Act Leg. History") (cleaned up).

Entitlements ("SAVE") system.

SAVE is an online system administered by U.S. Citizenship and Immigration Services ("USCIS") that was created to allow federal, state, and local agencies to verify the immigration and citizenship status of applicants for government benefits. Some states also used SAVE to verify the citizenship of voters and voter registrants. Prior to April 2025, SAVE was exceedingly limited in scope and functionality: it did not access databases with information on U.S.-born citizens, did not allow searches by Social Security number ("SSN") (instead requiring a DHS-issued identifier), and did not permit bulk searches of more than one individual at a time. When DHS made changes to SAVE in the past, it followed the Privacy Act's requirements by publishing revised System of Records Notices ("SORNs") and soliciting and considering public comments on any new uses of the system, including most recently in May 2020.[2]

Between April and August 2025, however, Defendants unilaterally "overhaul[ed]" the SAVE system,[3] transforming it into what they call "a single, reliable source for verifying immigration status and U.S. citizenship nationwide."[4] With no advance notice or opportunity for public comment, Defendants seismically expanded SAVE's scope and functionality far beyond its operative SORN and any statutory authority. They added a new search-by-SSN function that directly queries Social Security Administration ("SSA") systems of records (not just immigration-related systems), permits searches of information on U.S.-born citizens (not just naturalized and

---

[2] *See, e.g.*, 85 Fed. Reg. 31798 (May 27, 2020); 81 Fed. Reg. 78619 (Nov. 8, 2016); 77 Fed. Reg. 47415 (Aug. 8, 2012); 73 Fed. Reg. 75445 (Dec. 11, 2008); 73 Fed. Reg. 10793 (Feb. 28, 2008); 72 Fed. Reg. 17569 (Apr. 9, 2007); 67 Fed. Reg. 64134 (Oct. 17, 2002); 66 Fed. Reg. 46812 (Sept. 7, 2001).

[3] Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database*, DHS (April 22, 2025), https://perma.cc/Y8A5-YX3M ("April 22, 2025 SAVE Press Release").

[4] Press Release, *USCIS Deploys Common Sense Tools to Verify Voters*, USCIS (May 22, 2025), https://perma.cc/HBZ5-RW2E ("May 22, 2025 SAVE Press Release").

derived citizens), and enables "bulk" uploads and searches of potentially millions of individuals' sensitive SSA data in a single query. An agreement between DHS and SSA formalizing the overhaul—publicly released on September 25, 2025—confirms that SAVE now directly "match[es] data submitted through SAVE to SSA records."[5] Defendants' changes have ballooned the population of Americans whose sensitive personal data is accessed through SAVE *by over 1,000%*—from about 26.5 million to more than 300 million.[6] With this self-described "overhaul" of SAVE, Defendants have created precisely the type of interagency "national data bank" the Privacy Act prohibits and flouted the Act's numerous safeguards along the way.

Most alarmingly, the overhauled SAVE system utilizes SSA data that Defendant SSA *has admitted* is unreliable, incomplete, and not "definitive" of citizenship status, especially as to naturalized citizens.[7] SSA has repeatedly cautioned against relying on the data, stressing that "SSA is not the agency responsible for making citizenship determinations" and is "not the custodian of U.S. citizenship records."[8] SAVE user agencies are also querying SSA records systems using unreliable methods—including searches by the last four digits of an SSN—which are likely to generate false hits and mismatches of individuals' records.

Disregarding these known risks, Defendants are encouraging and enabling states to use the overhauled SAVE system (and the unreliable SSA data pooled in it) to purge voter rolls and open criminal investigations of alleged non-citizen voting. States such as Virginia, Louisiana, and Texas

---

[5] Letter Agreement Providing for Information Sharing Between DHS, USCIS, and SSA Regarding Citizenship (May 15, 2025), https://www.ssa.gov/foia/resources/proactivedisclosure/2025/May%2015,%202025%20SSA-DHS-USCIS%20Agreement_Redacted.pdf (posted Sept. 25, 2025) ("DHS-SSA SAVE Agreement").

[6] *See infra* Background, Part II.B.2.

[7] Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://perma.cc/KS2N-U2US ("July 2023 SSA Ltr.").

[8] *Id.*

are doing just that ahead of fast-approaching elections. Thus, continued use of SAVE imminently imperils the right to vote of naturalized citizens and other Americans for whom SSA maintains inaccurate citizenship data, including the Proposed Preliminary Injunction ("PI") Class Representatives,[9] the millions of class members they seek to represent, and members of Plaintiffs League of Women Voters of Virginia ("LWVVA") and League of Women Voters of Louisiana ("LWVLA"). To prevent these and other irreparable injuries, Plaintiffs now seek a stay under the APA, 5 U.S.C. § 705, and a preliminary injunction.

Plaintiffs readily meet each requirement for a stay and injunction. *First*, Plaintiffs are likely to succeed on their APA claims that Defendants' overhaul of SAVE violated the Privacy Act and was arbitrary and capricious. Plaintiffs are also likely to succeed on their claims that Defendants' overhaul of SAVE was *ultra vires* and violates the separation of powers. *Second*, the overhauled SAVE system will irreparably harm Plaintiffs absent a stay and injunction. The Proposed PI Class Representatives, proposed class members, and LWVVA and LWVLA members include naturalized citizens in states actively using the overhauled SAVE system for voter list maintenance and investigatory purposes. These eligible voters face real and irreversible risks of erroneous disenfranchisement in fast-approaching elections, obstacles to exercising their fundamental right to vote, intrusion on their privacy interests based on the misuse and repurposing of their personal data and increased exposure to data-security breaches, deprivation of statutorily guaranteed information on how their personal data is being pooled across the government, and denial of their

---

[9] Concurrent with this motion, Doe Plaintiffs 1, 4, and 5 are also moving for class certification of the "PI Class," a subclass of the proposed class who have urgent equities in obtaining preliminary relief against use of the overhauled SAVE system. The subclass is defined as: All naturalized citizens whose records within Social Security Administration databases do not accurately reflect their U.S. citizenship status, and who reside in jurisdictions using DHS's overhauled SAVE system for activities relating to voter registration and voter list maintenance. Compl. ¶ 197.

notice-and-comment rights. The League of Women Voters ("LWV"), LWVVA, and LWVLA (collectively, "the League Plaintiffs") likewise have been deprived of statutorily mandated information they urgently need to fulfill their mission-critical functions of protecting and educating voters, as well as the opportunity to protect their concrete interests through the notice-and-comment process. *Finally*, the public interest and equities weigh heavily in favor of granting relief, as Defendants will suffer no harm from complying with the law and returning the SAVE system to its operational state before they illegally transformed it.

The Court should enter a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction with respect to the overhauled SAVE system pending resolution of this suit, and order DHS and SSA to promptly publish SORNs in the Federal Register with all statutorily required information about the overhauled SAVE system.

## BACKGROUND

### I.    Legal Framework

Congress enacted the Privacy Act of 1974 "to restore trust in government and to address what at the time was seen as an existential threat to American democracy."[10] The Act creates "certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to "collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose," and ensuring "that adequate safeguards are provided to prevent misuses of such information." Privacy Act of 1974 § 2(b), 2(b)(4), 88 Stat. 1896 (1974), *codified at* 5 U.S.C. § 552a note.

A key objective of the Privacy Act was to prevent the government from secretly creating "formal or de facto national data banks" or "centralized Federal information systems" that would

---

[10] U.S. Dep't of Just., Overview of the Privacy Act of 1974, at 1 (2020 ed.), https://perma.cc/6SB9-XAEK (cleaned up).

consolidate sensitive personal data of Americans stored at separate agencies.[11] Congress established robust safeguards against such "interagency computer data banks" to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system."[12]

Congress reaffirmed this objective in 1988 when it amended the Privacy Act to authorize, only under strictly defined conditions, "computer matching programs" that compare data across agencies for purposes of determining eligibility for federal benefits. *See* 5 U.S.C. § 552a(o). In enacting those amendments, Congress codified clear instructions that nothing in the Privacy Act "shall be construed to authorize" the "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies"; the "direct linking of computerized systems of records maintained by Federal agencies"; or "the computer matching of records not otherwise authorized by law." Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514, *codified at* 5 U.S.C. § 552a note.

In addition to these express prohibitions, the Privacy Act functionally prevents agencies from creating national data banks through a series of transparency and notice-and-comment requirements, guardrails against data misuse, and information-security mandates. *See, e.g.*, 5 U.S.C. § 552a(e)(1)-(12). When an agency "establish[es] or revis[es]" any "system of records,"[13]

---

[11] Privacy Act Leg. History, *supra* n.1 at 168; *see also DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 766 (1989) ("The Privacy Act was passed largely out of concern over 'the impact of computer data banks on individual privacy.'" (quoting H.R. Rep. No. 93-1416, at 7 (1974)).
[12] Privacy Act Leg. History, *supra* n.1, at 884, 217.
[13] 5 U.S.C. § 552a(a)(5) (defining "system of records" as a "group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.").

it must "publish in the Federal Register … a notice of the existence and character of the system of records," *id.* § 552a(e)(4), commonly called a System of Records Notice ("SORN"). SORNs "shall include" nine categories of information:

> (A) the name and location of the system;
> (B) the categories of individuals on whom records are maintained in the system;"
> (C) the categories of records maintained in the system;
> (D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;
> (E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;
> (F) the title and business address of the agency official who is responsible for the system of records;
> (G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;
> (H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and
> (I) the categories of sources of records in the system.

5 U.S.C. § 552a(e)(4). An agency must also publish, at least 30 days in advance, "notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

These requirements are not mere window dressing. "In no circumstance may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following Federal Register publication." Off. of Mgmt. & Budget Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, at 7 (2016), https://perma.cc/N9QK-SDLE ("OMB Circular No. A-108").[14] Moreover, agencies "shall" not only solicit but also *consider* any "public comments on a published SORN" to "determine whether any changes to the SORN are necessary." *Id.* at 7. The "requirement for agencies to publish a

---

[14] *See* 5 U.S.C. § 552a(v)(1) (authorizing OMB to "prescribe guidelines and regulations for the use of agencies in implementing the provisions of" the Privacy Act).

SORN allows the Federal Government to accomplish one of the basic objectives of the Privacy Act—fostering agency accountability through public notice." *Id.* at 5.[15]

These requirements "assure knowledge by Congress, the executive branch, and interested groups of new Federal data banks and pooling of informational and computer resources to constitute centralized data systems not foreseen by Congress"; "prevent de facto national data banks on individuals free of all restraints on Federal power established by Constitution and statutes,"; and "prevent creation of data banks and new personal information systems without statutory authorization from Congress and without proper regard for privacy of the individual, confidentiality of data, and security of the system." Privacy Act Leg. History, *supra* n.1, at 217.

## II.    Factual Background

### A.  The Trump administration prioritizes government-wide data consolidation

The Trump administration has made consolidating Americans' sensitive personal data across government agencies a top priority. It has rapidly pursued that goal through its creation of the "Department of Government Efficiency" ("DOGE"), and a series of executive orders.

**The DOGE Executive Order.** On January 20, 2025, President Trump signed Executive Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency,"* ("DOGE EO"), renaming the former U.S. Digital Service the U.S. DOGE Service ("USDS") and establishing it as a new component of the Executive Office of the President. 90 Fed. Reg. 8441 (Jan. 29, 2025). Pertinent here, the DOGE EO requires that "Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records,

---

[15] The Privacy Act imposes similar transparency and notice-and-comment requirements for new and revised matching programs. *See* 5 U.S.C. §§ 552a(e)(12), 552a(o); OMB Circular No. A-108 at 18-19. Although Plaintiffs challenge Defendants' violations of those requirements, *see* Compl. ¶¶ 211, 217, this motion does not seek relief with respect to those violations.

software systems, and IT systems."

**The Data Consolidation Executive Order.** On March 20, 2025, President Trump signed Executive Order 14,243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos* (the "Data Consolidation EO"), which states that "[r]emoving unnecessary barriers to Federal employees accessing Government data and promoting inter-agency data sharing are important steps toward eliminating bureaucratic duplication and inefficiency while enhancing the Government's ability to detect overpayments and fraud." 90 Fed. Reg. 13681 (Mar. 25, 2025). Echoing the DOGE EO, the Data Consolidation EO instructs that "Agency Heads shall take all necessary steps, to the maximum extent consistent with law, to ensure Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records, data, software systems, and information technology systems." *Id.* The EO adds that "[t]his includes authorizing and facilitating both the intra- and inter-agency sharing and consolidation of unclassified agency records." *Id.*

**The Elections Executive Order.** On March 25, 2025, President Trump signed Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections* (the "Elections EO"), which directs DHS to provide state officials "access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." 90 Fed. Reg. 14005 (Mar. 28, 2025). The Elections EO further directs DHS to coordinate with DOGE in reviewing: (1) each state's publicly available voter registration list, (2) available records concerning voter list maintenance activities, (3) Federal immigration databases; and (4) state records, "for consistency with federal requirements." *Id.* It further instructs that the "Commissioner of Social Security shall take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant

information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered." *Id.*

### B. Defendants unlawfully transform USCIS's SAVE system into a national citizenship data bank that pools unreliable SSA data, which states are using to purge voter rolls and open criminal investigations

In furtherance of the administration's data-consolidation goals, DOGE and DHS have repurposed pre-existing technology at USCIS to pool, merge, and link individuals' sensitive personal data across agencies—all without statutorily required notice to the public or Congress, and without assessing the privacy implications or risks of error posed by repurposing the data in this way. *See* Compl. ¶¶111-174. As part of these actions, Defendants have transformed USCIS's SAVE system into a searchable national citizenship data system that utilizes unreliable SSA citizenship data, which states are now using to purge voter rolls and open criminal investigations.

#### 1. The prior SAVE system's limited authorized scope and functionality

The SAVE system is "an inter-governmental initiative" administered by USCIS that is "designed to help federal, state, tribal, and local government agencies confirm citizenship and immigration status prior to granting benefits and licenses, as well as for other lawful purposes."[16] SAVE users "are required to formalize the purpose for which they use SAVE through a Memorandum of Agreement" ("MOA") or "Computer Matching Agreement," which establish "the terms and conditions for the user agency's participation in SAVE."[17]

Over 1,200 federal, state, and local agencies have access to SAVE.[18] Election officials in some states have entered into MOAs to use SAVE to verify the citizenship of voter registrants and

---

[16] DHS, *Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program*, DHS Ref. No. DHS/USCIS/PIA-006(c) at 2, (June 30, 2020), https://perma.cc/HU2M-NTL8 ("SAVE PIA").
[17] *Id.*
[18] *Eligible Voters at Risk: Examining Changes to USCIS's Save System*, Fair Elections Ctr. Issue Brief (July 2025), https://perma.cc/ZN5K-ATUC.

registered voters.[19] Prior to 2025, ten states had such MOAs: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.[20] In 2025, a handful of other states—including Texas, Louisiana, and Indiana—have entered into MOAs to use SAVE for voter registration and list maintenance. *See infra* Background, Part II.B.4.

Prior to the current administration, USCIS published SORNs and followed the Privacy Act's notice-and-comment requirements when it made significant changes to the SAVE system.[21] USCIS last published a revised SORN for the SAVE system on May 27, 2020.[22] To accompany that SORN, on June 30, 2020, USCIS also published a Privacy Impact Assessment ("PIA") for the SAVE system pursuant to the E-Government Act of 2002.[23] These documents are, respectively, the operative SORN and PIA for the SAVE system.

Under its operative SORN, the SAVE system's scope and functionality is limited in three key respects. First, the SAVE SORN does not authorize or contemplate queries of U.S.-born citizens. It only permits queries regarding "individuals who have been granted *naturalized or derived U.S. citizenship.*" 85 Fed. Reg. at 31801 (emphasis added). The operative SAVE PIA similarly reflects that the SAVE system can only be used "to verify the citizenship and immigration

---

[19] *Id.*

[20] *Id.*

[21] *See supra* n.2.

[22] Privacy Act Notice of Modified System of Records, DHS, 85 Fed. Reg. 31798 (May 27, 2020) ("SAVE SORN").

[23] SAVE PIA, *supra* n.16, at 14, 20. The E-Government Act of 2002 requires federal agencies to conduct, review, and, "if practicable," publish, a PIA before either "developing or procuring information technology that collects, maintains, or disseminates" PII or "initiating a new collection of information" involving PII that will be "collected, maintained, or disseminated using information technology." Pub. L. No. 107-347, § 208(b)(1)(A)-(B), 116 Stat. 2899, 2921-23 (2002), *codified at* 44 U.S.C. § 3501 note. A PIA must address what information will be collected, why it is being collected, how it will be used, how it will be secured, with whom it will be shared, whether a system of records is being created under the Privacy Act, and what "notice or opportunities for consent" will be provided to those impacted. *Id.* § 208(b)(2)(B)(ii)(V).

status of an immigrant, nonimmigrant, and *certain naturalized and derived U.S. citizens*." SAVE PIA, *supra* n.16, at 2 (emphasis added).

Second, the operative SAVE SORN does not authorize or contemplate queries of records systems housed at SSA or any other external agency system with information on *U.S.-born* citizens. The SORN says only that the system may contain certain records sourced from SAVE user agencies, DHS systems, three immigration-related records systems housed at the State Department, and one immigration-related records system housed at DOJ; none of the "record source categories" identified in the SORN are housed at SSA. *See* 85 Fed. Reg. at 31802. Similarly, SSA's operative SORN for its "Master Files of Social Security Number (SSN) Holders and SSN Applications" does not authorize or contemplate SSA data being pooled into USCIS's SAVE system. *See* 90 Fed. Reg. 10025 (Feb. 20, 2025). And while the SAVE SORN acknowledges the system will contain certain immigration-related "[r]ecords … obtained from" other federal agencies (*not* including SSA), 85 Fed. Reg. at 31802, nothing in it purports to allow *directly linking* or automated pooling of DHS and non-DHS federal agency systems of records.

Third, neither the SAVE SORN nor the SAVE PIA authorize, contemplate, or assess the privacy implications or reliability of using the SAVE system for bulk searches of millions of individuals' records housed within DHS or at external agencies—whether for voter verification or other purposes. Rather, the SAVE PIA outlines a three-step verification process for conducting individualized queries of a single "applicant." SAVE PIA, *supra* n.16, at 3-4.

Consistent with the SAVE SORN and SAVE PIA, a "fact sheet" on USCIS's website previously stated (as late as April 26, 2025) that "SAVE <u>does not</u> verify U.S. born citizens under any circumstances," that "SAVE does not access databases that contain U.S.-born citizen information (for example, birth certificate databases)," and that "SAVE cannot verify an

individual's naturalized or acquired citizenship status using a Social Security Number."[24]

### 2. Defendants "overhaul" SAVE by transforming it into an interagency system that directly queries SSA databases and allows bulk searches of millions of Americans' sensitive data

Pursuant to the Elections EO, DHS, USCIS, and DOGE announced on April 22, 2025, that they were unilaterally transforming the SAVE system to "ensure government officials can swiftly verify legal status, halting entitlements and voter fraud." April 22, 2025 SAVE Press Release, *supra* n.3.[25] They described this transformation as an "overhaul" of SAVE that "breaks down silos for accurate results, streamlines mass status checks, and integrates criminal records, immigration timelines, and addresses." *Id.*

On May 22, 2025, USCIS consummated the overhaul of SAVE into what it called "a single, reliable source for verifying immigration status and U.S. citizenship nationwide." May 22, 2025 SAVE Press Release, *supra* n.4. The overhauled SAVE system has at least two new functionalities. First, user agencies can now "input Social Security numbers" to "verify U.S. citizenship," based on a "new partnership with the Social Security Administration" and USCIS. *Id.* USCIS explained that "[t]his new partnership … allows cases to verify citizenship or immigration status to be created using Social Security numbers rather than a DHS identifying number, which most state and local agencies do not collect." *Id.* DHS has described this as an "integration" of SSA data into SAVE. *Id.* Second, "for the first time, agencies can submit more than one case at a time" through a new bulk upload function. *Id.*

---

[24] USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Jan. 24, 2025), *archived at*
https://web.archive.org/web/20250426215013/https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet ("Archived SAVE Fact Sheet").

[25] Plaintiffs respectfully request that the Court "tak[e] judicial notice of information posted on official public websites of government agencies." *Pharm. Rsch. & Mfrs. of Am. v. HHS*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (citing cases).

USCIS has since made significant changes to its SAVE "fact sheet"—most recently on August 27, 2025—to reflect that the overhauled SAVE interagency can now "verify U.S.-born citizens for voter verification agencies."[26] The current fact sheet explains that, unlike the prior version of SAVE, users can now "create[] a case using an SSN," at which point "*SAVE first queries SSA databases*."[27] "Based on *SSA data*, SAVE can verify the U.S. citizenship of most U.S.-born individuals as well as check the SSA Death Master File."[28] While the prior fact sheet said that SAVE could verify citizenship "if found in *DHS records*,"[29] the new fact sheet says that the overhauled SAVE system "can verify U.S. citizenship *based on SSA* or DHS records."[30] Thus, the overhauled SAVE system now directly links to or pools from SSA systems of records.

This interagency data pooling is consistent with the Election EO's directive that SSA "make available" to states "the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information" for voter registration and list maintenance purposes. Exec. Order No. 14,248. A July 17, 2025, USCIS tutorial on the overhauled SAVE system further confirms the linkage of USCIS and SSA data systems.[31] The tutorial explains that "[c]ases created with a Social Security number (SSN) are compared against Social Security Administration (SSA) records," and that "[i]f there is an error with an applicant's SSA records, user agencies should direct applicants to contact SSA to update their records."[32] The tutorial also describes the overhauled SAVE system's new "bulk uploader" feature, which allows

---

[26] USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Aug. 27, 2025), https://perma.cc/PP4H-T7CK ("Updated SAVE Fact Sheet").

[27] *Id.* (emphasis added).

[28] *Id.* (emphasis added).

[29] Archived SAVE Fact Sheet (emphasis added), *supra* n.24.

[30] Updated SAVE Fact Sheet (emphasis added), *supra* n.26.

[31] USCIS, *Tutorial: Introduction to SAVE and the Verification Process for SAVE Users* (July 17, 2025), https://perma.cc/QLA3-P5BL.

[32] *Id.* at 25.

user agencies to query potentially millions of cases in a single search, in contrast to the individualized search function of the prior SAVE system.[33]

On September 25, 2025, SSA published on its website a May 15, 2025, letter agreement between DHS and SSA for the overhauled SAVE system. It describes "information sharing" between the agencies "by matching data submitted through SAVE to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications, System of Record Notice 60-0058, 90 Fed. Reg. 10025 (Feb. 20, 2025)." DHS-SSA SAVE Agreement, *supra* n.5, at 4. It further confirms that USCIS "will maintain information provided by SSA in its system of records entitled, 'DHS/U.S. Citizenship and Immigration Services (USCIS)-004 Systematic Alien Verification for Entitlements (SAVE) Program System of Records." *Id.* at 5.

USCIS has also allowed election officials in some states to use a new feature allowing SAVE searches with "just the last four digits of voters' Social Security numbers," and it plans to roll out this feature to all SAVE users.[34] The DHS-SSA SAVE Agreement allows searches by either "full or partial SSN." DHS-SSA SAVE Agreement, *supra* n.5, at 5.

Thus, Defendants' public statements confirm they have dramatically expanded SAVE by adding a new search-by-SSN function that directly queries SSA data systems (not just immigration-related systems), by enabling queries of information on U.S.-born citizens (not just foreign-born citizens), and by permitting "bulk" uploads and searches of potentially millions of individuals' sensitive SSA data in a single query. Defendants' changes have enlarged the population of Americans whose sensitive personal information is accessed through SAVE by more

---

[33] *Id.* at 10, 15-17.
[34] Jude Joffe-Block and Miles Parks, *33 million voters have been run through a Trump administration citizenship check*, NPR (Sept. 10, 2025), https://perma.cc/QWL3-DCVR; A.P. Dillon, *State Board of Elections tables SAVE invitation*, North State Journal (Sept. 4, 2025), https://perma.cc/X2GM-Y88R.

than a factor of 10—from about 26.5 million to more than 300 million citizens.[35] Despite undertaking this self-described "overhaul" of SAVE, Defendants have failed to publish a SORN detailing the transformed system, failed to solicit public comment on their actions, and failed to assess the privacy implications or risks of error posed by expanding SAVE in this manner.

### 3. The overhauled SAVE system utilizes unreliable SSA citizenship data

Experts and SSA itself have sounded the alarm about the unreliability and incompleteness of the SSA citizenship data SAVE is now utilizing, which SSA "collected independently and without this sort of [data] integration in mind."[36] A key limitation with SSA data is that the only citizenship data SSA possesses is provided by the individual at a single moment in time—i.e., when someone applies for an SSN and the corresponding card. *See* July 2023 SSA Ltr., *supra* n.7, at 2. SSA has no process for automatically updating the citizenship data it maintains, but rather relies on SSN-holders to inform SSA of any change in their status. *See id.*

SSA has conceded that because "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA," its "records do not provide definitive information about an individual's citizenship status," and it has cautioned against relying on SSA data to verify citizenship. *Id.* SSA collected this data for its own program purposes entirely unrelated to verifying individuals' eligibility to vote. As SSA has explained, "SSA is not the agency responsible for making citizenship determinations" and "SSA

---

[35] *Compare* U.S. Census Bureau, *Nativity and Citizenship Status in the United States*, https://data.census.gov/table/ACSDT1Y2023.B05001?q=B05001 (accessed Sept. 23, 2025) (estimating just over 25 million naturalized citizens in United States), *and* Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, Office of Homeland Security Statistics (Sept. 2024) (estimating roughly 2 million long-term permanent residents who derived citizenship from a parent since 1980), *with* SSA, *Social Security Performance* (last updated Sept. 4, 2025), https://www.ssa.gov/ssa-performance (SSA "serves more than 300 million Americans").

[36] Jude Joffe-Block and Miles Parks, *The Trump administration is building a national citizenship data system*, NPR (June 29, 2025), https://tinyurl.com/5anp3kz7.

is not the custodian of U.S. citizenship records." *Id.* Indeed, a 2006 audit by SSA's Office of Inspector General estimated that SSA's citizenship data inaccurately identified about 3.3 million U.S. citizens as non-citizens "because they had become U.S. citizens after obtaining their SSN" and "had not updated their records with SSA."[37] SSA also lacks complete citizenship data for U.S.-born citizens born before 1981. July 2023 SSA Ltr., *supra* n.7, at 3. According to SSA, "SSA's assessment of its citizenship data indicates that approximately ¼ of those records do not have an indication of citizenship present." *Id.*

### 4. States' use of the overhauled SAVE system threatens to disenfranchise eligible voters in impending elections and subject them to unwarranted criminal investigations

If states rely on inaccurate SSA citizenship data to purge voters from rolls, millions of eligible voters could be wrongly disenfranchised or face extra burdens in exercising their right to vote. Despite these intolerable risks, DHS has been advertising and encouraging states to use the overhauled SAVE system for voter verification, highlighting the new "Bulk Upload capability" and "Integration with SSA and case submission using Social Security Number."[38] Several states have already begun using the overhauled SAVE interagency system (and the unreliable SSA citizenship data pooled in it) for voter registration, voter list maintenance, and investigatory purposes. "[M]ore than 33 million voters" have already been run through the overhauled SAVE system,[39] including in the following states:

**Louisiana.** On May 21, 2025, the Louisiana Secretary of State announced Louisiana was

---

[37] SSA Off. of the Inspector Gen., No. A-08-06-26100, *Congressional Response Report: Accuracy of the Social Security Administration's Numident File* 13 (Dec. 18, 2006), https://perma.cc/5G2J-FF4V.
[38] USCIS, *SAVE Optimization for Voter Verification* 8 (July 23, 2025), https://www.aclu.org/cases/bower-v-social-security-administration?document=USCIS-FOIA-Response-2-of-14; *see also* USCIS, *Voter Verification Bulk Uploaded*, https://perma.cc/MK4Y-B2Z5.
[39] Joffe-Block and Parks, *33 million voters*, *supra* n.34.

"the first state to utilize a new voter list maintenance database from the federal Department of Government Efficiency," which "combines information on individuals' immigration status and death records."[40] On September 4, the Secretary announced "preliminary findings" of her investigation into alleged instances of non-citizen voting after running "names from Louisiana's voter rolls" through the overhauled SAVE system.[41] She said her office "discovered 390 non-citizen registered voters in the state, with 79 voting in at least one election" since the 1980s.[42] She "acknowledged the possibility that some of her findings could be attributed to errors or outdated information."[43] She added that the 390 suspects "have been given notice we have reason to believe they are not a U.S. citizen," and that "[a]nyone who does not respond or provide proof within 21 days is removed from the rolls," and "will be referred for criminal prosecution."[44]

      **Texas.** On June 5, 2025, the Texas Secretary of State announced she had "referred to the Office of [the Texas] Attorney General for investigation the names of 33 potential noncitizens who voted in the November 2024 General Election," based on information obtained from the overhauled SAVE system.[45] On June 17, 2025, the Texas Attorney General confirmed he had opened investigations of the 33 potential noncitizen voters referred by the Secretary of State, and

---

[40] Press Release, *Louisiana First State to Utilize New Voter List Maintenance Database*, Louisiana Secretary of State (May 21, 2025), https://perma.cc/MF6F-3DTU; Louisiana Secretary of State (@Louisiana_sos), X (May 23, 2025, 9:45 AM), https://tinyurl.com/bddz9w9b (stating Louisiana was "the first state to use the new []DOGE voter list maintenance database!").

[41] Wesley Muller, *Louisiana election investigation finds 79 noncitizens have voted since 1980s,* Louisiana Illuminator (Sept. 4, 2025), https://lailluminator.com/2025/09/04/louisiana-election-investigation-finds-79-noncitizens-have-voted-since-1980s/.

[42] *Id.*

[43] *Id.*

[44] Joffe-Block and Parks, *33 million voters*, *supra* n.34.

[45] Press Release, *After Gaining Access to SAVE Database, Secretary Nelson Refers Potential Noncitizen Voting Cases for Investigation*, Texas Sec'y of State (June 5, 2025), https://perma.cc/WZ3C-FUXL.

likewise credited the overhauled SAVE system.[46] Public records responses indicate that Texas's early use of the overhauled SAVE system has resulted in an error rate of at least 17%.[47]

**Virginia.** Virginia has used the SAVE system for voter list maintenance since at least 2014.[48] Since 2013, Virginia law has mandated that the Department of Elections use SAVE "for the purposes of verifying that voters listed in the Virginia voter registration system are United States citizens," and that general registrars delete from voter rolls "any voter who … is known not to be a citizen . . . based on information received from" SAVE. Va. Code Ann. §§ 24.2-404(A)(4), (E). On September 12, 2025, Virginia's Governor issued an Executive Order reaffirming Virginia's commitment to using the SAVE system and instructing that, "to the maximum extent possible under state and federal law," the Department of Elections must "coordinate with the federal government through partnerships with the Department of Homeland Security."[49] The order also mandates that officials utilize the overhauled SAVE system's "bulk upload" feature, stating: "The Commissioner shall continue to use the Department of Homeland Security's SAVE database to identify non-citizens on Virginia's voter list using bulk upload functionality in accordance with state law, a requirement first implemented by my administration."[50]

None of the states' SAVE MOAs address the unreliability and incompleteness of SSA

---

[46] Press Release, *Attorney General Ken Paxton Opens Investigations into 33 Noncitizens for Illegally Voting in the 2024 Election*, Att'y Gen. of Texas (June 17, 2025), https://perma.cc/MC8L-6RJ4; *see also* Dep't of Gov't Efficiency (@DOGE), X (June 20, 2025, 11:24 AM), https://tinyurl.com/4rstjr6e (quoting press release and stating "Great work by Texas using the new (and free) federal SAVE database to ensure voter integrity!").

[47] Natalia Contreras, *As Texas Embraces Federal Immigration Database to Verify Voter Citizenship, Some Experts are Worried*, The Texas Tribune (July 22, 2025), https://perma.cc/39FY-UVEK.

[48] MOA between the DHS, USCIS and the Virginia State Board of Elections (March 20, 2014), https://perma.cc/UV2V-G6UT.

[49] Va. Exec. Order 53 (Sept. 12, 2025), https://perma.cc/VY8P-UZGY.

[50] *Id.*

citizenship data or the risk of error in using it for voter verification.[51] Meanwhile, Virginia and Texas both have major elections on November 4, 2025,[52] and Louisiana has local primaries in October, with a municipal election in New Orleans on November 15.[53] Early voting is already underway in Virginia and Louisiana, and is soon to be in Texas. And numerous elections are approaching nationwide in 2026.[54]

## LEGAL STANDARD

"Section 705 of the APA authorizes 'the reviewing court' to stay 'the effective date of an agency action' pending judicial review 'to prevent irreparable injury.' The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (quoting 5 U.S.C. § 705). To obtain a preliminary injunction, a movant must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

**I.    Plaintiffs are likely to succeed on the merits**

Plaintiffs are likely to succeed on their APA claims that Defendants' overhaul of the SAVE system violated the Privacy Act and was arbitrary and capricious. *See* Compl. ¶¶204-21.

---

[51] *See, e.g.*, USCIS, *Voter Verification Agency Sample MOA Draft* (June 9, 2025), https://perma.cc/7X59-4DF4.

[52] Va. Dep't of Elections, *Upcoming Elections*, https://perma.cc/QB37-EPJ4; Texas Sec'y of State, *Important Election Dates*, https://perma.cc/SYA8-9P2Z.

[53] La. Sec'y of State, *Get Election Information*, https://perma.cc/55XG-6GRU; Lafayette Par. Clerk of Court, *2025 Lafayette Par. Elections*, https://perma.cc/S8VG-FA3R.

[54] National Conf. of State Legislatures, *2026 State Primary Election Dates*, (Sept. 26, 2025), https://www.ncsl.org/elections-and-campaigns/2026-state-primary-election-dates.

Alternatively, if the Court finds that the APA does not authorize Plaintiffs' requested relief, then Plaintiffs are likely to succeed on their mandamus claim. *See id.* ¶¶222-28. Plaintiffs are also likely to succeed on their claims that Defendants' overhaul of SAVE was *ultra vires* and violates the separation of powers. *See id.* ¶¶229-40.

### A. Plaintiffs have standing

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The declarations of the Proposed PI Class Representatives and LWVVA and LWVLA members detail how Defendants' unlawful overhaul of the SAVE system inflicts actual and imminent injuries to (1) their fundamental right to vote, Doe 1 Decl. ¶¶2-5, 7-8, 13-15, 20; Suppl. Doe 4 Decl. ¶¶2-5, 7-9, 13-15, 18; Doe 5 Decl. ¶¶2-5, 7-8, 11-14, 17; Doe 6 Decl. ¶¶2-16;[55] (2) their privacy interests in preventing the misuse and disclosure of their sensitive personal information and its exposure to security breaches, Doe 1 Decl. ¶¶9-11, 21-23; Suppl. Doe 4 Decl. ¶¶9-12, 19-21; Doe 5 Decl. ¶¶9-11, 18-20; Doe 6 Decl. ¶¶10-13, 20-22;[56] (3)

---

[55] *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025) (naturalized citizen voters had standing to challenge Arizona law requiring use of prior SAVE system for citizenship checks because "SAVE may not" have up-to-date "naturalization records," creating the "danger" that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled … , losing their constitutional right to vote"); *League of United Latin Am. Citizens ("LULAC") v. EOP*, 780 F. Supp. 3d 135, 190 (D.D.C. 2025) (voter had standing based on "difficulty complying with a documentary-proof-of-citizenship requirement"); *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (voters had standing based on risk of "disenfranchisement in the November 2020 election"); *see also Gill v. Whitford*, 585 U.S. 48, 65–66 (2018) ("voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage") (cleaned up).

[56] *See Am. Fed'n of Lab. & Cong. of Indus. Orgs ("AFL-CIO") v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (plaintiffs alleged cognizable "privacy harms" analogous to torts of "intrusion upon seclusion" and "breach of confidence" based on disclosure of their "personal information to unauthorized individuals"); *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 58 (D.C. Cir. 2019) (plaintiffs had standing based on breach of government database

their rights to statutorily guaranteed information (via SORNs) about how their personal data is being pooled across the government, Doe 1 Decl. ¶¶16-17, 19; Suppl. Doe 4 Decl. ¶¶16-17; Doe 5 Decl. ¶¶15-16; Doe 6 Decl. ¶¶17-18;[57] and (4) their rights to participate in notice-and-comment proceedings in which they have concrete interests, Doe 1 Decl. ¶18.[58] The declarations further demonstrate LWVVA's and LWVLA's standing to sue on behalf of their members, Porte Decl. ¶¶2-4, 9-10, 30-35, 41-44; Green Decl. ¶¶2-5, 11-12, 24-30, 36-39,[59] and all League Plaintiffs' standing to vindicate their own informational and notice-and-comment rights, Stewart Decl. ¶¶3, 7-27; Porte Decl. ¶¶5, 11-29, 36-40; Green Decl. ¶¶6, 13-23, 31-35; *see also infra* Argument, Part II. Because these injuries would be redressed by vacatur of Defendants' illegal overhaul of the SAVE system and publication of all statutorily guaranteed information, Plaintiffs have standing.

## B.  Defendants' overhaul of the SAVE system violated the APA

### 1.  Defendants' decision to overhaul the SAVE system is final agency action reviewable under the APA

Defendants' overhaul of the SAVE system is "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

Agency action is "final" if it (1) "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) is "one by which 'rights or obligations have been determined,'

---

and "subsequent misuse" of their information).

[57] *See Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 788–89 (D.C. Cir. 2022) ("The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt [plaintiffs'] claim that the information would help them."); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) (plaintiff had informational standing where statute required publication of information in the Federal Register as part of notice-and-comment procedures).

[58] *See Mendoza v. Perez*, 754 F.3d 1002, 1012-13 (D.C. Cir. 2014) ("Plaintiffs asserting a procedural rights challenge" need only "show the agency action affects their concrete interests in a personal way").

[59] *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (discussing requirements for associational standing).

or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Defendants' public statements confirm they have "consummated" their overhaul of SAVE by authorizing users to conduct bulk queries of SSA citizenship data, *see* April 22, 2025 SAVE Press Release, *supra* n.3; May 22, 2025 SAVE Press Release, *supra* n.4; and multiple states have confirmed they are using the system's new functionality, *see supra* Background, Part II.B.2, B.4. Defendants' overhaul also had immediate "legal consequences": it granted SAVE user agencies access to previously inaccessible SSA records systems containing millions of Americans' sensitive personal data, and enabled SAVE user agencies to bulk-query that data to conduct voter list maintenance, open criminal investigations, and perform other functions of legal significance. *See id.* Defendants' overhaul of SAVE is therefore final agency action. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("policy of disclosing confidential information without notice" was final agency action); *AFL-CIO*, 778 F. Supp. 3d 56, 77 (D.D.C. 2025) (policy of granting DOGE personnel access to agency systems was final agency action).

The Privacy Act itself does not provide an "adequate" alternative remedy precluding Plaintiffs' APA claims for injunctive relief. "The Privacy Act's remedial scheme provides 'for injunctive types of relief' in 'two instances' not present here, both involving an agency's failure to disclose" an individual's records to those with rights of access. *AFL-CIO*, 778 F. Supp. 3d at 79; *see* 5 U.S.C. § 552a(g). Because "the Privacy Act does not by itself authorize the injunctive relief sought" here, APA relief is available to enjoin the Defendants' Privacy Act violations. *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988); *accord AFL-CIO*, 778 F. Supp. 3d at 79-80 (citing *Cell Assocs., Inc. v. Nat'l Insts. Of Health*, 579 F.2d 1155 (9th Cir. 1978)); *see also Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004) (noting the APA's "general provisions for equitable relief" may explain the Privacy Act's omission of such provisions).

23

### 2. The overhauled SAVE system is an interagency "national data bank" prohibited by the Privacy Act

The overhauled SAVE system is a "national data bank" prohibited by the Privacy Act and thus its creation was "not in accordance with law," 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

The Privacy Act instructs that nothing in the statute "shall be construed to authorize … the establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies"; "the direct linking of computerized systems of records maintained by Federal agencies"; or "the computer matching of records not otherwise authorized by law." Pub. L. No. 100-503, § 9, 102 Stat. at 2514, *codified at* 5 U.S.C. § 552a note. Those instructions, together with the statute's reticulated scheme for "computer matching programs," *see* 5 U.S.C. § 552a(o), create a baseline prohibition on interagency national data banks absent separate statutory authorization.

Defendants' public statements confirm that the overhauled SAVE system is precisely such a prohibited system. Defendants have repeatedly acknowledged that "SAVE … queries SSA databases," that it runs "quer[ies] against source databases maintained by" SSA, that "[b]ased on SSA data, SAVE can verify the U.S. citizenship of most U.S.-born individuals as well as check the SSA Death Master File," Updated SAVE Fact Sheet, *supra* n.26, and that "[c]ases created with a Social Security number (SSN) are compared against Social Security Administration (SSA) records."[60] The recently released DHS-SSA SAVE Agreement confirms that SAVE now "match[es] data submitted through SAVE to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications," and that "USCIS will maintain information

---

[60] USCIS, *Tutorial: Introduction to SAVE and the Verification Process for SAVE Users* (July 17, 2025), https://perma.cc/QLA3-P5BL.

provided by SSA" in the SAVE system of records. DHS-SSA SAVE Agreement, *supra* n.5, at 4-5. No statute authorizes Defendants to use the SAVE system to match, combine, merge, link, or pool data across DHS and SSA systems of records to verify voter eligibility or for other purposes. Moreover, by allowing non-federal SAVE users to "bulk upload" state voter roll data and run searches against SSA databases, the overhauled system enables "computer matching[s] of records not otherwise authorized by law." 5 U.S.C. § 552a note.

Defendants' overhaul of the SAVE system must therefore be "h[e]ld unlawful and set aside" as "not in accordance with" the Privacy Act, and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* §§ 706(2)(A), (C).

### 3. Defendants violated the Privacy Act's SORN and notice-and-comment requirements in overhauling SAVE

Defendants also acted "without observance of procedure required by law," *id.* § 706(2)(D), by violating the Privacy Act's SORN and notice-and-comment requirements. Specifically, DHS and SSA significantly changed "systems of records"—*i.e.*, the SAVE system and the SSA databases that SAVE now queries—without first soliciting and considering public comment on "any new use or intended use of the information in the system[s]," 5 U.S.C. § 552a(e)(11), without considering any comments received, and without publishing revised SORNs in the Federal Register, *id.* § 552a(e)(4).

There is no dispute that SAVE is a "system of records." DHS has admitted as much in at least eight SORNs,[61] in its SAVE User Reference Guide,[62] and in the May 2025 DHS-SSA SAVE Agreement, *supra* n.5, at 4-5. Nor is there any dispute that the SSA database that SAVE now queries is also a system of records. *Id.* at 4 (citing 90 Fed. Reg. 10025).

---

[61] *See supra* n.2.
[62] USCIS, *SAVE User Reference Guide* Ch. 1.4 (June 4, 2025), https://perma.cc/DE8W-9US6.

Nor can there be any dispute that Defendants' changes to the SAVE system and the linked SSA systems were sufficiently substantial to require revised SORNs. Under binding OMB guidelines, agencies must "publish notice in the *Federal Register* when making significant changes to an existing system of records." OMB Circular No. A-108 at 5. "[S]ignificant changes are those that are substantive in nature and therefore warrant a revision of the SORN in order to provide notice to the public of the character of the modified system of records." *Id.*

OMB Circular No. A-108 lists several examples of "significant changes" warranting a revised SORN, nearly all of which track Defendants' overhaul of SAVE. *See id.* at 5-6. First, by expanding SAVE to incorporate SSA databases with information on U.S.-born citizens and *every American with a Social Security Number*, *see supra* Background, Part II.B.2, Defendants dramatically "increase[d] … the number, type, or category of individuals about whom records are maintained in the system," and "expand[ed] the types or categories of records maintained in the system," OMB Circular No. A-108 at 5. Indeed, Defendants have ballooned the population of Americans whose sensitive personal information is accessed through SAVE *by over 1,000%—* from about 26.5 million to over 300 million. *See supra* Background, Part II.B.2. Second, by adding the new "bulk uploader" function, Defendants made a "change to equipment configuration (either hardware or software) … or agency procedures that expand[ed] the availability of, and thereby create[d] substantially greater access to, the information in" SSA databases for SAVE's more than 1,200 user agencies—data which was previously inaccessible to those agencies. *See* OMB Circular No. A-108 at 5. Third, Defendants "combin[ed] … two or more existing systems of records" by directly linking DHS and SSA systems. *See id.* at 6. Finally, by repurposing SSA data for new and unauthorized uses, Defendants significantly "modifie[d] the purpose(s) for which the information in the [SSA] system of records is maintained." *Id.*; *see* McCall Decl. ¶¶24-42 (former DHS privacy

26

official opining that changes to SAVE were significant and historically would have triggered a revised SORN).

Despite significantly changing the SAVE system and SSA databases that SAVE now queries, DHS and SSA failed to publish revised SORNs as required by § 552a(e)(4), and failed to publish notice and solicit and consider public comments on new intended uses of the systems as required by § 552a(e)(11). Accordingly, Defendants' overhaul of SAVE must be "h[e]ld unlawful and set aside" as "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### 4.  Defendants unlawfully withheld agency action in overhauling SAVE

The APA mandates that courts "shall … compel agency action unlawfully withheld." 5 U.S.C. § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Here, as outlined above, the Privacy Act mandates that agencies "shall" publish a SORN "upon establishment or revision" of any system of records, 5 U.S.C. § 552a(e)(4), and, "at least 30 days" in advance, publish notice "of any new use or intended use of the information in the system" and accept and consider public comment, *id.* § 552a(e)(11). Each of these are "discrete" actions that Defendants were "required" to take *before* overhauling the SAVE system. *Norton*, 542 U.S. at 64. Indeed, Congress used mandatory language in the Privacy Act provisions that Defendants violated, *see* 5 U.S.C. § 552a(e) (using mandatory "shall"), but discretionary language in other provisions, *see id.* § 552a(j) (agency head "may promulgate" certain rules). "When, as is the case here, Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 311 (2020) (cleaned up). Because Congress "by organic statute set[] a specific deadline for agency action," the Court "must compel the action unlawfully withheld." *South Carolina v. United States*, 907 F.3d 742, 758 (4th Cir. 2018).

### 5. Defendants' overhaul of SAVE was arbitrary and capricious

The APA also requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). This standard "'requires agencies to engage in reasoned decisionmaking,'" and "to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)). A reviewing court must "consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Defendants' overhaul of SAVE flunks this test for at least four reasons.

*First*, Defendants "entirely failed to consider" a highly "relevant factor," *id.*—the documented unreliability of SSA's citizenship data and the difficulties of repurposing it for DHS programs. SSA itself has admitted that because "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA," its "records do not provide definitive information about an individual's citizenship status," and it has cautioned against relying on SSA data to verify citizenship. July 2023 SSA Ltr., *supra* n.7 at 2. SSA has no process for automatically updating the citizenship data it maintains, but rather relies on SSN-holders to inform SSA of any change in their status. *See id.* This is because, as SSA has stressed, "SSA is not the agency responsible for making citizenship determinations" and "SSA is not the custodian of U.S. citizenship records." *Id.* Underscoring that problem, an audit by SSA's Office of Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as non-citizens "because [they] had become U.S. citizens

after obtaining their SSN" and "had not updated their records with SSA."[63]

SSA also lacks complete citizenship information for U.S.-born citizens born before 1981. July 2023 SSA Ltr., *supra* n.7, at 2. According to SSA, "SSA's assessment of its citizenship data indicates that approximately ¼ of those records do not have an indication of citizenship present." *Id.* And as a federal district court recently found, SSA's citizenship data has many other "issues," including that "the error rate for data in the SSA database is approximately six percent," and the "SSA database returns 'soft' record matches based on the last four digits of a social security number, meaning a SSA check could return multiple matches." *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 956 (D. Ariz. 2024), *aff'd in part, vacated in part*, 129 F.4th 691 (9th Cir. 2025).

DHS has long known of the problems with both SSA's citizenship data and attempts to integrate it with DHS data. A July 2012 report submitted to DHS (at USCIS's request) found that "SSA … does not always have accurate information on the current citizenship status of foreign-born citizens" because "workers … who obtain citizenship status typically do not realize they should report these changes to SSA."[64] And "because immigration status for some noncitizens changes several times over the course of their stay in the United States, it would be very difficult to keep SSA records correctly updated."[65] The report added that any attempt to integrate DHS and SSA citizenship data would face significant significant challenges because "[t]he lack of a common identifier, such as the SSN, between SSA and DHS means that information about foreign-born citizens contained in USCIS naturalization databases may not be locatable when SSA

---

[63] *See supra* n.37.
[64] Westat Report to DHS, *Evaluation of the Accuracy of E-Verify Findings*, at 51 (July 2012), https://perma.cc/W348-NNUV ("E-Verify Report"); *see also id.* at 29 ("[T]he accuracy of [SSA's] information decreases over time as name and immigration and citizenship information change and are not reported to SSA.").
[65] *Id.* at A-4.

information is inadequate to confirm citizenship status."[66]

These known issues with SSA's citizenship data were unquestionably relevant factors DHS and SSA *should* have considered before incorporating that data into SAVE. The Privacy Act requires agencies "to assure," prior to disclosing records about individuals, that the records "are accurate, complete, timely, and relevant for agency purposes," 5 U.S.C. § 552a(e)(6); *see also id.* § 552a(e)(5), and to adopt "appropriate …safeguards" for any system of records "to protect against any anticipated threats or hazards to [the records'] security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," *id.* § 552a(e)(10). And yet, Defendants' reasoning for overhauling SAVE and their MOAs with SAVE users fail to acknowledge the well-documented limitations with SSA's citizenship data and attendant risks of "substantial harm" and "unfairness" to individuals in relying on it. By "entirely fail[ing] to consider" this highly "relevant data," *State Farm*, 463 U.S. at 43, Defendants' acted arbitrarily and capriciously.

*Second*, Defendants' public reasoning for overhauling SAVE (what little there is) rests on an empirically false premise: that noncitizen voting is pervasive in the United States. Defendants explained they were overhauling SAVE to "eliminate voter fraud" by "prevent[ing] aliens from voting in American elections."[67] But noncitizen voting is vanishingly rare, and extensive data debunks the myth that it is widespread. For instance, a recent study by the nonpartisan Center for Election Innovation and Research reviewed suspected cases of noncitizen voting in all 50 states, and found that the "vast majority of allegations of noncitizen registration or voting appear to arise from misunderstandings, mischaracterizations, or outright fabrications about complex voter data,"

---

[66] *Id.* at 34.
[67] May 22, 2025, SAVE Press Release, *supra* n.4; *see also* April 22, 2025, SAVE Press Release, *supra* n.3.

and even the largest claims of noncitizen voting "never allege numbers that amount to more than a few tenths of a percent of the number of eligible voters in a state."[68] Similarly, the Heritage Foundation's nationwide database of alleged instances of voter fraud identifies just *99 total cases* of suspected noncitizen voting *going back to the 1980s*.[69] And when Louisiana officials ran the state's voter rolls through the overhauled SAVE system, they identified only *79 possible instances* of noncitizen voting *since the 1980s*.[70] Thus, verified cases of noncitizen voting are infinitesimal and statistically insignificant. Defendants' decision to pool millions of Americans' sensitive SSA data with DHS systems based on the debunked myth of widespread noncitizen voting was arbitrary and capricious.

*Third*, Defendants failed to sufficiently consider the privacy and data-security risks of expanding SAVE to allow user agencies to conduct bulk queries of SSA databases with millions' of Americans' sensitive personal information, including the data of the proposed class members. *See* McCall Decl. ¶¶39, 42. Here again, these are considerations mandated by the Privacy Act. *See, e.g.*, 5 U.S.C. §§ 552a(e)(5), (6), (10). Defendants likewise failed to consider that the American people did not consent to or expect the government to repurpose their Social Security data into a tool "for verifying immigration status and U.S. citizenship nationwide," May 22, 2025 SAVE Press Release, *supra* n.4. And the public had no opportunity to voice their concerns because Defendants illegally bypassed notice and comment. *See supra* Argument, Part I.B.3.

*Fourth*, Defendants departed from longstanding agency policy and practice without

---

[68] *See Review of Allegations of Noncitizen Registrants and Voters*, Ctr. for Election Innovation & Rsch. (July 2025), https://electioninnovation.org/research/noncitizen-analysis/.

[69] Election Fraud Map, Explore the Data, The Heritage Foundation (last accessed Oct. 6, 2025), https://electionfraud.heritage.org/search (sort search results by "Fraud Sub-category" of "Alien").

[70] *See* Muller, *supra*, n.41.

acknowledgement or explanation. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 n.3 (D.C. Cir. 2017). DHS has published at least eight SORNs and followed notice-and-comment procedures when making changes to the SAVE system in the past. *See supra* n.2. DHS has also historically performed PIAs and other assessments of privacy and data-security risks when making changes to the SAVE system. *See supra* Background, Part II.B.1. Defendants' unexplained failure to do the same here—upon making by far their most substantial changes to SAVE to date—marked an "extraordinary departure from ordinary DHS policy and practice," McCall Decl. ¶42, and was therefore arbitrary and capricious.

* * *

Defendants' overhaul of SAVE violated the APA in myriad ways: it was contrary to the Privacy Act, in excess of statutory authority, without required procedure, and arbitrary and capricious. For any one of these reasons, this "[C]ourt shall … hold unlawful and set aside" the overhaul. 5 U.S.C. § 706(2); *see Am. Pub. Gas Ass'n v. Dep't of Energy*, 72 F.4th 1324, 1342 (D.C. Cir. 2023) ("[V]acatur is the normal remedy when [agency action] is found unlawful.").

### C.  Alternatively, Plaintiffs are entitled to mandamus relief

If the Court finds that Plaintiffs lack an APA remedy regarding Defendants' unlawfully withheld actions, Plaintiffs are alternatively entitled to mandamus relief. "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see* 28 U.S.C. § 1361. "What plaintiffs must show to establish a mandamus claim is similar to what they must show to succeed on their … unlawful withholding claims under [§ 706(1)] the APA, as in both instances plaintiffs must establish that the government has a clear, nondiscretionary duty." *Babamuradova v. Blinken*, 633 F. Supp. 3d 1, 19 (D.D.C. 2022); *see Norton*, 542 U.S. at 63 (noting § 706(1)

"carried forward the traditional practice" of mandamus). Thus, for the reasons set forth above regarding Plaintiffs' § 706(1) claim, *see supra* Argument, Part I.B.4, Plaintiffs meet the first two requirements for mandamus relief. If Plaintiffs lack an "adequate alternative remedy" under § 706(1) or any other statute, then the last mandamus element is met as well. And there are "compelling equitable grounds" for issuing the writ, *Am. Hosp. Ass'n*, 812 F.3d at 189, given the egregiousness of Defendants' conduct and the threat of irreparable harm to Plaintiffs and Proposed Class members. *See infra* Argument, Part II.

### D. Defendants' overhaul of the SAVE system was *ultra vires*

To prevail on an "*ultra vires* claim, the plaintiff must establish that (1) review is not expressly precluded by statute, (2) 'there is no alternative procedure for review of the statutory claim' and (3) the challenged action is 'plainly' in 'excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Glob. Health Council v. Trump*, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025); *see also Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022). Here, no statute expressly precludes review. So, if Plaintiffs lack an alternative remedy under the APA or the mandamus statute, then they are entitled to *ultra vires* review of Defendants' illegal overhaul of the SAVE system.

Defendants' overhaul of the SAVE system was "'plainly' in 'excess of [Defendants'] delegated powers and contrary to a specific prohibition[s] in the [the Privacy Act] that [are] clear and mandatory." *Glob. Health Council*, 2025 WL 2480618, at *12; *see supra* Argument, Parts I.B.2-4. Defendants' actions are unmistakably "an attempted exercise of power that had been specifically withheld" by Congress, *Leedom v. Kyne*, 358 U.S. 184, 189 (1958)—*i.e.*, the power to secretly create interagency "national data banks." 5 U.S.C. § 552a note. The Privacy Act was specifically designed to "prevent … de facto national data banks on individuals free of the restraints on Federal power established by Constitution and statutes … without statutory

authorization from Congress and without proper regard for privacy of the individual, confidentiality of data, and security of the system." Privacy Act Leg. History, *supra* n.1, at 217. By creating just such a system, Defendants acted *ultra vires*.

### E.  Defendants' overhaul of the SAVE system violated the separation of powers

Defendants' overhaul of the SAVE system also violates the Constitution's separation of powers. "Federal agencies are creatures of statute. They possess only those powers that Congress confers upon them. If no statute confers authority to a federal agency, it has none." *Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021). Here, no statute authorizes SSA and DHS to pool data through the SAVE system for purposes of determining voter eligibility. Nor does the Executive Branch possess any express constitutional authority over elections. The Constitution's "Elections Clause provides that Congress—not the President—is the check on States' authority to regulate federal elections." *LULAC*, 780 F. Supp. 3d at 194; *see* U.S. Const. art. I, § 4, cl. 1. Because Defendants' integration of SSA data into the overhauled SAVE system to verify voter eligibility "does not draw on an executive power that has been designated to the [Executive Branch] by the Constitution or statute," *Susman Godfrey LLP v. EOP*, 2025 WL 1779830, at *23 (D.D.C. June 27, 2025), it violates the separation of powers.[71]

## II.  The overhauled SAVE system irreparably harms Plaintiffs.

"The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm": (1) "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and (2) "the harm must be beyond remediation." *League of Women Voters of U.S. v. Newby*, 838

---

[71] Unlike in *Global Health Council*, Plaintiffs' separation-of-powers claim is based on the "*absence* of *any* statutory authority, not a claim that the [Executive] acted in excess of such authority." 2025 WL 2480618, at *7 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)).

F.3d 1, 7-8 (D.C. Cir. 2016) (cleaned up). Plaintiffs are already suffering and will continue to suffer several such harms absent a stay and preliminary injunction.

### A. Irreparable injuries to the Proposed PI Class Representatives and members of LWVVA and LWVLA

**Voter Injuries.** The Proposed PI Class Representatives (J. Does 1, 4, and 5) and LWVVA and LWVLA member declarants (J. Does 6 and 4, respectively) are naturalized citizen voters in states using the overhauled SAVE system for voter list maintenance and investigatory purposes who reasonably fear the system will cause them to be erroneously disenfranchised, face additional obstacles to voting, or be subjected to unwarranted criminal investigation, imperiling their fundamental right to vote. *See* Doe 1 Decl. ¶¶2-5, 7-8, 13-15, 20; Suppl. Doe 4 Decl. ¶¶2-5, 7-9, 13-15, 18; Doe 5 Decl. ¶¶2-5, 7-8, 11-14, 17; Doe 6 Decl. ¶¶2-16.

"Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. ("LWVNC") v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citing cases). A threat that even "*some* … voters will be disproportionately adversely affected in [an] upcoming election"—whether "the number is thirty or thirty-thousand"—is "real and completely irreparable" harm because "once the election occurs, there can be no do-over and no redress." *Id.* (emphasis added); *see also Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("Because there can be no 'do-over' or redress of a denial of the right to vote after an election, denial of that right weighs heavily" in assessing "irreparable harm"); *Newby*, 838 F.3d at 12 (similar). Thus, "plaintiffs risk[ing] losing their right to vote . . . qualifies as an irreparable harm." *Carey v. Wis. Elec. Comm'n*, 624 F. Supp. 3d 1020, 1034 (W.D. Wis. 2022).[72]

---

[72] *See, e.g.*, *Richardson v. Trump*, 496 F. Supp. 3d 165, 187 (D.D.C. 2020) (voters showed irreparable harm where "delays in the delivery of mail" created "a substantial risk that Plaintiffs will suffer an undue burden on their constitutional right to vote"); *Ga. Coal. for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1267-68 (N.D. Ga. 2018) (risk of disenfranchisement of voters flagged as non-citizens was irreparable harm).

As detailed above, the overhauled SAVE system now incorporates unreliable SSA citizenship data, and states such as Louisiana, Virginia, and Texas are actively using the system (and its incorporated SSA data) to purge voter rolls and open criminal investigations of suspected noncitizen voting. *See supra* Background, Part II.B. Because SSA's citizenship data is especially inaccurate for naturalized citizens, *id.*, SAVE's utilization of that data will "disproportionately adversely affect[]" naturalized citizen voters. *LWVNC*, 769 F.3d at 247. Proving the point, the Proposed PI Class Representatives and LWVVA and LWVLA member declarants have contacted SSA to confirm the inaccuracy of their SSA citizenship data, a measure they were forced to take to protect their voting rights due to Defendants' illegal overhaul of SAVE. *See* Doe 1 Decl. ¶14; Suppl. Doe 4 Decl. ¶14; Doe 5 Decl. ¶13; Doe 6 Decl. ¶15.

Given the ongoing federal government shutdown and the Trump administration's drastic staffing cuts at SSA field offices nationwide,[73] proposed class members will likely face substantial delays of weeks or even months to book in-person appointments to prove and correct their citizenship status with SSA. The earliest available SSA appointment time offered to one naturalized citizen member of LWVVA was November 24, 2025, 20 days *after* the Virginia election. *See* Doe 6 Decl. ¶¶15, 19. And that was *before* the shutdown, during which SSA has announced "local offices will remain open to the public but will provide reduced services."[74] The Proposed PI Class Representatives and LWVVA and LWVLA member declarants reasonably fear they will be culled from voter rolls and, if they successfully vote in elections *before* SSA corrects their outdated citizenship records, that they are at risk of being unfairly investigated for lawfully

---

[73] Jordyn Bradley, *Nearly Every US State Has Lost Social Security Field-Office Staff This Year*, Investopedia (Aug. 11, 2025), https://perma.cc/MYB8-38PQ.
[74] SSA, *What the Federal Government Shutdown Means to You*, Social Security Matters Blog (Oct. 1, 2025), https://perma.cc/C795-7UML.

voting. *See* Doe 1 Decl. ¶15; Suppl. Doe 4 Decl. ¶15; Doe 5 Decl. ¶14; Doe 6 Decl. ¶¶16, 19. They likewise reasonably fear such investigations for votes lawfully cast in prior elections. *See id.*

In Virginia, the risks to naturalized citizen voters are especially high. Virginia law *mandates* the general registrars to delete from voter rolls "any voter who … is known not to be a United States citizen . . . based on information received from" the SAVE system. Va. Code Ann. § 24.2-404(A)(4). And the Governor weeks ago confirmed that Virginia is using SAVE's new unlawful "bulk uploader" function. *See supra* Background, Part II.B.4.

Defendants' violations of the Privacy Act's transparency requirements, *see supra* Argument, Part I.B.3, have exacerbated the risks to proposed class members. The lack of statutorily guaranteed SORN information deprives proposed class members of advance notice and opportunity to take corrective measures to ensure they are not wrongfully purged from the voter rolls, such as contacting SSA to update their citizenship data. *See* Doe 1 Decl. ¶20; Suppl. Doe 4 Decl. ¶18; Doe 5 Decl. ¶17; Doe 6 Decl. ¶¶18-19. Many are likely unaware their state is even using SSA citizenship records to determine their eligibility to vote. They would have no reason to think so, since "SSA is not the agency responsible for making citizenship determinations" and "SSA is not the custodian of U.S. citizenship records." July 2023 SSA Ltr., *supra* n.7, at 2.

Further compounding these risks, USCIS has failed to alert SAVE users of the known deficiencies with SSA citizenship data or to update SAVE's "additional verification" procedures accordingly. SAVE's additional verification procedures involve USCIS employees conducting secondary and manual reviews of DHS records to confirm an initial SAVE response.[75] Under the current Sample MOA for SAVE voter verification users, a user agency "must request additional

---

[75] U.S. Gov't Accountability Off., Rep. No. GAO-17-204, *Immigration Status Verification for Benefits: Actions Needed to Improve Effectiveness and Oversight* 17 (Mar. 2017), https://perma.cc/CD6Y-48QV.

verification when required by SAVE for any registrant or registered voter that does not verify as a U.S. citizen on initial verification."[76] However, SAVE's user guide makes clear that "SAVE can only conduct additional verification if an immigration enumerator"—*i.e.*, a DHS-issued identifier, such as an Alien Registration Number—is provided by the SAVE user or found in SSA records.[77] And, as USCIS knows, SAVE users and SSA frequently lack DHS identifiers in their own records.[78] The upshot is that when outdated SSA data queried by SAVE indicates non-citizenship but fails to reveal a DHS-issued identifier—which will often be the case—there will be no additional verification of an initial "non-citizen" response.[79]

Each of these harms to the Proposed PI Class are intensified by looming election deadlines. Virginia and Texas have major elections on November 4, 2025, and Louisiana has local primaries in October, and a municipal election in New Orleans on November 15. *See supra* nn. 52-54. Early voting is already underway in Virginia and Louisiana, and fast approaching in Texas. And there are elections across the country in 2026. *See id.* Eligible voters in the proposed class are now forced to constantly re-check their voter registration status, are preparing in case they need to provide additional documentation of their citizenship or face other burdens in order to exercise their right

---

[76] USCIS, *Voter Verification Agency Sample MOA Draft* 4 (June 9, 2025), https://perma.cc/7X59-4DF4.

[77] USCIS, *SAVE User Reference Guid*e, §§ 9.1, 9.2 (July 16, 2025), https://perma.cc/DE8W-9US6.

[78] *See* May 22, 2025 SAVE Press Release, *supra* n.4 ("[M]ost state and local agencies do not collect … DHS identifying number[s]"); E-Verify Report, *supra* n.64, at 34 ("The lack of a common identifier, such as the SSN, between SSA and DHS means that information about foreign-born citizens contained in USCIS naturalization databases may not be locatable when SSA information is inadequate to confirm citizenship status.").

[79] To make matters worse, SAVE users historically have disregarded the additional verification process with impunity. As one government audit found, "the majority of SAVE user agencies that received a SAVE response prompting them to institute additional verification did not complete the required additional steps," and USCIS failed to police this widespread non-compliance. GAO-17-204, *supra* n.75, at 17. That was *before* SAVE included its new bulk upload feature, exponentially increasing the volume of cases potentially requiring additional verification.

to vote, and are intimidated by the overhauled SAVE system and the threat of unwarranted investigation and prosecution for their lawful voting. *See* Doe 1 Decl. ¶¶13-15; Suppl. Doe 4 Decl. ¶¶13-15; Doe. 5 Decl. ¶¶12-14; Doe 6 Decl. ¶¶14-16.

**Privacy Injuries.** The Proposed PI Class Representatives and LWVVA and LWVLA member declarants are also experiencing extreme, justified, and ongoing fear about their data privacy and security as a result of Defendants' misuse and unauthorized repurposing of their sensitive SSA data. *See* Doe 1 Decl. ¶¶21-23; Suppl. Doe 4 Decl. ¶¶19-21; Doe 5 Decl. ¶¶18-20; Doe 6 Decl. ¶¶20-22. None of them consented to the integration of their SSA data into the overhauled SAVE system. They entrusted their personal information to SSA for defined purposes, in reliance on longstanding privacy guarantees under federal law and the reasonable expectation their sensitive information would not be secretly aggregated, repurposed, and made broadly accessible through insecure means to other federal and state actors and third parties. *See* Doe 1 Decl. ¶¶9-11, 21; Suppl. Doe 4 Decl. ¶¶9-11, 19; Doe 5 Decl. ¶¶9-11, 18; Doe 6 Decl. ¶¶10-12, 20. They did not consent to their SSA data being fed into any governmentwide system "for verifying immigration status and U.S. citizenship nationwide." May 22, 2025 SAVE Press Release, *supra* n.4. Nor did they have reason to expect this repurposing of their SSA data, since SSA is "not . . . responsible for making citizenship determinations." July 2023 SSA Ltr., *supra* n.7, at 2.

These individuals also reasonably fear that their sensitive data is now at increased risk of hacking and theft. *See* Doe 1 Decl. ¶23; Suppl. Doe 4 Decl. ¶21; Doe 5 Decl. ¶20; Doe 6 Decl. ¶22. Their fears are substantiated by USCIS's own description of SAVE's new "voter verification bulk uploader" function, which allows SAVE users to upload CSV files with potentially millions of voters' SSNs and other sensitive data into SAVE.[80] Those bulk uploads are checked against

---

[80] *Voter Verification*, *supra* n.38.

DHS and SSA data, and users "can download an initial file associated with each bulk upload."[81] Thus, SAVE users are now generating and transferring files with enormous amounts of sensitive SSA data, increasing security risks that would have been mitigated had Defendants adhered to the SORN and PIA processes DHS historically followed. *See* McCall Decl. ¶¶39-42.

These data-security concerns are heightened by a recent congressional report finding that "[m]ultiple whistleblowers," including SSA's "former Chief Data Officer," have disclosed that "DOGE employees at SSA" created a "cloud environment" containing "personal data on all Americans, including Social Security Numbers" from SSA's Numident database for interagency sharing "without any verified security controls."[82] The report added that an "internal SSA risk assessment determined that the likelihood of a data breach with 'catastrophic adverse effect' is between 35 and 65 percent," and that "[i]f penetrated, *this data vulnerability could result in the most significant data breach of Americans' sensitive data in history*."[83]

Both the *ongoing* misuse of Plaintiffs' sensitive SSA data through the overhauled SAVE system, and the increased risk of cybertheft and additional misuse, qualify as irreparable injuries. *See Williams v. Harry's Nurses Registry, Inc.*, 2025 WL 842041, at *5 (2d Cir. Mar. 18, 2025) (plaintiff "made a strong showing of irreparable harm" based in part on increased risk of "identity theft and misuse of [her] personal information").

**Informational Injuries.** The Proposed PI Class Representatives' and LWVVA and

---

[81] USCIS, *SAVE Optimization: SAVE Enhances the Bulk Upload Process* (July 21, 2025), https://perma.cc/SS57-AEWN; *see also* USCIS, *SAVE User Reference Guide*, 10.1 Bulk Upload File Management (July 16, 2025), https://perma.cc/6CAZ-ZF4X (noting SAVE users can "download a [response] file of all the cases within the bulk upload file").

[82] U.S. S. Comm. on Homeland Sec. & Gov't Affairs, *Unchecked and Unaccountable: How DOGE Jeopardizes Americans' Data Without Regard for Law and Congress*, Minority Staff Report, at 2 (Sept. 2025), https://perma.cc/8ZMD-94T6.

[83] *Id.* at 3 (emphasis added).

LWVLA members' fear and uncertainty is compounded by Defendants' refusal to publish SORNs in violation of the Privacy Act's transparency requirements. *See supra* Argument, Part I.B.3. "[A]n informational injury can be sufficient to establish irreparable harm if the information sought is time-sensitive." *Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 54 (D.D.C. 2025) (citation omitted); *see also Citizens for Resp. & Ethics in Washington ("CREW") v. OMB*, 2025 WL 2025114, at *18 (D.D.C. July 21, 2025) (plaintiffs suffered irreparable injuries by being denied "information to which they are statutorily entitled" relating to "ongoing, imminent" issues of public concern).

Such is the case here. Defendants' refusal to publish statutorily required information about the overhauled SAVE system—combined with their rapid and secretive efforts to carry out that overhaul—has left the Proposed PI Class Representatives and LWVVA and LWVLA members in the dark about how their data is being repurposed and consolidated across government agencies. They have been denied basic details about whose data is in the system, what record sources it is pooling from, how the system is being used and accessed, as well as "the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him" and "the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content." 5 U.S.C. § 552a(e)(4); *see* Doe 1 Decl. ¶¶16-17, 19; Suppl. Doe 4 Decl. ¶¶16-17; Doe 5 Decl. ¶¶15-16; Doe 6 Decl. ¶¶17-18.

Without statutorily guaranteed SORNs, the Proposed PI Class Representatives and LWVVA and LWVLA members cannot fully understand how their personal data is being aggregated, repurposed, and pooled across the government; take steps to safeguard their privacy interests; or protect themselves against any attendant consequences to their personal lives, careers, or participation in elections. This lack of information impairs their abilities to exercise their rights

under the Privacy Act to submit appropriately targeted requests to access or correct their own records, *see* 5 U.S.C. § 552a(d), and requests for an accounting of how their records have been disclosed, *see id.* § 552a(c). Moreover, these informational injuries are irreparable because "[t]he time it would take to litigate … the merits … would likely result in a substantial delay of years. … By that time, … the information may indeed be 'stale,' or at least, significantly less useful." *CREW v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 28 (D.D.C. 2025); *see Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("stale information is of little value").

**Notice-and-Comment Injuries.** Defendants also stripped the Proposed PI Class Representatives and LWVVA and LWVLA members of their rights to comment on Defendants' overhaul of SAVE and to have their comments considered. *See supra* Argument, Part I.B.3. While a "procedural injury standing alone is insufficient to support a finding of irreparable harm," when a "Plaintiff has been deprived of notice and the opportunity 'to have their comments considered prior to" agency action "*which threatens' serious harms to their interests*, they have suffered 'irreparable harm.'" *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 115 (D. Md. 2025) (emphasis added); *accord Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18-19 (D.D.C. 2009).

As detailed above, Defendants' overhaul of the SAVE system "threatens serious harm" to Plaintiffs' concrete interests, including their interests in exercising their fundamental right to vote and preventing the misuse and unauthorized repurposing of their sensitive personal data. They had no opportunity to participate in the process—which was carried out in secret—for determining how their personal data is being collected, aggregated, and used on a massive scale. They have further been denied the opportunity to convey their significant and concrete privacy concerns about Defendants' unprecedented data-pooling efforts and proposals for how Defendants can ensure their

sensitive personal information is kept secure, and that data-matching is accurate and verified. They would have also conveyed their substantial privacy and data-security concerns over enabling bulk searches and outputs of millions of Americans' sensitive SSA data (including their own) and expanding the population of Americans whose personal data SAVE accesses by more than 1,000%. *See* Part I.B.3; Doe 1 Decl. ¶18. Because Defendants' "abrupt" overhaul of SAVE "without notice and comment" is "causing adverse effects to concrete interests that cannot be remedied by a final judgment," *Maryland*, 785 F. Supp. 3d at 121, it has inflicted irreparable harm.

### B. Irreparable injuries to the League Plaintiffs

Defendants' illegal overhaul of the SAVE system is also irreparably and directly harming the League Plaintiffs. Their core mission is to empower voters and defend democracy, including by registering voters and increasing voter participation. Stewart Decl. ¶¶2, 7-12; Porte Decl. ¶¶2, 11-15; Green Decl. ¶¶2, 13-17. The League Plaintiffs accomplish this mission by providing voter outreach, education, and assistance to all eligible voters, including naturalized citizens. Stewart Decl. ¶¶7-12; Porte Decl. ¶¶11-29; Green Decl. ¶¶13-23.

Defendants' illegal overhaul of SAVE, and the risks it creates for voters, "directly conflict[s] with the [Leagues Plaintiffs'] mission." *Newby*, 838 F.3d at 8. When voters are wrongly purged from voter rolls in any of the 50 states or the District of Columbia with League chapters and members (including Virginia and Louisiana), it decreases the number of voters, directly undermining the League Plaintiffs' mission of increasing the number of registered voters and voter participation. Stewart Decl. ¶¶7, 21; Porte Decl. ¶¶31-35; Green Decl. ¶¶25-30. And when voters are intimidated or must take additional steps to register or remain registered, it directly harms the League Plaintiffs' mission of ensuring that the ballot box is accessible for all eligible voters. Stewart Decl. ¶21; Porte Decl. ¶¶31-35; Green Decl. ¶¶25-30.

In furtherance of their mission, the League Plaintiffs wish to urgently educate and protect

43

the public and take remedial efforts to counteract the overhauled SAVE system's risks to eligible voters. Stewart Decl. ¶¶2-3, 23; Porte Decl. ¶¶2-5, 36-38; Green Decl. ¶¶2-6, 31-34.  But their efforts are stymied by Defendants' failure to publish required SORN information on the parameters of SAVE new uses for voter citizenship checks; the sources of data pooled in the system; the policies and practices for records retrieval; the procedures for voters to access records contained in the system and contest or correct their contents; and other steps voters can take to ensure their government records are accurate, up-to-date, and secure. Stewart Decl. ¶¶2-3, 17, 23; Porte Decl. ¶¶2-5, 36-38; Green Decl. ¶¶2-6, 31-34. Without this basic information, the League Plaintiffs cannot properly educate the public, their members, and eligible naturalized citizen voters about these risks or how to mitigate them. Because elections are looming in Virginia, Louisiana, and across the country, the League Plaintiffs' inability to *timely* obtain, utilize, and disseminate this statutorily guaranteed information is irreparable harm. *See CREW*, 2025 WL 2025114, at \*18; *Drs. for Am.*, 766 F. Supp. 3d at 54; *CREW*, 769 F. Supp. 3d at 28; *see also Protect Democracy Project, Inc. v. DOJ*, 498 F. Supp. 3d 132 (D.D.C. 2020) (granting preliminary injunction ordering release of information ahead of 2020 election); *Dunlap v. Pres. Advisory Comm'n on Election Integrity,* 286 F. Supp. 3d 96, 110 (D.D.C. 2017) ("plaintiffs may suffer irreparable harm" when "denied access to information" required by law that is "highly relevant to an ongoing public debate.").

In addition, Defendants' failure to follow the Privacy Act's notice-and-comment procedures "threatens serious harm" to the League Plaintiffs' "concrete" and mission-critical interests in protecting voters. *Maryland*, 785 F. Supp. 3d at 115. Had they been afforded notice and comment, the League Plaintiffs would have urged Defendants to consider the unreliability of using SSA citizenship data to verify voter eligibility, the unfairness of repurposing the data that way, and how doing so will disproportionately impact naturalized citizen voters and others for

whom SSA has inaccurate data. Stewart Decl. ¶¶17, 24-27; Porte Decl. ¶¶39-40; Green Decl. ¶35. They would have also refuted the myth of widespread noncitizen voting—Defendants' main rationale for overhauling the SAVE system. Stewart Decl. ¶26. But Defendants "did not provide notice and an opportunity to comment before [they] made significant changes to" SAVE, so the League Plaintiffs "were unable to voice their concerns about these changes," and now are "forced to reckon" with the fallout, *Maryland*, 785 F. Supp. 3d at 121, including risks to the voting rights of the millions of Americans they serve.

**III.    The balance of equities and public interest weigh in favor of injunctive relief**

"There is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. And "the public interest further favors a preliminary injunction because, absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present . . . election cycle. The public has a strong interest in exercising the fundamental political right to vote, a right that is preservative of all rights, and of the most fundamental significance under our constitutional structure." *Id.* (cleaned up). Defendants' overhaul of SAVE also "runs contrary to what Congress, in enacting the [Privacy Act], declared to be the public interest." *Id.* at 13. Meanwhile, Defendants will not be substantially harmed by a stay or injunction. Such an order would not prevent Defendants from operating the SAVE system entirely; it would only require them to return SAVE to the *status quo ante*, before they unlawfully overhauled it.[84]

## CONCLUSION

The Court should issue a stay under 5 U.S.C. § 705 and a preliminary injunction.

---

[84] The Court should decline any request by Defendants that Plaintiffs post an injunction bond. Requiring a bond beyond a nominal value "would 'contravene the interests of justice.'" *LULAC*, 780 F. Supp. 3d at 224-25 (citing cases).

Dated: October 7, 2025

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
Lauren C. Bingham (Fl. Bar No. 105745)*
Yoseph T. Desta (DC Bar No. 90002042)
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
Fax: (202) 588-5020
nsus@citizensforethics.org
jhill@citizensforethics.org
lbingham@citizensforethics.org
ydesta@citizensforethics.org

Aman T. George (D.C. Bar No. 1028446)
Jennifer Fountain Connolly (D.C. Bar No.
1019148)
Johanna M. Hickman (D.C. Bar No.
981770)
Mark B. Samburg (D.C. Bar No. 1018533)
Robin Thurston (D.C. Bar No. 1531399)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ageorge@democracyforward.org
jconnolly@democracyforward.org
hhickman@democracyforward.org
msamburg@democracyforward.org
rthurston@democracyforward.org

Respectfully Submitted,

Jon Sherman (D.C. Bar No. 998271)*
Michelle Kanter Cohen (D.C. Bar No.
989164)
Emily Davis (D.C. Bar No. 90020129)
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 701
Washington, DC 20006
202-331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
edavis@fairelectionscenter.org

*application for *pro hac vice admission*
pending or forthcoming

*Counsel for All Plaintiffs*

John L. Davisson (D.C. Bar No. 1531914)
Enid Zhou (D.C. Bar No. 1632392)
Abigail Kunkler (D.C. Bar No. 90030868)
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave NW
Washington, D.C. 20036
Telephone: 202-483-1140
Fax: 202-483-1248
davisson@epic.org
zhou@epic.org
kunkler@epic.org

*Counsel for Plaintiff Electronic Privacy
Information Center*