**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-03501 |

**BRIEF OF SENATOR ALEX PADILLA AND SENATOR GARY PETERS
AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS' MOTION FOR A STAY AND A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

STATEMENT OF INTEREST ........................................................................................................ 1

INTRODUCTION .......................................................................................................................... 2

ARGUMENT .................................................................................................................................. 4

    I.    Congress established clear notification requirements to permit congressional oversight and protection of Americans' sensitive data. ................... 4

        A.    Defendants have overhauled the SAVE program with no direct notice to Congress, contrary to law. ............................................................. 7

        B.    Defendants have overhauled the SAVE program to influence federal elections. ............................................................................................. 9

    II.    The executive branch lacks constitutional or statutory authority to create a national databank for voter surveillance. ............................................................. 11

CONCLUSION ............................................................................................................................. 12

# INDEX OF AUTHORITIES

**Cases**

*Arcia v. Florida Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) .................................................................................. 12

*Assoc'n of Comm. Org. for Reform Now v. Miller*,
  129 F.3d 833 (6th Cir. 1997) ...................................................................................... 11

*Foster v. Love,*
  522 U.S. 67 (1997) ...................................................................................................... 11

*League of United Latin Am. v. Exec. Off. of the President*,
  780 F.Supp 3d 135 (D.D.C. 2025) ............................................................................... 11

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) ...................................................................................................... 2

**Statutes**

5 U.S.C. § 552a(a)(5) ............................................................................................................ 4

5 U.S.C. § 552a(e)(4) ............................................................................................................ 5

5 U.S.C. § 552a(e)(7) .......................................................................................................... 10

5 U.S.C. § 552a(i)(2) ............................................................................................................ 6

5 U.S.C. § 552a(r) ................................................................................................................. 4

52 U.S.C. § 20507(a)(4) ...................................................................................................... 11

52 U.S.C. § 20507(b)(2) ...................................................................................................... 12

52 U.S.C. § 20507(c)(2)(A) ................................................................................................. 12

52 U.S.C. § 21085 ................................................................................................................ 11

52 U.S.C. §21083(a)(4) ........................................................................................................ 11

**Other Authorities**

Dep't of Homeland Sec., Privacy Impact Assessment for the Systematic Alien
  Verification Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(c) at
  2 (June 30, 2020), https://perma.cc/HU2M-NTL8 ........................................................ 7

*DHS, USCIS and DOGE Announce Comprehensive Optimization of SAVE Service*, United States Customs and Immigration Services Last reviewed/updated: Apr. 29, 2025) https://www.uscis.gov/save/current-user-agencies/news-alerts/dhs-uscis-and-doge-announce-comprehensive-optimization-of-save-service .................................................................................................................. 8

H.R. REP. NO. 93-1416 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6916, 6966 .......................... 5

H.R. REP. NO. 103-66 (1993) (Conf. Rep.) ............................................................................... 12

Hearings, U.S. Sen. Comm. on the Judiciary, Nomination of Joseph Edlow To be Director of the United States Citizenship and Immigration Services, Questions for the Record from Senator Alex Padilla (May 21, 2025), https://www.judiciary.senate.gov/imo/media/doc/2025-05-21_qfrresponses_edlow.pdf ............................................................................................ 9

Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, THE BRENNAN CTR. FOR JUST. (July 21, 2025), https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters ............................................................... 3

Jonathan Shorman, *DOJ is sharing state voter roll lists with Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/ .................................................................. 10

Jonathan Shorman, *Trump wants states to feed voter info into powerful citizenship data program*, Stateline (Aug. 15, 2025), https://stateline.org/2025/08/15/trump-wants-states-to-feed-voter-info-into-powerful-citizenship-data-program/ ...................................................................................... 9

Kaylie Martinez-Ochoa, Eileen O'Connor, and Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, THE BRENNAN CTR. FOR JUST. (last updated Oct. 7, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information ............ 9, 10

Letter from Senators Alex Padilla, Gary Peters, and Jeff Merkley to DHS Secretary Kristi Noem at 1 (July 15, 2025), available at https://perma.cc/3KD2-FCNQ ................... 3

Letter to Illinois State Board of Election Executive Director Bernadette Matthews from Assistant Attorney General Harmeet K. Dhillon, Civil Rights Division, Department of Justice (Aug. 14, 2025), https://capitolnewsillinois.com/wp-content/uploads/2025/08/State-of-Illinois-Final.pdf?inline=1 ......................................... 10

S. COMM. ON THE JUDICIARY, 94TH CONG., LEGISLATIVE HISTORY OF THE PRIVACY ACT OF 1974: S. 3418 (Pub. L. No. 93-579) (Comm. Print 1976) ...................................... 6

*USCIS Deploys Common Sense Tools to Verify Voters,* United States Customs and
    Immigration Services (May 22, 2025),
    https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-
    sense-tools-to-verify-voters ............................................................................................... 8

**Regulations**

85 Fed. Reg. 31798 (2020) ............................................................................................... 7

86 Fed. Reg. 67072 (Nov. 24, 2021)................................................................................. 7

## STATEMENT OF INTEREST[1]

*Amici curiae* are United States Senators who, because of their duty to their constituents, their responsibilities in the United States Senate given their committee leadership, their commitment to the rule of law, and their constitutional mandates, have an acute interest in the issues raised in this litigation. In particular, *amici* have a responsibility to ensure free and fair elections in the states they represent and across the United States, which requires allowing eligible voters to cast their ballots without being unlawfully purged from the rolls. *Amici* also have a responsibility to protect Americans' private and confidential information and to uphold the separation of powers through oversight of the executive branch. These duties can only be accomplished if the executive branch adheres to its legal requirements to notify Congress of any new data systems, significant changes in systems, or significant new uses in existing systems that contain data about individuals. This has not happened.

Senator Alex Padilla of California serves as the Ranking Member of the Senate Committee on Rules and Administration, which has oversight of federal elections and thus has a particularized interest in ensuring the National Voter Registration Act (NVRA) and Help America Vote Act (HAVA) are upheld. Before arriving to the Senate, Senator Padilla served as the Secretary of State for California and oversaw the maintenance of the state's voter rolls. Based on his position and this experience, Senator Padilla is deeply committed to ensuring eligible voters are able to cast their ballot and that the laws that structure our electoral system are upheld.

Senator Gary Peters of Michigan serves as the Ranking Member of the Senate Committee on Homeland Security and Governmental Affairs. Previously, Senator Peters was the chairman of

---

[1] Pursuant to Rule 37.6, no counsel for any party authored this brief in any part, and no person or entity other than *amicus* or *amicus*'s counsel made a monetary contribution to fund its preparation or submission.

1

the Committee. That Committee has jurisdiction over the Department of Homeland Security (DHS) and government information more broadly, and is tasked with receiving and reviewing notices from DHS and other agencies, including the Social Security Administration (SSA), about data system changes. Given his service, Senator Peters has overseen implementation of relevant laws by agencies across the government, and has a particularized interest in ensuring that the provisions of the Privacy Act of 1974 are upheld.

*Amici* also represent states that have been the subject of federal lawsuits by the Department of Justice's Civil Rights Division for failure to produce "all fields of" their statewide voter registration lists upon demand, despite the Division's questionable authority to demand such data for the reasons they allege. Targeted states include California and Michigan.

## INTRODUCTION

*Amici* are deeply troubled by the recent, unilateral overhaul of the Systematic Alien Verification for Entitlements (SAVE) program, which DHS has undertaken outside of normal legal processes seemingly in order to facilitate the *en masse* verification of voter citizenship on state voter rolls. Contrary to express provisions of law and despite repeated requests by *amici* and other members of Congress, DHS and DHS Secretary Kristi Noem have refused to provide any detailed information about this significant data systems change to Congress. It is obvious that "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). DHS's and SSA's failure to provide the statutorily required information severely undercuts Congress' ability to fulfill its oversight duties. Concerns are particularly heightened here, where the new use of the expanded SAVE program poses a significant risk of disenfranchising American voters and otherwise infringing upon fundamental rights.

2

For these reasons, on July 15, 2025, *amici* sent a public letter to Secretary Noem raising concerns about the SAVE program overhaul, its use as a standalone tool to determine voter eligibility without adequate safeguards given known data quality issues,[2] and DHS' failure to issue "any of the routine and required documentation about the program's operations and safeguards or issue[] any public notice or notice to Congress."[3] *Amici* requested information from DHS about these issues, laying out seven categories of requested documents and seeking a briefing by DHS for relevant committees and their staff. This letter was, unfortunately, ignored, despite several subsequent follow-up attempts by *amici*'s staff. To date, DHS has provided no detailed information to the Senate about its SAVE program overhaul, preventing meaningful congressional oversight and hamstringing *amici*'s ability to protect the rights of their constituents.

Now, as Plaintiffs set forth in their Complaint, ECF No. 1, and memorandum in support of their preliminary injunction, ECF No. 16-1, DHS is actively advertising and encouraging states to use the overhauled SAVE program for voter verification and several states have begun to do so, running tens of millions of voter files through this expanded system. *See* ECF No. 16-1 at 17-20. These actions — which, again, are occurring outside the bounds of the law — create an intolerable risk that eligible American voters will be disenfranchised and perhaps even wrongly prosecuted

---

[2] The Brennan Center for Justice has analyzed the particular data vulnerabilities of the SAVE program and has highlighted particular issues with the datasets provided by "U.S. Customs and Border Protection's Automated Targeting System (ATS) and TECS (not an acronym), and the State Department's Student and Exchange Visitor Information System (SEVIS)." The Brennan Center has also noted in the SAVE's overhaul the unreliability of data from the Social Security Administration particular for older Americans, as "[t]he agency only began asking for and maintaining citizenship information for all applicants in 1978." Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, THE BRENNAN CTR. FOR JUST. (July 21, 2025), https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters

[3] Letter from Senators Alex Padilla, Gary Peters, and Jeff Merkley to DHS Secretary Kristi Noem at 1 (July 15, 2025), available at https://perma.cc/3KD2-FCNQ

3

for their alleged ineligibility. This cannot continue. DHS, Secretary Noem and the other Defendants should be ordered to follow the legal procedures set forth in the Privacy Act and in the Administrative Procedures Act, which are meant to ensure that profound civil rights risks, just like these, are detected and mitigated in advance through congressional oversight.

## ARGUMENT

**I.    Congress established clear notification requirements to permit congressional oversight and protection of Americans' sensitive data.**

The Privacy Act of 1974 went into effect on September 27, 1975 as the principal law governing the handling of personal information within the federal government. The Privacy Act embodies fair information practice principles in a statutory framework, governing the means by which federal government agencies collect, maintain, use and disseminate individuals' records. It applies to information that is maintained by a "system of records." A "system of records" is a "group of any records under the control of an agency from which information is retrieved by the name of an individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5).

The Privacy Act explicitly outlines the notification requirements to the public and to members of Congress like *amici* for **any and all** significant change to the composition or use of a records system, and in particular to the Committee on Government Operations of the House of Representatives, and the Committee on Governmental Affairs of the Senate (now, the Committee on Homeland Security and Governmental Affairs), for the express purpose of allowing congressional oversight. 5 U.S.C. § 552a(r).[4] This includes the name and location of the system,

---

[4] Specifically, "[e]ach agency that proposes to establish or make a significant change in a system of records or a matching program **shall provide adequate advance notice of any such proposal** (in duplicate) to the Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of

4

the categories of individuals whose records are maintained and the specific categories of records maintained in the system, how the system is used and who has access to the system and for what purpose, how an individual can be notified if a record pertaining to them is included in the system, and the categories of sources of the data included in the system. *See* 5 U.S.C. § 552a(e)(4).

In establishing such explicit, clear notification requirements, Congress made clear its rationale for requiring that agencies share the uses for which American's sensitive data would be used. "Section 552a(e) is intended to ensure that all individuals may know the administrative structure of all systems of records; the uses to which such records will be put; and the procedures by which access, if mandated, may be had and inaccurate records contested. [...] Section (e)(2) encompasses the public notice required to be made by each agency. The intent of this section is to ensure that the essential characteristics of all information systems covered by this Act are known to the public." H.R. REP. NO. 93-1416, at 15 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6916, 6966.

In addition to notice by publication in the Federal Register, Congress also required notice to Congress itself, including to ensure principles of separations of powers are upheld. "Each agency shall provide adequate advance notice to Congress . . . of any proposal to establish or alter any system of records in order to permit an evaluation of the probable or potential effect of such proposal on the privacy and other personal or property rights of individuals or the disclosure of information relating to such individuals, and its effect on the preservation of constitutional principles of federalism and separation of powers." S. COMM. ON THE JUDICIARY, 94TH CONG.,

---

Management and Budget *in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals.*" 5 U.S.C. § 552a(r) (emphasis added).

Legislative History of the Privacy Act of 1974: S. 3418 (Pub. L. No. 93-579), at 482–483 (Comm. Print 1976) (containing Senate amendments to House amendments to S. 3418).

The rationale behind this requirement was to "assure that proposals to establish or modify systems are made known in advance so that there is a basis for monitoring the development or expansion of agency record-keeping activity . . . ." S. Comm. on the Judiciary, 94th Cong., Legislative History of the Privacy Act of 1974: S. 3418 (Pub. L. No. 93-579) at 1120 (Comm. Print 1976) (containing Privacy Act guidelines for implementing Sec. 552a of Title 5 of the U.S.C.). Further, Congress took these requirements so seriously it outlined criminal penalties for "any officer or employee of an agency who willfully maintains a system of records without meeting the notice requirements." 5 U.S.C. § 552a(i)(2).

As a matter of practice, a System of Records Notice (SORN) notification to Congress is commonplace. For instance, a SORN modification notification — on a wholly separate matter, by an agency that is not DHS — was received by the Senate's Homeland Security and Government Affairs Committee on April 15, 2025, contemplating changes to the routine use of the implicated agency data system. Routine uses are exempted from the requirements in the Privacy Act that there be advanced written consent of the individuals whose personally identifiable information is being shared, and therefore Committee staff recognized the potentially important implications of the changes proposed by that April 15 SORN and decided they needed to more deeply understand the impetus of such changes. Committee staff engaged in discussions with the relevant agency thereafter. Thus, in this very recent example, a SORN modification notice resulted in meaningful engagement between Committee staff and the agency professionals to discuss the intent of the changes and their potential implications — underscoring how SORNs further Congress' oversight role in practice.

SORN notifications are all the more important to Congress' ability to exercise its oversight role for the SAVE program because DHS has not updated its Privacy Impact Assessment (PIA) for the SAVE program since June 30, 2020. PIAs, a requirement of the E-Government Act of 2002, include information regarding what data will be collected, how it will be used, and what mitigating steps will be taken to manage privacy and security risks. Consistent with longstanding Office of Management and Budget guidance, PIAs are typically updated when significant changes are made to information systems – but in this case, despite DHS's substantial overhaul of the SAVE program, DHS did not formally release this critical documentation before implementing major changes.

**A. Defendants have overhauled the SAVE program with no direct notice to Congress, contrary to law.**

The SAVE program, first created in 1987, has operated as a fee-based system to help states verify an individual's immigration status for the purpose of receiving government benefits.[5] DHS last filed a SORN with respect to the SAVE program on May 27, 2020.[6] In that SORN, DHS slightly expanded the use of the system from its then-existing purpose of "making decisions related to verification of citizenship and immigration status — for naturalized and certain derived citizens — when issuing Social Security benefits, public health care, Supplemental Nutrition Assistance Program (SNAP) benefits, Temporary Assistance for Needy Families (TANF), Medicaid, Children's Health Insurance Program (CHIP), conducting background investigations, armed forces recruitment, REAL ID compliance, or any other purpose authorized by law." *Id*.

---

[5] *See* Dep't of Homeland Sec., Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(c) at 2 (June 30, 2020), https://perma.cc/HU2M-NTL8

[6] 85 Fed. Reg. 31798 (2020); *see generally* 86 Fed. Reg. 67072 (Nov. 24, 2021), which followed notification requirements as outlined by law for a minor system update.

Specifically, DHS expanded the scope of the SAVE program's use to include bond management processes at the United States Citizen and Immigration Services (USCIS).

By contrast, earlier this year, DHS, USCIS, and the Department of Government Efficiency (DOGE) announced a "comprehensive optimization" of the SAVE program, effective April 1, 2025, with little details outside of the removal of user fees for non-federal agencies.[7] The subsequent changes made to the SAVE program have been extensive, including a new partnership with the Social Security Administration allowing for the pooling and subsequent use of U.S. citizens' social security numbers to conduct searches, and allowing federal agencies to submit "more than one case at a time."[8] *See also* ECF No. 16-1 at 13-16. There is no doubt these changes require statutory notice given their significant nature. Again, no SORN has been issued.

Nor has Congress otherwise received more than cursory information from the executive branch on this issue. Despite repeated outreach to DHS to receive clarity around the SAVE program overhaul, to confirm the accuracy of the reported expanded use of the program, and to ascertain the steps USCIS is taking (or not taking) to educate state and local officials on the potential for falsely identifying individuals as non-citizens with the program as modified, Senators have still not received a response to their letter from DHS as of the filing of this brief.[9] *Amici* are left unable to fully fulfill their legal and constitutional duties as a result.

---

[7] *DHS, USCIS and DOGE Announce Comprehensive Optimization of SAVE Service*, United States Customs and Immigration Services Last reviewed/updated: Apr. 29, 2025) https://www.uscis.gov/save/current-user-agencies/news-alerts/dhs-uscis-and-doge-announce-comprehensive-optimization-of-save-service

[8] *USCIS Deploys Common Sense Tools to Verify Voters,* United States Customs and Immigration Services (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters

[9] As noted above, supra page 3, *amici* sent a public letter to Secretary Noem on July 15, 2025 seeking information on the very issues at the heart of this litigation; their staff then engaged in a series of non-public follow-up requests for information. In addition, as a follow-up to the May 21, 2025 confirmation hearing of Joseph Edlow to serve as USCIS Director, Senator Padilla

8

**B. Defendants have overhauled the SAVE program to influence federal elections.**

Plaintiffs credibly allege, and public reporting has confirmed, that the Trump Administration has made numerous solicitations to states to utilize the expanded SAVE program for voter list maintenance and investigatory purposes, and that some states have entered into agreements with USCIS to allow use of the voter data provided by the states for other purposes.[10] ECF No. 1 ¶¶ 140-159.

Moreover, since May 2025, the U.S. Department of Justice's (DOJ) Civil Rights Division has demanded that at least 38 states produce their statewide voter registration files.[11] The letters sent to states demand, among other information, the current statewide voter registration list, including both active and inactive voters, but make no reference as to how the data will be used, how long it will be kept, or to any partnership with additional federal agencies, including DHS.[12] Notably, when requesting the voter registration lists, DOJ has requested voter registration lists with "all fields," which — as it pointedly explains in a letter to Illinois — includes personally identifying and confidential information "including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's

---

asked a series of questions about the SAVE program. *See generally* Hearings, U.S. Sen. Comm. on the Judiciary, Nomination of Joseph Edlow To be Director of the United States Citizenship and Immigration Services, Questions for the Record from Senator Alex Padilla, at 1-3 (May 21, 2025), https://www.judiciary.senate.gov/imo/media/doc/2025-05-21_qfrresponses_edlow.pdf Mr. Edlow repeatedly committed to briefing the Senator on these issues. *Id*. That briefing has still not occurred.

[10] *See, e.g.*, Jonathan Shorman, *Trump wants states to feed voter info into powerful citizenship data program*, Stateline (Aug. 15, 2025), https://stateline.org/2025/08/15/trump-wants-states-to-feed-voter-info-into-powerful-citizenship-data-program/

[11] Kaylie Martinez-Ochoa, Eileen O'Connor, and Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, THE BRENNAN CTR. FOR JUST. (last updated Oct. 7, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information

[12] *See, e.g.*, Letter to Minnesota Secretary of State Simon from Maureen Riordan, Acting Chief, Voting Section, Civil Rights Division (June 25, 2025), https://www.democracydocket.com/wp-content/uploads/2025/07/State-of-Minnesota.pdf

9

social security number."[13] Further, "all fields" may also include whether a registrant has previously voted in specific elections, including political party primaries, despite the Privacy Act's prohibition on any federal agency maintaining "record[s] describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual[.]" 5 U.S.C. § 552a(e)(7).

As of September 25, 2025, the Department of Justice has also brought suit against eight states in an effort to obtain their statewide voter registration lists — California, Maine, Michigan, Minnesota, New York, New Hampshire, Oregon, and Pennsylvania — and voters in two other states (Nebraska and South Carolina) have sued to prevent the states from providing DOJ the voter files.[14]

*Amici*, of course, lack sufficient information to fully assess the Administration's plans and goals in this area. However, both DHS and DOJ have publicly confirmed that DOJ is sharing this information with DHS in order to "scrub" voter registration lists, which are "being screened for ineligible voter entries."[15] Thus, what is publicly known strongly suggests that the Trump Administration has overhauled the SAVE program in order to unilaterally expand its own power to impact federal elections — at the potential cost of individual privacy and voting rights.

---

[13] Letter to Illinois State Board of Election Executive Director Bernadette Matthews from Assistant Attorney General Harmeet K. Dhillon, Civil Rights Division, Department of Justice (Aug. 14, 2025), https://capitolnewsillinois.com/wp-content/uploads/2025/08/State-of-Illinois-Final.pdf?inline=1

[14] *See* Martinez-Ochoa et al, *supra* n. 11.

[15] *See, e.g.,* Jonathan Shorman, *DOJ is sharing state voter roll lists with Homeland Security*, Stateline (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/

**II.    The executive branch lacks constitutional or statutory authority to create a national databank for voter surveillance.**

Article I, Section 4, Clause 1, ("the Elections Clause") of the Constitution provides Congress with the authority to regulate "the times, places, and manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. The Elections Clause thereby provides *Congress* with the authority to set requirements in relation to voter registration and allows *Congress* to preempt state procedures. *See generally Foster v. Love,* 522 U.S. 67, 69 (1997) ("The Clause is a default provision; it invests the States with responsibility . . . but only so far as Congress declines to preempt state legislative choices.") The Constitution does not, however, provide the President or the executive branch with authority to dictate how states conduct their elections or voter registration processes. *League of United Latin Am. v. Exec. Off. of the President*, 780 F.Supp 3d 135, 159 (D.D.C. 2025) ("The States have initial authority to regulate elections. Congress has supervisory authority over those regulations. The President does not feature at all.")

The NVRA, passed by Congress pursuant to its Elections Clause authority, *see Assoc'n of Comm. Org. for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997), directs states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" due to death or change in the residence of the registrant. 52 U.S.C. § 20507(a)(4). HAVA similarly outlines a system of voter list maintenance to remove ineligible voters,[16] while ensuring that discretion on implementing the requirements of the law is left to the states. 52 U.S.C. § 21085.

---

[16] States are required to maintain accurate voter registration records by undertaking "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and to provide "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. §21083(a)(4).

11

While the NVRA provides DOJ with authority to file civil lawsuits to enforce the provisions of the NVRA, nothing in the NVRA nor HAVA provide a role for the DOJ to itself participate in the maintenance of state voter registration lists or to direct states in taking action related to list maintenance outside of the confines provided in the NVRA and HAVA. Indeed, the text of the NVRA statute demonstrates that Congress intended to keep narrow even a *state's* ability to systematically remove voters from the voter rolls, ensuring any program be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," and that, with limited articulated exceptions, any such removals do not occur within 90 days of a federal election. 52 U.S.C. §§ 20507(b)(2), 20507(c)(2)(A); *see also Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1343-46 (11th Cir. 2014) (determining that a state-run systematic program to remove alleged non-citizens from the rolls, conducted during the 90 day "quiet period" before an election, ran afoul of the NVRA as it did not involve one of the articulated exceptions to the NVRA removals allowed in the 90 days prior to an election); H.R. REP. NO. 103-66, at 20 (1993) (Conf. Rep.).

The two seminal laws passed by Congress which touch on voter registration, the NVRA and HAVA, provide direction to the *states* about how and when to conduct list maintenance, and, importantly, include key safeguards to protect individual voter rights in the face of state systematic removals from the rolls. These laws do not contemplate the executive's intervention in that list maintenance process by gathering voter data in a way that is itself violative of privacy laws, and then funneling that data into a federal system for purposes unknown.

## CONCLUSION

For the reasons set forth above, the court should grant the Plaintiffs' motion for a stay and preliminary injunction, thereby preventing DHS from collecting and deploying data, including voter registration information, in violation of federal law.

| | |
|---|---|
| October 10, 2025 | Respectfully submitted,<br><br>*/s/ Rebecca LeGrand*<br>Rebecca LeGrand (D.C. Bar No. 493918)<br>LEGRAND LAW PLLC<br>1100 H Street NW, Suite 1220<br>Washington, DC 20005<br>(202) 587-5725<br>rebecca@legrandpllc.com<br><br>-and-<br><br>Mimi Marziani*<br>Joaquin Gonzalez*<br>Rebecca (Beth) Stevens*<br>MARZIANI, STEVENS & GONZALEZ PLLC<br>500 W. 2nd Street, Suite 1900<br>Austin, TX 78701<br>(210) 343-5604<br>mmarziani@msgpllc.com<br>jgonzalez@msgpllc.com<br>bstevens@msgpllc.com<br><br>*Pro Hac Vice Motions Forthcoming*<br><br>COUNSEL FOR AMICI CURIAE |

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7(o), I hereby certify that this brief conforms to the requirements of Local Civil Rule 5.4, complies with the requirements set forth in Federal Rule of Appellate Procedure 29(a)(4), and does not exceed 25 pages in length.

October 10, 2025                                            */s/ Rebecca LeGrand*
                                                            Rebecca LeGrand