**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF WOMEN VOTERS, *et al.*,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        Defendants.

No. 1:25-cv-03501-SLS

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION OR A STAY UNDER 5 U.S.C. § 705**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

STEPHEN M. PEZZI (D.C. Bar No. 995500)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

I.     Creation of the SAVE System ................................................................. 3

II.    The use of SAVE for Voter Verification ................................................. 5

III.   Improvements and Modernization of SAVE ........................................... 6

IV.   This Litigation ......................................................................................... 8

LEGAL STANDARD ......................................................................................... 10

ARGUMENT ...................................................................................................... 10

I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ...... 10

    A.    Plaintiffs lack Article III standing ............................................... 10

         1.     Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing. ................................................ 11

         2.     Plaintiffs' alleged voting-related injuries are impermissibly speculative, and are neither caused by the federal government nor redressable in this suit. ................................................................. 18

         3.     Plaintiffs' alleged procedural and informational injuries cannot independently support Article III standing. ................................................ 22

    B.    Plaintiffs cannot bring APA claims seeking injunctive relief predicated on Privacy Act violations. ................................................................. 25

    C.    All of Plaintiffs' claims would fail on the merits. ............................... 29

         1.     Plaintiffs' Privacy Act claims lack merit. ................................................ 29

         2.     Plaintiffs' mandamus and unreasonable delay claims lack merit. ........... 30

         3.     Plaintiffs' ultra vires claim lacks merit. ................................................... 31

         4.     Plaintiffs' separation-of-powers claim lacks merit. ................................ 32

II.    PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO SHOW IRREPARABLE HARM. ..................................................................... 33

    A.    Plaintiffs cannot demonstrate any actual or imminent irreparable harm. ........... 33

    B.    Plaintiffs' delay in filing suit undermines any showing of irreparable harm. ................................................................. 36

III.   THE REMAINING EQUITABLE FACTORS WEIGH AGAINST PRELIMINARY RELIEF .................................................................... 38

IV.   PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD. ...................... 40

CONCLUSION ................................................................................................... 41

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*AFL-CIO v. Dep't of Lab.*,
   778 F. Supp. 3d 56 (D.D.C. 2025) ................................................................. 16, 17

*All. for Retired Americans v. Bessent*,
   770 F. Supp. 3d 79 (D.D.C. 2025) ............................................................ 3, 33, 34

*Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. SSA*,
   No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025), *stay granted*,
   145 S. Ct. 1626 (2025) ................................................................................... 16

*Am. Fed'n of Tchrs. v. Bessent*,
   152 F.4th 162 (4th Cir. 2025) ................................................................... 16, 28

*Am. First Legal Found. v. Greer*,
   --- F.4th ---, 2025 WL 2810813 (D.C. Cir. Oct. 3, 2025) .............................. 23

*Am. Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) .................................................................. 30, 31

*Archdiocese of Wash. v. WMATA*,
   897 F.3d 314 (D.C. Cir. 2018) ......................................................................... 10

*Benisek v. Lamone*,
   585 U.S. 155 (2018) ........................................................................................ 36

*Berardi v. U.S. Dep't of the Air Force*,
   No. 05-2269 (JR), 2006 WL 8448631 (D.D.C. Sep. 29, 2006) ...................... 28

*Bierly v. Dep't of Def.*,
   No. 23-2386 (RCL), 2024 WL 4227154 (D.D.C. Sep. 18, 2024) ................... 28

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ........................................................................................ 25

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ........................................................................................ 25

*Cabrera v. Dep't of Labor*,
   --- F. Supp. 3d ----, 2025 WL 2092026 (D.D.C. July 25, 2025) .................... 10

*Cal. Ass'n of Priv. PostSecondary Sch. v. DeVos*,
   344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................... 33

*Cell Assocs., Inc. v. NIH*,
   579 F.2d 1155 (9th Cir. 1978) .................................................................. 27, 28

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ........................................................... 31

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................... 33

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ........................................................... 12

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................... *passim*

*Competitive Enter. Inst. v. Mann*,
    150 A.3d 1213 (D.C. 2016), *as amended* (Dec. 13, 2018) ........................................................... 13

*Ctr. for L. & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) ........................................................... 23

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................... 32

*DCH Reg'l Med. Ctr. v. Azar*,
    925 F.3d 503 (D.C Cir. 2019) ........................................................... 31

*Dew v. United States*,
    192 F.3d 366 (2d Cir. 1999) ........................................................... 26

*Dickson v. Direct Energy, LP*,
    69 F.4th 338 (6th Cir. 2023) ........................................................... 15

*District of Columbia v. USDA*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 10

*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1988) ........................................................... 27

*DOJ v. Fed. Lab. Rels. Auth.*,
    981 F.2d 1339 (D.C. Cir. 1993) ........................................................... 31

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
    396 F.3d 1265 (D.C. Cir. 2005) ........................................................... 25

*EPIC v. Dep't of Com.*,
    928 F.3d 95 (D.C. Cir. 2019) ........................................................... 12, 23, 24

*EPIC v. OPM*,
    2025 WL 580596 (E.D. Va. Feb. 21, 2025) ........................................................... 12, 33, 34

*EPIC v. PACEI,*
    878 F.3d 371 (D.C. Cir. 2017) .................................................................................... 23

*FAA v. Cooper,*
    566 U.S. 284 (2012) ........................................................................................... 26, 27

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) .......................................................................... 10, 11, 19, 25

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ............................................................................... 31

*Feller v. Brock,*
    802 F.2d 722 (4th Cir. 1986) ................................................................................ 39

*Fund for Animals v. Frizzell,*
    530 F.2d 982 (D.C. Cir. 1975) .............................................................................. 37

*Gadelhak v. AT&T Servs., Inc.,*
    950 F.3d 458 (7th Cir. 2020) ............................................................................ 14,15

*Garcia v. Vilsack,*
    563 F.3d 519 (D.C. Cir. 2009) .............................................................................. 25

*Garey v. James S. Farrin, P.C.,*
    35 F.4th 917 (4th Cir. 2022) ................................................................................ 15

*Glob. Health Council v. Trump,*
    --- F.4th ---, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ............................. 32, 33

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) .............................................................................................. 20

*Haleem v. Dep't of Def.,*
    No. 23-1471 (JEB), 2024 WL 230289 (D.D.C. Jan. 22, 2024) ............................. 28

*Harrison v. Fed. Bureau of Prisons,*
    248 F. Supp. 3d 172 (D.D.C. 2017) ...................................................................... 28

*Hinck v. United States,*
    550 U.S. 501 (2007) .............................................................................................. 28

*Immigrant Defs. L. Ctr. v. Noem,*
    145 F.4th 972 (9th Cir. 2025) ............................................................................... 40

*Indiana v. Haaland,*
    2024 WL 5213401 (D.D.C. Dec. 24, 2024) .......................................................... 37

*Iowaska Church of Healing v. Werfel*,
    105 F.4th 402 (D.C. Cir. 2024) ................................................................ 14

*Jeffries v. Volume Servs. Am. Inc.*,
    928 F.3d 1059 (D.C. Cir. 2019) ........................................................ 16, 17

*Jones v. HUD*,
    2012 WL 1940845 (E.D.N.Y. May 29, 2012) ........................................ 26

*Krakauer v. Dish Network, LLC*,
    925 F.3d 643 (4th Cir. 2019) ............................................................. 14,15

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ......................................................... 41

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .................................................................. 34

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 10, 18

*Lupia v. Medicredit, Inc.*,
    8 F.4th 1184 (10th Cir. 2021) ................................................................. 15

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................ 11

*Muransky v. Godiva Chocolatier, Inc.*,
    922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*,
    939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020) .......... 17

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020) ................................................................ 17

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .......................................................................... 29, 21

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ...................................................... 37, 39

*Nat'l Treasury Emps. Union v. Trump*,
    No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) .................... 41

*NetworkIP, LLC v. FCC*,
    548 F.3d 116 (D.C. Cir. 2008) ................................................................ 14

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) ........................................................ 37

*Nieves v. Bartlett*,
   587 U.S. 391 (2019)..................................................................................... 21, 36

*Nken v. Holder*,
   556 U.S. 418 (2009)............................................................................................ 38

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004).............................................................................................. 30

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025)...................................................................................... 31, 32

*Nyunt v. Chairman, Broad. Bd. Of Governors*,
   589 F.3d 445 (D.C. Cir. 2009)........................................................................... 31

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
   48 F. Supp. 3d 87 (D.D.C. 2014)....................................................................... 37

*Parks v. IRS*,
   618 F.2d 677 (10th Cir. 1980) .......................................................................... 28

*Phyllis Schlafly Revocable Tr. v. Cori*,
   924 F.3d 1004 (8th Cir. 2019) .......................................................................... 37

*Poss v. Kern*,
   No. 23-cv-2199 (DLF), 2024 WL 4286088 (D.D.C. Sept. 25, 2024)............... 27, 28

*Progressive Cas. Ins. Co. v. FDIC*,
   2014 WL 12787793 (D.D.C. Jan. 9, 2014)....................................................... 40

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
   872 F.2d 75 (4th Cir. 1989) .............................................................................. 37

*Rimmer v. Holder*,
   700 F.3d 246 (6th Cir. 2012) ............................................................................ 26

*S. Educ. Found. v. Dep't of Educ.*,
   784 F. Supp. 3d 50 (D.D.C. 2025)..................................................................... 10

*Shaffer v. Globe Prot., Inc.*,
   721 F.2d 1121 (7th Cir. 1983) .......................................................................... 38

*Six v. IQ Data Int'l, Inc.*,
   129 F.4th 630 (9th Cir. 2025), *cert. denied*,
   ---S. Ct.---, 2025 WL 2823837 (U.S. Oct. 6, 2025) (mem.) ................................ 15

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)...................................................................................... 13, 17

*SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.,*
 605 U.S. ---, 145 S. Ct. 1626 (2025) (mem.) ........................................ 3, 13, 16, 39

*Steel Co. v. Citizens for a Better Env't,*
 523 U.S. 83 (1998) .............................................................................................. 12

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009) ............................................................................................ 23

*Sussman v. U.S. Marshal Serv.,*
 494 F.3d 1106 (D.C. Cir. 2007) ......................................................................... 27

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ..................................................................................... *passim*

*Tripp v. DOD,*
 193 F. Supp. 2d 229 (D.D.C. 2002) ................................................................... 28

*Trump v. Boyle,*
 606 U.S. ---, 145 S. Ct. 2653 (2025) ............................................................... 3, 39

*Trump v. CASA, Inc.,*
 606 U.S. 831 (2025) ............................................................................................ 40

*United States v. Texas,*
 599 U.S. 670 (2023) ............................................................................................ 25

*Univ. of Cal. Student Ass'n v. Carter,*
 766 F. Supp. 3d 114 (D.D.C. 2025) ............................................................ 3, 31, 32, 34

*UtahAmerican Energy, Inc. v. Dep't of Lab.,*
 685 F.3d 1118 (D.C. Cir. 2012) ......................................................................... 39

*VanDerStok v. Garland,*
 633 F. Supp. 3d 847 (N.D. Tex. 2022) .............................................................. 40

*Weight Watchers Int'l v. Luigino's,*
 423 F.3d 137 (2d Cir. 2005) ............................................................................... 37

*Westcott v. McHugh,*
 39 F. Supp. 3d 21 (D.D.C. 2014) ..................................................................... 3, 27

*Whitmore v. Arkansas,*
 495 U.S. 149 (1990) ............................................................................................ 10

*Williams v. Dep't of Veterans Affs.,*
 104 F.3d 670 (4th Cir. 1997) ............................................................................. 24

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................ 10, 38

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 33

*Wolf v. Regardie*,
   553 A.2d 1213 (D.C. 1989) ............................................................................... 14, 15

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) .............................................................................. 37

*Young v. DOJ*,
   882 F.2d 633 (2d Cir. 1989) ................................................................................... 17

**FEDERAL STATUTES**

5 U.S.C. § 552a ............................................................................................. 26, 27, 34

5 U.S.C. § 552a (note) ............................................................................................. 29

5 U.S.C. § 704 ......................................................................................................... 25

5 U.S.C. § 705 ............................................................................................. 9, 10, 40, 41

5 U.S.C. § 706 .................................................................................................... 30, 40

8 U.S.C. § 1373 ................................................................................................. *passim*

8 U.S.C. § 1644 ................................................................................................ 1, 5, 6

42 U.S.C. § 405 ......................................................................................................... 5

52 U.S.C. § 20501 ..................................................................................................... 5

52 U.S.C. § 20507 ....................................................................................... 2, 21, 35, 38

52 U.S.C. § 21083 ................................................................................................ 5, 21

Immigration Reform and Control Act of 1986,
   Pub. L. No. 99-603, 100 Stat. 3359 ......................................................................... 3

Computer Matching and Privacy Protection Act of 1988,
   Pub. L. No. 100-503, 102 Stat. 2507 ................................................................... 29, 30

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
   Pub. L. No. 104-193, 110 Stat. 2105 ........................................................................ 4

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
   Pub. L. No. 104-208, 110 Stat. 3009 ............................................................ 4

**STATE STATUTES**

Va. Code Ann. § 24.2-404 ...................................................................... 35

**RULES**

Fed. R. Civ. P. 12 ....................................................................... 19, 11, 41

Fed. R. Civ. P. 65 ........................................................................... 41

Local Rule 5.1 .............................................................................. 14

**EXECUTIVE ORDERS**

*Establishing and Implementing the President's "Department of Government Efficiency"*,
   Executive Order 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025)...................... 6

*Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*,
   Executive Order 14,243, 90 Fed. Reg. 13,681 (Mar. 20, 2025) ................. 6

*Preserving and Protecting the Integrity of American Elections*,
   Executive Order 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025) ................. 7

**OTHER AUTHORITIES**

*Letter Agreement Providing for Information-Sharing Between DHS, USCIS, and SSA re:
   Citizenship* (May 15, 2025),
   https://www.ssa.gov/foia/resources/proactivedisclosure/2025/May%2015,%202025%
   20SSA-DHS-USCIS%20Agreement_Redacted.pdf............................................ 7, 8

*Memorandum of Agreement Between DHS, USCIS and Indiana Sec. of State re: Participation
   in SAVE for Voter Registration and Voter List Maintenance Purposes* (July 8, 2025),
   https://perma.cc/A6LC-9CLQ ...................................................................... 8

Restatement (Second) of Torts § 652B (A.L.I. 1977)........................................ 14, 16

*SSA*, Programs Operations Manual System, RM 10210.500, *General Information on
   Evidence of U.S. Citizenship for a Social Security Number Card*,
   https://secure.ssa.gov/poms.nsf/lnx/0110210500 ...................................... 22

USCIS, *About SAVE*,
   https://perma.cc/5888-TH46 ....................................................................... 1, 4

USCIS, *About SAVE: History*,
   https://perma.cc/MG5B-MCZH.................................................................... 4

USCIS, *About SAVE: Verification Process*,
   https://perma.cc/49CU-XL6G ................................................................................. 8

USCIS, *Guide to Understanding SAVE Verification Responses* (April 2022),
   https://perma.cc/BW9M-WJUT ......................................................................... 5, 6

USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number
   and by Bulk Upload* (May 22, 2025),
   https://perma.cc/LM3N-RB76 ........................................................................... 6, 7

USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for
   Entitlements Database* (Apr. 22, 2025),
   https://perma.cc/Y8A5-YX3M ............................................................................... 7

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Aug. 27, 2025),
   https://perma.cc/PP4H-T7CK .............................................................................. 22

**INTRODUCTION**

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress placed an affirmative "obligation" on the Department of Homeland Security (DHS) to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). To fulfill this statutory obligation, DHS has long used the SAVE system, which "is an online service administered by U.S. Citizenship and Immigration Services (USCIS) that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." USCIS, *About SAVE*, https://perma.cc/5888-TH46. This is not a new program: it was originally created in 1986, and "[i]n fiscal year 2023, SAVE performed over 21.5 million verifications." *Id.*

In the same section of the same statute—in language that does not appear in any of Plaintiffs' filings—Congress also spoke directly to the issue of "[c]ommunication between" other "government agencies and" DHS. 8 U.S.C. § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). Congress also emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b). Congress provided similar clarity about sharing information with States for this purpose: "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

Despite this clear congressional directive to break down information silos between government agencies, the core premise of this lawsuit is that various older, "other provision[s] of Federal . . . law," implicitly require maintaining strict firewalls between Defendant DHS and other "Federal . . . government entit[ies]," *id.* § 1373(a), (b), such as Defendant Social Security Administration (SSA).  Those firewalls, Plaintiffs argue, primarily stem from the Privacy Act of 1974.  But any conflict between a 1996 statute and a 1974 statute would be resolved in favor of the more recent (and more specific) enactment—especially where, as here, the newer statute applies "[n]otwithstanding any other provision of Federal, State, or local law."  *Id.* § 1373(a), (b).  So the basic foundation of this lawsuit lacks merit: the Privacy Act does not stand in the way of DHS's efforts to modernize the SAVE system, including by allowing search functionality on SSA data.

Regardless, the Court need not resolve any statutory conflict in this suit—both because Plaintiffs are not entitled to any relief under the Privacy Act (whether or not it applies here), and because of several other threshold defects that each independently warrant denial of Plaintiffs' motion for a preliminary injunction, and will ultimately require dismissal of this suit in its entirety.

Most obviously, Plaintiffs are unlikely to succeed on the merits because they lack Article III standing.  The primary target of Plaintiffs' preliminary injunction motion is the fact that USCIS queries of the SAVE system can now search using Social Security numbers held by SSA—a modernization that assists USCIS in more effectively fulfilling its statutory obligations.  But Plaintiffs suffer no concrete and particularized harm from intra-governmental sharing of information that was created by the government, for the government.  And generalized fears of possible future privacy-related harms are not enough to establish standing (much less irreparable harm).  Plaintiffs' concerns that *State* officials may, one day, accidentally and unlawfully use information from SAVE to remove them from voter rolls are not only highly speculative, but also provide no basis for relief against the federal government.  And if Plaintiffs fear that they will be subject to some unlawful "purge" of state voter rolls in elections taking place *now*, that theory ignores a separate provision of federal law, which prohibits any such "purge" within 90 days of the election.  52 U.S.C. § 20507(c)(2)(A).  It is thus telling that Plaintiffs do not identify a single voter, in any State,

who has suffered any of the voting-related harms about which Plaintiffs complain—even after Plaintiffs' long delay in filing suit, which is another independent basis for denial of their motion.

Plaintiffs are also unlikely to succeed on the merits for several other threshold reasons. All of Plaintiffs' Administrative Procedure Act (APA) claims are based on alleged violations of the Privacy Act, but "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014). And the same problems that doom Plaintiffs' theories of standing are even more obviously fatal to their claims of irreparable harm. In short, "courts in this District have consistently 'declined to find irreparable injury' from the disclosure of private information 'where the challenged disclosure is not public,' but instead is to a small number of 'individuals obligated to keep [the information] confidential.'" *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 108 (D.D.C. 2025) (quoting *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025)). Such is the case here.

It is thus unsurprising that the Supreme Court already ruled in favor of the government earlier this year, in granting an application to stay a preliminary injunction in an analogous Privacy Act challenge to intra-governmental data sharing. *See SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 605 U.S. ---, 145 S. Ct. 1626 (2025) (mem.). Although the Supreme Court's order in that case is "not conclusive as to the merits," it still "inform[s] how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025). That is all but fatal to Plaintiffs' claims here—especially at the preliminary injunction stage.

For these reasons, Plaintiffs' motion for a preliminary injunction should be denied.

## **BACKGROUND**

### I.    **Creation of the SAVE System**

The Systematic Alien Verification for Entitlements (SAVE) system was created by Congress in 1986, as part of the Immigration Reform and Control Act of 1986. *See* Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. 3359, 3384-86. Today, SAVE "is an online service administered by" USCIS "that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." *About SAVE*, *see supra* at 1. Over "1,200

agencies nationwide use SAVE to support their benefit eligibility and licensing determinations," and "[i]n fiscal year 2023, SAVE performed over 21.5 million verifications." *Id.* The purpose of SAVE is to carry out congressional intent to "[h]elp[] ensure that only applicants who are eligible for benefits and licenses receive them." *Id.* In doing so, SAVE "[i]ncorporates privacy principles and security measures into user agencies' processes and procedures." *Id.* Ultimately, however, SAVE does not "[d]etermine applicant eligibility for a specific benefit or license." *Id.* "That determination is made by the benefit issuing or licensing agency," *id.*—often, a State or local government agency.

In 1996, SAVE took on greater importance, because of two new congressional enactments. First, in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, Congress "restructured the welfare system in the United States and restricted immigrant eligibility for public benefits," thus "expanding the need for benefit-granting agencies to verify immigration status." USCIS, *About SAVE: History*, https://perma.cc/MG5B-MCZH. Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009, for the first time, Congress placed an affirmative legal "obligation" on what was then the INS (now, DHS) to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

In doing so, Congress also spoke to the issue of "[c]ommunication between" other "government agencies and" DHS. *Id.* § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). Congress also emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in

any way restrict, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchang-

ing . . . with any other Federal, State, or local government entity" any "information regarding the

immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b).

## II.    The use of SAVE for Voter Verification

Separately, Congress placed an affirmative statutory obligation on the States: to "ensure

that voter registration records in the State are accurate and are updated regularly." 52 U.S.C.

§ 21083(a)(4); *see also* § 20501(b)(4) ("ensure that accurate and current voter registration rolls are

maintained"). In doing so, Congress also provided that States must establish "[s]afeguards to en-

sure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

§ 21083(a)(4)(B). Congress also emphasized that the same sort of information-sharing that it was

now authorizing within the federal government also applied to the States: "[n]otwithstanding any

other provision of Federal, State, or local law, no State or local government entity may be prohib-

ited, or in any way restricted, from sending to or receiving from [DHS] information regarding the

immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644.[1]

Since the mid-2000s, in carrying out these statutory obligations, States have entered into

agreements with USCIS to use the SAVE system to confirm the citizenship or immigration status

of voters within their jurisdiction. For many years, however, SAVE suffered from some significant

information-technology limitations when used for this purpose. Most significantly, until recently,

SAVE could not verify an application's immigration status without a DHS-specific immigration

identifier, such as an "A-Number," which most voters do not have. *See* USCIS, *Guide to Under-*

*standing SAVE Verification Responses* (April 2022), https://perma.cc/BW9M-WJUT. SAVE

could not run searches based on other federal government documentation, such as a Social Security

number or a passport number. *See id.* SAVE could not verify any information at all of those

individuals—including many U.S. citizens, born in the United States—who had never had any

---

[1] Separately, under the Help America Vote Act of 2002, SSA has long been required to
provide validation responses directly to States for voter-verification purposes, including last-four-
digit verifications. *See* 42 U.S.C. § 405(r)(9).

encounter with DHS and thus did not appear in DHS record systems.  *See id.*  And SAVE could only accept one verification request at a time, rather than accepting bulk requests.  *See* USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76.

Dissatisfied with those outdated systems, between October of 2024 and April of 2025, five different States sued the federal government, arguing that DHS and USCIS were violating 8 U.S.C. §§ 1373 and 1644 due to the inability of SAVE to provide prompt and useful responses to many of their verification requests.  *See Florida v. DHS*, No. 24-cv-00509 (N.D. Fla., filed Oct. 16, 2024); *Texas v. Noem*, No. 24-cv-49 (W.D. Tex., filed Oct. 22, 2024); *Ohio v. DHS*, No. 24-cv-283 (S.D. Ohio, filed Oct. 24, 2024); *Bird v. Noem*, No. 24-cv-423 (S.D. Iowa, filed Dec. 3, 2024); *Indiana v. DHS*, No. 25-cv-732 (S.D. Ind., filed April 16, 2025).  All of those suits remain pending as of the date of this filing.

## III.    Improvements and Modernization of SAVE

In his second term, President Trump has made it a priority to modernize and improve outdated government information-technology systems.  On inauguration day, President Trump signed Executive Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 20, 2025).  That Order "establishe[d] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."  *Id.* § 1.  It also directed compliance with "rigorous data protection standards."  *Id.* § 4.

A few months later, President Trump signed Executive Order 14,243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13,681 (Mar. 20, 2025).  That Order found that "[r]emoving unnecessary barriers to Federal employees accessing Government data and promoting inter-agency data sharing are important steps toward eliminating bureaucratic duplication and inefficiency while enhancing the Government's ability to detect overpayments and fraud."  *Id.* § 1.

On March 25, 2025, President Trump signed Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14,005 (Mar. 25, 2025).  The Order notes that, unlike many "modern, developed nations," the United States "largely relies on self-attestation for citizenship" in registering voters.  *Id.* § 1.  The Order acknowledges that federal law already "require[s] States to maintain an accurate and current Statewide list of every legally registered voter in the State," and that DHS "is required to share database information with States upon request so they can fulfill this duty."  *Id.* (citing 8 U.S.C. § 1373(c)).  To that end, the Executive Order provides that the "Commissioner of Social Security shall take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered."  *Id.* § 3(a).  The Order also specified that, "[i]n determining and taking such action, the Commissioner of Social Security shall ensure compliance with applicable privacy and data security laws and regulations."  *Id.*

On April 22, 2025, DHS announced that it had begun "a comprehensive optimization of the Systematic Alien Verification for Entitlements (SAVE) database to ensure a single, reliable source for verifying non-citizen status nationwide."  USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M.  The update "eliminates fees for database searches, breaks down silos for accurate results, streamlines mass status checks, and integrates criminal records, immigration timelines, and addresses."  *Id.*  And on May 22, 2025, DHS announced two specific changes: (1) "[u]sers are now able to create cases using a Social Security number (SSN) as the applicant's enumerator," and (2) "users may now create cases in bulk."  USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76.

The agreement between DHS and SSA that allows searching via Social Security number was memorialized in a written agreement that is publicly available on the SSA website.  *See Letter*

*Agreement Providing for Information-Sharing Between DHS, USCIS, and SSA re: Citizenship* (May 15, 2025), *available at* https://www.ssa.gov/foia/resources/proactivedisclo-sure/2025/May%2015,%202025%20SSA-DHS-USCIS%20Agreement_Redacted.pdf. The agreement discusses data-security procedures, loss reporting, breach notifications, and other ad-ministrative safeguards. *See id.*

Similarly, when States use SAVE for purposes of verifying eligible voters, they likewise are required to enter into a written agreement with USCIS. *See, e.g.*, *Memorandum of Agreement Between DHS, USCIS and Indiana Sec. of State re: Participation in SAVE for Voter Registration and Voter List Maintenance Purposes* (July 8, 2025), https://perma.cc/A6LC-9CLQ. Those agree-ments require procedures for "additional verification" for any "voter that does not verify as a U.S. citizen on initial verification," provision of "notice and hearing or other due process available under State or other applicable law" before "any removal from a voter roll," and acknowledge all parties' obligations to comply with other applicable federal and State laws. *See id.* at 4, 6.

The SAVE website provides detailed (and public) instructions to user agencies about how the system works. Among other things, it specifies that, "[i]f SAVE cannot provide a response after initial verification for a case created using only a Social Security number, SAVE will close the case and instruct the user agency to submit a new case with corrected/updated information or to include an immigration enumerator, if available." USCIS, *About SAVE: Verification Process*, https://perma.cc/49CU-XL6G.

## IV.    This Litigation

Plaintiffs filed this Privacy Act lawsuit on September 30, 2025. Compl., ECF No. 1. Plain-tiffs include the League of Women Voters, three of its affiliates, the Electronic Privacy Information Center, and five pseudonymous individual "J. Doe" Plaintiffs.[2] The complaint names six Defend-ants: DHS, SSA, and the Department of Justice, and their leaders in their official capacities.

---

[2] The individual Plaintiffs, J. Doe 1 through 5, filed a sealed motion to proceed under a pseudonym. ECF No. 14. That motion was granted by Chief Judge Boasberg on October 10, 2025, ECF No. 23, before Defendants' deadline to respond had run, and before Defendants had

Plaintiffs purport to bring six claims: three alleging directly that Defendants have violated the Privacy Act (and thus, are entitled to relief under three different provisions of the APA), *see* Compl. ¶¶ 205-14 (Count I, "Contrary to Law and Required Procedure"), *id.* ¶¶ 216-18 (Count II, "Agency Action Unlawfully Withheld or Unreasonably Delayed"), *id.* ¶¶ 220-21 (Count III, "Arbitrary and Capricious Agency Action"); a mandamus claim, *see id.* ¶¶ 223-28 (seeking a "writ of mandamus compelling Defendants to comply with their non-discretionary duties under the Privacy Act"); an ultra vires claim, *see id.* ¶¶ 230-34 (alleging that Defendants "have defied" the Privacy Act); and a separation-of-powers claim, *see id.* ¶¶ 236-40 (arguing that the Privacy Act does not "give[] Defendants authority to establish an interagency national data bank"). Although the procedural trappings of each claim vary, all of them ultimately depend on the theory that Defendants have violated the Privacy Act. Plaintiffs' complaint is largely focused on the SAVE system but also raises other miscellaneous concerns with federal government data-security practices. *See, e.g.*, *id.* ¶ 17 (discussing what Plaintiffs call the "USCIS Data Lake").

On October 7, 2025, Plaintiffs filed a motion for a preliminary injunction or for a stay under 5 U.S.C. § 705. ECF No. 16 ("Pls.' Mot."). That motion is narrower than Plaintiffs' complaint, in that it (in Plaintiffs' words) seeks relief only with respect to what Plaintiffs call the "overhaul" of the SAVE system—that is, allowing search functionality on Social Security numbers, and allowing bulk verification requests (instead of one-by-one verification requests). Doe Plaintiffs 1, 4, and 5 also filed a motion for certification of a preliminary relief subclass. ECF No. 17.

Defendants' deadline to answer or otherwise respond to the complaint is currently stayed by Standing Order No. 25-55 (JEB), due to the lapse in appropriations. Accordingly, although many of the arguments in this brief would justify dismissal of this suit in its entirety, *see* Fed. R. Civ. P. 12(b)(1), (h)(3), Defendants are not separately moving to dismiss at this time.

---

filed any response. The order also provided that "Defendants may seek reconsideration by the United States District Judge to whom this case is randomly assigned." *Id.* But for the lapse in appropriations and the requirements of the Anti-Deficiency Act, Defendants would have filed an opposition to Plaintiffs' motion, and thus reserve their right to seek further relief on that issue once appropriations are restored.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 321 (D.C. Cir. 2018). On each factor, plaintiff "bears the burden of producing credible evidence sufficient to demonstrate its entitlement to injunctive relief." *S. Educ. Found. v. Dep't of Educ.*, 784 F. Supp. 3d 50, 70 (D.D.C. 2025). "When a federal agency is the defendant, the last two factors merge." *Cabrera v. Dep't of Labor*, --- F. Supp. 3d ----, 2025 WL 2092026, at *2 (D.D.C. July 25, 2025). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Id.* (quoting *District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020)).

## ARGUMENT

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

A.    **Plaintiffs lack Article III standing.**

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381

(2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

At the preliminary injunction stage, a lack of Article III standing is grounds for (at least) denial of the motion, and can also justify outright dismissal of the suit. *See Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it." (cleaned up)); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

1. <u>Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing.</u>

**a.** Plaintiffs' core theory of standing in this case relies on "their privacy interests in preventing the misuse and disclosure of their sensitive personal information and its exposure to security breaches." Pls.' Mot. at 21. Essentially, Plaintiffs are worried that, due to increased information-sharing between DHS and SSA, they face some marginally increased risk that their data may, one day, be hacked or otherwise misused by some as-yet-unidentified bad actors. This causes them stress. In Plaintiffs' words:

- "I am disturbed, uneasy, and frustrated that the government has violated my trust." Decl. of Doe 1 ¶ 22, ECF No. 16-2; *see also* Decl. of Doe 4 ¶ 20, ECF No. 16-3.

- "I am also worried that my data might be stored or transferred in an insecure manner, exposing me to a data breach and identity theft and fraud." Decl. of Doe 1 ¶ 23; *see also* Decl. of Doe 4 ¶ 21; Decl. of Doe 5 ¶ 20, ECF No. 16-4.

- "I hate the idea that so many people in the government have access to my private data without my consent. I am experiencing a lot of distress over the possibility of this data being accessed, shared, or used in some way that would put me at risk of harm." Decl. of Doe 1 ¶ 27; *see also* Decl. of Doe 4 ¶ 24.

- "I feel anxious and frustrated, and do not want to be in a country that invades my privacy in this way." Decl. of Doe 5 ¶ 19.

These sorts of speculative and emotional fears are not enough to support standing.  In general, "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  Instead, "it is the *reality* of the threat of [future] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).  The "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant."  *Id.*

The Supreme Court rejected a very similar (but stronger) theory of standing in *Clapper*.  There, the Second Circuit had "allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not fanciful, paranoid, or otherwise unreasonable."  *Clapper*, 568 U.S. at 416.  The Supreme Court reversed, explaining that the Second Circuit's approach "improperly waters down the fundamental requirements of Article III."  *Id.*  Those plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id.*

*Clapper* is fatal to Plaintiffs' standing here.  After all, unlike in *Clapper*, these Plaintiffs have not even demonstrated that they have "incurred certain costs as a reasonable reaction to a risk of harm," *id.*—they are mostly just *worried* about those risks.  That is not enough, as the D.C. Circuit and other courts have recognized in analogous litigation brought by some of the same parties.  *See, e.g.*, *EPIC v. Dep't of Com.*, 928 F.3d 95, 102 (D.C. Cir. 2019) ("[T]o the extent that EPIC relies on the potential disclosure of their citizenship status to third parties as the source of injury, we reject the theory as a 'speculative chain of possibilities' that cannot establish an injury.") (quoting *Clapper*, 568 U.S. at 414); *EPIC v. OPM*, No. 2025 WL 580596, at *5 (E.D. Va. Feb. 21, 2025) ("Plaintiffs' fear of harm from future exfiltration of their data by bad actors 'relies on a highly attenuated chain of possibilities, [and] does not satisfy the requirement that threatened injury must be certainly impending.'") (quoting *Clapper*, 568 U.S. at 410).

**b.** *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), is also fatal to Plaintiffs' theories of privacy-related injury. There, the Supreme Court rejected a standing theory based on "the risk of future harm" due to the mere existence of inaccurate credit-reporting information sitting in a computer database. *Id.* at 437. Because "the inaccurate OFAC alerts in their internal TransUnion files were" never "provided to third parties or caused a denial of credit," they did not cause any concrete Article III injury—only a speculative, increased risk of future harm, which did not suffice. *Id.* And although the Supreme Court formally reserved the question of whether emotional or psychological harm" might support standing under different facts "by analogy to the tort of intentional inflection of emotional distress," *id.* at 436 n.7, Plaintiffs do not rely on any such analogy here. Nor could they—there is no allegation of any conduct by any of the Defendants that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016), *as amended* (Dec. 13, 2018).

To be sure, *TransUnion* also recognizes that "[v]arious intangible harms can . . . be concrete" for standing purposes, at least in some circumstances. 594 U.S. at 425. But to qualify, such an injury must, at a minimum, bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.*; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). As examples, in *TransUnion*, the Supreme Court mentioned "reputational harms, disclosure of private information, and intrusion upon seclusion." 594 U.S. at 425.

Recently, plaintiffs in other analogous litigation have seized upon that language in *TransUnion*, relying heavily on analogies to the torts of intrusion upon seclusion and breach of confidence—for the most part, without success. *See SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025) (granting stay of preliminary injunction that had relied on an intrusion-upon-seclusion analogy). Plaintiffs here, however, say nothing about that subject in the body

- 13 -

of their preliminary injunction brief, or in their complaint. Plaintiffs do make one passing reference to those torts—though only in a single case-citation parenthetical, and only in a footnote.[3] *See* Pls.' Mot. at 21-22 n.56. But this Court "need not" and should not "consider cursory arguments made only in a footnote." *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024). And "arguments *in favor of* subject matter jurisdiction can be waived by inattention or deliberate choice," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008)—especially where, as here, Plaintiffs bear the burden. So there is no basis to rescue Plaintiffs' theory of standing via a strained analogy to a common-law tort that Plaintiffs have not even advanced.

    **c.** In the alternative, even if the Court were to excuse Plaintiffs' forfeiture, the harms alleged here bear no resemblance to an intrusion-upon-seclusion or a breach-of-confidence claim.

    The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (A.L.I. 1977); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989). The tort has three elements: "(1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." *Id.* (cleaned up). The D.C. Court of Appeals has explained that the "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, and so on. *See id.* at 1217-18; *see also Krakauer v. Dish Network, LLC*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls"). Or, as then-Judge Barrett termed it in a case cited in *TransUnion* itself, "irritating intrusions." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *see also TransUnion*, 594 U.S. at 425.

---

[3] This is not the only important part of Plaintiffs' brief that appears only in a footnote. Notwithstanding Local Rule 5.1(d), Plaintiffs' brief contains 84 footnotes.

Plaintiffs' alleged injuries primarily stem from USCIS's ability to run searches based on Social Security numbers—numbers that were created by and for the use of the federal government—in a federal government database. But sharing of government-created data within the government bears no resemblance to the "irritating" intrusions envisioned by the tort of intrusion upon seclusion, even accepting the (incorrect) premise that such sharing is forbidden by statute.

Even if Plaintiffs could show that allowing USCIS to run searches involving their Social Security numbers could be analogized to an "invasion or interference" that has traditionally been actionable at common law, the access is not analogous to the types of conduct that have been deemed "highly offensive to an ordinary, reasonable person" for purposes of the tort. *Wolf*, 553 A.2d at 1217. Here, the federal government is simply using federal-government information to carry out its legal responsibilities under federal law. *See* 8 U.S.C. § 1373. Indeed, much like in *TransUnion* itself, Plaintiffs here would generally have no reason even to *know* that a USCIS employee has queried their information for purposes of responding to a SAVE request. *See* 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where no evidence showed they "even *knew*" their files contained inaccurate information).[4]

The Fourth Circuit, in the preliminary injunction context, recently affirmed that allegedly unauthorized access by government employees to individual data is likely not closely related to

---

[4] For additional examples of injury contemplated by the tort of intrusion upon seclusion, all of which stand in stark contrast with Plaintiffs' alleged injury here, *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained plaintiffs' information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak*, 950 F.3d at 462 (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345-46 (6th Cir. 2023) (concluding that "invasion-of-privacy-like harms flow[] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025) (explaining that other courts have "found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion"), *cert. denied*, ---S. Ct.---, 2025 WL 2823837 (U.S. Oct. 6, 2025) (mem.).

the tort of intrusion upon seclusion. *See Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025). As the Fourth Circuit explained in that case, "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Id.* at 172 (citing Restatement (Second) of Torts § 652B cmt. a). On the other hand, the alleged "harm that might come from [a] generalized grant of database access to an additional handful of government employees . . . seems different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi" traditionally recognized by the tort. *Id.*; *see also Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. SSA*, No. 25-1411, 2025 WL 1249608, at *7 (4th Cir. Apr. 30, 2025) (en banc) (Richardson, J., dissenting) ("anxiety and distress from the fact DOGE-affiliated employees can access SSA databases" "does not establish the sort of 'unease' that has been 'traditionally recognized as providing a basis for a lawsuit' under the tort of intrusion upon seclusion") (quoting *TransUnion*, 594 U.S. at 424); *stay granted* 145 S. Ct. 1626 (2025).[5]

Any reliance on the tort of "breach of confidence" would also be misplaced. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (citation omitted). To start, it is doubtful whether this tort qualifies as a traditional cause of action that satisfies *TransUnion*. *See* 594 U.S. at 427 (starting that "lawsuit may not proceed because that plaintiff has not suffered any . . . harm traditionally recognized as providing a basis for a lawsuit in American courts"). While the D.C. Circuit in *Jeffries* invoked the tort to find standing, that decision predates *TransUnion*; does not address whether the tort has a sufficient

---

[5] Plaintiffs' only citation to the contrary—*AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025)—agreed with, and relied upon, two decisions of the District of Maryland that were later rejected on appeal (once by the Fourth Circuit and once by the Supreme Court). Defendants respectfully disagree with those district-court decisions for the reasons stated in this brief, in the relevant opinions from the Fourth Circuit, *see Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025); *AFL-CIO v. SSA*, 2025 WL 1249608, at *7 (en banc) (Richardson, J., dissenting), and consistent with the Supreme Court's subsequent decision to grant the government's application for a stay, *SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025).

historical origin; and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See Jeffries*, 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

In that en banc decision, decided after *Jeffries*, the Eleventh Circuit questioned—without deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo*, 578 U.S. at 341). The Eleventh Circuit found that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out in its infancy." *Id.* (cleaned up). The Second Circuit, moreover, has described it as "a relative newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. DOJ*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent and underdeveloped pedigree raises serious doubts about whether this tort could ever serve as a valid analogue under *TransUnion*'s require-ment of a historically grounded cause of action. 594 U.S. at 414.

But even assuming that the breach-of-confidence tort could sometimes be a permissible analogue for standing purposes under *TransUnion*, the facts here bear no resemblance to the cir-cumstances where it applies—*e.g.*, the physician-patient or bank-customer relationships. *Young*, 882 F.2d at 640. In *Jeffries*, the D.C. Circuit analogized it to a situation involving unauthorized disclosure of credit card information, which is close to the bank-customer framework. 928 F.3d at 1064. This case, by contrast, involves intra-governmental sharing of data created by and for the use of the federal government. Social Security numbers were not provided by Plaintiffs *to* the government in confidence—just the opposite, they were created by (and for) the federal govern-ment, and provided *to* the Plaintiffs. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *Am. Fed'n of Lab.*, 778 F. Supp. 3d at 73 (quoting *Jeffries*, 928 F.3d at 1064). This case alleges nothing of the sort. So any reliance on an analogy to the tort of breach of confidence would also fail.

2.    <u>Plaintiffs' alleged voting-related injuries are impermissibly speculative, and are neither caused by the federal government nor redressable in this suit.</u>

In their preliminary-injunction motion, Plaintiffs repeatedly assert—often with little explanation—that the "overhaul of the SAVE system inflicts actual and imminent injuries to . . . their fundamental right to vote." Pls.' Mot. at 21. In their complaint, Plaintiffs offer more explanation of this theory: "the Individual Plaintiffs and organizational members in states using the overhauled SAVE system for voter list maintenance and investigatory purposes reasonably fear that the system will cause them to be disenfranchised, face obstacles to voting, or be subjected to unwarranted criminal investigations, imperiling their fundamental right to vote." Compl. ¶ 181.

This theory of standing is baseless for multiple reasons—some factual, some legal. On the facts, Plaintiffs do not identify a single voter who has suffered any of the problems that they claim to fear. And absent baseless speculation that State officials are going to commit widespread violations of the law, there is likewise no reason to think that any such injury to any of the Plaintiffs is likely, let alone imminent or "certainly impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2). As for the law, Plaintiffs cannot bring a Privacy Act suit against federal government agencies based on the theory that *State* election officials might improperly run a *State* election. That mismatch between Plaintiffs' theory of harm and the claims they bring in this suit creates causation and redressability problems that independently warrant dismissal.

**a.** First, the facts. Over their 60-page complaint with 240 numbered paragraphs, their 45-page preliminary-injunction motion, or their 85 pages of attachments and declarations, Plaintiffs do not identify *a single voter* who has faced *any* of the harms that they claim to fear in this suit—much less a Plaintiff, a proposed class representative, or a member of one of the Plaintiff organizations. In short, although the improvements to SAVE that Plaintiffs challenge here were completed in April and May of 2025, Plaintiffs nonetheless have not identified a single voter who, as a result of those changes, was "disenfranchised," has "face[d] obstacles to voting," or has been "subjected to unwarranted criminal investigations, imperiling their fundamental right to vote," Compl. ¶ 181. Instead, Plaintiffs rely entirely on hypotheticals: "*If* states rely on inaccurate SSA

citizenship data to purge voters from rolls, millions of eligible voters *could be* wrongly disenfranchised, or face unwarranted burdens in exercising their right to vote." *Id.* ¶ 140 (emphasis added). That conjecture identifies only a possible future injury, not one that is actual or imminent or "certainly impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2).

Plaintiffs' declarations make it worse. Plaintiff J. Doe 5, for example, swears that (1) he or she was "naturalized as a United States citizen," but (2) "SSA records" nonetheless "(incorrectly) describe" him or her "as a non-citizen." Decl. of Doe 5 ¶¶ 2, 13. Even so, Plaintiff Doe 5 "voted in elections in 2020, 2021, 2022, 2023, 2024, *and 2025* in Virginia," apparently without incident. *Id.* ¶ 6 (emphasis added). That unremarkable story is hard to square with Plaintiffs' confident and pessimistic assumptions of widespread, accidental, unlawful disenfranchisement—after all, according to Plaintiffs, "[i]n Virginia, the risks to naturalized citizen voters are *especially* high." Pls.' Mot. at 37 (emphasis added). If that is so, it is not clear why any of these sophisticated organizational Plaintiffs can't seem to find *anyone* facing *any* of these problems.

To support standing, "the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. Under these circumstances, the inability to identify a single example of any disenfranchised voter—even though all the changes to the SAVE system that Plaintiffs complain about took effect many months ago—significantly undermines the credibility of Plaintiffs' predictions about the likelihood of future harm coming to any of the Plaintiffs in this suit (or their members). In short, Plaintiffs have done little more than concoct a speculative theory of *possible* future injury. And "allegations of *possible* future injury are not sufficient" to support Article III standing. *Clapper*, 568 U.S. at 409.

**b.** Second, on the law, Plaintiffs' voting-related standing theories get even more tenuous—because the critical role played by State officials enforcing State voting laws creates a straightforward causation (*i.e.*, traceability) and redressability problem. "[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). When it comes to their fears of

inappropriate "obstacles to voting," or being "subjected to unwarranted criminal investigations," Compl. ¶ 181, Plaintiffs have sued the wrong government. *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) ("[E]njoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements.").

It bears repeating: this is a Privacy Act lawsuit against federal agencies, based on the theory that improved search functionality in a USCIS database violates the law. But despite some scattered rhetoric that sweeps more broadly, Plaintiffs do not seek any relief (nor make any legal claims) relating to the management of State voter rolls. That is not surprising, as neither SSA nor USCIS are responsible for how State officials manage State voter rolls under State law.

To be sure, if USCIS receives "an inquiry" from a State "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law," then USCIS has an "[o]bligation to respond" "by providing the requested verification or status information." 8 U.S.C. § 1373(c). USCIS has fulfilled that obligation, for decades, using the SAVE system. But that doesn't make SSA or USCIS legally responsible for the possible future second- and third-order effects that may later result from State officials exercising their discretion to enforce State law.

So, for example, if a State official receives a verification response from USCIS, through SAVE, and then uses that information to subject a U.S. citizen "to unwarranted criminal investigations" that "imperil[] their fundamental right to vote," Compl. ¶ 181, that may very well be a legal problem—but it is a problem between that citizen and the relevant State. USCIS is not responsible (and this Court cannot confidently predict) how State officials will carry out their discretion under State law. The Supreme Court has appropriately been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, but Plaintiffs would have this Court do exactly that.

To show standing based on assumptions about independent third parties, at a minimum, "[r]ather than guesswork, the plaintiffs must show that the third-party" State officials "will likely

react in predictable ways to the defendants' conduct." *Murthy*, 603 U.S. at 57-58.  But now that the elections Plaintiffs are concerned about are less than 90 days away, federal law prohibits "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(c)(2)(A).  And States are always required to maintain "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* § 21083(a)(4)(B).  Plaintiffs have not alleged (let alone demonstrated) that any State has violated or will violate any of those laws.  Accordingly, Plaintiffs' cynical assumptions of widespread, unlawful, accidental disenfranchisement of U.S. citizens would hardly be a "predictable" act by any State officials.  Just the opposite—the Court should presume that State officials will *follow* the law, not violate it.  *See Nieves v. Bartlett*, 587 U.S. 391, 400 (2019) (discussing the "presumption of regularity" that attaches to State law-enforcement officials).  Not to mention, as discussed above, thus far, it seems that none of Plaintiffs' doomsday predictions have come to pass—the very sorts of voters they are most concerned about (like Plaintiff Doe 5) are seemingly having no trouble voting in 2025, many months after the changes to SAVE that are challenged in this lawsuit.

Of course, there are many possible explanations for this disconnect between the rhetoric in Plaintiffs' filings and the evidence (or lack thereof) of any real-world problems.  Because it is Plaintiffs' burden to establish standing (rather than Defendants' burden to refute it), neither Defendants nor the Court needs to do any investigation of State law-enforcement practices to get to the bottom of Plaintiffs' concerns about the possible future mistakes that might be made by independent third parties who are not before the Court.  Even so, there are several obvious logical flaws in Plaintiffs' assumptions about standing that are worth pointing out.

First, Plaintiffs seem to assume that they are the only ones who know that SSA "records do not provide definitive information about an individual's citizenship status."  Compl. ¶ 132.  There is no factual basis for that assumption.  In fact, SSA shares publicly many policies about the citizenship and immigration-related data that it does (or does not) collect and maintain.  *See, e.g.*, *SSA*, Programs Operations Manual System, RM 10210.500, *General Information on Evidence of*

*U.S. Citizenship for a Social Security Number Card*, https://se-cure.ssa.gov/poms.nsf/lnx/0110210500.   Presumably, the relevant State officials know just as much (or more) than the Plaintiffs do about the systems they use to manage their own voter rolls.

Second, Plaintiffs likewise seem to assume that, because *SSA* does not have complete records about naturalization, that any SAVE verification involving a search for a Social Security number for a naturalized citizen will necessarily return inaccurate results.  Again, that assumption is baseless.  Setting aside SSA, it is undisputed that *USCIS* has extensive records about which citizens have (or have not) naturalized, or derived citizenship, and so on.  Plaintiffs offer no reason to think that USCIS would ignore its own records before responding to a SAVE verification request.  And in fact, USCIS is appropriately cautious before providing any voter-verification response other than one that confirms that the voter in question is (1) a U.S. citizen, or (2) deceased.  *See* Ex. 1, Decl. of Brian Broderick ¶ 11-14 (discussing when cases are "escalated to manual review," and confirming that "SAVE only returns a response to a user agency based on an SSA record when: (1) the information matches an SSA record indicating U.S. Citizenship or (2) the information matches an SSA record indicating the individual is deceased"); *accord* USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Aug. 27, 2025), https://perma.cc/PP4H-T7CK (discussing procedures to be followed "[i]f the SAVE response is other than U.S. Citizen").

Ultimately though, whether it is for legal, practical, or political reasons, there is zero basis to assume that State officials have any interest in haphazardly and unlawfully removing large numbers of U.S. citizens from their voter rolls, and no credible evidence that any such thing has happened or is going to happen any time soon.  And even if it did, that would at most be a basis for a lawsuit against the relevant State—not the federal government.

> **3.**   Plaintiffs' alleged procedural and informational injuries cannot independently support Article III standing.

Plaintiffs also try to show standing based on the government's alleged violation of "their rights to participate in notice-and-comment proceedings."  Pls.' Mot. at 22; *see also* Compl. ¶ 180

(alleging violations of Plaintiffs' "right to comment" and "right to have those comments considered"). But those allegations add nothing to Plaintiffs' theory of standing. That is because "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, --- F.4th ---, 2025 WL 2810813, at *2 (D.C. Cir. Oct. 3, 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). In other words, even when a plaintiff alleges a violation of some procedural right, the plaintiff still "must show that the violation of a procedural right 'resulted in injury' to some 'concrete, particularized interest." *Id.* (quoting *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)). So, if Plaintiffs cannot show some separate concrete injury, then allegations of procedural violations of the law get them no closer to standing. *See, e.g.*, *EPIC*, 928 F.3d at 102 ("EPIC must allege harm that is distinct from a simple failure to comply with the procedural requirements of § 208."). The ultimate question thus remains the same: whether Plaintiffs can demonstrate "some concrete interest" connected to the alleged violation of law. And for the reasons already explained elsewhere in this brief, they cannot.

At times, Plaintiffs also refer to informational injuries, alleging violations of "their rights to statutorily guaranteed information (via SORNs) about how their personal data is being pooled across the government." Pls.' Mot. at 21-22. This is mostly just another way of repackaging their allegations of procedural harm, so it fails for the same reasons. But, to the extent Plaintiffs try to rely on an independent theory of informational standing, that effort fails, because the relevant provisions of the Privacy Act (or the E-Government Act) do not create any "informational" rights.

The D.C. Circuit has "recognized that a denial of access to information can, in certain circumstances, work an 'injury in fact' for standing purposes." *EPIC v. PACEI*, 878 F.3d 371, 378 (D.C. Cir. 2017). But, "[t]o carry its burden of demonstrating a sufficiently concrete and particularized informational injury, the plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Id.*

Unlike FOIA, the Privacy Act "was not designed to vest a general right to information in the public." *EPIC*, 928 F.3d at 103 (discussing the E-Government Act); *see also, e.g.*, Compl. ¶ 50 ("The Privacy Act's 'raison d'etre' is 'to provide for protection against possible abuses of governmental power to affect an individual's privacy and confidential information.' *Williams v. Dep't of Veterans Affs.*, 104 F.3d 670, 676 (4th Cir. 1997)."). "Rather, the statute was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making." *EPIC*, 928 F.3d at 103. "In this respect," the Privacy Act "is fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself." *Id.* Accordingly, "[b]ecause the lack of information itself is not the harm that Congress sought to prevent through" the Privacy Act, Plaintiffs "must show how the lack of a timely" SORN "caused its members to suffer the kind of harm that Congress did intend to prevent: harm to individual privacy." *Id.* at 103-04. And again, for all the reasons above, Plaintiffs still cannot make that showing here—so Plaintiffs "cannot show an informational injury, just as [they] cannot show a privacy injury." *Id.* at 104.[6]

One further point about informational injury warrants mention. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. And so, even if Plaintiffs could show, for example, that they suffered some cognizable informational injury from the failure to publish a SORN about changes to the SAVE system, the appropriate remedy for that injury would be straightforward: a court order requiring publication of a SORN. *See* Proposed Order, ECF No. 16-10 ("Defendants shall publish systems of records notices in the Federal Register . . . ."). That

---

[6] The only argument in Plaintiffs' preliminary injunction motion about organizational standing relies entirely (in one part of one sentence) on their theory of informational or procedural injuries. *See* Pls.' Mot. at 21-22. And Plaintiffs' arguments about associational standing fail for an inability to identify any individual member with standing, for the other reasons stated in this brief. Accordingly, the Court need not separately consider the doctrines of organizational standing or associational standing to deny Plaintiffs' motion.

theory of standing could never justify any of the other, more ambitious relief that Plaintiffs seek, relating to the general operations of what Plaintiffs describe as the "overhauled SAVE system."

\*        \*        \*

The law of Article III standing "is 'built on a single basic idea—the idea of separation of powers.'"  *All. for Hippocratic Med.*, 602 U.S. at 378 (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)).  Plaintiffs seem to have sincere policy concerns with the way USCIS is carrying out its legal obligations to respond to citizenship verification requests.  That is their right.  But federal "courts do not opine on legal issues in response to citizens who might roam the country in search of governmental wrongdoing." *Id.* at 379.  To enforce that important constitutional principle, Plaintiffs' motion for a preliminary injunction should be denied, because Plaintiffs are unlikely to succeed in demonstrating Article III standing.

**B.    Plaintiffs cannot bring APA claims seeking injunctive relief predicated on Privacy Act violations.**

**1.**  Plaintiffs' APA claims (Counts I, II, and III) fail for the additional, independent reason that the APA does not grant a cause of action where there is "[an]other adequate remedy in a court." 5 U.S.C. § 704.  This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  Accordingly, a plaintiff has adequate relief— and thus cannot rely on the cause of action in 5 U.S.C. § 704—"'where a statute affords an opportunity for *de novo* district-court review' of the agency action." *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)).  Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme.  The mode of review established by the statutory review scheme is presumed exclusive.  This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349

(1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999). It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

**2.** Under these principles, Plaintiffs may not challenge purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute.[7]

The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). The Privacy Act applies only to individuals, not corporate or organizational entities. *Id.* §552a(g)(1)(D) (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). So, at an absolute minimum, the organizational Plaintiffs are straightforwardly ineligible for any relief under the Privacy Act, and their claims should be dismissed on that basis.

Even for the individual Plaintiffs (or members of the Plaintiff organizations), more generally, relief under the Privacy Act is carefully circumscribed. Civil remedies are available—and

---

[7] Counts I and II are APA claims that are explicitly premised on violations of the Privacy Act (and only the Privacy Act), so they are straightforwardly precluded for the reasons stated in this section. Count III at least purports (in part) to be a standalone APA claim, but even that claim simply repackages Plaintiffs' same Privacy Act-related concerns under a different heading. *See, e.g.*, Compl. ¶ 221 (alleging that Defendants "failed to consider whether the data they are pooling is sufficiently reliable to fulfill the new purposes for which it is being used and the attendant risks of error"). So this argument also applies to Count III.

thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), *id.* § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D).

For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful" and if that plaintiff could prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299 (quoting 5 U.S.C. § 552a(g)(4)(A)).

Beyond these monetary damages, the Privacy Act allows for injunctive relief in only two narrow circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). But Plaintiffs here have not sought any such relief. And injunctive relief, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *see also Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Because of the Privacy Act's comprehensive remedial scheme, courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott*, 39 F. Supp. 3d at 33; *see also, e.g.*, *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL

4286088, at *6 (D.D.C. Sept. 25, 2024); *Haleem v. Dep't of Def.*, No. 23-1471 (JEB), 2024 WL 230289, at *13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, No. 23-2386 (RCL), 2024 WL 4227154, at *8-9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, No. 05-2269 (JR), 2006 WL 8448631, at *6 (D.D.C. Sep. 29, 2006); *Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002). That result is consistent with the principle that, "[w]here, as here, [a] 'statute provides for certain types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161-62).  In short, Congress concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages.  That congressional determination fore-closes plaintiffs' APA claims.  *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (cleaned up)).

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed man-ner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1158-59.  Indeed, were injunctive relief freely avail-able for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiffs bring here—"the detailed remedial scheme adopted by Congress would make little sense."  *Id.* at 1160.  It is "unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board."  *Id.*; *see also Am. Fed'n of Tchrs*, 152 F.4th at 175 ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here.").

Accordingly, Plaintiffs' efforts to obtain sweeping injunctive relief—by smuggling otherwise-unavailable Privacy Act claims through the APA—would be an end-run around these common-sense principles and should be rejected.

**C.    All of Plaintiffs' claims would fail on the merits.**

Because all of Plaintiffs' claims fail for non-merits reasons, the Court need not (and should not) reach the merits at all—at the very least, not at the preliminary-injunction stage.  Even so, all of Plaintiffs' claims are unlikely to succeed on the merits.  Defendants here briefly address some (though not all[8]) of the reasons.

**1.    Plaintiffs' Privacy Act claims lack merit.**

As discussed above, this Court should not permit Plaintiffs to bring what are effectively Privacy Act claims that Congress never authorized, simply by wrapping them in APA labeling.  Even if they could do so, however, Plaintiffs' Privacy Act theories in this case fail on the merits.

In their preliminary-injunction motion, primarily, Plaintiffs argue that what they describe as the "overhauled SAVE system" is a "national data bank" that is "prohibited by the Privacy Act."  Pls.' Mot. at 24.  A closer look at the actual statutory text refutes this claim.  Plaintiffs' only citation for this point is not to any statutory *prohibition* on agency action, it is to a savings clause (from the 1988 amendments to the Privacy Act) providing that "[n]othing in the amendments made by this Act shall be construed to authorize" various things, including "a national data bank."  Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514; *see also* 5 U.S.C. § 552a (note).  But Defendants do not rely on the 1988 amendments to the Privacy Act as the relevant congressional authorization for any of the actions at issue here—they rely primarily on the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 U.S.C. § 1373.  So that savings clause is irrelevant here.

Even if it were relevant, on its face, that statutory language also contains an explicit carve out for "computer matching of records" that is "otherwise authorized by law."  Pub. L. No. 100-

---

[8] Due to the relatively short time available to prepare this filing, and the several significant threshold, non-merits issues that justify denial of Plaintiffs' motion in full, Defendants may provide more fulsome briefing on some merits issues at future stages of this litigation, if necessary.

503, § 9, 102 Stat. at 2514. So, even if it were true that that statutory text (in Plaintiffs' words) creates "a baseline prohibition on interagency national data banks *absent separate statutory authorization*," Pls.' Mot. at 24 (emphasis added), here, there *is* separate statutory authorization. *See* 8 U.S.C. § 1373.[9]

### 2.    Plaintiffs' mandamus and unreasonable delay claims lack merit.

The APA places strict limits on judicial review of alleged agency inaction. Because the APA "carried forward" the common law writ of mandamus in § 706(1), the mandamus standard also applies to an APA claim of unreasonable delay. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("*SUWA*"). So, both Counts II and IV of Plaintiffs' complaint are subject to the mandamus standard.

"To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *SUWA*, 542 U.S. at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."). "These three threshold requirements are jurisdictional." *Am. Hosp. Ass'n*, 812 F.3d at 189.

Plaintiffs cannot satisfy these requirements here. As for a "clear and indisputable right to relief" or a "clear duty to act" in the manner that Plaintiffs demand, 8 U.S.C. § 1373 is fatal to that notion. Indeed, DHS is currently defending against five different lawsuits—all of which also include mandamus claims pointing the opposite direction—which are premised on the idea that the SAVE system doesn't go far *enough* to satisfy the obligations of 8 U.S.C. § 1373(c). *See supra* at 6. Wherever the line is properly drawn, it cannot be said that Plaintiffs' right to relief is "indisputable" here, when five other litigants are simultaneously arguing that DHS has a "clear duty" to do the very sorts of things that *these* litigants challenge here as unlawful. In addition, as discussed above, *see supra* at 25-29, an "adequate alternative remedy exists" under the Privacy Act itself.

---

[9] Plaintiffs' complaint alleges other violations of the Privacy Act that do not appear in Plaintiffs' preliminary injunction motion. Defendants do not address those arguments here.

*Am. Hosp. Ass'n*, 812 F.3d at 189; *see, e.g.*, *Carter*, 766 F. Supp. 3d at 123 (discussing "the remedies provided in the Privacy Act," which offer "a possibility of compensatory relief at a later date").

      **3.**    <u>Plaintiffs' ultra vires claim lacks merit.</u>

Plaintiffs' ultra vires claim is also plainly meritless—though the fact that Plaintiffs bring it at all is telling, with respect to Plaintiffs' confidence in their ability to bring Privacy Act claims labeled as APA claims.

An ultra vires claim is the judicial equivalent of "a Hail Mary pass," which "rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. Of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). To state such a claim, among other things, Plaintiffs must show that "the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C Cir. 2019) (quoting *Nyunt*, 589 F.3d at 449). That requirement is "especially demanding." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). "Only error that is patently a misconstruction of the [statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)). This doctrine is thus reserved for the most "extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express Corp.*, 39 F.4th at 764. "Said another way, garden-variety errors of law or fact are not enough." *Id.* (cleaned up).

Here, Plaintiffs fall far short of the "nearly insurmountable" showing necessary. *DOJ v. Fed. Lab. Rels. Auth.*, 981 F.2d 1339, 1343 (D.C. Cir. 1993). Instead, Plaintiffs "basically dress up a typical statutory-authority argument as an ultra vires claim." *Texas*, 605 U.S. at 682. "That is a fairly common maneuver" in trying to bring an ultra vires claim—which the Supreme Court has now squarely rejected. *Id.*

"Second, and alternatively, ultra vires review is not available because" the individual Plaintiffs here have "an alternative path to judicial review" of any actual violation of the Privacy Act. *Id.* As discussed above, the Privacy Act provides a specialized mechanism for judicial review, including the availability of money damages for certain violations. *See supra* at 25-29; *see also Carter*, 766 F. Supp. 3d at 123 (discussing "the remedies provided in the Privacy Act," which offer "a possibility of compensatory relief at a later date"). The availability of that alternative path to potential relief is also fatal to an ultra vires claim.

### 4.    Plaintiffs' separation-of-powers claim lacks merit.

Finally, Plaintiffs' "separation of powers" claim in Count Six can also be rejected easily. Plaintiffs first assert that the Executive Branch does not "possess any express constitutional authority over elections." Pls.' Mot. at 34. Regardless of whether that is correct, it is irrelevant— none of the actions challenged here involve any federal regulation of elections.

Plaintiffs also argue that "no statute authorizes SSA and DHS to pool data through the SAVE system for purposes of determining voter eligibility," *id.*, but 8 U.S.C. § 1373 does exactly that. Regardless, that is a statutory claim, not a separation-of-powers claim, and one that lacks any cause of action under recent D.C. Circuit precedent. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The D.C. Circuit recently reaffirmed that principle. *See Glob. Health Council v. Trump*, --- F.4th ---, 2025 WL 2480618, at *7-8 (D.C. Cir. Aug. 28, 2025) ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review.").

Clearly aware of this problem, Plaintiffs halfheartedly try to distinguish *Global Health Council*, in a one-sentence footnote that truncates a critical quotation. *See* Pls.' Mot. at 34 n.71 (omitting the word "conceded"). Not only is that footnote insufficient to preserve the argument, *see supra* at 14 & n.3, it is meritless—as this case plainly does not "involve[] the *conceded* absence

of *any* statutory authority." *Id.* (quoting *Glob. Health Council*, 2025 WL 2480618, at *7) (first emphasis added). Again, 8 U.S.C. § 1373 provides the relevant statutory authority (and obligations) here—but any disagreement about that is a routine statutory-interpretation dispute, not a constitutional question.

## II. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO SHOW IRREPARABLE HARM.

### A. Plaintiffs cannot demonstrate any actual or imminent irreparable harm.

Even if Plaintiffs had demonstrated an injury that was sufficient to show standing, "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. PostSecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). For one, "the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The moving party must show the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* And of course, "the injury must be beyond remediation." *Id.* That means that even "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297-98; *accord Bessent*, 770 F. Supp. 3d at 108.

**1.** Here, the same flaws that plague Plaintiffs' theories of standing are even more obviously fatal to any notion of imminent irreparable harm. Again, "Plaintiffs have not provided concrete evidence that Defendants are actively misusing or even attempting to misuse their sensitive data." *EPIC*, 2025 WL 580596, at *7. Instead, they have offered "hypothetical scenarios" that are "based on a series of possibilities, any one of which may never materialize." *Id.* For example, "to accept Plaintiffs' argument based on the exfiltration of their information by hostile actors, the Court would have to conclude that Defendants' conduct is causing an increased likelihood of hacking, that any resulting breach would target the specific systems containing Plaintiffs' information, that Plaintiffs' information would be specifically targeted, and that such a breach would lead to identity

theft or other tangible harm, economic or otherwise." *Id.* That sort of "speculative chain of events is insufficient to establish irreparable harm." *Id.*

That is why, even district courts that have found—mistakenly, in the government's view—Article III standing to bring similar claims, have nonetheless still denied preliminary injunction motions due to the lack of any imminent and irreparable harm. In short, "courts in this District have consistently 'declined to find irreparable injury' from the disclosure of private information 'where the challenged disclosure is not public,' but instead is to a small number of 'individuals obligated to keep [the information] confidential.'" *Bessent*, 770 F. Supp. 3d at 108 (quoting *Carter*, 766 F. Supp. 3d at 121). That is the case here.

Plaintiffs, "in contrast, cite[] no authority for the proposition that mere 'access' to personal data by government employees who are not formally authorized to view it, without more, creates an irreparable injury." *Carter*, 766 F. Supp. 3d at 122. To the contrary, if Plaintiffs ultimately prevail in this litigation, the Court could simply "order the small number of individuals who received the information to return or destroy it." *Bessent*, 770 F. Supp. 3d at 108.

Plaintiffs likewise ignore "the remedies provided in the Privacy Act" itself, which separately "confirm that [Plaintiffs] are not suffering (and will not suffer) an irreparable harm." *Carter*, 766 F. Supp. 3d at 123. As discussed above, the Privacy Act "provide[s] a private right of action and money damages for certain unauthorized disclosures." *Id.* (citing 5 U.S.C. § 552a(g)(4)). If Plaintiffs "have been injured by violations of" the Privacy Act, "and they meet the other requirements for obtaining relief, there is at least a possibility of compensatory relief at a later date," which is fatal to any theory of irreparable harm arising from alleged privacy interests. *Id.*

**2.** As for Plaintiffs' voting-related theories of harm, Defendants have no quarrel with the general proposition that "restrictions on fundamental voting rights" may qualify as "irreparable injury." Pls.' Mot. at 35 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). But that argument belongs in a different brief from another case. Improving search functionality in a government database does not place *any* "restrictions" on *anyone's* "fundamental voting rights." *Id.* The right to vote is simply not at stake in this suit.

In any event, it also bears repeating: neither the complaint, Plaintiffs' preliminary injunction motion, nor any of their attached declarations identifies a single instance of disenfranchisement of *any* voter—let alone some widespread and systematic effort to unlawfully "purge" voter rolls that is likely to capture any of the named Plaintiffs (or their members) any time soon.

Even in Virginia—where Plaintiffs assert that "the risks to naturalized citizen voters are especially high," *id.* at 37—Plaintiff Doe 5 swears that he or she was "naturalized as a United States citizen," but that "SSA records" nonetheless "(incorrectly) describe" him or her "as a non-citizen." Decl. of Doe 5 ¶¶ 2, 13. Then, based on his or her apparent misinterpretation of Virginia law, Doe 5 definitively declares that "[a]ny voter that SAVE identifies as a non-citizen is required to be deleted from voter rolls." *Id.* ¶ 12. Despite that confident and pessimistic assessment, Plaintiff Doe 5 nonetheless *also* swears under penalty of perjury that he or she "ha[s] voted in elections in 2020, 2021, 2022, 2023, 2024, *and 2025* in Virginia"—apparently without incident. *Id.* ¶ 6 (emphasis added). It is hard to square Plaintiffs' confident predictions of widespread accidental disenfranchisement with their own declarations—which reveal no hint of any such problem.

Ultimately, of course, the federal government does not speak for the Virginia Department of Elections, and cannot offer any definitive statement about what Virginia law means when it says that those who are "*known* not to be a citizen" should be removed from the voter rolls. Va. Code Ann. § 24.2-404(A)(4) (emphasis added). For now, it suffices to say that, if Plaintiffs truly believe that Virginia (or any State) is going to start accidentally and unlawfully disenfranchising United States Citizens *en masse*, they can sue that State. But that is not a problem that can be solved in this suit, or by any of the Defendants here—who are simply modernizing government databases to more effectively and efficiently fulfill their statutory obligations under 8 U.S.C. § 1373.

Were there any doubt on that subject, it is resolved by another provision of federal law that Plaintiffs also ignore. Under the National Voter Registration Act, "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). Plaintiffs do not allege that any State has

violated this provision, nor that any State is likely to violate this provision—nor could they, given the "presumption of regularity" that is owed to state officials enforcing state law. *Nieves*, 587 U.S. at 400. With respect to the 2025 elections in Virginia, Texas, and Louisiana that feature so heavily in Plaintiffs' allegations of time-sensitive and irreparable voting-related harms, that 90-day cooling-off period is already in effect. That alone is fatal to Plaintiffs' theory of imminent and irreparable harm related to voting. And there is plenty of time to litigate this case to final judgment before the 2026 election cycle (assuming that were necessary).

**3.** Finally, Plaintiffs' allegations of procedural harm or informational injury are even more obviously not "irreparable." If Defendants committed some procedural error or failed to publish some legally required information, and Plaintiffs satisfy all the other prerequisites for judicial relief, the Court could simply order the agency to go through the relevant procedure, or to publish the information. That would provide complete redress for any procedural or informational harm—whenever that order is issued.

In their opposition to the government's stay motion, Plaintiffs assert (with minimal substantiation) that "Plaintiffs need that information *now*—before elections in 2025 and 2026—so that the individuals can use the information to protect their voting rights and privacy interests." Pls.' Opp'n to Stay Mot. at 9, ECF No. 21. But that argument only works if the Court has already accepted Plaintiffs' *other* arguments about privacy-related harms or voting-related harms. It should not, for all the reasons explained at length above.

**B.  Plaintiffs' delay in filing suit undermines any showing of irreparable harm.**

Even if this Court were to indulge the dubious premise that Plaintiffs now face some genuinely time-sensitive harm, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Plaintiffs have not. This suit challenges a variety of government actions that have taken place over the last nine months, with Plaintiffs' core concerns announced in widely available press releases in April and May of 2025. *See, e.g.*, Compl. ¶ 111 (USCIS press release on April 22, 2025); *id.* ¶ 112 ("On May 22, 2025, Defendants consummated the overhaul of SAVE."). If Plaintiffs truly believed that they faced

- 36 -

irreparable harm, there was no reason to wait six months—and until a lapse in appropriations, no less—to seek this purportedly time-sensitive relief.  Indeed, one of the elections that Plaintiffs rely upon in their declarations is now over.  *See* Decl. of Doe 4 ¶ 7 (stating, on October 7, 2025: "I plan on voting in Louisiana's upcoming local elections, which will be held on October 11, 2025").

Courts in this District have held that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).  In one case, the district court denied a motion for a preliminary injunction in which the plaintiffs "delayed thirty-six days before filing for preliminary injunctive relief." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 88 (D.D.C. 2014) (calling a forty-four day delay in seeking emergency injunctive relief "inexcusable" (citing *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975))); *Indiana v. Haaland*, 2024 WL 5213401, at *11 n.11 (D.D.C. Dec. 24, 2024) ("This significant delay in moving for a preliminary injunction further weighs against the plaintiffs' claims of irreparable harm because, presumably, if the harm from the Final Rule was truly irreparable, the plaintiffs would not have waited more than three months after the Final Rule went into effect to seek an injunction."); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (delay of "over two months" in filing suit "further militates against a finding of irreparable harm").

Courts around the country have likewise relied on comparable (or shorter) delays to support the denial of preliminary relief.  *See, e.g.*, *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1010, 1010 n.4 (8th Cir. 2019) (five-month delay fatal to request for injunctive relief); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."); *Weight Watchers Int'l v. Luigino's*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction, calling six months "a long delay in seeking relief" that "indicates that speedy action is not required")

(citation omitted); *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (affirming denial of preliminary-injunction after plaintiffs "wait[ed] two months . . . to make the request," because "[s]uch a delay is inconsistent with a claim of irreparable injury").

Plaintiffs' significant delay in seeking this purportedly time-sensitive relief thus belies the assertion that any of the challenged government actions are causing truly irreparable harm that warrants the extraordinary remedy of a preliminary injunction.

## III.   THE REMAINING EQUITABLE FACTORS WEIGH AGAINST PRELIMINARY RELIEF.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, neither favors Plaintiffs' request for preliminary relief.

In addressing this factor in one paragraph on the final page of their brief, Plaintiffs make no serious effort to explain why the equities and the public interest fall in their favor—rather, their arguments largely collapse into the merits. For example, they assert that because they challenge an "unlawful agency action," an injunction is appropriate. Pls.' Mot. at 45 (citation omitted). Of course, Defendants disagree that the challenged actions are unlawful. Regardless, the Supreme Court has squarely held that a likelihood of success, standing alone, is insufficient to justify injunctive relief. *See, e.g.*, *Winter*, 555 U.S. at 24-27. So Plaintiffs' decision to largely ignore these mandatory equitable considerations is reason enough to deny their motion.

To the extent they say anything at all about the public interest, Plaintiffs do so by making passing reference to the (undisputed) importance of the "right to vote." Pls.' Mot. at 45. But again, the right to vote is not at stake in a Privacy Act suit against three federal agencies. And even if it were, Plaintiffs are mistaken to say that "absent an injunction, there is a substantial risk that citizens will be disenfranchised in the present . . . election cycle." *Id.* Among many other reasons why that statement is incorrect, as discussed above, federal law already prohibits the very sort of "voter list maintenance" that they claim to be concerned about within 90 days of an election. *See* 52 U.S.C. § 20507(c)(2)(A). And regardless, none of the relief that Plaintiffs request in this suit will run against any States, nor say anything at all about how States manage their voter rolls.

On the other side of the ledger, the federal government has a significant interest in carrying out congressional intent, by fully and effectively carrying out its obligations in 8 U.S.C. § 1373. *See, e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000) ("It is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers.").

To that end, this is not the first pending lawsuit to be filed on the subject of the SAVE program—it is the sixth. *See supra* at 6 (citing cases filed in late 2024 and early 2025, all of which remain pending). Plaintiffs here seek relief that, in theory, could conflict with the relief being sought in some of those five earlier-filed cases—counseling against rushed litigation in this later-filed suit that may create the potential for conflicting court orders. That is yet another reason for this Court to deny Plaintiffs' motion, as a matter of sound equitable remedies. *See, e.g.*, *UtahAmerican Energy, Inc. v. Dep't of Lab.*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (cautioning against simultaneous suits that would "potentially produce contradictory decisions" and "in turn, generate dueling appeals"); *cf. Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986) ("Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders.").

Finally, it bears repeating that the Supreme Court ruled in favor of the government earlier this year, in granting an application to stay a district court's preliminary injunction in an analogous Privacy Act challenge to intra-government data sharing. *See SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025). Although the Supreme Court's order in that case contained limited explanation and is "not conclusive as to the merits," it still "inform[s] how a court should exercise its equitable discretion in like cases." *Boyle*, 145 S. Ct. at 2654. That is all but fatal to Plaintiffs' claims here—at least at the preliminary-injunction stage.

## IV.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

For the reasons above, Plaintiffs' motion should be denied in its entirety. But, if the Court grants any relief, Plaintiffs' requested injunction is overbroad in several respects, and subject to important equitable limitations.

**a.**   Any relief should be narrowly tailored to prevent any irreparable harm only of any parties who have established Article III standing.  The Supreme Court recently addressed the subject of "universal injunctions" in *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025).  It is now clear that, in granting equitable relief,  a court "may administer complete relief between the parties."  *Id.* at 851.  But that is also "the maximum a court can provide."  *Id.* at 854.  Plaintiffs seem to recognize this, which is presumably why they have also moved for class certification.  *See* ECF No. 17.

To be sure, in a footnote in *CASA*, the Supreme Court formally reserved the question (which has previously been addressed by the D.C. Circuit) about the meaning of the "set aside" language in the APA, 5 U.S.C. § 706(2).  606 U.S. at 847 n.10.  But Plaintiffs' proposed order makes clear that they do not seek to "set aside" any agency action at this stage of the litigation.  *See* Proposed Order, ECF No. 16-10 (seeking only a preliminary injunction under Rule 65, and a stay under 5 U.S.C. § 705).  So that question is not presented here.

Plaintiffs do purport to seek a "stay" under a different provision of the APA, 5 U.S.C. § 705.  That request does not change the result.  After all, Section 705 is constrained by the same traditional equitable principles as the Judiciary Act of 1789, addressed in *CASA*.  Just as those principles foreclose universal preliminary injunctions, they also foreclose universal relief under § 705.  *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) ("Though the Supreme Court's recent *Trump v. CASA, Inc.* decision explicitly declined to extend its holding to the APA context, . . . its complete-relief principle for crafting injunctive relief provides some useful guidance for crafting interim equitable relief [under Section 705] in this case.").

Regardless, relief under 5 U.S.C. § 705 is also unavailable here under the plain text of the statute.  Section 705 authorizes courts to "postpone the effective date of an agency action or . . . preserve status or rights pending" judicial review.  But there is nothing to "postpone" here—the challenged actions took effect months ago.  *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 862-63 (N.D. Tex. 2022) (holding that § 705 was "inapposite" where final rule had already gone into effect).  At most, the Court could "preserve status or rights pending" further judicial review.  That

statutory language, coupled with the ordinary equitable principles cited above, counsels for (at most) Plaintiff-specific relief.

The text of 5 U.S.C. § 705 is also a very poor fit for what Plaintiffs are asking for here: their proposed order asks that "the overhauled [SAVE] system" be "STAYED pursuant to 5 U.S.C. § 705." It is not even clear what that means—an independent problem under Federal Rule of Civil Procedure 65(d)(1), which requires reasonable specificity in ordering injunctive relief.

**b.** Finally, if the Court orders any injunctive relief, it should also order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). And the D.C. Circuit has recently "clarif[ied] that injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump,* No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (citing Fed. R. Civ. P. 65(c)). So, in the event the Court issues preliminary relief, it should also require Plaintiffs to post an appropriate bond, commensurate with the scope of any such order.

Plaintiffs (again, only in a footnote) state in conclusory fashion that requiring "a bond beyond a nominal value would contravene the interests of justice." Pls.' Mot. at 45 n.84 (quoting *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 225 (D.D.C. 2025)). But that position (and the only case Plaintiffs cite for it) cannot be squared with the D.C. Circuit's recent "clarif[ication]" in *NTEU*, 2025 WL 1441563, at *3 n.4.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction or for a stay under 5 U.S.C. § 705 should be denied. And, if the Court denies the motion due to lack of Article III standing, the Court should also dismiss the case on that basis, without prejudice, under Rule 12(h)(3). Otherwise, the case should then be litigated in the normal course, after appropriations are restored.

Dated:  October 22, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ELIZABETH J. SHAPIRO
                                            Deputy Director
                                            Federal Programs Branch

                                            /s/ Stephen M. Pezzi
                                            STEPHEN M. PEZZI (D.C. Bar No. 995500)
                                            Senior Trial Counsel
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Tel: (202) 305-8576
                                            Email: stephen.pezzi@usdoj.gov

                                            *Counsel for Defendants*