IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Case No. 25-cv-03501-SLS |

**[PROPOSED] BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Interest of *Amicus Curiae* ..........................................................................................................1

Argument .....................................................................................................................................2

    I.    The Constitution gives States and Congress the power to regulate federal elections, and any Executive Branch regulation of elections must be clearly authorized by Congress...................................................................................................................2

        A.    The Elections Clause empowers States and Congress to regulate federal elections ..................................................................................................3

        B.    Any Executive Branch intrusion into elections and voter qualifications must be clearly authorized by Congress.............................................................................3

    II.    The SAVE overhaul is an Executive Branch intrusion into the States' and Congress' constitutional roles that Congress has not authorized.....................................................5

        A.    The SAVE overhaul and the Executive Branch's unlawful effort to coerce state data sharing directly interfere with the States' and Congress' election authority....5

        B.    Congress has not authorized the Executive Branch's actions here ..........................8

Conclusion .................................................................................................................................10

## TABLE OF AUTHORITIES

**Cases**                                                                                                                     **Pages**

*Alabama Association of Realtors v. Department of Health & Human Services*,
    594 U.S. 758 (2021) ............................................................................................... 4

*Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013) ............................ 2, 3

*Biden v. Nebraska*, 600 U.S. 477 (2023) .................................................................... 4

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) ............................................. 6

*Foster v. Love*, 522 U.S. 67 (1997) ........................................................................ 2

*Judge Rotenberg Education Center v. Food and Drug Administration*,
    3 F.4th 390 (D.C. Cir. 2021) ................................................................................ 3

*League of United Latin American Citizens v. Executive Office of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ................................................................. 3, 5, 6

*League of United Latin American Citizens v. Executive Office of the President*,
    No. 25-0946 (D.D.C. 2025) .................................................................................. 1

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*, 996 F.3d 257
    (4th Cir. 2021) ................................................................................................... 8

*Smiley v. Holm*, 285 U.S. 355 (1932) ..................................................................... 3

*West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) ........................ 4, 9

**Statutes and Constitutional Provisions**

8 U.S.C. § 1373 ....................................................................................................... 8

8 U.S.C. § 1373(a) .................................................................................................. 9

8 U.S.C. § 1644 .................................................................................................. 8, 9

52 U.S.C. § 10302 .................................................................................................. 5

52 U.S.C. § 20503(a) .............................................................................................. 9

52 U.S.C. § 20507(a) .............................................................................................. 9

52 U.S.C. § 21083(a)(1)(A) ..................................................................................... 9

52 U.S.C. § 21083(a)(1)(A)(iv) ................................................................................ 9

52 U.S.C. § 30106 .................................................................................................. 5

U.S. Const. amend. XVI ............................................................................................................3

U.S. Const. art. I, § 2..................................................................................................................3

**Other Authorities**

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025), available at
    https://perma.cc/EN47-E37Z ..............................................................................1, 2, 6

Jude Joffe-Block and Miles Parks, *33 million voters have been run through a Trump
    administration citizenship check*, NPR (Sep. 11, 2025) https://www.npr.org/2025/09/10/nx-
    s1-5477367/save-election-citizenship-data-trump .......................................................7

Kaylie Martinez-Ochoa et al., *Tracker of Justice Dept. Requests for Voter Information*, Brennan
    Ctr. For Justice (Oct. 23, 2025), https://www.brennancenter.org/our-work/research-
    reports/tracker-justice-department-requests-voter-information ..................................6

Letter Agreement Providing for Information Sharing Between the Department of Homeland
    Security (DHS), U.S. Citizenship and Immigration Services (USCIS) and the Social Security
    Administration (SSA) Regarding Citizenship (May 15, 2025), available at
    https://www.ssa.gov/foia/resources/proactivedisclosure/2025/May%2015,%202025%20SSA-
    DHS-USCIS%20Agreement_Redacted.pdf........................................................................8

Letter from Harmeet K. Dhillon to Hon. Steve Hobbs, at 1 (Sep. 8, 2025)
    https://www.brennancenter.org/media/14395/download/washington_09.08.2025_doj-
    letter.pdf?inline=1 .........................................................................................................6

Letter from Michael E. Gates to Hon. Shirley Weber, at 1 (July 10, 2025)
    https://www.brennancenter.org/media/14271/download/california_07.10.25_doj-
    letter.pdf?inline=1 .........................................................................................................7

Letter from SSA Off. of Gen. Counsel to Jon Sherman, at 2 (July 13, 2023), available at
    https://perma.cc/KS2N-U2US ......................................................................................8

Miles Parks, *DOJ sues eight states for voting data*, NPR (Sep. 30, 2025)
    https://www.npr.org/2025/09/30/nx-s1-5554499/doj-sues-eight-states-for-voting-data ...........7

Miles Parks and Stephen Fowler, *DHS to states: Follow our voting rules or lose out on election
    security money*, NPR (Aug. 23, 2025) https://www.npr.org/2025/08/22/nx-s1-
    5508345/election-security-grants-trump-voting-policy...............................................7

The Federalist No. 59..................................................................................................................3

The Federalist No. 60..................................................................................................................3

The Federalist No. 61 .................................................................................................................3

**INTEREST OF AMICUS CURIAE**[1]

*Amicus Curiae* Campaign Legal Center ("CLC") is a leading nonpartisan, nonprofit organization that has been working for more than 20 years to advance democracy through law. CLC engages in litigation, policy development, and advocacy to protect voting rights and ensure broad and equal access to the ballot. CLC currently represents clients challenging Executive Order No. 14,248 (the "Elections EO"), which, among other things, directs the Department of Homeland Security ("DHS") to provide state and local officials access to government systems for verifying citizenship and directs DHS to coordinate with the Department of Government Efficiency to review various data sources "for consistency with Federal requirements." 90 Fed. Reg. 14005, § 2(b)(iii) (Mar. 25, 2025); *see also LULAC v. Exec. Off. of the President*, No. 25-0946 (D.D.C. 2025). Acting in concert with Executive Orders 14,158 and 14,243, the Elections EO is a dramatic intrusion of the Executive Branch into election administration that threatens the right to vote of millions of Americans. CLC has an interest in this case because it concerns DHS's implementation of the Elections EO and because its resolution will affect the voting rights of countless American citizens. CLC's expertise in voting rights and election administration, combined with its work to challenge Executive Order No. 14,248, enables CLC to contribute unique insights as part of the Court's consideration of the issues in this case.

---

[1] Pursuant to Local Rule 7(o)(5) and Federal Rule of Appellate Procedure 24(a)(4)(E), *amicus* CLC affirms that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund the preparation and submission of this brief, and no person other than *amicus* or its counsel contributed money that was intended to fund the preparation and submission of this brief.

1

# ARGUMENT

Plaintiffs are entitled to a preliminary injunction or stay because Defendants have violated the Privacy Act and the Administrative Procedure Act. But Defendants are doing much more. They have dramatically expanded the SAVE system to fuel voter roll purges based on faulty data, in part to implement the Elections EO, which purported to make a range of changes to election administration by executive fiat.[2] And they have sought to coerce states into joining that project, first by demanding sensitive voter roll data from dozens of states, by suing eight states that refused to submit to those unlawful demands, and by threatening to cut states' funding. DHS's lawless expansion of the SAVE database into a clearinghouse for the citizenship status of every single American voter constitutes an unprecedented intrusion by the Executive Branch into the administration of elections. But these intrusions run counter to the framework established by the Constitution, which empowers state governments with primary responsibility for administering elections, subject to Congressional oversight.

I. **The Constitution gives States and Congress the power to regulate federal elections, and any Executive Branch regulation of elections must be clearly authorized by Congress.**

  A. <u>The Elections Clause empowers States and Congress to regulate federal elections.</u>

The Constitution explicitly outlines a framework for the regulation and implementation of elections. The Elections Clause operates as a "default provision" that invests "the States with responsibility for the mechanics of [federal] elections" in the first instance. *Foster v. Love*, 522 U.S. 67, 69 (1997). From there, the Elections Clause permits Congress to regulate the time, place, and manner of federal elections "to any extent which it deems expedient." *Arizona v. Inter Tribal*

---

[2] Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025), available at https://perma.cc/EN47-E37Z.

*Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1, 9 (2013). But the decision to supersede state regulation of elections can only be "exercised by the Congress in making 'such regulations'" as the Elections Clause contemplates. *Smiley v. Holm*, 285 U.S. 355, 367 (1932) (quoting U.S. Const. art. I, § 4). There is no constitutional role for the Executive Branch to act alone in this scheme— the only role the Executive plays is to faithfully enforce the statutes Congress passes. *See, e.g.*, The Federalist Nos. 59, 60, and 61 (lacking any reference to the Executive Branch in administering elections).

Furthermore, "the Constitution empowers the States to decide who is qualified to vote in federal elections." *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 156–57 (D.D.C. 2025). The "States determine who is eligible to vote for their state legislators," *id.*, and the Constitution incorporates that decision by making those same voters eligible to vote for members of the U.S. House and Senate, *see* U.S. Const. art. I, § 2 and amend. XVII. Indeed, the Supreme Court has held that prescribing qualifications for voter eligibility "'forms no part of the power to be conferred upon the national government' by the Elections Clause." *ITCA*, 570 U.S. at 17 (quoting The Federalist No. 60, at 371). Once again, the Constitution leaves no room for the Executive to intrude into the area of voter qualifications.

### B. Any Executive Branch intrusion into elections and voter qualifications must be clearly authorized by Congress.

In the absence of independent constitutional authority, the Executive Branch's only role in the realm of elections is to faithfully execute the laws and policy decisions of Congress. Federal agencies, like DHS, "possess only those powers that Congress confers upon them." *Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021) (internal citations omitted). "If no statute confers authority to [DHS], it has none." *Id*. But no statute authorizes DHS to expand its citizenship tracking to create a national clearinghouse for all American voters. And given the

3

constitutional, political, and logistical significance of this unprecedented Executive Branch intrusion, the Court should maintain a skepticism of DHS's position until it can "point to clear congressional authorization." *W. Virginia v. EPA*, 597 U.S. 697, 766 (2022) (internal quotations omitted).

      Whenever an executive agency points to a statute that purportedly confers authority to act, courts must conduct an inquiry to determine "whether Congress in fact meant to confer the power the agency has asserted." *W. Virginia v. EPA*, 597 U.S. at 721. In "certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent" require that agencies' claimed authority be supported by "clear congressional authorization" rather than "ambiguous statutory text." *Id.* at 723. Here, DHS's unprecedented intrusion into the realm of voter qualifications bears several indicia that it is the kind of "major policy decision" that requires clear congressional authorization. *Id.* First, this newly federalized verification system "significantly alter[s] the balance between federal and state power," which has historically required "exceedingly clear language" from Congress to authorize. *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). Second, the delegation of an area of major "political significance," like managing voter eligibility verification, generally requires a "clear statement to that effect" by Congress. *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023). Finally, the Executive Branch as a whole and DHS specifically lack "comparative expertise" in verifying voter eligibility because this is an area historically handled by the States—which means that "Congress presumably would not task [DHS]" with handling this subject unless it clearly said so. *W. Virginia v. EPA*, 597 U.S. at 748. Given these significant political, logistical, and constitutional considerations, any purported authority for DHS's actions must constitute clear congressional authorization.

Importantly, in the areas where Congress has expressly regulated the implementation of elections, it has done so with limited delegation to the Executive Branch and great deference to the States. Where Congress does delegate election policymaking power to the Executive Branch, those delegations are typically limited to independent, bipartisan agencies.[3] For example, the most prominent federal agency involved in elections is the Federal Election Commission, which is an independent agency statutorily designed to include an equal number of Commissioners from each major political party. *See* 52 U.S.C. § 30106. Further, all decisions and actions require a majority of Commissioners, which necessarily includes at least one Commissioner from each party. *Id.* Similarly, the Elections Assistance Commission, which has responsibility for maintaining the federal mail voter registration form and collecting data on election administration, is also structured as an independent agency with bipartisan membership that can only take action on a bipartisan basis. *See LULAC*, 780 F. Supp. 3d at 162. But Congress has not delegated any list maintenance or voter eligibility functions to DHS.

## II.     The SAVE overhaul is an Executive Branch intrusion into the States' and Congress' constitutional roles that Congress has not authorized.

### A. The SAVE overhaul and the Executive Branch's unlawful effort to coerce state data sharing directly interfere with the States' and Congress' election authority.

As Plaintiffs demonstrate, Defendants' SAVE overhaul is not an isolated effort to facilitate citizenship checks; it is part of a larger effort to usurp and disrupt the States' and Congress' administration of elections. While the overhaul itself was explicitly billed as a means to prevent voter fraud, it was undertaken in conjunction with the Elections EO and the Department of Justice's ("DOJ's") attempts to coerce states into handing over the sensitive data of millions of Americans.

---

[3] Congress has also occasionally delegated limited enforcement functions to the Department of Justice. *See, e.g.*, 52 U.S.C. § 10302 (authorizing the Attorney General to institute voting rights proceedings).

The Elections EO, issued the month before DHS announced the SAVE overhaul, directs the Election Assistance Commission to alter the federal mail voter registration form to require documentary proof of citizenship, directs DHS to provide citizenship data to other state and federal agencies, and directs DHS to coordinate with the DOGE Administrator to review state voter lists and "Federal immigration databases and State records requested" to determine "consistency with Federal requirements." Elections EO § 2. Indeed, two federal courts have already preliminarily enjoined parts of the Elections EO as a likely violation of the constitutional separation of powers. *See LULAC*, 780 F. Supp. 3d at 194; *California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025). However, the presidential orders directing DHS to provide citizenship information to other state and federal agencies and to otherwise review citizenship data on American voters have not yet been enjoined. *LULAC*, 780 F Supp. 3d at 205 (holding that "uncertainty" about how DHS would implement the Executive Order "cautions against the Court's intervention at this early stage"). But here, the form and scope of that implementation is plainly before the Court and raises serious separation of powers and federalism concerns.

This summer, a few months after DHS announced the SAVE overhaul, DOJ sent letters to dozens of states demanding their statewide voter registration lists "contain[ing] *all fields*," including voters' "state driver's license number or the last four digits of the registrants' social security number," along with other detailed information.[4] DOJ largely cited the voter list maintenance provisions of the National Voter Registration Act ("NVRA") and Help America Vote Act ("HAVA") as the basis for its demands. For example, DOJ's letter to California "request[ed]

---

[4] Letter from Harmeet K. Dhillon to Hon. Steve Hobbs, at 1 (Sep. 8, 2025) https://www.brennancenter.org/media/14395/download/washington_09.08.2025_doj-letter.pdf?inline=1; *see also* Kaylie Martinez-Ochoa et al., *Tracker of Justice Dept. Requests for Voter Information*, Brennan Ctr. For Justice (Oct. 23, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the [NVRA]."[5] Even after repeated demands, many states refused to provide the data or only provided public information, citing state and federal laws preventing them from providing full voter lists. In September, DOJ sued eight states, asking federal courts to require the states to turn over data the states seek to protect.[6]

In the wake of DOJ's demands for data, several states have agreed to run their voter lists through the overhauled SAVE system to identify potential non-U.S. citizen voters.[7] And DHS has made certain state election security funding contingent on using the overhauled SAVE system as a "citizenship verification tool for all people working at a polling place."[8]

These coordinated actions by DHS and DOJ demonstrate that the SAVE overhaul at issue in this case cannot be properly understood in isolation; it is closely tied with a broader effort to regulate American elections. The SAVE overhaul is not simply creation of a tool to identify non-U.S. citizens—the federal government has coerced states to submit to its use through demand letters, lawsuits, and threats to cut funding.

Notably, DHS's expansion of the SAVE database creates a substantial risk of error, helping demonstrate how its use—perhaps with data pried from unwilling States—will affect elections across the country. DHS's expanded ability to query the status of U.S. citizens is based upon data

---

[5] Letter from Michael E. Gates to Hon. Shirley Weber, at 1 (July 10, 2025) https://www.brennancenter.org/media/14271/download/california_07.10.25_doj-letter.pdf?inline=1.
[6] Miles Parks, *DOJ sues eight states for voting data*, NPR (Sep. 30, 2025) https://www.npr.org/2025/09/30/nx-s1-5554499/doj-sues-eight-states-for-voting-data.
[7] Jude Joffe-Block and Miles Parks, *33 million voters have been run through a Trump administration citizenship check*, NPR (Sep. 11, 2025) https://www.npr.org/2025/09/10/nx-s1-5477367/save-election-citizenship-data-trump.
[8] Miles Parks and Stephen Fowler, *DHS to states: Follow our voting rules or lose out on election security money*, NPR (Aug. 23, 2025) https://www.npr.org/2025/08/22/nx-s1-5508345/election-security-grants-trump-voting-policy.

from the Social Security Administration ("SSA"), which itself has admitted that SSA does not reliably track citizenship status of Americans because "SSA is not the agency responsible for making citizenship determinations."[9] Indeed, even before the expansion of SAVE, courts recognized its high error rate when used to identify non-U.S. citizens on the voter rolls. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021) (noting North Carolina Board of Elections' conclusion "that about 75% of individuals who later provided proof of citizenship continued to be listed as noncitizens in the SAVE system"). And importantly, compelled use of SAVE could jeopardize not only voters' ability to vote in federal elections, but also their eligibility to vote in state elections.

### B. Congress has not authorized the Executive Branch's actions here.

In the absence of an election-related statute authorizing the creation of a nationwide citizenship verification system, DHS relies upon vague statutory language that has nothing to do with voters or elections. By contrast, when Congress has engaged in election-related regulation or delegation, it has circumscribed those delegations to the Executive Branch and has consistently left the realm of voter eligibility verification to the states.

The statutes DHS relies on to authorize its wholesale transformation of SAVE fall far short of the "clear congressional authorization" required to justify its action. In its Information Sharing Agreement, DHS principally relies upon 8 U.S.C. § 1373 and 8 U.S.C. § 1644 as authorization.[10] But neither statute mentions elections, voter registration, or voting. The former statute is framed

---

[9] Letter from SSA Off. of Gen. Counsel to Jon Sherman, at 2 (July 13, 2023), available at https://perma.cc/KS2N-U2US.

[10] *See* Letter Agreement Providing for Information Sharing Between the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) and the Social Security Administration (SSA) Regarding Citizenship, at 2 (May 15, 2025), available at https://www.ssa.gov/foia/resources/proactivedisclosure/2025/May%2015,%202025%20SSA-DHS-USCIS%20Agreement_Redacted.pdf.

8

entirely in terms of requests directed *to* DHS; it is not an authorization for DHS to seek and compile records or create new data systems amassed from information outside DHS's possession. *See* 8 U.S.C. § 1373(a) (discussing information being "sen[t] to, or receiv[ed] from" DHS). And the latter statute expressly excludes U.S. citizens from its scope, so it cannot possibly authorize the creation of a database to verify the voting eligibility of U.S. citizens. *See* 8 U.S.C. § 1644 (concerning only "information regarding . . . an alien in the United States"). Moreover, these vague information sharing statutes are precisely the kind of "ambiguous statutory text" where courts should be reluctant to find some newfound authority "lurking." *W. Virginia v. EPA*, 597 U.S. at 723 (citation omitted).

When it comes to specific context of verifying voters' eligibility, Congress has consistently and expressly left those duties to the states. For example, in enacting the NVRA, Congress required that "each State shall establish procedures to register to vote," 52 U.S.C. § 20503(a), and that "each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters form the official lists of eligible voters" on the basis that the registrant died or changed residence, *id.* § 20507(a). Similarly, when it enacted HAVA, Congress specified that "each State, acting through the chief State Election official, shall implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). In that way, Congress could not have been clearer about which governments and which government officials may create and operate a database of eligible voters: state governments and their chief state election officials. Congress was also clear about which government databases should be coordinated with these voter lists: "other agency databases *within* the State." 52 U.S.C. § 21083(a)(1)(A)(iv) (emphasis added). Congress expressly omitted any direction to DHS to manage state and federal databases from the top down for the purpose of voter eligibility

9

verification. DHS's intrusion into the realm of verifying voter qualifications conflicts with these decisions by Congress to limit its election-related delegations and leave voter eligibility verification functions to the states.

## CONCLUSION

For the foregoing reasons, *amicus* CLC supports Plaintiffs' motion for a stay and/or preliminary injunction.

Dated: October 24, 2025

Respectfully submitted,

By: <u>Robert Brent Ferguson</u>
Robert Brent Ferguson (DC Bar No. 1782289)
William K. Hancock (DC Bar No. 90002204)
Heather Szilagyi (DC Bar No. 90006787)
Anna Baldwin (DC Bar No. 998713)
Sejal Jhaveri*
Daniel S. Lenz**
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: 202-736-2200
bferguson@campaignlegalcenter.org
whancock@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
*Counsel for Amicus Curiae Campaign Legal Center*

*\*Admitted to practice only in New York. Practice in the District of Columbia is limited to federal courts.*
*\*\*Admitted to practice only in Wisconsin. Practice in the District of Columbia is limited to federal courts.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rules 5.4 and 7(o), I hereby certify that this brief complies with the requirements of Local Civil Rule 5.4, Federal Rule of Appellate Procedure 29(a)(4), and that this brief does not exceed 25 pages in length.

Dated:   October 24, 2025                                    *Robert Brent Ferguson*
                                                             Robert Brent Ferguson