**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

LEAGUE OF WOMEN VOTERS, *et al.*,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

      Defendants.

Case No. 25-cv-3501-SLS

---

**REPLY IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A STAY UNDER 5 U.S.C. § 705 AND**
**A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.      Plaintiffs are likely to succeed on the merits ................................................ 2

        A.    Plaintiffs have standing ............................................................................. 2

            1.    Voter injuries ..................................................................................... 2

            2.    Informational and notice-and-comment injuries ............................... 7

            3.    Privacy injuries .................................................................................. 9

        B.    Plaintiffs have an APA remedy for Defendants' Privacy Act violations .................... 12

            1.    Congress did not intend to preclude APA review of Privacy Act claims ................ 12

            2.    The Privacy Act does not provide Plaintiffs an adequate remedy ........................... 14

        C.    Plaintiffs' claims are likely meritorious ................................................... 15

            1.    8 U.S.C. § 1373 does not limit Plaintiffs' claims .................................... 15

            2.    Defendants have conceded Plaintiffs' likelihood of success on their SORN and arbitrary-and-capricious claims ............................................................. 19

            3.    Defendants fail to refute Plaintiffs' claims for unlawfully withheld agency action and mandamus relief .............................................................. 19

            4.    Defendants fail to refute Plaintiffs' *ultra vires* claim ............................ 19

            5.    Defendants mischaracterize Plaintiffs' separation of powers claim ..................... 20

    II.      Plaintiffs have demonstrated irreparable injury ........................................... 21

        A.    Voter injuries ........................................................................................... 21

        B.    Notice-and-comment and informational injuries ..................................... 21

        C.    Privacy injuries ....................................................................................... 22

        D.    Plaintiffs did not delay in filing suit ....................................................... 23

    III.    The remaining factors favor preliminary relief ............................................. 24

    IV.    Plaintiffs' requested relief is appropriately tailored and authorized by 5 U.S.C. § 705 ............................................................................................. 24

CONCLUSION .............................................................................................................. 25

## INTRODUCTION

For decades, DHS has rigorously complied with the Privacy Act of 1974's transparency and notice-and-comment requirements whenever making major (and even minor) changes to its Systematic Alien Verification for Entitlements ("SAVE") system. ECF 16-1 ("Mem.") at 2 n.2. The same is true for SSA's Master Files of Social Security Number Holders and SSN Applications, 90 Fed. Reg. 10,025 (Feb. 20, 2025). But now, Defendants claim for the first time that a law enacted in *1996* authorizes—and indeed *requires*—DHS to funnel sensitive citizenship information from SSA to state and local governments, free of all constraints imposed by the Privacy Act and all other federal privacy and data-security law. ECF 37 ("Opp.") at 1-2 (citing 8 U.S.C. § 1373). Section 1373 does no such thing. As the Department of Justice has long construed the law, § 1373 is neither an implied repeal of federal privacy laws nor an affirmative grant of authority. Rather, it is a *restriction* on officials' "discretionary authority . . . to adopt disclosure prohibitions or restrictions" for information they are otherwise lawfully permitted to share with DHS—in other words, it is a restriction on restrictions.[1] Defendants' contrary reading of § 1373 defies decades of executive branch practice, the express terms of DHS's operative SAVE user agency agreements (which mandate compliance with the Privacy Act), and the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up).

Defendants' other arguments are equally unavailing. Defendants grossly mischaracterize the law governing voter standing, overlook that the 90-day quiet period of the National Voter Registration Act ("NVRA") expressly does *not* apply to *state and local* elections (including those upcoming in Virginia and Louisiana), and fail to address (and thus concede) many of Plaintiffs' core factual and legal assertions, including the undisputed fact that the unreliable SSA data that

---

[1] *Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963, at *5 (O.L.C. May 18, 1999) (Acting Ass't Att'y Gen. Randolph D. Moss) ("OLC Op.").

DHS is now illegally funneling through the SAVE system is all but certain to disproportionately adversely affect eligible naturalized citizen voters.

Defendants also disingenuously seek to disavow responsibility for how states use the unreliable SSA citizenship data made available through SAVE, insisting that SAVE users are independent third parties. But the undisputed facts demonstrate that Defendants are not only enabling, but actively encouraging states to use the illegally overhauled SAVE system for "voter verification," to fuel the debunked myth of widespread noncitizen voting.[2] The Court should preliminarily set aside Defendants' illegal overhaul of SAVE pending final resolution of this case and order Defendants to publish all statutorily mandated details about the system.

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits

"[A] plaintiff 'need only establish a likelihood of success on the merits of one claim to obtain ... injunctive relief.'" *Media Matters for Am. v. FTC*, No. 25-cv-1959-SLS, 2025 WL 2378009, at *7 (D.D.C. Aug. 15, 2025). Plaintiffs easily pass that threshold, especially given that Defendants have conceded several merits arguments by failing to address them. *See id.* at *22.

#### A. Plaintiffs have standing

##### 1. Voter injuries

Plaintiffs previously detailed how Defendants' illegal overhaul of the SAVE system poses realistic dangers to the voting rights of naturalized citizens, including proposed class representatives J. Doe 1, 4, and 5, and members of the League of Women Voters of Virginia and Louisiana (collectively, "Voter Plaintiffs and LWV Members"). *See* Mem. 21 & n.55, 35-40. In arguing otherwise, Defendants mischaracterize the law and the facts.

---

[2] *See, e.g.*, Homeland Security (@DHSgov), X (Oct. 21, 2025, 9:08 AM), https://perma.cc/R2XH-R6FE (screenshotting news report of Texas's announcement of "2,724 *potential* noncitizens flagged through" the SAVE system and crediting the "revamped" SAVE system for "stopping … voter fraud," even though Texas's announcement did not identify a single verified case of noncitizen voting) (emphasis added).

**a.** Start with the law. Because "the fundamental right to vote is a cornerstone premise of democracy," courts have zealously "guard[ed]" against burdens on that right. *Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 n.3 (9th Cir. 2025) (citing cases). It is not necessary, as Defendants wrongly argue, for Plaintiffs to show actual disenfranchisement to demonstrate injury. *Cf.* Opp. 18-19. Where, as here, "the harm alleged is prospective," a "plaintiff can satisfy the injury-in-fact requirement" by showing "probabilistic harm" that is not "merely hypothetical or conjectural." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (cleaned up); *see also Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (standing to challenge the "increased risk" of disenfranchisement caused by delays in mailing ballots) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)); *N.C. State Conf. of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 403 (M.D.N.C. 2017) (voter "did not need to be purged from the rolls or prevented from voting to demonstrate injury") (cleaned up).

Directly relevant here, two federal appeals courts have held that naturalized voters had standing to challenge use of the pre-overhauled version of DHS's SAVE system for voter list maintenance. *See Mi Familia Vota*, 129 F.4th at 708-09; *Arcia*, 772 F.3d at 1341-42. In *Mi Familia Vota*, the Ninth Circuit held that naturalized voters had standing to challenge an Arizona law requiring use of SAVE based on evidence that "SAVE may not" have up-to-date "naturalization records," creating the "danger" that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled … losing their constitutional right to vote." 129 F.4th at 708-09. The court rejected standing objections mirroring Defendants'. *Compare id.* 764-66 (Bumatay, J., dissenting), *with* Opp. 18-19. Similarly, in *Arcia*, the Eleventh Circuit held that naturalized voters had "standing to prospectively challenge" Florida's "attempt to remove non-citizens from the voter rolls using the SAVE database" in light of "potential errors that could occur when the Secretary attempted to confirm their immigration status in various state and federal databases in the hurried 90–day window before the election." 772 F.3d at 1341; *see also id.* (finding "foreseeable risk" of harm based on "flaws in the underlying databases").

Here, the Voter Plaintiffs and LWV Members face an even more "substantial risk of future

3

injury." *Attias*, 865 F.3d at 627. By incorporating data into SAVE that Defendants concede is incomplete and unreliable, *see* Mem. 16-17, 28-30; Opp. 21-22, and enabling SAVE's new bulk search functionality, *see* Mem. 13-16, Defendants have exponentially increased the "probability" and "realistic danger" that the Voter Plaintiffs and LWV Members will—solely "because of their … status as naturalized citizens"—be "wrongly identified as non-citizens" and face additional obstacles to voting or unwarranted investigations for lawfully voting. *Arcia*, 772 F.3d at 1341-42. Indeed, contrary to Defendants' assertions (Opp. 19), Plaintiffs have *already faced such burdens*: the Voter Plaintiffs and LWV Members have been forced to contact SSA to book in-person appointments to prove their citizenship, to collect documentation to prove their citizenship, to constantly re-check their voter registration, and to endure fears of investigation or prosecution. *See* Mem. 36-39 (citing declarations). These remedial measures were not the product of baseless paranoia, but rather are consistent with Defendants' *own SAVE guidance*, which expressly instructs that individuals with erroneous SSA records should "contact SSA to update their records."[3] Defendants do not dispute that these burdens will "disproportionately" fall on "naturalized citizen" voters. Mem. 36. Such injuries, even if they do "not prevent" Plaintiffs "from voting," are more than "sufficient to confer standing." *Arcia*, 772 F.3d at 1341; *see Boustani v. Blackwell*, 460 F. Supp. 2d 822, 827 (N.D. Ohio 2006) ("singl[ing] out" naturalized voters for extra scrutiny caused injury); *cf. Meese v. Keene*, 481 U.S. 465, 475 (1987) ("the need to take … affirmative steps to avoid the risk of harm ... constitutes a cognizable injury").

Nor is the danger posed by concededly unreliable SSA citizenship data in SAVE mitigated by the "procedures to be followed '[i]f the SAVE response is other than U.S. Citizen,'" which includes cross-checking DHS databases. Opp. 22. While official guidance on these procedures has been in flux and released piecemeal, Defendants' declarant now claims that if SSA databases identify an individual as a noncitizen and that result cannot be verified in DHS databases accessible by SAVE, then "SAVE informs the user agency to resubmit with an immigration enumerator or

---

[3] USCIS, *Tutorial: Introduction to SAVE and the Verification Process for SAVE Users* (July 17, 2025), https://perma.cc/QLA3-P5BL.

different information" to verify citizenship status. Broderick Decl. ¶14. As part of this process, SAVE users are instructed to "provid[e] the individual with an opportunity to contact the appropriate federal agency (e.g., SSA or DHS) to correct their records and/or contacting the individual to obtain proof of U.S. citizenship." USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Aug. 27, 2025), https://perma.cc/PP4H-T7CK. But Defendants do not dispute that SAVE users and SSA frequently lack DHS identifiers in their own records, and that SAVE itself cannot perform additional verification without a DHS identifier. *See* Mem. 38. And so, here again, naturalized voters will bear the burden of proving their citizenship to SSA to protect and preserve their fundamental voting rights.

Distorting the facts, Defendants insist that if Plaintiffs were right about the SAVE system, then surely there would have been mass disenfranchisement by now since "all the changes to the SAVE system … took effect many months ago." Opp. 19. But Louisiana did not announce its "preliminary findings" from its use of SAVE until September 4, Mem. 18, Virginia did not announce its use of the overhauled system until September 12, *id.* 19, and Texas only announced *four days* ago, on October 20, that it had completed the first phase of its use of SAVE for voter list maintenance.[4] Plaintiffs reasonably believe that the worst is yet to come, and "Damocles's sword does not have to actually fall on" Plaintiffs to demonstrate an injury. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). In any event, the threat that even "*some* … voters will be disproportionately adversely affected in [an] upcoming election"—whether "the number is thirty or thirty-thousand"—can constitute a "real and completely irreparable" injury in fact. *League of Women Voters of N. Carolina ("LWVNC") v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).[5]

---

[4] Press Release, *Texas Completes Citizenship Verifications in the SAVE Database*, Tx. Sec'y of State (Oct. 20, 2025), https://perma.cc/9WZ2-XVDA.
[5] Defendants also make much of the fact that J. Doe 5 voted in a 2025 Virginia election. Opp. 19, 21, 35. But J. Doe 5 voted in the *June* 2025 primary elections—several months *before* Virginia announced its use of the overhauled SAVE system—and has not voted in Virginia's upcoming November 2025 general election. *See* J. Doe 5 Suppl. Decl. ¶¶ 3-5. And regardless of the timing

**b.** Equally unavailing are Defendants' efforts to shirk responsibility for the highly predictable (indeed, desired) consequences of their actions on traceability and redressability grounds. Opp. 19-21. "[S]tanding will lie where 'a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise.'" *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (citing cases). "This is precisely the case here." *Id.* Defendants—not the states—established and are operating the overhauled SAVE system. But for Defendants' actions, SAVE user agencies would not have lawful access to the unreliable SSA citizenship data that the SAVE system is now utilizing. "Because Article III 'requires no more than *de facto* causality,' traceability is satisfied here." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (cleaned up).

Defendants' and SAVE users' public statements confirm this. As the Texas Secretary of State announced just four days ago, "[t]he Trump Administration's decision to give states free and direct access to this data set for the first time has been a game changer, and we appreciate the partnership with the federal government to verify the citizenship of those on our voter rolls and maintain accurate voter lists." Press Release (Oct. 20, 2025), *supra* n.5. DHS reciprocated by retweeting Texas's announcement, and crediting Defendants' "revamp[]" of SAVE to allow "government officials" to "stop[]" (unsubstantiated) "voter fraud." *Supra* n.2. And yet now, after persistently encouraging and enabling SAVE user agencies to "prevent aliens from voting in American elections," Mem. 30, Defendants seek to wash their hands of the highly "predictable effect of [their] action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768.

Redressability is likewise easily met. Vacating Defendants' SAVE overhaul would prevent SAVE users from accessing the unreliable SSA data that is causing Plaintiffs' voting-related injuries. And under Fed. R. Civ. P. 65(d)(2), an injunction prohibiting the use of data illegally pooled into SAVE would "not only bind[] the part[y] defendant[s] but also those identified with them in interest" or "in 'privity' with them," *Washington Metro. Area Transit Comm'n v. Reliable*

---

of any Plaintiffs' voting, these naturalized citizens remain reasonably unnerved about voting in *future* elections and facing unwarranted investigations for their prior lawful voting.

*Limousine Serv., LLC*, 776 F.3d 1, 9-10 (D.C. Cir. 2015), including SAVE users with memoranda of agreement with DHS. *See* USCIS, *Voter Verification Agency Sample MOA Draft* 5 (June 9, 2025), https://perma.cc/7X59-4DF4 (specifying that SAVE user agencies must "[c]omply with the Privacy Act" and that "[i]nformation shared as a result of this MOA shall be considered DHS-USCIS information."); *cf.* Opp. 20, 35, 38 (incorrectly arguing that Plaintiffs seek no relief against SAVE user agencies).

Defendants' cited cases are readily distinguishable. Opp. 19-20. In neither case were federal actors a direct, but-for cause of the plaintiffs' injuries, as Defendants are here. *See Murthy v. Missouri*, 603 U.S. 43, 57, 69 (2024); *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023).

Defendants also badly mischaracterize the NVRA's 90-day "quiet period." Opp. 21, 35-36. As previously noted, ECF No. 21 at 9 n.6, the NVRA quiet period applies only to *federal* elections, not state and local elections, *see* 52 U.S.C. § 20507(c)(2)(A) (only applying to "election[s] for *Federal* office") (emphasis added), including those upcoming in Virginia and Louisiana, *see* Mem. 20. And Virginia asserts it can conduct voter list maintenance of suspected noncitizens even on the eve of a federal election. *See* Order*, Beals v. Va. Coalition for Imm. Rights*, No. 24A407 (U.S. Oct. 30, 2024) (allowing Virginia's last-minute voter purge ahead of 2024 election). In fact, the 90-day quiet period may *incentivize* states to purge voter rolls using SAVE sooner than later, given looming federal elections in the spring of 2026. *See* Mem. 20.[6]

## 2. Informational and notice-and-comment injuries

Contrary to Defendants' arguments, *see* Opp. 22-24, the Voter Plaintiffs, LWV Members, and LWV Organizations satisfy the tests for both informational and notice-and-comment standing.

**a.** A plaintiff has informational standing "where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt [plaintiffs'] claim that the information would help them." *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 783 (D.C. Cir. 2022). This includes required release of information as part of notice-and-comment

---

[6] For instance, 90 days before Texas's March 3, 2026 primary election is December 3, 2025.

procedures, *see, e.g.*, *United to Protect Democracy v. FEC*, 288 F. Supp. 3d 99, 108-10 (D.D.C. 2017)—as the Privacy Act indisputably does, *see* Mem. 6-7; Opp. 22-24 (failing to dispute). The Voter Plaintiffs, LWV Members, and LWV Organizations easily meet these requirements.

*First*, the Privacy Act guarantees them, but Defendants have denied them, nine pieces of vital SORN information regarding Defendants' overhauled SAVE system. *See* Mem. 6-8, 40-41, 43-44. Binding agency guidelines and legislative history confirm that this statutorily guaranteed information, and the Privacy Act more broadly, are intended to ensure public transparency for all interested individuals and organizations, so that they can safeguard their privacy and other rights. *See* Mem. 7-8 (citing sources); Privacy Act Leg. History (cited at Mem. 1 n.1) at 58 (explaining that the Privacy Act's "public notice function" is meant to ensure that "organizations and individuals" have information regarding data systems "which may affect privacy and civil liberties"); *id.* at 15, 219 (similar).

*Second*, Defendants' failure to publish SORN information harms the Voter Plaintiffs, LWV Members, and LWV Organizations in exactly the manner that Congress envisioned in enacting the Privacy Act's notice-and-comment requirements: it denies them the vital information necessary to understand Defendants' changed treatment of their protected information and, in turn, knowledgeably take the steps necessary to safeguard their civil rights and those of others. *See* Mem. 22, 41-44. And "there is no reason to doubt their claim that the information would help them." *Friends of Animals v. Jewell*, 824 F.3d 1033, 1041 (D.C. Cir. 2016). Defendants' response conflates informational standing and procedural standing, miscasting the former as simply a "repackaging [of] [plaintiffs'] allegations of procedural harm" for the latter. Opp. 30. Not so. Under binding precedent, Plaintiffs have asserted distinct and cognizable informational and procedural injuries, and it is of no moment that the former arises from a notice-and-comment statutory provision that also gives rise to the latter. *See Friends of Animals*, 824 F.3d at 1041; *Protect Democracy*, 288 F. Supp. 3d at 108-10.

Contrary to Defendants' arguments, Opp. 24, the plain text of the Privacy Act, binding agency guidance, and legislative history all make clear that transparency and public disclosure are

core aspects of the Act's guarantees. *See* Mem. 7-8. And *Electronic Privacy Information Center v. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("*EPIC*"), the sole case on which Defendants rely, *see* Opp. 24, did not hold that the Privacy Act lacks a general right to information because *EPIC* addressed a single provision of a *different statute*, the E-Government Act, *see EPIC*, 928 F.3d 103-04, as Defendants parenthetically acknowledge, *see* Opp. 24.[7]

**b.** Plaintiffs asserting a notice-and-comment injury have standing if they show that the deprivation affects their concrete interests in a personal way. *See Mendoza v. Perez*, 754 F.3d 1002, 1012-13 (D.C. Cir. 2014); Opp. 23. Plaintiff Doe 1 and the LWV Organizations have been deprived of their opportunity to (1) raise their many concerns regarding the overhauled SAVE system before Defendants took action, and (2) safeguard concrete and substantial interests in voting and privacy. *See* Mem. 22 (citing declarations). This is sufficient. *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013); *Iyengar v. Barnhart*, 233 F. Supp. 2d 5, 13 (D.D.C. 2002).

"[V]acatur is the normal remedy" to redress such "procedural violation[s]." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (cleaned up). Defendants offer no reason to depart from that default rule here—which in this preliminary relief context simply entails applying § 705 of the APA, *see, e.g.*, *Cabrera v. U.S. Dep't of Lab.*, No. 25-CV-1909-DLF, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025); *infra* § IV—and forbidding them from operating the overhauled SAVE system without first conducting notice and comment.

### 3. Privacy injuries

Defendants' violations of the Privacy Act are also causing the Voter Plaintiffs and LWV Members harms closely analogous to those caused by intrusion upon seclusion and breach of confidence, two distinct torts "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016)).

---

[7] Defendants' redress argument (Opp. 24-25) is a strawman. Plaintiffs seek SORN publication to redress their informational injury.

**a.** Unauthorized disclosures of Plaintiffs' sensitive information, even within the government, is closely analogous to the tort of intrusion upon seclusion. "That tort makes liable any person who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns if the intrusion would be highly offensive to a reasonable person. The intrusion itself inflicts the harm; no publication or other use of any kind of the information intruded upon is necessary." *AFL-CIO v. U.S. Dep't of Lab.*, 778 F. Supp. 3d 56, 71 (D.D.C. 2025) (cleaned up). "The Privacy Act makes it so an individual 'should . . . be at peace' with the fact that his information is maintained and only reviewable by the relevant agency," and that citizens are cognizably harmed by the unease caused by unauthorized disclosures. *Id.* at 72. Defendants' intrusions are causing Plaintiffs precisely such injuries. *See* Decl. of J. Doe 1, ECF No. 16-2 ¶¶ 22, 26 (Defendants' consolidation of data "makes me feel like I am living in a surveillance state"); Decl. of J. Doe 4, ECF No. 16-3 ¶ 20 (similar); Decl. of J. Doe 5, ECF No. 16-4 ¶¶ 19, 22 (similar). Defendants fail to explain, Opp. 14-15 & n. 4, what relevant facts distinguish this matter. If receiving five unwanted text messages is injury in fact, *see Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020), unauthorized access to sensitive personal information is likewise an intrusion.

Defendants also erroneously point to two Fourth Circuit opinions; the panel decision in *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025) ("*AFT*"), and dissent in *Am. Fed'n of State, Cnty., & Mun. Emps. v. SSA*, No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025) ("*AFSCME*"). As an initial matter, *AFT*'s core holdings are currently being reviewed by the full Fourth Circuit in *AFSCME*, which previously declined to stay a preliminary injunction that found intrusion-upon-seclusion standing. *See AFSCME*, 2025 WL 1249608 at *1; *AFSCME v. SSA*, 25-cv-0596-ELH, 2025 WL 1141737 at *27-42 (D. Md. Apr. 17, 2025) (extensively discussing applicability of intrusion upon seclusion to misuse of sensitive data within agencies).

In any event, while the *AFT* panel found that unauthorized intragovernmental disclosures of sensitive records seem "different in kind, not just in degree" from traditional intrusions, *id.*, the harm Plaintiffs suffer need not be "an exact duplicate" of the harm required to prevail on an

intrusion upon seclusion claim, so long as it "bears a sufficiently close relationship to the harm." *TransUnion*, 594 U.S. at 433. Even a "differen[ce] in kind" does not overcome the fact that it is typically "*Congress*, not judges, [who] determine what is sufficiently bad to be deemed unlawful." *AFL-CIO*, 778 F. Supp. 3d at 72. And Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo,* 578 U.S. at 341. Congress did so with the Privacy Act, imbuing safeguards for federal agencies holding sensitive personal information as "'a modern relative of a harm with long common law roots.'" *AFL-CIO*, 778 F. Supp. 3d at 72 (quoting *Gadelhak*, 950 F. 3d at 462).

Defendants also wrongly downplay any intrusions as not "highly offensive to an ordinary, reasonable person." Opp. 15 (cleaned up). But as Defendant SSA itself recognizes, "the SSN is one of the most sensitive pieces of personal information in our records. It is the key to identifying and retrieving most of the highly personal and sensitive information we maintain about individuals." SSA, *Program Operations Manual System (POMS)*, GN 03325.002, https://secure.ssa.gov/poms.nsf/lnx/0203325002.

**b.** Plaintiffs' injuries are also independently cognizable as analogous to the tort of breach of confidence, which "'lies where a person offers private information to a third party in confidence and the third party reveals that information' to another." *Jeffries v. Volume Servs. America, Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). "The harm in a breach-of-confidence case occurs when the plaintiff's trust in the breaching party is violated, whether or not the breach has other consequences." *Id.* Defendants' arguments, Opp. at 17, cannot overcome binding precedent finding this common law tort exists.[8]

Defendants' remaining arguments are unavailing. Characterizing SSA data as "created by and for the use of the federal government." Opp. 17, unpersuasively downplays the sensitivity of SSA records. Defendants cherry-pick language to suggest that the tort requires a plaintiff to *offer*

---

[8] Defendants also get the history wrong, as the tort dates back to the 1800s. *See* Daniel J. Solove & Neil M. Richards, *Privacy's Other Path: Rediscovering the Law of Confidentiality*, 96 Geo. L.J. 123, 125 (2007); Thomas M. Cooley, *The Law of Torts* 595 (2d ed. 1888).

information to a third party and cannot apply here because the government creates SSNs to give to plaintiffs. *See id.* (quoting *AFL-CIO*, 778 F. Supp. 3d at 73). In *Jeffries*, the D.C. Circuit described the tort in part as one that "occurs when the plaintiff's trust in the breaching party is violated." 928 F.3d at 1064 (cleaned up). This language properly emphasizes the breach of confidentiality, rather than the origin of the information. Further, the *Jeffries* court found a plaintiff's injuries analogous to breach of confidence when a merchant printed the plaintiff's full credit card number and expiration date on a receipt. 928 F.3d at 1062, 1064-65. According to Defendants, the plaintiff in *Jeffries* would experience a breach of confidence if a merchant shared their credit card number, but not if the credit card company themselves did so. That cannot be.

### B. Plaintiffs have an APA remedy for Defendants' Privacy Act violations

The APA's requirement for "federal courts to set aside federal agency action that is 'not in accordance with law'" generally applies to "*any* law." *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). In evaluating whether a statute provides a remedy displacing APA review, courts evaluate congressional intent to create a comprehensive scheme that would narrow judicial review of APA claims, and whether the alternate remedy is of such a nature as to provide an adequate substitute for APA review. *See Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009). Neither condition is satisfied here.

#### 1. Congress did not intend to preclude APA review of Privacy Act claims

"[O]nly upon a showing of clear and convincing evidence" of a "legislative intent" to preclude APA review "should the courts restrict access to judicial review." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967); *see United States v. Fausto*, 484 U.S. 439, 444 (1988). Defendants fall well short of meeting this burden.

The Privacy Act created new requirements to restrain government surveillance and protect Americans' sensitive data. Mem. at 5-8. Its expansive new protections distinguish it from statutes designed to, for example, streamline "[existing] haphazard arrangements for administrative and judicial review" with new "integrated scheme[s]." *Fausto*, 484 U.S. at 444. The contemporaneous history confirms the Act was not understood to displace the APA. As required by the Act, 5 U.S.C.

§ 552a(v)(1), the Office of Management and Budget published contemporaneous guidelines explaining that "an individual may have grounds for action under other provisions of the law in addition to those provided" by the Privacy Act, including "seek[ing] judicial review under other provisions of the Administrative Procedure Act." 40 Fed. Reg. 28,948, 28,968 (July 9, 1975). These guidelines are "a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent" and carry "particular force" in aiding this court's interpretation of the Act. *See Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477 (1979) (discussing contemporaneous regulations).

Congress has also demonstrated that when it wishes to make Privacy Act remedies exclusive, it does so expressly. In the Judicial Redress Act of 2015, Congress extended the Privacy Act to cover citizens of certain foreign countries or regional economic organizations. Pub. L. 114-126, 130 Stat. 282, 282, 284, 5 U.S.C. §§ 552a note, 2(a), 2(c), 2(h) (2016). For *only* this category of newly covered persons, the 2015 Act provides that "[t]he remedies set forth" by the Privacy Act "are the exclusive remedies available to a covered person under this section." *Id.* § 2(b). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Fausto*, 484 U.S. at 448 (such differences are a presumptive "manifestation of a considered congressional judgment"). In its 2015 Privacy Act amendments, Congress chose for the Act's remedies to be exclusive, but *only* for one category of affected people (a category not relevant to this case). Congress did not make Privacy Act remedies exclusive for other individuals.

Finally, both the Supreme Court and D.C. Circuit have contemplated that the APA authorizes relief for Privacy Act violations beyond the remedies built into the Act itself. In *Doe v. Chao*, the Supreme Court posited that the "inattention" of the Privacy Act to certain "standards of proof governing equitable relief . . . may be . . . explained by the general provisions for equitable relief within the" APA. 540 U.S. 614, 619 n.1 (2004). In *Doe v. Stephens*, the D.C. Circuit considered a claim that the Veterans Administration improperly disclosed medical records in

violation of the Act. 851 F.2d 1457, 1460-61, 1463 (D.C. Cir. 1988). After finding that the "Privacy Act [did] not by itself authorize the injunctive relief sought by Doe," the court explained that such relief nevertheless *was* available under the APA, because Doe's "clearly [was] a case of agency action 'not in accordance with law' within the meaning of 5 U.S.C. 706(2) . . . [where] the disclosure of Doe's psychiatric records violated the Veterans' Records Statute, as amended by the Privacy Act." *Id.* at 1463, 1466. Other judges in this District have reached the same result. *See AFL-CIO*, 778 F. Supp. 3d at 81; *Radack v. DOJ*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005).

### 2. The Privacy Act does not provide Plaintiffs an adequate remedy

Though a statutory remedy "need not provide relief identical to relief under the APA, so long as it offers relief of the same genre," *Garcia*, 563 F.3d at 522 (cleaned up), "[a]n alternative remedy will not be adequate . . . if the remedy offers only 'doubtful and limited relief.'" *Id.* at 522. Under the Privacy Act's remedial scheme, individuals may seek injunctive relief to force the release or modification of their particular records, or monetary damages for unlawful disclosures. 5 U.S.C. § 552a(g). Such relief is woefully inadequate to redress Plaintiffs' injuries.

*First*, the Privacy Act's remedies are inadequate here because Plaintiffs "cannot initiate" the administrative remedies while they continue to accrue harms, *Sackett v. EPA*, 566 U.S. 120, 127 (2012), and Defendant's unlawful conduct itself impedes Plaintiffs' access to the Act's remedies. When an agency issues a new or revised SORN, they are required to explain, among other things, "the categories of individuals" whose records are implicated and the procedures whereby individuals can gain access to any records pertaining to them and contest their contents. *See* 5 U.S.C. § 552a(e)(4)(B); Mem. 7. By unlawfully failing to provide this information, Defendants' misconduct frustrates the ability of any individual to obtain relief under the Act, withholding the conditions precedent for individuals to effectuate the Act's remedies.

*Second*, Plaintiffs do not seek relief in the same "genre" as the remedies offered by the Privacy Act. *Garcia*, 563 F.3d at 522 (cleaned up). Rather, Plaintiffs seek, in the face of looming election deadlines, (1) a stay of the overhauled SAVE system created and operated by Defendants to prevent irreparable and imminent harm caused by the wrongful misuse and repurposing of their

14

personal data, and (2) the issuance of SORNs reflecting and describing Defendants' overhaul of SAVE to permit voter education and outreach. *See* PI Mot. 1, ECF No. 16. Were Plaintiffs relegated to the Privacy Act's limited set of remedies, they could suffer imminent burdens on the fundamental right to vote or even outright disenfranchisement. Reading the Privacy Act—a statute designed to protect Americans from governmental abuses of their personal data—to force Plaintiffs to endure such risks would be nonsensical.

*Third*, while the LWV Organizations are suffering acute and ongoing injuries as a result of Defendants' violations of the Privacy Act, they are not "individuals" within the meaning of the Act. *See* 5 U.S.C. §§ 552a(a)(2), (g)(1)(D). The Privacy Act's remedies do not offer those Plaintiffs any (let alone adequate) relief, but the APA does.

### C. Plaintiffs' claims are likely meritorious

#### 1. 8 U.S.C. § 1373 does not limit Plaintiffs' claims

**a.** DHS and SSA lack statutory authority to pool data from SSA into a revamped SAVE system at DHS. As Plaintiffs showed in their opening brief, black letter law dictates that agencies are creatures of statute, whose powers must derive from clear statutory authority, and no statute authorizes DHS to pool SSA data as they have here. Mem. 34. Defendants respond that § 1373 authorizes this data pooling. Opp. 32. But § 1373 cannot reach so broadly.

Typical statutory interpretation cases involve analyzing the limits of an affirmative grant of authority to an agency. *See, e.g.*, *NextEra Energy Resources*, *LLC v. FERC*, 118 F.4th 361, 369 (D.C. Cir. 2024). But §§ 1373(a) and (b) only instruct that an "entity or official may not prohibit, or in any way restrict" certain information sharing, 8 U.S.C. § 1373(a), or that "no person or agency may prohibit, or in any way restrict" certain information sharing. *Id.* § 1373(b). Plaintiffs have identified no case where *prohibitory* language in a statute was read to confer *affirmative* authority on an agency. But cases interpreting prohibitions like those in § 1373 show that, consistent with the plain meaning of the text, such statutes do not confer new authority. *Cf. New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (provision in Federal Power Act stating that particular section "shall not . . . deprive a State or State commission of its lawful authority" was

15

"in no sense an affirmative grant of power to the states . . . which would otherwise not be permissible") (cleaned up).

Indeed, Defendants' approach is irreconcilable with the nondelegation doctrine, which requires Congressional delegations of authority to "ma[ke] clear both the general policy that the agency must pursue and the boundaries of its delegated authority," allowing courts to "ascertain whether the agency has followed the law." *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2497 (2025) (cleaned up). Statutory statements that instruct agencies *not* to take certain actions inherently do not provide the guidance the non-delegation doctrine requires and thus cannot be sufficient to establish an agency's affirmative powers to *do* anything.

The same principle applies here. Indeed, DOJ itself has long construed § 1373 that way. In 1999, then Acting AAG Randolph D. Moss considered the sharing of confidential census data and concluded that § 1373(a) does "not clearly invest governmental officials or entities with the affirmative authority to disclose information in circumstances where they otherwise would be prohibited from doing so by a federal statute." OLC Op., 1999 WL 34995963, at *4. He noted hypothetical language that *would* have granted such authority: "a federal, state, or local official or entity may provide information, without restriction." *Id.* But absent such affirmative language, it was improper to read affirmative powers into a prohibitory clause. *See id.* Other DOJ components have similarly construed § 1373.[9]

The only affirmative obligation in § 1373 is in § 1373(c), which imposes on DHS an "[o]bligation to respond to inquiries" from government entities seeking to verify the immigration status of an individual. 8 U.S.C. § 1373(c). But Plaintiffs do not challenge whether *DHS* must respond to such inquiries—Plaintiffs challenge the pooling of *SSA data* into DHS's SAVE system, an action that is not plausibly authorized by § 1373(c).

---

[9] *See, e.g.*, DOJ Office of Inspector General, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients*, 6 n.7 (May 31, 2016), https://tiny url.com/f6kyj5xv; Office of Justice Programs, *Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373*, https://perma.cc/8R8M-XTL2.

**b.** Section 1373 also does not impliedly repeal the Privacy Act or APA. "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys.*, 584 U.S. at 510 (cleaned up). "[R]epeals by implication are disfavored," and courts apply a "strong presumption . . . that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Id.* (cleaned up). Courts thus can "not infer a statutory repeal unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all." *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 306 (D.C. Cir. 2014) (cleaned up). Defendants fail to overcome this "strong presumption" for several reasons.

*First*, Congress did not specifically address either the Privacy Act or the APA when it enacted § 1373 in 1996. By contrast, Congress has expressly amended the Privacy Act numerous times—in 1988, 1997, 1999, 2010, and 2014—to create carveouts for specified computerized matches of records across federal agencies comparable to the interagency data sharing Defendants have established through the overhauled SAVE system. *See* 5 U.S.C. §§ 552a(a)(8)(B)(i)-(x). These carveouts show that when Congress wants to create exceptions to the Privacy Act's comprehensive restrictions on interagency data sharing and national data banks, it does "so clearly and expressly." *FCC*, 537 U.S. at 302 (applying canon in a different context).

Defendants highlight the "notwithstanding" clauses in § 1373(a) and (b), Opp. 2, but even a notwithstanding clause can have a limited scope where "nothing in the statute indicates that Congress intended" an action to be taken "contrary to its own laws." *D.C. Fed'n of Civic Ass'ns, Inc. v. Volpe*, 434 F.2d 436, 447 (D.C. Cir. 1970). In *Volpe*, the D.C. Circuit found that Congress, when pushing for a particular bridge to be built in the District of Columbia, "inten[ded] to countermand" local government action that had impeded construction, but that its order that the bridge be built "notwithstanding any other provision of law" should not be read to preempt existing federal construction planning laws. *Id.* at 437-39, 447; *see also*, *e.g.*, *Northwest Forest Res. Council v. Pilchuck Audubon Soc.*, 97 F.3d 1161, 1166-67 (9th Cir. 1996) (similar). As Acting

17

AAG Moss concluded, the notwithstanding clause in § 1373 reflects a "congressional intention to displace inconsistent law," but not a "broad construction of the substantive provision that would give rise to such inconsistencies." OLC Op., 1999 WL 34995963, at *6.

*Second*, the Privacy Act and § 1373 are not "irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550 (1974). In the first instance, the statutes can be readily harmonized if, as detailed *supra*, § 1373 is understood not as an affirmative grant of data-sharing authority that supersedes the Privacy Act, but rather a restriction on certain restrictions. Moreover, Section 1373(a) and (b) prevent "entities," "officials," "person[s]" and "agenc[ies]" from prohibiting or restricting certain information sharing. 8 U.S.C. §§ 1373(a), (b). But the Privacy Act and the APA are existing provisions of law, not entities, officials, persons, or agencies. To define those existing laws as being within the scope of §§ 1373(a) and (b), a court would need to adopt a construction of the statute prohibiting *Congress* (which passed the Privacy Act and APA) from enacting restrictions. Doing so would run afoul of the fundamental constitutional principle that "one legislature cannot abridge the powers of a succeeding legislature." *Fletcher v. Peck*, 10 U.S. 87, 135 (1810). OLC came to the same conclusion. *See* OLC Op., 1999 WL 34995963, at *6.

Rather than treat § 1373 and the Privacy Act and APA as irreconcilable, this Court should interpret § 1373's limitations to "apply only when the source of the prohibition or restriction on disclosure is an entity or official *other than Congress*," such that, "notwithstanding a federal statute that would authorize federal officials or entities to exercise their general administrative discretion in a manner that would prohibit or restrict disclosures of the type identified in §1373(a), such federal officials or entities may not exercise such discretion." *Id.* This is also consistent with Congress's intent in enacting § 1373. *See* H.R. Rep. No. 104-725, at 383 (1996).

*Third*, Defendants' implied repeal argument is belied by their own actions. DHS has issued revised SORNs for the SAVE system at least eight times since Congress enacted § 1373, showing that for decades and across administrations Defendants did not understand § 1373 to impliedly repeal the Privacy Act's requirements. *See* Mem. 2 at n.2. Moreover, the SSA-DHS SAVE Agreement and Memoranda of Agreements governing the overhauled SAVE system explicitly

state that the SSA citizenship data pooled into SAVE is subject to the requirements of the Privacy Act. *See* SSA-DHS SAVE Agreement at 3, 4, 6; USCIS, *Voter Verification Agency Sample MOA Draft*, 1, 5, 7, 9. Defendants' reading of § 1373 would render those provisions inoperative.

*Finally*, Defendants articulate no limiting principle for their reading of § 1373, arguably allowing it to preclude *any* statute that in any way arguably impeded the information sharing Defendants desire. This absurd and dangerous proposition cannot be correct.

### 2. Defendants have conceded Plaintiffs' likelihood of success on their SORN and arbitrary-and-capricious claims

Defendants fail to address, and thus concede, the merits of Plaintiffs' claims that the SAVE overhaul was procedurally defective, Mem. 25-27, and arbitrary and capricious, *id.* 28-32, both of which are independent grounds for preliminary relief, *id.* 32.

### 3. Defendants fail to refute Plaintiffs' claims for unlawfully withheld agency action and mandamus relief

In challenging Plaintiffs' claims for unlawfully withheld agency action and mandamus relief, Defendants simply reiterate their § 1373 argument, which Plaintiffs refute *supra* § I.C1. Defendants likewise incorporate by reference their arguments about the availability of APA relief in opposing mandamus relief. *See* Opp. 30-31. But that reasoning does not translate to the mandamus context. In contrast to the standard for APA preclusion, "[a] statute does not strip" a court's mandamus authority "absent a clear statement to that effect." *In re al-Nashiri*, 791 F.3d 71, 76 (D.C. Cir. 2015) (cleaned up); *see CREW v. Trump*, 302 F. Supp. 3d 127, 134 (D.D.C. 2018), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019). The Privacy Act lacks such a clear statement.

### 4. Defendants fail to refute Plaintiffs' *ultra vires* claim

Defendants tellingly spend more time reciting the burden for establishing an *ultra vires* claim than addressing Plaintiffs' actual claim. Opp. 31-32. That is because the Privacy Act imposes "clear and specific statutory mandate[s]" Defendants have concededly violated based on their implausible, unprecedented reading of § 1373. *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). This is hardly a "typical statutory-authority argument." Opp. 31. And if the Court rejects Plaintiffs' APA claim, equitable relief is otherwise available, since "the right

of action for an *ultra vires* claim flows from the federal courts' equity jurisdiction[.]" *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *51 (4th Cir. Apr. 30, 2025).

### 5. Defendants mischaracterize Plaintiffs' separation of powers claim

Defendants wrongly argue that it is "irrelevant" that the Executive Branch "does not 'possess any express constitutional authority over elections," because "none of the actions challenged here involve any federal regulation of elections." Opp. 32. But they overlook that the Elections EO explicitly directs SSA to make available the agency's citizenship information to "*assist States in determining whether individuals are eligible to register and vote*." Exec. Order No. 14,248, § 3 (emphasis added). And the SSA-DHS SAVE Agreement at the heart of this case expressly invokes the Elections EO as a basis for authority. SSA-DHS SAVE Agreement at 2-3. But under the Constitution's Elections Clause, Defendants have no such authority. *See* U.S. Const. art. I, § 4, cl. 1; *League of United Latin Am. Citizens ("LULAC") v. EOP*, 780 F. Supp. 3d 135, 194 (D.D.C. 2025); Br. of Amicus Curiae Campaign Legal Ctr., ECF 40-1.

Defendants' other arguments are likewise unavailing. First, Defendants repeat their already-refuted reading of § 1373. Opp. 32; *see supra* § I.C.1. Second, Defendants wrongly mischaracterize the claim as concerning whether the Executive Branch *exceeded* its statutory authority under § 1373 rather than whether it *lacked* any authority at all. Accepting this framing would mean that in all separation of powers cases where an Executive Branch defendant has no authority to act, that the defendant could point to a plainly inapplicable statute to attempt to re-frame the claim as "a statutory claim, not a separation-of-powers claim." Opp. 32. The D.C. Circuit rejected such gamesmanship in *Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).

*Dalton v. Specter*, 511 U.S. 462 (1994), and *Glob. Health Council v. Trump*, 153 F.4th 1, 7-8 (D.C. Cir. 2025), confirm this is not a run-of-the-mill statutory claim. "Here, unlike in *Dalton* [and *Global Health Council*], Plaintiffs' claim is not one 'simply alleging that the President has exceeded his statutory authority.' Rather, Plaintiffs claim that to the extent Defendants did not have statutory authority" to pool SSA data for voter eligibility determinations, "they acted in

violation of constitutional separation of powers principles because Defendants lack any background constitutional authority." *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) (cleaned up).

## II. Plaintiffs have demonstrated irreparable injury

### A. Voter injuries

Defendants simply repackage their standing arguments in disputing Plaintiffs' voting-related irreparable injuries, Opp. 34-35, and they thus fail for the reasons outlined *supra* § I.A. Indeed, these injuries are necessarily irreparable because they are tied to upcoming elections in 2025 and 2026 that are certain to pass before this suit reaches final judgment, and, once they do, "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (quoting *LWVNC*, 769 F.3d at 247); *accord LULAC,* 780 F. Supp. 3d at 194; *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 128-30 (D.D.C. 2020). Defendants also puzzlingly claim the "right to vote is simply not at stake in this suit," despite encouraging and enabling states to use the overhauled SAVE system for "voter verification." Opp. 34; Mem. 39. Defendants' statements are not only wrong, but also directly contradicted by DHS's own acknowledgment, just last year, of "the very serious consequences of the results produced by SAVE and its import in ensuring the right to vote for U.S. citizens." USCIS, *Letter from USCIS Director to Ohio Sec'y of State* (Oct. 10, 2024), https://perma.cc/8SN3-C88W.

### B. Notice-and-comment and informational injuries

Defendants wrongly claim that informational harms are irreparable only "if the Court has already accepted Plaintiffs' *other* arguments about privacy-related harms or voting-related harms." Opp. 36. But this is simply a redux of Defendants' mistaken attempt to conflate informational and procedural harms. *See supra* § I.A.2. Nor do Defendants grapple with the common-sense conclusion that movants quite obviously need the required SORN information now, so that they can understand the full parameters of Defendants' ongoing expansion of SAVE's uses and users and make informed decisions about how to safeguard their voting and privacy interests (which are separately at stake) in advance of fast-approaching elections. *See* Mem. 41, 44. This time-sensitive

information is of little value if Defendants can publish SORN information at their leisure. *See* Mem. 41 (citing cases finding irreparable harm for similarly time-sensitive information).

Defendants assert that procedural harms are not irreparable because the Court could order them to publish SORN information and that would provide complete redress "whenever that order is issued." Opp. 36. But both the law and facts undercut this suggestion. The Privacy Act does not permit agencies to publish SORNs "whenever" they desire; it requires them to do so *at least 30 days in advance* of any new use or intended use of information in a system of records, so that interested persons can submit comments and have them considered. *See* Mem. 7; *see also id.* at 42 (collecting cases finding irreparable harm because plaintiffs lacked the opportunity to have comments considered). Defendants ignore this legal requirement, which reflects Congress's view of the immediate need for SORN information, with zero mention. And they likewise brush aside the voting and privacy interests at stake with little mention; those are significant and pressing for all the reasons discussed. *See* Mem. 42-45; *supra* § II.A; *infra* § II.C.

### C. Privacy injuries

For many of the same reasons that Plaintiffs have established standing to vindicate their privacy related interests, *supra* § I.A.3, they have also demonstrated that Defendants' lawlessness is causing irreparable harm. As described above, the records being misappropriated by DHS include "one of the most sensitive pieces of personal information in [SSA's] records." SSA, *POMS*, GN 03325.002. And DHS is consolidating and sending inquiring to state officials confidential details of Plaintiffs' citizenship status at the time they applied for SSA numbers. Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://perma.cc/KS2N-U2US. Plaintiffs have explained the anxiety they experience about the ongoing intrusions into their personal records, the concerns they have about the integrity of their data, and their fears that wrongful disclosures of inaccurate information to states will have severe consequences. Decl. of J. Doe 1 at ¶¶ 13-15, 22-23; Decl. of J. Doe 4 at ¶¶ 12-15, 20-11; Decl. of J. Doe 5 ¶¶ 11-14, 18-20. These harms are tangible, ongoing, and irreparable. *See, e.g.*, *Hum. Touch DC, Inc. v.*

*Merriweather*, No. 15-cv-00741, 2015 WL 12564166 (D.D.C. May 26, 2015); *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000).

While it is true that courts that have found standing to challenge improper intragovernmental disclosures but declined to issue preliminary relief absent proof of imminent data "misuse," Opp. 34; *see AFL-CIO v. U.S. Dep't of Lab.*, No. 1:25-cv-339, 2025 WL 1783899 at *1, here Defendants *are* actively misusing and disclosing Plaintiffs' sensitive information. It is uncontested that DHS is, *currently*, inviting state officials to access Plaintiffs' information, and sending state officials the SSA's information about Plaintiffs' citizenship status. As a result, this case is readily distinguishable from the cases that Defendants cite. This is particularly true given that the types of state officials receiving Plaintiffs records have a long history of declining to abide by the requirements of the SAVE system. *See* Mem. 38 n. 79.

### D.  Plaintiffs did not delay in filing suit

Defendants' claim of unreasonable delay is baseless. Opp. 36-38. Despite being hindered by Defendants' pervasive disregard of notice and transparency requirements, Plaintiffs have diligently pursued their claims. While Defendants selectively publicized certain details about their SAVE overhaul between April and August of this year, it was not until September that the serious risks posed by their actions came into focus. First, on September 4, Louisiana announced "preliminary findings" of an investigation into alleged instances of non-citizen voting after running "names from Louisiana's voter rolls" through the overhauled SAVE system. Mem. 18. Next, on September 12, Virginia confirmed its use of the overhauled system's new bulk upload functionality. Mem. 19. Then, on September 25, SSA posted to its FOIA reading room the SSA-DHS SAVE agreement—which revealed key details about Defendants' illegal data consolidation arrangement.[10] Plaintiffs promptly filed suit just five days later, and moved for a stay and preliminary injunction the following week.

---

[10] SSA, *FOIA Reading Room*, https://perma.cc/C9E3-JS55 (listing "date posted" for May 15, 2025 agreement as September 25, 2025).

### III. The remaining factors favor preliminary relief

Defendants' wrongly claim that the equities tip in their favor by rehashing their erroneous assertion that this case has nothing to do with voting, their misunderstanding of the NVRA's quiet period, and their misconstruction of § 1373. Opp. 38-39. On top of those already-refuted arguments, Defendants cite the Supreme Court's cursory order granting a stay in *SSA v. AFSCME*, 145 S. Ct. 1626 (2025). Insofar as any weight can be assigned to that order, that case is readily distinguishable because Plaintiffs here assert an array of injuries and claims—including those related to voting, informational rights, and notice-and-comment rights—not alleged there.

### IV. Plaintiffs' requested relief is appropriately tailored and authorized by 5 U.S.C. § 705

Defendants claim that both the "equitable principles" articulated in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and § 705 of the APA make Plaintiffs' requested universal injunctive relief under § 705 inappropriate here. Opp. 40-41. They are wrong on both counts.

First, *CASA* does not control the scope of relief under the APA, as the Supreme Court made explicitly clear. 606 U.S. at 847 & n.10; *see also City of Columbus v. Kennedy*, No. 25-cv-2114-BAH, 2025 WL 2426382, at *33-34 (D. Md. Aug. 22, 2025) (citing cases). Defendants try to rewrite the Court's express "reserv[ation]" on the question of APA remedies, claiming it concerned only the continued availability of universal relief under § 706(2) of the APA and not the § 705 preliminary relief at issue here. But *CASA* did not restrict the longstanding ability of district courts to "grant . . . the functional equivalent of a universal injunction" by "preliminarily setting aside" agency action under the APA. 606 U.S. at 873 (Kavanaugh, J., concurring).

Defendants ignore not only the context of *CASA* (which solely construed the 1789 Judiciary Act), but also the principle that "the scope of preliminary relief under [§] 705 aligns with the scope of ultimate relief under [§] 706." *Career Colls. & Sch. of Texas v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024); *see also Make the Rd. New York v. Noem*, No. 25-cv-190-JMC, 2025 WL 2494908, at *22 (D.D.C. Aug. 29, 2025). "Courts in this circuit have thus consistently applied § 705 to permit wholesale, rather than party-specific, stays of agency action" at the preliminary relief stage, just as they have done when applying § 706(2) to grant final relief. *Cabrera*, 2025 WL

2092026, at *8. And the Court can enter an order that provides complete relief to the parties in the case, regardless of incidental nonparty benefits. *See L.G.M.L. v. Noem*, No. 25-cv-2942-TJK, 2025 WL 2671690, at *19 (D.D.C. Sept. 18, 2025)

Defendants next insist a § 705 stay is "unavailable" because § 705 permits courts to "postpone" upcoming actions only, not ones that, like the "challenged actions" here, "took effect months ago." Opp. 40. But they ignore that judges in this District and elsewhere regularly construe § 705 as permitting stays for "already-effective action[s]." *Cabrera*, 2025 WL 2092026, at *8; *see also Haitian Evangelical Clergy Ass'n v. Trump*, 2025 WL 1808743, at *10 (E.D.N.Y. July 1, 2025). Here, the required stay is straightforward and "clear," Opp. 40—Defendants must revert the SAVE system back to its prior operational state and take all steps necessary to do so, *see* Proposed Order, ECF No. 16-10.

Finally, the Court should decline Defendants' cursory bond request. Opp. 41. This Court and others have routinely exercised their broad discretion to set no bond or only a nominal bond amount in similar circumstances, including in cases post-dating the D.C. Circuit decision Defendants cite. *E.g.*, *Thein v. Trump*, No. 25-cv-2369-SLS, 2025 WL 2418402, at *19 (D.D.C. Aug. 21, 2025); *L.G.M.L.*, 2025 WL 2671690, at *20.

## CONCLUSION

The Court should issue a stay under 5 U.S.C. § 705 and a preliminary injunction.

Dated: October 24, 2025

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
Lauren C. Bingham (Fl. Bar No. 105745)*
Yoseph T. Desta (DC Bar No. 90002042)
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
(202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org
lbingham@citizensforethics.org
ydesta@citizensforethics.org

Jennifer Fountain Connolly (D.C. Bar No. 1019148)
Aman T. George (D.C. Bar No. 1028446)
Johanna M. Hickman (D.C. Bar No. 981770)
Mark B. Samburg (D.C. Bar No. 1018533)
Robin Thurston (D.C. Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ageorge@democracyforward.org
jconnolly@democracyforward.org
hhickman@democracyforward.org
msamburg@democracyforward.org
rthurston@democracyforward.org

Jon Sherman (D.C. Bar No. 998271)*
Michelle Kanter Cohen (D.C. Bar No. 989164)
Emily Davis (D.C. Bar No. 90020129)
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 701
Washington, DC 20006
(202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
edavis@fairelectionscenter.org

*admitted *pro hac vice*

*Counsel for All Plaintiffs*

Respectfully Submitted,

John L. Davisson (D.C. Bar No. 1531914)
Enid Zhou (D.C. Bar No. 1632392)
Abigail Kunkler (D.C. Bar No. 90030868)
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave NW
Washington, D.C. 20036
(202) 483-1140
davisson@epic.org
zhou@epic.org
kunkler@epic.org

*Counsel for Plaintiff Electronic Privacy
Information Center*