**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | No. 1:25-cv-03501-SLS |

### DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM

After the recent hearing in this matter, Plaintiffs withdrew their motion for certification of a preliminary-relief subclass, *see* Notice, ECF No. 46, and their motion for a preliminary injunction, *see* Pls.' Supp. Br. at 1 n.1, ECF No. 47. So, now, Plaintiffs' only pending motion is their request for a "stay" under 5 U.S.C. § 705. For all the reasons Defendants have already explained, that request is meritless, and should be denied. In particular, the Court can deny the motion solely on the basis that Plaintiffs have failed to show irreparable harm, leaving resolution of all other issues in this case for another day. *See, e.g.*, *Univ. of California Student Ass'n v. Carter*, 766 F. Supp. 3d 114 (D.D.C. 2025).

Plaintiffs have now filed a "supplemental memorandum" attempting to rectify their failure to carry their burden to show standing and irreparable harm on their theories of voting-related injury.[1] That memorandum, however, is plagued by many of the same problems that Defendants and the Court already identified with Plaintiffs' prior filings. Most importantly, it doesn't purport to have any connection to any of the Plaintiffs in this case. Accordingly, to the extent the Court considers any of the new material in Plaintiffs' filing, none of it changes the bottom-line problem

---

[1] Plaintiffs' supplemental filing does not offer any new arguments or evidence relating to their theories of harm relating to privacy, procedural injury, or informational injury.

with their amorphous and ever-shifting requests for preliminary relief: there remains no good reason to think that any of the Plaintiffs (or even any members of any of the Plaintiff organizations) face any actual or imminent harm—irreparable or otherwise.

## I.    Plaintiffs' supplemental memorandum establishes no connection to Plaintiffs.

At the recent hearing in this matter, counsel for Plaintiffs addressed, at some length, questions about whether and to what extent certain of Plaintiffs' arguments were connected to Plaintiffs (or their members)—and if so, *which* Plaintiffs.  Ultimately, the Court explained correctly that it was not sufficient for Plaintiffs' filings to "lump[] together your claims, your plaintiffs, your injuries, and your relief" in a way that makes it impossible to disentangle which Plaintiffs were seeking what relief, on what theories, to remedy what injuries.  Tr. of Prelim. Inj. Hr'g (Oct. 28, 2025) ("Hr'g Tr."), at 20:2-3.

The Court returned to this subject again at the end of the hearing, in direct response to Plaintiffs' eleventh-hour request to supplement the record.  The Court emphasized that any supplemental filing "needs to be really clear about what you are asking me to do and why, and which harms relate to which plaintiffs and which claims." *Id.* at 80:12-14.  Then, just before granting leave to file the supplemental memorandum, the Court specified again: "I hope the plaintiffs have heard me with respect to my concerns on irreparable harm and that whatever you want to file is responsive to that." *Id.* at 81:25-82:2.

Despite that explicit guidance, however, Plaintiffs' latest filing perpetuates the same error: it lacks any clarity about "which harms relate to which plaintiffs and which claims." *Id.* at 80:12-14.  Indeed, it is not even clear that *any* of Plaintiffs' "new" information has anything to do with *any* of the Plaintiffs in this case.  The filing, for example, does not say whether any of the individual Plaintiffs (or any members of any of the Plaintiff organizations) live in any of the counties in Texas that Plaintiffs discuss.[2]  And most importantly, the filing does not say whether any of the individual

---

[2] This is another example of why Plaintiffs' attempt to litigate this case via pseudonyms is hampering Defendants' ability to defend the suit.  Defendants continue to request disclosure of Plaintiffs' identities and continue to reserve their right to seek relief from the Chief Judge's order

Plaintiffs (or any members of any of the Plaintiff organizations) appear on any of the lists of voters

for whom SAVE (apparently) returned a non-citizen response, and who (apparently) might now

be subject to some sort of additional inquiry by some State officials.

To be clear, as discussed further below, even taking Plaintiffs' latest submission at face

value, none of it refutes Defendants' arguments about why Plaintiffs' fears are too speculative to

support standing or irreparable harm.  But even if Plaintiffs were right that these facts support their

factual narrative in some more general sense, they still cannot support court-ordered relief in the

absence of at least some evidentiary link to at least one of the actual Plaintiffs in this case.  Plain-

tiffs do not even attempt to establish that link.

Plaintiffs might respond that, even if none of the factual assertions in their latest filing have

any documented connection to any of the Plaintiffs, it more generally validates their fears.  That

argument, too, would be meritless.  If anything, the fact that Texas apparently ran the entirety of

its voter rolls through SAVE—more than 18 million people, according to publicly available

sources[3]—and came back with a list of only "2,724 potential non-citizens registered to vote in

Texas," underscores how extraordinarily unlikely it is that any of the Plaintiffs here will face any

of the (potential) problems hypothesized in their papers.  Even if one were to assume—without

factual basis—that all 2,724 of the "potential non-citizens" apparently identified in Texas are U.S.

citizens (which Plaintiffs do not even assert), that would mean a Texas-specific error rate of ap-

proximately 0.01%.  That is nowhere close to the error rate that one would expect from accepting

the assumptions in Plaintiffs' filings, which assert (without citation or evidence) that "millions of

eligible voters could be wrongly disenfranchised."  Pls.' Mot. for Prelim. Inj. at 17, ECF No. 16.

The bottom line is that, even accepting Plaintiffs' pessimistic assumptions about how States are

---

granting Plaintiffs' motion to proceed under pseudonyms at the appropriate time.  Discussions
between counsel on that subject are ongoing.

[3] *Press Release: Texas Has 18.6 Million Registered Voters* (Oct. 19, 2024),
https://perma.cc/MY3B-J2NP.

using (or will use) the SAVE program, it is extremely unlikely that any of these (currently hypothetical) problems will affect any of the Plaintiffs in this case.

## II.    None of Plaintiffs' "new" information warrants preliminary injunctive relief.

Even if the Court were to consider Plaintiffs' "new" material—despite the lack of connection to any of the Plaintiffs in this case, *see supra*, Section I, and despite the fact that much of it was available during the prior round of briefing,[4] and despite the fact that some of Plaintiffs' sources are not properly subject to judicial notice[5]—none of it undermines Defendants' arguments on standing or irreparable harm.  *See* Defs.' Opp'n at 10-25, 33-38, ECF No. 37.

**a. President Trump's October 8, 2025, letter.**  In early-October, President Trump sent a generic letter to several State officials, thanking them for their "commitment to safeguarding American elections."  *See* Ltr. from President Trump to F. LaRose (Oct. 8, 2025), https://perma.cc/E6P2-ZDML.  Without much explanation, Plaintiffs suggest that this letter "confirm[s] that Defendants are operating the overhauled SAVE system for the express purpose of enabling states to remove voter rolls of alleged non-citizens quickly and through 'decisive action.'"  Pls.' Supp. Br. at 10.  In fact, the letter says nothing about the speed of any State action (which, in any event, is not under the control of the federal government).  Regardless, Defendants have never disputed that both the United States and State governments share an interest in removing *non-citizens* from State voter rolls.  Indeed, doing so is generally required by both federal and State law.  *See, e.g.*, 18 U.S.C. § 611 (generally making it a federal crime for "any alien to vote in any

---

[4] Plaintiffs' preliminary-injunction reply brief was filed late in the evening of October 24, 2025.  So Plaintiffs could have cited many of the key materials that appear in their supplemental filing, most of which were published between October 20th and 24th.  *See* Pls.' Supp. Br. at 4-7, 9 n.2.  (Two of Plaintiffs' sources date back to January of 2019.  *See id.*)

[5] Plaintiffs ask the Court to "take judicial notice of materials cited" in their filing, then cite a case for the proposition that the Court may take judicial notice of the contents of documents published on websites of government agencies.  Pls.' Supp. Br. at 2.  But several of their key sources are social-media posts, local news reports, and double-hearsay rumors that seem to be spreading amongst Texas officials.  None of this material demonstrates standing or irreparable harm (even taken at face value) for the reasons in this filing.  But it is also far from clear that any or all of it is appropriate for judicial notice.

election held solely or in part" for a federal office); 52 U.S.C. § 21083(a)(4) (requiring States to ensure "that voter registration records in the State are accurate and are updated regularly").

Plaintiffs' theory of injury here, by contrast, is not that *non-citizens* will be disenfranchised—indeed, that is a logical impossibility, as non-citizens have no right to vote in any of these elections in the first place. One cannot be "disenfranchised" without ever having the franchise at all. Instead, Plaintiffs' theory of harm is their fear that *U.S. citizens* will be disenfranchised. And on that theory, this letter is no help: there is nothing in the President's letter (nor anything else in the record) suggesting that the President, any of the federal government defendants, or even any of the relevant (non-party) State officials have any interest in removing *U.S. citizens* from the voter rolls. Ultimately, Plaintiffs' repeated conflation of what a more effective SAVE system might mean for *non*-citizens, rather than citizens, undermines their theory of voting-related harm.

**b. Tennessee's use of the SAVE program.** Plaintiffs assert that "[o]n October 27, 2025, the Tennessee Secretary of State announced that his office referred 42 alleged non-citizens who appear to have registered to vote and voted in Tennessee to the Federal Bureau of Investigation" for further review. Pls.' Supp. Br. at 9 (quoting part of a sentence from a report from "WBBJ 7 Eyewitness News"). Plaintiffs offer no explanation of how or why that supports any of their theories of standing or irreparable harm—even ignoring the fact that this anecdote has no apparent connection to Plaintiffs. For example, Plaintiffs do not assert (let alone establish) that any of those 42 individuals identified for some possible further review were U.S. citizens, let alone naturalized citizens who were mistakenly included on this list due to some error in Social Security Administration (SSA) data. So, even accepting the (dubious) proposition that mistakenly appearing on a list of names forwarded from one law-enforcement agency to another is a cognizable (let alone irreparable) Article III harm, there is no evidence in the record that anyone was included on this list mistakenly—rather than, for example, because they are in fact non-citizens who *should* be removed from Tennessee's voter rolls. Without that sort of evidence, this data point seems at least as likely to indicate that SAVE is working properly and as intended—not anything nefarious.

**c. Texas's use of the SAVE program.**  With respect to Texas, Plaintiffs at least (1) include an actual declaration, and (2) suggest that some small number of individuals (but not Plaintiffs) *might* have been erroneously included on a list of potential non-citizens, sent from one Texas law-enforcement official to other Texas law-enforcement officials, for the purpose of some further inquiry under Texas law.  None of those individuals have any apparent connection to this case.  But even ignoring that (dispositive) threshold problem, on closer inspection, Plaintiffs have still not established any actual or imminent injury, much less irreparable harm.

Plaintiffs' new declarant's concern is that, apparently, "[a]bout twenty-five percent of the non-citizen matches on Travis County's list have a voter registration source code of *64 – Department of Public Safety*."  Decl. of C. Davis ¶ 9, ECF No. 47-1 ("Davis Decl.").  That is a Texas "designation" about which the federal government defendants have no independent knowledge.  But, taking the declaration at face value, Mr. Davis's "understanding" of "this designation is that the applicant registered to vote at the Department of Public Safety (DPS) and, through the process at DPS, provided proof of citizenship at the time of registration."  *Id.*

Even if Mr. Davis's "understanding" is correct, that does not establish that these individuals are, in fact, citizens—only that they were *supposed to* prove their citizenship when they registered to vote.  Of course, the entire purpose of Texas's use of the SAVE program for voter-verification purposes is to double check this very thing: that is, to ensure that those on Texas voter rolls—all of whom are *supposed* to be U.S. citizens—are *actually* U.S. citizens.  So, even if there were some discrepancy between the output of the SAVE database (indicating non-citizenship) and some older, pre-existing Texas records (indicating citizenship), an error by SAVE is far from the only possible explanation for any such discrepancy.  Perhaps, for example, some or all of these individuals are non-citizens who should not have been permitted to register in Texas.  In a State with over 18 million registered voters, mistakenly allowing a small number of erroneous registrations, over many years, is hardly implausible.  Again, the declaration does not actually assert (let alone establish) that any of the voters at issue are U.S. citizens (naturalized or otherwise), nor that any error was attributable to SAVE, or SSA data queried by SAVE.

To be sure, one might now expect Texas officials to do some additional digging into the facts alleged by Plaintiffs, to better understand why the lists they are sharing seem to include at least some individuals for whom there is at least some reason to think should have provided proof of citizenship when they originally registered to vote.  But Plaintiffs' declaration remains fully consistent with the possibility of an intra-Texas miscommunication, or some other error by Texas officials—either at the moment of registration at the Texas Department of Public Safety, or in generating the lists that were transmitted from one Texas official to another, or something else entirely.  Indeed, the declaration itself closes with the massive disclaimer that "[t]he situation described in this declaration is evolving day-to-day," and that the declarant is "working to adapt to the situation as it evolves in real time given the limited information provided to us by the Secretary of State."  Davis Decl. ¶ 15.  That is quite a thin reed on which to rest the extraordinary remedy that Plaintiffs seek here—particularly when they are seeking relief against a different sovereign than the one described in their filing.  *See* Defs.' Opp'n at 18-22, 34-36, ECF No. 37.

Indeed, there are other portions of the Davis Declaration that plainly *support* Defendants' arguments.  The declarant's bottom-line message is that Texas officials "are in the process of carefully researching each non-citizen match sent to us from the Secretary of State to determine if further action, including a possible notice under Texas Election Code 16.033, is truly warranted."  Davis Decl. ¶ 10.  Again, that sort of caution is how this system is supposed to work, and at least in some instances may even be required by law, or a jurisdiction's SAVE agreement with USCIS.  And if some other (hypothetical) State official behaves more recklessly than Mr. Davis has, that is a matter to be resolved between the affected voter and the relevant State official—not a Privacy Act suit against the federal government.

In sum, as the Davis Declaration nicely illustrates, Plaintiffs' theory of harm in this case relies on a very long and very speculative chain of possible mistakes that could be made by a series of government officials, which Plaintiffs fear could eventually result in some State official mistakenly removing someone from State voter rolls, in violation of the law.  But if *any* of the relevant officials in Plaintiffs' hypothesized chain—such as the declarant, Mr. Davis—does their job

properly, then no U.S. citizen should be removed from the voter rolls due to any SAVE-related query. The bottom line is that Plaintiffs have still not identified any voter (much less any Plaintiff) who has been improperly removed from the voter rolls, or who has actually suffered any cognizable (let alone irreparable) voting-related harm.

**III.    DHS has now published a SORN and a Privacy Impact Assessment.**

Defendants also wish to notify the Court that, as previewed at the recent hearing in this matter, DHS has now published a System of Records Notice (SORN), as well as a Privacy Impact Assessment relating to this year's updates to the SAVE system. *See* DHS, *Notice of a Modified System of Records*, 90 Fed. Reg. 48,948 (Oct. 31, 2025); DHS, *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program*, Reference No. DHS/USCIS/PIA-006(d) (Oct. 31, 2025), *available at* https://perma.cc/HXG9-83G2. Defendants will further address their significance, if necessary, in future briefing in this case.

Undersigned counsel's understanding is that the Social Security Administration is also working to publish an amendment to its relevant SORN.

**CONCLUSION**

For the reasons stated above, in Defendants' prior filings, and at the recent hearing in this matter, Plaintiffs' motion for a stay under 5 U.S.C. § 705 should be denied.

- 9 -

Dated:  November 3, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*