## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEAGUE OF WOMEN VOTERS
1233 20th Street, NW, Suite 500
Washington, DC 20036,

LEAGUE OF WOMEN VOTERS OF TEXAS
1212 Guadalupe St. No. 107
Austin, TX  78701,

LEAGUE OF WOMEN VOTERS OF
LOUISIANA
P.O. Box 851068
New Orleans, LA 70185,

LEAGUE OF WOMEN VOTERS OF
LOUISIANA EDUCATION FUND
P.O. Box 851068
New Orleans, LA 70185,

LEAGUE OF WOMEN VOTERS OF
VIRGINIA
1011 East Main Street, Suite 214A
Richmond, VA 23219,

ELECTRONIC PRIVACY INFORMATION
CENTER
1519 New Hampshire Avenue, NW
Washington, DC 20036,

     Plaintiffs,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY
245 Murray Ln., SW
Washington, DC 20528,

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security
245 Murray Ln., SW

**FIRST AMENDED AND SUPPLEMENTAL
COMPLAINT**

Case No. 25-cv-3501-SLS

Washington, DC 20528,

SOCIAL SECURITY ADMINISTRATION
6401 Security Blvd.
Baltimore, MD 21235,

FRANK BISIGNANO, in his official capacity as
Commissioner of the Social Security
Administration
6401 Security Blvd.
Baltimore, MD 21235,

       Defendants.

# INTRODUCTION

1.     As part of the Administration's effort to seize control of our nation's election infrastructure, the Department of Homeland Security ("DHS") has illegally created a national citizenship data bank for conducting mass "voter verification" checks. It made the system by haphazardly combining and repurposing millions of Americans' sensitive personal data— including citizenship data known to be unreliable—from disparate records systems at the Social Security Administration ("SSA"), DHS, the State Department, and various other federal and state agencies. In doing so, DHS vastly exceeded its lawful authority, usurped powers our Constitution reserves for the States and Congress, and flouted multiple statutes that protect Americans' privacy and data security. DHS has in fact created precisely what the Privacy Act of 1974 was designed to prevent: a "centralized Federal information system" that consolidates Americans' sensitive data across agencies in ways that endanger our liberties.[1]

2.     DHS's power grab harms the privacy rights of millions of Americans whose personal data Defendants are illegally disclosing, repurposing, and misusing without their consent. It is also causing eligible U.S. citizen voters to be wrongfully identified as non-citizens and even removed from voter rolls, imperiling their fundamental right to vote. Plaintiffs are voting and privacy rights organizations whose members have suffered these injuries, and whose missions are directly harmed by Defendants' flagrantly illegal actions.

3.     Defendants have carried out this unlawful operation by transforming a pre-existing system housed at U.S. Citizenship and Immigration Services ("USCIS") called the Systematic Alien Verification for Entitlements ("SAVE") system. As its name indicates, Congress established

---

[1] S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy, at 168, 217 (1976), https://perma.cc/9W9F-R5ZL ("Privacy Act Leg. History").

1

SAVE to verify whether *non-citizens* (or "aliens") are entitled to certain government *benefits*.[2] SAVE was never meant to conduct mass queries about U.S. citizens who have had no interaction with immigration agencies, or to conduct mass voter eligibility checks. Thus, prior to April 2025, SAVE was exceedingly limited in scope and functionality: it did not access databases with information on U.S.-born citizens, it was not integrated with SSA records, and it did not permit bulk searches of more than one individual at a time.

4.      But between April and August 2025, Defendants unilaterally took a series of actions to "overhaul" SAVE by transforming it into what they call "a single, reliable source for verifying immigration status and U.S. citizenship nationwide."[3] Without following the Privacy Act's notice-and-comment procedures, Defendants dramatically expanded SAVE by connecting it to SSA systems of records, allowing it to access records on U.S.-born citizens, and enabling it to accept "bulk" uploads and search millions of Americans' sensitive data in a single query. Defendants added these features to enable states to bulk upload and check their entire voter registration lists—including voters' full names, dates of birth, and Social Security numbers ("SSNs")—against federal databases to identify potential non-citizen voters, pursuant to the President's directives to DHS and SSA in Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 28, 2025) (the "Elections EO").

5.      DHS claims that, as of November 3, 2025, overhauled SAVE has already "enabled state voting agencies to submit over 46 million voter verification queries and has also allowed

---

[2] *See* Immigration Reform Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note; *id.* § 121(a)(1)(C), 100 Stat. at 3384-86 (1986), *codified at* 42 U.S.C. § 1320b-7(d) (section titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs").

[3] Press Release, DHS, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (April 22, 2025), https://perma.cc/Y8A5-YX3M.

federal agencies to submit over 110 million queries to help verify eligibility for federally funded benefits."[4] And DHS is vigorously "encourag[ing] *all* federal, state, and local agencies to use the SAVE program," based on the debunked myth that non-citizen voting is widespread and with the goal of fueling that false narrative.[5]

6.     Predictably, DHS's haphazard and poorly vetted overhaul has yielded harmful results: in states such as Texas, the overhauled SAVE process has incorrectly identified eligible U.S. citizen voters as non-citizens, forced them to needlessly provide documentary proof of citizenship to election officials and DHS in order to retain their voter registration, and even caused some of them to be wrongfully removed from voter rolls.[6] Plaintiffs' members include voters who have suffered these harms and will continue to face them absent judicial relief.

7.     No statute authorizes DHS's overhaul of the SAVE system, and Defendants' bulk inter-governmental disclosures and repurposing of Americans' sensitive SSA data violates the substantive and procedural protections of the Privacy Act, the Social Security Act, and longstanding SSA policies.

8.     Separately, to the extent that overhauled SAVE is being used as a new or revised "computer matching program" to determine eligibility for federal benefits, Defendants have flouted the Privacy Act's notice-and-comment procedures for matching programs and deprived Plaintiffs of critical information to which they are statutorily entitled.

---

[4] Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025), https://perma.cc/9LN5-SEDU ("USCIS Enhances Voter Verification Systems").

[5] *Id.* (emphasis added).

[6] *See* Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

9.      The Court should hold unlawful, vacate, and set aside Defendants' overhaul of the SAVE system, and order Defendants to follow the Privacy Act's notice-and-comment procedures for SAVE's use as a computer matching program for federal benefits determinations.

## PARTIES

10.     Plaintiff League of Women Voters ("LWV") is a nonprofit, nonpartisan, grassroots, community-based membership organization headquartered in Washington, D.C., that promotes political responsibility by encouraging Americans to participate in the electoral process. Founded in 1920 as an outgrowth of the struggle to win voting rights for women, LWV now has more than a million members and supporters and is organized in more than 750 communities and in every state and the District of Columbia. LWV comprises two entities: the League of Women Voters of the United States ("LWVUS") and the League of Women Voters Education Fund ("LWVEF"). LWVUS is a 501(c)(4) social welfare organization that encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy. LWVEF is a 501(c)(3) organization and works to register and provide voters with election information through its election resource VOTE411.org, candidate forums, and debates.

11.     As part of its mission, LWV—with its state and local Leagues[7]—operates one of the longest-running and largest nonpartisan voter registration efforts in the nation. Through its work, LWV registers many thousands of voters every election cycle and is instrumental in ensuring access to voter registration for all eligible voters, including naturalized and derived U.S. citizens.[8]

---

[7] Affiliates of the League of Women Voters are referred to as state or local "Leagues" as opposed to chapters or branches. The "League" refers to the entire organization.

[8] A "derived" citizen refers to an individual born outside of the U.S. who automatically becomes a U.S. citizen by operation of law where: (1) the person is the child of a parent who is a U.S. citizen by birth or becomes a U.S. citizen through naturalization, (2) the child is under 18 years old, (3)

With its state and local Leagues, LWV maintains VOTE411.org, an award-winning, nonpartisan, online resource committed to ensuring voters have the information they need to successfully participate in every election—local, state, and federal.

12. Plaintiff League of Women Voters of Texas ("LWVTX") is a 501(c)(3) nonpartisan, nonprofit, membership organization that seeks to encourage informed and active participation in government. LWVTX is the Texas affiliate of the national League of Women Voters, and is headquartered in Austin, Texas. LWVTX has approximately 3,500 members across 34 chapters in the state of Texas. LWVTX's members include naturalized and derived citizens.

13. Plaintiffs League of Women Voters of Louisiana and League of Women Voters of Louisiana Education Fund (together, "LWVLA"), formed under Section 501(c)(4) and 501(c)(3) of the Internal Revenue Code, respectively, are nonpartisan, nonprofit, membership organizations that seek to encourage informed and active participation in government. LWVLA is the Louisiana affiliate of the national League of Women Voters, and is headquartered in New Orleans, Louisiana. LWVLA has approximately 300 members across six chapters in the state of Louisiana. LWVLA's members include naturalized and derived citizens.

14. Plaintiff League of Women Voters of Virginia ("LWVVA") is a 501(c)(3) nonpartisan, nonprofit, membership organization that seeks to encourage informed and active participation in government. LWVVA is the Virginia affiliate of the national League of Women Voters, and is headquartered in Richmond, Virginia. LWVVA has approximately 2,000 members across the state of Virginia. LWVVA's members include naturalized and derived citizens.

---

the child is a lawful permanent resident, and (4) the child is residing in the U.S. in the legal and physical custody of the U.S. citizen parent. *See* USCIS, Policy Manual, Chapter 4 - Automatic Acquisition of Citizenship after Birth (INA 320) (Aug. 29, 2026), https://perma.cc/L95Q-H2HL ("USCIS Policy Manual").

15.     LWVTX, LWVLA, and LWVVA have dues-paying members, who are also members of the national League. LWVTX, LWVLA, and LWVVA members volunteer in their communities to provide voter services. LWVTX has an executive director who works for the organization; however, the majority of LWVTX's work is done by volunteers. LWVLA and LWVVA have no paid employees or staff. Through their volunteer leaders, LWVTX, LWVLA, and LWVVA provide regular training to their members and to their nonpartisan partners to assist Texans, Louisianans, and Virginians, respectively, registering to vote, voting, and confirming their voter registration status. They do this work as a part of their missions to empower Texas, Louisiana, and Virginia voters, including naturalized and derived citizen voters, and to defend their right to vote. They consider their work registering voters, encouraging them to vote, and confirming their registration to be an expression of those core values. LWVTX, LWVLA, and LWVVA use voter registration assistance as part of a larger dialogue about a citizen's voter registration, voting plan, and the importance of voter participation in elections. Their goal is to ensure all eligible Texas, Louisiana, and Virginia voters—including naturalized and derived U.S. citizens—are registered to vote, have a plan to vote, and can and do actually vote.

16.     Plaintiff EPIC is a nonprofit organization, headquartered in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues. Central to EPIC's mission is oversight and analysis of government activities that impact individual privacy. EPIC is a membership organization. An individual member of EPIC is any person who contributes to the advancement of EPIC's mission, who acts in accordance with the core values and policies of EPIC, and who has been recognized and registered as a member by EPIC, by virtue of payment of annual dues or having been granted a dues waiver. This includes members of EPIC's Advisory Board, who are distinguished experts in law, technology, and public policy.

17.    Defendant DHS is an agency within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1), and the APA, 5 U.S.C. § 551(1), which is headquartered in Washington, D.C.

18.    Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity.

19.    Defendant SSA is an agency within the meaning of the Privacy Act, 5 U.S.C. § 552a(a)(1), and the APA, 5 U.S.C. § 551(1), which is headquartered in Baltimore, Maryland.

20.    Defendant Frank Bisignano is the Commissioner of SSA and is sued in his official capacity.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.*

22.    The Court further has jurisdiction under the mandamus statute, 28 U.S.C. § 1361.

23.    Venue lies in this District under 28 U.S.C. § 1391(e)(1)(C), because Defendants include officers and agencies of the United States headquartered in this District.

## LEGAL BACKGROUND

I.    **The Privacy Act**

24.    "Enacted in the wake of the Watergate and the Counterintelligence Program (COINTELPRO) scandals involving illegal surveillance on opposition political parties and individuals deemed to be 'subversive,' the Privacy Act sought to restore trust in government and to address what at the time was seen as an existential threat to American democracy."[9]

---

[9] DOJ, *Overview of the Privacy Act of 1974*, at 1 (2020 ed.), https://perma.cc/6SB9-XAEK (citation modified).

25.     To that end, the Act establishes "certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies" to "collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose," and ensuring "that adequate safeguards are provided to prevent misuses of such information." Privacy Act of 1974 § 2(b), 2(b)(4), 88 Stat. 1896 (1974), *codified at* 5 U.S.C. § 552a note.

26.     A key objective of the Privacy Act was to prevent the government from secretly creating "formal or de facto national data banks" or "centralized Federal information systems" that would consolidate sensitive personal data of Americans stored at separate agencies.[10]   Congress established robust safeguards against such "interagency computer data banks" to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system."[11]

27.     Congress reaffirmed this objective in 1988 when it amended the Privacy Act to authorize, only under strictly defined conditions, "computer matching program[s]" that compare data across agencies for purposes of determining eligibility for federal benefits. *See* 5 U.S.C. § 552a(o). Congress codified clear instructions that nothing in those amendments "shall be construed to authorize" the "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other

---

[10] Privacy Act Leg. History, *supra* n.1, at 168; *see also DOJ v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 766 (1989) ("The Privacy Act was passed largely out of concern over 'the impact of computer data banks on individual privacy.'" (quoting H.R. Rep. No. 93-1416, at 7 (1974)).

[11] Privacy Act Leg. History, *supra* n.1, at 884, 217.

Federal agencies"; the "direct linking of computerized systems of records maintained by Federal agencies"; or "the computer matching of records not otherwise authorized by law." Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514, *codified at* 5 U.S.C. § 552a note.

28.    The Privacy Act functionally prevents agencies from creating unauthorized national data banks through a series of substantive restrictions and procedural safeguards.

**A.    Substantive restrictions**

29.    The Act imposes numerous restrictions and mandatory obligations for any agency "system of records." 5 U.S.C. § 552a(a)(5).

30.    The Act generally prohibits agencies from disclosing records contained in their systems without the consent of the individual to whom the record pertains, subject to limited exceptions. 5 U.S.C. § 552a(b). One of those exceptions allows an agency to disclose records pursuant to a properly noticed "routine use," *id.* § 552a(b)(3), which is defined as the use of a record "for a purpose which is compatible with the purpose for which it was collected," *id.* § 552a(a)(7).

31.    For a "routine use" to satisfy § 552a(a)(7)'s compatibility requirement, "[t]here must be a . . . concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549-50 (3d Cir. 1989); *see also Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017). This requirement prevents "personal data collected by one organization for a stated purpose" from being "used and traded by another organization for a completely unrelated purpose," which could "seriously threaten[]" Americans' "individual rights." *Britt*, 886 F.2d at 550 (quoting 120 Cong. Rec. 36,894 (1974) (statement of Sen. Percy)).

32.     In addition, each agency that maintains a system of records must take certain steps to ensure the records it maintains on individuals are accurate, relevant, up-to-date, and secure, *see* 5 U.S.C. §§ 552a(e)(5), (6), (10), in order to prevent "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," *id.* § 552(e)(10).

33.     The Computer Matching and Privacy Protection Act of 1988 amended the Privacy Act to further prohibit disclosure of records contained in a system of records "to a recipient agency or non-Federal agency for use in a computer matching program except pursuant to a written agreement between the source agency and the recipient agency or non-Federal agency." *Id.* § 552a(o)(1).

34.     The Act defines "matching program" to include "any computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records for the purpose of . . . establishing or verifying the eligibility of . . . applicants for, recipients or beneficiaries of, participants in, or providers of . . . Federal benefit programs." *Id.* § 552a(a)(8).

35.     "Matching agreements" must include detailed data elements and meet strict requirements designed to ensure public transparency and participation, congressional and internal agency oversight, and rigorous legal compliance. *See id.* §§ 552a(o)(1)-(2).

**B.      Procedural safeguards**

36.     The Privacy Act also adopts procedural safeguards when systems of records are changed or used in a new way. *See* 5 U.S.C. § 552a(a)(5), (e).

37.     When an agency "establish[es] or revis[es]" any "system of records" containing retrievable information about individuals, it must "publish in the Federal Register … a notice of the existence and character of the system of records," 5 U.S.C. § 552a(e)(4), commonly called a

10

System of Records Notice ("SORN"). Each SORN "shall include" nine categories of information concerning the system's contents, functions, uses, and procedures for individuals to access and correct records about themselves. *Id.*

38.    At least 30 days *in advance* "of any new use or intended use of the information in the system," an agency must "publish in the Federal Register notice" of the new use and "provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11). "In no circumstance may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following Federal Register publication." Off. of Mgmt. & Budget Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, at 7 & 12 (2016), https://perma.cc/N9QK-SDLE ("OMB Circular No. A-108"); *see also* 5 U.S.C. § 552a(v)(1) (authorizing OMB to issue binding Privacy Act guidelines).

39.    Similarly, at least 30 days before establishing or revising a "matching program," an agency must "publish in the Federal Register notice of such establishment or revision." 5 U.S.C. § 552a(e)(12).

40.    Agencies "shall" review and consider any "public comments on a published SORN" or "a published matching [program] notice." OMB Circular No. A-108 at 7, 19.

41.    To further ensure transparency and congressional oversight, any time an agency "proposes to establish or make a significant change in a system of records or a matching program," it must "provide adequate advance notice of any such proposal" to Congress and the Office of Management and Budget "to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r).

42.     Congress enacted these requirements to "assure knowledge by Congress, the executive branch, and interested groups of new Federal data banks and pooling of informational and computer resources to constitute centralized data systems not foreseen by Congress"; to "prevent [] de facto national data banks on individuals free of the restraints on Federal power established by Constitution and statutes"; and to "prevent creation of data banks and new personal information systems without statutory authorization from Congress and without proper regard for privacy of the individual, confidentiality of data, and security of the system."[12]

## II.     Restrictions on the disclosure and verification of Social Security information

43.     As SSA has long recognized, "the SSN is one of the most sensitive pieces of personal information in our records" because "of its use as a unique identifier" and it "is the key to identifying and retrieving most of the highly personal and sensitive information we maintain about individuals."[13] Due to the special sensitivity of SSNs and other SSA data, various statutes, regulations, and agency policies restrict the data's disclosure, verification, and use.

44.     First, the Social Security Act prohibits SSA from "disclosure" of "any file, record, report, or other paper, or any information" except as the SSA Commissioner "may by regulations prescribe" or "as otherwise provided by Federal law." 42 U.S.C. § 1306(a)(1); *see also* 20 C.F.R. § 401.135.

45.     Second, the Social Security Act further provides that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized

---

[12] Privacy Act Leg. History, *supra* n.1, at 217.

[13] SSA, *Disclosure and Verification of Social Security Numbers (SSN) Without Consent*, Program Operations Manual System (POMS), GN 03325.002 (2023), https://perma.cc/PE44-2QBK ("SSN Disclosure Policy").

person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I).

46.    Third, under longstanding SSA policy, the agency will disclose or "verify SSNs, and SSN information" only "under limited circumstances as allowed or required by Federal laws," where SSA has express "legal authority and where we are able to identify the true number holder."[14] Under that policy, for SSA to verify SSNs pursuant to a federal statute, "the statute must *specifically mandate* that SSA disclose SSNs."[15] The policy further states unequivocally that SSA does "not have the legal authority to disclose information about U.S. citizens to DHS," and that "[i]f DHS requests information and we determine the information pertains to both U.S. citizens and aliens, only information about the aliens can be disclosed."[16]

## FACTUAL ALLEGATIONS

### I.    The Administration prioritizes government-wide data consolidation.

47.    The Administration has made consolidating Americans' sensitive personal data across government agencies a top priority. It has rapidly pursued that goal through its creation of the "Department of Government Efficiency" ("DOGE"), and a series of executive orders.

48.    On January 20, 2025, President Trump signed Executive Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency,"* ("DOGE EO"), renaming the former U.S. Digital Service the U.S. DOGE Service ("USDS") and establishing it as a new component of the Executive Office of the President. 90 Fed. Reg. 8441 (Jan. 29, 2025). The DOGE EO requires the installation of "DOGE Teams" at federal agencies

---

[14] SSN Disclosure Policy, *supra* n.13.

[15] *Id.* (emphasis added).

[16] *Id.*

and requires agency heads "to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.*

49.    On March 20, 2025, President Trump signed Executive Order 14,243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos* (the "Data Consolidation EO"), which states that "[r]emoving unnecessary barriers to Federal employees accessing Government data and promoting inter-agency data sharing are important steps toward eliminating bureaucratic duplication and inefficiency while enhancing the Government's ability to detect overpayments and fraud." 90 Fed. Reg. 13681 (Mar. 20, 2025). Echoing the DOGE EO, the Data Consolidation EO instructs agency heads "to ensure Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records, data, software systems, and information technology systems." *Id.* The EO adds that "[t]his includes authorizing and facilitating both the intra- and inter-agency sharing and consolidation of unclassified agency records." *Id.*

50.    On March 25, 2025, President Trump signed the Elections EO. It instructs that, for the purpose of "identify[ing] unqualified voters registered in the States …. the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." 90 Fed. Reg. 14005 (Mar. 28, 2025). The Elections EO further directs that DHS, in coordination with DOGE, "shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements." *Id.* And it further

instructs that the "Commissioner of Social Security shall take all appropriate action to make available the Social Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered." *Id.*

## II.    DHS and SSA unlawfully transform the SAVE system into a national citizenship data bank.

51.    Pursuant to the Elections EO and the Trump administration's broader data-consolidation objectives, DHS has dramatically expanded SAVE into an inter-governmental data bank for conducting mass citizenship checks to determine individuals' eligibility to vote and obtain government benefits. The expanded system now enables bulk searches, disclosures, and repurposing of millions of Americans' personal data from one of SSA's most sensitive databases—NUMIDENT—and other agency systems. SAVE now queries unreliable citizenship data using unreliable methods at a massive scale, and several states are actively deploying it to purge voter rolls and open criminal investigations.

52.    Defendants took these actions without legal authority, without statutorily required notice to the public or Congress, and without addressing the privacy implications or risks of error posed by repurposing Americans' sensitive data in this way.

### A.    The prior SAVE system's limited authorized scope and functionality

53.    The SAVE system is an "online inter-governmental service" designed to help government entities "determine citizenship and immigration status of individuals within their jurisdiction for the purpose of granting benefits, licenses, as well as for other lawful purposes."[17]

---

[17] DHS, *Privacy Impact Assessment for the Systematic Alien Verification Entitlements "SAVE" Program*, DHS Ref. No. DHS/USCIS/PIA-006(d), at 1 (Oct. 31, 2025), https://perma.cc/G92U-LYPM ("2025 SAVE PIA").

54.     Congress established the SAVE system in the Immigration Reform and Control Act of 1986 to help agencies verify whether non-citizens (or "aliens") were eligible for certain government benefits. *See* Pub. L. No. 99-603, title I, § 121(a)(1)(C), 100 Stat. 3359, 3384-86 (1986), *codified at* 42 U.S.C. § 1320b-7(d) (section titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs"); *id.* §121(c)(1), 100 Stat. at 3391, *codified at* 42 U.S.C. § 1320b-7 note ("The Commissioner of Immigration and Naturalization shall implement a system for the verification of immigration status under … [42 U.S.C. 1320b-7(d)(3),] (4)(B)(i) … so that the system is available to all the States by not later than October 1, 1987.").

55.     The statute's plain text (referring to the "immigration status" of "aliens" applying for "benefits") and the name of the system itself (Systematic *Alien* Verification for *Entitlements*) indicates SAVE was never meant to include U.S. citizens or be used for voter eligibility checks.

56.     To access SAVE, user agencies must execute "a Memorandum of Agreement (MOA) or Computer Matching Agreement (CMA)," which establish "the terms and conditions for the user agency's participation in SAVE."[18]

57.     Prior to 2025, SAVE was limited in three critical respects.

58.     First, SAVE did not permit queries of U.S.-born citizens.[19] Under the 2020 SORN and 2020 Privacy Impact Assessment ("PIA") for SAVE,[20] SAVE could only verify the

---

[18] DHS, *Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program*, DHS Ref. No. DHS/USCIS/PIA-006(c), at 2-3 (June 30, 2020), https://perma.cc/HU2M-NTL8 ("2020 SAVE PIA").

[19] *See id.* at 2; Privacy Act Notice of Modified System of Records, 85 Fed. Reg. 31798, 31801 (May 27, 2020) ("2020 SAVE SORN").

[20] PIAs are governed by the E-Government Act of 2002, which requires federal agencies to conduct, review, and, "if practicable," publish, a PIA before either "developing or procuring information technology that collects, maintains, or disseminates" PII or "initiating a new collection of information" involving PII that will be "collected, maintained, or disseminated using information technology." Pub. L. No. 107-347, § 208(b)(1)(A)-(B), 116 Stat. 2899, 2921-

"citizenship and immigration status of an immigrant, nonimmigrant, and certain *naturalized and derived* U.S. citizens."[21] SAVE rarely had access to records about U.S.-born citizens unless they had some other interaction with DHS, e.g., as a sponsor for a non-citizen.[22]

59.    Second, SAVE only accessed records stored in DHS systems, along with certain immigration-related records systems at the State Department and DOJ.[23] Prior to 2025, SAVE did not access databases housed at SSA, nor did it allow users to run searches using an individual's SSN; instead, it required users to provide an individual's DHS numeric identifier (e.g., an alien registration number or "A-Number").[24]

60.    Third, SAVE searches could only be conducted on an individualized basis.[25] SAVE did not permit bulk searches of more than one individual's data at a time.

61.    Consistent with the 2020 SAVE SORN and PIA, USCIS stated as recently as April 26, 2025 that "SAVE does not verify U.S. born citizens under any circumstances," that "SAVE does not access databases that contain U.S.-born citizen information (for example, birth certificate

---

23 (2002), *codified at* 44 U.S.C. § 3501 note. A PIA must address what information will be collected, why it is being collected, how it will be used, how it will be secured, with whom it will be shared, whether a system of records is being created under the Privacy Act, and what "notice or opportunities for consent" will be provided to those impacted. *Id.* § 208(b)(2)(B)(ii)(V).

21 2020 SAVE PIA, *supra* n.18, at 2 (emphasis added); *see also* 2020 SAVE SORN, *supra* n.19, at 31801 ("individuals who have been granted naturalized or derived U.S. citizenship").

22 2020 SAVE SORN, *supra* n.19, at 31801.

23 *Id.* at 31802.

24 Privacy Act Notice of Modified System of Records, 90 Fed. Reg. 48948, 48949-50 (Oct. 31, 2025) ("2025 SAVE SORN").

25 2020 SAVE SORN, *supra* n.19, at 31799.

databases),” and that “SAVE cannot verify an individual’s naturalized or acquired citizenship status using a Social Security Number.”[26]

62.    Since 2009, election officials in some states have used SAVE for voter registration and voter list maintenance purposes.[27]

63.    In a February 2025 letter to DHS, a group of secretaries of state asked DHS to expand SAVE to, among other things, allow bulk searches of “multiple individuals . . . at once,” and enable searches using numeric identifiers other than those issued by DHS, which election officials typically do not possess.[28]

**B.    Defendants “overhaul” SAVE in May 2025 to enable bulk searches, disclosures, and matching of sensitive personal information from SSA’s NUMIDENT database and other agency systems.**

64.    Pursuant to the Elections EO, DHS, USCIS, and DOGE announced on April 22, 2025, that they were expanding SAVE to “ensure government officials can swiftly verify legal status, halting entitlements and voter fraud.”[29] They described this transformation as an “overhaul” of SAVE that “breaks down silos for accurate results, streamlines mass status checks, and integrates criminal records, immigration timelines, and addresses,” and that it will include “[a]utomatic status updates” to user agencies.[30]

---

[26] USCIS, Voter Registration and Voter List Maintenance Fact Sheet (Jan. 24, 2025), https://perma.cc/QW29-JZK8 (captured on Apr. 26, 2025).

[27] Letter from USCIS Director to Ohio Sec’y of State, at 1 (Oct. 10, 2024), https://perma.cc/8SN3-C88W.

[28] Letter from 21 Secretaries of State to DHS Sec’y (Feb. 27, 2025), https://perma.cc/D4QK-QJB6 (“Letter from 21 SOS to DHS”).

[29] Press Release, DHS, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M.

[30] *Id.*

65.     On May 22, 2025, Defendants formally launched the newly expanded SAVE system, touting it as "a single, reliable source for verifying immigration status and U.S. citizenship nationwide."[31]

66.     According to USCIS's May 22 press release, the overhauled SAVE system featured two new major functionalities.

67.     First, user agencies can now "input Social Security numbers" to "help verify U.S. citizenship"—including of U.S.-born citizens—based on a "new partnership with the Social Security Administration" and USCIS.[32] USCIS explained that "[t]his new partnership … allows cases to verify citizenship or immigration status to be created using Social Security numbers rather than a DHS identifying number, which most state and local agencies do not collect."[33]

68.     Second, "for the first time, agencies can submit more than one case at a time," using a new bulk upload function that allows searches of millions of individuals' records in a single query.[34]

69.     Although Defendants effectuated the SAVE overhaul in May 2025, they failed at that time to publish modified SORNs reflecting the major changes they had made to the relevant DHS and SSA systems of records.

70.     On September 25, 2025, in response to a Freedom of Information Act ("FOIA") lawsuit, SSA revealed a May 15, 2025 letter agreement between DHS and SSA for the overhauled

---

[31] Press Release, USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025), https://perma.cc/HBZ5-RW2E ("May 22, 2025, SAVE Press Release").

[32] *Id.*

[33] *Id.*

[34] *Id.*

SAVE system.[35] Invoking the Elections EO and other directives, the agreement purports to authorize "information sharing" between the agencies "by matching data submitted through SAVE to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications, System of Record Notice 60-0058, 90 Fed. Reg. 10025 (Feb. 20, 2025)," specifies the data elements SSA will share with DHS in response to SAVE inquiries relating to voter eligibility and other purposes, and notes SSA records provided under the agreement will be maintained in the SAVE system of records.[36]

71.    SSA's "Master Files of Social Security Number (SSN) Holders and SSN Applications" (also known as the NUMIDENT system) is SSA's master database of individuals who have applied for or obtained a Social Security number.[37] NUMIDENT is a highly sensitive database that contains Social Security numbers, other identifying numbers, names, dates and places of birth, citizenship indicators, and other information obtained during the processing of requests for Social Security numbers,[38] including information on more than 300 million Americans.[39]

72.    On January 14, 2026, in response to another FOIA lawsuit, DHS revealed two internal Privacy Threshold Analysis ("PTA") documents for the SAVE overhaul that DHS approved, respectively, on July 17 and September 11, 2025. Both PTAs recognize that DHS's

---

[35] Letter Agreement Providing for Information Sharing Between DHS, USCIS, and SSA Regarding Citizenship, at 4-5 (May 15, 2025), https://www.ssa.gov/foia/resources/proactivedisclosure/2025/May%2015,%202025%20SSA-DHS-USCIS%20Agreement_Redacted.pdf (posted Sept. 25, 2025) ("DHS-SSA SAVE Agreement").

[36] Id. at 4.

[37] Systems of Record Notice, 90 Fed. Reg. 10025, 10026 (Feb. 20, 2025) ("February 2025 NUMIDENT SORN").

[38] Id. at 10026.

[39] Social Security Performance, SSA (Dec. 5, 2025), https://perma.cc/K5UK-MSP2 (SSA "serve[s] more than 300 million Americans").

changes to SAVE required modified SORNs and that SAVE's continued operation was "not in compliance" with the Privacy Act.[40]

### C. DHS and SSA belatedly publish modified SORNs in response to this litigation.

73.    Months after putting the overhauled SAVE system into operation, and after Plaintiffs filed this suit, DHS and SSA published modified SORNs reflecting SAVE's new uses of millions of Americans' personal data.

#### 1. DHS's 2025 SAVE SORN and associated public comments

74.    On October 31, 2025, DHS updated the SORN for SAVE (the "2025 SAVE SORN"),[41] and published an accompanying PIA (the "2025 SAVE PIA").

75.    The 2025 SAVE SORN provided for a comment period until December 1, 2025, but also made clear that "[n]ew or modified routine uses will be effective December 1, 2025," regardless of the comments.[42] In other words, DHS predetermined it would not await, let alone consider, public comments on the SORN and that it would continue operating overhauled SAVE as it had since May.

76.    The 2025 SAVE SORN describes both previously announced changes to SAVE and new ones that had not yet gone into effect, including: (1) adding "individuals that are U.S. citizens by birth to the categories of individuals covered by the system"; (2) "updating the categories of records in the system to include collecting both full and truncated (last four digits)

---

[40] DHS, *Privacy Threshold Analysis for the SAVE Program*, at 39-41 (approved July 17, 2025), https://perma.cc/9AXY-WCLU ("July 2025 SAVE PTA"); DHS, *Privacy Threshold Analysis for the SAVE Program*, at 39-41 (approved Sept. 11, 2025), https://perma.cc/A44N-4729 ("Sept. 2025 SAVE PTA").

[41] 2025 SAVE SORN, *supra* n.24.

[42] *Id*. at 48949.

Social Security number … U.S. passport number, driver's license number, and information from the Social Security Administration"; (3) "revising the record source categories to add [SSA's NUMIDENT system] and state or other national agencies that issue or maintain driver's license information"; (4) adding new "routine uses" to "support sharing with Social Security Administration" and "to support sharing with federal agencies" to aid "auditing of federal programs administered by state, local, and tribal governments (*e.g.,* Medicaid)";[43] and (5) describing the new "capability to create cases in SAVE by uploading a file with a list of multiple cases."[44]

77.    The 2025 SAVE SORN establishes two new routine uses.

78.    First, the SORN establishes Routine Use L to enable DHS to disclose records to SSA "and other federal, state, tribal, territorial, local, governments and other authorized entities to assist [SAVE] user agencies [to] determine U.S. citizenship and immigration status of an individual when a DHS approved agreement is in place between DHS and the entity."[45]

79.    Second, the SORN establishes Routine Use M to enable DHS to disclose records to "federal, state, territorial, tribal, local, and other entities that have legal authority to provide oversight to programs and benefits supported by SAVE for auditing of program requirements and when a DHS-approved agreement (*e.g.,* Memorandum of Agreement (MOA) or Computer Matching Agreement (CMA)) is in place between DHS and the entity."[46]

---

[43] *Id.*

[44] *Id.* at 48951.

[45] *Id.* at 48954.

[46] *Id.*

80.    The 2025 SAVE SORN identifies only one new source of "authority" for DHS's overhaul of SAVE: 8 U.S.C. § 1373(c), a statute enacted nearly 30 years ago as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 642(c), 110 Stat. 3009, 707 (1996).[47]

81.    8 U.S.C. § 1373(c) requires DHS "to respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status" of individuals.

82.    8 U.S.C. § 1373(c) does not authorize or require SSA or any other agency to disclose information, nor does it authorize or require DHS to obtain information from other agencies.

83.    The 2025 SAVE SORN also describes plans to introduce driver's license data from state and non-governmental databases (*i.e.*, the National Law Enforcement Telecommunications System ("NLETS")), to enable SAVE users to search by driver's license number to verify citizenship.[48] The SORN notes that this "search functionality is not live at the time of publication but will be in the foreseeable future."[49]

84.    The SORN further specifies that "[r]ecords collected … in verifying U.S. citizenship or immigration status are stored and retained in SAVE for ten (10) years from the date of the completion of verification," unless required longer for "investigation[s]."[50]

---

[47] *Compare* 2020 SAVE SORN, *supra* n.19, at 31800 (identifying authority for maintenance of the system), *with* 2025 SAVE SORN, *supra* n.24, at 48952 (identifying same authority with sole addition of 8 U.S.C. § 1373(c)).

[48] 2025 SAVE SORN, *supra* n.24, at 48951.

[49] *Id.*

[50] *Id.* at 48954-55.

85.     DHS received and posted over 9,350 public comments on the 2025 SAVE SORN, nearly 98% of which opposed the SAVE overhaul.[51] Commenters opposing the overhaul included Plaintiffs,[52] a group of 20 state attorneys generals,[53] a group of 12 state secretaries of state,[54] members of Congress,[55] several state and local agencies,[56] several voting, immigrant, and privacy rights organizations,[57] and many thousands of individual Americans who objected to DHS and

---

[51] Document Comments, 2025 SAVE SORN, https://tinyurl.com/48hrxzkv.

[52] Comment to DHS by League of Women Voters, the League of Women Voters of Louisiana, the League of Women Voters of Virginia, and the League of Women Voters of Texas (Nov. 26, 2025), https://tinyurl.com/3hx8auzb ("LWV DHS Comment"); Comment to DHS by Electronic Privacy Information Center (Dec. 1, 2025), https://tinyurl.com/3kw2uuam ("EPIC DHS Comment").

[53] Comment to DHS by State Attorneys General (Dec. 1, 2025), https://tinyurl.com/4jhav34z ("AGs DHS Comment").

[54] Comment to DHS by Secretaries of State (Dec. 1, 2025), https://tinyurl.com/56hcp2rc ("SOS DHS COMMENT").

[55] Comment to DHS by U.S. Sen. Alex Padilla (Dec. 1, 2025), https://tinyurl.com/2s4dvea8 ("Padilla DHS Comment"); Comment to DHS by Members of U.S. House of Reps., (Dec. 1, 2025), https://tinyurl.com/4m97pyat ("House Members DHS Comment").

[56]  Comment to DHS by New Mexico Dep't of Workforce Solutions (Dec. 1, 2025), https://tinyurl.com/4ukw4cju ("NMDWS DHS Comment"); Comment to DHS by Members of California Dep't of Social Services (Dec. 1, 2025), https://tinyurl.com/k9jp4wzr ("CDSS DHS Comment"); Comment to DHS by Travis County Clerk, Travis County Tax Assessor-Collector, and Travis County (Dec. 1, 2025), https://tinyurl.com/3wrn29dv ("Travis County DHS Comment").

[57] *See, e.g.*, Comment to DHS by ACLU (Dec. 1, 2025), https://tinyurl.com/yd5h4jfj ("ACLU DHS Comment"); Comment to DHS by Asian Americans Advancing Justice (Dec. 1, 2025), https://tinyurl.com/bdfya5s9 ("Advancing Justice DHS Comment"); Comment to DHS by Brennan Center for Justice (Dec. 1, 2025), https://tinyurl.com/yc2dhkfa ("Brennan DHS Comment"); Comment to DHS by Campaign Legal Center (Dec. 1, 2025), https://tinyurl.com/3k2ve8kn ("CLC DHS Comment"); Comment to DHS by MALDEF (Dec. 1, 2025), https://tinyurl.com/2fr7md7x ("MALDEF DHS Comment"); Comment to DHS by NAACP Legal Defense and Education Fund (Dec. 1, 2025), https://tinyurl.com/fnynzdd3 ("LDF DHS Comment"); Comment to DHS by Protect Democracy Project (Dec. 1, 2025), https://tinyurl.com/yabxvuv8 ("PD DHS Comment"); Comment to DHS by Texas Civil Rights (Nov. 18, 2025), https://tinyurl.com/2z46yd2j.

SSA repurposing and misusing their data without notice or their consent.[58]

86.     Commenters asserted that Defendants' establishment and operation of the overhauled SAVE system was unlawful because, among other things, Defendants exceeded their constitutional and statutory authority,[59] and violated the Privacy Act,[60] the Social Security Act,[61] other federal laws,[62] and state privacy laws.[63]

87.     Commenters also explained that overhauled SAVE now incorporates SSA citizenship data known to be unreliable and difficult to link to DHS records,[64] includes new search functions likely to lead to false matches and non-matches (e.g., searching by the last four digits of an SSN),[65] exacerbates pre-existing problems with SAVE,[66] burdens eligible voters' fundamental

---

[58] *See, e.g.*, Comment to DHS by Rebecca Stanwyck (Dec. 1, 2025), https://tinyurl.com/3hvtbyby.

[59] *See, e.g.*, LWV DHS Comment, *supra* n.52, at 4-7: ACLU DHS Comment, *supra* n.57, at 3-7; Brennan DHS Comment, *supra* n.57, at 2-4; CLC DHS Comment, *supra* n.57, at 11-13; MALDEF DHS Comment, *supra* n.57, at 7-9.

[60] *See, e.g.*, LWV DHS Comment, *supra* n.52, at 2-4, 13-14; EPIC DHS Comment, *supra* n.52, at 3-13; AGs DHS Comment, *supra* n.53, at 2-5; SOS DHS Comment, *supra* n.54, at 14-19; Padilla DHS Comment, *supra* n.55, at 2; House Members DHS Comment, *supra* n.55, at 2-3; CDSS DHS Comment, *supra* n.56, at 2-5.

[61] *See, e.g.*, ACLU DHS Comment, *supra* n.57, at 9; MALDEF DHS Comment, *supra* n.57, at 5-6; PD DHS Comment, *supra* n.57, at 8.

[62] *See, e.g.*, CDSS DHS Comment, *supra* n.56, at 5-6; LWV DHS Comment, *supra* n.52, at 4-7.

[63] *See, e.g.*, SOS DHS Comment, *supra* n.54, at 19-20.

[64] *See, e.g.*, LWV DHS Comment, *supra* n.52, at 7-9: ACLU DHS Comment, *supra* n.57, at 9-10; CLC DHS Comment, *supra* n.57, at 2-6, 8-9; LDF DHS Comment, *supra* n.57, at 3-5.

[65] *See, e.g.*, Advancing Justice DHS Comment, *supra* n.57, at 3-6; EPIC DHS Comment, *supra* n.52, at 5-7; LWV DHS Comment, *supra* n.52, at 8; AGs DHS Comment, *supra* n.53, at 6-7.

[66] *See, e.g.*, LWV DHS Comment, *supra* n.52, at 7-9; AGs DHS Comment, *supra* n.53, at 5-7; SOS DHS Comment, *supra* n.54, at 20-26; Padilla DHS Comment, *supra* n.55, at 2; House Members DHS Comment, *supra* n.55, at 2-3; Travis County DHS Comment, *supra* n.56, at 6-7.

right to vote,[67] burdens state and local election administrators and other officials,[68] jeopardizes millions of Americans' data privacy and security and repurposes their sensitive SSA data without notice or consent,[69] has been justified by DHS based on a thoroughly debunked and erroneous premise (namely, the myth that non-citizen voting is widespread), and risks fueling that false narrative.[70]

88.    Consistent with the terms of the 2025 SAVE SORN, DHS has continued to operate the overhauled SAVE system since the SORN comment period closed on December 1, 2025. DHS has made no public statement or taken any action indicating any response to the thousands of public comments.

### 2.    SSA's November 2025 NUMIDENT SORN and associated public comments

89.    On November 12, 2025, SSA published a modified SORN for NUMIDENT ("November 2025 NUMIDENT SORN").

90.    The November 2025 NUMIDENT SORN provided for a comment period until December 12, 2025, but, like the 2025 SAVE SORN, also made clear that "new routine uses"

---

[67] *See, e.g.*, LWV DHS Comment, *supra* n.52, at 9-12; AGs DHS Comment, *supra* n.53, at 7-9; SOS DHS Comment, *supra* n.54, at 4-6; Padilla DHS Comment, *supra* n.55, at 2; House Members DHS Comment, *supra* n.55, at 2-3; Travis County DHS Comment, *supra* n.56, at 6-8.

[68] *See, e.g.*, AGs DHS Comment, *supra* n.53, at 7-9; SOS DHS Comment, *supra* n.54, at 4-6; House Members DHS Comment, *supra* n.55, at 2-3; NMDWS DHS Comment, *supra* n.56, at 1-2, 3-4; Travis County DHS Comment, *supra* n.56, at 6-8.

[69] *See, e.g.*, AGs DHS Comment, *supra* n.53, at 9-10; SOS DHS Comment, *supra* n.54, at 4-6; NMDWS DHS Comment, *supra* n.56, at 2-3.

[70] *See, e.g.*., LWV DHS Comment, *supra* n.52, at 12-13; PD DHS Comment, *supra* n.57, at 1, 5-6; AGs DHS Comment, *supra* n.53, at 8-9.

would automatically become "effective December 12, 2025."[71]

91.    The November 2025 NUMIDENT SORN added a new routine use permitting disclosures of "citizenship and immigration information to the Department of Homeland Security, pursuant to 8 U.S.C. 1373(a)."[72]

92.    The November 2025 NUMIDENT SORN does not address SSA's disclosure of personal information unrelated to "citizenship and immigration" that Defendants have acknowledged SSA is now verifying and disclosing to DHS through SAVE, such as individuals' SSNs, names, dates of birth, and death indicators.[73]

93.    SSA received and posted over 21,200 comments in response to the November 2025 NUMIDENT SORN, the overwhelming majority of which opposed the SORN changes and SSA's participation in the SAVE overhaul.[74]

94.    Commenters included Plaintiffs,[75] members of Congress,[76] former SSA personnel,[77] several voting, immigrant, and privacy rights organizations,[78] and many thousands of

---

[71] Privacy Act Notice of Modified System of Records, 90 Fed. Reg. 50879, 50880 (Nov. 12, 2025) ("November 2025 NUMIDENT SORN").

[72] *Id.* at 50880, 50883.

[73] *See* 2025 SAVE SORN, *supra* n.24, at 48950; DHS-SSA SAVE Agreement, *supra* n.35 at 5.

[74] Document Comments, November 2025 NUMIDENT SORN, https://tinyurl.com/mry98j2m.

[75] Comment to SSA by League of Women Voters, the League of Women Voters of Louisiana, the League of Women Voters of Virginia, and the League of Women Voters of Texas (Dec. 12, 2026), https://tinyurl.com/yc6wm2rj ("LWV SSA Comment"); Comment to SSA by Electronic Privacy Information Center (Dec. 12, 2025), https://tinyurl.com/eskycca7 ("EPIC SSA Comment").

[76] *See* Comment to SSA by U.S. Sen. Alex Padilla (Dec. 11, 2025), https://tinyurl.com/mrer3pam; Comment to SSA by U.S. Reps. Nikema Williams & Eleanor Holmes Norton (Dec. 12, 2025), https://tinyurl.com/3mhnaws9.

[77] *See, e.g.*, Comment to SSA by Barb Reuter (Dec. 8, 2025), https://tinyurl.com/mr44ythw.

[78] *See, e.g.*, Comment to SSA by ACLU (Dec. 12, 2025), https://tinyurl.com/axkac3ww ("ACLU SSA Comment");  Comment to SSA by Campaign Legal Center (Dec. 12, 2025),

individual Americans who objected to DHS and SSA repurposing and misusing their data without notice or their consent.[79]

95.    Commenters asserted that SSA's participation in the SAVE overhaul and bulk disclosure of NUMIDENT data to DHS was unlawful because, among other things, it exceeds DHS's and SSA's constitutional and statutory authority,[80] and violates the Privacy Act,[81] the Social Security Act,[82] and other federal laws.[83]

96.    Commenters also submitted voluminous data, echoing the 2025 SAVE SORN comments, on why SSA's NUMIDENT data was unreliable and unsuitable for the new purposes for which SAVE is now utilizing it, the impropriety of repurposing Americans' sensitive SSA data without prior notice or their consent, and the attendant risks to voting and privacy rights.[84]

---

https://tinyurl.com/y5mraaby ("CLC SSA Comment); Comment to SSA by MALDEF (Dec. 12, 2025), https://tinyurl.com/yp9jv9ft ("MALDEF SSA Comment"); Comment to SSA by Protect Democracy Project (Dec. 12, 2025), https://tinyurl.com/muht9abf ("PD SSA Comment"); Comment to SSA by UnidosUS (Dec. 12, 2025), https://tinyurl.com/53k9chdu ("Unidos SSA Comment'); Comment to SSA by Service Employees International Union (Dec. 12, 2025), https://tinyurl.com/8ap5krys ("SEIU SSA Comment"); Comment to SSA by Texas Civil Rights Project (Dec. 2, 2025), https://tinyurl.com/d5kn2vjk.

[79] *See, e.g.*, Comment to DHS by Brenda Gray (Dec. 12, 2016), https://tinyurl.com/yxbm36cb.

[80] *See, e.g.*, LWV SSA Comment, *supra* n.75, at 5-8; ACLU SSA Comment, *supra* n.78, at 3-6; CLC SSA Comment, *supra* n.78, at 7-8.

[81] *See, e.g.*, LWV SSA Comment, *supra* n.75, at 9-10: EPIC SSA Comment, *supra* n.75, at 4-9; PD SSA Comment, *supra* n.78, at 8-9; MALDEF SSA Comment, *supra* n.78, at 5-7; Unidos SSA Comment, *supra* n.78, at 8-10.

[82] *See, e.g.*, LWV SSA Comment, *supra* n.75, at 8-9; EPIC SSA Comment, *supra* n.75, at 13; ACLU SSA Comment, *supra* n.78, at 7-8; Unidos SSA Comment, *supra* n.78, at 10-11.

Add citation.

[83] *See, e.g.*, Unidos SSA Comment, *supra* n.78, at 7.

[84] *See, e.g.*, LWV SSA Comment, *supra* n.75, at 4, 11-17; EPIC SSA Comment, *supra* n.75, at 10-12; CLC SSA Comment, *supra* n.78, at 2-5; MALDEF SSA Comment, *supra* n.78, at 13-14; PD SSA Comment, *supra* n.78, at 2-6.

97.    Consistent with the terms of SSA's SORN, SSA has continued to allow overhauled SAVE to access SSA data since the SORN comment period closed on December 12, 2025. SSA has made no public statement or taken any action indicating any response to the thousands of public comments.

### 3.    The overhauled SAVE process for voter roll bulk uploads and SSN searches

98.    Based on publicly available documents such as the DHS-SSA SAVE Agreement, the 2025 SAVE SORN, the 2025 SAVE PIA, and DHS's SAVE guidance, and on information and belief, the following is Plaintiffs' understanding of how the overhauled SAVE system currently operates for "voter verification" checks when a SAVE user agency runs a bulk search using voters' full names, dates of birth, and full or partial SSNs:

99.    **First**, a SAVE user downloads a CSV template file (*i.e.*, a blank spreadsheet) from DHS's SAVE website. The user then manually enters into the CSV file at least the following data elements, for up to millions of voters: first name, last name, date of birth, and either a full or partial SSN. The user then uploads the completed file into the SAVE interface.[85] While the SAVE user can also provide voters' DHS numeric identifiers (e.g., an A-number) at this step, state and local election agencies typically do not have this information.[86]

---

[85] 2025 SAVE PIA, *supra* n.17, at 4; 2025 SAVE SORN, *supra* n.24, at 48950; USCIS, SAVE User Reference Guide, § 8.2 How to Submit Cases in Bulk (June 2025), https://perma.cc/H7FS-PTD4 ("SAVE User Reference Guide"); USCIS, Tutorial: Introduction to SAVE and the Verification Process for SAVE Users, at 15-16 (July 17, 2025), https://perma.cc/NN9H-TTFT ("SAVE Tutorial").

[86] *See* May 22, 2025, SAVE Press Release, *supra* n.31 ("[M]ost state and local agencies do not collect … DHS identifying number[s]"); Letter from 21 SOS to DHS, *supra* n.28, at 2 ("DHS numbers . . . do not generally come through the offices of election officials while conducting regular business.").

100. **Second**, DHS discloses the voters' uploaded data elements to SSA and uses it to search SSA's NUMIDENT system.[87]

101. **Third**, SSA discloses the NUMIDENT system search results to DHS, including the following fields:

- SSN Match (True/False)
- Full SSN for all matches (when a partial SSN is provided)
- Name Match (True/False)
- Date of Birth Match (True/False)
- Citizenship/Foreign Indicator
  - Blank – Citizenship code is blank and foreign-born indicator is blank
  - "A" - U.S. citizen
  - "B" - Legal alien; eligible to work;
  - "C" - Legal alien, not eligible to work;"D"- Other;
  - "E" - Alien student- restricted work authorized; and
  - "F"- Conditionally legalized alien
- Foreign Born indicator (Citizenship code is not present, but voter was foreign born);
- State/Country code;
- American Samoa indicator (True/False);
- Alien Registration number (where applicable);
- Death indicator (Yes Deceased/Not Deceased); and
- Error code descriptions (transaction and record levels).[88]

102. The **fourth** step can proceed in several ways, depending on what results DHS receives from SSA's NUMIDENT system.

103. If a DHS numeric identifier is available (either found in SSA records or provided to DHS by the SAVE user), then SAVE will automatically query additional systems available to it,[89] including systems housed at DHS (multiple systems), the Department of Defense, the

---

[87] 2025 SAVE PIA, *supra* n.17 at 4, 8.

[88] 2025 SAVE PIA, *supra* n.17, at 4-5; 2025 SAVE SORN, *supra* n.24, at 48950; 2025 DHS-SSA SAVE Agreement, *supra* n.35, at 5.

[89] 2025 SAVE PIA, *supra* n.17, at 19-20; USCIS, Voter Registration and Voter List Maintenance Fact Sheet (Aug. 27, 2025), https://perma.cc/Q5F7-YBCA ("SAVE Voter Registration and Voter List Maintenance Fact Sheet"); SAVE User Reference Guide, *supra* n.85, §§ 9.1, 9.2; Sept. 2025 SAVE PTA, *supra* n.40, at 11.

Department of Education, the Department of Health and Human Services, DOJ, the Department of State, state driver's licensing agencies and, in the future, non-governmental sources such as NLETS.[90] SAVE will then return a response that will either include the voter's citizenship status—*e.g.*, "U.S. Citizen" or "Lawful Permanent Resident"—or request additional actions by the SAVE user, like submitting additional documents.[91]

104.    Alternatively, if (a) no DHS numeric identifier is found in SSA records or provided to DHS by the SAVE user, (b) the match to SSA records is inconclusive, or (c) SSA records confirm a voter is a citizen or is deceased, then SAVE ends the automated query and generates a response based solely on its search of SSA records.[92] Those possible SAVE responses include:

- U.S. Citizen (per SSA Record);
- Deceased (per SSA record);
- Immigration Enumerator [*i.e.* DHS identifier] Required – Resubmit with Additional Information;
- No Record Found with SSA – Resubmit with Additional Information
- Unable to Return Record from SSA – Resubmit with Additional Information; or
- Full Social Security Number Required – Resubmit with Additional Information.[93]

105.    Without a DHS numeric identifier, the SAVE process cannot proceed beyond querying SSA records. SAVE cannot perform additional review of a response based solely on SSA

---

[90] 2025 SAVE PIA, *supra* n.17, at 6-9; 2025 SAVE SORN, *supra* n.24, at 48953.

[91] 2025 SAVE PIA, *supra* n.17, at 5-6; SAVE Tutorial, *supra* n.85, at 24; Sept. 2025 SAVE PTA, *supra* n.40, at 12-14.

[92] Decl. of Brian Broderick ¶ 11, ECF No. 37-1 ("SAVE only returns a response to a user agency based on an SSA record when: (1) the information matches an SSA record indicating U.S. Citizenship or (2) the information matches an SSA record indicating the individual is deceased."); Sept. 2025 SAVE PTA, *supra* n.40, at 12 .

[93] SAVE Tutorial, *supra* n.85, at 25; USCIS, Updated Guide to Understanding SAVE Verification Responses (July 30, 2025), https://perma.cc/ZQX4-TEDL.

records because DHS "does not have direct access to the [SSA] system to support these additional steps."[94]

106.    **Fifth** and finally, SAVE users will take action based on the results of the above-described process, which will vary based on the response received.

107.    If the SAVE result identifies a voter as a *citizen*, then the MOA between DHS and SAVE users permits the user to rely on SAVE's confirmation of citizenship.

108.    If the SAVE result identifies a voter as a *non-citizen* (*e.g.*, SAVE provides a "Lawful Permanent Resident" response), then the SAVE MOA directs that the SAVE user "contact the registrant or registered voter to obtain proof of U.S. citizenship" before denying or cancelling their voter registration.[95]

109.    And if the SAVE result is inconclusive (*e.g.*, SAVE provides an "Immigration Enumerator Required – Resubmit with Additional Information" response), then the SAVE process requires that (1) the SAVE user provide the voter's DHS numeric identifier (which state and local

---

[94] 2025 SAVE PIA, *supra* n.17, at 19-20; *see also* 2025 SAVE SORN at 48951 (agencies using SAVE's new bulk search-by-SSN function "are not prompted to institute additional verification . . . but are instructed to resubmit with additional information when the process is unable to return a response"); SAVE Tutorial, *supra* n.85, at 25 ("Additional verification can only be conducted with [a DHS numeric identifier]. Cases that receive any of the SSN specific responses will not be eligible for additional verification and should be checked and created with corrected or additional information."); SAVE User Reference Guide, *supra* n.85, § 8 ("Additional verification can only be conducted using an immigration enumerator. SAVE cannot verify a benefit applicant's immigration status or U.S. citizenship using . . . non-DHS documentation.").

[95] USCIS, SAVE Voter Verification Agency Sample MOA Draft at 4 (June 9, 2025), https://perma.cc/HXE7-WEV2 ("SAVE Voter Verification Agency Sample MOA Draft"); *see also* SAVE Voter Registration and Voter List Maintenance Fact Sheet, *supra* n.89 ("If the SAVE response is other than U.S. Citizen, the SAVE process, as agreed to by the voter agency, permits the registrant or registered voter an opportunity to correct their records or present proof of citizenship prior to relying on a SAVE result to deny registration or remove someone from a voting roll.").

agencies likely do not possess), or (2) the SAVE user "contact the registrant or registered voter to obtain proof of U.S. citizenship" before denying or cancelling their voter registration.[96]

### D. The overhauled SAVE system conducts bulk queries of unreliable citizenship data using unreliable methods, creating high risks of error.

110.    DHS, SSA, election officials, federal courts, and numerous commenters on the 2025 SAVE and NUMIDENT SORNs have identified serious problems with (1) the citizenship data utilized by both the legacy and current SAVE system, (2) the attempt to use SAVE to repurpose SSA data and link it to DHS datasets, and (3) SAVE's new search-by-partial-SSN functionality. Despite acknowledging these risks and the inability to fully mitigate them, DHS continues to tout SAVE's reliability and to enable and encourage officials to use the flawed system for mass citizenship checks to determine voter and benefits eligibility.[97]

### 1. DHS's belated 2025 SAVE PIA acknowledges major risks that cannot be fully mitigated or mitigated at all.

111.    DHS itself concedes many problems with SAVE in its 2025 SAVE PIA—an assessment the agency belatedly conducted six months *after* overhauling SAVE in May 2025.

112.    First, DHS acknowledges there "is a risk that the U.S. Citizenship and Immigration Services may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual."[98] DHS concedes that SAVE

---

[96] SAVE Voter Verification Agency Sample MOA Draft, *supra* n.95, at 4; *see also* SAVE Voter Registration and Voter List Maintenance Fact Sheet, *supra* n.89 (stating that "[i]f, after additional verification, SAVE cannot verify the individual as a U.S. citizen or verifies them as something other than U.S. citizen, the user agency or voting administrator" may "use the SAVE response to deny registration or remove someone from a voting roll" if they "first … contact[] the individual to obtain proof of U.S. citizenship if required under federal, state or other applicable law").

[97] USCIS Enhances Voter Verification Systems, *supra* n.4.

[98] 2025 SAVE PIA, *supra* n.17, at 19.

only "**partially mitigates** this risk," and that "due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results."[99] Remarkably, DHS admits that SAVE's additional verification process cannot fully mitigate these problems because the new search-by-SSN functionality "does not allow for a second and third step review," since USCIS "does not have direct access to the Social Security Administration system to support these additional steps."[100] "Additionally, registered agencies may not go through all steps to ensure accuracy of information."[101]

113.    These findings built on DHS's prior admissions, relayed in its July and September 2025 PTAs for SAVE, that "[s]hortfalls in data accuracy in the [SAVE] system could cause incomplete or false results."[102]

114.    Second, the PIA acknowledges there "is a risk that the new category [of] individuals covered by this assessment/notice, specifically, United States born citizens[,] do not have the opportunity to individually participate or consent in how the U.S. Citizenship and Immigration Services uses their information."[103] DHS asserts it "**cannot mitigate** this risk" at all and can only "assume[] that each [SAVE] user agency factors in the principles of notice, individual participation, and consent prior to providing information to" DHS.[104] With this alarming statement, DHS abdicates its own legal obligation under the Privacy Act to ensure that any new routine use of information is "compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7).

---

[99] *Id.*

[100] *Id.* at 19-20.

[101] *Id.* at 20.

[102] July 2025 SAVE PTA, *supra* n.40, at 17; Sept. 2025 SAVE PTA, *supra* n.40, at 17.

[103] 2025 SAVE PIA, *supra* n.17, at 21.

[104] *Id.* (emphasis in original).

115.    Third, DHS acknowledges there "is a risk that all United States citizens, including natural born U.S. citizens, have not been provided notice that the SAVE Program collects or maintains their information for citizenship and immigration status."[105] DHS claims to have "**partially mitigate[d]**" this risk by publishing the 2025 SAVE PIA and 2025 SAVE SORN several months *after* it overhauled SAVE to repurpose millions of Americans' sensitive personal data.[106]

## 2.    Unreliability of SSA's citizenship data

116.    The unreliability of SSA's citizenship data is well-documented. As SSA itself has repeatedly recognized, its citizenship data is especially unreliable for persons who are born abroad and become U.S. citizens—*i.e.*, naturalized and derived citizens. That is because SSA captures citizenship data from an individual at a single moment in time, when they apply for an SSN and the corresponding card.[107] If the individual obtains an SSN *before* becoming a citizen by naturalization or derivation, SSA does not automatically update their citizenship status after they attain citizenship, and "there is no obligation for an individual to report to SSA a change in their immigration status unless the individual is receiving Social Security payments."[108] Such citizens typically must call SSA and schedule an in-person appointment at a regional SSA office to prove their citizenship status so that their record can be updated.[109]

---

[105] *Id.* at 20.

[106] *Id.* (emphasis in original).

[107] Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/KS2N-U2US ("Letter from SSA to Fair Elections Ctr.").

[108] *Id.*

[109] Between April 2024 and March 2025, non-citizens applying for naturalization could check a box on USCIS's Form N-400 to authorize SSA automatically updating their citizenship status "without having to visit an SSA office." Press Release, USCIS, *New Citizens Will Be Able to Seamlessly Request Social Security Updates* (March 28, 2024), https://perma.cc/3HKK-N6BU.

117.    SSA's data gaps are especially likely to impact derived citizens, who are born outside of the United States and derive citizenship as children by operation of law when their parents naturalize.[110] These individuals would have no reason to interact with SSA until they are ready to apply for Social Security benefits. While derived citizens can apply to DHS for a Certificate of Citizenship, the form's instructions make clear that obtaining the certificate is optional,[111] and the online filing fee is currently $1,335.[112] Thus, as DHS has recognized, derived citizens "frequently do not apply for and thus do not receive a determination and certificate of United States citizenship."[113]

118.    SSA admitted in 2023 that because "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA," its "records do not provide definitive information about an individual's citizenship status," and thus has cautioned against relying on SSA data to verify citizenship or immigration status.[114] As SSA has explained, "SSA is not the agency responsible for making citizenship determinations" and "SSA is not the custodian of U.S. citizenship records."[115]

---

However, SSA halted automatic updates under this program in March 2025. *See* Amy L. Peck, *SSA Pauses Automatic Issuance of SSNs for Certain Immigration Applicants*, Jackson Lewis: Immigration Blog (June 11, 2025), https://perma.cc/QX6L-S5AZ.

[110] *See* USCIS Policy Manual, *supra* n.8.

[111] *See* Instructions for Application for Certificate of Citizenship, USCIS Form N-600 (Jan. 20, 2025), https://perma.cc/TL82-TTDW ("You are not required to obtain evidence of your U.S. citizenship.").

[112] USCIS, Fee Schedule, N-600, Application for Certificate of Citizenship (Jan. 8, 2026), https://perma.cc/MSK9-DM5E.

[113] July 2025 SAVE PTA, *supra* n.40 at 16; Sept. 2025 SAVE PTA, *supra* n.40 at 16.

[114] Letter from SSA to Fair Elections Ctr., *supra* n.107, at 2.

[115] *Id.*

119.    Consistent with SSA's 2023 findings, a 2006 audit by SSA's Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as non-citizens "because [they] had become U.S. citizens after obtaining their SSN" and "had not updated their records with SSA."[116] That number has likely increased substantially since 2006. In the last decade, more than 7.9 million Americans have naturalized, including over 800,000 in fiscal year 2024.[117]

120.    SSA also lacks complete citizenship data for U.S.-born citizens born before 1981, the year SSA began consistently collecting citizenship information.[118] According to SSA, "SSA's assessment of its citizenship data indicates that approximately ¼ of those records do not have an indication of citizenship present."[119] That means SSA likely does not have information about citizenship status for U.S.-born citizens older than their mid-forties unless they have subsequently filed for Social Security benefits or sought a new Social Security card.

121.    DHS acknowledged these shortcomings and the risks of SAVE's reliance on SSA's citizenship data in its July and September 2025 PTAs for SAVE.[120]

122.    SSA's citizenship data was never intended to be used in the ways SAVE is now repurposing it. SSA originally collected the data for its own program purposes concerning work authorization and eligibility for SSA benefits.[121] It did not collect the data for disclosure to DHS

---

[116] SSA Off. of the Inspector Gen., Cong. Resp. Rep. No. A-08-06-26100, *Accuracy of the Social Security Administration's Numident File* 13 (Dec. 18, 2006), https://perma.cc/5G2J-FF4V.

[117] *See* Naturalization Statistics, USCIS (Jan. 24, 2025), https://perma.cc/X3T9-5CJS.

[118] Letter from SSA to Fair Elections Ctr., *supra* n.107, at 2.

[119] *Id.* at 3.

[120] July 2025 SAVE PTA, *supra* n.40, at 17; Sept. 2025 SAVE PTA, *supra* n.40, at 17.

[121] *See* Social Security Amendments of 1972, Pub. L. 92-603, 86 Stat. 1329 (codified as amended in scattered sections of 42 U.S.C.); SSA, *Citizenship, Alien Status and Residency*, Program

and state and local agencies for mass voter eligibility checks. And as SSA has stressed, although its "citizenship information is accurate for SSA's program purposes, if used later for other purposes, it may not be current."[122]

### 3. Unreliability of DHS's citizenship data and difficulty linking it to SSA data

123.    The problems with SSA's data are not mitigated by SAVE's cross-checking of search results against DHS's own citizenship records for at least two reasons.

124.    First, there is no "common identifier" for searching both DHS and SSA records—*i.e.*, an SSN cannot be used to query DHS-accessed records, and a DHS-issued numeric identifier such as an A-number cannot be used to query SSA records.[123] This means that "information about foreign-born U.S. citizens contained in USCIS naturalization databases may not be locatable when SSA is unable to confirm" U.S. citizenship.[124] That is why, as explained above, SAVE needs a DHS-issued numeric identifier to query DHS and other non-SSA systems accessible to SAVE.[125]

125.    Second, DHS's citizenship data queried by SAVE is itself non-current and incomplete for naturalized and derived citizens, and, for that reason, has been deemed unreliable for voter eligibility checks by various bodies.

126.    For instance, a 2017 audit by the North Carolina State Board of Elections found that a "match with the SAVE database"—which at that time queried the same DHS databases

---

Operations Manual System, GN 00303.000 (2026) https://perma.cc/SPH7-RMDQ; 20 C.F.R. § 422.104(a)(3).

[122] Letter from SSA to Fair Elections Ctr., *supra* n.107, at 2.

[123] Westat Report to DHS, *Evaluation of the Accuracy of E-Verify Findings*, at xii (July 2012), https://perma.cc/54EN-82KN.

[124] *Id.*

[125] *See supra* n.94.

SAVE currently does—was "not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE."[126] Federal courts have similarly found that the DHS citizenship data queried by the pre-2025, legacy SAVE database was unreliable for voter eligibility checks. *See, e.g.*, *Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 n.3 (9th Cir. 2025) (citing evidence that legacy SAVE may not have up-to-date USCIS "naturalization records," creating the "danger" that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled . . . losing their constitutional right to vote").

127.    Indeed, DHS itself admits in recent SAVE guidance that "if an individual with acquired citizenship has not received a Certificate of Citizenship from USCIS (e.g., some foreign-born children of U.S. citizens) or is not designated as a U.S. citizen in SSA records, SAVE may not be able to confirm that individual's U.S. citizenship," and that, "[i]n these circumstances, SAVE returns the case to the user agency for review of their information for data entry errors or *to seek additional information from the individual*."[127]

128.    As explained below, this feature of the SAVE process—requiring voters to provide "additional information" to make up for the admitted shortcomings in SAVE's data—is far from harmless, and the problem has been exacerbated by SAVE's new bulk upload feature. It has already caused election officials in states such as Texas to demand documentary proof of citizenship ("DPOC") from eligible U.S. citizen voters in order for them to retain their voter registration status, needlessly burdening their right to vote.

---

[126] N.C. St. Bd. of Elections, *Post-Election Audit Report—General Election 2016* app. 2 (Apr. 21, 2017), https://perma.cc/6VCM-LDVQ.

[127] SAVE Voter Registration and Voter List Maintenance Fact Sheet, *supra* n.89 (emphasis added).

### 4.    Unreliability of SAVE's new search-by-partial-SSN functionality

129.    Yet another problem with overhauled SAVE is that it now enables SAVE users to conduct citizenship checks using only the last four digits of an SSN ("SSN4"), which is not a unique identifier.[128] This creates a major risk of misidentifying or mismatching people between voter registration lists bulk uploaded into SAVE and the databases SAVE queries.

130.    Here again, this problem is well-documented and known to SSA. A 2009 report by SSA's Inspector General examining states' use of SSN4 to verify voter information for the Help America Vote Verification ("HAVV") Program found a "high no-match response rate" of "31 percent," and inconsistent verification responses when the same applicant data was entered at different times.[129] The Inspector General attributed this problem in large part to the fact that "the last four digits of the SSN is not a unique identifier."[130] It found that the "high no-match response rate and the inconsistent verification responses could hinder the States' ability to determine whether applicants should be allowed to vote," and urged SSA to "ensure that the [U.S. Election Assistance Commission] is aware of the limitations and potential risks (risk of providing a high rate of false positives or false negatives to the States) of using the last four digits of the SSN to verify the identity of an individual registering to vote."[131]

---

[128] *See* 2025 SAVE SORN, *supra* n.24, at 48950; USCIS Enhances Voter Verification Systems, *supra* n.4.

[129] SSA Office of the Inspector General, *Accuracy of the Help America Vote Verification Program Responses*, Number A-03-09-29115, at 4 (June 22, 2009), https://perma.cc/3NKG-TLWP.

[130] *Id.* at 2.

[131] *Id.* at 11.

**E.** **States are rapidly using overhauled SAVE to conduct mass voter eligibility checks, imperiling millions of Americans' privacy and voting rights.**

131.    Despite overhauled SAVE's known and unmitigated risks, several states are—at the Administration's urging—rapidly deploying the federal system for what DHS calls "voter verification" purposes. The early results are damning: they show that the overhauled SAVE process has forced eligible U.S. citizen voters to needlessly provide DPOC to state and federal authorities, caused lawful voters to be wrongfully removed from voter rolls, created significant confusion and problems for election administrators, and jeopardized millions of Americans' privacy and data security, including Plaintiffs' members.

132.    DHS nonetheless continues to "encourage all federal, state, and local agencies to use the SAVE program" based on false claims of widespread non-citizen voting.[132] DHS has touted overhauled SAVE, noting that as of November 3, 2025, it "ha[d] enabled state voting agencies to submit over 46 million voter verification queries and ha[d] also allowed federal agencies to submit over 110 million queries to help verify eligibility for federally funded benefits."[133]

**1.** **Texas**

133.    Texas's use of overhauled SAVE began as early as June 5, 2025, when the Texas Secretary of State's Office ("Texas SOS") announced it had referred to the Texas Attorney General 33 potential non-citizens who had voted in the November 2024 General Election.[134]

---

[132] USCIS Enhances Voter Verification Systems, *supra* n.4.

[133] *Id.*; *see also* Press Release, USCIS, *Making America Safe Again: U.S. Citizenship and Immigration Services End-of-Year Review Demonstrates Impact of Rigorous Immigration Crackdown* (Dec. 22, 2025), https://perma.cc/M62C-YU82.

[134] Press Release, Tex. Sec'y of State, *After Gaining Access to SAVE Database, Secretary Nelson Refers Potential non-citizen Voting Cases for Investigation* (June 5, 2025), https://perma.cc/WZ3C-FUXL.

41

134.    On October 20, 2025, the Texas SOS announced it had "run[] the entire Texas voter list with more than 18 million voters through the SAVE database," to conduct "a full comparison of the state's voter registration list against citizenship data" in SAVE.[135] The SOS explained that SAVE had identified "2,724 potential non-citizens who are registered to vote in Texas," and that, "[l]ast week those voter files were provided to Texas counties, who will now conduct their own investigations into the eligibility of these voters … Once that process is complete, individuals who are deemed non-citizens that voted in a Texas election will be referred to the Office of the Attorney General."[136]

135.    To facilitate removal of suspected non-citizens identified by SAVE, the Texas SOS has created a new template notice for county voter registrars to require proof of citizenship documentation for voters identified as potential non-citizens by the overhauled SAVE system (the "Texas SAVE Non-Citizenship Notice").[137]

136.    The Texas SAVE Non-Citizenship Notice states that "[a] comparison of the information in your voter registration records with the United States Citizenship and Immigration Services SAVE records show that you were not a United States citizen at the time of the comparative process."[138] It then informs the recipient of the notice that they *must* provide DPOC to the county registrar in the form of (1) a U.S. birth certificate or consular report of birth abroad of a citizen, (2) a United States passport, (3) a Certificate of Naturalization or Certificate of

---

[135] Press Release, Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/9WZ2-XVDA.

[136] *Id.*

[137] *Id.*

[138] Tex. Sec'y of State, Notice to Registered Voter for Proof of Citizenship (USCIS Verification) (Oct. 2025), https://perma.cc/WM6Q-P48N.

Citizenship, or (4) a parent's Certificate of Naturalization along with the target's birth certificate if the target became a U.S. citizen as a result of their parent's naturalization.[139] Recipients have only 30 days to respond, and if the county registrar does not receive DPOC within 30 days, their voter registration "will be cancelled."[140]

137.    The notice says that voters may provide the county registrar copies of the sensitive personal information requested as DPOC by non-secure methods including "fax, electronic mail, or any other method of transmission." It does not specify how that information will be stored or transmitted by the county registrar.[141]

138.    If a voter provides the requested DPOC, the Texas SOS has instructed county registrars that "the county must send a copy of that documentation to the Secretary of State's office to be provided to USCIS" under the Secretary's Memorandum of Understanding with DHS for SAVE, though the Texas SOS has not specified how that sensitive personal information must be transmitted and stored (either by the county or the Texas SOS).[142] The Texas SAVE Non-Citizenship Notice does not disclose to voters that any DPOC they provide to county registrars will be disclosed to the Texas SOS and DHS.

139.    Counties started to send Texas SAVE Non-Citizenship Notices to voters within days of the Texas SOS's October 21, 2025, guidance email to counties, some without any apparent effort to verify the SAVE results relayed by the Texas SOS first.

---

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] Email from Tex. Sec'y of State to Voter Registrars/Election Administrators (Oct. 21, 2025), https://perma.cc/X9MN-ZTVJ.

140.    For example, Denton County sent out Texas SAVE Non-Citizenship Notices on October 22, 2025, days after the Texas SOS sent Denton a list of 84 individuals identified as potential non-citizens by SAVE, leaving essentially no time for Denton to independently investigate the list.[143] Out of the 84 flagged registered voters, 14 have already proven their citizenship as of December 10, 2025.[144] 56 people in Denton County have had their registration cancelled after not responding to the Texas SAVE Non-Citizenship Notice, including five people whose notices came back as undeliverable.[145]

141.    Travis County, in conducting its own investigation of the list of purported non-citizen registered voters provided by the Texas Secretary of State, identified that "[a]bout twenty-five percent of the non-citizen matches on Travis County's list" had already proven citizenship at the time they registered to vote, and an additional forty percent of the non-citizen matches had already previously had their citizenship status cross-checked.[146]

142.    The Texas SOS has declined to take any steps to verify the results produced by SAVE, instead delegating that task to counties and trusting them to catch errors such as the ones identified by Travis County officials.

143.    Travis County's Voter Registration Director stated that "[i]t is my understanding that other counties have experienced this same issue with the lists sent to them by the [Texas] Secretary of State."[147]

---

[143] See Camila Gonzalez, *Denton County has 84 possible non-citizens registered to vote, state says. Most have never voted*, Denton Record-Chronicle (Oct. 23, 2025), https://perma.cc/M6X7-MK2Z.

[144] Jude Joffe-Block, *supra* n.6.

[145] *Id.*

[146] Travis County DHS Comment, *supra* n.56, at 7.

[147] *Id.*

144.    Travis County further explained that forcing voters to provide DPOC when they already have done so "can be a burden on voters given the required short turnaround for providing proof of citizenship. The Travis County Officials have interacted with voters in the past who felt intimidated by receiving a governmental document indicating that they needed to provide proof of citizenship when they had previously done so with a state agency, like DPS."[148]

### 2.    Louisiana

145.    On May 21, 2025, the Louisiana Secretary of State's office ("Louisiana SOS") announced Louisiana was "the first state to utilize a new voter list maintenance database from the federal Department of Government Efficiency."[149]

146.    On September 4, 2025, the Louisiana SOS announced "preliminary findings" of her investigation into alleged instances of non-citizen voting after running "names from Louisiana's voter rolls" through the overhauled SAVE system, including "state voting records going back to the 1980s."[150] The Louisiana SOS ran "nearly all of the state's 2.9 million registered voters through SAVE."[151]

147.    The Louisiana SOS "discovered 390 non-citizen registered voters in the state, with 79 voting in at least one election" since the 1980s.[152] The Secretary "acknowledged the possibility

---

[148] Travis County DHS Comment, *supra* n.56, at 7.

[149] Press Release, La. Sec'y of State, *Louisiana First State to Utilize New Voter List Maintenance Database* (May 21, 2025), https://perma.cc/MF6F-3DTU.

[150] Wesley Muller, *Louisiana election investigation finds 79 non-citizens have voted since 1980s,* La. Illuminator (Sept. 4, 2025), https://lailluminator.com/2025/09/04/louisiana-election-investigation-finds-79-non-citizens-have-voted-since-1980s/.

[151] Jude Joffe-Block and Miles Parks, *33 million voters have been run through a Trump administration citizenship check*, NPR (Sept. 10, 2025), https://perma.cc/QWL3-DCVR.

[152] *Id.*

that some of her findings could be attributed to errors or outdated information."[153] She added that the 390 suspects "have been given notice we have reason to believe they are not a U.S. citizen," and that "[a]nyone who does not respond or provide proof within 21 days is removed from the rolls," and "will be referred for criminal prosecution."[154]

### 3.    Virginia

148.    Since 2013, Virginia law has mandated that the Department of Elections participate in the SAVE program "for the purposes of verifying that voters listed in the Virginia voter registration system are United States citizens," Va. Elec. Code § 24.2-404(E), and that general registrars delete from voter rolls "any voter who … is known not to be a United States citizen . . . based on information received from" SAVE, *id.* §§ 24.2-404(A)(4). The Virginia State Board of Elections first signed an MOU to use SAVE for voter list maintenance in 2014.[155]

149.    On September 12, 2025, Virginia Governor Glenn Youngkin issued an Executive Order reaffirming Virginia's commitment to using the SAVE system and instructing that, "to the maximum extent possible under state and federal law," the Virginia Department of Elections must "coordinate with the federal government through partnerships with the Department of Homeland Security."[156]

150.    Governor Youngkin's Executive Order explicitly mandates that Virginia officials utilize the overhauled SAVE system's "bulk upload" feature, stating: "The Commissioner shall

---

[153] *Id.*

[154] *Id.*

[155] Mem. of Agreement between the DHS, USCIS, and the Virginia State Board of Elections (March 20, 2014), https://perma.cc/UV2V-G6UT.

[156] Va. Exec. Order No. 53, *Enhancing Security for Election Preparedness* (Sept. 12, 2025), https://perma.cc/VY8P-UZGY.

continue to use the Department of Homeland Security's SAVE database to identify non-citizens on Virginia's voter list using bulk upload functionality in accordance with state law, a requirement first implemented by my administration."[157]

151.    Although Governor Youngkin is no longer in office, his September 12, 2025, Executive Order has not been publicly rescinded as of the time of this filing.

### 4.    Indiana

152.    On July 7, 2025, the Indiana Secretary of State's office ("Indiana SOS") announced it had entered into an MOA with DHS to use the overhauled SAVE system "to verify the citizenship status of individuals on Indiana's voter rolls ensuring that only eligible U.S. citizens are registered to vote in Indiana."[158]

153.    On September 12, 2025, the Indiana SOS announced that Indiana "uploaded [its] base of registrations [to SAVE] with the last four digits of Social Security numbers as an identifier and [Indiana is] currently going through those results."[159] The SOS stated that Indiana's use of the overhauled SAVE system is ongoing and that Indiana is querying SAVE using only the last four digits of voters' SSNs.[160] The SOS also said Indiana had referred an alleged non-citizen voter

---

[157] *Id.*

[158] Press Release, Ind. Sec'y of State, *Indiana Sec'y of State Diego Morales Signs Agreement with Dep't of Homeland Sec'y to Identify non-citizens on Indiana Voter Rolls* (July 7, 2025), https://perma.cc/WJ74-9EMB; Mem. of Agreement between the Dep't of Homeland Sec'y, U.S. Citizenship and Immigration Services and Indiana Sec'y of State Regarding Participation in the SAVE Program for Voter Registration and Voter List Maintenance Purposes (July 1, 2025), https://perma.cc/A6LC-9CLQ.

[159] Marilyn Odendahl, *VOTING CASE: Morales Touts 'Proof' Of non-citizens On Rolls, Sends Voter Info to DOJ*, Ind. Citizen (Sept. 12, 2025), https://perma.cc/44A5-DSPS.

[160] *Id.*

identified through SAVE to the Indiana State Police and FBI for criminal investigation, and that he had turned over the state's voter rolls to the Department of Justice.[161]

## 5.    Other states

154.    Several other states are likewise using or poised to use overhauled SAVE for bulk voter verification. As of November 3, 2025, 26 states had or were in the process of establishing a memorandum of agreement for voter verification with SAVE.[162] For example, Alabama purports to have used overhauled SAVE to identify and remove potential 186 non-citizens from its voter rolls.[163] Likewise, Arkansas claims to have identified 240 potential non-citizens on its voter rolls; on October 30, 2025, each individual was sent a letter giving them 30 days to prove citizenship using documents before county clerks remove them from the rolls.[164] And Tennessee has referred dozens of individuals to the FBI for investigation after running 4 million of its voters' records through the new SAVE system.[165]

155.    In Missouri, 70 county clerks in December 2025 reportedly "signed a letter sent to state House and Senate leadership describing the [SAVE] system as flawed, saying it regularly included 'individuals we know to be U.S. citizens — our neighbors, colleagues and even voters

---

[161] *Id.*

[162] USCIS Enhances Voter Verification Systems, *supra* n.4.

[163] Press Release, Ala. Sec'y of State, *Secretary of State Wes Allen Directs Immediate Removal of 186 non-citizens Illegally Registered to Vote in Alabama, Identifies 25 non-citizens Who Illegally Voted* (Jan. 6, 2026), https://perma.cc/5PTA-2KHW.

[164] Ainsley Platt, *Jester says 240 potential non-citizens found on Arkansas voter rolls, 0.013% of all registered voters*, Ark. Advoc. (Oct. 30, 2025), https://arkansasadvocate.com/2025/10/30/jester-says-240-potential-non-citizens-found-on-arkansas-voter-rolls-0-013-of-all-registered-voters/.

[165] Press Release, Tenn. Sec'y of State, *Tennessee Secretary of State Tre Hargett Protecting the Vote in Tennessee: Uses Enhanced SAVE Program to Identify Ineligible Voters* (Oct. 27, 2025), https://perma.cc/ULF4-7JWA.

we have personally registered at naturalization ceremonies.'"[166] The election director for St. Louis County reportedly "found that around 35 percent of roughly 690 people initially flagged by the SAVE tool were registered at naturalization ceremonies."[167]

## <u>INJURIES TO PLAINTIFFS</u>

156.    Plaintiffs have suffered and are suffering various injuries as a result of Defendants' unlawful overhaul of the SAVE system. These injuries include:

a.    **Privacy and reputational injuries to members of the LWV organizations and EPIC**, who did not consent to the aggregation and misappropriation of their sensitive data by Defendants and are injured by that data's misuse;

b.    **voting-related injuries to LWV members** whose voting rights are being burdened by the use of SAVE to wrongly identify them as potential non-citizen voters;

c.    **organizational injuries to the LWV entities** whose missions are directly impaired by widespread use of the overhauled SAVE system, and who are, to counteract that harm, expending additional resources on identifying and educating affected voters and protecting their right to vote; and

d.    **informational and procedural injuries to EPIC**, whose mission is impaired by the lack of transparency and public input that have been hallmarks of Defendants' SAVE overhaul.

---

[166] Alexandra Berzon and Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.

[167] *Id.*

## I.    The overhauled SAVE system harms LWV and its members.

### A.    Privacy and reputational injuries to LWV members

157.    As detailed above, several states have bulk uploaded or will imminently bulk upload sensitive voter roll data into the overhauled SAVE system to run searches of multiple agency systems to identify potential non-citizens on their voter rolls. DHS has, in turn—through the overhauled SAVE system—queried or will imminently query SSA systems to (1) verify each voter's SSN (including based on partial SSN searches), and (2) access information about these voters' citizenship statuses as reflected in SSA records. DHS then has provided or will imminently provide to the SAVE users: (1) verification of each voter's SSN, and (2) information about each voter's citizenship status, as reflected in some combination of DHS and SSA records. In some cases, the information supplied to SAVE users states falsely indicated or will indicate that particular people may be non-citizens registered to vote unlawfully.

158.    Members of LWVTX, LWVLA, and LWVVA who are registered voters in those states and who are, as discussed above, also members of the national League of Women Voters, have been injured through the deprivation of their statutory privacy rights. They reasonably fear and are emotionally distressed by the unauthorized inter-governmental disclosure, aggregation, misuse, and potential mishandling of their sensitive personal data through the overhauled SAVE system.

159.    These injuries were caused by Defendants, who collected, consolidated, disclosed, and matched their personal information in violation of the Privacy Act and other applicable legal requirements and without the legally required safeguards.

160.    LWVTX, LWVLA, and LWVVA members did not consent to the inter-governmental collection, consolidation, disclosure, and matching of their personal information

held by SSA and DHS, including disclosure to third-party SAVE user states, which the overhauled SAVE system now performs. Nor did they consent to this information being used for "voter verification" purposes.

161.    With respect to SSA, LWV members interacted in confidence with the agency to obtain a Social Security number and card for purposes relating to work authorization and SSA benefits. LWV members never expected or consented to their personal SSA information being disclosed to and repurposed by DHS or other federal, state, or local agencies through a massive inter-governmental data bank to determine their eligibility to vote. Rather, they reasonably expected that the privacy of their sensitive SSA information would be protected by the explicit guarantees of the Privacy Act and the Social Security Act. They also reasonably expected protection based on longstanding SSA policy recognizing that "the SSN is one of the most sensitive pieces of personal information in our records," assuring that SSA will "only verify SSNs without consent" in "narrow circumstances in which we have legal authority," and explicitly affirming that SSA "does not have the legal authority to disclose information about U.S. citizens to DHS."[168] Under these circumstances, LWV members have reasonably treated their SSA data as highly sensitive and have trusted SSA to do the same.

162.    The unlawful aggregation in SAVE of LWV members' personal information, making it broadly accessible to SAVE users outside the federal government, has caused and will continue to cause LWV members significant harm. Those harms include: the loss of LWV members' statutory privacy rights; the misuse and repurposing of LWV members' private data in unauthorized ways; the sharing of LWV members' private data with unauthorized third parties with no lawful right to access it through unsecured means; LWV members' unease and fears about

---

[168] SSN Disclosure Policy, *supra* n.13.

the examination and transmission of their sensitive data by those who have accessed and will access it; the increased vulnerability of LWV members' data to theft and security breaches; and the increased risk that LWV members' data will be used to subject them to unwarranted investigations or impediments to their fundamental right to vote.

163.    Moreover, those LWV members whom DHS falsely identified to SAVE users as potential non-citizen registered voters—and thus potential criminals—have suffered reputational harm based on the dissemination of false or misleading information about them to third parties.

164.    Members of LWVTX, LWVLA, and LWVVA have already suffered these harms and will continue to suffer them absent judicial relief. For example, LWVTX has identified members whose personal information was uploaded into SAVE via its new bulk-upload and search-by-SSN features, resulting in the unauthorized disclosure, matching, and repurposing of their SSA data without their consent for purposes of determining their citizenship status and eligibility to vote. LWVTX has also identified members whom DHS incorrectly identified as potential non-citizen registered voters to the Texas Secretary of State.

165.    One LWVTX member who has suffered each of these harms is Anthony Nel, a derived U.S. citizen and resident of Denton County, Texas, whom overhauled SAVE incorrectly identified as having a non-citizen status to the Texas SOS based on outdated data, leading to his voter registration being wrongfully cancelled in December 2025. Because the Texas Secretary of State has executed a Memorandum of Understanding to continue using the overhauled SAVE system for voter list maintenance, his and other LWVTX members' personal information will continue to be improperly disclosed, matched, and repurposed in the future absent judicial relief.

166.    Similarly, LWVLA and LWVVA have previously identified members who are suffering privacy injuries based on their states' ongoing or imminent use of SAVE for voter-roll

bulk uploads and queries of their sensitive personal data. *See* J. Doe Decl. 4, ECF No. 16-3 (LWVLA member); J. Doe Decl. 5, ECF No. 16-4 (LWVVA member); J. Doe Decl. 6, ECF No. 16-8 (LWVVA member).

167.    Over the last several months, LWVTX, LWVLA, and LWVVA have each heard from additional members who are extremely disturbed by and concerned about how the federal government's overhaul of the SAVE system is making their sensitive SSA information readily available to DHS and various state and local election officials.

**B.    Voting-related injuries to LWV members**

168.    The overhauled SAVE system has also inflicted, and will continue to inflict, burdens on the voting rights of members of LWVTX, LWVLA, and LWVVA, by placing members at risk of improper removal from state voter rolls and wrongful investigation based on faulty data.

169.    The state League Plaintiffs' members now must constantly re-check their voter registration status; may need to provide additional citizenship documentation to both state and federal agencies or face other burdens in order to exercise their right to vote; may have difficulty obtaining this additional citizenship documentation, since, for millions of Americans in Texas, Louisiana, Virginia, and other states across the country, it is not readily available and may be difficult, time-consuming, and expensive to obtain; and are intimidated by the overhauled SAVE system and the threat of unwarranted investigation and prosecution. LWV members face these consequences, not simply because the overhauled SAVE system includes unreliable SSA citizenship data, but also because Defendants are making that data accessible without adequate safeguards and verification to ensure that state and local officials are not utilizing SAVE to purge eligible voters from voter rolls.

170.    Members of LWVTX, LWVLA, and LWVVA have already suffered these harms

and will continue to suffer them absent judicial relief. For example, LWVTX has identified members whose personal information was uploaded into SAVE using its new bulk upload and search-by-SSN functionality, resulting in the unauthorized disclosure, matching, and repurposing of their SSA NUMIDENT data without their consent for purposes of determining their citizenship and eligibility to vote. Some of these members have faced burdens on their voting rights as a direct result of inaccurate SSA citizenship data now being utilized by SAVE, including having their voter registration cancelled (such as LWVTX member Anthony Nel) or being forced to provide DPOC in order to avoid having their registration cancelled. Because the Texas Secretary of State has executed a Memorandum of Understanding to continue using the overhauled SAVE system for voter list maintenance, these LWVTX members and others will continue to face these harms absent judicial relief.

### C.    Organizational injuries to LWVTX, LWVLA, and LWVVA

171.    The League's core mission is to empower voters and defend democracy, including by registering voters and increasing voter participation. The League seeks to increase the number of registered voters and voter participation in elections, and it accomplishes this mission by engaging in voter outreach, education, and assistance, not just to U.S.-born citizens, but also to naturalized and derived citizens.

172.    Among other activities, the state League Plaintiffs advance their missions by providing voter outreach and education to assist naturalized and derived citizens in checking their voter registration and encouraging and helping them to register or re-register. They also provide regular trainings to local Leagues, their members, their volunteers, voter services teams, and nonpartisan partners to assist voters—including U.S.-born, naturalized, and derived citizens—in registering to vote and staying registered.

173.    Each League Plaintiff also maintains their respective VOTE411 webpages as part of VOTE411.org, an online resource committed to ensuring voters have the information they need to understand potential obstacles to voting and successfully participate in every election in Texas, Louisiana, and Virginia.

174.    The overhauled SAVE system harms the state League Plaintiffs' core mission and disrupts and impairs their mission-critical efforts, undertaken consistently over the course of many decades, to register Texas, Louisiana, and Virginia voters and encourage them to vote.

175.    The overhauled SAVE system directly undermines the state League Plaintiffs' voter-registration and voter-education work by threatening swaths of naturalized and derived-citizen voters—many tens of thousands across Louisiana, Texas, and Virginia[169]—and instilling in these voters credible fears of being erroneously disenfranchised, facing additional obstacles to voting, and being subjected to baseless criminal investigations into their lawful voting. The overhauled SAVE system's outdated and unreliable citizenship data risks impairing eligible naturalized and derived citizens' ability and willingness to register and vote, frustrating the state League Plaintiffs' mission-critical functions of educating, empowering, and encouraging them to register and vote, and providing services to facilitate their registration and voting.

176.    When voters are unlawfully purged from voter rolls in Texas, Louisiana, and

---

[169] *See* Texas has over 2 million naturalized citizens, *Texas*, Migration Pol'y Inst., https://www.migrationpolicy.org/data/state-profiles/state/demographics/TX (last visited Jan. 16, 2026); Virginia has over 650,000 naturalized citizens, *Virginia*, Migration Pol'y Inst., https://www.migrationpolicy.org/data/state-profiles/state/demographics/VA (last visited Jan. 16, 2026); Louisiana has over 90,000 naturalized citizens, *Louisiana*, Migration Pol'y Inst., https://www.migrationpolicy.org/data/state-profiles/state/demographics/LA (last visited Jan. 16, 2026). Additional citizens in these states are derived citizens. *See, e.g.*, Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, DHS, Off. of Homeland Sec. Stat., at 3 (Sept. 2024), https://perma.cc/7BST-ZZZ2 (estimating roughly 2 million lawful permanent residents who derived citizenship from a parent since 1980).

Virginia, it decreases the number of voters in those states, directly impairing the state League Plaintiffs in their core mission of increasing the number of registered voters and voter participation in their respective states. And when voters' eligibility is questioned, they must take additional steps to register or remain registered, or, at a minimum, are caused to distrust the electoral process and are discouraged from voting. This directly impairs the state League Plaintiffs' mission of ensuring that the ballot box is accessible for all eligible voters in Texas, Louisiana, and Virginia.

177.    To try to protect their organizational interests, the state League Plaintiffs jointly submitted comments on the 2025 SAVE SORN and November 2025 NUMIDENT SORN laying out in detail how the expanded system and the unreliable SSA citizenship data within it will lead to naturalized and derived citizens being wrongly targeted, investigated, and needlessly forced to provide documentary proof of citizenship.[170]

178.    LWVTX, LWVLA, and LWVVA have also already expended scarce resources in response to the SAVE overhaul to counteract its harmful effects. In particular, LWVTX, LWVLA, and LWVVA have undertaken extensive efforts to both identify and educate eligible voters who may have been adversely impacted by the SAVE overhaul, to ensure they remain registered to vote and are not discouraged from voting. As part of these efforts, they have devoted time and resources to submitting public records requests to state and local election offices to identify voters whom SAVE has identified as potential non-citizens.

179.    In Texas, several counties have provided responses to public records requests identifying individuals who received Texas SAVE Non-Citizenship Notices requiring that they provide DPOC to avoid cancellation of their voter registration. Based on those responses, LWVTX has mailed letters to over 500 registered voters who received SAVE Non-Citizenship Notices to

---

[170] *See* LWV DHS Comment, *supra* n.52; LWV SSA Comment, *supra* n.75.

help them ensure they remain registered if they are eligible, and to provide guidance if they have been wrongly removed from the voter rolls. So far, LWVTX estimates that five of its staff members and four of its volunteers have devoted approximately 50 hours to these efforts, which remain ongoing. In the coming weeks, LWVTX anticipates needing to mail letters to more than 1,900 additional Texas voters who received Non-Citizenship Notices. LWVTX estimates that the letters it has mailed and will continue to mail will cost it several thousand dollars. So long as the Texas Secretary of State continues to use the overhauled SAVE system for voter registration and voter list maintenance, LWVTX will be forced to continue expending these resources to protect Texans' right to vote.

180.    LWVTX further anticipates having to expend additional time and resources in response to, and directly as a result of, the impact of the SAVE overhaul on its core voter-services work. It is creating social media posts to educate Texas voters; developing educational materials for local chapters and staff so that they can assist voters calling to receive registration assistance after being purged from voter rolls; creating a handout on citizenship information for volunteer deputy registrants to use; creating a one-page document related to the SAVE overhaul for community partners to use; and doing media interviews to educate Texas voters. It is also working to update VOTE411 with SAVE-related information, including information for voters who have been affected by the use of the overhauled system in Texas. These various efforts have delayed LWVTX's work to implement its mobilization software and new website, and it has forced staff and volunteers to work overtime to complete work on other mission-critical work, like producing its voter guides and reviewing county election websites for election-related information.

181.    In response to the SAVE overhaul, LWVLA and LWVVA similarly have been forced to expend time and resources, and anticipate continuing to do so, in order to identify voters

affected by the SAVE overhaul and assist them in ensuring they are properly registered and able to vote; develop educational information and other materials (including for VOTE411); and respond to media outreach. LWVVA anticipates needing to undertake these efforts at least so long as former Governor Youngkin's September 12, 2025, Executive Order directing use of the overhauled SAVE system remains in effect.

182.    All of these impacts to the state League Plaintiffs' mission-critical and ongoing voter-services work are tied to the SAVE overhaul and require them to expend critical staff time and other resources. And because Defendants only announced these changes to SAVE after having implemented them and only recently issued SORNs, the League and its members have been deprived of any meaningful opportunity to offer input. The 2026 election cycle is now well underway—with several upcoming state, local, and federal elections in Texas,[171] Louisiana,[172] and Virginia[173]—so the SAVE overhaul will force the state League Plaintiffs to make mid-cycle adjustments to ensure their members and the eligible voters they serve are protected and their voter registration work is not undermined.

## II.    The overhauled SAVE system harms EPIC and its members.

### A.    Privacy and reputational injuries to EPIC members

183.    Similar to the state League Plaintiffs, EPIC's members include registered voters in states like Texas and Indiana that have bulk uploaded or will imminently bulk upload sensitive voter roll data into the overhauled SAVE system to run searches of SSA's NUMIDENT system

---

[171] *Important Election Dates 2025-2026*, Tex. Sec'y of State, https://perma.cc/L54D-WD9G (last visited Jan. 16, 2026).

[172] *Get Election Information*, La. Sec'y of State, https://perma.cc/RX3C-Y5NS (last visited Jan. 16, 2026).

[173] *Upcoming Elections*, Va. Dep't of Elections, https://perma.cc/VBF7-PX9X (last visited Jan. 16, 2026).

and other agency systems to identify potential non-citizens on their voter rolls. These EPIC members have suffered the same types of privacy injuries as the state League Plaintiffs' members outlined above in paragraphs 157 through 162.

184.    Moreover, EPIC members whom DHS falsely identified to SAVE users as potential non-citizen registered voters—and thus potential criminals—have suffered reputational harm based on the dissemination of false or misleading information about them to third parties.

185.    EPIC members have already suffered these harms and will continue to suffer them absent judicial relief. For example, EPIC has identified members whose personal information was uploaded into SAVE via its new bulk-upload and search-by-SSN features, resulting in the unauthorized disclosure, matching, and repurposing of their SSA data without their consent for purposes of determining their citizenship status and eligibility to vote. EPIC has also identified members whom DHS incorrectly identified as potential non-citizen registered voters to the Texas Secretary of State.

### B.    Informational and notice-and-comment injuries to EPIC

186.    EPIC's mission is to secure the fundamental right to privacy in the digital age for all people through advocacy, research, and litigation. Among other activities, EPIC monitors, analyzes, and educates the public about the collection, use, retention, and transfer of personal information by federal agencies. EPIC routinely submits comments on SORNs and matching agreement notices published in the Federal Register and other proposed agency actions related to information databases and mobilizes its members and partners to do the same.

187.    For decades, EPIC has relied extensively on information that the Privacy Act mandates agencies to disclose, including information in SORNs and matching agreements. These documents are often the only publicly available records of how and why a federal entity is

collecting personal information, what information is being collected, what burdens collection will impose, how that information may be used and shared, how it will be stored and secured, and for how long it will be retained. EPIC depends on this public information to inform its research, advocacy, public education, and education of its members concerning the systems and databases used throughout the government. EPIC further relies on this information to craft targeted Freedom of Information Act requests for agency records. EPIC's ability to perform these mission-critical functions is directly impaired by Defendants' failure to publish statutorily required matching agreements for the overhauled SAVE system.

188.    As detailed above, the overhauled SAVE system constitutes a new or revised "matching program" for benefits determinations for which the Privacy Act required notice and comment. Indeed, DHS has touted that, as of November 3, 2025, the overhauled SAVE system has already "allowed federal agencies to submit over 110 million queries to help verify eligibility for federally funded benefits."[174]

189.    However, Defendants' (belated) DHS SORN for the overhauled SAVE system does not identify or solicit public comment on any matching agreements between DHS and the relevant agencies that would authorize DHS to carry out the consolidation and bulk matching of information described in the SORN—*i.e.*, the bulk matching of data from SSA and driver's license information from state and federal agencies that issue or maintain such information. Nor do Defendants disclose or solicit public comment on such matching agreements elsewhere.

190.    Likewise, Defendants' (belated) SSA SORN for its NUMIDENT system does not identify or solicit public comment on any matching agreements that would authorize SSA to carry out the proposed routine use of disclosing citizenship and immigration information to DHS as part

---

[174] USCIS Enhances Voter Verification Systems, *supra* n.4.

of SAVE. Nor do Defendants disclose or solicit public comment on such matching agreements elsewhere.

191.    In its SORN comments, EPIC identified Defendants' failure to provide matching agreement information and offer notice and comment on matching agreements. Nonetheless, Defendants have pressed ahead with the inter-governmental data matching that undergirds the SAVE overhaul.

192.    EPIC has been harmed and will continue to be harmed by the lack of matching-agreement information for the overhauled SAVE system, and by the denial of notice-and-comment required by the Privacy Act. This vital information and opportunity for public comment would help EPIC fulfill its core mission of educating, advocating for, and protecting the public and its members with respect to issues affecting privacy rights.

193.    For example, EPIC lacks matching-agreement information on the anticipated results of the various types of data matching, including a specific estimate of any savings; specific information on the data elements to be used in matching and the approximate number of records to be matched; the procedures for verifying information produced via matching; the procedures for ensuring the administrative, technical, and physical security of the records matched and the results of such programs; and information on assessments that have been made on the accuracy of the records that will be used in matching. Without this vital information, EPIC is kept in the dark about exactly how its members' information and the information of millions of Americans is being matched across agencies and the magnitude of the privacy risks to eligible naturalized, derived, and U.S.-born citizen registrants and voters, and it cannot properly educate the public or their members about these risks and how to mitigate them.

194.    EPIC has also been denied statutorily guaranteed opportunities to comment on any matching agreements, to raise the privacy and security risks attendant to the federal government matching large volumes of personal information across sources, and to offer potential solutions to safeguard sensitive personal information in a manner that could be constructive to Defendants' policy goals while protecting privacy rights.

195.    Because of Defendants' failure to disclose information required by statute, EPIC must expend resources on more burdensome methods of research and information gathering, including time-intensive FOIA requests, and likely litigation, to attempt to obtain timely access to relevant records, none of which is a substitute for the unique information Defendants have failed to create and publish as required by the Privacy Act.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the APA, 5 U.S.C. § 706(2)
### (Agency Action Contrary to Law and in Excess of Statutory Authority)
### *By All Plaintiffs Against All Defendants*

196.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

197.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

198.    DHS's and SSA's overhaul of the SAVE system, along with the associated DHS-SSA SAVE Agreement and modified SORNs published by DHS (90 Fed. Reg. 48948) and SSA (90 Fed. Reg. 50879), are "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704.

199.    As alleged above, DHS and SSA have expanded DHS's SAVE system to perform the following new functions: (i) ingest and retain for ten years personal records and information about millions of individuals uploaded in bulk by SAVE user agencies, including but not limited to state voter roll data with individuals' full names, dates of birth, and full or partial SSNs; (ii) disclose that data from SAVE to SSA for purposes of querying SSA's NUMIDENT system; (iii) disclose the queried data elements from SSA's NUMIDENT system—including information about U.S. citizens of all types—to DHS and cross-check those results against DHS and other agency systems of records; and (iv) disclose the results of this bulk interagency data-sharing and matching to SAVE user agencies.

200.    "Federal agencies are creatures of statute. They possess only those powers that Congress confers upon them." *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021).

201.    DHS's dramatic expansion of SAVE to query records of U.S. citizens for purposes of determining their eligibility to vote far exceeds DHS's authority under SAVE's authorizing statute. That statute directed DHS's predecessor agency to establish a "system for the verification of *immigration status*" to assist states in determining whether *non-citizens* (or "aliens") are eligible for *benefits*. Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note (emphasis added); *see also id.* § 121(a)(1)(C), 100 Stat. at 3384-86 (1986), *codified at* 42 U.S.C. § 1320b-7(d) (section titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs"). Neither that statute nor any other authorizes using SAVE to query records of U.S. citizens who have never interacted with immigration agencies, or to conduct mass voter eligibility checks.

202.    No other statute authorizes the bulk inter-governmental collection, consolidation, disclosure, and matching of individuals' records that the SAVE system now performs. The statutes Defendants cited as supporting authority in the modified SORNs (8 U.S.C. § 1373, 8 U.S.C. § 1642, § 121 of the Immigration Reform and Control Act, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the REAL ID Act, the Patient Protection and Affordable Care Act, and the Federal Aviation Administration Extension, Safety, and Security Act of 2016) do not provide the authority they have asserted.

203.    If Congress had intended for these statutes to confer the extraordinary authority that DHS and SSA now claim, it would have done so clearly and expressly. *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Congress did no such thing.

204.    The overhauled SAVE system also discloses individuals' SSNs and other protected SSA information without their consent in violation of express prohibitions of the Social Security Act forbidding disclosure of SSA information except as permitted by law or SSA regulation, *see* 42 U.S.C. § 1306(a), and forbidding disclosure of SSNs and related records obtained or maintained by authorized persons under any law enacted after October 1, 1990, *see id.* § 405(c)(2)(C)(viii)(I). SSA's disclosures further contravene longstanding agency policy affirming that SSA does "not have the legal authority to disclose information about U.S. citizens to DHS," and that "[i]f DHS requests information and we determine the information pertains to both U.S. citizens and aliens, only information about the aliens can be disclosed."[175]

---

[175] SSN Disclosure Policy, *supra* n.13.

205.    DHS's and SSA's actions are therefore "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

## COUNT TWO
### Violation of the APA, 5 U.S.C. § 706(2)(B)
### (Agency Action Contrary to Constitutional Power)
#### By All Plaintiffs Against All Defendants

206.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

207.    The APA requires courts to "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

208.    The Constitution presumes coequal branches, and the "doctrine of separation of powers" lies "at the heart of our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 119 (1976).

209.    The Executive cannot usurp Congress's legislative authority by fiat. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no constitutional power to enact, amend, or repeal parts of duly enacted statutes. *See Clinton v. City of New York*, 524 U.S. 417, 438-39 (1998).

210.    DHS and SSA lack any statutory or constitutional authority to transform SAVE into a national data bank to conduct citizenship checks for purposes of determining individuals' eligibility to vote in elections.

211.    The Constitution vests "the power to determine who is qualified to vote" in the States and "the power to regulate federal election procedures" in the States and Congress; the Constitution "assigns no direct role to the President in either domain." *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-0946-CKK, 2025 WL 3042704, at *2 (D.D.C. Oct. 31, 2025); *see* U.S. Const. art. I, § 2, cl. 1 (Voter Qualifications Clause); *id.* amend. XVII; *id.*

art. I, § 4, cl. 1 (Elections Clause); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

212.    Congress has exercised its power under the Elections Clause to regulate elections through statutes such as the National Voter Registration Act of 1993 and the Help America Vote Act of 2002. These laws charge the *States* with maintaining their voter rolls. *See* 52 U.S.C. §§ 20507(a), 20507(c)-(g), 21083(a). They vest no authority over election administration in the President, DHS, or SSA, and they contemplate no role for the federal government to review, conduct, or intervene in voter list maintenance.

213.    By transforming SAVE into a national data bank for conducting voter eligibility checks without statutory or constitutional authority, DHS and SSA have arrogated to the Executive Branch powers that the Constitution expressly delegates to the States and Congress, in violation of the separation of powers.

214.    Defendants' actions are therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

### COUNT THREE
### Violation of the Separation of Powers
### *By All Plaintiffs Against All Defendants*

215.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

216.    This Court has inherent equitable power to enjoin unconstitutional executive conduct. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

217.    For the same reasons set forth above in Count Two, Defendants' SAVE overhaul violates the separation of powers and must therefore be enjoined and declared unlawful.

**COUNT FOUR**
**Violation of the APA, 5 U.S.C. § 706(2)(A)**
**(Agency Action Contrary to the Privacy Act)**
*By All Plaintiffs Against All Defendants*

218.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

219.    The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

220.    The Privacy Act generally prohibits disclosure of an individual's records from a system of records without consent unless it fits one of 13 exceptions. *See* 5 U.S.C. § 552a(b)(1)-(13). One of those exceptions permits disclosure pursuant to a properly noticed "routine use," *id.* § 552a(b)(3), *i.e.*, a use "for a purpose which is compatible with the purpose for which [the record] was collected," *id.* § 552a(a)(7).

221.    Defendants' bulk inter-agency and inter-governmental disclosures through the overhauled SAVE system fit none of the exceptions set out in 5 U.S.C. § 552a(b)(1)-(13).

222.    New "Routine Use L" of DHS's 2025 SAVE SORN, *see* 90 Fed. Reg. at 48954, purports to authorize DHS to use and disclose records in ways that are not compatible with the purposes for which the records were collected.

223.    New "Routine Use No. 49" of SSA's November 2025 NUMIDENT SORN, *see* 90 Fed. Reg. at 50883, purports to authorize SSA to use and disclose records in ways that are not compatible with the purposes for which the records were collected.

224.    Insofar as the 2025 SAVE SORN and November 2025 NUMIDENT SORN include "routine uses" that are not "compatible with the purpose for which [the records were] collected," 5 U.S.C. § 552a(a)(7), and that are not otherwise authorized by law, Defendants' adoption and

67

utilization of these routine uses and their disclosure of records through the overhauled SAVE system without any basis for disclosure under 5 U.S.C. § 552a(b) violates the Privacy Act.

225.    Insofar as DHS and SSA effectuated the SAVE overhaul without ensuring  that the records SAVE incorporates are accurate, relevant, timely, complete, and subject to appropriate safeguards, they have further violated the Privacy Act's non-discretionary "requirements" for "system[s] of records," 5 U.S.C. § 552a(e), by failing to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination," *id.* § 552a(e)(5); failing to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" before disclosing the records to persons other than agencies, *id.* § 552a(e)(6); and failing to establish "appropriate . . . safeguards" for the overhauled SAVE system "to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained," *id.* § 552a(e)(10).

226.    Defendants' actions therefore violate the Privacy Act and are "not in accordance with law," *id.* § 706(2)(A).

**COUNT FIVE**
**Violation of the APA, 5 U.S.C. § 706(2)(D)**
**(Agency Action Contrary to Statutory Procedure)**
***By All Plaintiffs Against All Defendants***

227.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

228.    The APA requires courts to "hold unlawful and set aside" agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

229.    Under the Privacy Act, an agency must "publish in the Federal Register notice of any new use or intended use of the information in [a] system [of records], and provide an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days before using the system in new ways. 5 U.S.C. § 552a(e)(11).

230.    "In no circumstance may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following Federal Register publication." OMB Circular No. A-108 at 7 & 12. And agencies "shall" review and consider any "public comments on a published SORN." *Id.* at 7.

231.    In overhauling the SAVE system in May 2025, DHS and SSA significantly modified their use and disclosure of information in the SAVE and NUMIDENT systems of records without first publishing modified SORNs and soliciting public comment.

232.    DHS did not publish a modified SORN for SAVE or solicit public comment on new routine uses until October 31, 2025. *See* 90 Fed. Reg. 48948.

233.    SSA did not publish a modified SORN for NUMIDENT or solicit public comment on new routine uses until November 12, 2025. *See* 90 Fed. Reg. 50879.

234.    Even after publishing the modified SORNs, DHS and SSA continued their significantly modified use and disclosure of information from the SAVE and NUMIDENT systems without awaiting, let alone considering, public comments submitted to the agencies on the modified SORNs. DHS and SSA predetermined they would continue to operate SAVE in its overhauled state, regardless of the public comments.

235.    By effectuating the SAVE overhaul without complying with the Privacy Act's notice-and-comment requirements, Defendants acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT SIX
### Violation of the APA, 5 U.S.C. § 706(2)(A)
### (Arbitrary and Capricious Agency Action)
### *By All Plaintiffs Against All Defendants*

236.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

237.    The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

238.    DHS's and SSA's overhaul of SAVE, as well as the associated DHS-SSA SAVE Agreement and modified SORNs, are arbitrary and capricious because, among other things, the agencies:

    a.  failed to engage in reasoned decisionmaking or reasonably explain their actions;

    b.  implemented the overhaul months before soliciting public comment and subsequently failed to consider relevant comments on the 2025 SAVE SORN and the November 2025 NUMIDENT SORN;

    c.  failed to sufficiently consider and assess the reliability and accuracy of the citizenship data SAVE is now utilizing in bulk and the attendant risks of error, including the wrongful impairment of voting rights and wrongful denial of government benefits;

    d.  failed to provide clear and adequate verification procedures to ensure that individuals are not erroneously deprived of their right to vote or otherwise impacted based on unreliable SAVE data;

    e.  justified the SAVE overhaul based on the empirically false premise that non-citizen voting is widespread;

70

f.  failed to consider the robust processes that state officials already have in place to ensure secure and lawful elections and to faithfully discharge their responsibilities under the National Voter Registration Act, the Help America Vote Act, and other laws;

g.  failed to consider the privacy implications of their actions;

h.  failed to consider the data security risks of their actions;

i.  failed to consider the reliance interests and reasonable privacy expectations of the millions of Americans who never consented to their personal data being pooled and repurposed as Defendants have; and

j.  failed to acknowledge or explain their abrupt departure from longstanding agency policies, positions, and statutory interpretations.

**COUNT SEVEN**
**Violation of the APA,  5 U.S.C. § 706(1)**
**(Agency Action Unlawfully Withheld or Unreasonably Delayed)**
*By EPIC Against All Defendants*

239.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

240.    The APA requires courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

241.    The Privacy Act imposes non-discretionary duties on Defendants to publish notices of matching agreements in the Federal Register and provide opportunity for public comment whenever they establish or significantly revise a "computer matching program" used to determine eligibility for federal benefits. *See* 5 U.S.C. §§ 552a(e)(12), 552a(o); OMB Circular No. A-108 at 18-20.

71

242.    Defendants' SAVE overhaul constituted a new or significantly revised computer-matching program, triggering Defendants' non-discretionary duties under the Privacy Act to publish notices of matching agreements in the Federal Register and provide opportunity for public comment.

243.    Since overhauling SAVE in May 2025, Defendants have enabled SAVE user agencies to submit over 110 million queries to verify eligibility for federally funded benefits.

244.    To date, Defendants have failed to publish notices of matching agreements and provide opportunity for public comment on the overhauled SAVE system.

245.    Defendants have therefore "unlawfully withheld or unreasonably delayed" agency action. 5 U.S.C. § 706(1).

**COUNT EIGHT**
**Violation of Non-Discretionary Official Duties, 28 U.S.C. § 1361**
**(Mandamus)**
***By EPIC Against All Defendants***

246.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

247.    "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

248.    For the same reasons alleged above in Count Seven, Defendants violated their non-discretionary duties under the Privacy Act to publish notices of matching agreements and provide opportunity for public comment for the overhauled SAVE system.

249.    Plaintiff EPIC has a clear and indisputable right to relief from Defendants' Privacy Act violations.

250.    If the Court finds that the APA does not authorize any of the relief sought herein, mandamus is EPIC's only adequate remedy, and there are compelling equitable grounds for issuing the writ.

251.    EPIC is therefore entitled to a writ of mandamus compelling Defendants to comply with their non-discretionary duties under the Privacy Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1) Declare DHS's and SSA's overhaul of the SAVE system, the associated DHS-SSA SAVE Agreement, and the relevant portions of the 2025 SAVE SORN and November 2025 NUMIDENT SORN unlawful, *ultra vires*, unconstitutional, and arbitrary and capricious;

2) Hold unlawful, vacate, and set aside DHS's and SSA's overhaul of the SAVE system, the DHS-SSA SAVE Agreement, and the relevant portions of the 2025 SAVE SORN and November 2025 NUMIDENT SORN;

3) Order DHS and SSA to revert the SAVE system to its prior operational state before they unlawfully overhauled it;

4) Order DHS and SSA to delete, disentangle, and unlink data unlawfully pooled into or made available through the overhauled SAVE system;

5) Order DHS to direct SAVE user agencies to delete, disentangle, and unlink data unlawfully pooled into or made available to them through the overhauled SAVE system;

6) Order DHS and SSA to publish notices of matching agreements for the overhauled SAVE system in the Federal Register containing all details for which the Privacy Act mandates disclosure, and provide opportunity for public comment thereon;

7)  Grant any temporary, preliminary, or permanent injunctive relief necessary to prevent Defendants' actions from irreparably harming Plaintiffs;

8)  Retain jurisdiction to ensure compliance with this Court's orders;

9)  Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

10) Grant any other relief this Court deems just and proper.

Dated: January 21, 2026

Respectfully Submitted,

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
Lauren C. Bingham (Fl. Bar No. 105745)*
Yoseph T. Desta (D.C. Bar No. 90002042)
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
Fax: (202) 588-5020
nsus@citizensforethics.org
jhill@citizensforethics.org
lbingham@citizensforethics.org
ydesta@citizensforethics.org

Aman T. George (D.C. Bar No. 1028446)
Jennifer Fountain Connolly (D.C. Bar No.
1019148)
Johanna M. Hickman (D.C. Bar No.
981770)
Mark B. Samburg (D.C. Bar No. 1018533)
Robin Thurston (D.C. Bar No. 1531399)
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ageorge@democracyforward.org
jconnolly@democracyforward.org
hhickman@democracyforward.org
msamburg@democracyforward.org
rthurston@democracyforward.org

Jon Sherman (D.C. Bar No. 998271)*
Michelle Kanter Cohen (D.C. Bar No.
989164)
Emily Davis (D.C. Bar No. 90020129)
FAIR ELECTIONS CENTER
1825 K St. NW, Suite 701
Washington, DC 20006
202-331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
edavis@fairelectionscenter.org

*admitted *pro hac vice*

*Counsel for All Plaintiffs*

John L. Davisson (D.C. Bar No. 1531914)
Enid Zhou (D.C. Bar No. 1632392)
Abigail Kunkler (D.C. Bar No. 90030868)
ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave NW
Washington, D.C. 20036
Telephone: 202-483-1140
Fax: 202-483-1248
davisson@epic.org
zhou@epic.org
kunkler@epic.org

*Counsel for Plaintiff Electronic Privacy
Information Center*

74