**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>      Plaintiffs,<br><br>      v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br><br>      Defendants. | Case No. 25-cv-3501-SLS |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 3

I.    SAVE was previously a limited tool used to verify citizenship or immigration status of individuals who had interacted with the immigration system. ............................................. 3

II.   Defendants unlawfully transform SAVE into a national citizenship data bank pursuant to the Elections EO. .............................................................................................. 5

III.  DHS and SSA belatedly publish modified SORNs and solicit public comment in response to this suit. ..................................................................................................... 7

IV.  How the overhauled SAVE process works for voter roll bulk uploads and SSN searches.. 8

V.   States are rapidly using SAVE to conduct mass voter citizenship checks, imperiling millions of Americans' privacy and voting rights, including Plaintiffs' members. ........... 11

LEGAL STANDARD ................................................................................................ 12

ARGUMENT ........................................................................................................... 12

I.    Plaintiffs have standing. ..................................................................................... 13

     A.    Plaintiffs have associational standing. ................................................. 13

           1.    Privacy injuries to Plaintiffs' members ..................................... 14

           2.    Reputational injuries to LWVTX and EPIC members ............................. 16

           3.    Voting-related injuries to LWVTX members ........................................... 16

           4.    Plaintiffs satisfy the remaining elements of associational standing.......... 19

     B.    LWVTX and LWVLA have organizational standing based on overhauled SAVE's harm to their mission-critical functions. .............................................. 20

     C.    EPIC has standing to challenge Defendants' violations of the Privacy Act's procedural requirements for matching programs. .................................................. 22

     D.    Plaintiffs' injuries are caused by Defendants' SAVE overhaul and redressable by this Court........................................................................................ 24

II.   Plaintiffs are entitled to summary judgment. ...................................................... 25

     A.    The SAVE overhaul lacks statutory authorization and affirmatively violates the Social Security Act (Count One). ...................................................... 25

           1.    Traditional tools of construction show that the SAVE overhaul lacks statutory authorization. ............................................................. 26

           2.    The major questions doctrine confirms that the SAVE overhaul lacks statutory authorization. ............................................................. 30

3. Defendants' unauthorized disclosures violate the Social Security Act. ... 32

B. The SAVE overhaul violates the separation of powers (Counts Two and Three).33

C. The SAVE overhaul violates the APA because it was contrary to the Privacy Act's substantive restrictions (Count Four). ....................................................... 35

1. Overhauled SAVE improperly discloses and repurposes records in bulk in violation of 5 U.S.C. § 552a(b) and § 552a(a)(7). .................................... 35

2. Overhauled SAVE maintains records that are inaccurate, untimely, and incomplete and uses them for agency determinations about individuals, contrary to 5 U.S.C. §§ 552a(e)(5), (6), and (10). ................................... 38

D. The SAVE overhaul violates the APA because it failed to comply with the Privacy Act's procedural requirements (Count Five). .......................................... 38

E. The SAVE overhaul violates the APA because it was arbitrary and capricious (Count Six). ................................................................................................... 40

1. Defendants predetermined the outcome. .................................................. 40

2. Defendants disregarded relevant factors. ................................................ 41

3. Defendants disregarded adverse evidence. .............................................. 41

4. Defendants violated the change-in-position doctrine. ............................. 43

F. Defendants have unlawfully withheld compliance with the Privacy Act's requirements for computer matching programs (Counts Seven and Eight). .......... 44

G. Counts One, Two, and Four through Seven are reviewable under the APA. ....... 45

1. Plaintiffs challenge final agency action. ................................................. 45

2. Plaintiffs have an APA remedy for the Privacy Act violations alleged in Counts Four, Five, and Seven. ................................................................. 46

III. Plaintiffs are entitled to their requested relief. ................................................. 48

CONCLUSION .................................................................................................... 50

# TABLE OF AUTHORITIES†

**Cases**

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach*,
  469 F.3d 129 (D.C. Cir. 2006) .............................................................................13

*\*AFL-CIO v. Dep't of Lab.*,
  778 F. Supp. 3d 56 (D.D.C. 2025) ....................................................14, 15, 46, 47

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021)..............................................................................................32

*All. for Retired Ams. v. Bessent*,
  770 F. Supp. 3d 79 (D.D.C. 2025).................................................................14, 15

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001)............................................................................12

*Am. C.R. Union v. Phila. City Comm'rs*,
  872 F.3d 175 (3d Cir. 2017)..................................................................................34

*Am. Encore v. Fontes*,
  152 F.4th 1097 (9th Cir. 2025) .............................................................................16

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016)..............................................................................50

*Ames v. DHS*,
  861 F.3d 238 (D.C. Cir. 2017)..............................................................................35

*\*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ...................................................................... *passim*

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013)..................................................................................................34

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017)..............................................................................17

*Babamuradova v. Blinken*,
  633 F. Supp. 3d 1 (D.D.C. 2022)..........................................................................50

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
  972 F.3d 83 (D.C. Cir. 2020)................................................................................40

*Bridgeport Hosp. v. Becerra*,
  108 F.4th 882 (D.C. Cir. 2024).......................................................................48, 49

*Britt v. Naval Investigative Serv.*,
  886 F.2d 544 (3d Cir. 1989)............................................................................35, 36

*California v. Trump*,
  786 F. Supp. 3d 359 (D. Mass. 2025) .............................................................33, 49

---

† Authorities marked with an asterisk are those on which counsel chiefly relies.

*Carlson v. Postal Regul. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ...................................................................40, 41

*Charles H. Wesley Educ. Found., Inc. v. Cox,*
    408 F.3d 1349 (11th Cir. 2005) ..................................................................17

*Chichakli v. Tillerson,*
    882 F.3d 229 (D.C. Cir. 2018) ....................................................................35

*City & County of San Francisco v. EPA,*
    604 U.S. 334 (2025) ...............................................................................29, 30

*Common Cause Indiana v. Lawson,*
    937 F.3d 944 (7th Cir. 2019) .......................................................................22

*Common Cause/Ga. League of Women Voters of Ga., Inc. v. Billups,*
    439 F. Supp. 2d 1294 (N.D. Ga. 2006) .....................................................19

*Common Cause/Ga. v. Billups,*
    554 F.3d 1340 (11th Cir. 2009) ..................................................................17

*Ctr. for Biological Diversity v. EPA,*
    141 F.4th 153 (D.C. Cir. 2025)...................................................................42

*Ctr. for Taxpayer Rts. v. IRS,*
    2025 WL 3251044 (D.D.C. Nov. 21, 2025) .........................................14, 16, 47

*Dalton v. Specter,*
    511 U.S. 462 (1994)....................................................................................34

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019)....................................................................................24

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) .......................................................................................40

*Doe v. Chao,*
    540 U.S. 614 (2004)....................................................................................47

*Doe v. Stephens,*
    851 F.2d 1457 (D.C. Cir. 1988) .................................................................47

*Drs. for Am. v. OPM,*
    793 F. Supp. 3d 112 (D.D.C. 2025) ...........................................................25

*Equal Rts. Ctr. v. Post Props., Inc.,*
    633 F.3d 1136 (D.C. Cir. 2011) .................................................................22

*FCC v. Consumers' Rsch.,*
    145 S. Ct. 2482 (2025)...............................................................................27

*FCC v. NextWave Pers. Commc'ns, Inc.,*
    537 U.S. 293 (2003)....................................................................................30

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)....................................................................................20

*FDA v. Wages & White Lion Invs.*,
  604 U.S. 542 (2025)............................................................................................43

*FEC v. Cruz*,
  596 U.S. 289 (2022)............................................................................................25

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) .........................................................................17

*Friends of Animals v. Jewell*,
  824 F.3d 1033 (D.C. Cir. 2016)..........................................................................23

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)............................................................................................13

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009)............................................................................47

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)......................................................................................20, 21

*Husted v. A. Philip Randolph Inst.*,
  584 U.S. 756 (2018)............................................................................................34

*Jeffries v. Volume Servs. Am.*,
  928 F.3d 1059 (D.C. Cir. 2019).....................................................................15, 16

*Judge Rotenberg Educ. Ctr., Inc. v. FDA*,
  3 F.4th 390 (D.C. Cir. 2021)...............................................................................25

*Kennedy v. Braidwood Mgmt.*,
  606 U.S. 748 (2025)............................................................................................28

*LaRoque v. Holder*,
  650 F.3d 777 (D.C. Cir. 2011).............................................................................13

*Las Ams. Immigrant Advoc. Ctr. v. DHS*,
  783 F. Supp. 3d 200 (D.D.C. 2025).....................................................................48

*\*League of United Latin Am. Citizens v. EOP*,
  2026 WL 252420 (D.D.C. Jan. 30, 2026) ................................................. *passim*

*\*League of United Latin Am. Citizens v. EOP*,
  808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................ *passim*

*League of Women Voters of Fla., Inc. v. Lee*,
  576 F. Supp. 3d 1004 (N.D. Fla. 2021)...............................................................19

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)...........................................................................48, 49

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)......................................................................................25, 36

*Marin Audubon Soc'y v. FAA*,
  121 F.4th 902 (D.C. Cir. 2024)...........................................................................25

*Maydak v. United States*,
  363 F.3d 512 (D.C. Cir. 2004) ........................................................36

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ......................................................24

*\*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025) ...........................................16, 18, 19

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ........................................................................33

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................49

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..........................................................................40

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025) ...............................................49

*N.H. Youth Movement v. Scanlan*,
  2026 WL 323171 (D.N.H. Feb. 6, 2026) ........................................17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
  595 U.S. 109 (2022) (per curiam) ..................................................31

*New Eng. Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) ........................................................................27

*New Mexico v. Musk*,
  784 F. Supp. 3d 174 (D.D.C. 2025) ...............................................14

*NRDC v. EPA*,
  755 F.3d 1010 (D.C. Cir. 2014) ......................................................24

*Powder River Basin Res. Council v. Dep't of Interior*,
  749 F. Supp. 3d 151 (D.D.C. 2024) ...............................................20

*Pub. Emps. for Env't Resp. v. Hopper*,
  827 F.3d 1077 (D.C. Cir. 2016) ......................................................41

*RAICES v. Noem*,
  793 F. Supp. 3d 19 (D.D.C. 2025) ..................................................21

*Richardson v. Trump*,
  496 F. Supp. 3d 165 (D.D.C. 2020) ...............................................17

*Richman v. United States*,
  350 F.R.D. 401 (D.D.C. 2025) ........................................................48

*RNC. v. N. Carolina State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) ...................................................20, 21

*Rural Cellular Ass'n v. FCC*,
  588 F.3d 1095 (D.C. Cir. 2009) ......................................................39

*Sandusky Cnty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) .................................................................................34

*Sierra Club v. Dep't of Transp.*,
   125 F.4th 1170 (D.C. Cir. 2025) ............................................................................41

*Sierra Club v. Perry*,
   373 F. Supp. 3d 128 (D.D.C. 2019) .......................................................................20

*Sierra Club v. Salazar*,
   177 F. Supp. 3d 512 (D.D.C. 2016) .......................................................................41

*South Carolina v. United States*,
   907 F.3d 742 (4th Cir. 2018) .................................................................................50

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ...............................................................................................13

*Stuttering Found. of Am. v. Springer*,
   498 F. Supp. 2d 203 (D.D.C. 2007) .......................................................................12

*Townsend v. United States*,
   236 F. Supp. 3d 280 (D.D.C. 2017) .......................................................................35

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021).........................................................................................14, 16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ...............................................................................................45

*U.S. Sugar Corp. v. EPA*,
   113 F.4th 984 (D.C. Cir. 2024)..............................................................................25

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*,
   517 U.S. 544 (1996)...............................................................................................20

*United States v. Weber*,
   2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ..........................................................40

*United to Protect Democracy v. Pres. Advisory Comm'n on Election Integrity*,
   288 F. Supp. 3d 99 (D.D.C. 2017) .........................................................................23

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014)...............................................................................................30

*Va. Coal. for Immigrant Rts. v. Beals*,
   803 F. Supp. 3d 454 (E.D. Va. 2025) ........................................................20, 21, 22

*Venetian Casino Resort, LLC v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ...............................................................................46

*Voto Latino v. Hirsch*,
   712 F. Supp. 3d 637 (M.D.N.C. Jan. 21, 2024) .....................................................22

*Washington v. Trump*,
   2026 WL 73866 (W.D. Wash. Jan. 9, 2026)......................................................33, 49

*West Virginia v. EPA*,
   597 U.S. 697 (2022)........................................................................30, 32, 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952).................................................................................33

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 1................................................................................34

U.S. Const. art. I, § 4, cl. 1................................................................................34

**Statutes, Rules, & Regulations**

*5 U.S.C.
   § 552a(a)(2) ...............................................................................................48
   § 552a(a)(3) ...............................................................................................38
   § 552a(a)(7) .........................................................................................35, 37
   § 552a(a)(8)(A)(i)(I) ............................................................................44, 45
   § 552a(a)(8)(B)(i) .......................................................................................30
   § 552a(a)(8)(B)(ix) .....................................................................................30
   § 552a(b) ....................................................................................................35
   § 552a(b)(3) ...............................................................................................35
   § 552a(b)(7) ...............................................................................................38
   § 552a(e)(4) ............................................................................................6, 39
   § 552a(e)(5) ...............................................................................................38
   § 552a(e)(6) ...............................................................................................38
   § 552a(e)(10) .............................................................................................38
   § 552a(e)(11) ....................................................................................6, 39, 46
   § 552a(e)(12) ...............................................................................................6
   § 552a(g) ....................................................................................................48
   § 552a(g)(1)(D) ..........................................................................................48
   § 552a(o) ....................................................................................................45
   § 552a(o)(1)(A) ..........................................................................................44
   § 552a(o)(1)(B) ..........................................................................................44
   § 552a(o)(1)(C) ..........................................................................................44
   § 552a(o)(1)(D) ..........................................................................................44
   § 552a(o)(1)(E) ..........................................................................................44
   § 552a(o)(1)(F) ..........................................................................................44
   § 552a(o)(1)(G) ..........................................................................................44
   § 552a(o)(1)(J) ...........................................................................................44

\*5 U.S.C.
§ 552a(o)(2)(A) ...................................................................45
§ 552a(o)(2)(C) ...................................................................45
§ 552a(p)(1) .......................................................................44
§ 704 ................................................................................47
§ 706(1) ............................................................................49
§ 706(2) ............................................................................47
§ 706(2)(A) ...........................................................33, 37, 38, 47, 48
§ 706(2)(B) ........................................................................48
§ 706(2)(C) ................................................................33, 48
§ 706(2)(D) ...........................................................39, 40, 48

8 U.S.C.
§ 1324a note .......................................................................29
§ 1373 .......................................................................26, 27
§ 1373(a) ....................................................................27, 28
§ 1373(c) ....................................................................27, 28

18 U.S.C.
§ 611 ................................................................................16
§ 1015(f) ...........................................................................16

\*42 U.S.C.
§ 405(c)(2)(C)(viii)(I) ...........................................................33
§ 405(c)(2)(C)(viii)(IV) .........................................................33
§ 1306(a) ..........................................................................32
§ 1320b-7(d) .................................................................3, 26
§ 1320b-7 note ............................................................1, 3, 26

44 U.S.C. § 3501 note ...............................................................4

52 U.S.C.
§ 20506 .............................................................................34
§ 20507 .............................................................................34
§ 20509 .............................................................................34
§ 21085 .............................................................................34

20 C.F.R.
§ 401.120 ..........................................................................32
§ 401.155 ..........................................................................38
§ 422.104 ..........................................................................36
§ 422.107 ..........................................................................36

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
No. 104-208, § 642, 110 Stat. 3009 (1996) .................................26

Immigration Reform Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1),
100 Stat. 3359 (1986) ...................................................1, 3, 26

Pub. L. No. 104-208, § 404, 110 Stat. 3009 (1996) ..........................29

Fed. R. Civ. P. 56(a) ...............................................................12

Executive Order 14,248, Preserving and Protecting the Integrity of American Elections, 90 Fed. Reg. 14005 (Mar. 28, 2025) ........................................................2

*OMB Privacy Act Guidelines, 40 Fed. Reg. 28949 (July 1, 1975) ................................36, 39, 40

**Other Authorities and Materials**

DOJ Office of Inspector General, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* (May 31, 2016) ......................28

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Texas Tribune (Feb. 13, 2026) .......................................................................................................................2

Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025) ...................................................................3

Legislative History of the Privacy Act of 1974, Source Book on Privacy (1976) ........................1

Letter from SSA Office of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023) ......................37

National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025) ..............................................................................37

Office of Justice Programs, *Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373* ..............................................................................28

OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act* (2016) .................................................39, 40

Press Release, DHS*, DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025) ...............................................................2

Press Release, Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025) .........................................................................18

Press Release, USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025) ........................................................................................................6

Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025) ................................................................................................................2, 7

*Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963, at *4 (O.L.C. May 18, 1999) ..............................................................28

Restatement (2d) of Torts, § 652B ........................................................................................15

Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, Office of Homeland Security Statistics (Sept. 2024) ....................................................31

SSA Office of the Inspector General, *Accuracy of the Help America Vote Verification Program Responses*, No. A-03-09-29115 (June 22, 2009) ...............................42

SSA, Program Operations Manual System (POMS), *GN 00303.000 Citizenship, Alien Status and Residency* (Jan. 9, 2026) ...........................................................36

SSA, Program Operations Manual System (POMS), *GN 03312.001 Disclosure Without Consent for Law Enforcement Purposes* (Sept. 12, 2005) ........................................38

SSA, Program Operations Manual System (POMS), *GN 03312.080 Valid Law Enforcement Requests* (Nov. 9, 2023) .................................................................................38

SSA, Program Operations Manual System (POMS), *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023) .........................15

U.S. Census Bureau, *Nativity and Citizenship Status in the United States* (accessed Feb. 23, 2026) ............................................................................................31

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Jan. 24, 2025).....................4

*Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 2025 WL 3251685 (Nov. 7, 2025) .......................................................28

**INTRODUCTION**

Congress has not authorized the federal government to create a master registry of U.S. citizens. As a result, no single agency has a comprehensive dataset capable of providing accurate, real-time verification of individuals' U.S. citizenship status. Federal agencies instead possess citizenship data that they collected for disparate, congressionally authorized functions, but that was never meant to be fed into a centralized database.

This is no accident. Half a century ago, in response to unprecedented Executive Branch abuse of Americans' personal data, Congress enacted the Privacy Act of 1974 specifically to prevent the government from creating "centralized Federal information systems" that consolidate our sensitive information across agencies in ways that could endanger our fundamental rights. Legislative History of the Privacy Act of 1974, Source Book on Privacy, at 168, 217, 884 (1976), https://perma.cc/9W9F-R5ZL.

But in 2025, the Department of Homeland Security ("DHS") created—without statutory authorization—a never-before-seen system for mass citizenship checks to "verify" individuals' eligibility to vote and obtain government benefits. DHS made the system by haphazardly combining and repurposing millions of Americans' sensitive personal data, including citizenship data known to be unreliable, from disparate records systems at the Social Security Administration ("SSA"), DHS, the State Department, and various other federal and state agencies. In doing so, DHS vastly exceeded its lawful authority, usurped powers our Constitution reserves for the States and Congress, and flouted multiple statutes that protect Americans' privacy and data security.

Defendants carried out this illegal operation by repurposing a preexisting system housed at U.S. Citizenship and Immigration Services ("USCIS") called the Systematic Alien Verification for Entitlements ("SAVE") system. As its name indicates, Congress established SAVE to help agencies verify whether *non-citizens* ("aliens") are eligible for certain government *benefits* ("entitlements"). *See* Immigration Reform Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note. SAVE was never meant to conduct bulk queries about U.S. citizens or mass voter eligibility checks. Thus, before

2025, SAVE was exceedingly limited: it did not access databases with information on U.S.-born citizens, incorporate SSA records, or permit bulk searches of more than one individual at a time.

Now, Defendants have "overhaul[ed]" SAVE by transforming it into what they call "a single, reliable source for verifying immigration status and U.S. citizenship nationwide." Press Release, DHS, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M; *see* DHS-AR-491. Without following the Privacy Act's notice-and-comment procedures, Defendants dramatically expanded SAVE by connecting it to SSA and various other agency systems, allowing it to access records on U.S.-born citizens, and enabling it to accept "bulk" uploads and search hundreds of millions of Americans' sensitive data in a single query. Defendants hastily took these actions to enable mass voter citizenship checks pursuant to the President's directives in Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 28, 2025), DHS-AR-334, without public input or reasoned decision-making.[2]

DHS claims that, as of November 3, 2025, overhauled SAVE has already "enabled state voting agencies to submit over 46 million voter verification queries and has also allowed federal agencies to submit over 110 million queries to help verify eligibility for federally funded benefits." DHS-AR-1341. And DHS is "encourag[ing] *all* federal, state, and local agencies to use the SAVE program," based on a false narrative of "voter fraud" by people other than "American citizens." Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025), https://perma.cc/8JWH-G64X (emphasis added).

Predictably, DHS's haphazard and poorly vetted SAVE overhaul has yielded harmful results. As one recent investigation found, "SAVE has made persistent mistakes, particularly in assessing the status of people born outside the U.S." Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica &

---

[2] As used here, the "SAVE overhaul" refers to Defendants' expansion of SAVE in 2025 to allow bulk searches, using non-DHS unique identifiers, of systems of record that are housed outside of DHS and include information on U.S.-born citizens.

Texas Tribune (Feb. 13, 2026), https://perma.cc/GKU7-3C9E. In states like Texas, the overhauled SAVE process has falsely identified significant numbers of eligible voters as non-citizens, forced them to needlessly provide documentary proof of citizenship to retain their voter registration, caused some to be wrongfully removed from voter rolls, and even disenfranchised some. Overhauled SAVE has also subjected its victims to potential investigation for "non-citizen voting" by state and federal authorities. *See id.*; Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU. Plaintiffs are voting and privacy rights organizations whose members have suffered these injuries, and whose core functions are directly harmed by Defendants' illegal actions.

No statute or constitutional provision authorizes Defendants' overhaul of SAVE, and their bulk inter-agency disclosures and repurposing of Americans' sensitive data violates the substantive and procedural protections of the Privacy Act, the Social Security Act, and longstanding SSA policies. Separately, to the extent that overhauled SAVE is being used as a new "computer matching program" to verify eligibility for federal benefits, Defendants have flouted the Privacy Act's notice-and-comment requirements for matching programs.

The Court should enter summary judgment for Plaintiffs; hold unlawful, vacate, and set aside Defendants' overhaul of SAVE; order them to publish all matching agreement information required by law; and issue corresponding declaratory and injunctive relief.

## BACKGROUND

**I.    SAVE was previously a limited tool used to verify citizenship or immigration status of individuals who had interacted with the immigration system.**

Congress established SAVE in the Immigration Reform and Control Act of 1986 to help agencies verify whether non-citizens were eligible for certain government benefits. *See* Pub. L. No. 99-603, title I, § 121(a)(1)(C), 100 Stat. 3359, 3384-86 (1986), *codified at* 42 U.S.C. § 1320b-7(d) (section titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs"); *see also id.* §1 21(c)(1), 100 Stat. at 3391, *codified at* 42 U.S.C. § 1320b-7 note; DHS-AR-420.

Before 2025, SAVE was limited in three critical respects. First, it did not permit queries of U.S.-born citizens. DHS-AR-278; *see also* DHS-AR-108. As confirmed by SAVE's 2020 System of Records Notice ("SORN") and 2020 Privacy Impact Assessment ("PIA"),[3] SAVE could only verify the "citizenship and immigration status of an immigrant, nonimmigrant, and certain *naturalized and derived* U.S. citizens." DHS-AR-195 (emphasis added); *see also* DHS-AR-108. SAVE rarely had access to records about U.S.-born citizens unless they had some other interaction with DHS, *e.g.*, as a sponsor for a non-citizen. *See* DHS-AR-111.

Second, SAVE only accessed records stored in DHS systems, along with certain immigration-related records systems at the State Department and DOJ. *See* DHS-AR-112. Prior to 2025, SAVE did not access databases housed at SSA, nor did it allow users to run searches using an individual's SSN. Instead, it required users to provide an individual's DHS numeric identifier (*e.g.*, an alien registration number or "A-Number"). DHS-AR-248; *see also* DHS-AR-399. Because most U.S.-born citizens do not have DHS numeric identifiers, SAVE could not query most U.S. citizens' records. *See* DHS-AR-248.

Third, SAVE searches could only be conducted on an individualized basis; SAVE did not permit bulk searches of more than one person's data at a time. DHS-AR-247.

Confirming SAVE's prior limited scope, USCIS stated as recently as April 26, 2025, that "SAVE <u>does not</u> verify U.S.-born citizens under any circumstances" and "does not access databases that contain U.S.-born citizen information (for example, birth certificate databases)." USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (Jan. 24, 2025), https://perma.cc/QW29-JZK8 (captured on Apr. 26, 2025).

Since 2009, election officials in some states have used SAVE for voter registration and voter list maintenance purposes, even though no statute explicitly authorizes using SAVE in this

---

[3] The E-Government Act of 2002 requires federal agencies to conduct a PIA for certain collections of information, addressing what information will be collected, why it is being collected, how it will be used, how it will be secured, with whom it will be shared, whether a system of records is being created under the Privacy Act, and what "notice or opportunities for consent" will be provided to those impacted. *See* 44 U.S.C. § 3501 note.

way. *See* DHS-AR-402. But "[s]ome states . . . complained to DHS-USCIS about the limitation on their ability to verify voters caused by the [DHS] unique identifier requirement," since states typically do not possess individuals' DHS identifiers. DHS-AR-421. In a February 2025 letter to DHS, a group of secretaries of state asked DHS to expand SAVE to, among other things, allow bulk searches of "multiple individuals . . . at once," and enable searches using numeric identifiers other than those issued by DHS. DHS-AR-2.

## II.    Defendants unlawfully transform SAVE into a national citizenship data bank pursuant to the Elections EO.

On March 25, 2025, President Trump signed an Executive Order directing federal agencies to take various actions related to the administration of federal elections (the "Elections EO"). DHS-AR-334. The Elections EO instructs that, for the purpose of "identify[ing] unqualified voters registered in the States . . . the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered." DHS-AR-335. It further states that DHS "is required to share database information with States upon request" under "8 U.S.C. 1373(c)" for voter list maintenance, and directs DHS, in coordination with the Department of Government Efficiency ("DOGE"), to compare voter records with "Federal immigration databases." *Id.* And the EO directs SSA to make its databases available "to all State and local election officials" for verifying voter eligibility. *Id.*

Defendants immediately began implementing the Election EO's directives. SSA-AR-1-2 (March 2025 request for DHS-SSA "Voter Verification Service" to begin "immediately"); *see also* DHS-AR-39-67 (March 2025 appendix to prior DHS-State Department data sharing agreement). On April 22, 2025, DHS, USCIS, and DOGE publicly announced they were expanding SAVE to "ensure government officials can swiftly verify legal status, halting entitlements and voter fraud." April 2025 DHS Release, *supra.* They described this transformation as an "overhaul" of SAVE that "breaks down silos for accurate results, streamlines mass status checks, and integrates criminal

records, immigration timelines, and addresses." *Id.*; *see also* DHS-AR-253.

On May 15, 2025, DHS and SSA executed a letter agreement for the overhauled SAVE system ("DHS-SSA SAVE Agreement"). DHS-AR-420-431. Invoking the Elections EO and other directives, DHS-AR-420-422, the agreement purports to authorize "information sharing" between the agencies "by matching data submitted through SAVE to SSA records in SSA's Master Files of Social Security Number (SSN) Holders and SSN Applications, System of Record Notice 60-0058, 90 Fed. Reg. 10025 (Feb. 20, 2025)" ("SSA Master File"), specifies the data elements SSA will share with DHS in response to SAVE inquiries relating to voter eligibility and other purposes, and notes SSA records provided under the agreement will be maintained in the SAVE system of records. DHS-AR-423; SSA-AR-9.

The SSA Master File (also known as NUMIDENT)—to which SAVE is now linked—is a comprehensive database of individuals who have applied for or obtained an SSN. *See* SSA-AR-149. It is a highly sensitive SSA system of record that contains SSNs, other identifying numbers, names, dates and places of birth, citizenship indicators, death records, and information obtained while processing requests for SSNs, *see* SSA-AR-170; DHS-AR-253, including information on "easily over 300 million" Americans, SSA-AR-238.

On May 22, 2025, Defendants publicly launched the expanded SAVE system, touting it as "a single, reliable source for verifying immigration status and U.S. citizenship." DHS-AR-491; *see also* DHS-AR-493, 1385. USCIS announced that overhauled SAVE had two new major features. First, USCIS touted a "new partnership" between SSA and USCIS allowing user agencies to "input Social Security numbers" to "help verify U.S. citizenship." Press Release, USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025), https://perma.cc/HBZ5-RW2E. Second, USCIS highlighted that "for the first time" user agencies could bulk upload requests to search millions of individuals' records in a single query. *Id.*; *see also* DHS-AR-491.

Defendants ran roughshod over the Privacy Act's requirements by failing to publish modified SORNs and solicit public comment on their major changes to SAVE. *See* 5 U.S.C. §§ 552a(e)(4), (11), (12). Internal "Privacy Threshold Analysis" documents from July and September

2025 show that DHS was aware that SAVE's continued operation was "not in compliance" with the Privacy Act, DHS-AR-277, 319, and that "[s]hortfalls in data accuracy" in the SSA citizenship data integrated into the overhauled SAVE system "could cause incomplete or false results," DHS-AR-260; DHS-AR-302; *see infra* Argument § II.E. Despite *internally* acknowledging these risks, DHS *publicly* touted SAVE's reliability and enabled and encouraged officials across the country to use the flawed system for "voter verification" and benefits eligibility checks. *See* DHS-AR-449; DHS-AR-491; Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025), https://perma.cc/9LN5-SEDU.

### III.    DHS and SSA belatedly publish modified SORNs and solicit public comment in response to this suit.

Plaintiffs sued on September 30, 2025, challenging, among other things, Defendants' violations of the Privacy Act's notice-and-comment requirements in overhauling SAVE. *See* Compl. ¶¶ 204-218, ECF 1. DHS and SSA then published—on October 31 and November 12, respectively—modified SORNs for SAVE and the SSA Master File. DHS-AR-114 ("2025 SAVE SORN"); SSA-AR-206 ("2025 SSA Master File SORN") (collectively, the "Modified SORNs").[4] DHS modified the SAVE SORN in part because of this suit. *See* DHS-AR-85.

The 2025 SAVE SORN describes various changes to SAVE, including incorporating records about "U.S. citizens by birth," "revising the record source categories to add [SSA's Master File] and state or other national agencies that issue or maintain driver's license information," and describing the new "capability to create cases in SAVE by uploading a file with a list of multiple cases." DHS-AR-115-17. Invoking the Elections EO, *see id.*, the SORN established new "Routine Use L" to enable DHS to disclose records to SSA "and other federal, state, tribal, territorial, local, governments and other authorized entities to assist [SAVE] user agencies [to] determine U.S. citizenship and immigration status of an individual when a DHS approved agreement is in place between DHS and the entity." DHS-AR-120. Along with the 2025 SAVE SORN, DHS also

---

[4] SSA issued two modified SORNs for the SSA Master File in 2025—one in February and another in November. As used here, "2025 SSA Master File SORN" refers to the November 2025 SORN.

published an updated PIA for SAVE. *See* DHS-AR-221.

The 2025 SSA Master File SORN provides no details about the SAVE overhaul, but it adds new Routine Use No. 49 for disclosures of "citizenship and immigration information to the Department of Homeland Security, pursuant to 8 U.S.C. 1373(a)." SSA-AR-207.

The Modified SORNs solicited public comment but also included automatic effective dates that made clear Defendants had decided to continue operating SAVE as they had since May 2025, notwithstanding any comments. *See* DHS-AR-115; SSA-AR-207. Within the 30-day comment periods, DHS received over 9,350 comments and SSA received over 21,200, the overwhelming majority of which opposed the SAVE overhaul. *See* FAC ¶¶ 85, 93.[5] Commenters opposing the overhaul included Plaintiffs; a group of 20 state attorneys general; a group of 12 state secretaries of state; members of Congress; state and local agencies; former federal privacy officials and SSA personnel; several voting, immigrant, and privacy rights organizations; and many thousands of individual Americans who objected to DHS and SSA repurposing and misusing their data without notice or their consent. *See* FAC ¶¶ 85, 93 (collecting comments).

Defendants have continued to operate overhauled SAVE since the SORNs' comment periods closed in December 2025 without addressing the tens of thousands of comments opposing their actions. *See generally* DHS-AR; SSA-AR.

## IV.    How the overhauled SAVE process works for voter roll bulk uploads and SSN searches.

To access SAVE, user agencies must execute "a Memorandum of Agreement (MOA) or Computer Matching Agreement (CMA)" with USCIS, which establishes "the terms and conditions for the user agency's participation in SAVE." DHS-AR-195-96; *see also* DHS-AR-223; DHS-AR-1344. The Administrative Record reflects the following overhauled SAVE process for when a

---

[5] Instead of reproducing public comments on the Modified SORNs in the Administrative Record, Defendants have incorporated all comments by reference by linking to regulations.gov. *See* DHS-AR-1537; SSA-AR-0212. Here, Plaintiffs cite to the paragraphs in their FAC compiling links to relevant comments available on regulations.gov.

SAVE user agency runs a bulk search using voters' full names, dates of birth, and full or partial SSNs for mass "voter verification" checks:

**First**, a SAVE user downloads a CSV file (*i.e.*, a spreadsheet) from DHS's SAVE website. DHS-AR-1443. The user then manually enters at least the following data elements into the spreadsheet, for up to millions of voters: first name, last name, date of birth, either a full or partial SSN, and the reason for verification (e.g., voter verification). *Id.* The user then uploads the completed file into the SAVE interface. DHS-AR-1444. While the SAVE user can also provide voters' DHS numeric identifiers (*e.g.*, an A-number) at this step, state and local election agencies typically do not have this information. DHS-AR-225; DHS-AR-2.

**Second**, DHS automatically discloses the voters' uploaded data elements to SSA and uses it to search the SSA Master File. *See* DHS-AR-225; DHS-AR-253; DHS-AR-1525.

**Third**, SSA automatically discloses the SSA Master File search results to DHS, including the following fields:

- SSN Match (True/False)
- Full SSN for all matches (when a partial SSN is provided)
- Name Match (True/False)
- Date of Birth Match (True/False)
- Citizenship/Foreign Indicator
  - Blank – Citizenship code is blank and foreign-born indicator is blank
  - "A" - U.S. citizen
  - "B" - Legal alien; eligible to work;
  - "C" - Legal alien, not eligible to work;
  - "D"- Other;
  - "E" - Alien student- restricted work authorized; and
  - "F"- Conditionally legalized alien
- Foreign Born indicator (Citizenship code is not present, but voter was foreign born);
- State/Country code;
- American Samoa indicator (True/False);
- Alien Registration number (where applicable);
- Death indicator (Yes Deceased/Not Deceased); and
- Error code descriptions (transaction and record levels).

DHS-AR-116; DHS-AR-225-26; DHS-AR-424; DHS-AR-437-438.

The **fourth** step can proceed in several ways, depending on what results DHS receives from SSA's Master File.

If a potential non-U.S. citizen status is identified and a DHS numeric identifier is available (either found in SSA records or provided to DHS by the SAVE user), then SAVE will automatically query additional systems available to it, DHS-AR-1450-1458; DHS-AR-1525, including systems housed at DHS, the Department of Defense, the Department of Education, the Department of Health and Human Services, DOJ, the Department of State, state driver's licensing agencies and, in the future, non-governmental sources such as the National Law Enforcement Telecommunications System (NLETS). DHS-AR-119-120; DHS-AR-227-230. After a manual review of system responses, SAVE will then return a response that will either include the voter's citizenship status—*e.g.*, "U.S. Citizen" or "Lawful Permanent Resident"—or request additional actions by the SAVE user, like submitting additional documents. DHS-AR-1525; DHS-AR-1507; DHS-AR-1378-1379; DHS-AR-1530.

Alternatively, if (a) a potential non-U.S. citizen status is identified and no DHS numeric identifier is found in SSA records or provided to DHS by the SAVE user, (b) the match to SSA records is inconclusive, or (c) SSA records confirm a voter is a citizen or is deceased, then SAVE ends the automated query and generates a response based solely on its search of SSA records. DHS-AR-255; DHS-AR-297. Those possible SAVE responses include:

- U.S. Citizen (per SSA Record);
- Deceased (per SSA record);
- Immigration Enumerator [*i.e.* DHS identifier] Required – Resubmit with Additional Information;
- No Record Found with SSA – Resubmit with Additional Information
- Unable to Return Record from SSA – Resubmit with Additional Information; or
- Full SSN Required – Resubmit with Additional Information.

DHS-AR-1379.

Without a DHS identifier, SAVE cannot proceed beyond querying SSA records. SAVE cannot perform additional review of a response based solely on SSA records because DHS "does not have direct access to the [SSA] system to support these additional steps." DHS-AR-240-241.

**Fifth** and finally, SAVE users act based on the results of the above-described process, which will vary based on the response received.

If the SAVE result identifies a voter as a *citizen*, then the MOA between DHS and SAVE users permits the user to rely on SAVE's confirmation of citizenship. *See* DHS-AR-1508.

If the SAVE result identifies a voter as a *non-citizen* (*e.g.*, SAVE provides a "Lawful Permanent Resident" response), then the SAVE MOA directs that the SAVE user "contact the registrant or registered voter to obtain proof of U.S. citizenship" before denying or cancelling their voter registration. DHS-AR-762; *see also* DHS-AR-1526; DHS-AR-1530.

And if the SAVE result is inconclusive (*e.g.*, SAVE provides an "Immigration Enumerator Required – Resubmit with Additional Information" response), then the SAVE process requires that (1) the SAVE user provide the voter's DHS numeric identifier (which state and local agencies likely do not possess), or (2) the SAVE user "contact the registrant or registered voter to obtain proof of U.S. citizenship" before denying or cancelling their voter registration. DHS-AR-762; *see also* DHS-AR-1526.

## V. States are rapidly using SAVE to conduct mass voter citizenship checks, imperiling millions of Americans' privacy and voting rights, including Plaintiffs' members.

Despite the known and unmitigated problems with overhauled SAVE, *see infra* Argument § II.E, several states are—at the Administration's urging—rapidly deploying the system for mass voter citizenship checks. Early results are damning: they show that, in states such as Texas, the overhauled SAVE process has falsely identified eligible U.S. citizen voters as non-citizens, forced them to needlessly provide documentary proof of citizenship ("DPOC") to state and federal authorities, caused eligible voters to be wrongfully removed from voter rolls, and even disenfranchised some. *See*, *e.g.*, LeBombard Decl. ¶¶ 31-45; Nel Decl. ¶¶ 12-26; B. Doe Decl. ¶¶ 28-31; C. Doe Decl. ¶¶ 17-18. SAVE has also created significant confusion and problems for election administrators, and jeopardized millions of Americans' privacy and data security, including Plaintiffs' members. *See* FAC ¶¶ 131-155; *infra* Argument § I.A-B.

11

Yet DHS continues to "encourage all federal, state, and local agencies to use the SAVE program" based on false claims of widespread non-citizen voting. Nov. 2025 USCIS Release, *supra*. DHS has touted that overhauled SAVE has, as of November 3, 2025, "enabled state voting agencies to submit over 46 million voter verification queries and ha[d] also allowed federal agencies to submit over 110 million queries to help verify eligibility for federally funded benefits." *Id.*; DHS-AR-1339.

After the close of public comment on the Modified SORNs, Plaintiffs League of Women Voters ("LWV"), League of Women Voters of Texas ("LWVTX"), League of Women Voters of Louisiana and League of Women Voters of Louisiana Education Fund (together, "LWVLA"), League of Women Voters of Virginia ("LWVVA") (collectively, "the League"), and the Electronic Privacy Information Center ("EPIC") filed their First Amended and Supplemental Complaint ("FAC"), on January 21, 2026, ECF 61, and now move for summary judgment.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing agency action under the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). "[T]he district judge sits as an appellate tribunal[] [and] [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

## ARGUMENT

In overhauling SAVE, Defendants vastly exceeded their authority, violated multiple statutes, usurped constitutional powers reserved for the States and Congress, acted arbitrarily and capriciously, and withheld publication of statutorily mandated information. Plaintiffs—voting and privacy rights organizations whose members and missions are directly harmed by Defendants' unlawful actions—are entitled to summary judgment on each of their claims.

## I.    Plaintiffs have standing.

To demonstrate Article III standing, a plaintiff must show that (1) "it has suffered an injury in fact" that is "concrete and particularized" and "actual or imminent," (2) "the injury is fairly traceable to the challenged action of the defendant," and (3) "it is likely . . . that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). In evaluating standing, the Court "must assume [Plaintiffs] will prevail on the merits." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011).

Here, LWV, LWVTX, LWVLA, and LWVVA have **associational standing** "on behalf of [their] members,"[6] based on their members' privacy, reputational, and voting-related injuries caused by overhauled SAVE, and LWVTX and LWVLA have **organizational standing** "on [their] own behalf," based on harm to their mission-critical functions. *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). And EPIC has **associational standing** based on the privacy and reputational injuries to its members. Any one of these standing bases, for any Plaintiff, confers jurisdiction over Counts One through Six of the FAC. Moreover, all Plaintiffs have **procedural injuries** to assert Count Five due to the SAVE overhaul's harm to their concrete interests. And EPIC has **informational standing** to challenge Defendants' failure to publish matching agreement notices for the SAVE overhaul, conferring jurisdiction over Counts Seven and Eight. *See* Index of Decls. ISO Pls.' MSJ.

### A.    Plaintiffs have associational standing.

To establish associational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Plaintiffs meet each requirement based on various theories of injury.

---

[6] "Members of local and state Leagues are also members of LWV." Stewart Decl. ¶ 6, ECF 16-5; *see also* Supp. Stewart Decl. ¶ 10.

### 1.   Privacy injuries to Plaintiffs' members

As explained below, *see infra* Argument § II.A-D, overhauled SAVE is purpose-built to violate Plaintiffs' members' statutory privacy rights under the Social Security Act and the Privacy Act. While a statutory violation alone cannot confer standing, Defendants' violations here inflict concrete privacy injuries akin to those long recognized as sufficient to confer standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (injuries are concrete when they have "a close historical or common-law analogue"). Specifically, as several judges in this District have held, the government unlawfully disclosing private information bears a close relationship to the harms vindicated by the common law torts of "intrusion upon seclusion and breach of confidence." *E.g.*, *League of United Latin Am. Citizens v. EOP ("LULAC II")*, 2026 WL 252420, *51 (D.D.C. Jan. 30, 2026) ("wrongful sharing of sensitive [voter] information" through SAVE "bears a close relationship to the harms traditionally redressable through suits for intrusion upon seclusion and breach of confidence"); *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025) (disclosure of financial information has close relationship to harm vindicated by intrusion upon seclusion); *Ctr. for Taxpayer Rts. v. IRS*, 2025 WL 3251044, *13-15 (D.D.C. Nov. 21, 2025) (disclosure of taxpayer addresses has close relationship to harms vindicated by intrusion upon seclusion and breach of confidence); *New Mexico v. Musk*, 784 F. Supp. 3d 174, 195 (D.D.C. 2025) (disclosure of financial information has close relationship to harm vindicated by intrusion upon seclusion); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (disclosure of PII including SSNs has close relationship to harms vindicated by intrusion upon seclusion and breach of confidence).

Here, Defendants have already unlawfully accessed and disclosed the private voter registration and SSA information of LWV, LWVTX, LWVLA, and EPIC members without their consent, through the bulk queries run in SAVE by Texas and Louisiana, and their members' SSA data remains unlawfully accessible via SAVE to DHS and user agencies. *See* Nel Decl. ¶¶ 27-33 (LWVTX); A. Doe Decl. ¶¶ 18, 23-24 (LWVTX and EPIC); B. Doe Decl. ¶¶ 32-38 (LWVTX); C. Doe Decl. ¶¶ 19-25 (LWVTX); Kisselburgh Decl. ¶¶ 13-15 (EPIC); Green Supp. Decl. ¶¶ 8,

45-46, 48-50 (LWVLA President); J. Doe 4 Supp. Decl. ¶¶ 8-12, ECF 16-3 (LWVLA). LWVVA members' sensitive SSA data is likewise unlawfully accessible to DHS and SAVE user agencies without their consent. *See* J. Doe 6 Decl. ¶¶ 9-11, ECF 16-8 (LWVVA).

These statutory violations parallel both essential features of intrusion upon seclusion: (1) an intentional intrusion into private affairs, which (2) would be "highly offensive to a reasonable person." *All. for Retired Americans*, 770 F. Supp. 3d at 102 (quoting Restatement (2d) of Torts, § 652B). Through overhauled SAVE, Defendants are verifying and disclosing individuals' information from the SSA Master File including SSNs, dates of birth, full names, and various data elements about citizenship status. *See supra* Background § IV.[7] Verification of an SSN alone is a disclosure sensitive enough to parallel the interests protected by the tort of intrusion upon seclusion. *See AFL-CIO*, 778 F. Supp. 3d at 73. And Plaintiffs' members confirm that these disclosures are highly offensive to them. *See* Nel Decl. ¶¶ 35, 40-44; A. Doe Decl. ¶¶ 18, 22-24; B. Doe Decl. ¶¶ 40, 45-47, 50; C. Doe Decl. ¶¶ 27, 31-33, 36; Kisselburgh Decl. ¶¶ 16-20; J. Doe 4 Supp. Decl. ¶ 20, ECF 16-3; J. Doe 6 Decl. ¶¶ 21, ECF 16-8.

SSA's conduct is also analogous to a breach of confidence. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). Plaintiffs' members provided their citizenship and other information to SSA in confidence when they applied for an SSN and reasonably expected it to be kept confidential, based on longstanding statutory protections and agency policies. *See* Nel Decl. ¶ 33; A. Doe Decl. ¶ 18; B. Doe Decl. ¶ 38; C. Doe Decl. ¶ 25; Kisselburgh Decl. ¶ 15; Green Supp. Decl. ¶ 49; J. Doe 4 Supp. Decl., ECF 16-3, ¶ 19; J. Doe 6 Decl., ECF 16-8, ¶ 20. Indeed, SSA policy assures it will only disclose SSNs where a statute "specifically mandate[s] that SSA disclose SSNs," and that SSA "do[es] not have the legal authority to disclose information about U.S. citizens to DHS." SSN Disclosure Policy, *supra* n.7.

---

[7] Under SSA policy, "verification" of an individual's protected SSA information is tantamount to a "disclosure" of that information. *See* SSA, Program Operations Manual System (POMS), *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023), https://perma.cc/PE44-2QBK ("SSN Disclosure Policy").

SSA's betrayal of trust in disclosing this information to DHS and SAVE users parallels the type of injury vindicated by the tort of breach of confidence. *See Jeffries*, 928 F.3d at 1064; *LULAC II*, 2026 WL 252420, *51; *Ctr. for Taxpayer Rts.*, 2025 WL 3251044, *13-15.

### 2.    Reputational injuries to LWVTX and EPIC members

Further, Defendants' statutory violations inflicted harms on LWVTX and EPIC members similar to those protected by the common law tort of defamation. DHS provided false information to SAVE users, through overhauled SAVE, indicating that certain LWVTX and EPIC members were not citizens. *See* Nel Decl. ¶ 36 & Ex.1; A. Doe Decl. ¶ 23 & Ex.1; B. Doe Decl. ¶¶ 22, 25-26, 34, 41 & Ex.1; C. Doe Decl. ¶¶ 20-21, 28 & Ex.1. *TransUnion* recognizes that the injury associated with such false statements bears a "close relationship" to the reputational harm associated with the tort of defamation. 594 U.S. at 432. There, the defendant provided third parties with information labeling the plaintiff class members as potential criminals. So too here: It is a federal crime for non-citizens to vote or register to vote in federal elections, *see* 18 U.S.C. §§ 611, 1015(f), so when DHS represented to state election officials in Texas that certain registered voters were non-citizens, it was effectively labeling them as criminals. Under facts also implying criminal conduct, the *TransUnion* Court had "no trouble concluding that the 1,853 class members suffered a concrete harm that qualifies as an injury in fact." 594 U.S. at 432. It is no defense that SAVE only labels voters as *potential* non-citizens: *TransUnion* considered and rejected a similar argument, explaining that "[t]he harm from being labeled a '*potential* terrorist' bears a close relationship to the harm from being labeled a 'terrorist'" and that Article III does not require "an exact duplicate." *Id*. at 433 (emphasis added).

### 3.    Voting-related injuries to LWVTX members

The overhauled SAVE system has also harmed and will continue to harm LWVTX's members' voting rights. "There is no doubt that the right to vote is a legally protected interest" for standing purposes. *Am. Encore v. Fontes*, 152 F.4th 1097, 1111 (9th Cir. 2025). Because "the fundamental right to vote is a cornerstone premise of democracy," courts must zealously "guard" against, and "firmly and unequivocally reject," burdens on that right. *Mi Familia Vota v. Fontes*,

129 F.4th 691, 709 n.3 (9th Cir. 2025) (citing cases). A voter "need not have the franchise wholly denied to suffer injury." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005). Rather, "any concrete, particularized, non-hypothetical" burden on the right to vote "is sufficient." *Id.* For example, requiring voters to produce DPOC "would directly harm the concrete interests of [voters] in registering to vote," and "having their votes counted in upcoming federal elections." *League of United Latin Am. Citizens v. EOP ("LULAC I")*, 808 F. Supp. 3d 29, 59, 60-61 (D.D.C. 2025); *LULAC II*, 2026 WL 252420, at *38 (same); *accord N.H. Youth Movement v. Scanlan*, 2026 WL 323171, at *11 (D.N.H. Feb. 6, 2026) (citing *Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020), and *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009)). And even an "increased risk" of disenfranchisement can make an injury "sufficiently 'imminent' for standing purposes." *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017)); *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

Here, overhauled SAVE has already harmed LWVTX's members' voting rights, and its continued operation substantially increases the risk of future burdens and outright disenfranchisement.

As LWVTX's declarants attest, the overhauled SAVE process has played out exactly as DHS and the SAVE MOAs contemplate: in October 2025, the Texas Secretary of State used SAVE's new bulk upload function to run the state's entire voter registration list with more than 18 million voters through SAVE, and identified at least "2,724 potential non-citizens who are registered to vote in Texas." LeBombard Decl. ¶ 33. Relying entirely on SAVE's output, the Secretary referred those "potential non-citizens" to Texas counties for investigation, and created a template notice for county registrars to send those voters demanding that they provide DPOC (such as a U.S. passport or birth certificate) within 30 days or else have their voter registration cancelled. *Id.* ¶ 34. LWVTX has submitted multiple member declarations by eligible U.S. citizen voters who received these SAVE "non-citizenship notices." Per those notices, as a direct result of a "comparison of the information in [their] voter registration records with the United States

Citizenship and Immigration Services SAVE records," Nel Decl., Ex. 1; A. Doe Decl., Ex. 1; B.

Doe Decl., Ex. 2; C. Doe Decl., Ex. 1, the LWVTX members have:

- been forced to quickly provide DPOC within 30 days or else face wrongful cancellation of their voter registration, *see* A. Doe Decl. ¶¶ 11-14 & Ex. 1; C. Doe Decl. ¶¶ 12-14, 18 & Ex. 1;

- had their voter registration wrongfully cancelled for failure to provide DPOC within 30 days, *see* Nel Decl. ¶¶ 19-21, 24, 26 & Exs. 1, 2; B. Doe Decl. ¶¶ 11-17, 21-22, 24-27, 30-31 & Exs. 1, 2;

- been disenfranchised and prevented from voting in the March 2026 primary election, *see* B. Doe Decl. ¶¶ 11-31 ; and

- felt compelled to regularly check their voter registration status to ensure it is not wrongfully cancelled, *see* Nel Decl. ¶ 39; B. Doe Decl. ¶ 44; C. Doe Decl. ¶ 30.

LWVTX members also fear facing unwarranted criminal investigation for their

prior lawful voting due to DHS's overhauled SAVE process. *See* Nel Decl. ¶ 37; B. Doe

Decl. ¶ 42. These fears are reasonable and non-speculative based on public statements of

state and federal authorities.[8]

These harms are ongoing and likely to recur. LWVTX have submitted declarations from

naturalized and derived citizen members whose SSA data does not reflect they are U.S. citizens.

*See* Nel Decl. ¶ 34; B. Doe Decl. ¶ 39; C. Doe Decl. ¶ 26. These and other similarly situated

LWXTX members face substantially increased risks of being forced to provide DPOC in the

future, being wrongfully removed from the voter rolls, and facing other burdens due to SAVE's

continued operation and its reliance on unreliable citizenship data and verification methods. *See*

Nel Decl. ¶¶ 38-39; B. Doe Decl. ¶¶ 43-44; C. Doe Decl. ¶¶ 29-30; *infra* Argument § II.E.

The LWVTX member declarants have an even stronger basis for standing than in prior

cases where naturalized voters challenged the use of pre-overhauled SAVE. *See Mi Familia Vota*,

---

[8] *See, e.g.*, Press Release, Tex. Sec'y of State, *Texas Completes Citizenship Verifications in the SAVE Database* (Oct. 20, 2025), https://perma.cc/9WZ2-XVDA ("[I]ndividuals who are deemed non-citizens" based on overhauled SAVE process "that voted in a Texas election will be referred to the Office of the Attorney General" for investigation.); Fifield & Despart, *supra* ("[S]peaking at a recent conference, [USCIS official Brian] Broderick said that when SAVE flags voters as noncitizens, they are also referred to DHS for possible criminal investigation.").

129 F.4th at 708-09; *Arcia*, 772 F.3d at 1341-42. In *Mi Familia Vota*, the Ninth Circuit held that naturalized voters had standing to challenge an Arizona law requiring use of SAVE based on evidence that "SAVE may not" have up-to-date "naturalization records," creating the "danger" that "properly registered voters, who in fact are citizens, may have their voter registrations cancelled . . . losing their constitutional right to vote," even though the plaintiffs identified no voter whose registration was actually cancelled. 129 F.4th at 708-09. Similarly, in *Arcia*, the Eleventh Circuit held that naturalized voters had "standing to prospectively challenge" Florida's "attempt to remove non-citizens from the voter rolls using the SAVE database" based on "*potential* errors that *could* occur when the Secretary attempted to confirm their immigration status in various state and federal databases in the hurried 90–day window before the election." 772 F.3d at 1341 (emphasis added). Here, LWVTX has adduced evidence of *actual* cases where SAVE generated inaccurate citizenship responses, resulting in concrete burdens on their members' voting rights and even disenfranchisement, not just "potential errors." *See id.*

### 4. Plaintiffs satisfy the remaining elements of associational standing.

The remaining elements of associational standing are easily met. LWV, LWVTX, LWVLA, and LWVVA seek to protect the voting and privacy rights of their members, which is germane—indeed central—to the League's purpose to "empower voters and defend democracy, including by registering voters and increasing voter participation." Stewart Decl. ¶¶ 2, 7, ECF 16-5 (LWV); *see also* LeBombard Decl. ¶¶ 2, 5, 14 (LWVTX); Suppl. Green Decl. ¶¶ 2, 6 (LWVLA); Porte Decl. ¶¶ 2, 3, 11, 14, ECF 16-6 (LWVVA). Courts routinely deem this element met in cases brought by the League. *E.g.*, *League of Women Voters of Fla., Inc. v. Lee,* 576 F. Supp. 3d 1004, 1009 (N.D. Fla. 2021); *Common Cause/Ga. League of Women Voters of Ga., Inc. v. Billups*, 439 F. Supp. 2d 1294, 1302 (N.D. Ga. 2006). Similarly, EPIC is seeking to protect the privacy rights of its members, in furtherance of its "mission [] to secure the fundamental right to privacy in the digital age." Butler Decl. ¶ 3; *see also id.* ¶¶ 24, 31-41. Nothing requires the participation of individual members in this suit. Courts routinely hold that individual member participation is not necessary where, as here, only vacatur, declaratory, and injunctive relief is sought in APA cases.

*E.g.*, *Powder River Basin Res. Council v. Dep't of Interior*, 749 F. Supp. 3d 151, 162 (D.D.C. 2024); *Sierra Club v. Perry*, 373 F. Supp. 3d 128, 135 (D.D.C. 2019); *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996).

      **B.**      **LWVTX and LWVLA have organizational standing based on overhauled SAVE's harm to their mission-critical functions.**

      LWVTX and LWVLA have organizational standing to challenge the SAVE overhaul based on the "perceptibl[e]" harms it causes to their "core" voter-services mission and "activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Courts frequently hold that voter services and political party organizations have standing to challenge conduct that impairs their mission-critical functions. *See, e.g.*, *Arcia*, 772 F.3d at 1341-42; *RNC. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 395 (4th Cir. 2024); *LULAC I*, 808 F. Supp. 3d at 57-59; *LULAC II*, 2026 WL 252420, at *28; *Va. Coal. for Immigrant Rts. v. Beals*, 803 F. Supp. 3d 454, 465-67 (E.D. Va. 2025). So too here.

      LWVTX's and LWVLA's shared mission is to protect the right to vote and increase voter registration and participation, including by providing voter counseling to U.S.-born, naturalized, and derived citizens. *See* LeBombard Decl. ¶¶ 2, 14, 16-28 (LWVTX); Suppl. Green Decl. ¶¶ 2, 12-13 (LWVLA). Consistent with this mission, their core services are to provide voter outreach, education, and assistance to Texas and Louisiana citizens to aid them in checking their voter registration and encouraging and helping them to register or re-register. *See* LeBombard Decl. ¶¶ 16, 18, 20-28; Suppl. Green Decl. ¶¶ 13, 15-22. Providing these services and programming to naturalized and derived citizens is essential to fulfilling their mission of ensuring that *all* eligible voters, including those born abroad who became U.S. citizens, can fully participate in the democratic process. *See* LeBombard Decl. ¶ 28; Suppl. Green Decl. ¶ 22.

      Overhauled SAVE directly interferes with LWVTX's and LWVLA's core mission to ensure voter access and maximize participation, and their work to register Texas and Louisiana voters and keep them registered. *See* LeBombard Decl. ¶¶ 29-45 (LWVTX); Suppl. Green Decl. ¶¶ 23-36 (LWVLA). As Defendants admit, *see infra* Argument § II.E, overhauled SAVE conducts

bulk queries of unreliable citizenship data using unreliable methods that create high risks of error, especially for naturalized and derived citizens across the country, *see* LeBombard Decl. ¶¶ 36-37 & nn.15-17 (LWVTX); Suppl. Green Decl. ¶¶ 29-30 & nn.6-7 (LWVLA). As a result, Defendants' SAVE overhaul predictably has hampered and will continue to hamper the registration of eligible voters in Texas and Louisiana and their right to vote. It requires those erroneously identified by SAVE as potential non-citizens to take additional steps to register or remain registered, and enables improper voter-roll removals and investigation of those unable or unwilling to take these steps and discouraged from voting after having their eligibility questioned pursuant to the overhauled SAVE process. *See, e.g.*, LeBombard Decl. ¶¶ 38-45 ; Suppl. Green Decl. ¶¶ 31-36 (LWVLA); Nel Decl. ¶¶ 12-26, 36-39 (LWVTX); A. Doe Decl. ¶¶ 11-21 (LWVTX); B. Doe Decl. ¶¶ 11-31, 41-43 (LWVTX); C. Doe Decl. ¶¶ 12-18, 28-30 (LWVTX). These voting impediments are not hypothetical: thousands of Texas and Louisiana registered voters have already faced removal from voter rolls and potential investigation due to overhauled SAVE, and, predictably, there have been demonstrable errors. *See, e.g.*, LeBombard Decl. ¶¶ 32-40, 43 (LWVTX); Green Decl. ¶¶ 26-29, 34 (LWVLA); Nel Decl. ¶¶ 12-26; A. Doe Decl. 11-14; B. Doe Decl. ¶¶ 11-31, 41; C. Doe Decl. ¶¶ 12-18, 28. Such SAVE-caused errors, and attendant disruptions, directly impair LWVTX's and LWVLA's core work of maximizing participation by eligible voters.

Courts regularly find organizational standing in similar circumstances. *See, e.g.*, *Arcia* 772 F.3d at 1341-42 (voting rights groups had organizational standing to challenge Florida's use of pre-overhauled SAVE because it risked wrongful purging of naturalized voters and thus "impair[ed]" plaintiffs' mission-critical functions relating to "voter registration and education" and increasing voter participation); *LULAC I*, 808 F. Supp. 3d at 57-59 (similar); *accord LULAC II*, 2026 WL 252420, at *37-38; *Beals*, 803 F. Supp. 3d at 465-66. LWVTX and LWVLA's standing here also tracks *Havens* itself, insofar as SAVE's *inaccurate* citizenship information frustrates their ability to provide their core registration and engagement services. *Cf. RNC*, 120 F.4th at 397 (similarly analogizing to *Havens*); *accord LULAC I*, 808 F. Supp. 3d at 57-59; *LULAC II*, 2026 WL 252420, at *15; *RAICES v. Noem*, 793 F. Supp. 3d 19, 69 (D.D.C. 2025).

Moreover, the overhauled SAVE process is forcing LWVTX and LWVLA to expend greater resources to fulfill their mission-critical functions. *See LULAC*, 2025 WL 3042704, at *13, 15 (citing *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). LWVTX explains that (1) it has already devoted nearly ten staff and volunteers, 65 hours of staff and volunteer time, and $7,000 to identify and contact by letter the more than 2,000 Texas voters who have received SAVE non-citizenship notices and may be erroneously purged from voter rolls, and (2) it anticipates needing to devote additional personnel, time, and money—totaling approximately $5,000 to $10,000 in organizational resources each year—to address Texas's use of the flawed SAVE system used for voter list maintenance, so long as the state continues to use the system. *See* LeBombard Decl. ¶¶ 47-53; *cf., e.g.*, *Arcia*, 772 F.3d at 1341-42 (finding standing where voting nonprofits "expended resources to locate and assist" individuals identified as noncitizens by SAVE and "ensure that they were able to vote"); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 657 (M.D.N.C. Jan. 21, 2024) (similar). LWVTX has also devoted and will continue to devote similar resources to update and increase its various programming and communications on voter registration—to educate Texas voters about the overhauled SAVE process and its DPOC requirements, to encourage more voters to check and re-check their voter registration status so that use of SAVE does not deprive them of their right to vote, and to equip their staff and volunteers with the necessary information to assist voters potentially impacted by SAVE. *See, e.g.*, LeBombard Decl. ¶¶ 54-56; *cf., e.g.*, *Common Cause Indiana v. Lawson*, 937 F.3d 944, 951-53 (7th Cir. 2019) (similar) (citing cases); *LULAC*, 2025 WL 3042704, at *14–15 (similar); *Beals*, 803 F. Supp. 3d at 466-67 (similar). LWVLA has likewise shown such resource harms. Suppl. Green Decl. ¶¶ 37-43.

In sum, LWVTX and LWVLA have shown paradigmatic organizational injuries to their voter-protection and voter-engagement missions.

### C.    EPIC has standing to challenge Defendants' violations of the Privacy Act's procedural requirements for matching programs.

Defendants' SAVE overhaul constitutes a new "matching program" under the Privacy Act. *See infra* Argument § II.F. The creation of a new matching program triggers various procedural and transparency obligations under the Privacy Act and implementing OMB guidelines, which Defendants have flouted. *Id.* In doing so, Defendants injured EPIC by depriving it of information and notice-and-comment opportunities to which it is legally entitled.

First, Defendants' SAVE overhaul has inflicted informational injuries on EPIC. A plaintiff suffers an informational injury when "(1) it has been deprived of information that . . . a statute requires the government . . . to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016). The second prong turns on whether "Congress, in mandating disclosure, sought to protect individuals or organizations like" the plaintiff. *Id.*; *see also United to Protect Democracy v. Pres. Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 108-10 (D.D.C. 2017).

EPIC routinely relies on information that the Privacy Act mandates agencies to disclose, including information in SORNs and matching agreements. Butler Decl. ¶¶ 8-13. These documents are often the only publicly-available records of how and why a federal entity is collecting personal information, what information is being collected, what burdens collection will impose, how that information may be used and shared, how it will be stored and secured, and for how long it will be retained. *Id.* ¶ 12. EPIC depends on this public information to inform its research, advocacy, public education, and education of its members concerning the systems and databases used throughout the government. *Id.* ¶¶ 8-13, 17-19, 24-30. EPIC's ability to perform these mission-critical functions is directly impaired by Defendants' failure to disclose statutorily required information, which constitutes a cognizable informational injury. *See Friends of Animals*, 824 F.3d at 1040; *Protect Democracy*, 288 F. Supp. 3d at 108-10.

Second, EPIC has standing to challenge Defendants' failure to follow the procedural requirements for new matching programs in overhauling SAVE. A plaintiff has standing to challenge agency "action taken without required procedural safeguards" if that action "threatens

23

their concrete interest." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Such a plaintiff "need not demonstrate that but for the procedural violation the agency action would have been different"; rather, the plaintiff need only "demonstrate a causal relationship between the final agency action and the alleged injuries," after which "the court will 'assume the causal relationship between the procedural defect and the final agency action.'" *Id.*

By failing to publish notices of matching agreements and solicit public comment on them as required by the Privacy Act and OMB guidelines, Defendants have acted "without required procedural safeguards." *Mendoza*, 754 F. 3d at 1010. Defendants' procedural violations threaten and impact EPIC's core interests in transparency and public education about private data collection, and impede EPIC's ability to carry out its mission. The unlawful matching programs also  threaten the concrete privacy and reputational interests of EPIC's members. *See supra* Argument § II.A.1-2. The Privacy Act's matching program requirements are precisely the types of safeguards that would remedy the injuries suffered by EPIC's members.[9]

### D. Plaintiffs' injuries are caused by Defendants' SAVE overhaul and redressable by this Court.

Plaintiffs' injuries are all traceable to the SAVE overhaul. But for Defendants' expansion of SAVE to collect, use, disclose, and match in bulk the sensitive personal data of Plaintiffs' members and millions of other Americans, none of these injuries would have occurred. "Because Article III 'requires no more than *de facto* causality,' traceability is satisfied here." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (citation modified) (citing cases).

That Plaintiffs' voting-related injuries were inflicted in part by state actors does not defeat traceability. "[S]tanding will lie where 'a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise.'" *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014). Defendants entered into MOAs authorizing states to run their entire voter rolls through SAVE with its new bulk-upload

---

[9] Because overhauled SAVE harms each Plaintiff's concrete interests (on the various grounds outlined above), all Plaintiffs have cognizable procedural injuries sufficient to assert Count Five of the FAC. *See*, *e.g.*, Supp. Stewart Decl. ¶¶ 6-11; *see also infra* Argument § II.D.

and search-by-SSN features, and to require individuals whom SAVE identifies as potential non-citizens to provide DPOC or have their voter registration cancelled or denied. *See*, *e.g.*, DHS-AR-1281-91 (Texas SAVE MOA); DHS-AR-1193-1203 (Louisiana SAVE MOA); Worrell Adkins Decl. ¶¶ 6-12, ECF 43-2 (Texas official touting the state's reliance on SAVE). Absent Defendants' actions, SAVE users would not have lawful access to the data SAVE is utilizing to perform citizenship checks en masse. *See* Nel Decl., Ex. 1 (template notice stating voter was identified as non-citizen based on "SAVE records"); *accord* A. Doe Decl., Ex. 1; B. Doe Decl. 22 & Ex. 2; C. Doe Decl., Ex. 1.

Redressability is also easily met. Plaintiffs' requested relief would redress their injuries by requiring Defendants to reverse the SAVE overhaul and undo its effects, and to publish matching-agreement information required by law. *See infra* Argument § III.

## II.    Plaintiffs are entitled to summary judgment.

Defendants' overhaul of SAVE was unlawful for multiple reasons, each of which is independently sufficient to enter summary judgment for Plaintiffs.

### A.    The SAVE overhaul lacks statutory authorization and affirmatively violates the Social Security Act (Count One).

An "agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022); *accord Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 911 (D.C. Cir. 2024); *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021). "And if an agency acts without statutory authority, then a court must set that action aside" under the APA. *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 143 (D.D.C. 2025). "To determine 'whether an agency has acted within its statutory authority,' [courts] use 'the traditional tools of statutory construction.'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024)).

Here, no statute authorizes Defendants' dramatic expansion of SAVE to (i) ingest and retain millions of Americans' sensitive records bulk-uploaded by SAVE user agencies, including but not limited to state voter roll data with individuals' full names, dates of birth, and full or partial

SSNs; (ii) disclose that data from DHS to SSA for purposes of querying SSA's Master File; (iii) disclose the queried data elements from SSA's Master File—including information about U.S. citizens of all types—to DHS and cross-check those results against DHS and other federal, state, and non-governmental systems of records; and (iv) disclose the results of this bulk inter-agency data-sharing and data-matching to SAVE user agencies. And absent statutory authorization, SAVE's bulk disclosure of individuals' protected SSA data violates the Social Security Act. *See* FAC ¶¶ 196-205 (Count One).

### 1. Traditional tools of construction show that the SAVE overhaul lacks statutory authorization.

Even Defendants seem to recognize that the statute establishing SAVE—the Immigration Reform and Control Act of 1986—does not authorize the newly expanded system. That law directed DHS's predecessor agency to create a "system for the verification of immigration status" to assist states in determining whether "aliens" are eligible for "benefits." Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note; *see also id.* § 121(a)(1)(C), 100 Stat. at 3384-86, *codified at* 42 U.S.C. § 1320b-7(d). The statute's plain text—referring to the "immigration status" of "aliens"—indicates that SAVE was only meant to be used for *non-citizens*. No provision of the statute authorizes SAVE to query records of U.S. citizens or to conduct mass voter eligibility checks.

Defendants have instead invoked, per the Elections EO, 8 U.S.C. § 1373 as statutory authority for the SAVE overhaul. *See* DHS-AR-116; DHS-AR-421-422; SSA-AR-7-8; SSA-AR-207, 210. Section 1373 was enacted 30 years ago as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 642, 110 Stat. 3009, 707 (1996). That statute provides in relevant part:

> **(a) In general**
> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
> . . .

**(c) Obligation to respond to inquiries**

[DHS] shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

8 U.S.C. §§ 1373(a), (c).

Section 1373 does not even mention SAVE (or any comparable system), let alone contemplate its use for mass citizenship checks. Nonetheless, for the first time since the statute's enactment nearly three decades ago, Defendants insist that § 1373 broadly authorizes—and indeed *requires*—DHS to use SAVE to siphon up millions of Americans' citizenship data from seemingly *any federal agency* and then disclose it to SAVE user agencies in response to "voter verification" and benefits eligibility inquiries. *See* DHS-AR-115, 117; SSA-AR-7-8.

Section 1373 does no such thing. For starters, § 1373(a)'s plain text does not affirmatively grant any authority. It is framed in purely *prohibitory* terms, instructing that an "entity or official *may not prohibit, or in any way restrict*" certain information sharing. 8 U.S.C. § 1373(a) (emphasis added). Plaintiffs have identified no case where prohibitory language in a statute was read to confer affirmative authority on an agency. And cases interpreting the plain text of prohibitions like those in § 1373 show that such statutes do not confer affirmative authority. *See New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (section of Federal Power Act stating it "shall not . . . deprive a State or State commission of its lawful authority" was "in no sense an affirmative grant of power to the states" (citation modified)).

Indeed, Defendants' reading of § 1373(a) is irreconcilable with the nondelegation doctrine, which requires congressional delegations of authority to set out an "intelligible principle" that "[makes] clear both the general policy that the agency must pursue and the boundaries of its delegated authority," allowing courts to "ascertain whether the agency has followed the law." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2497 (2025) (citation modified). Statutory instructions *not* to take certain actions inherently lack such an "intelligible principle" that could constrain any implied affirmative authorization, and cannot establish an agency's power to *do* anything. Insofar as Defendants' reading of § 1373(a) would violate the Constitution's nondelegation principle, the

27

"constitutional avoidance" canon "would counsel against adopting [their] expansive interpretation." *Kennedy v. Braidwood Mgmt.,* 606 U.S. 748, 775 (2025) (applying canon in different context).

Defendants' newfound reading of § 1373(a) is also contrary to the Executive Branch's longstanding interpretation of that law. In 1999, DOJ's Office of Legal Counsel ("OLC")[10] considered the sharing of confidential census data and concluded that § 1373(a) does "not clearly invest governmental officials or entities with the affirmative authority to disclose information in circumstances where they otherwise would be prohibited from doing so by a federal statute"; rather, the statute merely "limit[s] . . . the authority" of government offices "to impose prohibitions or restrictions on disclosures" otherwise authorized by law. *Relationship Between Illegal Immigr. Reform & Immigrant Resp. Act of 1996 & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963, at *4 (O.L.C. May 18, 1999) (Acting Ass't Att'y Gen. Randolph D. Moss). OLC noted hypothetical language that *would* have granted such disclosure authority: "a federal, state, or local official or entity may provide information, without restriction." *Id.* But absent such language, it was improper to read affirmative powers into § 1373's prohibitory text. *See id.* Other DOJ components have similarly construed § 1373. *See, e.g.*, DOJ Office of Inspector General, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients*, 6 n.7 (May 31, 2016), https://tinyurl.com/f6kyj5xv; Office of Justice Programs, *Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373*, https://perma.cc/8R8M-XTL2.

The only affirmative obligation in § 1373 is in § 1373(c), which requires *DHS* "to respond to inquiries" from government entities seeking to verify the immigration status of an individual. 8 U.S.C. § 1373(c). But nothing in that provision empowers DHS to *acquire data from other federal agencies* like SSA to respond to such inquiries, nor does it empower other federal agencies like

---

[10] OLC "exercises the Attorney General's delegated authority to interpret the Constitution and laws for the Executive Branch." *Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at A Loss*, 49 Op. O.L.C. __, 2025 WL 3251685, at *22 (Nov. 7, 2025).

SSA to *disclose their data to DHS*. Moreover, SSA is disclosing much more than just individuals' "citizenship and immigration" data through overhauled SAVE; it is also disclosing their SSNs, names, dates of birth, and death indicators, none of which concerns "citizenship and immigration status." *See supra* Background § IV. So even under Defendants' flawed reading of § 1373(c), they are vastly exceeding their statutory authority.

Other canons of construction further confirm that § 1373 does not authorize the bulk inter-agency data collection, disclosure, and matching that SAVE now performs. The Supreme Court has, "time and time again," "invoked th[e] canon" that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *City & County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) (citing cases). Here, while nothing in § 1373 expressly authorizes the SAVE overhaul, different provisions of the same statute—the IIRIRA—*do* expressly authorize similar types of inter-agency data sharing and matching between DHS and SSA solely for purposes of determining an employee's work-authorization status under the E-Verify program (formerly known as the "Basic Pilot Program"). Pub. L. No. 104-208, § 404, 110 Stat. 3009, 664-65 (1996), *codified at* 8 U.S.C. § 1324a note.[11] Those provisions require that E-Verify's inter-agency data-matching and data-sharing be conducted using "reliable, secure method[s]," strictly limits the data that SSA can share with DHS, mandates that both agencies "shall update their information in a manner that promotes the maximum accuracy and shall provide a process for the prompt correction of erroneous information," and prohibits the data from being used "for any other purpose other than" for E-Verify. *Id.* §§ 404(e)-(h), 110 Stat. at 665. The IIRIRA omits any similar provisions authorizing data-matching and data-sharing between DHS and SSA for citizenship checks through SAVE,

---

[11] SAVE and E-Verify utilize the same "underlying technology"—DHS's "Verification Information System"—but are separate programs subject to different legal authorities and parameters. DHS-AR-94; *see also* DHS-AR-146, 248, 422.

creating a strong presumption that "Congress act[ed] intentionally and purposely in the disparate . . . exclusion." *San Francisco*, 604 U.S. at 344.

Congress has elsewhere shown that when it wants to authorize the type of bulk matching of information across federal and non-federal agencies that SAVE now performs, it does "so clearly and expressly." *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 302 (2003) (applying canon in different context). For instance, Congress has amended the Privacy Act several times—in 1988, 1997, 1999, 2010, and 2014—to create specific carve-outs from the Act's robust restrictions on inter-agency and inter-governmental data sharing and matching. 5 U.S.C. §§ 552a(a)(8)(B)(i)-(x). To take one example, the Affordable Care Act of 2010 amended the Privacy Act to add an exclusion for "matches performed by [HHS] or the [HHS Inspector General] with respect to potential fraud, waste, and abuse, including matches of a system of records with non-Federal records." *Id.* § 552a(a)(8)(B)(ix). Congress has adopted no such express carve-out for SAVE, or for any data-matching purportedly authorized by § 1373.

In addition to § 1373, the 2025 SAVE SORN summarily cites other statutes as "authority." DHS-AR-118. Yet the Administrative Record confirms that Defendants' expansion of SAVE hinges entirely on their and the President's new misreading of § 1373. *See, e.g.*, DHS-AR-1361; DHS-AR-1479; SSA-AR-132; DHS-AR-116; DHS-AR-334-335; SSA-AR-7-8.

### 2. The major questions doctrine confirms that the SAVE overhaul lacks statutory authorization.

Under the Supreme Court's major questions doctrine, when an agency "assert[s] highly consequential power" of "vast economic and political significance," it "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Based on the cases in which the Court has invoked the doctrine, this case easily triggers major questions scrutiny, and Defendants lack the requisite "clear congressional authorization" for their actions.

First, Defendants have "'claim[ed] to discover in . . . long-extant statute[s] 'an unheralded power' representing a 'transformative expansion [of their] . . . authority.'" *Id.* at 724. In the nearly

40-year period between SAVE's creation in 1986 and 2025, DHS never asserted the statutory authority to operate SAVE as a comprehensive system for verifying U.S. citizenship status. To the contrary, prior to 2025, SAVE could only conduct individualized searches of "certain naturalized and derived U.S. citizens," and could "<u>not</u> verify U.S. born citizens *under any circumstances*." *Supra* Background § I (second emphasis added). Yet in 2025, DHS suddenly "discover[ed]" the "unheralded power" under a statute passed in 1996, § 1373, to grab mass amounts of citizenship data from *any agency*—including information on U.S.-born citizens from SSA's Master File—and funnel it to SAVE users free of all legal constraints, including the substantive limitations of the Privacy Act. *See, e.g.*, Defs.' PI Opp. at 2, ECF 37 (arguing that § 1373 supersedes the Privacy Act). The total "'lack of historical precedent'" for DHS's actions, "coupled with the breadth of authority that [DHS] now claims, is a 'telling indication'" that the SAVE overhaul "extends beyond the agency's legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (per curiam).

Second, by expanding SAVE to conduct bulk searches of U.S.-born citizens, Defendants enlarged the population whose sensitive personal information SAVE accesses *by more than 1,000%*—from about 27 million naturalized and derived citizens to more than 300 million citizens of all types.[12] Major questions cases often consider whether the agency's action expands the class of persons or entities affected by orders of magnitude. *See, e.g.*, *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 118 (vaccine mandate went beyond merely regulating "employers" to burdening "a vast number of employees").

---

[12] *Contrast* U.S. Census Bureau, *Nativity and Citizenship Status in the United States*, https://data.census.gov/table/ACSDT1Y2023.B05001?q=B05001 (accessed Feb. 23, 2026) (estimating around 25 million naturalized citizens in United States), *and* Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, Office of Homeland Security Statistics, at 3 (Sept. 2024), https://perma.cc/E4TP-6FWX (estimating roughly 2 million lawful permanent residents who derived citizenship from a parent since 1980), *with* SSA-AR-238 (SSA Master File includes information on "easily over 300 million" Americans).

Third, Defendants' SAVE overhaul "intrudes into an area that is the particular domain of state law" and is of "vast . . . political significance," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)—namely, the administration of elections and verification of voter eligibility. *See infra* Argument § II.B. The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors*, 594 U.S. at 764 (eviction moratorium intruded into state-law domain of "the landlord-tenant relationship"). That rule applies with special force in the context of elections, over which our Constitution vests powers in the States and Congress, but not the President. *See LULAC II*, 2026 WL 252420, at *42 (citing *West Virginia*, 597 U.S. at 723)). As explained above, such a clear statement is entirely absent here.

In sum, both traditional tools of construction and the major questions doctrine confirm that the SAVE overhaul vastly exceeds Defendants' statutory authority.

### 3.    Defendants' unauthorized disclosures violate the Social Security Act.

Defendants' unauthorized and ongoing disclosure of millions of Americans' protected SSA data through the overhauled SAVE system also affirmatively violates two provisions of the Social Security Act. First, it violates the Act's prohibition on SSA's "disclosure . . . of any file, record, report, or other paper, or any information . . . except as . . . agency . . . regulations prescribe and except as otherwise provided by Federal law." 42 U.S.C. § 1306(a). No statute or SSA regulation authorizes the agency to disclose SSA information to DHS for use in the overhauled SAVE system. Moreover, SSA policy states unequivocally that SSA does "not have the legal authority to disclose information about U.S. citizens to DHS," and that "[i]f DHS requests information and we determine the information pertains to both U.S. citizens and aliens, only information about the aliens can be disclosed." SSN Disclosure Policy, *supra* n.7; *cf.* 20 C.F.R. § 401.120 (recognizing SSA's authority to disclose information "regarding aliens" to DHS).

Second, Defendants' disclosures violate another provision of the Act providing that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no

authorized person shall disclose any such social security account number or related record."[13] 42 U.S.C. § 405(c)(2)(C)(viii)(I). Here, Defendants are collecting, verifying, and disclosing SSNs and related records en masse through overhauled SAVE, *see supra* Background § IV, and they are doing so under § 1373, a statute enacted "after October 1, 1990." Because no statute authorizes these disclosures, they violate § 405(c)(2)(C)(viii)(I).

For all these reasons, the SAVE overhaul was "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A), (C).

## B. The SAVE overhaul violates the separation of powers (Counts Two and Three).

Recall that Defendants expanded SAVE pursuant to the President's Elections EO. *See supra* Background § II. Multiple courts have enjoined federal agencies from implementing provisions of that EO on the ground that it violates "the constitutional separation of powers." *LULAC II*, 2026 WL 252420, at *4-5, *44; *see also LULAC I*, 808 F. Supp. 3d at 80; *Washington v. Trump*, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026); *California v. Trump*, 786 F. Supp. 3d 359, 396 (D. Mass. 2025). The same rationale applies to Defendants here: by following the President's direction to expand SAVE to conduct mass voter verification, Defendants violated the separation of powers by "acting in the total absence of authority from Congress in a domain that the Constitution assigns to Congress and the States." *LULAC II*, 2026 WL 252420, at *5; *see* FAC ¶¶ 206-17 (Counts Two and Three).

It is "black letter law" that the Executive's "'power, if any, . . . must stem either from an act of Congress or from the Constitution itself.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 189 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). "Our Constitution provides that only the States—not Congress, and certainly not the President—may decide who is qualified to vote in federal elections." *LULAC II*, 2026 WL

---

[13] "[T]he term 'related record' means any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained pursuant to this clause." 42 U.S.C. § 405(c)(2)(C)(viii)(IV).

252420, at *42; *see also LULAC I*, 808 F. Supp. 3d at 42; U.S. Const. art. I, § 2, cl. 1 (Voter Qualifications Clause); *id.* amend. XVII. Determining voter qualifications "forms no part of the power to be conferred upon the national government." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013). As for the "procedural conduct of federal elections, the Constitution grants broad regulatory authority to the States but reserves final, supervisory authority to Congress." *LULAC II*, 2026 WL 252420, at *6; *see* U.S. Const. art. I, § 4, cl. 1 (Elections Clause). "The Constitution assigns no direct role to the President in either domain." *LULAC II*, 2026 WL 252420, at *5; *LULAC I*, 808 F. Supp. 3d at 42.

Nor has Congress delegated to the Executive Branch any power to create a federal system for "verification of registrants and registered voters in voter registration and voter list maintenance processes." DHS-AR-115. The National Voter Registration Act ("NVRA") "'erects a complex superstructure of federal regulation atop state voter-registration systems.'" *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (citation modified). And the Help America Vote Act ("HAVA") requires, among other things, "that each state maintains a computerized database for voter registrations." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180-81 (3d Cir. 2017). But neither statute authorizes Defendants to intervene in voter list maintenance or determine voter qualifications—through SAVE or otherwise. Rather, the NVRA and HAVA explicitly charge *the States* with maintaining their voter rolls. *See* 52 U.S.C. §§ 20506, 20507, 20509, 21085; *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576 (6th Cir. 2004).

Defendants thus have not merely "*exceeded* their statutory authority." *Cf. Dalton v. Specter*, 511 U.S. 462, 474 (1994) (emphasis added). They have acted with a "*total absence* of authority from Congress in a domain that the Constitution assigns to Congress and the States." *LULAC II*, 2026 WL 252420, at *5 (emphasis added). Given the significant horizontal and vertical separation-of-powers concerns at stake, "Congress must speak clearly if it intends to delegate any part of [its Elections Clause] power to the Executive Branch." *Id.* at *42 (citing *West Virginia*, 597 U.S. at 723). Congress has not done so. *Supra* Argument § I.A. And neither the President nor Defendants have any constitutional authority to arrogate election administration to themselves.

Defendants have thus "overstepped the constitutional separation of powers." *LULAC II*, 2026 WL 252420, at *31.

### C. The SAVE overhaul violates the APA because it was contrary to the Privacy Act's substantive restrictions (Count Four).

In overhauling SAVE, Defendants acted contrary to the Privacy Act's substantive restrictions in two respects. *See* FAC ¶¶ 218-26 (Count Four). First, they enabled SAVE to improperly disclose and repurpose records in bulk in violation of 5 U.S.C. § 552a(b) and § 552a(a)(7). Second, they enabled SAVE to maintain records that are inaccurate, untimely, and incomplete for use in determinations about individuals, contrary to §§ 552a(e)(5), (6), and (10).

#### 1. Overhauled SAVE improperly discloses and repurposes records in bulk in violation of 5 U.S.C. § 552a(b) and § 552a(a)(7).

"An agency violates the [Privacy] Act when it 'discloses' information in the form of a 'record' from a 'system of records' and the disclosure is not pursuant to a valid exception under the Act." *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (citing 5 U.S.C. § 552a(b)). One of those exceptions permits disclosure pursuant to a properly noticed "routine use." *Id.* § 552a(b)(3). "To fit within the confines of the routine use exception to the Privacy Act, an agency's disclosure of a record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames v. DHS*, 861 F.3d 238, 240 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552a(a)(7) and citing § 552a(e)(4)(D)). Although the D.C. Circuit "has not definitively determined the precise meaning of 'compatible'" as used in § 552a(a)(7), *id.* at 240 n.1, other courts have sensibly construed the term to require a "concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure," *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549-50 (3d Cir. 1989); *see also Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017). The compatible-use requirement prevents "personal data collected by one organization for a stated purpose" from being "used and traded by another organization for a completely unrelated purpose," which could "seriously threaten[]" Americans' "individual rights." *Britt*, 886 F.2d at 550.

OMB's Original Privacy Act Guidelines—issued close in time to passage of the Act—reinforce that the Act's routine use provisions are "intended to discourage the unnecessary exchange of information to other persons or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material." OMB, Privacy Act Guidelines, 40 Fed. Reg. 28949, 28953 (July 1, 1975), https://perma.cc/776J-4L46. Thus, "a 'routine use' must be not only compatible with, but related to, the purpose for which the record is maintained." *Id.* OMB's "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," are "especially useful in determining the [Privacy Act's] meaning." *Loper Bright*, 603 U.S. at 394; *see also Maydak v. United States*, 363 F.3d 512, 518 (D.C. Cir. 2004) (relying on OMB's 1975 Privacy Act Guidelines in construing statute).

Here, the Modified SORNs adopted two new routine uses to enable overhauled SAVE's bulk voter verification checks. *See* DHS-AR-115, 120 (Routine Use L); SSA-AR-207, 210 (Routine Use 49). Both new routine uses flunk § 552a(a)(7)'s compatible-use requirement.

With respect to the SSA Master File records being bulk disclosed through SAVE, *see supra* Background § IV, SSA collected this information for its own program purposes concerning work authorization and eligibility for SSA benefits. *See* SSA-AR-115-116, 0132, 0149, 0168-69, 0188-89, 0207.[14] SSA did not collect the data for disclosure to DHS and state and local agencies to determine individuals' eligibility to vote. Nor does such a new use of SSA data have any "meaningful degree of convergence" with the reasons for SSA's initial data collection. *See Britt*, 886 F.2d at 549-50. In fact, SSA has explicitly warned agencies *not* to repurpose its citizenship data for other uses, explaining that while "citizenship information is accurate for SSA's program purposes, if used later for other purposes, it may not be current" because "SSA is not the custodian

---

[14] *See also* SSA, Program Operations Manual System (POMS), *GN 00303.000 Citizenship, Alien Status and Residency* (Jan. 9, 2026), https://perma.cc/R7CE-W26P; 20 C.F.R. § 422.104 (section titled "Who can be assigned a social security number"); *id.* § 422.107 (section titled "Evidence requirements").

of U.S. citizenship records." SSA-AR-103.[15] So it is no surprise that Defendants' "compatibility analysis" for the Modified SORNs' new routine uses were entirely perfunctory, lacking any discussion of statutory criteria. *See* DHS-AR-488-489 (Routine Use L); SSA-AR-145 (Routine Use 49). And SSA is, in any event, disclosing far more than just information on individuals' "citizenship and immigration status" through SAVE, *see supra* Argument § II.A, and thus it is acting well beyond its new routine use.

Similarly, with respect to the voter roll data that DHS is ingesting in bulk from SAVE user agencies and then disclosing to various other federal agencies, that information was collected for use by *state and local* officials as part of the voter registration process. Those officials did not collect the data to be fed into a massive national data bank for *federal government officials* to conduct citizenship checks,[16] or, as SAVE user agreements broadly authorize, for "any [other] purpose permitted by law, including, but not limited to, the prosecution of violations of Federal administrative or criminal law." DHS-AR-1351. DHS itself acknowledged in the 2025 SAVE PIA that there is a "risk" it "cannot mitigate" that "United States born citizens" whose data is now being accessed by SAVE lacked notice or opportunity to consent to how DHS is repurposing their sensitive personal data. DHS-AR-242; *see also* DHS-AR-484.

Thus, overhauled SAVE and its new routine uses are enabling mass repurposing of millions of Americans' sensitive information in ways that are fundamentally incompatible with and unrelated to "the purpose for which [the information] was collected." 5 U.S.C. § 552a(a)(7). Because these new uses are contrary to § 552a(a)(7), and because Defendants' disclosures through SAVE for bulk voter verification checks fit no other routine use or exception to § 552a(b),[17] the disclosures are "not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[15]  *See also* Letter from SSA Office of Gen. Counsel to Fair Elections Ctr. 2 (July 13, 2023), https://perma.cc/C6CU-9BQB ("2023 SSA Ltr.") (same).

[16] Indeed, many states prohibit disclosure of the sensitive data elements included in voter rolls. *See* National Conference of State Legislatures, *Access to and Use of Voter Registration Lists* (updated July 17, 2025), https://tinyurl.com/3jr9w6a3.

[17] The Privacy Act's "law enforcement" exception does not permit these disclosures. First, the Administrative Record contains no indication that the relevant agency "head[s]" made the requisite

2.    **Overhauled SAVE maintains records that are inaccurate, untimely, and incomplete and uses them for agency determinations about individuals, contrary to 5 U.S.C. §§ 552a(e)(5), (6), and (10).**

Defendants also acted contrary to the Privacy Act's substantive restrictions by overhauling SAVE to "maintain" (a term the statute defines as "maintain, collect, use, or disseminate," 5 U.S.C. § 552a(a)(3)) citizenship records that are inaccurate, untimely, and incomplete, for purposes of making "determination[s]" about individuals. *See id.* §§ 552a(e)(5), (6). Defendants have conceded that overhauled SAVE uses and disseminates such inaccurate records. *See, e.g.*, DHS-AR-240 (finding "risk" that overhauled SAVE "may share inaccurate information with registered agencies"); DHS-AR-260 (recognizing overhauled SAVE's "[s]hortfalls in data accuracy"); DHS-AR-302 (same); SSA-AR-44 ("citizenship information in SSA's records might not be current"); Mem. Op. at 8, ECF 55 ("The Government does not dispute that . . . inaccuracies" in SSA citizenship data "likely still exist."). And these data inaccuracies have in fact caused "substantial harm, embarrassment, inconvenience, or unfairness," *id.* § 552a(e)(10), to individuals wrongfully identified as non-citizens or potential non-citizens, including Plaintiffs' members. *See supra* Argument § I.A.1-3. Defendants' decision to overhaul SAVE without protecting against these known and substantial risks of "unfairness" caused by SAVE's inaccurate citizenship "determination[s]," *see* 5 U.S.C. §§ 552a(e)(5), (6), and (10), was "not in accordance with law," *id.* § 706(2)(A).

D.    **The SAVE overhaul violates the APA because it failed to comply with the Privacy Act's procedural requirements (Count Five).**

---

"written request[s]" for records. 5 U.S.C. § 552a(b)(7). Second, § 552a(b)(7) by its plain terms does not authorize the type of bulk, automated data sharing that SAVE enables; it instead requires a targeted request specifying the "particular portion" of a record sought and "law enforcement activity" at issue. *Id.*; *see* SSA, Program Operations Manual System (POMS), *GN 03312.080 Valid Law Enforcement Requests* (Nov. 9, 2023), https://perma.cc/K4Q7-QSJV. Third, SSA's privacy regulations "are more restrictive than the Privacy Act's law enforcement exception." SSA, Program Operations Manual System (POMS), *GN 03312.001 Disclosure Without Consent for Law Enforcement Purposes* (Sept. 12, 2005), https://perma.cc/YE7Z-N9SL. They only allow disclosure of information about an individual who "has been indicted or convicted" of committing "a violent crime such as murder or kidnapping," or information about "[c]riminal activity involving the social security program or another program with the same purposes." 20 C.F.R. § 401.155.

Defendants also overhauled SAVE without following the Privacy Act's notice-and-comment requirements and thus acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see* FAC ¶¶ 227-35 (Count Five).

Under the Privacy Act, an agency "shall" "publish in the Federal Register notice of any new use or intended use of the information in [a] system [of records], and provide an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days *before* using the system in new ways. *Id.* § 552a(e)(11); *see id.* § 552a(e)(4). OMB's Original Privacy Act Guidelines, and more recent guidelines, underscore that § 552a(e)(11) requires agencies to *both* provide advance notice before using systems in new ways *and* meaningfully consider public comments received. *See* 40 Fed. Reg. at 28966; OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, at 7, 12 (2016), https://perma.cc/N9QK-SDLE ("OMB Circular A-108"). Defendants did neither.

First, Defendants failed to publish Modified SORNs at least 30 days before overhauling SAVE. They instead launched the overhauled system on May 22, 2025. *See* DHS-AR-491; *see also* DHS-AR-493; DHS-AR-1385. And they continued its new uses for five months before DHS issued its modified SORN on October 31, 2025, and SSA issued its modified SORN on November 12, 2025. *See* DHS-AR-114; SSA-AR-207.

Defendants further violated § 552a(e)(11) by predetermining they would not consider public comments on the Modified SORNs. Although the SORNs solicited comments, they also made clear that the new routine uses would automatically take effect after 30 days. *See* DHS-AR-115; SSA-AR-207. Defendants predetermined they would not await, let alone consider, any public comments and would continue operating overhauled SAVE as they had since May 2025. That violated the Privacy Act and OMB guidelines. As the D.C. Circuit has held in other notice-and-comment contexts, for the "opportunity for comment" to be "meaningful," the agency must "remain sufficiently open minded." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). Here, Defendants were anything but. And they still have failed to provide any public response to the more than 30,000 comments received, in violation of their duty to provide "as

complete an explanation of the routine uses and any changes made or not made as a result of the public comment as possible so that the public will be fully informed of the proposed use." 40 Fed. Reg. at 28966; *see also* OMB Circular A-108 at 7, 12.

"The Privacy Act's public notice and comment structure is an essential component of the Act and an essential piece of American democracy. Americans deserve to know the nature, scope, and routine uses of the records *before* they are collected by the federal government." *United States v. Weber*, 2026 WL 118807, at *18 (C.D. Cal. Jan. 15, 2026) (emphasis added). Indeed, "it is flatly inconsistent with the text, structure, and purpose of the Privacy Act for an agency to initiate a major new data-sharing program affecting the sensitive data of millions of Americans, then validate that program as a 'routine use' months after it has begun." *LULAC II*, 2026 WL 252420, at *55. By flouting these requirements, Defendants acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### E.    The SAVE overhaul violates the APA because it was arbitrary and capricious (Count Six).

The SAVE overhaul was also arbitrary and capricious. *See* FAC ¶¶ 236-38 (Count Six). The APA "'requires agencies to engage in reasoned decisionmaking'" and "to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin*., 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)). "An agency violates this standard if it 'entirely fail[s] to consider an important aspect of the problem.'" *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "An agency also violates this standard if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Id.* Here, the paltry Administrative Record amply confirms that Defendants' SAVE overhaul was neither reasonable nor reasonably explained.

### 1.    Defendants predetermined the outcome.

As noted, the Modified SORNs stated their new routine uses would automatically take

effect after 30 days, with Defendants continuing operating overhauled SAVE while public comment was ongoing. The Administrative Record confirms Defendants acted in blind adherence to the Elections EO without reasoned decision-making, failing to undertake *any* consideration of the tens of thousands of public comments opposing the SAVE overhaul. *See* DHS-AR-224-25, 421-22; SSA-AR-7-8. Insofar as Defendants predetermined the outcome and "acted essentially as a rubber stamp" for the Election EO's directives, they acted arbitrarily and capriciously. *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 541 (D.D.C. 2016).

### 2.    Defendants disregarded relevant factors.

Defendants failed to consider highly relevant factors raised in the public comments. A diverse array of public officials; election administrators; former federal privacy officials and SSA personnel; voting, immigrant, and privacy rights organizations; and many thousands of individuals objected to the SAVE overhaul. *See supra* Background § III. They asserted that Defendants' expansion of SAVE exceeded their lawful authority, and violated the Privacy Act, the Social Security Act, other federal laws, and state privacy laws. DHS-AR-1537; SSA-AR-212; FAC ¶¶ 86, 95. Commenters also explained that overhauled SAVE now incorporates SSA citizenship data known to be unreliable and difficult to link to DHS records; includes unreliable search methods (e.g., searching by the last four digits of an SSN); exacerbates pre-existing problems with SAVE; threatens eligible voters' fundamental right to vote, including by imposing burdensome DPOC requirements, burdens state and local election administrators and other officials; jeopardizes millions of Americans' data privacy and security and repurposes their sensitive SSA data without notice or consent, *id.*; and has been justified by DHS based on the empirically false premise that voting by non-citizens is widespread. *See* DHS-AR-1537; SSA-AR-212; FAC ¶¶ 87, 96. Defendants' "decision to disregard" each of these salient points was "arbitrary and capricious." *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1090 (D.C. Cir. 2016); *accord Carlson*, 938 F.3d at 344; *Sierra Club v. Dep't of Transp.*, 125 F.4th 1170, 1182 (D.C. Cir. 2025).

### 3.    Defendants disregarded adverse evidence.

Defendants further disregarded, without explanation, their own findings about the serious

risks posed by overhauled SAVE's data and methods. *See Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 172 (D.C. Cir. 2025) (arbitrary and capricious for agency to "disregard[] the results of [their] own literature . . . without adequate explanation").

First, SAVE now incorporates SSA citizenship data that SSA has long acknowledged is incomplete and stale, especially for persons born abroad who become U.S. citizens—*i.e.*, naturalized and derived citizens. *See* 2023 SSA Ltr. at 2. The Administrative Record shows that Defendants acknowledged these data problems, but failed to explain why they were proceeding with the overhaul anyway. *See supra* Argument § II.C.2; *see also e.g.*, SSA-AR-44 (SSA "citizenship information is accurate for SSA's program purposes," but "if used for later purposes, it may not be current," and "SSA is not the custodian of U.S. citizenship records").

Second, Defendants disregarded known difficulties linking DHS and SSA datasets due to the lack of a "common [numeric] identifier" between the agencies, as well as known gaps in DHS's own citizenship data. *See, e.g.*, LWV Comment on 2025 SAVE SORN, at 8-9 https://perma.cc/GB3B-YQLB (citing sources). DHS acknowledges these data gaps are especially likely to impact derived citizens. *See* DHS-AR-1525 (if a derived citizen "has not received a Certificate of Citizenship from USCIS (e.g., some foreign-born children of U.S. citizens), . . . SAVE may not be able to confirm that individual's U.S. citizenship"); DHS-AR-259 (derived citizens "frequently do not apply for and thus do not receive a determination and certificate of United States citizenship"). Plaintiffs' naturalized and derived citizen members have experienced firsthand the fallout from these known data deficiencies. *See supra* Argument § I.A.2-3.

Third, Defendants disregarded known problems with conducting searches using the last four digits of an SSN, which SAVE now enables. *See* DHS-AR-1339. SSA has long known that such searches produce a "high no-match response rate" of "31 percent," because "the last four digits of the SSN is not a unique identifier." SSA Office of the Inspector General, *Accuracy of the Help America Vote Verification Program Responses*, No. A-03-09-29115, at 4 (June 22, 2009), https://perma.cc/3NKGTLWP (cited in LWV Comment on 2025 SSA Master File SORN, at 12-14, https://perma.cc/6R7N-TDEA).

Fourth, the 2025 SAVE PIA and DHS's "Narrative Statement" for the 2025 SAVE SORN reveal several other major risks with overhauled SAVE that DHS failed to mitigate or sufficiently address. *See* DHS-AR-240 (risks that DHS "may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual," and that "due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results"); DHS-AR-484 (same); DHS-AR-241 (risks posed by search-by-SSN functionality because it "does not allow for a second and third step review" and "registered agencies may not go through all steps to ensure accuracy of information"); DHS-AR-484 (same); DHS-AR-241 (risks that new categories of individuals lacked sufficient notice and opportunity to consent to DHS's mass repurposing of their sensitive data); DHS-AR-484 (same).

### 4.    Defendants violated the change-in-position doctrine.

Finally, Defendants violated the "change-in-position doctrine" by failing to "provide a reasoned explanation" for their departure from longstanding agency policy, failing to "display awareness that they [were] changing position," and failing to "consider serious reliance interests." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) (citation modified).

Since its creation, SSA has collected and maintained some of Americans' most sensitive data for program-specific purposes including work authorization and eligibility for SSA benefits. *See supra* Argument § II.C.1. Never before has SSA collected data for bulk disclosure to DHS to conduct mass citizenship checks. To the contrary, longstanding agency policy provides that SSA will only disclose SSNs where explicitly mandated by statute, that it unequivocally does "not have the legal authority to disclose information about U.S. citizens to DHS," and that "[i]f DHS requests information and we determine the information pertains to both U.S. citizens and aliens, only information about the aliens can be disclosed"—a statement that remains SSA policy to this day. SSN Disclosure Policy, *supra* n.7. And the record shows that DHS repeatedly recognized it "must" issue an updated PIA explaining its "change in legal rationale for now collecting and maintaining Social Security Numbers of United States natural born citizens." DHS-AR-277; DHS-AR-319.

Yet the record is devoid of a reasoned explanation for Defendants' change in policy and mass repurposing of Americans' sensitive data. And both SSA and DHS failed to consider the reliance interests and reasonable privacy expectations of the hundreds of millions of Americans who never consented to their personal data being pooled and repurposed. By failing to do so, Defendants acted arbitrarily and capriciously.

### F.    Defendants have unlawfully withheld compliance with the Privacy Act's requirements for computer matching programs (Counts Seven and Eight).

Defendants have also unlawfully withheld compliance with the Privacy Act's non-discretionary requirements for "matching programs." *See* FAC ¶¶ 239-51 (Counts Seven and Eight). A matching program is "any computerized comparison of two or more automated systems of records or a system of records with non-Federal records for the purpose of verifying the eligibility of . . . applicants for, recipients or beneficiaries of … Federal benefit programs." 5 U.S.C. § 552a(a)(8)(A)(i)(I). To use agency records in a matching program, the Privacy Act requires that both the source and recipient agencies first execute a "written agreement . . . specifying" a variety of information, including, among other things:

- The purpose, legal authority, and justification for the matching program, a description of the records to be matched, and the start and end dates of the matching program, 5 U.S.C. § 552a(o)(1)(A)-(C);

- A process for providing "individualized notice at the time of application … as directed by the Data Integrity Board of such agency" to applicants and recipients of benefits that the information they provide "may be subject to verification through matching programs," *id.* § 552a(o)(1)(D);

- Procedures for verifying information produced in the matching program before any individual faces a suspension, termination, or reduction of benefits or faces other adverse action as a result of the matching program, *id.* § 552a(o)(1)(E), (p)(1);

- Data retention and destruction procedures, *id.* § 552a(o)(1)(F);

- Procedures for ensuring the security of the records matched and the results of the matching programs, *id.* § 552a(o)(1)(G); and

- Information on "assessments that [have been] made on the accuracy of the records that have been used in such matching program," *id.* § 552a(o)(1)(J).

Matching agreements must be transmitted to relevant congressional committees and available upon request to the public. *Id.* § 552a(o)(2)(A). And they must be subject to time limits (not to exceed 18 months) set by agency Data Integrity Boards. *Id.* § 552a(o)(2)(C). Notice of any matching program with a non-Federal agency must be published in the Federal Register "at least 30 days prior to conducting such program." *Id.* § 552a(e)(12). And OMB guidelines require agencies to review and consider any "public comments on a . . . published matching [program] notice." OMB Circular A-108 at 7, 19.

Overhauled SAVE is a new matching program subject to the requirements of 5 U.S.C. § 552a(o). SAVE and the various federal systems it accesses are "systems of record"; SAVE ingests "non-Federal records" uploaded in bulk by state and local SAVE users; and SAVE undertakes a "computerized comparison" of those records to verify the eligibility of applicants for federal benefit programs. *See* 5 U.S.C. § 552a(a)(8)(A)(i)(I); *see* DHS-AR-114-117. Yet Defendants have not executed matching agreements for these new programs, published notice in the Federal Register, or solicited public comment, in violation of their mandatory duties.

### G.    Counts One, Two, and Four through Seven are reviewable under the APA.

#### 1.    Plaintiffs challenge final agency action.

Defendants' overhaul of SAVE is final agency action reviewable under the APA, as are the associated Modified SORNs and DHS-SSA SAVE Agreement.

For agency action to be "final" and subject to APA review, it must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which 'legal consequences will flow.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Defendants' self-described "overhaul" of SAVE is the consummation of Defendants' relevant decision-making. Defendants call the overhauled SAVE system a "single, reliable source for verifying immigration status" and a new "partnership" with powerful functionalities. DHS-AR-491; *see also* DHS-AR-493; DHS-AR-1385; May 2025 USCIS Release, *supra*. The legal consequences flowing from the overhaul are likewise clear: SAVE user agencies now have access to a massive trove of sensitive records

containing data on millions of individuals, and are now able to bulk query that information to access and analyze it en masse. Another judge in this District recently held that SAVE's "sharing [of] sensitive records with others outside the agency" "clearly" constitutes final agency action. *LULAC II*, 2026 WL 252420, at *53; *see also Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("policy of disclosing confidential information without notice" was final agency action); *AFL-CIO*, 778 F. Supp. 3d at 77 (policy of granting DOGE personnel access to agency systems was final agency action).

Defendants' Modified SORNs are also final agency action. The Privacy Act requires that SORN modifications be made through notice and comment, 5 U.S.C. § 552a(e)(11), a quintessential "consummation" of agency decision-making. The modifications here also gave rise to a range of legal consequences: adding whole categories of citizens to SAVE, drawing in data from new systems, and repurposing individuals' data in ways to which they never consented and that is detrimental to them. *See supra* Argument § III.C. And both Modified SORNs add broad categories of information-sharing with other agencies as "new routine uses." DHS-AR-115, 117; SSA-AR-207, 210.

The DHS-SSA SAVE Agreement, *see* DHS-AR-420-31; SSA-AR-6-17, is an instrumental piece of SAVE's "overhaul," and is "final" for similar reasons to the other actions Plaintiffs challenge: it prescribes specific procedures and requirements for inter-agency information-sharing, sets agency policies with regard to specific information-sharing practices, and in doing so, both determines agency employees' obligations and alters the rights of individuals whose data is contained in the systems to which it applies.

### 2. Plaintiffs have an APA remedy for the Privacy Act violations alleged in Counts Four, Five, and Seven.

While the Privacy Act provides for relief not sought here—damages to individuals for wrongful disclosure under 5 U.S.C. § 552a(g)(1)(D), and injunctive relief to correct wrongful withholding or factual inaccuracies in individuals' records under §§ 552a(g)(1)(A)-(C)—plaintiffs may seek judicial review under the APA to seek other forms of relief for Privacy Act violations.

The APA's "set aside" remedy generally applies to violations of "*any* law," *NextWave Pers.*, 537 U.S. at 300 (quoting 5 U.S.C. § 706(2)(A)), but not where another statute provides an "adequate remedy in court," 5 U.S.C. § 704. In evaluating whether a particular statutory remedy displaces APA review, courts evaluate congressional intent to create a comprehensive scheme that would prelude judicial review of APA claims, and whether the alternate remedy is of such a nature as to provide an adequate substitute for APA review. *See Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009).

Congress did not intend to preclude APA review of all claims for injunctive relief grounded in violations of the Privacy Act. Both the Supreme Court and D.C. Circuit have contemplated that the APA authorizes relief for Privacy Act violations beyond the remedies built into the Act itself. In *Doe v. Chao*, the Supreme Court posited that the "inattention" of the Privacy Act to certain "standards of proof governing equitable relief . . . may be . . . explained by the general provisions for equitable relief within the" APA. 540 U.S. 614, 619 n.1 (2004). In *Doe v. Stephens*, the D.C. Circuit considered a claim that an agency improperly disclosed medical records in violation of the Act. 851 F.2d 1457, 1460-61, 1463 (D.C. Cir. 1988). After finding that the "Privacy Act [did] not by itself authorize the injunctive relief sought by Doe," the court explained that such relief nevertheless *was* available under the APA, because Doe's "clearly [was] a case of agency action 'not in accordance with law' within the meaning of 5 U.S.C. 706(2) . . . [where] the disclosure of Doe's psychiatric records violated . . . the Privacy Act." *Id.* at 1463, 1466. Several judges in this District have expressly held that the Privacy Act does not preclude the type of APA relief Plaintiffs seek here. *See, e.g.*, *AFL-CIO*, 778 F. Supp. 3d at 81; *LULAC II*, 2026 WL 252420, *51-52; *Ctr. for Taxpayer Rights*, 2025 WL 3251044, at *21.

Nor does the Privacy Act provide Plaintiffs an adequate alternative remedy for Counts Four, Five, and Seven of the FAC.[18] An "alternative remedy will not be adequate . . . if the remedy offers only doubtful and limited relief." *Garcia*, 563 F.3d at 522 (citation modified). The Privacy

---

[18] Counts One, Two, Three, and Six of the FAC do not depend on Privacy Act violations.

Act only authorizes individuals to seek injunctive relief to force the release or modification of their records and monetary damages for unlawful disclosures. *See* 5 U.S.C. § 552a(g). Plaintiffs here seek vacatur of the SAVE overhaul; directions to SAVE user agencies to delete, disentangle, and unlink data unlawfully shared with them through the overhauled SAVE system; and publication of matching agreements and opportunity to comment on them as required by the Privacy Act. *See* FAC, Prayer for Relief. The Privacy Act grants none of these remedies to Plaintiffs.

If relegated to the Privacy Act's limited remedies with respect to Counts Four, Five, and Seven of the FAC, Plaintiffs' members would have no recourse for their ongoing privacy injuries, *see supra* Argument § I.A.1, which are "non-monetary" injuries "not fully redressable by damages alone," *Richman v. United States*, 350 F.R.D. 401, 420 (D.D.C. 2025). Nor would they have a remedy for the ongoing threats to their fundamental voting rights, including outright disenfranchisement, *see supra* Argument § I.A.3; *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (once an election passes, "there can be no do over and no redress"). Plaintiffs have also directly suffered organizational injuries as a result of Defendants' Privacy Act violations. *See supra* Argument § I.B-C. Because they are not "individuals" within the meaning of the Act, the statute does not offer them *any* remedy, let alone an adequate one. *See* 5 U.S.C. §§ 552a(a)(2), (g)(1)(D). But the APA can and does afford such relief.

## III.    Plaintiffs are entitled to their requested relief.

The APA mandates that a "reviewing court *shall* . . . hold unlawful and set aside agency action" that is in excess of statutory authority, contrary to law, unconstitutional, arbitrary and capricious, or procedurally defective. 5 U.S.C. §§ 706(2)(A)-(D) (emphasis added). "[T]o 'set aside'" an agency action "is to vacate it." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024). And vacatur requires an agency to "re-establish the status quo absent the unlawful agency action." *Las Ams. Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 233 (D.D.C. 2025). Here, that means ordering Defendants to revert SAVE to its functionality prior to the overhaul and undo its effects, delete any unlawfully obtained data, instruct SAVE users to do the same, and

terminate all MOAs for overhauled SAVE.[19] *See* FAC, Prayer for Relief. Defendants can effectuate such relief under the SAVE users' MOAs, which provide that "DHS-USCIS may suspend or terminate this MOA, and thereby the Agency's use of SAVE, without prior notice if deemed necessary because of a requirement of law or policy." DHS-AR-1353.

Plaintiffs are also entitled to a permanent injunction prohibiting Defendants from continuing to operate overhauled SAVE,[20] and a declaratory judgment that the overhaul was unlawful and unconstitutional. *See LULAC I*, 808 F. Supp. 3d at 80-86 (granting similar relief); *accord LULAC II*, 2026 WL 252420, at *43-44; *Washington*, 2026 WL 73866, at *37; *California*, 786 F. Supp. 3d at 395. The SAVE overhaul will "irreparably harm Plaintiffs' interests in the absence of an injunction because, in the inherently time-constrained context of an election cycle, the Court cannot provide meaningful redress for lost opportunities," *LULAC II*, 2026 WL 252420, at *44, including the threatened irreparable loss of voting rights, *see Newby*, 838 F.3d at 9. And "because agencies have no legitimate interest in the perpetuation of unlawful practices and because the public interest 'favors permitting as many qualified voters to vote as possible,' both the balance of hardships and the public interest weigh in favor of granting a permanent injunction." *LULAC II*, 2026 WL 252420, at *44 (quoting *Newby*, 838 F.3d at 12). Since LWV and EPIC are national organizations, Stewart Decl. ¶ 4, ECF 16-5; Butler Decl. ¶ 32, nationwide relief is necessary. *See LULAC I*, 808 F. Supp. 3d at 84-86; *LULAC II*, 2026 WL 252420, at *44.

Finally, under the APA, the Court "shall . . . compel" Defendants to comply with their mandatory duties under § 552a(e)(12) of the Privacy Act to publish matching-agreement information. *See* 5 U.S.C. § 706(1). Because Congress "by organic statute set[] a specific deadline

---

[19] D.C. Circuit precedent only permits remand-without-vacatur in "exceptional" cases where "an agency's error is 'curable.'" *Bridgeport Hosp.*, 108 F.4th at 890. Because Defendants "can't 'cure' the fact that [they] lack[] authority to take a certain action, remand-without-vacatur is unavailable here." *Id.*

[20] "The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have a meaningful practical effect independent of its vacatur.'" *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 312 (D.D.C. 2025) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Thus, the Court need not issue an injunction if it grants identical relief under the APA.

for agency action," the Court "must compel the action unlawfully withheld." *South Carolina v. United States*, 907 F.3d 742, 758 (4th Cir. 2018). Alternatively, if the Court finds Plaintiffs lack an APA remedy for this claim, it should issue a writ of mandamus under 28 U.S.C. § 1361 because "no adequate alternative remedy exists," and there are "compelling equitable grounds" for issuing the writ. *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see Babamuradova v. Blinken*, 633 F. Supp. 3d 1, 19 (D.D.C. 2022) ("What plaintiffs must show to establish a mandamus claim is similar to what they must show to succeed on their . . . unlawful withholding claims under [§ 706(1) of] the APA").

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment.

Dated: March 12, 2026                                 Respectfully submitted,

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)         Jon Sherman (D.C. Bar No. 998271)*
John B. Hill (N.Y. Bar No. 5505508)*          Michelle Kanter Cohen (D.C. Bar No.
Lauren C. Bingham (Fl. Bar No. 105745)*       989164)
CITIZENS FOR RESPONSIBILITY                   Emily Davis (D.C. Bar No. 90020129)
AND ETHICS IN WASHINGTON                      FAIR ELECTIONS CENTER
P.O. Box 14596                                1825 K St. NW, Suite 701
Washington, DC 20044                          Washington, DC 20006
(202) 408-5565                                (202) 331-0114
nsus@citizensforethics.org                    jsherman@fairelectionscenter.org
jhill@citizensforethics.org                   mkantercohen@fairelectionscenter.org
lbingham@citizensforethics.org                edavis@fairelectionscenter.org

*Counsel for All Plaintiffs*                   *Counsel for All Plaintiffs*

Aman T. George (D.C. Bar No. 1028446)         John L. Davisson (D.C. Bar No. 1531914)
Jennifer Fountain Connolly (D.C. Bar No.      Enid Zhou (D.C. Bar No. 1632392)
1019148)                                      Abigail Kunkler (D.C. Bar No. 90030868)
Johanna M. Hickman (D.C. Bar No. 981770)      Mayu Tobin-Miyaji (D.C. Bar No. 90033340)
Mark B. Samburg (D.C. Bar No. 1018533)        ELECTRONIC PRIVACY INFORMATION CENTER
Robin Thurston (D.C. Bar No. 1531399)         1519 New Hampshire Ave. NW
DEMOCRACY FORWARD FOUNDATION                   Washington, DC 20036
P.O. Box 34553                                (202) 483-1140
Washington, DC 20043                          davisson@epic.org
(202) 448-9090                                zhou@epic.org
ageorge@democracyforward.org                  kunkler@epic.org

jconnolly@democracyforward.org
hhickman@democracyforward.org
msamburg@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*

*Counsel for Plaintiff Electronic Privacy Information Center*

\* admitted pro hac vice