UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Case No. 25-cv-03501-SLS |

**SUPPLEMENTAL DECLARATION OF M. CHRISTIAN GREEN**

I, M. Christian Green, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the President of the League of Women Voters of Louisiana and the League of Women Voters of Louisiana Education Fund (collectively "LWVLA"). I have served in this role since 2023.

2. I previously submitted this declaration to describe the LWVLA's mission to empower Louisiana voters through voter registration, education, and engagement, and to explain how the LWVLA and its members have been harmed by Defendants' actions to transform the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements ("SAVE") system into a searchable national citizenship data system for conducting mass "voter verification" checks. *See* ECF No. 16-7.

3. I submit this supplemental declaration, which incorporates my prior declaration by reference, to describe additional harms that LWVLA faces.

4. As discussed in my prior declaration, it is my understanding that the overhauled SAVE system now draws on Social Security Administration ("SSA") systems of records and its

1

incomplete and unreliable citizenship data—which, from publicly available information, I understand is particularly unreliable for naturalized and derived citizens—and that the overhauled system allows local, state, and federal user agencies to run bulk searches of the citizenship or immigration status of many thousands of individuals.

5. Because the Louisiana Secretary of State's office is using the overhauled SAVE system for voter list maintenance and has run the state's entire list through the system, thousands of eligible Louisiana voters are now at serious risk of being erroneously purged from voter rolls and deprived of their right to vote in upcoming elections. As I discussed in my prior declaration, the Louisiana Secretary of State has already announced that, through use of the overhauled SAVE system, her office has identified 390 non-citizen registered voters and is investigating these individuals and requiring them to respond to notices and provide documentary proof of citizenship ("DPOC").[1] The office has plowed forward with these actions, at Defendants' encouragement and pursuant to Defendants' rules and processes for using the overhauled SAVE system, even though SAVE's faulty citizenship data means that U.S. citizens in Louisiana are being and will be forced to needlessly provide DPOC and are having and will have their voter registration wrongfully cancelled or denied.

6. The overhauled SAVE system's unlawful pooling of information, including incomplete and unreliable SSA citizenship data, thus directly harms the LWVLA's voter registration and voter empowerment mission and its members. With local, state, and federal

---

[1] Wesley Muller, *Louisiana election investigation finds 79 non-citizens have voted since 1980s,* La. Illuminator (Sept. 4, 2025), https://lailluminator.com/2025/09/04/louisiana-election-investigation-finds-79-non-citizens-have-voted-since-1980s; Secretary of State Nancy Landry: September 4, 2025 Press Conference, Youtube (Sept. 4, 2025), https://www.youtube.com/watch?v=N5PR71BQ814.

elections in Louisiana taking place throughout, and registration deadlines for these elections on the horizon,[2] time is of the essence to protect this mission.

7. With elections looming, naturalized and derived citizen LWVLA members, and naturalized and derived citizens in Louisiana whom the LWVLA has engaged with as part of its voter education and participation work, reasonably fear they will be wrongly purged from voter rolls and unable to exercise their right to vote, or that they will be criminally investigated for their lawful voting. The LWVLA has heard these fears firsthand, including from those who have received SAVE non-citizenship notices, and they impair its ability to facilitate voter registration and voting in Louisiana.

8. The LWVLA has also heard firsthand from members who did not consent to the aggregation and misappropriation of their sensitive data by Defendants and extremely disturbed by and concerned about how the federal government's overhaul of the SAVE system is making their sensitive SSA information readily available to the Department of Homeland Security ("DHS") and various state and local election officials.

9. For all these reasons, the League and its members need judicial relief.

**LWVLA Background**

10. I provide an overview of LWVLA at paragraphs 8-12 of my prior declaration (ECF No. 16-7), incorporated by reference here.

11. To reiterate, LWVLA has approximately 300 members across the state of Louisiana, some of whom are naturalized or derived citizens. These members, including naturalized-citizen and derived-citizen members, are registered voters, have records in various federal databases, including SSA, and have not consented to SSA's provision of their records to

---

[2] *Upcoming Louisiana Election Dates*, Vote411, https://www.vote411.org/upcoming/41/events.

the overhauled SAVE tool. Although some may have had their SSA records updated to account for the fact that, after they applied for a Social Security Number and card, they became a naturalized or derived citizen, many others have not.

**LWVLA's Mission and its Members**

12. I provide an overview of LWVLA's mission and members at paragraphs 13-17 of my prior declaration (ECF No. 16-7), incorporated by reference here.

13. To reiterate, LWVLA's mission is to empower eligible Louisianans to vote and defend the democratic process in Louisiana. The LWVLA works to ensure that all eligible individuals have the opportunity and the information needed to register and vote, with a particular focus on traditionally underrepresented and underserved communities who benefit the most from additional education and assistance.

14. As part of its voting-rights mission, LWVLA is dedicated to ensuring the privacy of the personal information of its members and the Louisiana citizens that it serves, so that they are able to exercise their right to vote and do so without fear or burden.

**LWVLA's Voter-Registration Activities**

15. I provide an overview of LWVLA's voter-registration activities at paragraphs 18-23 of my prior declaration (ECF No. 16-7), incorporated by reference here.

16. To reiterate, LWVLA actively works to register eligible Louisianans to vote and ensure that they cast a ballot that actually counts. LWVLA and its local Leagues, through their voter services and public services programs, host public events on civic education, including providing information and assistance with the voter registration process and confirming a voter's registration status.

17. LWVLA voter services and programs span across Louisiana and reach a diversity of locations, including online, in order to reach potential Louisiana voters, register them to vote, and help them re-register or remain registered if needed. Such locations include schools, community centers, and public events, and through the media and social media. LWVLA members and volunteers bring registration materials, voting materials, and any other supplies needed to further assist and facilitate voters to engage in the democratic process. In addition, members host a number of nonpartisan candidate forums for local and state offices and engage directly with voters there, and they also engage with voters at other types of voting events, such as get-out-the-vote and canvassing events.

18. At LWVLA and local League registration drives and other events, volunteers typically guide applicants through the voter registration process, answer questions, and ensure that applications are completed correctly.

19. Throughout LWVLA's programming, a number of voters who are submitting applications to register to vote or who have questions about the process are naturalized or derived citizens. And at voter registration drives, naturalized and derived citizens frequently ask questions about their eligibility to vote, and League members answer those questions, help them to determine if they are eligible to register to vote and to register if they are eligible, and emphasize why it is important for new American citizens to participate in the democratic process, just like citizens born in the United States.

20. Aside from holding registration events, the LWVLA helps its own members and other registered voters update their registrations, double-check that they remain registered, and remain on the rolls or be reinstated.

21. LWVLA also helps Louisiana voters by developing and distributing, by paper and online, various voter guides and other educational materials to ensure that they are informed about how to check their voter registration and register and ensure that their right to vote is protected. And, in response to voting issues facing particular communities, League members conduct interviews with local newspapers, radio stations, and digital media sources to address questions about voter registration and elections in Louisiana.

22. In short, the LWVLA conducts an array of activities to further its mission of registering eligible voters, including naturalized and derived citizen voters, and ensuring they can exercise their right to vote. Through its work, LWVLA works with and helps register thousands of Louisiana voters every year, in furtherance of its core mission of ensuring that all eligible Louisiana voters are registered to vote, have a plan to vote, and can and do actually vote. In 2024, for example, LWVLA registered 3,654 Louisiana voters. It did so through the tireless work of its members and volunteers; it hosted 670 registration events and other events and expended over 7,000 volunteer hours from 770 league volunteers across the state.[3]

**The Overhauled SAVE System's Harmful Effects on LWVLA's Voter-Registration Mission and Activities**

23. I provide an overview of LWVLA's voter-registration activities at paragraphs 24 onward of my prior declaration (ECF No. 16-7), incorporated by reference here.

24. As I explained, the overhauled SAVE system harms LWVLA and its members in several ways, which holds true and is particularly salient in advance of the upcoming 2026 elections in Louisiana.

---

[3] *League of Women Voters of Louisiana*, https://lwvofla.org/ (League in Focus: Our Impact in 2024 graphic).

25. First, when voters are unlawfully and erroneously purged from Louisiana voter rolls, it decreases the number of Louisiana voters, directly undermining the LWVLA's mission of increasing the number of registered voters and voter participation. And when voters are intimidated or must take additional steps to register or remain registered, it directly harms the League's mission of ensuring that the ballot box is accessible for all eligible voters in Louisiana.

26. The overhauled SAVE system imposes these very harms because it creates a serious risk that naturalized-citizen and derived-citizen Louisianans who are eligible to vote will nonetheless be purged from voter rolls. The purges, and the threat of criminal prosecution against individuals wrongly believed to be non-citizen voters, are already underway.

27. In May 2025, the Louisiana Secretary of State's office announced Louisiana was the first state to use the overhauled SAVE system for voter-list maintenance.[4] Then, on September 4, 2025, the Secretary of State announced the preliminary findings of her office's investigation of alleged instances of non-citizen voting using SAVE, *i.e.*, running nearly all of the 2.9 million registered voters on Louisiana's voter rolls through the overhauled system.[5] She announced that her office had discovered 390 non-citizen registered voters in the state, with 79 voting in at least one election since the 1980s, and she announced that the 390 individuals had to respond to SAVE notices or give proof of their removal from voter rolls within 21 days would be referred for criminal prosecution. Nonetheless, she acknowledged that some of the findings of non-citizen registration and voting could be due to errors or outdated information.

---

[4] Press Release, La. Sec'y of State, *Louisiana First State to Utilize New Voter List Maintenance Database* (May 21, 2025), https://perma.cc/MF6F-3DTU.

[5] *See supra* n.1; Jude Joffe-Block and Miles Parks, *33 million voters have been run through a Trump administration citizenship check*, NPR (Sept. 10, 2025), https://perma.cc/QWL3-DCVR.

7

28. It is my understanding from the Louisiana Secretary of State's announcement, and from public reporting, that Louisianans have received SAVE notices and have had to provide DPOC or risk being removed from the voters rolls and investigated.

29. It is my understanding, based on publicly available information, that the overhauled SAVE system creates a serious risk of error because it includes citizenship data from SSA, which has inaccurate and unreliable citizenship data, especially for naturalized and derived citizens. These data issues are discussed at length in Plaintiffs' Amended Complaint and System of Record Notice Comments to both DHS and SSA, which I am familiar with and have reviewed.[6]

30. It is my understanding from publicly available information that Defendants' overhauled SAVE system and the rules and processes governing its use for bulk voter verification authorize SAVE user agencies to use SAVE citizenship results—which again, are especially unreliable for naturalized and derived citizens and may wrongfully identify them as actual or potential non-citizens—to require SAVE-identified individuals to provide DPOC or have their registration cancelled or denied.[7] And it is my understanding that the Louisiana Secretary of State's office, as a SAVE user agency using the overhauled SAVE system for bulk voter verification and contacting those identified in SAVE results as non-citizens or potential non-citizens to require them to provide DPOC within 21 days in order to stay registered to vote, is acting in accordance

---

[6] *See* First Am. & Suppl. Compl. ¶¶ 87, 96, 110-30, *LWV et al., v DHS et al.*, No. 25-cv-3501 (D.D.C. Jan. 21, 2026) (citing, *inter alia*, Comment to DHS by League of Women Voters, the League of Women Voters of Louisiana, the League of Women Voters of Virginia, and the League of Women Voters of Texas at 7-9 (Nov. 26, 2025), https://tinyurl.com/3hx8auzb [hereinafter LWV DHS Comment], and Comment to SSA by League of Women Voters, the League of Women Voters of Louisiana, the League of Women Voters of Virginia, and the League of Women Voters of Texas, at 4, 11-17 (Dec. 12, 2026), https://tinyurl.com/yc6wm2rj).

[7] The publicly available documents discussing the use of the overhauled SAVE system by SAVE user agencies, including in Louisiana, are summarized in Plaintiffs' amended complaint, *see id.* ¶¶ 98-109; accordingly, I will not belabor them here.

8

with Defendants' published rules and processes for the overhauled system and using it in exactly the manner envisioned and authorized by Defendants.

31. I know from my work with LWVLA and from publicly available information that requiring DPOC significantly burdens the right to vote for millions of American citizens, including those in Louisiana. Many do not have DPOC or easy access to DPOC, let alone the ability to access DPOC in time for upcoming election or registration deadlines or within 21 days,[8] and others may fear providing DPOC to government officials, including to avoid attracting attention to family members who are not citizens.[9]

32. For all these reasons, Defendants' SAVE overhaul burdens and threatens the voter registration and thus right to vote for scores of Louisiana—particularly the tens of thousands of naturalized and derived citizens in the state and the hundreds who have already received SAVE non-citizenship notices. And it subjects them to the emotional toll of having their sensitive SSA information disclosed, aggregated, misused, and potential mishandled through the overhauled SAVE system without proper authorization or consent, and with the reputational harm of being falsely identified to third-party SAVE users as potential non-citizen registered voters.

---

[8] *See, e.g.*, LWV DHS Comment at 11; Comment to DHS by Texas Civil Rights Project at 4-5 (Nov. 18, 2025), https://tinyurl.com/4zs3dd6e. For example, passports are not free and often require months to apply for and receive them by mail. Replacing a birth certificate or driver's license also comes with financial costs. As a result, voters facing DPOC requirements need to plan many months ahead of registration deadlines to receive the documentation necessary to register to vote, in addition to committing the time required to travel to the offices responsible for issuing official documents.

[9] LWVLA expects that many of its naturalized-citizen and derived-citizen members and those it seeks to register to vote will face onerous barriers to obtaining and providing the proof of citizenship necessary to provide DPOC in time to resolve any SAVE-related error. Specifically, it expects that a number of them do not currently possess common forms of proof of citizenship reflecting their current name. LWVLA further expects that these individuals will face significant financial and logistical hurdles in attempting to obtain proof of citizenship and may not be able to do so at all.

33. The purging of "non-citizen" voters from voter rolls, based on bad citizenship data from SAVE shared through unauthorized and nonconsensual inter-governmental pooling of sensitive information, has sowed fear, confusion, and distrust in the electoral process and thus hindered the counseling LWVLA can provide to its members and thousands of other Texans about the voter rolls, the safeguards in place to prevent the purging of their registration prior to an election, and the lawful administration of elections and safety of voter data. The overhauled SAVE tool therefore has directly interfered with the League's effort to increase voter participation and turnout and will continue to do so.

34. It is inevitable that, because of the overhauled SAVE system and its faulty citizenship data, some Louisiana voters, including some registered by the LWVLA and some LWVLA members, will have their voter registration cancelled or be denied registration, will not be able to correct any faulty citizenship data in time to maintain their voter registration or register/re-register, will choose to take their name off the registration list out of fear, or will choose not to vote or be unable to vote.

35. The downsides of registering to vote because of Defendants' actions—where SAVE's flaws create the serious risk that naturalized and derived citizens will be identified as non-citizens, forced to potentially take costly and time-intensive steps to prove their citizenship, and potentially even criminally investigated for their lawful voting—are simply too burdensome for many of these citizens. As a result, the overhauled SAVE system has and will continue to directly interfere with LWVLA's efforts to register voters, keep eligible voters on the rolls, accurately inform these voters about the process, and effectively promote civic engagement and voting across Louisiana.

36. To summarize, when Louisiana voters are unlawfully purged or denied from Louisiana voter rolls, as the overhauled SAVE system inevitably facilitates, that decreases the number of Louisiana voters—inherently frustrating the LWVLA's core mission of increasing participation in our elections, including from naturalized and derived citizens. And when Louisiana citizens' voting eligibility is questioned through use of the overhauled system, they unfairly must take additional steps to register or remain registered—just as SAVE's rules and processes envision—and, as a result, may be caused to distrust the electoral process and are discouraged from voting. This too directly impairs LWVLA's mission of ensuring that the ballot box is accessible for all eligible voters in Louisiana.

**The Overhauled SAVE System is Forcing LWVLA to Expend Greater Resources to Fulfill its Mission-Critical Functions**

37. LWVLA has expended scarce resources in response to the SAVE overhaul to counteract its harmful effects and will be forced to continue doing so going forward. The overhauled SAVE process, and the lack of transparency surrounding it, has also impaired LWVLA's ability to educate Louisiana voters and provide them with accurate information on how they can avoid being adversely affected by the newly expanded system.

38. To begin with, LWVLA has had to spend dozens of extra volunteer hours to understand the multifaceted nature of the SAVE overhaul and the grave risks it poses to Louisiana voters—especially naturalized and derived citizen voters—so that it can effectively serve these voters, assist its local Leagues in doing so, and counteract the confusion and alarm generated by SAVE-based voter-registration targeting.[10]

---

[10] Defendants have compounded this confusion and alarm, which LWVLA has heard for months from citizens and local Leagues across the state, by developing and rolling out the overhauled SAVE system in an opaque process, without advanced notice. *See* LWV DHS Comment at 3-4.

11

39. LWVLA has also undertaken efforts to both identify and educate eligible Louisiana voters who may have been adversely impacted by the SAVE overhaul, to ensure they remain registered to vote and are not discouraged from voting. As part of these efforts, LWVLA, in conjunction with its counsel, has devoted time and resources to preparing and submitting one public-records request to the Louisiana Secretary of State's office and four public-records requests to the registrars of voters in Caddo, Jefferson, Lafayette, and Tangipahoa parishes to identify Louisiana voters whom SAVE has identified as potential non-citizens. These SAVE-related record requests have been labor intensive because, to properly submit each record request to each parish's registrar of voters, LWVLA has had to identify, and provide signatures from and addresses for, 25 registered voters for each parish who are willing to sign.[11]

40. LWVLA estimates that volunteers have devoted approximately 20 hours to these efforts to identify and contact affected Louisiana voters. These manpower, time, and resources expenditures go beyond our ordinary resource expenditures for carrying out voter registration activities in the ordinary course. So long as the Louisiana Secretary of State continues to use the overhauled SAVE system for voter registration and voter list maintenance, LWVLA will be forced to continue expending these additional resources to identify and contact affected Louisianans and protect their right to vote.

41. LWVLA has expended, and anticipates continuing to expend, additional time and resources in response to, and directly as a result of, the impact of the SAVE overhaul on its core voter-services work. This includes all forms of programming and communications LWVLA engages in. It is creating social media posts to educate Louisiana voters; developing educational materials for local chapters and staff and coordinating communications with them so that they can

---

[11] *See* La. R.S. 18:154(B)(1)(a).

assist voters reaching out to receive registration assistance after receiving non-citizenship notices and being purged from voter rolls, or after hearing about the SAVE overhaul and becoming worried about their voting and privacy rights; and creating handouts and other materials that provide specific and correct information to voters about what they need to do to correct or address any challenges to their citizenship because of SAVE. It is also working to update VOTE411 with SAVE-related information, including information for voters who have been affected by the use of the overhauled system in Louisiana. All of this work is ongoing; so far, LWVLA estimates that volunteers have devoted approximately 20 hours to these efforts.

42. From its engagement with partners, LWVLA members, and voters, LWVLA anticipates that it will be more difficult and costly to register new voters who reasonably fear and are extremely disturbed by and concerned about how the federal government's overhaul of the SAVE system is making their sensitive SSA information readily available to DHS and various state and local election officials for bulk voter verification. That means that LWVLA may need to further retool its critical voter registration efforts and messaging to account for these privacy concerns, and it is already considering how to do so.

43. LWVLA's various ongoing efforts have also forced staff and volunteers to work overtime to complete work on other mission-critical work, like producing its voter guides. And, if the LWVLA did not have to expend resources on the activities described above to counteract the harmful effects of the SAVE overhaul, it would be able help more Louisianans with the many additional challenges that Louisiana's citizens face in accessing the ballot and participating as informed and active voters in the democratic process, through more its other core activities. That includes, *inter alia*, more canvassing, candidate forums, get-out-the-vote events, and other related activities—all of which LWVLA has been able to do less of, and anticipates being able to do less

of in the future, in light of the resources it has had to devote and will continue to have to devote to counteracting the SAVE overhaul's harmful effects.

**The Overhauled SAVE System's Harmful Effect on LWVLA Members**

44. Finally, as discussed, our members are being directly harmed by the Defendants' SAVE overhaul.

45. As explained, the Louisiana Secretary of State has bulk uploaded its entire voter roll data into the overhauled SAVE system, which has resulted in DHS, through the system, querying SSA systems to (1) verify each registered Louisiana voter's SSN, and (2) access information about these voters' citizenship statuses as reflected in SSA records, and then to provide to Louisiana (1) verification of each voter's SSN, and (2) information about each voter's citizenship status, as reflected in some combination of DHS and SSA records. And, as explained, the information supplied to Louisiana (and in turn to Louisiana counties) has potentially falsely indicated that particular Louisianans are or may be non-citizens registered to vote unlawfully.

46. The LWVLA's members include Louisiana voters who, by virtue of the overhauled SAVE system and its use in Louisiana, have had precisely these actions taken with respect to them, resulting in injuries to their voting and privacy rights.

47. First LWVLA members such as J. Doe 4 (ECF No. 16-3) now must constantly re-check their voter registration status; may need to provide additional citizenship documentation to both state and federal agencies or face other burdens in order to exercise their right to vote; may have difficulty obtaining this additional citizenship documentation; and are intimidated by the overhauled SAVE system and the threat of unwarranted investigation and prosecution and may be discouraged from registering or voting.

48. Second, LWVLA members such as J. Doe 4 reasonably fear and are emotionally distressed by the unauthorized inter-governmental disclosure, aggregation, misuse, and potential mishandling of their sensitive personal data through the overhauled SAVE system. Their personal information was uploaded into SAVE using its new bulk upload and search-by-SSN functionality, resulting in the unauthorized disclosure, matching, and repurposing of their SSA NUMIDENT data without their consent for purposes of determining their citizenship and eligibility to vote.

49. None of them consented to this inter-governmental collection, consolidation, disclosure, and matching of their personal information held by SSA and DHS, including disclosure to third-party SAVE users in Louisiana, for voter verification purposes or other broad-ranging purposes. Rather, they interacted in confidence with SSA to obtain a Social Security number and card for limited purposes relating to work authorization and SSA benefits and reasonably expected that the privacy of their sensitive SSA information would be protected by the explicit guarantees of the Privacy Act and the Social Security Act, and by SSA policy treating SSN information as highly sensitive and not subject to disclosure to DHS.

50. LWVLA members such as J. Doe 4 have, because of the overhauled SAVE system, lost their statutory privacy rights; have had their private data misused and repurposed in unauthorized ways; had their private data shared with unauthorized third parties with no lawful right to access it through unsecured means; suffered unease and fears about the examination and transmission of their sensitive data by those who have accessed and will access it, including to subject them to unwarranted investigations or impede their right to vote; and faced increased vulnerability of their data to theft and security breaches.

51. As a result of these various voting and privacy harms to its members, LWVLA additionally is compelled to challenge Defendants' SAVE overhaul. Doing so is a part of parcel of

its mission to safeguard the civic rights of its members (and the broader voting population) in Louisiana.

**Defendants' Failure to Consider LWVLA Organizational and Member Harms and the Defects of Their SAVE Overhaul**

52. None the above-described harms stemming from, and defects regarding, Defendants' SAVE overhaul should come as a surprise to Defendants. LWVLA, alongside the national LWV organization and the Texas and Virginia League of Women Voters chapters, submitted System of Records Notice ("SORN") comments to both DHS and SSA. \

53. In its SORN comments, LWVLA extensively discussed the litany of reasons why Defendants' SAVE overhaul (1) harms its interests and mission; (2) was undertaken with a SORN and SORN comment period that were untimely and woefully insufficient; (3) lacks any statutory or constitutional authority; (4) utilizes SSA citizenship data that is unreliable, cannot be easily linked to DHS data, and will lead to wrongfully targeting naturalized citizens, barriers to voting, and unlawful purging as Defendants push Louisiana and other election officials to use the system without mitigating against known risks to voters; (5) rests on a debunked and harmful myth of widespread noncitizen voting; and (6) involves a new routine use for disclosure of SAVE records that violates the Privacy Act's compatibility requirement by authorizing the mass repurposing of millions of Americans' protected data in ways fundamentally incompatible with the reasons for which that data was collected.

54. My understanding from publicly available information is that Defendants did not, and could not possibly, properly consider LWVLA's SORN comments because they overhauled the SAVE system in May 2025,[12] published the DHS and SSA SORNs and accepted comments on

---

[12] *See, e.g.*, Press Release, USCIS, *USCIS Deploys Common Sense Tools to Verify Voters* (May 22, 2025), https://perma.cc/HBZ5-RW2E

16

them from LWVLA and others in October and November 2025,[13] and, throughout this period, continued to operate the overhauled SAVE system and still operate it in its overhauled state today. In other words, Defendants decided to overhaul SAVE and engaged in the SORN comment process as an afterthought; they predetermined they would overhaul SAVE and did so in spite of any SORN comments.

55. As a result, Defendants wrongly disregarded LWVLA's SORN comments. They did not properly consider them as part of the required SORN process, since they overhauled SAVE before undertaking that process and continued their operation of the overhauled system during and after the SORN processes and LWVLA submitted its SORN comment.

56. The deprivation of LWVLA's ability to have its SORN comments properly considered has harmed it for all the reasons discussed above. If Defendants had properly considered its comment (and, for that matter, the comments of the range of other groups and individuals who pointed out the same or similar issues), they would not, reasonably, have undertaken the SAVE overhaul as they have done and, in turn, harmed the voting rights and privacy rights of LWVLA members and the voting population LWVLA serves.

I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on March 10, 2026, in New Orleans, Louisiana.



_____
M. Christian Green

---

[13] *See* 90 Fed. Reg. 48948; 90 Fed. Reg. 50879.