# Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.,* | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 25-cv-3501-SLS |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, *et al.,* | § | |
| *Defendants.* | § | |
| | § | |

## BRIEF OF *AMICUS CURIAE* TEXAS CIVIL RIGHTS PROJECT
## IN SUPPORT OF PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**INTEREST OF** *AMICUS CURIAE* ............................................................................ **5**

**SUMMARY OF ARGUMENT** ..................................................................................... **5**

**ARGUMENT** .................................................................................................................. **7**

    **I.     The APA and the Privacy Act require Defendants to give notice and consider comments like those submitted by TCRP prior to acting** ......................................................... **7**

    **II.   TCRP became aware of the use of overhauled SAVE in Texas before Defendants provided the legally-required notice, including to affected Texans** ..................................... **8**

    **III.     TCRP's comments raised concerns with Defendants' use of SAVE, including the ways Defendants' sharing of data violates the Privacy Act** .................................................. **10**

        A.    There are no facts to support the DOJ and Texas AG's concerns about widespread noncitizen voting. ........................................................................................................ 10

        B.    Overhauled SAVE violates Sections 552a(e)(5) and (6) of the Privacy Act because it has proven to be unreliable at distinguishing citizens from noncitizens and operates without an audit process. ................................................................................................... 12

        C.    The use of SAVE violates Section 552a(e)(10) of the Privacy Act and raises serious concerns about Texans' data privacy ........................................................................... 13

    **IV.     The problems stemming from Defendants' lack of consideration and failure to act have ongoing significance, as seen in Texas.** ........................................................ **15**

**CONCLUSION** .......................................................................................................... **19**

**TABLE OF AUTHORITIES**

**Statutes**

5 U.S.C. § 552a(a) ................................................................................................................ 7

5 U.S.C. § 552a(e) .................................................................................................. 7, 8, 12, 13

5 U.S.C. § 706(2)(A) ........................................................................................................... 7

5 U.S.C. § 706(2)(D) ........................................................................................................... 7

Tex. Elec. Code § 16.033 ..................................................................................................... 18

**Other Authorities**

*About American Oversight*, https://americanoversight.org/about .................................... 9

Dep't of Homeland Sec., Privacy Impact Assessment for the Systematic Alien Verification
    Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(d), at 16 (Oct. 31, 2025)
    https://www.dhs.gov/sites/default/files/2025-10/privacy-pia-dhsuscis006d-save-
    october2025%20%28002%29.pdf ("2025 SAVE PIA") ........................................... 16

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Took to Check Voter
    Citizenship Keeps Making Mistakes*, ProPublica & Tex. Trib. (Feb. 13, 2026),
    https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion ... 13, 14, 18

Jen Fifield, *Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social
    Security Data for Voter Citizenship Checks*, ProPublica (Oct. 30, 2025)
    https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump ............... 8

Jim Saksa, *Trump's Voter Citizenship Database Is 'Flawed' and Could Lead to
    Disenfranchisement*, *Election Administrator Warns*, Democracy Docket (Oct. 30, 2025),
    https://www.democracydocket.com/news-alerts/trumps-voter-citizenship-database-is-flawed-
    and-could-lead-to-disenfranchisement-election-administrator-warns ..................................... 12

Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S.
    citizens too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-
    voting-data-us-citizens ................................................................................................. 12

Lexi Churchill, Vianna Davila, James Barragan & Natalia Contreras, *This Trump Supporter Was
    Labeled a Noncitizen and Kicked Off Texas' Voter Rolls*, Tex. Trib. (Oct. 29, 2024),
    https://www.texastribune.org/2024/10/29/texas-noncitizen-voter-roll-removal-mary-howard-
    elley ....................................................................................................................... 11

Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act, https://perma.cc/N9QK-SDLE ................... 8

Penelope Rivera, *Personal Information Leaked For More Than 115,000 Texans In DPS Data Breach*, KERA News (Oct. 15, 2024), https://www.keranews.org/government/2024-10-15/personal-information-for-more-than-115-000-texans-leaked-in-dps-data-breach ............... 14

Perry Stein, Patrick Marley & Isaac Arnsdorf, *DOJ Struggles as White House Presses On Voter Fraud*, Wash. Post (February 20, 2026), https://www.washingtonpost.com/politics/2026/02/20/trump-voting-fraud-justice-department ............................................................................................................................................. 10

Press Release, *Attorney General Paxton Launches Illegal Voting Tipline to Stop Unlawful Voting Activity Ahead of March Primary*, Texas Att'y Gen. (Feb. 16, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-illegal-voting-tipline-stop-unlawful-voting-activity-ahead ....................................................... 11

Press Release, *Texas Completes Citizenship Verifications in the SAVE Database*, Tex. Sec'y of State (Oct. 20, 2025) https://www.sos.state.tx.us/about/newsreleases/2025/102025.shtml ....... 9

U.S. Citizenship & Immigration Servs., *Naturalization Statistics, Data Table 2 Approved Naturalizations for FY 2024 and Top 10 States*, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics ................................................................................................. 12

U.S. Citizenship & Immigration Servs., *Voter Registration and Voter List Maintenance Fact Sheet (What You Should Know)* https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet .......................... 12

**Regulations**

Dep't of Homeland Sec., Notice of a Modified System of Records (Categories of Individuals Covered by the System), 90 Fed. Reg. 48948 (Oct. 31, 2025) https://www.govinfo.gov/content/pkg/FR-2025-10-31/pdf/2025-19735.pdf ("2025 DHS SORN") ................................................................................................................... 8, 9, 13, 14

Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14,005, (Mar. 25, 2025) https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections .................................... 10

**INTEREST OF *AMICUS CURIAE***

*Amicus curiae* Texas Civil Rights Project ("TCRP") is a nonpartisan, nonprofit civil rights organization that has been dedicated to protecting voting rights in the state of Texas for over thirty years. As part of this work, TCRP helps to lead the largest nonpartisan Election Protection program in the state. TCRP engages in significant advocacy to protect voting rights, including litigating on behalf of individual voters in Texas to protect their access to the ballot, educating communities on their rights, developing and supporting policy initiatives, and submitting comments to administrative agencies.

TCRP has an interest in this case because it concerns Defendants' use of and overhaul of the data verification system called the Systematic Alien Verification for Entitlements ("SAVE"), combined with Social Security data—which has already been deployed against Texas voters and continues to impact their voting rights. TCRP has already submitted comments to Defendants regarding overhauled SAVE, which outlined TCRP's concerns that persist to this day. In addition, TCRP continues to regularly field messages and emails from Texas voters concerned about the impact of Defendants' actions. TCRP's expertise in voting rights and election administration in the state of Texas, combined with its work dealing with issues resulting from the use of overhauled SAVE, enable TCRP to contribute unique insights as part of the Court's consideration of the issues in this case.

**SUMMARY OF ARGUMENT**

In May 2025, without notice to the public, Defendants overhauled SAVE, utilized Social Security data, and tested the faulty system on millions of Texans—with real consequences. When Defendants finally gave notice months later, TCRP sent Defendants comments describing these consequences and warning of ongoing issues. Yet TCRP has continued to view the fallout first-hand and field messages from concerned voters across the state—bolstering Plaintiffs' argument

that Defendants acted arbitrarily and capriciously and in dangerous violation of laws meant to protect Americans' privacy and right to vote.

Under the Administrative Procedure Act ("APA"), courts must set aside agency action that is arbitrary and capricious, or undertaken without observing proper lawful procedures. When federal agencies wish to use systems of records like SAVE or Social Security data, the Privacy Act institutes proper lawful procedures, including the requirements that agencies provide opportunity for notice and comment and wait 30 days after publication in the Federal Register before using any new or modified system of records. In addition, agencies *must* consider the submitted comments.

But here, TCRP's experience in Texas shows that Defendants failed to consider the comments submitted regarding its overhaul and use of SAVE and disclosure of Social Security data, including the two comments submitted by TCRP, which highlighted significant concerns pertaining to the effect on Texas voters. That failure to follow lawful procedures is evidenced by the ongoing issues related to the use of overhauled SAVE in Texas, impairing the rights of over 18.4 million Texans. In fact, Defendants do not appear to have responded to TCRP and others' comments, nor taken any action to address those concerns.

Defendants also acted arbitrarily and capriciously by failing to consider important aspects of the problem and explain their decision-making process, including how the overhauled SAVE would—as TCRP warned—disenfranchise eligible voters and put all Texans' sensitive data at risk of disclosure and mishandling.

Ultimately, Texans should not have been used as guinea pigs for Defendants. As a result, everyday Texans—including eligible voters who have reached out to TCRP about their registrations being cancelled—have been thrown into a state of distress, confusion, fear, and

apprehension. Congress passed laws to safeguard against such cavalier, slapdash actions by executive agencies, and Defendants' disregard of those laws has forced Texans to pay the price.

## ARGUMENT

**I.    The APA and the Privacy Act require Defendants to give notice and consider comments like those submitted by TCRP prior to acting.**

The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious."[1] The APA also requires courts to "hold unlawful and set aside" agency action that is "without observance of procedure required by law."[2]

Here, SAVE is a system of records governed by the Privacy Act.[3] Along with requiring agencies to take certain steps to maintain accurate and secure records on individuals, Dkt 61., ¶¶ 32–35 (citing 5 U.S.C. §§ 552 *et seq.*), the Privacy Act also adopts procedural safeguards governing changes to systems of records like SAVE.[4]

In particular, agencies must "publish in the Federal Register notice of any new use or intended use of the information in [a] system [of records], and provide an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days before using the system in new ways.[5] "In no circumstance may an agency use a new or significantly modified routine use as the basis for a disclosure fewer than 30 days following Federal Register

---

[1] 5 U.S.C. § 706(2)(A).

[2] 5 U.S.C. § 706(2)(D).

[3] *See* Dkt. 61, Am. Compl. at ¶ 29 (citing 5 U.S.C. § 552a(a)(5)).

[4] Dkt. 61 at ¶¶ 36–40.

[5] 5 U.S.C. § 552a(e)(11); *see also id.* § 552a(e)(4) (requiring agencies to "publish in the Federal Register . . . a notice of the existence and character of the system of record" (i.e., a "System of Records Notice," or "SORN") when it "establish[es] or revis[es]" any "system of records" containing retrievable information about individuals); *id.* § 552a(e)(12) (requiring agencies to "publish in the Federal Register notice of [any] establishment or revision" to a "matching program").

publication."[6] And importantly, agencies "shall" review and consider any "public comments on a published SORN."[7]

**II.    TCRP became aware of the use of overhauled SAVE in Texas before Defendants provided the legally-required notice, including to affected Texans.**

Despite these requirements—including the requirement that agencies wait for at least 30 days following Federal Register publication before using a system of records in new ways[8]—Defendants implemented new uses of SAVE and Social Security data in conjunction with the Texas voter roll prior to issuing a SORN. See Exhibit A at 2, 4–5, Comment to DHS by Texas Civil Rights (Nov. 18, 2025) ("TCRP Comment on 2025 DHS SORN"), https://tinyurl.com/2z46yd2j (cited by Dkt. 61, Am. Compl. at ¶ 85 n.57); Exhibit B at 2, 5–7, Comment to SSA by Texas Civil Rights Project (Dec. 2, 2025) ("TCRP Comment on 2025 SSA SORN"), https://tinyurl.com/d5kn2vjk (cited by Dkt. 61 at ¶ 94 n.78).

More specifically, in May of last year, without notice to the public, Defendant Department of Homeland Security ("DHS") expanded SAVE to cover U.S. citizens, including U.S. citizens by birth.[9] To make this expansion possible, Defendant Social Security Administration ("SSA") began sharing Americans' personal information, including dates of birth and full Social Security numbers, as a way to verify citizenship for voter registration.[10] Historically, SAVE only used DHS

---

[6] Off. of Mgmt. & Budget Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act, at 7, 12, https://perma.cc/N9QK-SDLE.

[7] *Id.* at 7.

[8] *See* 5 U.S.C. § 552a(e)(11); Off. of Mgmt. & Budget Circular No. A-108 at 7, 12.

[9] Dep't of Homeland Sec., Notice of a Modified System of Records (Categories of Individuals Covered by the System), 90 Fed. Reg. 48948, 48952 (Oct. 31, 2025) https://www.govinfo.gov/content/pkg/FR-2025-10-31/pdf/2025-19735.pdf ("2025 DHS SORN").

[10] Jen Fifield, *Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social Security Data for Voter Citizenship Checks*, ProPublica (Oct. 30, 2025) https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump.

records to verify citizenship, but the new system would expand SAVE by making it capable of verifying "the Social Security number and U.S. citizen indicators of many U.S. citizens by birth."[11] This expansion placed Texans' data at risk without the legally required notice or opportunity to comment.

TCRP was made aware of Defendants' use of overhauled SAVE and disclosure of Social Security data in Texas after the Texas Secretary of State ("Texas SOS") announced on October 20, 2025 that her office had *already* run over 18.4 million registered Texas voters though the SAVE database—even though Defendants had not fulfilled their statutory and regulatory obligations to publish notices in the Federal Register. *See* Exhibit A at 2 n.8 (citing Press Release, *Texas Completes Citizenship Verifications in the SAVE Database*, Tex. Sec'y of State (Oct. 20, 2025) https://www.sos.state.tx.us/about/newsreleases/2025/102025.shtml); Exhibit B at 2 n.7 (same). Later evidence revealed that Defendants had been working with Texas to implement the untested SAVE and use the disclosed Social Security data to verify citizenship as early as May 2025—and that Defendant DHS heavily encouraged SAVE's use for these purposes. *See, e.g.*, Exhibit C,[12] Email from Timothy Benz (DHS) to Kristi Hart (Texas SOS).

Yet Defendant DHS did not publish a SORN seeking to codify its previous unauthorized overhaul of SAVE until October 31, 2025 ("2025 DHS SORN").[13] Defendant SSA did not publish

---

[11] 2025 DHS SORN, 90 Fed. Reg. at 48950 (Categories of Individuals Covered by the System).

[12] Exhibits C through I are emails produced by the Texas Secretary of State in response to public records requests issued by American Oversight, "a nonpartisan, nonprofit watchdog that advances truth, accountability, and democracy by enforcing the public's right to government records." *About American Oversight*, https://americanoversight.org/about (accessed Mar. 20, 2026).

[13] *See* Dkt. 61, ¶ 69.

a SORN seeking to codify its previous unauthorized disclosures of Social Security data for various uses, including use by Defendant DHS, until November 12, 2025 ("2025 SSA SORN").[14]

### III.   TCRP's comments raised concerns with Defendants' use of SAVE, including the ways Defendants' sharing of data violates the Privacy Act.

By the time that Defendants belatedly published the statutorily-required SORNs in the Federal Register, TCRP had already discovered significant impacts of Defendants' actions on Texas voters and on Texas election administration, which it described in its comments. On November 18, 2025, TCRP submitted a comment to Defendant DHS urging reconsideration and highlighting significant concerns. *See* Exhibit A. On December 2, 2025, TCRP submitted a comment to Defendant SSA. *See* Exhibit B.

As TCRP explained to Defendants, the issues with the overhauled SAVE and use of Social Security data were myriad:

### A.   There are no facts to support the DOJ and Texas AG's concerns about widespread noncitizen voting.

As TCRP flagged in its comments, actual evidence shows that noncitizen voting is vanishingly rare. *See* Exhibit A at 5; Exhibit B at 5. Despite no evidence of widespread noncitizen voting, the federal government continues to invest resources and drastically reshape its systems in an attempt to identify noncitizens who vote. The Trump Administration frequently raises concerns

---

[14] *Id.*

about noncitizen voting.[15] Yet "the Justice Department has struggled to meet White House demands to prosecute noncitizen voters."[16]

The story is no different in Texas. In February, Texas Attorney General Ken Paxton launched an "illegal voting tipline" to stop unlawful voting activity ahead of the March Primary.[17] The Texas Attorney General cited motivations including "[s]ignificant growth of the noncitizen population in Texas" and "partisan efforts to illegally weaponize voter registration and the voting process to manipulate electoral outcomes."[18] Yet after years of investigating noncitizen voting in Texas, the State has never come close to showing that noncitizens are changing election outcomes. And in Texas's years-long search for noncitizen voters, citizen voters have been sacrificed. Voters across the political spectrum have been incorrectly flagged as noncitizens.[19]

---

[15] Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14,005 (Mar. 25, 2025) https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections.

[16] Perry Stein, Patrick Marley & Isaac Arnsdorf, *DOJ Struggles as White House Presses On Voter Fraud*, Wash. Post (Feb. 20, 2026), https://www.washingtonpost.com/politics/2026/02/20/trump-voting-fraud-justice-department.

[17] Press Release, *Attorney General Paxton Launches Illegal Voting Tipline to Stop Unlawful Voting Activity Ahead of March Primary*, Texas Att'y Gen. (Feb. 16, 2026), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-illegal-voting-tipline-stop-unlawful-voting-activity-ahead.

[18] *Id.*

[19] Lexi Churchill, Vianna Davila, James Barragan & Natalia Contreras, *This Trump Supporter Was Labeled a Noncitizen and Kicked Off Texas' Voter Rolls*, Tex. Trib. (Oct. 29, 2024), https://www.texastribune.org/2024/10/29/texas-noncitizen-voter-roll-removal-mary-howard-elley.

**B.      Overhauled SAVE violates Sections 552a(e)(5) and (6) of the Privacy Act because it has proven to be unreliable at distinguishing citizens from noncitizens and operates without an audit process.**

The Privacy Act requires that agencies make "reasonable efforts to assure" that its records are "accurate, complete, and timely" for agency purposes. But U.S. Citizenship and Immigration Services ("USCIS")—an agency of Defendant DHS—itself recognizes that the data searched by SAVE is not always accurate or complete. For example, USCIS's fact sheet admits that SAVE may not be able to confirm U.S. citizenship for individuals who are U.S. citizens but lack documentation of their citizenship or are not designated U.S. citizens in SSA records.[20] In practice, SAVE's errors go beyond this group. In Texas, naturalized U.S. citizens with passports have been flagged as noncitizens.[21] In fact, officials in some of Texas's largest counties have since confirmed that at least 25 percent of those flagged last fall by the Texas SOS via the SAVE database already provided proof of citizenship when they registered to vote.[22] The impact of these errors is amplified in Texas, which was the state with the fourth highest number of approved naturalized citizens in fiscal year 2024.[23] That year, nearly 80,000 Texans became naturalized U.S. citizens.[24]

---

[20] U.S. Citizenship & Immigration Servs., *Voter Registration and Voter List Maintenance Fact Sheet (What You Should Know)* https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet (accessed Mar. 19, 2026).

[21] Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens.

[22] Jim Saksa, *Trump's Voter Citizenship Database Is 'Flawed' and Could Lead to Disenfranchisement*, *Election Administrator Warns*, Democracy Docket (Oct. 30, 2025), https://www.democracydocket.com/news-alerts/trumps-voter-citizenship-database-is-flawed-and-could-lead-to-disenfranchisement-election-administrator-warns.

[23] U.S. Citizenship & Immigration Servs., *Naturalization Statistics, Data Table 2 Approved Naturalizations for FY 2024 and Top 10 States*, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (accessed Mar. 16, 2026).

[24] *Id.*

Despite known errors produced by the overhauled SAVE, Defendants are not taking steps to remedy the accuracy issues. One obvious way to remedy these issues is to conduct audits of the SAVE program and the SSA and DHS data. Audit procedures appear to be missing from the 2025 DHS SORN.[25] Nor did the 2025 DHS SORN include any processes to ensure SAVE's accuracy or reliability as a voter verification tool.[26] While the 2025 DHS SORN allows "agencies with legal authority" to monitor voter registration records, there is no audit process for the accuracy of SAVE itself as a search tool.[27] Without a review process, these mistakes will continue, including erroneous flags of citizens as noncitizens. Those mistakes will be more widespread in Texas due to the state's larger population and all-out use of SAVE. While other states like Missouri only used SAVE to verify the citizenship of suspected noncitizen voters, Texas ran its *entire voter roll* of 18 million registered voters through SAVE.[28]

### C. The use of SAVE violates Section 552a(e)(10) of the Privacy Act and raises serious concerns about Texans' data privacy.

The expansion of the SAVE database sources puts a massive amount of citizens' sensitive data at risk. The Privacy Act requires agencies to "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records . . . ."[29] But the security measures put in place by Defendants fall far short of ensuring the security of Texans' information.

---

[25] 2025 DHS SORN, 90 Fed. Reg. at 48948.

[26] *Id.*

[27] *Id.* at 48951 (Auditing Verification Records to Support Oversight Organizations).

[28] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Took to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Tex. Trib. (Feb. 13, 2026), https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion.

[29] 5 U.S.C. § 552a(e)(10).

Those measures are not detailed, have gaps in dealing with downloaded data, and are not cabined with respect to who can access the data.

According to the 2025 DHS SORN, the data is stored in a "secure, cloud hosted environment."[30] The SORN does not specify what security measures are in place to protect the information. Additionally, the data pulled by SAVE is downloadable, but the 2025 DHS SORN does not include processes for the deletion or protection of downloaded data.[31] The "safeguards" listed in the 2025 DHS SORN include limiting access to the records to "individuals who have a need to know the information and who have appropriate clearances or permissions."[32] The 2025 DHS SORN does not foreclose vendors or non-agency employees from accessing the information.

Having sensitive data hosted, downloaded, and exchanged across multiple agencies is especially risky in today's world. Cybercriminals increasingly target state and local governments. Over 115,000 Texans experienced this kind of breach in December 2022, when their "names, addresses, Social Security numbers, driver's license numbers, and government-issued ID numbers" were leaked due to a data breach at the Texas Department of Public Safety ("Texas DPS").[33] The security threat posed by overhauled SAVE puts even more Texans at risk, with the data of 18 million Texans hastily exposed in an unprecedented manner. Without appropriate security measures in place, millions of Texans' sensitive information will be at risk.

---

[30] 2025 DHS SORN, 90 Fed. Reg at 48951–52 (System Location).

[31] Fifield & Despart, *supra* note 28 (linking November 7, 2025 email from USCIS to Missouri about a "final response spreadsheet available for download").

[32] 2025 DHS SORN, 90 Fed. Reg. at 48955 (Administrative, Technical, and Physical Safeguards).

[33] Penelope Rivera, *Personal Information Leaked For More Than 115,000 Texans In DPS Data Breach*, KERA News (Oct. 15, 2024), https://www.keranews.org/government/2024-10-15/personal-information-for-more-than-115-000-texans-leaked-in-dps-data-breach.

**IV.    The problems stemming from Defendants' lack of consideration and failure to act have ongoing significance, as seen in Texas.**

Ultimately, despite the comments of TCRP and many others, Defendants have made no public statement or taken any action indicating any response to the thousands of public comments.[34] This failure is particularly concerning given the significant problems resulting from the deployment of overhauled SAVE and disclosure of Social Security data in conjunction with the Texas voter roll, which Defendants evidently failed to address.[35] Those problems are especially significant in Texas because of the degree of cooperation between Texas and the Defendants and the lack of communication between the Texas SOS and Texas counties. Absent relief from the Court, Texan voters will continue to be disenfranchised.

First, Defendants' obligations under the APA and Privacy Act may not be overridden simply because some states are willing to use the unlawfully-implemented systems. Yet evidence suggests that Defendants eagerly offered up overhauled SAVE to willing states like Texas— knowing fully well that the system was untested. As early as August 11, an official from Defendant DHS emailed an official at the Texas SOS:

> We here at the SAVE Program are getting ready to roll out the next enhancement to our service: the ability for agencies such as yours to submit verification requests using the last four digits of the SSN as the enumerator. However, we want to make sure it's working properly when we launch, so *we'd like to ask you if Texas is willing to participate in a little testing of this feature…*

Exhibit C at 3, Email from Timothy Benz (DHS) to Kristi Hart (Texas SOS) (Aug. 11, 2025) (emphasis added). A week later, the Texas official replied that Texas "would be happy to" test SAVE. *Id.* The next day, Defendant DHS emailed the Texas SOS that "we completed testing last week," and invited her to participate in a "soft launch" by submitting the state's voter roll to be

---

[34] Dkt. 61, ¶¶ 88, 97.

[35] *See* Dkt. 61, ¶¶ 133–44 (discussing use of overhauled SAVE in Texas).

run through the overhauled SAVE. *Id.* at 2–3. The soft launch was "by invitation only," and Texas was prioritized because of its "prior participation and engagements between" itself and Defendant DHS. Exhibit D at 2–3, Email from Timothy Benz (DHS) to Kristi Hard (Texas SOS) (Aug. 18, 2025). Defendants clearly sought out Texas as a test state in the early stages of its rollout of overhauled SAVE due to the pliability of its elected officials.

Defendant DHS also assured Texas that SAVE was equipped to provide "actual responses that [Texas] can use for action," while also acknowledging that there were "bug[s]" still "actively being worked." Exhibit C at 1–2. Without asking about the results of the testing of the new functionality, Texas agreed to verify the citizenship for a group of Texans. *Id.* at 1.

Second, Defendants' eagerness to deploy untested, unregulated, and unlawful uses of SAVE and Social Security data was compounded by their disregard for the importance of proper communication with state and local officials about the system—which has had serious consequences for Texas election administration. Defendants were aware of the importance of communication between itself and the Texas SOS. In fact, Defendants flagged the risks of under-communication in its untimely Privacy Impact Assessment ("2025 SAVE PIA") and SORN.[36] Specifically, the 2025 SAVE PIA made clear that to satisfy its legal obligations to provide notice to citizens about the use of their data, Defendants would have to rely on the state agencies (including the Texas SOS) using the overhauled SAVE to provide notice to its citizens. The 2025 SAVE PIA acknowledged that Defendant DHS only *partially* mitigated the risk of lack of notice

---

[36] Dep't of Homeland Sec., Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(d), at 16 (Oct. 31, 2025) https://www.dhs.gov/sites/default/files/2025-10/privacy-pia-dhsuscis006d-save-october2025%20%28002%29.pdf ("2025 SAVE PIA").

to United States citizens.[37] The 2025 SAVE PIA ultimately shifts responsibility to "each registered agency to provide notice to individuals within their jurisdiction of their use of information and sharing with the U.S. Department of Homeland Security/U.S. Citizenship and Immigration Services," but does not provide a process for how the different levels of government will communicate to ensure citizens have notice of their data being shared. Thus, both the federal Defendants and the State of Texas failed to communicate to local governments about this unprecedented use of voter data.

As a result, Texas counties were left in the dark about Defendants' SAVE program rollout in cooperation with state authorities. At times, county officials learned new information at the same time the public did. For example, Hunt County first became aware that five potential noncitizens had been flagged via the Texas SOS's public press release from October 20, 2025. Exhibit E at 1–2, Email from Jeannie Ash (Hunt County) to Kristi Hart (Texas SOS) (Oct. 22, 2025). This confusion occurred despite the Texas SOS indicating by email that a representative had already reached out to the counties to discuss the list maintenance process. Exhibit F at 1–3, Email from Texas SOS to Voter Registrars/Election Administrators (Oct. 21, 2025). Importantly, this "citizenship check" using the overhauled SAVE was performed by the Texas SOS before anyone, counties and the public alike, received notice of the sweeping changes to SAVE through a SORN. Even after the Texas SOS finally publicly announced that the sensitive data of millions of Texans had been run through SAVE in October 2025, the Texas SOS refused to share detailed, relevant information about the program with the public. News outlets reached out to the Texas SOS for public comment about the program, but the Texas SOS failed to respond to some of the requests, and in the rare instance it did respond, it did not share additional details about the SAVE

---

[37] *Id.* at 20.

program. Exhibit G at 1–2, Fox News Inquiry (Oct. 21, 2025); Exhibit H at 2–3, Votebeat inquiry (Oct. 22, 2025). This secrecy and confusion highlights the insufficiency of Defendants' administrative procedures relating to the overhauled SAVE database.

The Texas SOS has also made clear that it expects Texas counties to be failsafes for the SAVE program, by performing their own verification of voter eligibility. However, in practice, silos between agencies have made this verification difficult. After receiving notice of potential non-citizen matches through the SAVE program, Travis County attempted to verify the citizenship status of the flagged voters through the Texas DPS before approaching the voters themselves. Exhibit I at 4-5, Email from Christopher Davis (Travis County) to Rebekah Hibbs (Texas DPS) (Oct. 31, 2025). However, the Texas DPS shared that it "does not verify citizenship for county registrars" and does not provide citizenship documents to the Texas SOS, given that citizenship status can change and their records may be outdated. Exhibit I at 3-4, Emails from Rebekah Hibbs (Texas DPS) to Christopher Davis (Travis County) (Nov. 3, 2025). Thus, during the overhauled SAVE rollout, it has been difficult for counties to verify the information provided by the SAVE program, heightening the importance of its accuracy.

As a result, the use of Defendants' faulty SAVE will disenfranchise voters—an absolutely foreseeable outcome. Because not all Texas counties conduct their own investigation into a person's citizenship status, thanks to Defendants' faulty SAVE rollout, local registrars have mailed notices warning of voter registration cancellation to eligible Texas voters.[38] And under the Texas election code, those *eligible* voters' registration must be cancelled unless they provide proof of eligibility to the registrar within the narrow window of thirty days, Tex. Elec. Code § 16.033, a

---

[38] *See, e.g.*, Fifield & Despart, *supra* note 28; *see also* Tex. Elec. Code § 16.033.

highly foreseeable result given the risk that a voter will not check their mail, the possibility of lost notices, and the time and effort burden on voters who are rightfully and lawfully registered.

Finally, because of this lack of consideration, Texans remain confused and fearful about how their private information is being used by the government or third parties. In the months and weeks since news broke of Texas SOS's cooperation with Defendants' use of overhauled SAVE and disclosure of Social Security data, TCRP has regularly fielded emails, messages, and concerns from Texans—including eligible voters—confused by the Defendants' actions and fearful of the consequences. Many of these messages express shock and distress that their private information, including their Social Security data, was disclosed without observance of legal and regulatory procedure. Others have communicated concern over how Defendants' actions will impact the fairness of our elections, including the registration of eligible voters. Texans should not be used as guinea pigs for Defendants' failure to follow statutes and regulations protecting Americans' privacy.

**CONCLUSION**

Ultimately, Defendants chose to implement this overhaul months before soliciting public comment, resulting in a cascading domino effect of issues that fall upon Texas voters and local elections administrators. Even when TCRP and other commentators raised those issues to Defendants through statutorily- and regulatorily-required processes, Defendants failed to consider those comments, as evidenced by their failure to respond or take action in any way, and the arbitrary and capricious nature of the rollout and usage of overhauled SAVE. This disregard for lawful procedure has had serious consequences for Texas voters, who now face the threat of disenfranchisement, confusion in their electoral systems, and fear that their private information has been disclosed in irresponsible ways, which our federal laws were meant to guard against.

For these reasons, *amicus curiae* TCRP respectfully urges the Court to grant Plaintiffs' request for summary judgment.

Dated this 24th day of March, 2026.

/s/ Nina L.M. Oishi

**Nina L.M. Oishi**

**TEXAS CIVIL RIGHTS PROJECT**
**Nina L.M. Oishi**
TX Bar No. 24142250
D.D.C. Bar ID: TX0085
**Karla Maradiaga**
TX Bar No. 24126746
*Pro hac vice forthcoming*
P.O. Box 1108
Houston, Texas 77251-1108
Telephone: (512) 474-5073
Fax: (512) 474-0726
noishi@texascivilrightsproject.org
kmaradiaga@texascivilrightsproject.org


**ATTORNEYS FOR *AMICUS CURIAE***

20