**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF WOMEN VOTERS, *et al.*,

      Plaintiffs,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

      Defendants.[1]

No. 1:25-cv-03501 (SLS)

**DEFENDANTS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS (OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT) AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

STEPHEN M. PEZZI (D.C. Bar No. 995500)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

---

[1] Under Federal Rule of Civil Procedure 25(d), Markwayne Mullin is automatically substituted as a Defendant in his official capacity as Secretary of Homeland Security, in place of his predecessor Kristi Noem.

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................. 1

BACKGROUND .................................................................................................................. 4

I.      The Creation of the SAVE System ........................................................................... 4

II.     The use of SAVE for Voter Verification .................................................................. 6

III.    Improvements and Modernization of SAVE ............................................................. 7

IV.   This Litigation........................................................................................................... 8

ARGUMENT....................................................................................................................... 10

I.      PLAINTIFFS LACK ARTICLE III STANDING ........................................................ 11

      A.      Several Plaintiffs lack associational standing for failure to identify any member with Article III standing........................................................... 11

      B.      No Plaintiff attempts to show standing to challenge bulk-upload capability................................................................................................. 14

      C.      All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing......................................................... 15

            1.     Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing. ............................... 15

            2.     Plaintiffs' alleged voting-related injuries are impermissibly speculative, and are neither caused by the federal government nor redressable in this suit................................................................... 23

            3.     Plaintiffs' diversion-of-resources theory of organizational standing is inconsistent with recent Supreme Court precedent. ............................... 29

            4.     EPIC's alleged procedural and informational injuries cannot independently support Article III standing. ............................... 30

II.     PLAINTIFFS' PRIVACY ACT NOTICE-AND-COMMENT CLAIM (COUNT 5) IS MOOT....... 33

III.    PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION. ........ 36

IV.   PLAINTIFFS CANNOT BRING APA CLAIMS PREDICATED ON PRIVACY ACT VIOLATIONS..................................................................................................... 39

**V.    ALL OF PLAINTIFFS' CLAIMS LACK MERIT.**.................................................................... **44**

    A.    SAVE is authorized by statute (Count 1)............................................................. 45

    B.    SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3)................................................ 53

    C.    Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6). .................................................................... 54

    D.    Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8)................................................ 59

**VI.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD AND SUBJECT TO EQUITABLE LIMITS**..................................................................................................... **61**

**CONCLUSION** .................................................................................................................... **64**

## TABLE OF AUTHORITIES

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ............................................................................................................. 51

*AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) ................................................................................... 19, 21

*AFL-CIO v. Dep't of Lab.*,
No. 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026) ................................................. 19

*Alaska v. USDA*,
17 F.4th 1224 (D.C. Cir. 2021) ............................................................................................ 36

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ............................................................................................................. 35

*Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. SSA*,
No. 25-1411, 2025 WL 1249608 (4th Cir. Apr. 30, 2025), *stay granted*,
605 U.S.---, 145 S. Ct. 1626 (2025) (mem.) ...................................................................... 19, 20

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025) ..................................................................................... 19, 20, 42

*Am. First Legal Found. v. Greer*,
153 F.4th 1311 (D.C. Cir. 2025) .......................................................................................... 30

*Am. Hosp. Ass'n v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016) ......................................................................................... 60, 61

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) ............................................................................................................. 51

*Ames v. DHS*,
861 F.3d 238 (D.D.C. 2017) ................................................................................................ 58

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ............................................................................................... 62

*Bahman Grp. v. Palluconi*,
No. 22-3826 (RDM), 2025 WL 3225196 (D.D.C. Sep. 29, 2025) ............................................ 55

*Baltimore v. ATF*,
No. CV 23-3762 (RDM), 2026 WL 143346 (D.D.C. Jan. 20, 2026) ........................................ 50

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................................................. 36, 37, 39

*Berardi v. U.S. Dep't of the Air Force,*
No. 05-2269 (JR), 2006 WL 8448631 (D.D.C. Sep. 29, 2006) ................................................ 41

*Bergh v. Washington,*
535 F.2d 505 (9th Cir. 1976) ........................................................................................ 64

*Biccum v. City of Watertown,*
2019 WL 4752927 (N.D.N.Y. Sept. 30, 2019) ......................................................... 50

*Biden v. Nebraska,*
600 U.S. 477 (2023) ............................................................................................ 50, 51

*Bierly v. Dep't of Def.,*
No. 23-2386 (RCL), 2024 WL 4227154 (D.D.C. Sep. 18, 2024) ........................... 41

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984) .................................................................................................. 39

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) .................................................................................................. 39

*Britt v. Naval Investigative Serv.,*
886 F.2d 544 (3d Cir. 1989) ......................................................................... 57, 58, 59

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .................................................................................................. 62

*California v. Texas,*
593 U.S. 659 (2021) .................................................................................................. 62

*Carver v. Knox Cnty.,*
887 F.2d 1287 (6th Cir. 1989) .................................................................................. 64

*Cell Assocs., Inc. v. NIH,*
579 F.2d 1155 (9th Cir. 1978) ............................................................................ 41, 42

*Centro de Trabajadores Unidos v. Bessent,*
167 F.4th 1218 (D.C. Cir. 2026) ............................................................. 3, 36, 37, 38

*Chamber of Com. of U.S. v. EPA,*
642 F.3d 192 (D.C. Cir. 2011) .................................................................................. 11

*Chichakli v. Tillerson,*
882 F.3d 229 (D.C. Cir. 2018) .................................................................................. 57

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000) .................................................................................................. 34

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)...................................................................................................... 16, 22, 24

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...................................................................................................... *passim*

*Clarke v. United States*,
    915 F.2d 699 (D.C. Cir. 1990) ..................................................................................... 35

*Coal. of Airline Pilots Ass'ns v. FAA*,
    370 F.3d 1184 (D.C. Cir. 2004)................................................................................... 35

*Colby v. J.C. Penney Co.*,
    811 F.2d 1119 (7th Cir. 1987) ..................................................................................... 64

*Collette v. District of Columbia*,
    No. 18-cv-1104 (RC), 2019 WL 3502927 (D.D.C. Aug. 1, 2019) ..................................... 35, 36

*Common Cause v. Jud. Ethics Comm.*,
    473 F. Supp. 1251 (D.D.C. 1979)................................................................................. 63

*Competitive Enter. Inst. v. Mann*,
    150 A.3d 1213 (D.C. 2016), *as amended* (Dec. 13, 2018) ........................................... 17, 22, 23

*Conservation Force, Inc. v. Jewell*,
    733 F.3d 1200 (D.C. Cir. 2013)................................................................................... 33

*Ctr. for L. & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005)................................................................................... 30

*Dalton v. Specter*,
    511 U.S. 462 (1994)..................................................................................................... 53

*Dew v. United States*,
    192 F.3d 366 (2d Cir. 1999)......................................................................................... 39

*Dickson v. Direct Energy, LP*,
    69 F.4th 338 (6th Cir. 2023) ....................................................................................... 19

*Doe v. Chao*,
    540 U.S. 614 (2004)..................................................................................................... 42

*Doe v. Stephens*,
    851 F.2d 1457 (D.C. Cir. 1988).................................................................................. 41, 42

*Dorsey v. United States*,
    567 U.S. 260 (2012)..................................................................................................... 49, 50

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
    396 F.3d 1265 (D.C. Cir. 2005) ................................................................................. 39

*EPIC v. PACEI*,
    878 F.3d 371 (D.C. Cir. 2017) .................................................................................... 31

*FAA v. Cooper*,
    566 U.S. 284 (2012) ............................................................................................. 40, 41

*EPIC v. OPM, No.*,
    No. 1:25-CV-255 (RDA/WBP), 2025 WL 580596 (E.D. Va. Feb. 21, 2025) ........................ 16

*EPIC v. Dep't of Com.*,
    928 F.3d 95 (D.C. Cir. 2019) ................................................................. 16, 30, 31, 32

*FBI v. Fikre*,
    601 U.S. 234 (2024) .................................................................................................... 35

*FCC v. Consumers' Rsch.*,
    606 U.S. 656 (2025) .................................................................................................... 51

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ............................................................................................. 55, 56

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................ *passim*

*FDA v. Wages & White Lion Invs.*,
    604 U.S. 542 (2025) .................................................................................................... 56

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) ..................................................................................... 63

*Fletcher v. Peck*,
    10 U.S. (6 Cranch) 87 (1810) .................................................................................... 50

*FPC v. Hope Nat. Gas Co.*,
    320 U.S. 591 (1944) .................................................................................................... 52

*Gadelhak v. AT&T Servs., Inc.*,
    950 F.3d 458 (7th Cir. 2020) ............................................................................... 18, 19

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ................................................................................... 39

*Garey v. James S. Farrin, P.C.*,
    35 F.4th 917 (4th Cir. 2022) ...................................................................................... 18

*Gill v. Whitford*,
    585 U. S. 48 (2018)................................................................................ 62

*Glob. Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir.), *reh'g en banc denied,*
    2025 WL 2709437 (D.C. Cir. Aug. 28, 2025) ....................................... 53

*Grams v. Esters*,
    No. 1:07CV-145-R, 2007 WL 9780467 (W.D. Ky. Nov. 19, 2007) ........................................ 50

*Guedes v. ATF*,
    920 F.3d 1 (D.C. Cir. 2019)................................................................... 33

*Gundy v. United States*,
    588 U.S. 128 (2019)............................................................................... 51

*Haaland v. Brackeen*,
    599 U.S. 255 (2023)............................................................................... 26

*Haleem v. Dep't of Def.*,
    No. 23-1471 (JEB), 2024 WL 230289 (D.D.C. Jan. 22, 2024) ................................................ 41

*Harrison v. Fed. Bureau of Prisons*,
    248 F. Supp. 3d 172 (D.D.C. 2017) ....................................................... 41

*Harvey v. Lynch*,
    123 F. Supp. 3d 3 (D.D.C. 2015) ........................................................... 35

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................... 29

*Hinck v. United States*,
    550 U.S. 501 (2007)............................................................................... 41

*Humane Soc'y of the U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988)................................................................. 13

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)............................................................................... 11

*J.T. v. District of Columbia*,
    983 F.3d 516 (D.C. Cir. 2020)............................................................... 35

*Jeffries v. Volume Servs. Am. Inc.*,
    928 F.3d 1059 (D.C. Cir. 2019).......................................................... 20, 21

*Jones v. HUD*,
    No. 11 CV 0846 RJD JMA, 2012 WL 1940845 (E.D.N.Y. May 29, 2012)............................ 39

*Krakauer v. Dish Network, LLC*,
  925 F.3d 643 (4th Cir. 2019) ........................................................................... 18, 19

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  --- F. Supp. 3d ----, 2026 WL 252420 (D.D.C. Jan. 30, 2026) ......................... *passim*

*League of Women Voters v. DHS*,
  No. CV 25-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ............................. *passim*

*Learning Res., Inc. v. Trump*,
  146 S. Ct. 628 (2026) ......................................................................................... 50

*Little Sisters of the Poor v. Pennsylvania*,
  591 U.S. 657 (2020) ........................................................................................... 55

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 11, 23

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................................... 36

*Lupia v. Medicredit, Inc.*,
  8 F.4th 1184 (10th Cir. 2021) ............................................................................ 19

*Make the Rd. N.Y. v. Noem*,
  No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .................................... 62

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) .......................................................................................... 22, 27

*Mistretta v. United States*,
  488 U.S. 361 (1989) ........................................................................................... 52

*Muransky v. Godiva Chocolatier, Inc.*,
  922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*,
  939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020) .......... 20

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) ............................................................................ 20

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ......................................................................................... 26, 27

*NAACP, Jefferson Cnty. Branch v. Brock*,
  619 F. Supp. 846 (D.D.C. 1985) ........................................................................ 63

*Nat. Res. Def. Council, Inc. v. NRC*,
  680 F.2d 810 (D.C. Cir. 1982) ....................................................................... 33, 34

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) .................................................................................................... 52

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022) .................................................................................................... 50

*Nat'l Mining Ass'n v. Dep't of Interior*,
251 F.3d 1007 (D.C. Cir. 2001) .................................................................................. 34

*Nemeth-Greenleaf v. OPM*,
No. 25-CV-407 (CRC), 2026 WL 607905 (D.D.C. Mar. 4, 2026) ............................ 19

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .................................................................................................... 27

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ................................................................................................. 36, 60

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) .................................................................................................... 51

*Parks v. IRS*,
618 F.2d 677 (10th Cir. 1980) .................................................................................... 41

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ...................................................................................................... 43

*Poss v. Kern*,
No. 23-cv-2199 (DLF), 2024 WL 4286088 (D.D.C. Sep. 25, 2024) ......................... 41

*Rimmer v. Holder*,
700 F.3d 246 (6th Cir. 2012) ...................................................................................... 39

*Robert F. Kennedy Hum. Rts. v. Dep't of State*,
No. 25-cv-1774 (JEB), 2026 WL 820811 (D.D.C. Mar. 25, 2026) ...................... 37, 38

*Rural Cellular Ass'n v. FCC*,
588 F.3d 1095 (D.C. Cir. 2009) .................................................................................. 55

*Six v. IQ Data Int'l, Inc.*,
129 F.4th 630 (9th Cir.), *cert. denied*, 146 S. Ct. (2025) (mem.) ............................. 19

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ................................................................................................. 17, 20

*SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
145 S. Ct. 1626 (2025) ................................................................................................ 20

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ................................................................................................... 62

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ...................................................................................................... 16

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .............................................................................................. 11, 30

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ................................................................................. 41

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................................ *passim*

*Tripp v. DOD*,
   193 F. Supp. 2d 229 (D.D.C. 2002) ........................................................................... 41

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) .............................................................................................. 61, 62

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
   9 F.3d 138 (D.C. Cir. 1993) ....................................................................................... 58

*United States v. Cooper*,
   750 F.3d 263 (3d Cir. 2014) ....................................................................................... 51

*United States v. Texas*,
   599 U.S. 670 (2023) .............................................................................................. 33, 62

*Univ. of Cal. Student Ass'n v. Carter*,
   766 F. Supp. 3d 114 (D.D.C. 2025) ........................................................................... 61

*Valley Reg'l Ctr., LLC v. DHS*,
   106 F.4th 1195 (D.C. Cir. 2024) ................................................................................ 38

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) .............................................................................................. 43, 55

*W. Gulf Maritime Ass'n v. ILA Deep Sea Loc. 24*,
   751 F.2d 721 (5th Cir. 1985) ...................................................................................... 64

*West Virginia v. EPA*,
   597 U.S. 697 (2022) .................................................................................................... 51

*Westcott v. McHugh*,
   39 F. Supp. 3d 21 (D.D.C. 2014) ............................................................................. 3, 41

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)............................................................................. 51, 52

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)..................................................................................... 11

*Williams v. Dep't of Veterans Affs.*,
  104 F.3d 670 (4th Cir. 1997) ...................................................................... 31

*Wolf v. Regardie*,
  553 A.2d 1213 (D.C. 1989) .................................................................... 17, 18

*Yakus v. United States*,
  321 U.S. 414 (1944)..................................................................................... 52

*Young v. DOJ*,
  882 F.2d 633 (2d Cir. 1989)................................................................... 20, 21

*Zambrana v. Califano*,
  651 F.2d 842 (2d Cir. 1981)........................................................................ 64

**STATUTES**

5 U.S.C. § 552a..................................................................................... *passim*

5 U.S.C. § 553....................................................................................... *passim*

5 U.S.C. § 704............................................................................... 36, 37, 39

5 U.S.C. § 705............................................................................................. 9

5 U.S.C. § 706....................................................................................... 44, 62

8 U.S.C. § 1373..................................................................................... *passim*

8 U.S.C. § 1644.......................................................................................... 2, 6

42 U.S.C. § 405........................................................................................ 6, 49

42 U.S.C. § 1306........................................................................................... 49

42 U.S.C. § 1320b-7 (note)................................................................... *passim*

52 U.S.C. § 21083............................................................................... 6, 27, 48

52 U.S.C. § 21083...................................................................................... 6, 48

Immigration Reform and Control Act of 1986,
  Pub. L. No. 99-603, 100 Stat. 3359 ................................................... *passim*

Personal Responsibility and Work Opportunity Reconciliation Act of 1996,
Pub. L. No. 104-193, 110 Stat. 2105 ........................................................................ 5

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Pub. L. No. 104-208, 110 Stat. 3009 ................................................................... 5, 45

Restatement (Second) of Torts § 652B (A.L.I. 1977).................................................... 17

Restatement (Second) of Torts § 652B cmt. a ............................................................. 19

**REGULATIONS**

*Guidance on the Privacy Act*,
52 Fed. Reg. 12,990 (Apr. 20, 1987) ................................................................ 57, 58

*Reissuance of OMB Circular No. A-108, "Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*,"
81 Fed. Reg. 94,424 (Dec. 23, 2016), https://perma.cc/B5KU-PN8H .............................. 43, 57

*Notice of a Modified System of Records*,
90 Fed. Reg. 48,948 (Oct. 31, 2025).................................................................... 34

*Notice of a Modified System of Records*,
90 Fed. Reg. 50,879 (Nov. 12, 2025).................................................................... 34

**OTHER AUTHORITIES**

C. Puckett, SSA, *The Story of the Social Security Number* (July 2009),
https://perma.cc/8Z3Z-DDB3 .......................................................................... 58

GAO, GAO-14-44, *Computer Matching Act* (2014),
https://perma.cc/YMK8-PTD7.......................................................................... 60

*Letter Agreement Providing for Information-Sharing Between DHS, USCIS, and SSA re: Citizenship* (May 15, 2025),
https://perma.cc/8SVE-SES5 ............................................................................ 8

*Relationship Between IIRIRA & Statutory Requirement for Confidentiality of Census Info.*,
1999 WL 34995963 (O.L.C. May 18, 1999) ............................................................ 47

SSA, Program Operations Manual System, RM 10210.500, *General Information on Evidence of U.S. Citizenship for a Social Security Number Card*,
https://perma.cc/HX8Y-W2XK .......................................................................... 28

USCIS, *About SAVE*,
https://perma.cc/5888-TH46 ..................................................................... 1, 5, 23

USCIS, *About SAVE: History*,
https://perma.cc/MG5B-MCZH........................................................................... 5

USCIS, *About SAVE: Verification Process*,
https://perma.cc/49CU-XL6G ........................................................................................ 8

USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022),
https://perma.cc/BW9M-WJUT ................................................................................. 6, 7

USCIS, *Mem. of Agreement Between DHS, USCIS and Indiana Sec. of State re: Participation in SAVE for Voter Registration and Voter List Maintenance Purposes* (July 8, 2025),
https://perma.cc/A6LC-9CLQ ................................................................................... 8, 23

USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025),
https://perma.cc/LM3N-RB76 ............................................................................ 7, 8, 56

USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025),
https://perma.cc/Y8A5-YX3M ............................................................................ 7, 8, 56

USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Feb. 2, 2026),
https://perma.cc/F63E-PQ87 ........................................................................... 8, 28, 56

**INTRODUCTION**

In the Immigration Reform and Control Act of 1986, Congress provided that the predecessor agency of the Department of Homeland Security (DHS) "shall implement a system for the verification of immigration status."  Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391; 42 U.S.C. § 1320b-7 (note).  Then, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress placed an affirmative "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."  8 U.S.C. § 1373(c).  To fulfill these obligations, DHS has long used the SAVE system, which "is an online service administered by U.S. Citizenship and Immigration Services (USCIS) that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies."  USCIS, *About SAVE*, https://perma.cc/5888-TH46.  This is not new: SAVE was created in 1986 and, "[i]n fiscal year 2023, SAVE performed over 21.5 million verifications."  *Id.*

Congress also spoke directly to the issue of "[c]ommunication between" other "government agencies and" DHS.  8 U.S.C. § 1373.  Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  *Id.* § 1373(a).  Congress also emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual."  *Id.* § 1373(b).  Congress provided similar clarity about sharing information with States for this purpose: "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or

- 1 -

in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

Despite these clear congressional directives to DHS to provide citizenship verification services for other government agencies, the core premise of this lawsuit (as amended) is that DHS lacks statutory and constitutional authority to effectively and efficiently do what Congress tasked DHS to do. Plaintiffs likewise insist that various "other provision[s] of Federal . . . law," such as the Privacy Act, implicitly require maintaining strict firewalls between Defendant DHS and other "Federal . . . government entit[ies]," *id.* § 1373(a), (b), such as Defendant Social Security Administration (SSA). All of those claims lack merit, but the court should never have to reach them—because several threshold defects doom this case at the outset.

First, Plaintiffs lack Article III standing. The primary target of Plaintiffs' lawsuit is the fact that USCIS queries of the SAVE system can now search using Social Security numbers that DHS verifies against records held by SSA—a modernization that assists USCIS in more effectively fulfilling its statutory obligations. But Plaintiffs suffer no concrete and particularized harm from intra-governmental sharing of information that was created by the government, for the government. Generalized fears of possible future privacy-related harms are not enough. Plaintiffs' concerns that *State* officials may, one day, accidentally and unlawfully use information from SAVE to remove them from voter rolls not only remain highly speculative but also provide no basis for relief against the federal government. And Plaintiffs' concerns about SAVE users submitting bulk verification requests (as opposed to one-by-one verification requests) do not give rise to any Article III injury in the first place—Plaintiffs have no cognizable legal interest in whether government computer systems move slowly or quickly.

Other threshold problems abound. Plaintiffs' notice-and-comment claim under the Privacy Act—the linchpin of the preliminary-injunction motion that this Court denied—is now moot. Both DHS and SSA have now published new System of Records Notices (SORNs) that went through the notice-and-comment process required by the Privacy Act—whether or not that was required. Now, Plaintiffs' "claim for injunctive relief against the relevant changes to SAVE and Numident

based on the Privacy Act is moot." *League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. 3d ----, 2026 WL 252420, at *53 (D.D.C. Jan. 30, 2026) ("*LULAC*").

Plaintiffs also fail to challenge any final agency action under the APA. For example, as for the information-sharing agreement between DHS and SSA, the D.C. Circuit recently held that an analogous intra-governmental data-sharing "MOU is a nonbinding, nonfinal policy statement that is not reviewable under the APA." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026). That holding is straightforwardly fatal to many of Plaintiffs' claims.

Moreover, Plaintiffs' Administrative Procedure Act (APA) claims are largely premised on alleged violations of the Privacy Act, but "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014). The importance of that general principle is underscored by this very case, in which Plaintiffs repeatedly try to graft APA-specific litigation concepts—for example, DHS's alleged failure to respond to comments—despite the absence of any comparable procedures in the Privacy Act. More generally, allowing these sorts of Privacy Act claims to proceed under the rubric of the APA would effectively rewrite the sections of the Privacy Act in which Congress painstakingly specified the judicial remedies that are (or are not) available for violations of that statute.

On the merits, Plaintiffs' claims only get worse. In a significant shift from their original complaint, the core of this case is now premised on Plaintiffs' allegations that the recent changes to SAVE exceed DHS's statutory and constitutional authority. But Congress provided expressly that DHS "shall implement a system for the verification of immigration status." 42 U.S.C. § 1320b-7 (note). And DHS is not just permitted, but under an affirmative legal "[o]bligation" to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). Congress had no obligation to further specify the technical software mechanisms by which DHS should carry out those obligations. Plaintiffs' arguments to the contrary would hamper many federal programs—which virtually never include the level of granular detail

that Plaintiffs demand here.  Instead, such programs evolve and improve over time, as technological progress marches forward.  That is good government, not a statutory violation.

As for Plaintiffs' constitutional claims, all are either (1) statutory-authority claims repackaged in constitutional garb, or (2) premised on a fundamental misunderstanding of what SAVE does.  For example, this case does not present the question of whether "Defendants have any constitutional authority to arrogate election administration to themselves."  Pls.' Mot. for Summ. J. at 34, ECF No. 66 ("Pls.' Br.").  By improving the effectiveness and efficiency of SAVE, neither DHS nor SSA is engaged in any "election administration" at all.  *Id.*  And Plaintiffs' obvious dissatisfaction with State election officials cannot be remedied by suing the United States.

Finally, Plaintiffs also offer a series of more technical privacy-related arguments about, for example, the limits of the "compatible use" requirement in the Privacy Act, internal SSA disclosure policies, requirements to publish computer-matching agreements (even seeking mandamus on the latter), and so on.  All of those more technical claims also lack merit—though the scarcity of comparable precedent also underscores why most of these sorts of Privacy Act claims have never before been understood to be subject to routine APA review in the first place.

Defendants acknowledge that, at the preliminary-injunction stage, the Court expressed concerns about "the lawfulness of the Government's actions" under the Privacy Act.  *League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025).  But the issue at the forefront of those proceedings—that is, making changes to SAVE without first completing notice-and-comment under the Privacy Act—has now been resolved.  Plaintiffs' remaining claims raise no comparable concerns.  This suit should be dismissed in its entirety.

## BACKGROUND

### I.    The Creation of the SAVE System

The Systematic Alien Verification for Entitlements (SAVE) system was created by Congress in 1986, as part of the Immigration Reform and Control Act of 1986.  *See* Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391; 42 U.S.C. § 1320b-7 (note).  In that statute, Congress

provided that DHS "shall implement a system for the verification of immigration status." *Id.* Fulfilling that statutory obligation, today, SAVE "is an online service administered by" USCIS "that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies." *About SAVE*, *supra* at 1. Over "1,200 agencies nationwide use SAVE to support their benefit eligibility and licensing determinations," and "[i]n fiscal year 2023, SAVE performed over 21.5 million verifications." *Id.* The purpose of SAVE is to carry out congressional intent to "[h]elp[] ensure that only applicants who are eligible for benefits and licenses receive them." *Id.* In doing so, SAVE "[i]ncorporates privacy principles and security measures into user agencies' processes and procedures." *Id.* Ultimately, however, SAVE does not "[d]etermine applicant eligibility for a specific benefit or license." *Id.* "That determination is made by the benefit issuing or licensing agency," *id.*—often, a State or local government agency.

In 1996, SAVE took on greater importance, because of two new congressional enactments. First, in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, Congress "restructured the welfare system in the United States and restricted immigrant eligibility for public benefits," thus "expanding the need for benefit-granting agencies to verify immigration status." USCIS, *About SAVE: History*, https://perma.cc/MG5B-MCZH. Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009, Congress placed an affirmative "[o]bligation" on what was then the INS (now, DHS) to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

In doing so, Congress also spoke to the issue of "[c]ommunication between" other "government agencies and" DHS. *Id.* § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or

unlawful, of any individual." *Id.* § 1373(a). Congress also emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b).

## II.    The use of SAVE for Voter Verification

Separately, Congress also placed an affirmative legal obligation on the States: to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also id.* § 20501(b)(4) ("ensure that accurate and current voter registration rolls are maintained"). In doing so, Congress also provided that States must establish "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* § 21083(a)(4)(B). Congress also emphasized that the same sort of information-sharing that it was now authorizing within the federal government also applied to the States: "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [DHS] information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644.[2]

Since the mid-2000s, in carrying out these statutory obligations, States have entered into agreements with USCIS to use SAVE to confirm the citizenship or immigration status of voters. *See* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶ 20. For many years, however, SAVE suffered from some significant information-technology limitations when used for this purpose. Most significantly, until recently, SAVE could not verify immigration status without a DHS-specific immigration identifier, such as an "A-Number," which most voters do not have. *See* USCIS, *Guide to Understanding SAVE Verification Responses* (Apr. 2022), https://perma.cc/BW9M-WJUT. SAVE could not run searches based on other government documents, such as a Social Security

---

[2] Separately, under the Help America Vote Act of 2002, SSA has long been required to provide Social Security Number (SSN) verification responses directly to States for voter-verification purposes, including verifications on last-four-digit SSNs. *See* 42 U.S.C. § 405(r)(9).

number or a passport number.  *See id.*  SAVE could not verify any information at all of those individuals—including most U.S. citizens, born in the United States—who had never had any encounter with DHS and thus did not appear in DHS systems.  *See id.*  And SAVE could only accept one verification request at a time, rather than bulk requests.  *See* USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76.

Dissatisfied with those outdated systems, between October of 2024 and April of 2025, five States sued the federal government, arguing that DHS and USCIS were violating 8 U.S.C. §§ 1373 and 1644 due to the inability of SAVE to provide meaningful responses to most of their verification requests.  *See Florida v. DHS*, No. 24-cv-00509 (N.D. Fla., filed Oct. 16, 2024); *Texas v. Noem*, No. 24-cv-49 (W.D. Tex., filed Oct. 22, 2024); *Ohio v. DHS*, No. 24-cv-283 (S.D. Ohio, filed Oct. 24, 2024); *Bird v. Noem*, No. 24-cv-423 (S.D. Iowa, filed Dec. 3, 2024); *Indiana v. DHS*, No. 25-cv-732 (S.D. Ind., filed Apr. 16, 2025).  After nearly a year of settlement discussions, *see Florida* ECF Nos. 19, 23, 25, 27, the United States ultimately entered into a settlement agreement in *Florida*, which was approved by a court order in the U.S. District Court for the Northern District of Florida.  *Florida* ECF Nos. 30, 31.  Plaintiffs in *Ohio*, *Bird*, and *Indiana* then dismissed their suits.  *Ohio* ECF No. 19; *Bird* ECF No. 23; *Indiana* ECF No. 29.  As of this filing, the *Texas* case remains pending; the United States recently filed an (opposed) motion to dismiss on mootness grounds, which was fully briefed as of February 12, 2026.  *Texas* ECF Nos. 12, 15, 16.

## III.    Improvements and Modernization of SAVE

In his second term, President Trump has made it a priority to modernize and improve outdated government information-technology systems.  As part of those efforts, on April 22, 2025, DHS announced that it had begun "a comprehensive optimization of the [SAVE] database to ensure a single, reliable source for verifying non-citizen status nationwide."  USCIS Press Release, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025), https://perma.cc/Y8A5-YX3M.  The update "eliminates fees for database searches, breaks down silos for accurate results, streamlines mass status checks, and integrates criminal records,

immigration timelines, and addresses." *Id.*  And on May 22, 2025, DHS announced two specific changes: (1) "[u]sers are now able to create cases using a Social Security number (SSN) as the applicant's enumerator," and (2) "users may now create cases in bulk."  *Optimizing SAVE*, *supra* at 7.  The information-sharing agreement between DHS and SSA is available on the SSA website. *See Letter Agreement Providing for Information-Sharing Between DHS, USCIS, and SSA re: Citizenship* (May 15, 2025), https://perma.cc/8SVE-SES5.  The agreement discusses data-security procedures, loss reporting, breach notifications, and other administrative safeguards.  *See id.*

When States use SAVE for purposes of verifying eligible voters, they likewise are required to enter into a written agreement with USCIS.  *See, e.g.*, USCIS, *Mem. of Agreement Between DHS, USCIS and Indiana Sec. of State re: Participation in SAVE for Voter Registration and Voter List Maintenance Purposes* (July 8, 2025), https://perma.cc/A6LC-9CLQ.  Those agreements require procedures for "additional verification" for any "voter that does not verify as a U.S. citizen on initial verification," provision of "notice and hearing or other due process available under State or other applicable law" before "any removal from a voter roll," and acknowledge all parties' obligations to comply with other applicable federal and State laws.  *See id.* at 4, 6.

The SAVE website provides detailed instructions to user agencies about how the system works.  Among other things, it specifies that, "[i]f SAVE cannot provide a response after initial verification for a case created using only a Social Security number, SAVE will close the case and instruct the user agency to submit a new case with corrected/updated information or to include an immigration enumerator, if available."  USCIS, *About SAVE: Verification Process*, https://perma.cc/49CU-XL6G.  It further explains that "SAVE prohibits agencies from rejecting a voter registration or removing an individual from a voter roll based on a SAVE response until the agency has completed all SAVE-required steps."  USCIS, *Voter Registration and Voter List Maintenance Fact Sheet* (last updated Feb. 2, 2026), https://perma.cc/F63E-PQ87.

## IV.    This Litigation

Plaintiffs filed this suit on September 30, 2025—four months after the key changes to SAVE had already been announced.  Compl., ECF No. 1.  Plaintiffs then filed a motion for a

preliminary injunction or for a stay under 5 U.S.C. § 705. ECF No. 16. Plaintiffs also filed a motion for certification of a preliminary-relief subclass. ECF No. 17. The Court held a hearing on October 28, 2025. After that hearing, Plaintiffs withdrew their certification motion. ECF No. 46. Defendants then informed the Court that DHS and SSA had each published new draft System of Records Notices (SORNs), soliciting comments for 30 days, ensuring that the information-sharing at issue would be subject to a "routine use" under the Privacy Act. *See* ECF Nos. 51, 54.

On November 17, 2025, the Court denied Plaintiffs' motion for preliminary relief, holding that Plaintiffs had failed to show irreparable harm. ECF Nos. 55, 56; *see League of Women Voters v. DHS*, No. 25-cv-3501-SLS, 2025 WL 3198970 (D.D.C. Nov. 17, 2025).

On December 5, 2025, Defendants filed a notice, ensuring that both the Court and the Plaintiffs were aware of developments in other related litigation, including the *Florida* settlement. ECF No. 59; *see supra* at 7. After an extension, ECF No. 60, Plaintiffs filed an amended complaint on January 21, 2026. ECF No. 61. Now, Plaintiffs are the League of Women Voters, four of its affiliate organizations, and the Electronic Privacy Information Center (EPIC). The amended complaint names four Defendants: DHS, SSA, and their leaders in their official capacities.[3]

In their amended complaint, Plaintiffs bring eight claims, alleging that Defendants: (1) exceeded their statutory authority in using and improving SAVE for purposes of voter-verification, Am. Compl. ¶¶ 197-205; (2) violated the Constitution in using and improving SAVE for purposes of voter-verification, *id.* ¶¶ 207-14; (3) violated "the separation of powers" "[f]or the same reasons set forth above in Count Two," *id.* ¶¶ 216-17; (4) violated various substantive restrictions in the Privacy Act and thus also violated the APA, *id.* ¶¶ 219-26; (5) violated the Privacy Act's notice-and-comment requirements by failing to timely publish new SORNs and thus also violated the APA, *id.* ¶¶ 228-35; (6) violated the APA due to a failure to consider or failure to explain all of the above, *id.* ¶¶ 237-38; (7) violated the Privacy Act by failure to publish certain "computer

---

[3] Unlike the original complaint, the amended complaint includes no allegations relating to the Department of Justice and does not name the Department of Justice as a Defendant. Also unlike the original complaint, the amended complaint includes no individual Plaintiffs (only associations).

matching agreements" and thus also violated the APA, *id.* ¶¶ 240-45; and (8) should be subject to a writ of mandamus "[f]or the same reasons alleged above in Count Seven," about computer-matching agreements, *id.* ¶¶ 247-51.  Plaintiffs request not only vacatur under the APA, but also a long list of specific mandatory injunctions that would substantially overhaul SAVE "within 14 days of entry of this Order."  Proposed Order, ECF No. 66-12.

Defendants produced an Administrative Record on March 2, 2026.  ECF Nos. 64, 65.[4] Plaintiffs moved for summary judgment on March 12, 2026.  ECF No. 66.  Defendants now oppose Plaintiffs' motion and also move to dismiss (or, in the alternative, for summary judgment).

## ARGUMENT

Plaintiffs throw a remarkable amount of material at the wall, hoping something will stick. But what used to be Plaintiffs' primary argument has now been mooted by the publication of new SORNs from both DHS and SSA.  Plaintiffs' remaining claims are far weaker, on the merits—which is why they range wildly from the small and technical (*e.g.*, whether DHS needed to proceed by "computer matching agreements" rather than a more routine MOU), to high-concept constitutional law (*e.g.*, seeking to persuade this Court to find the first violation of the nondelegation doctrine since 1935), to very easy questions of statutory-interpretation (*e.g.*, whether a program created by Congress is authorized by Congress).  Ultimately, all of Plaintiffs' claims lack merit.

Before the Court can reach the merits, however, Plaintiffs need to establish subject-matter jurisdiction.  Although their standing theories have multiplied, their evidence of actual or imminent harm remains sparse and speculative.  They have failed to identify any discrete and final agency action.  One claim is moot.  And they still have no answer to the problem of the Privacy Act specifying a comprehensive set of remedies for exactly the sort of legal violations they are concerned about here—none of which bears any resemblance to the remedies they seek here.

This case should be dismissed, or judgment should be entered for Defendants on all claims.

---

[4] In doing so, Defendants maintained their position that no Administrative Record was necessary in this case (including for Count Six), but "nonetheless agreed to produce such a record, in the interest of avoiding unnecessary ancillary litigation over the record."  ECF No. 62 at 1 n.*.

## I.   PLAINTIFFS LACK ARTICLE III STANDING

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

### A.   Several Plaintiffs lack associational standing for failure to identify any member with Article III standing.

Plaintiffs rely heavily on associational standing—indeed, every Plaintiff is an association. Generally, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). On the first requirement, when a litigant "claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). Instead, the plaintiff "must specifically 'identify members who have suffered the requisite harm.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Several Plaintiffs fail to satisfy that requirement.

**League of Women Voters of Louisiana (LWVLA).**  Plaintiff LWVLA has failed to identify any member with Article III standing—indeed, it has failed to identify any member at all. Plaintiffs did not submit any declaration from any member in connection with their summary-judgment motion.  Instead, Plaintiffs submitted a declaration only from the organization's President.  Suppl. Decl. of M. Green, ECF No. 66-8.  But the Supplemental Green Declaration merely makes vague reference to the declaration of J. Doe 4, ECF No. 16-3, which was submitted in connection with preliminary-injunction proceedings.  Even if Plaintiffs can proceed by incorporating a prior declaration by reference, and even if the requisite member with standing may proceed anonymously, that prior declaration does not establish any actual or imminent injury.  To the contrary, it says that J. Doe 4 "plan[s] on voting in Louisiana's upcoming local elections, which will be held on October 11, 2025." *Id.* ¶ 7.  Presumably, J. Doe 4 did so without incident—or Plaintiffs would have said so.  In part because of those very shortcomings in the record at the preliminary-injunction stage, this Court found it "telling that the Plaintiffs have not identified a single individual who has experienced this hypothetical injury." *League of Women Voters*, 2025 WL 3198970, at *7.  Plaintiffs cannot show standing now based on the same declarations that this court previously concluded (correctly) established nothing more than a "hypothetical injury." *Id.*

In addition, Plaintiff the League of Women Voters of Louisiana Education Fund goes almost entirely unmentioned in Plaintiffs' brief, as well as the amended complaint (other than the caption).  It has not even tried to identify any member with standing.  Accordingly, both entities called LWVLA, *see* Am. Compl. ¶ 13, should be dismissed from this case on that basis.

**League of Women Voters of Virginia (LWVVA).**  Plaintiff LWVVA has submitted even less evidence than LWVLA—indeed, it has submitted no summary-judgment declarations at all. LWVVA relies entirely on the same speculative declaration (of "J. Doe 6") that was insufficient at the preliminary-injunction phase.  *See* ECF No. 16-8.  Again, J. Doe 6 stated last fall that he or she "plan[ned] on voting in the November 4, 2025 election in Virginia." *Id.* ¶ 6.  Presumably, much like J. Doe 4, the speculative concerns of J. Doe 6 did not play out in the manner that Plaintiffs feared.  There is no reason to take that speculation any more seriously now.

**League of Women Voters of Texas (LWVTX).**  Plaintiff LWVTX, in contrast to LWVLA and LWVVA, has identified at least one member by name, *see* Am. Compl. ¶ 165; Decl. of A. Nel, ECF No. 66-3, and also identified three additional members who seem to have received correspondence from Texas regarding their citizenship status and eligibility to vote, Decl. of A. Doe, ECF No. 66-4; Decl. of B. Doe, ECF No. 66-5; Decl. of C. Doe, ECF No. 66-6.

These "members" raise another problem, however.  Plaintiffs do not even allege (much less establish with evidence at the summary-judgment stage) that *any* of these individuals were actually members of LWVTX at the time of the alleged injury that forms the basis of their allegations of Article III standing.[5]  The natural inference is that, after denial of their preliminary-injunction motion, Plaintiffs went searching for affected individuals, found a few, and signed them up for membership—and in doing so, tried to sign these associations up for this lawsuit.[6]

The D.C. Circuit has sought to apply associational-standing doctrine in a way that "prevent[s] associations from being merely law firms with standing." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988).  Unfortunately, Plaintiffs' tactics here squarely implicate that concern.  Although associational standing remains a viable theory of standing in general, this Court need not sign off on this sort of lawsuit-by-recruitment—after all, even in a more typical case, associational standing already presses on the outer bounds of modern understandings of Article III remedies and jurisdiction.  *Cf. All. for Hippocratic Med.*, 602 U.S. at 397 (Thomas, J., concurring).  This Court should not extend the doctrine even further, by allowing these Plaintiff associations to strategically recruit their way into federal court.

---

[5] The same is true of Alex Doe's membership in EPIC, but his declaration is not offered in support of EPIC's associational standing (only that of LWVTX).  *See* Pls.' Index of Declarations, ECF No. 66-2.  Defendants address the standing theories unique to EPIC *infra*, at 30-33.

[6] After the filing of the amended complaint, undersigned counsel asked Plaintiffs' counsel whether or not Mr. Nel was a member of LWVTX at the time of the events described in the complaint, in an effort to avoid the need to brief this issue.  Plaintiffs' counsel refused to provide any additional information on this subject.

**B.    No Plaintiff attempts to show standing to challenge bulk-upload capability.**

One of the few discrete changes to SAVE that Plaintiffs challenge here is the move from requiring all verification requests to be submitted one-by-one, to acceptance of verification requests submitted in bulk.  Plaintiffs thus request an order "disabling any functionality that allows SAVE users to conduct bulk searches."  Proposed Order at 1-2.

But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion*, 594 U.S. at 431.  Despite their extensive arguments about standing, *see* Pls.' Br. at 13-25, none of the Plaintiffs has even attempted to establish any concrete Article III injury from the acceptance of bulk requests.  Nor has any Plaintiff explained how any injury would be redressed by an order requiring SAVE to revert back to a more logistically cumbersome, one-by-one request-submission system.

That failure is unsurprising—as nobody has any concrete or cognizable Article III interest in whether SAVE searches move slowly or quickly.  That is fatal to this portion of Plaintiffs' case: "No concrete harm, no standing."  *TransUnion*, 594 U.S. at 417.  Even if Plaintiffs had attempted to show standing for this request for relief, "[c]entral" to that inquiry would be "whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts."  *Id.*  And a desire for less-effective computer systems at USCIS does not come anywhere close to satisfying that standard.  There is no tradition in American courts of litigation over whether, for example, a user of government computer systems submits requests via drop-down menu, a text box, one email submission, multiple email submissions, or (as is currently the case for SAVE) by uploading an excel spreadsheet with one or more requests at once.

The same problem could also be viewed through the lens of redressability.  All of Plaintiffs' concerns about voting and privacy rights, for example, would be equally applicable to a version of SAVE that allowed searches on SSA data, but still required those searches to be submitted one-by-one, as was the case before the spring of 2025 (or on paper, or by making an appointment at USCIS headquarters, or through any other method).  So although intentionally degrading SAVE to simulate 1990s era technology would make the system less efficient—and might require hiring

- 14 -

more staff—the end result for Plaintiffs' privacy and voting-related interests would be exactly the same.  All the same searches could happen on all the same data, all of which could still be reported to State and local governments in the same way that Plaintiffs dislike—just more slowly.  In other words, the relief that Plaintiffs' request on this issue would not actually redress any harm to Plaintiffs—it would just make things harder for government employees.

Accordingly, all of Plaintiffs' claims (and requests for relief) relating to the move from one-by-one to bulk submission of verification requests should be dismissed for lack of standing.

**C.    All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing.**

That leaves only one discrete change to SAVE: the agreement between USCIS and SSA that now allows SAVE users to submit requests to USCIS using a Social Security Number (partial or complete).  Plaintiffs offer several theories of standing on this issue, but all are meritless.

**1.    <u>Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing.</u>**

**a.**  Plaintiffs allege that their members "reasonably fear and are emotionally distressed by the unauthorized inter-governmental disclosure, aggregation, misuse, and potential mishandling of their sensitive personal data."  Am. Compl. ¶ 158.  Essentially, they claim to be worried that, due to increased information-sharing between DHS and SSA, they face some marginally increased risk that their data may, one day, be hacked or otherwise misused by some as-yet-unidentified bad actors.  This causes them stress.  In the words of Plaintiffs' declarants:

- "I am disturbed, uneasy, anxious, and frustrated that the government has violated my trust by collecting, disclosing, matching, and repurposing my personal information." Decl. of A. Nel ¶ 41; Decl. of B. Doe ¶ 46 (same); Decl. of C. Doe ¶ 32 (similar).

- "Beyond feeling violated by the disclosure of my personal information, I also feel scared. . . . I question how secure my information is."  Decl. of A. Doe ¶ 24.

- "Learning that my SSA data has been shared without my consent is distressing because it makes me feel vulnerable and nervous like I felt before I became a U.S. citizen." Decl. of B. Doe ¶ 40.

- "I am distressed by the fact that the government has repurposed my sensitive SSA data without my consent to determine my eligibility to vote, when the information is not suitable for that purpose and was never intended to be used in that way." Decl. of C. Doe ¶ 27.

This sort of speculative and emotional anxiety is not enough to support standing. In general, "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). Instead, "it is the *reality* of the threat of [future] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). The "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

The Supreme Court rejected a similar theory of standing in *Clapper*. There, the Second Circuit had "allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not fanciful, paranoid, or otherwise unreasonable." *Clapper*, 568 U.S. at 416. The Supreme Court reversed, explaining that the Second Circuit's approach "improperly waters down the fundamental requirements of Article III." *Id.* Those plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.*

*Clapper* is fatal to Plaintiffs' standing here. After all, unlike in *Clapper*, these Plaintiffs have not even demonstrated that they have "incurred certain costs as a reasonable reaction to a risk of harm," *id.*—they are mostly just *worried* about those risks. That is not enough, as the D.C. Circuit and other courts have recognized in analogous litigation brought by some of the same parties. *See, e.g.*, *EPIC v. Dep't of Com.*, 928 F.3d 95, 102 (D.C. Cir. 2019) ("[T]o the extent that EPIC relies on the potential disclosure of their citizenship status to third parties as the source of injury, we reject the theory as a 'speculative chain of possibilities' that cannot establish an injury." (quoting *Clapper*, 568 U.S. at 414)); *EPIC v. OPM*, No. 2025 WL 580596, at *5 (E.D. Va. Feb. 21, 2025) ("Plaintiffs' fear of harm from future exfiltration of their data by bad actors 'relies on a

- 16 -

highly attenuated chain of possibilities, and does not satisfy the requirement that threatened injury must be certainly impending.'" (quoting *Clapper*, 568 U.S. at 410)).

**b.** *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), is also fatal to Plaintiffs' theories of privacy-related injury. There, the Supreme Court rejected a standing theory based on "the risk of future harm" due to the mere existence of inaccurate credit-reporting information sitting in a computer database. *Id.* at 437. Because "the inaccurate OFAC alerts in their internal TransUnion files were" never "provided to third parties or caused a denial of credit," they did not cause any concrete Article III injury—only a speculative, increased risk of future harm, which did not suffice. *Id.* And although the Supreme Court formally reserved the question of whether "emotional or psychological harm" might support standing under different facts "by analogy to the tort of intentional infliction of emotional distress," *id.* at 436 n.7, Plaintiffs do not rely on any such analogy here. Nor could they—there is no allegation of any intentional conduct by any of the Defendants that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016), *as amended* (Dec. 13, 2018).

To be sure, *TransUnion* also recognizes that "[v]arious intangible harms can . . . be concrete" for standing purposes, at least in some circumstances. 594 U.S. at 425. But to qualify, such an injury must, at a minimum, bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.*; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). As examples, in *TransUnion*, the Supreme Court mentioned "reputational harms, disclosure of private information, and intrusion upon seclusion." 594 U.S. at 425. But for the reasons that follow, the harms alleged here bear no resemblance to any of those three theories:

**i. Intrusion Upon Seclusion.** The tort of intrusion upon seclusion makes liable any person "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (A.L.I. 1977); *see also Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989). The tort has three elements: "(1) an invasion or interference by physical

intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination; (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns; (3) that would be highly offensive to an ordinary, reasonable person." *Id.* (cleaned up). The D.C. Court of Appeals has explained that "the kind of invasion that this cause of action seeks to redress" are various forms of offensive "invasions" including harassment, peeping, eavesdropping, and so on. *See id.* at 1217-18; *see also Krakauer v. Dish Network, LLC*, 925 F.3d 643, 653 (4th Cir. 2019) (addressing "intrusions made via phone calls"). Or, as then-Judge Barrett termed it in a case cited in *TransUnion* itself, "irritating intrusions." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *see also TransUnion*, 594 U.S. at 425.

Plaintiffs' alleged injuries primarily stem from USCIS's ability to run searches based on Social Security numbers—numbers that were created by and for the use of the federal government—in a federal government database. But sharing of government-created data within the government bears no resemblance to the "irritating" intrusions envisioned by the tort of intrusion upon seclusion, even accepting the (incorrect) premise that such sharing is forbidden by statute.

Even if Plaintiffs could show that allowing USCIS to run searches involving their Social Security numbers could be analogized to an "invasion or interference" that has traditionally been actionable at common law, the access is not analogous to the types of conduct that have been deemed "highly offensive to an ordinary, reasonable person" for purposes of the tort. *Wolf*, 553 A.2d at 1217. Here, the federal government is simply using federal-government information to carry out its legal responsibilities under federal law. *See* 8 U.S.C. § 1373. Indeed, much like in *TransUnion* itself, Plaintiffs here would generally have no reason even to *know* that a USCIS employee has queried their information for purposes of responding to a SAVE request. *See* 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where no evidence showed they "even *knew*" their files contained inaccurate information).[7]

---

[7] For additional examples of injury contemplated by the tort of intrusion upon seclusion, all of which stand in stark contrast with Plaintiffs' alleged injury here, *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained

The Fourth Circuit, in the preliminary injunction context, recently affirmed that allegedly unauthorized access by government employees to individual data is likely not closely related to the tort of intrusion upon seclusion. *See Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025). As the Fourth Circuit explained, "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Id.* at 172 (citing Restatement (Second) of Torts § 652B cmt. a). On the other hand, the alleged "harm that might come from [a] generalized grant of database access to an additional handful of government employees . . . seems different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi" traditionally recognized by the tort. *Id.*; *see also Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. SSA*, No. 25-1411, 2025 WL 1249608, at *7 (4th Cir. Apr. 30, 2025) (en banc) (Richardson, J., dissenting) ("anxiety and distress from the fact DOGE-affiliated employees can access SSA databases" "does not establish the sort of 'unease' that has been 'traditionally recognized as providing a basis for a lawsuit' under the tort of intrusion upon seclusion" (quoting *TransUnion*, 594 U.S. at 424)); *stay granted*, 605 U.S. ---, 145 S. Ct. 1626 (2025) (mem.).[8]

---

plaintiffs' information to mail unsolicited advertising materials to the plaintiffs' homes); *Krakauer*, 925 F.3d at 653 (addressing "intrusions made via phone calls"); *Gadelhak*, 950 F.3d at 462 (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345-46 (6th Cir. 2023) (concluding that "invasion-of-privacy-like harms flow[] from unwanted telephonic communications" in part because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1192 (10th Cir. 2021) (standing based on unwanted telephone communications because they were an "unwanted intrusion into [the plaintiff's] peace and quiet"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir.) (explaining that other courts have "found that the harm caused by unwanted communications bears a close relationship to intrusion upon seclusion"), *cert. denied*, 146 S. Ct. 120 (2025) (mem.).

[8] Plaintiffs (at 14) cite a few recent district-court opinions to the contrary, such as *AFL-CIO v. Department of Labor*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025)—a case that agreed with, and relied upon, two decisions of the District of Maryland that were later rejected on appeal (once by the Fourth Circuit and once by the Supreme Court). *See also, e.g.*, 2026 WL 879518 (D.D.C. Mar. 31, 2026); *Nemeth-Greenleaf v. OPM*, 2026 WL 607905, at *5 (D.D.C. Mar. 4, 2026). Defendants

**ii. Breach of Confidence.** Plaintiffs' reliance on the tort of "breach of confidence" is also misplaced. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (citation omitted). To start, it is doubtful whether this tort qualifies as a traditional cause of action that satisfies *TransUnion*. *See* 594 U.S. at 427 (stating that "lawsuit may not proceed because that plaintiff has not suffered any . . . harm traditionally recognized as providing a basis for a lawsuit in American courts"). While the D.C. Circuit in *Jeffries* invoked the tort to find standing, that decision predates *TransUnion*; does not address whether the tort has a sufficient historical origin; and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See* 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

In that en banc decision, decided after *Jeffries*, the Eleventh Circuit questioned—without deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo*, 578 U.S. at 341). The Eleventh Circuit found that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out in its infancy." *Id.* (citation omitted). The Second Circuit, moreover, has described it as "a relative newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. DOJ*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent and underdeveloped pedigree raises serious doubts about whether this tort could ever serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action. 594 U.S. at 414.

---

respectfully disagree with those decisions for the reasons stated in this brief, in the relevant opinions from the Fourth Circuit, *see Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025); *AFL-CIO v. SSA*, 2025 WL 1249608, at *7 (en banc) (Richardson, J., dissenting), and consistent with the Supreme Court's subsequent decision to grant the government's application for a stay, *SSA v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 145 S. Ct. 1626 (2025).

But even if the breach-of-confidence tort could sometimes be a permissible analogue for standing purposes under *TransUnion*, the facts here bear no resemblance to the circumstances where it applies—*e.g.*, the physician-patient or bank-customer relationships. *Young*, 882 F.2d at 640. In *Jeffries*, the D.C. Circuit analogized it to a situation involving unauthorized disclosure of credit card information, which is close to the bank-customer framework. 928 F.3d at 1064. This case, by contrast, involves intra-governmental sharing of data created by and for the use of the federal government. Social Security numbers were not provided by Plaintiffs *to* the government in confidence—just the opposite, they were created by (and for) the federal government, and provided *to* the Plaintiffs. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *Am. Fed'n of Lab.*, 778 F. Supp. 3d at 73 (quoting *Jeffries*, 928 F.3d at 1064). This case alleges nothing of the sort. So Plaintiffs' reliance on an analogy to the tort of breach of confidence also fails.

    **iii. Defamation.** For the first time in this case, Plaintiffs try a third common-law-tort analogue: defamation. In Plaintiffs' view, "DHS provided false information to SAVE users . . . indicating that certain LWVTX and EPIC members were not citizens," which was "effectively labeling them as criminals." Pls.' Br. at 16. Plaintiffs were right to omit this argument the first time, because nothing about the recent changes to SAVE bears any "close relationship" to the harm suffered by a victim of defamation at common law. Nobody here has been "labeled a 'potential terrorist,'" or anything close, *TransUnion*, 594 U.S. at 433—and certainly not by DHS or SSA.

    As a threshold matter, unlike the breach-of-confidence and intrusion-upon-seclusion theories—which purport to be about the privacy rights of *everyone* with information accessible by SAVE—Plaintiffs' defamation theory only works for the exponentially smaller universe of people who have actually established that SAVE provided some inaccurate result to a SAVE user. Plaintiffs seem to recognize this, by limiting this argument to a handful of Plaintiffs' declarants, all of whom are in Texas. *See* Pls.' Br. at 16 (citing declarations of A. Nel, A. Doe, B. Doe, and C. Doe).

    In any event, even with respect to the extremely small universe of people who have some reason to think that SAVE might have provided some inaccurate information about them in the

past, there is no reason to think that this harm will repeat itself. To the contrary, Plaintiffs' own declarations establish that States have established processes to remedy any such inaccuracies. *See, e.g.*, Decl. of A. Doe ¶ 14 ("I did email a scan of my passport to the County Elections Office in order to preserve my right to vote."). And where, as here, Plaintiffs seek only prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103. That is a significant (indeed, dispositive) distinction with *TransUnion*. Critically, in *TransUnion*, the individuals who had been labeled "potential terrorists" were seeking money damages to compensate for past harms. 594 U.S. at 421-22. These individuals are not (and could not, due to sovereign immunity).

Regardless, Plaintiffs have not alleged anything close to defamation. As the Supreme Court explained in *TransUnion* itself, "[u]nder longstanding American law, a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule'" is published to a third party." *Id.* at 432 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990)). But a former non-citizen being described as a current non-citizen—even if mistakenly and inaccurately, after naturalization—does not come close to meeting that test. This is nothing like being labeled a "potential terrorist," as in *TransUnion*. *See, e.g.*, *Mann*, 150 A.3d at 1241 (a defamatory statement "must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous"). The factual predicate for this theory is thus not satisfied.

Plaintiffs argue that, because "[i]t is a federal crime for non-citizens to vote or register to vote in federal elections," Pls.' Br. at 16, someone could theoretically connect the dots and then make an (erroneous) assumption that the person in question had committed a crime. But DHS and SSA do not have any knowledge—and, critically here, made no public statement—about who is or is not registered to vote in any particular state, or who has voted in the past. In other words, even adopting the most dramatic interpretation possible of Plaintiffs' theory of reputational harm, it was State officials (if anyone) who uttered any statement that (arguably) implied any criminality. By responding to a SAVE verification request, DHS is not making any judgment—much less any public statement—about anyone's criminal culpability. USCIS does not "[d]etermine applicant

eligibility for a specific benefit or license." *About SAVE*, *supra* at 1. "That determination is made by the" SAVE user alone. *Id.* And so, as SAVE agreements makes clear, although "DHS-USCIS will verify limited citizenship and immigration status information," it "will not recommend" to the SAVE user what to do (if anything) with that information. *See* Memorandum of Agreement, *supra* at 8. Were there any doubt, those agreements also specify that "[t]he DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency." *Id.* Instead, it is the SAVE user who always retains "the responsibility to determine the registrant's or registered voter's eligibility for the benefit." *Id.* So, even accepting the (dubious) premise that anyone has suffered any defamation-like harm, it would not have been defamation *by Defendants*.

     **2.**     <u>Plaintiffs' alleged voting-related injuries are impermissibly speculative, and are neither caused by the federal government nor redressable in this suit.</u>

Plaintiffs allege that their members have "credible fears of being erroneously disenfranchised, facing additional obstacles to voting, and being subjected to baseless criminal investigations into their lawful voting." Am. Compl. ¶ 175. This theory of standing is baseless for multiple reasons—some factual, some legal. On the facts, Plaintiffs' own submissions confirm that it is extraordinarily unlikely that any individual (much less any member of any Plaintiff association) will suffer any of the problems that they claim to fear. That is so even if, as appears to be the case, Plaintiffs have now located four individuals—of the many *millions* of people at issue—who have had to deal with some minor inconveniences to correct their records. Absent speculation that State officials are going to commit widespread violations of the law, there is still no reason to think that any future injury to any of the Plaintiffs (or their members) is likely, let alone imminent or "certainly impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2). In any event, Plaintiffs cannot sue the federal government on the theory that *State* officials might improperly run an election in that State. That mismatch between Plaintiffs' theory of harm and the claims they bring here creates causation and redressability problems that independently warrant dismissal.

**a.** First, the facts. At the preliminary-injunction stage, this Court held (correctly) that, at that time, "Plaintiffs ha[d] not identified a single individual who has experienced" any actual (rather than "hypothetical") voting-related injury. *League of Women Voters*, 2025 WL 3198970, at *7. Now, after many more "millions of Americans" have been verified via SAVE, Am. Compl. ¶ 131, Plaintiffs have found four people who were apparently asked to confirm their citizenship to Texas officials. *See generally* Decl. of A. Nel; Decl. of A. Doe; Decl. of B. Doe; Decl. of C. Doe.

But Plaintiffs here are not seeking to redress a past injury—they are seeking prospective injunctive relief to redress a *future* injury. And there is no reason to think that any of the individuals who have already gone through this process once will be subjected to it again. *See Lyons*, 461 U.S. at 95. To the contrary, it is presumably even *less* likely that these particular individuals will ever again face any problem of the sort—all having now had the opportunity to correct their records. *See* Decl. of A. Nel ¶ 23; Decl. of A. Doe ¶ 14; Decl. of B. Doe ¶ 27; Decl. of C. Doe ¶ 18. Accordingly, those individuals lack standing to seek forward-looking relief just as much—or more—as anyone else relying on pure speculation about highly unlikely future events.

Indeed, despite a handful of edge cases, overall, the record is now even *less* favorable to Plaintiffs than it was at the preliminary-injunction stage. That is because the Court can now be *more* confident that the odds that any of these individuals—or *any* individual, much less one that also happens to be a member of a Plaintiff association—will ever face some concrete injury as a result of the 2025 changes to SAVE is astronomically small. In 2025 and 2026, approximately 59.7 million SAVE verifications were completed for purposes of voter-verification. Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶ 22. With numbers like that, finding mistakes in a single-digit number of individuals strongly suggests that SAVE is working well—not poorly. And in general, that Plaintiffs' doomsday predictions have already failed to come to pass once should inform this Court's assessment of their latest predictions. *See, e.g.*, Pls.' Mot. to Stay at 17, ECF No. 16 (in October of 2025, predicting incorrectly that "millions of eligible voters could be wrongly disenfranchised" in the absence of preliminary relief).

- 24 -

Plaintiffs' declarations further undermine their cause. For one thing, they repeatedly underscore the extraordinarily small number of individuals who have faced any issues of the sort that Plaintiffs are concerned about. For example, the President of LWVLA says that, according to Louisiana officials, there were "390 non-citizen registered voters" identified in Louisiana of the "2.9 million registered voters" that were recently run through SAVE. Suppl. Decl. of M. Green ¶ 27. That means that only 1 of about every 7,400 registered voters appeared on the sort of list that Plaintiff fears. And of those 390 individuals, surely some of them—one would expect, the vast majority—were on that list because they *are*, in fact, non-citizens. And returning to the preliminary-injunction record (which Plaintiffs seem to try to incorporate by reference, *see* Pls.' Index of Declarations, ECF No. 66-2), multiple individuals previously submitted sworn declarations to this Court about their concerns about voting in various elections in fall of 2025 and early 2026. That this Court never heard anything further from those declarants is even more "telling" now than it was at the preliminary-injunction phase. *League of Women Voters*, 2025 WL 3198970, at *7.

Ultimately, to support standing, "the injury must be actual or imminent, not speculative— meaning that the injury must have already occurred or be likely to occur soon." *Alliance*, 602 U.S. at 381. Under these circumstances, the inability to identify even a full handful of examples of voters who faced any paperwork issues (much less actual disenfranchisement)—even though all the changes to the SAVE system that Plaintiffs complain about took effect approximately a year ago—significantly undermines the credibility of Plaintiffs' predictions about the likelihood of future harm coming to any of the Plaintiffs in this suit (or their members). In short, with respect to any particular individual (or member of an of the Plaintiff organizations), Plaintiffs still offer no more than a highly speculative theory of *possible* future injury. And "allegations of *possible* future injury are not sufficient" to support standing. *Clapper*, 568 U.S. at 409.

**b.** Second, on the law, Plaintiffs' voting-related standing theories are even more tenuous— because the critical role played by State officials enforcing State voting laws creates a straightforward causation (*i.e.*, traceability) and redressability problem. "[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not

before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). When it comes to their fears of "obstacles to voting," or being "subjected to baseless criminal investigations," Am. Compl. ¶ 175, Plaintiffs have sued the wrong government. *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) ("[E]njoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements.").

It bears repeating: this is a lawsuit against federal agencies, based on the theory that improved search functionality in a (congressionally mandated) USCIS database violates the law. Despite some scattered rhetoric that sweeps more broadly, Plaintiffs do not seek any relief (nor make any legal claims) relating to the management of State voter rolls. That is unsurprising, as neither SSA nor USCIS is responsible for how State officials manage State voter rolls under State law.

To be sure, if USCIS receives "an inquiry" from a State "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law," then USCIS has an "[o]bligation to respond" "by providing the requested verification or status information." 8 U.S.C. § 1373(c). USCIS has fulfilled that obligation, for decades, using the SAVE system. But that doesn't make SSA or USCIS legally responsible for the possible future second- and third-order effects that may later result from State officials exercising their discretion to enforce State law.

So, for example, if a State official receives a verification response from USCIS, through SAVE, and then uses that information to subject a U.S. citizen "to baseless criminal investigations" that impedes "their fundamental right to vote," Am. Compl. ¶¶ 162, 175, that could conceivably be a legal problem—but it is a problem between that citizen and the relevant State. USCIS is not responsible (and this Court cannot confidently predict) how State officials will carry out their discretion under State law. The Supreme Court has appropriately been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, but Plaintiffs would have this Court do exactly that.

That all of Plaintiffs' examples are from the same State (Texas), only underscores why Plaintiffs' real gripe is with States, rather than DHS or SSA. To be clear, Defendants are not

suggesting that Texas has violated the law—only that the significant variation between States show that it is States, not the federal government, that are ultimately the cause of any voting-related injury attributed to State-led voter-verification processes.  Neither DHS nor SSA should be on the hook for the widely varying procedures used (or not used) by State officials in carrying out States' legal obligations to maintain accurate voter rolls.  After all, both federal law, *see* 52 U.S.C. § 21083(a)(4)(B), and SAVE user agreements, *see* Memorandum of Agreement, *supra* at 8, require States to proceed cautiously before cancelling anyone's voter registration.  But beyond securing that commitment from States *before* fulfilling any voter-verification requests—as USCIS (undisputedly) does—DHS and SSA play no role in the management of state voter rolls.

To show standing via assumptions about independent third parties, at a minimum, "[r]ather than guesswork, the plaintiffs must show that the third-party" State officials "will likely react in predictable ways to the defendants' conduct."  *Murthy*, 603 U.S. at 57-58.  But States are always required to maintain "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters."  52 U.S.C. § 21083(a)(4)(B).  Plaintiffs have not alleged (let alone demonstrated) that any State has violated or will violate any of those laws.  Plaintiffs' cynical assumptions of widespread, unlawful, accidental disenfranchisement of U.S. citizens would hardly be a "predictable" act by any State officials.  Just the opposite—the Court should presume that State officials will *follow* the law, not violate it.  *See Nieves v. Bartlett*, 587 U.S. 391, 400 (2019) (discussing the "presumption of regularity" that attaches to State law-enforcement officials).

Of course, there are many possible explanations for this disconnect between the rhetoric in Plaintiffs' filings and the evidence (or lack thereof) of any widespread real-world problems.  Because it is Plaintiffs' burden to establish standing (rather than Defendants' burden to refute it), neither Defendants nor the Court needs to do any investigation of State law-enforcement practices to get to the bottom of Plaintiffs' concerns about the possible future mistakes that might be made by independent third parties who are not before the Court.  Even so, there are several obvious logical flaws in Plaintiffs' assumptions about standing that are worth pointing out.

First, Plaintiffs seem to assume that they are the only ones who know that SSA "records do not provide definitive information about an individual's citizenship status." Am. Compl. ¶ 118. There is no factual basis for that assumption. In fact, SSA shares publicly many policies about the citizenship and immigration-related data that it does (or does not) collect and maintain. *See, e.g.*, SSA, Program Operations Manual System, RM 10210.500, *General Information on Evidence of U.S. Citizenship for a Social Security Number Card*, https://perma.cc/HX8Y-W2XK. Presumably, the relevant State officials know just as much (or more) than the Plaintiffs do about the systems they use to manage their own voter rolls.

Second, Plaintiffs likewise seem to assume that, because *SSA* does not have complete records about naturalization, that any SAVE verification involving an SSN for a naturalized citizen will necessarily return inaccurate results. Again, that assumption is baseless. Setting aside SSA, it is undisputed that *USCIS* has extensive records about which citizens have (or have not) naturalized, or derived citizenship, and so on. Plaintiffs offer no reason to think that USCIS would ignore its own records before responding to a SAVE verification request. And in fact, USCIS is appropriately cautious before providing any voter-verification response other than one that confirms that the voter in question is (1) a U.S. citizen, or (2) deceased. *See* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶¶ 12-16 (discussing when cases are "escalated to manual review," and confirming that "SAVE only returns a response to a user agency based on an SSA record when: (1) the information matches an SSA record indicating U.S. Citizenship or (2) the information matches an SSA record indicating the individual is deceased"); *accord Voter Registration and Voter List Maintenance Fact Sheet*, *supra* at 8 (discussing procedures to be followed "[i]f the SAVE response is other than U.S. Citizen"); Oct. 22, 2025 Decl. of B. Broderick ¶¶ 11-14, ECF No. 37-1.

Ultimately though, whether it is for legal, practical, or political reasons, there is no basis to assume that State officials have any interest in haphazardly and unlawfully removing large numbers of U.S. citizens from their voter rolls, and no credible evidence that any such thing has happened or is going to happen any time soon. And even if it did, that would at most be a basis for a lawsuit against the relevant State—not the federal government.

**3.**    Plaintiffs' diversion-of-resources theory of organizational standing is inconsistent with recent Supreme Court precedent.

Plaintiffs LWVTX and LWVLA rely on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), in an effort to show organizational standing. *See* Pls.' Br. at 20-22. Plaintiffs allege, for example, that the improvements to SAVE "harm[] the state League Plaintiffs' core mission and disrupts and impairs their mission-critical efforts." Am. Compl. ¶ 174. How so? For example, they have allegedly "expended scarce resources in response to the SAVE overhaul to counteract its harmful effects," which has "require[d] them to expend critical staff time and other resources" that could have instead been focused elsewhere. *Id.* ¶¶ 178, 182.

This theory of standing is inconsistent with *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The *Alliance* plaintiffs, medical associations and several individual doctors, challenged FDA actions making it easier for doctors to prescribe mifepristone. *Id.* at 376. Those plaintiffs did not prescribe or use mifepristone, and FDA did not impose any relevant regulatory requirements on plaintiffs. The *Alliance* Court observed that organizations may "sue on their own behalf for injuries *they* have sustained," *id.* at 393 (quoting *Havens*, 455 U.S. at 379 n.19) (emphasis added), but also clarified that an organization cannot establish injury by asserting the right of others: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381. In doing so, *Alliance* explicitly rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Id.* at 395. After *Alliance*, it is now clear that a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.

Plaintiffs' extensive allegations about, for example, having "expended scarce resources in response to the SAVE overhaul," Am. Compl. ¶ 178, are exactly the sort of "diversion of resources" arguments rejected in *Alliance*. But Plaintiffs' brief does not engage with *Alliance* at all, nor its rejection of the maximalist interpretation of *Havens* that imbues the amended complaint.

- 29 -

Instead, Plaintiffs double down on a strained factual analogy to "*Havens* itself"—a case about racist lies regarding apartment availability to black renters—arguing that "SAVE's *inaccurate* citizenship information frustrates their ability to provide their core registration and engagement services." Pls.' Br. at 21. Unlike in *Havens*, none of the Plaintiff organizations here are requesting (or receiving) *any* information (accurate or inaccurate) from the Defendants. And more fundamentally, the factual coincidence that *Havens* happened to be a case (at least, at a very high level of generality) about inaccurate information has no bearing on the viability of the *legal* theory of Article III standing that *Alliance* rejected. After all, "*Havens* was an unusual case, and [the Supreme] Court has been careful not to extend the *Havens* holding beyond its context." *Alliance*, 602 U.S. at 396. Plaintiffs ask this Court to do exactly that.

### 4. EPIC's alleged procedural and informational injuries cannot independently support Article III standing.

Finally, Plaintiff EPIC (and only Plaintiff EPIC) also tries to show standing on a procedural-injury theory, claiming harm due to the absence of "notice-and-comment opportunities to which it is legally entitled." Pls.' Br. at 23; *see also* Am. Compl. ¶¶ 186-95. But those allegations of procedural injury—which seem to apply only to Counts 7 and 8, about computer-matching agreements—add nothing to EPIC's other theories of standing. That is because "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1314 (D.C. Cir. 2025) (quoting *Summers*, 555 U.S. at 496). In other words, even when a plaintiff alleges a violation of some procedural right, the plaintiff still "must show that the violation of a procedural right 'resulted in injury' to some 'concrete, particularized interest.'" *Id.* at 1315 (quoting *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)). So, if EPIC cannot show a separate concrete injury, then allegations of procedural violations get it no closer to standing. *See, e.g., EPIC*, 928 F.3d at 102 ("EPIC must allege harm that is distinct from a simple failure to comply with the procedural requirements of § 208."). The

ultimate question thus remains the same: whether EPIC can demonstrate "some concrete interest" connected to the alleged violation of law.  And for the reasons already explained above, it cannot.

At times, EPIC also refers to informational injuries, asserting that the organization "routinely relies on information that the Privacy Act mandates agencies to disclose, including information in SORNs and matching agreements."  Pls.' Br. at 23.  This is mostly just another way of repackaging their allegations of procedural harm, so it fails for the same reasons.  But, to the extent that EPIC does try to rely on an independent theory of informational standing, that effort fails for two reasons: (1) because the relevant provisions of the Privacy Act do not create any "informational" rights, and (2) because EPIC already has the information that it claims to be looking for.

The D.C. Circuit has "recognized that a denial of access to information can, in certain circumstances, work an 'injury in fact' for standing purposes."  *EPIC v. PACEI*, 878 F.3d 371, 378 (D.C. Cir. 2017).  But, "[t]o carry its burden of demonstrating a sufficiently concrete and particularized informational injury, the plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."  *Id.*

Unlike FOIA, the Privacy Act "was not designed to vest a general right to information in the public."  *EPIC*, 928 F.3d at 103 (discussing the E-Government Act); *see also, e.g.*, First Compl. ¶ 50, ECF No. 1 ("The Privacy Act's 'raison d'etre' is 'to provide for protection against possible abuses of governmental power to affect an individual's privacy and confidential information.'" (quoting *Williams v. Dep't of Veterans Affs.*, 104 F.3d 670, 676 (4th Cir. 1997)).  "Rather, the statute was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making."  *EPIC*, 928 F.3d at 103.  "In this respect," the Privacy Act "is fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself."  *Id.*  Accordingly, "[b]ecause the lack of information itself is not the harm that Congress sought to prevent through" the Privacy Act,

Plaintiffs "must show how the lack of a timely" computer matching agreement "caused its members to suffer the kind of harm that Congress did intend to prevent: harm to individual privacy." *Id.* at 103-04. And again, for all the reasons above, Plaintiffs cannot make that showing—so Plaintiffs "cannot show an informational injury, just as [they] cannot show a privacy injury." *Id.* at 104.

Even if the Privacy Act were the sort of statute that created informational rights, this theory of standing still doesn't work, because EPIC already has the information it claims to be looking for. EPIC argues that it "routinely relies on information that the Privacy Act mandates agencies to disclose, including information in SORNs and matching agreements." Pls.' Br. at 23. But as for "information in SORNs," DHS and SSA have *already* published SORNs relating to the 2025 changes to SAVE. *See* Oct. 28, 2025 Hr'g Tr. at 76:4-6 (Mr. Sus: "If they do publish SORNS, that would, we agree, address our informational injuries both for DHS and SSA."), ECF No. 48.

As for information in "[m]atching agreements," those agreements typically include, for example, "the purpose and legal authority for conducting the program," "procedures for ensuring the administrative, technical, and physical security of the records," and so on. 5 U.S.C. § 552a(o). But that sort of information is already included in the DHS-SSA agreement that has been public for over six months and that is in the administrative record. *See supra* at 8; DHS-AR-420-31; SSA-AR-6-49, 89-108. And DHS and SSA have also published (and included in the administrative record) much *more* information in various Privacy Impact Assessments (PIAs) and SORN amendment records. *See* DHS-AR-141-243, 374-95, 483-90; SSA-AR-109-363. So even if EPIC could have alleged an informational injury before, any such injury has been long since resolved.[9]

One further point about informational injury warrants mention. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. And so, even if EPIC could show, for example, that it suffered some cognizable informational injury from the failure to publish

---

[9] Even if there were some small delta between the information required by 5 U.S.C. § 552a(o) and the information that has already been provided to EPIC, that would still only support standing if EPIC could show that that delta caused it some concrete injury. EPIC has not even tried to make that showing.

a computer-matching agreement about changes to SAVE, the appropriate remedy for that injury would be (at most) an order requiring publication of a computer-matching agreement. *See* Proposed Order at 2 ("Defendants shall publish all statutorily required matching-agreement information concerning the overhauled SAVE system in the Federal Register"). That theory of standing could never justify any of the other, more ambitious relief that Plaintiffs seek, relating to the general operations of what Plaintiffs describe as the "overhauled SAVE system." *Id.*

*    *    *

The law of Article III standing "is 'built on a single basic idea—the idea of separation of powers.'" *Alliance*, 602 U.S. at 378 (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). Plaintiffs seem to have sincere policy concerns with the way USCIS is carrying out its legal obligations to respond to citizenship verification requests. That is their right. But federal "courts do not opine on legal issues in response to citizens who might roam the country in search of governmental wrongdoing." *Id.* at 379. To enforce that important constitutional principle, this suit should be dismissed, in its entirety, for lack of subject-matter jurisdiction. At an absolute minimum, the court should dismiss any Plaintiffs (and any claims, or requests for relief) for which Plaintiffs have failed to carry their standing burden at summary judgment.

## II.    PLAINTIFFS' PRIVACY ACT NOTICE-AND-COMMENT CLAIM (COUNT 5) IS MOOT.

The mootness doctrine "ensures compliance with Article III's case and controversy requirement by limiting federal courts to deciding actual, ongoing controversies." *Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019). A dispute is moot when "the court can provide no effective remedy because a party has already obtained all the relief that it has sought." *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (cleaned up). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council, Inc. v. NRC*, 680 F.2d 810, 814 (D.C. Cir. 1982).

**a.** In their original complaint, Plaintiffs' lead claim alleged that Defendants changed SAVE "without first publishing a SORN or soliciting public comment . . . in violation of the Privacy Act."

- 33 -

First Compl. ¶ 210. Shortly before the Court denied Plaintiffs' motion for preliminary relief, however, DHS and SSA published revised SORNs to allow for the information-sharing in question, and solicited comments for 30 days. *See* DHS, *Notice of a Modified System of Records*, 90 Fed. Reg. 48,948 (Oct. 31, 2025); SSA, *Notice of a Modified System of Records*, 90 Fed. Reg. 50,879 (Nov. 12, 2025). Defendants notified Plaintiffs and the Court. *See* ECF Nos. 51, 54. Despite those significant intervening events, Count 5 of Plaintiffs' amended complaint continues to assert essentially the same notice-and-comment claim—though, tellingly, now phrased as a violation that occurred in the past tense. *See, e.g.*, Am. Compl. ¶ 232 ("DHS did not publish a modified SORN for SAVE or solicit public comment on new routine uses until October 31, 2025.").

Given these events, Count 5 is now moot. Whether or not the Privacy Act applies here at all, *but see* 8 U.S.C. § 1373, and whether or not the prior SORNs permitted the sharing of this information, DHS and SSA have now published the SORNs and solicited the comments that Plaintiffs alleged were required by the Privacy Act. In doing so, both agencies complied with all notice-and-comment provisions in the Privacy Act: by (1) providing notice of the change and (2) soliciting comments for 30 days. *See* 5 U.S.C. § 552a(e)(4), (e)(11).

Although Defendants do not concede that these specific updates to these SORNs were legally required, the Court need not decide that question now, because DHS and SSA have now addressed Plaintiffs' stated concerns through the new SORNs, which explicitly (1) detail the use of SAVE for verifying citizenship, including of U.S. citizens, (2) identify SSA's Numident database as an authorized source of information for SAVE, and (3) authorize sharing of SSA data to DHS for purposes of verifying citizenship. In other words, regardless of whether the agencies' previous actions violated the Privacy Act, those agencies took "[c]orrective action" by publishing the revised SORNs and soliciting comments. *Nat. Res. Def. Council*, 680 F.2d at 814. And because "[a] new system is now in place," in which published SORNs expressly authorize the use of SAVE to verify citizenship and the sharing of SSA data for that purpose, *Nat'l Mining Ass'n v. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001), the Court cannot grant "any effectual relief" on Count 5, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (cleaned up). So Count

5 is moot. *See Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184, 1191 (D.C. Cir. 2004) (reissuing rule with notice-and-comment mooted claim that rule was promulgated without those procedures); *Collette v. District of Columbia*, No. 18-cv-1104 (RC), 2019 WL 3502927, at *12 (D.D.C. Aug. 1, 2019) (claims asserting procedural violations moot once procedures invoked).

**b.** In rare cases, exceptions to mootness may apply for: (1) actions "capable of repetition yet evading review," *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990), or (2) a defendant's "voluntary cessation of the challenged practice," *FBI v. Fikre*, 601 U.S. 234, 241 (2024). Neither exception applies here.

The capable-of-repetition-yet-evading-review exception requires that "a reasonable expectation that the same complaining party would be subjected to the same action again." *Clarke*, 915 F.2d at 703. But disputes that are "sharply focused on a unique factual context" "rarely present a reasonable expectation that the same complaining party would be subjected to the same actions again." *J.T. v. District of Columbia*, 983 F.3d 516, 524 (D.C. Cir. 2020) (citation omitted). Here, the current dispute regards the propriety of the use of particular information, in a particular program, by particular agencies, under particular Privacy Act SORNs—a unique factual and legal context. Moreover, the "discrete wrong" alleged by Plaintiffs—specifically, DHS accessing SSA Numident data through SAVE without first complying with all procedures in the Privacy Act— will not occur again. *Harvey v. Lynch*, 123 F. Supp. 3d 3, 8 (D.D.C. 2015). That alleged wrong "came to an end" when the revised SORNs took effect. *Id.* Accordingly, any future use of SAVE for the same purpose will be authorized by a SORN published pursuant to the Privacy Act.

The voluntary-cessation exception is also inapplicable. That exception prevents a defendant from manipulating the judicial process by stopping unlawful activity when sued, only to resume it again later to avoid judicial review. *See Fikre*, 601 U.S. at 241 (citing *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). Here, DHS and SSA have now published SORNs that explicitly authorize this information sharing. Now that they have done the work to draft and publish these new SORNs, there is no reasonable basis to expect either DHS or SSA to rescind them. Among other reasons, these new SORNs explicitly authorize the information sharing in question—thus

- 35 -

eliminating any litigation risk under the Privacy Act might have existed before.  If Plaintiffs were to suggest otherwise, they would be asking this Court to improperly "impute . . . manipulative conduct to a coordinate branch of government" against the D.C. Circuit's express guidance. *Alaska v. USDA*, 17 F.4th 1224, 1227 (D.C. Cir. 2021) (citation omitted).

**c.**  Judge Kollar-Kotelly recently came to the same conclusion on the same facts.  Other plaintiffs brought a nearly identical claim as Plaintiffs do here, "challeng[ing] DHS's recent changes to the SAVE program, arguing that the new data-sharing practices violate the Privacy Act." *LULAC*, 2026 WL 252420, at *53.  In that case, "[s]oon after briefing on the parties' cross-motions for summary judgment concluded, the Federal Defendants notified [Judge Kollar-Kotelly] that DHS and SSA had issued new SORNs relating to the use of SAVE and Numident." *Id.*  As a result, Judge Kollar-Kotelly held that plaintiffs' "claim for injunctive relief against the relevant changes to SAVE and Numident based on the Privacy Act is moot." *Id.* at *54.  So too here.

## III.    PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION.

"The APA authorizes courts to review only 'final agency action[s].'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) (quoting 5 U.S.C. § 704).  "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  "Each prong of *Bennett* must be satisfied independently for agency action to be final." *Id.*

The agency action in question must also be "circumscribed" and "discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004).  Plaintiffs cannot, for example, "seek wholesale improvement of" an agency "program by court decree," they instead "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Id.* at 64 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

Here, Plaintiffs use the word "overhaul" to capture the 2025 changes to SAVE that they challenge in this suit.  *See generally* Am. Compl.; Pls.' Br.  That may work as rhetoric, but not as a discrete and final agency action that can be challenged under the APA.  Instead, to satisfy those

requirements, Plaintiffs must identify what, exactly, the agency did that they are seeking to challenge, on the theory that it both violated the law and caused them some Article III injury that would be remedied by a court order.  Ultimately, Plaintiffs offer only three plausible candidates: (1) the switch to acceptance of bulk requests; (2) the agreement between DHS and SSA allowing SAVE to search on SSA data; and (3) the Privacy Act SORNs that were published to memorialize the two changes above.  *See* Am. Compl. ¶ 198 (listing alleged final agency actions); Proposed Order at 1 n.1 (defining the term "SAVE overhaul").  So, despite Plaintiffs' repeated references to a "SAVE overhaul," those are the only agency actions that are actually at stake in this litigation.  None is challengeable "final agency action" within the meaning of 5 U.S.C. § 704.

First, allowing SAVE users to upload and submit SAVE requests in bulk is a software-based customer-service improvement—not an agency action that determines any "rights or obligations" or has "legal consequences." *Bennett*, 520 U.S. at 177-78.  On this issue, the only difference between the old system and the new system is how quickly it works—before bulk upload, SAVE could verify all of the same records as it can now, it just took more time to submit requests. If DHS had retained the one-by-one request requirement, but then user agencies hired thousands of additional people to do nothing but submit SAVE requests more quickly, then Plaintiffs would be facing the same situation (and certainly the same legal regime).  So this software improvement cannot be a final agency action.  *See supra* at 14-15 (no standing to challenge bulk submission).

Second, as for the agreement between DHS and SSA that memorializes the agencies' intent to allow SAVE to search on SSA data, recent D.C. Circuit precedent confirms that it too fails to qualify as final agency action.  In *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), the plaintiffs had challenged "an IRS-ICE memorandum of understanding for sharing taxpayer address information in connection with immigration enforcement." *Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-cv-1774 (JEB), 2026 WL 820811, at *18 (D.D.C. Mar. 25, 2026) (citing *Centro de Trabajadores*, 167 F.4th at 1224).  That "MOU was not the product of notice-and-comment rulemaking," the government "never characterized it as a 'rule,' and neither party . . . argued that IRS relies on the MOU to justify its actions." *Centro de Trabajadores*, 167

F.4th at 1236.  Instead, "[t]he MOU merely outline[d] the process through which ICE can request addresses from IRS." *Id.*  Ultimately, its purpose was to "merely 'explain how IRS will administer' a process established by statute and 'make[] explicit existing requirements.'"  *Id.* (quoting *Del. Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1204 (D.C. Cir. 2024) (cleaned up)).

The same is true of the DHS-SSA agreement at issue here.  It is not "a rule," and the government does not "rel[y] on the MOU" as legal justification for any of the information-sharing at issue in this case.  *Id.*  Instead, the agreement simply memorializes and explains how the agencies "will administer" the information-sharing already contemplated by statutes like 8 U.S.C. § 1373.  So, as Chief Judge Boasberg held in a similar context just last week, "[a]ny substantive change" attributable to the MOU stemmed not from the MOU itself but "from the Administration's decision to use statutorily authorized tools" to "further its objectives."  *Robert F. Kennedy Human Rights*, 2026 WL 820811, at *18 (quoting *Centro de Trabajadores*, 167 F.4th at 1228) (cleaned up).  Plaintiffs, to be sure, disagree with the government's interpretation of those statutes on the merits.  But before even reaching the merits, they need to identify a discrete and final agency action that determines rights or obligations or causes some legal consequence.  Under recent cases like *Centro de Trabajadores* and *Robert F. Kennedy Human Rights*, they cannot.

Third, at times, Plaintiffs seem to imply that the new SORNs themselves are the relevant final agency action that they are challenging in this case.  That is a counterintuitive theory, as Plaintiffs' original complaint argued strenuously that Defendants had erred by *not* publishing new SORNs.  And taking Plaintiffs' allegations of harm seriously, vacating those SORNs would seem to make their alleged injuries worse, not better.  *See, e.g.*, Am. Compl. ¶ 69 (lamenting that "Defendants effectuated the SAVE overhaul in May 2025" but "failed at that time to publish modified SORNs").  In any event, providing notice of a draft SORN modification is also not a final agency action that is challengeable under the APA.  It does not "mark the 'consummation' of the agency's decisionmaking process" because it explicitly contemplates 30 days of comments and future agency consideration of those comments before any change may take effect.  *Centro de Trabaja-*

*dores*, 167 F.4th at 1235 (quoting *Bennett v. Spear*, 520 U.S. at 177-78.  So any true "legal conse-quences" come later, *id.*, after the comment period closes, with or without changes from the agency.  *See infra*, Section IV (discussing how the Privacy Act interacts with the APA).

## IV.    PLAINTIFFS CANNOT BRING APA CLAIMS PREDICATED ON PRIVACY ACT VIOLATIONS.

1.  Several of Plaintiffs' claims (Counts 4, 5, 6, 7, and 8) fail for the additional, independent reason that the APA does not grant a cause of action where there is "[an]other adequate remedy in a court."  5 U.S.C. § 704.  This statutory provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  Accordingly, a plaintiff has adequate relief— and thus cannot rely on the cause of action in 5 U.S.C. § 704—"'where a statute affords an oppor-tunity for *de novo* district-court review' of the agency action."  *Garcia v. Vilsack*, 563 F.3d 519, 522-23 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)).  Stated differently, where an agency action is subject to review in some manner under a separate statutory review scheme, then the general rule is that action must be reviewed within the confines of that scheme.  The mode of review established by the statutory review scheme is presumed exclusive.

This is true even where a statutory review scheme only provides for review of issues by certain parties; other parties are presumptively precluded from obtaining review of those issues under the APA.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute pro-vides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *see also Dew v. United States*, 192 F.3d 366, 372 (2d Cir. 1999).  It is also true even where the plaintiff may not succeed on the merits of her claim under the alternative statutory re-view procedure; the existence of that procedure alone suffices.  *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. HUD*, 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted").

**2.** Under these principles, Plaintiffs may not challenge purported violations of the Privacy Act under the APA, because the Privacy Act already provides an adequate alternative remedy for persons entitled to sue under that statute. The Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and authorizes adversely affected individuals to bring suit for violations of those requirements, 5 U.S.C. § 552a(g)(1)(D). And importantly here, the Privacy Act applies only to individuals—not corporate or organizational entities. *Id.* (authorizing a cause of action for adversely affected "individuals"); *id.* § 552a(a)(2) (defining "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."). But here, all Plaintiffs are organizations—the amended complaint (unlike the original) includes no individuals at all. Because Plaintiffs are not "individual[s]," *id.*, they are straightforwardly ineligible for any relief under the Privacy Act, and all of their claims predicated on violations of the Privacy Act should be dismissed on that basis alone.

**3.** Even if this case still included individuals as plaintiffs, more generally, relief under the Privacy Act is carefully circumscribed. Civil remedies are available—and thus the United States' sovereign immunity has been waived—in four circumstances: (1) when the agency "makes a determination . . . not to amend an individual's record in accordance with his request," (an "Amendment Action"), *id.* § 552a(g)(1)(A), (2) when the agency refuses to comply with an individual's request for access to her records, (an "Access Action"), *id.* § 552a(g)(1)(B), (3), when the agency fails to maintain an individual's records "with such accuracy, relevance, timeliness, and completeness" as is necessary for a government action and "consequently a determination is made which is adverse to the individual," (a "Benefits Action"), *id.* § 552a(g)(1)(C), or (4) where the government "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual," (an "Other Action"), *id.* § 552a(g)(1)(D). For Benefits Actions or Other Actions, a plaintiff may be entitled to "actual damages sustained by the individual as a result of the refusal or failure," subject to a $1,000 statutory minimum, but only if the "agency acted in a manner which was intentional or willful," 5 U.S.C. § 552a(g)(4)(A), and if that plaintiff could

prove "actual damages," which is "limited to proven pecuniary or economic harm." *Cooper*, 566 U.S. at 291, 299.

Beyond these monetary damages, the Privacy Act allows for injunctive relief in two circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records of an individual, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and (2) to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). But Plaintiffs here have not sought such relief. And injunctive relief, as the D.C. Circuit has recognized, is otherwise unavailable for any other situation arising out of the Privacy Act. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs" (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))); *see also Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978).

Because of the Privacy Act's comprehensive remedial scheme, courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott*, 39 F. Supp. 3d at 33; *see also, e.g.*, *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sep. 25, 2024); *Haleem v. Dep't of Def.*, No. 23-1471 (JEB), 2024 WL 230289, at *13-14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, No. 23-2386 (RCL), 2024 WL 4227154, at *8-9 (D.D.C. Sep. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Berardi v. U.S. Dep't of the Air Force*, No. 05-2269 (JR), 2006 WL 8448631, at *6 (D.D.C. Sep. 29, 2006); *Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002). That result is consistent with the principle that, "[w]here, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell Assocs.*, 579 F.2d at 1161-62). Congress concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages. That congressional determination forecloses all of Plaintiffs' APA claims that are predicated on violations of the Privacy Act. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (cleaned up)).

This result is especially sensible with respect to the Privacy Act, because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1158-59. Indeed, were injunctive relief freely available for violations of the Privacy Act generally—such as through the sort of generic APA claims that Plaintiffs bring here—"the detailed remedial scheme adopted by Congress would make little sense." *Id.* at 1160. It is "unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.*; *see also Am. Fed'n of Tchrs*, 152 F.4th at 175 ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here.").[10]

**4.** This case is a powerful illustration of the importance of these principles. In trying to force a Privacy Act peg into an APA hole, Plaintiffs' claims present paradoxes and conundrums that make orderly judicial review all but impossible. For example, the APA contains an explicit requirement that, "[a]fter consideration of the relevant matter presented" during the comment period, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). That statutory provision is why courts have long held that, as

---

[10] Now anticipating this remedial argument, Plaintiffs (at 47) cite *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004), and *Doe v. Stephens*, 851 F.2d 1457, 1460-61 (D.C. Cir. 1988), but neither resolves the question presented here. *Chao* contains one sentence of unexplained dicta on this subject, and even that ultimately only offers a speculative and ambiguous pondering about what Congress "may" have intended. And in *Doe v. Stephens*, this remedial argument was seemingly not raised by the government—presumably because the plaintiff there (unlike here) did not even assert an equitable APA claim. *See* 851 F.2d at 1465 n.8 ("Strictly speaking, Doe does not premise his claim for equitable relief on the APA."). The D.C. Circuit instead seems to have construed the plaintiff's complaint to raise such a claim, in order to vindicate the "more important principle" of avoiding the need to resolve a difficult (and unrelated) Fourth Amendment question. *See id*. Ultimately, neither case is an obstacle to this Court faithfully interpreting the remedial provisions of the Privacy Act, now that the argument is raised by the government and fully briefed by the parties. *See also supra* at 19-20 n.8 (discussing other recent district-court cases that also address this issue).

part of an APA rulemaking, the agency "must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(c)). And that is why agencies publish a document titled a "Final Rule," in which they engage (often at great length) with commenters, explaining their reasoning.

But the Privacy Act's notice-and-comment provisions contain no comparable requirement—they require only notice of the proposed SORN modification and a 30-day comment period. *See* 5 U.S.C. § 552a(e)(4), (e)(11) (requiring "notice" and "an opportunity for interested persons to submit written data, views, or arguments to the agency"). That is why, unsurprisingly, agencies typically do not provide such an explanation, and did not provide one here. *See* OMB, *Reissuance of OMB Circular No. A-108, "Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*," 81 Fed. Reg. 94,424 (Dec. 23, 2016), https://perma.cc/B5KU-PN8H. But now, Plaintiffs ask this Court to hold that the agency's non-existent and not-required explanation was insufficient. *See, e.g.*, Pls.' Br. at 43 (arguing that Defendants "failed to provide a reasoned explanation"); Am. Compl. ¶ 238 (arguing that Defendants "failed to . . . reasonably explain their actions," "failed to consider" comments, and so on).

That makes no sense. If Plaintiffs are correct that every agency faces an implied APA-like obligation to respond to all significant comments received under the Privacy Act, then virtually *every* SORN publication (and OMB guidance since 1975, *see* 81 Fed. Reg. at 94,424) is unlawful under the APA—counsel's understanding is that agencies typically do not provide such an explanation, because there is no legal obligation to do so. Plaintiffs have certainly cited no case (and no example) to the contrary. And analogous case law under the APA itself confirms that federal courts are not permitted to innovate atextual procedural requirements that Congress declined to impose. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (5 U.S.C. § 553 "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").

As another example: Plaintiffs assert in (conclusory fashion) that inaccurate citizenship records "have in fact caused 'substantial harm, embarrassment, inconvenience, or unfairness,' to

individuals wrongfully identified as non-citizens or potential non-citizens." Pls.' Br. at 38 (quoting 5 U.S.C. § 552a(e)(10)).  If that is true (which Plaintiffs have not established), those individuals may seek damages under the Privacy Act.  But the availability of those remedies for "individuals," confirms that that argument does not belong in *this* case—which seeks only injunctive relief on behalf of *non*-individuals.

*       *       *

Congress specified the procedural requirements for agencies to follow when issuing rules under the APA, *see* 5 U.S.C. § 553, and also separately specified the remedies that are available for APA violations, *see id.* § 706.  Congress likewise specified the procedural requirements for agencies to follow when making significant changes to a "system of records" under the Privacy Act, *see id.* § 552a(e)(4), (e)(11), and likewise separately specified the remedies that are available to "individual[s]" (but not organizations) for Privacy Act violations, *see id.* § 552a(g).  Both the substantive arguments advanced and the relief requested in this suit make a mess of those choices, by mixing and matching from different parts of different statutes.  In short, Congress's decision to provide narrow, targeted causes of action for damages or particular kinds of injunctive relief under the Privacy Act strongly suggests that it did not intend to allow plaintiffs to end-run that carefully constructed scheme via APA claims.  This Court should respect that congressional choice.

## V.       ALL OF PLAINTIFFS' CLAIMS LACK MERIT.

Because all of Plaintiffs' claims fail for non-merits reasons, the Court need not (and should not) reach the merits at all.  Even so, all of Plaintiffs' claims would also fail on the merits.  Indeed, rejecting Plaintiffs' claims on the merits would, in some ways, be easier than puzzling through some of the jurisdictional and remedial complexities addressed above.  That is because, whatever can be said, for example, about the remains of *Havens Realty*, or the interactions between Privacy Act and APA remedies, this is an easy case on the merits.  Congress told DHS to "implement a system for the verification of immigration status," Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391; 42 U.S.C. § 1320b-7 (note).  Congress also imposed an "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the

- 44 -

citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). That is all that DHS is doing here. Plaintiffs' claims lack merit.

### A. SAVE is authorized by statute (Count 1).

After denial of their preliminary-injunction motion and publication of new SORNs, Plaintiffs' lead merits argument is now that the recent changes to SAVE "exceed[] DHS's authority under SAVE's authorizing statute." Am. Compl. ¶ 201. Citing everything from the major-questions doctrine to the nondelegation doctrine to OLC opinions about different statutes, Plaintiffs spill much ink over what is ultimately an easy question of statutory authority. SAVE was created at the specific *direction* of Congress, so it is also *authorized* by Congress. None of the recent software improvements change that straightforward conclusion.

**1.** In the Immigration Reform and Control Act of 1986, Congress provided that DHS "shall implement a system for the verification of immigration status," and directed that it be "available to all the States by not later than October 1, 1987." Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391; 42 U.S.C. § 1320b-7 (note). Then, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009, Congress also placed an affirmative legal "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

Congress also addressed "[c]ommunication between" other "government agencies and" DHS. *Id.* § 1373. Congress provided expressly that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a). Congress further emphasized—again "[n]otwithstanding any other provision of Federal, State, or local law"—that "no person or agency may prohibit, or in any way restrict, a

- 45 -

Federal, State, or local government entity from" "[m]aintaining" or "[e]xchanging . . . with any other Federal, State, or local government entity" any "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b).

SAVE—whether in its original form, or after the recent improvements—fits comfortably within these statutory authorities and obligations. SAVE, after all, is nothing more than the very "system for the verification of immigration status" that Congress explicitly directed DHS to "implement" in 1987. Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391. Accordingly, Plaintiffs cannot be right that SAVE exceeds DHS's statutory authority unless the recent changes have, somehow, so fundamentally changed the system that it can no longer fairly be described as a "system for the verification of immigration status." *Id.* Plaintiffs have not made that showing.

Even setting aside the original text authorizing SAVE's creation, 8 U.S.C. § 1373 provides additional authority. That statute confirms that SAVE requests can come in from any "Federal, State, or local government agency," 8 U.S.C. § 1373(c)—resolving any doubt that DHS may (indeed, must) work with State and local governments for this purpose. Section 1373 also confirms that SAVE requests may "seek[] to verify or ascertain" either "citizenship *or* immigration status" of "*any* individual" in the relevant jurisdiction—thus making clear that the system may include U.S. citizenship information. *Id.* (emphases added). The statue further confirms that SAVE requests may be submitted "for any purpose authorized by law," *id.*— including, as relevant here, voter verification. That resolves all of the statutory-authority questions raised here.

**2.** Plaintiffs' arguments to the contrary lack merit. First, Plaintiffs argue that the 1986 act "refer[s] to the 'immigration status' of 'aliens,'" which "indicates that SAVE was only meant to be used for *non-citizens*." Pls.' Br. at 26. That argument ignores that there are also several references in the same section of the same statute to citizenship status. *See, e.g.*, Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. at 3385 (requiring "a declaration in writing by the individual . . . under penalty of perjury, stating whether or not the individual is a citizen or national of the United States"). Regardless, that argument also fails the test of common-sense: the animating purpose of *any* "system for the verification of immigration status" is to sift those with a lawful "immigration

status" from those without a lawful "immigration status."  In other words, to provide "verification" of those who are aliens and those who are not, those who are citizens and those who are not, and so on.  As a result, there is no such thing as an effective "system for the verification of immigration status" that has no information at all about U.S. citizens—after all, one's citizenship (or lack thereof) is an extremely common form of "immigration status."  To suggest that Congress wanted to limit the system so severely (but without saying so) strains credulity.

Were there any doubt, it was resolved in 1996, by the enactment of 8 U.S.C. § 1373(c). Again, that statute confirms explicitly that these requests may "seek[] to verify or ascertain" either "citizenship *or* immigration status" of "*any* individual" in the relevant jurisdiction.  8 U.S.C. § 1373(c) (emphases added).  Plaintiffs make no attempt to square that language with their view that SAVE may not be used for purposes of verifying citizenship.  Nor could they.

Plaintiffs do argue that 8 U.S.C. § 1373 "does not even mention SAVE (or any comparable system)."  Pls.' Br. at 27.  But Congress didn't have to specify the computer program by name, nor use any particular acronym.  DHS can call the system whatever it wants—as long as it "implement[s] a system for the verification of immigration status" and "provid[es] the requested verification or status information" in response to lawful requests.  The point is, SAVE is the mechanism by which DHS fulfills its statutory obligations under 8 U.S.C. 1373(c).  That means SAVE is not only authorized by Congress, it (or some comparable alternative) is *required* by Congress.

When it comes to 8 U.S.C. § 1373, most of Plaintiffs' arguments are specific to § 1373(a), and conveniently brush aside § 1373(c).  *See* Pls.' Br. at 27-28.  Defendants also disagree with Plaintiffs' narrow reading of 1373(a),[11] but the Court need not resolve most of those questions.

---

[11] For example, Plaintiffs suggest that the government's position is inconsistent with an opinion from the Office of Legal Counsel (OLC) from 1999. *See* Pls.' Br. at 28 (citing *Relationship Between IIRIRA & Statutory Requirement for Confidentiality of Census Info.*, 1999 WL 34995963 (O.L.C. May 18, 1999)).  Not so.  That OLC opinion does not address 8 U.S.C. § 1373(c) at all, which is the most significant statutory provision for the government's statutory-authority argument in this case.  Moreover, although it does interpret § 1373(a), it does so in the context of separate statutory provisions (not at issue here) about the confidentiality of responses to the decennial census.  In all events, the mode of statutory-interpretation invoked in that opinion—which

- 47 -

That is because § 1373(c) alone is more than enough to justify SAVE. By telling DHS that it has an "[o]bligation" to do something, that is necessarily also *authorizing* DHS to do that very thing— § 1373(c) is thus both a statutory obligation on DHS, and a statutory authorization for DHS.

At times, Plaintiffs argue that even if SAVE is authorized for *some* purposes, Congress did not specifically authorize its use for "mass voter eligibility checks." Pls.' Br. at 26. If that were correct, then the government has been violating the law for decades—SAVE was used for voter-verification purposes during the George W. Bush Administration, the Obama Administration, the first Trump Administration, and the Biden Administration. *See* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶ 20; *see also, e.g.*, DHS-AR-551-55. In any event, even accepting the (dubious) premise that Congress had to specify all permissible purposes for the "system for the verification of immigration status" that it told DHS to create, Pub. L. No. 99-603, § 121(c)(1), 100 Stat. at 3391, it did so in 8 U.S.C. § 1373(c). And Congress went very broad: DHS must respond to verification requests "for *any* purpose authorized by law." 8 U.S.C. § 1373(c) (emphasis added). Confirming the citizenship of voters is a "purpose authorized by law," *id.*—States are not just permitted, but *required* to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also id.* § 20501(b)(4) ("ensure that accurate and current voter registration rolls are maintained"). That resolves any question about the purpose of the system.

At other times, Plaintiffs suggest that the problem is the lack of specific statutory language authorizing information-sharing across agencies. *See, e.g.*, Pls.' Br. at 28 ("[N]othing in [8 U.S.C. § 1373(c)] empowers DHS to *acquire data from other federal agencies* like SSA to respond to such inquiries."). But again, no such specificity was required. After all, as Plaintiffs know better than anyone, there are several other statutes that explicitly speak to the sharing of information across federal agencies—most notably, the Privacy Act. Generally, the limits of that sort of information-sharing are specified in those statutes, and Congress need not repeat them in every other federal statute to remind agencies of those obligations, even if they apply. Of course, Plaintiffs

---

relies heavily, for example, on legislative committee reports—is in significant tension with more modern statutory-interpretation precedent that post-dates the opinion.

also think that *those* limitations were violated here.  Plaintiffs are wrong, *see infra*, but that does not go to the agency's statutory authority—it goes to Plaintiffs' Privacy Act claims.

In any event, *this* case is an especially poor candidate for insisting on the sort of specificity that Plaintiffs are demanding on the topic of information-sharing across agencies.  That is because, in the very same statute, Congress *did* specify that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* § 1373(b).  Despite this language, somehow, Plaintiffs seem to think, for example, that SSA should have "prohibit[ed]" or "in [some] way restrict[ed]" USCIS from searching on its "information regarding the citizenship or immigration status" of individuals in SSA systems—whether by pointing to the Privacy Act, the Social Security Act, or some "other provision of . . . law." *Id.*  Congress made a different choice.  Given the text of § 1373(a) and (b), it is impossible to imagine that Congress intended to prohibit DHS from obtaining information from other agencies to carry out its obligations under 8 U.S.C. § 1373(c).

**3.**  Plaintiffs next argue that the information-sharing at issue here violates two provisions of the Social Security Act.  But the first expressly *permits* sharing of information when "otherwise provided by Federal law."  42 U.S.C. § 1306(a)(1).  So that citation gets Plaintiffs no closer to relief; it just tees up the same questions about whether these actions are "otherwise" permissible.

The second statute that Plaintiffs cite purports to prohibit future federal statutes, beginning in 1990, from changing the rules surrounding sharing of SSNs.  *See* Pls.' Br. at 32-33 (citing 42 U.S.C. § 405(c)(2)(C)(viii)(I)).  As a threshold matter, that statute is inapplicable on its face to the Immigration Reform and Control Act of 1986, which is enough to resolve the argument.  In any event, it is a foundational principle of Article I of the U.S. Constitution that "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." *Dorsey v. United States*, 567 U.S. 260, 274 (2012).  And in doing

so, "Congress remains free to express any such intention either expressly or by implication as it chooses."  *Id.*; *see also Baltimore v. ATF*, No. 23-cv-3762 (RDM), 2026 WL 143346, at *14 (D.D.C. Jan. 20, 2026) (discussing "the well-established rule that 'one legislature cannot abridge the powers of a succeeding legislature'") (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810)).  So to the extent there is any conflict here, the more specific, later-enacted statute—which expressly applies "notwithstanding any other provision of . . . law," 8 U.S.C. § 1373—must prevail.

In all events, Plaintiffs do not have a private cause of action to enforce these provisions of the Social Security Act.  *See, e.g.*, *Biccum v. City of Watertown*, 2019 WL 4752927 (N.D.N.Y. Sept. 30, 2019); *Grams v. Esters*, 2007 WL 9780467 (W.D. Ky. Nov. 19, 2007).[12]

**4.**  Eventually, Plaintiffs retreat to the major-questions doctrine, arguing that Defendants cannot rely on just *any* statutory authority, but instead must identify some "*clear* congressional authorization."  Pls.' Br. at 30-31 (emphasis added).  If necessary, Defendants have already done so, for the reasons above.  Plaintiffs' major-questions theory can be rejected on that basis.

In any event, the major-questions doctrine does not apply here.  Past major-questions cases have turned on extraordinary economic impact, *see Biden v. Nebraska*, 600 U.S. 477, 503 (2023) (student loan forgiveness that would have "amount[ed] to nearly one-third of the Government's $1.7 trillion in annual discretionary spending"), unprecedented intrusions into the medical deci-sions of "84 million Americans," *see Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (a mandate for "84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing"), or the asserted Presidential power "to impose tariffs on imports from any coun-try, of any product, at any rate, for any amount of time," *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 637 (2026) (op. of Roberts, C.J.).

---

[12] Plaintiffs also cite what they call the "SSA Disclosure Policy," which is an SSA docu-ment with a chart with one entry that says "[w]e do not have the legal authority to disclose infor-mation about U.S. citizens to DHS."  Pls.' Br. at 15 n.7.  That unexplained, categorical statement has no citation, and it is incorrect (at least, as a blanket statement).  *See, e.g.*, 8 U.S.C. § 1373(a). In any event, that sort of statement is not judicially enforceable.  Plaintiffs do not argue otherwise.

This case is not remotely analogous. Plaintiffs are free to scrutinize SORNs to ensure that every Privacy Act "T" is crossed and "I" is dotted—but none of this reflects any "highly consequential power" of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022). Whether SAVE users submit one request or multiple requests at a time has no legal or economic effect on anyone—it just makes a few people's jobs easier. And intra-governmental data sharing of data created by the government is hardly some "transformative expansion" of any agency's authority, *id*. at 724. Ultimately, improving government software to make it easier to confirm the citizenship of registered voters is good government—not some "staggering" or "unprecedented" action claiming "virtually unlimited power" under a statute. *Nebraska*, 600 U.S. at 500-02. There is therefore no "'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* at 501 (quoting *West Virginia*, 597 U.S. at 721).

**5.** Plaintiffs next turn to the nondelegation doctrine and the constitutional avoidance canon, arguing that Defendants' interpretation of 8 U.S.C. § 1373 raises constitutional questions under the "intelligible principle" test. Pls.' Br. at 27-28. It does not.

"[I]n examining a statute for the requisite intelligible principle," the Supreme Court has "generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). "Those standards, the Court has made clear, are not demanding." *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality op.). "On only two occasions has the Court invalidated legislation based on the nondelegation doctrine, and both occurred in 1935." *United States v. Cooper*, 750 F.3d 263, 268 (3d Cir. 2014). One of those statutory provisions "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). By con-

- 51 -

trast, in the 90 years since, the Supreme Court has consistently upheld "Congress' ability to delegate power under broad standards," *Mistretta v. United States*, 488 U.S. 361, 373 (1989), and "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law,'" *Am. Trucking*, 531 U.S. at 474-75 (quoting *Mistretta*, 488 U.S. at 416) (Scalia, J., dissenting).

There is nothing so special about this delegation that would justify breaking that 90-year streak. Indeed, it is far more specific than many delegations that have been upheld by the Supreme Court—for example, congressional authorization for agencies to regulate in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225-26 (1943), to set "just and reasonable" rates, *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944), or to set "fair and equitable" commodity prices, *Yakus v. United States*, 321 U.S. 414, 420-27 (1944). None of the statutory provisions at issue here come close to the wide outer bounds permitted by modern nondelegation precedent. So the avoidance canon has no place in interpreting any of these statutes.

Ultimately, Plaintiffs' nondelegation-plus-avoidance argument is a bold one, but it is in keeping with a fundamental error that imbues their brief: insistence on an extraordinary level of specificity by Congress in directing DHS's work. What Plaintiffs miss is that our modern "jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372. By contrast, by requiring the level of specificity that Plaintiffs demand here, virtually every modern agency program would be unlawful. For example, there is presumably no federal statute that specifically authorizes government agencies to update their computers to the new version of Windows each year. Or to streamline customer-service at the U.S. Postal Service to submit change-of-address requests online, rather than on paper or in person at the post office. Plaintiffs' understanding of congressional authority—seeking a specific U.S. code citation for every technological or software improvement—would hamper wide swaths of the government. This Court should reject it.

**B.** **SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3).**

**1.** Once Plaintiffs' statutory claims are resolved, their constitutional claims follow as a matter of course. That is because Plaintiffs' primary "constitutional" theory is that "Defendants violated the separation of powers by acting in the total absence of authority from Congress." Pls.' Br. at 33 (citation omitted). For all the reasons discussed above, *see supra* at 45-52, that is incorrect—SAVE falls comfortably within statutory authority explicitly delegated by Congress. But regardless, that is really the same statutory claim addressed above—not a separation-of-powers claim—and one that lacks any cause of action under recent D.C. Circuit precedent.

Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The D.C. Circuit recently reaffirmed that principle. *See Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir.) ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."), *reh'g en banc denied*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). So reframing their statutory-authority claim as a constitutional one gets Plaintiffs no closer to relief.

**2.** Separately, Plaintiffs also assert (with little explanation of its relevance to this case) that "[o]ur Constitution provides that only the States—not Congress, and certainly not the President— may decide who is qualified to vote in federal elections." Pls.' Br. at 33-34 (quoting *LULAC*, 2026 WL 252420, at *42). That assertion at least attempts to raise a genuine constitutional claim, rather than repackaging a statutory-interpretation dispute under a different label. But the claim still fails, for the simple reason that none of the actions challenged here involve any federal regulation of elections at all—much less any effort to "decide who is qualified to vote." *Id.* (cleaned up).

- 53 -

For this argument, Plaintiffs rely heavily on Judge Kollar-Kotelly's January 2026 opinion in *LULAC*, 2026 WL 252420. Although Defendants respectfully disagree with much of that opinion, this Court need not weigh in on any of those disagreements. That is because the core of that case is about Executive Order No. 14,248, in which (in the court's view) the President "directed several federal agencies and officers to make a variety of changes to the administration of federal elections." *Id.* at *3; *see, e.g.*, *id.* at *13 ("Section 2(a) of the Executive Order directs the EAC to 'take appropriate action' within 30 days 'to require' people registering to vote using the Federal Form to submit 'documentary proof of United States citizenship.'"). This case, by contrast, challenges no Executive Order, and no regulatory requirements whatsoever. The legal rights and obligations of voters or (voting administrators) are entirely unaffected by the 2025 changes to SAVE. Whatever might be said about Executive Order 14,248, this case does not reflect any effort by the Executive Branch "to arrogate election administration to themselves." Pls.' Br. at 34.

C.    **Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6).**

As discussed above, this Court should not permit Plaintiffs to bring what are effectively Privacy Act claims that Congress never authorized, simply by wrapping them in APA labeling. But even if they that were permissible, each of these claims would still fail on the merits.

1. **Count 6 – Arbitrary and Capricious.** As discussed above, *see supra* at 42-44, the process for publication of a modified SORN under the Privacy Act is governed by specific notice-and-comment procedures set forth in the Privacy Act. Unlike for an APA rulemaking, however—which starts with a notice of proposed rulemaking and ends with a final rule—a Privacy Act SORN publication does *not* end with any agency obligation to state "in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). So arbitrary-and-capricious review—which is typically based on the quality and the content of the agency's explanation in that "statement" of the final rule's "basis and purpose," *id.*—does not make sense in this distinct Privacy Act context. That is reason enough to reject this claim, and to instead respect the remedial limits of

the Privacy Act. *See supra*, Section IV. In any event, even if the Court were to allow Plaintiffs to import these APA litigation concepts into the Privacy Act, their arguments lack merit.

**i.** Plaintiffs first argue—without any evidence of this purely factual assertion—that Defendants failed to "remain sufficiently open minded" during the comment process. Pls.' Br. at 39 (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009)). Setting aside the facts, that sort of claim used to be a viable APA theory in the D.C. Circuit. Today, it is not. The Supreme Court now "decline[s] to evaluate . . . final rules under the open-mindedness test" that some lower courts used previously. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 685 (2020); *see Bahman Grp. v. Palluconi*, No. 22-3826 (RDM), 2025 WL 3225196, at *5 (D.D.C. Sep. 29, 2025) (acknowledging the holding in *Little Sisters* that "the APA imposes no general 'open-mindedness' requirement on agencies"). That is because, like other judge-made APA "procedures that [the Supreme Court] ha[s] held invalid, the open-mindedness test violates the general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." *Id.* (citing *Vermont Yankee*, 435 U.S. at 524, 549). So even if there were any factual basis in the record for Plaintiffs' cynical assumption that Defendants "predetermined" the outcome of the comment process, Pls.' Br. at 40-41, that would not even state an APA claim—much less a Privacy Act claim, *see id.* at 39-40, given the absence of any obligation in the Privacy Act to respond to comments in the first place. *See supra* at 42-44.

**ii.** Plaintiffs next argue that DHS and SSA "disregarded relevant factors" and "adverse evidence." Pls.' Br. at 41. Again, given the absence of any statutory obligation to publish a statement responding to any of the Privacy Act comments, it is hard to know how and when Defendants should have remedied that concern. In any event, Plaintiffs' arguments on this point turn out to be self-refuting. Other than the issuance of a policy change that Plaintiffs disfavor, *but see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("a court may not substitute its own policy judgment for that of the agency"), the only evidence Plaintiffs point to for Defendants' supposed "disregard" of these points are *documents in the administrative record*. *See* Pls.' Br. at 41-42 (repeatedly citing comments or other materials in the administrative record, and nothing else).

Both agencies have certified that those materials *were* considered by the agency, *see* ECF Nos. 64, 65, and those signed certifications are "entitled to a presumption of regularity," *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 577 (2025)). By considering those materials, DHS and SSA satisfied any applicable APA obligation—even if they came to different conclusion than Plaintiffs (or even this Court) might have. *See, e.g.*, *Prometheus Radio*, 592 U.S. at 426 (no APA violation where the agency "did not ignore the Free Press studies," it "simply interpreted them differently").

**iii.** Plaintiffs then argue that Defendants "violated the 'change-in-position' doctrine" by "failing to 'provide a reasoned explanation'" for these policy changes, by "failing to 'display awareness that they were changing position,' and by "failing to 'consider serious reliance interests.'" Pls.' Br. 43 (quoting *Wages*, 604 U.S. at 568). Again, this is one of the more obvious examples of trying to force an APA argument into the rubric of the Privacy Act in a logically incoherent context. Given the absence of any Privacy Act obligation to state "in the rules adopted a concise general statement of their basis and purpose," 5 U.S.C. § 553(c), Defendants never had either the obligation *or* the opportunity to explain any of this.

Regardless, even taking this change-in-position theory on its own terms, it still fails. Defendants were quite obviously "aware[] that they were changing position," *Wages*, 604 U.S. at 568 —that is why press releases accompanied each of the relevant changes, referring to an "[o]verhaul" of SAVE and a "revamped SAVE system," USCIS Press Release (Apr. 22, 2025), *supra* at 7, and exalting "[n]ew options" to "create cases using a Social Security number" and to "create cases in bulk," *Optimizing SAVE*, *supra* at 7. Those press releases (as well as many other documents in the administrative record or otherwise publicly available) also provide a brief but sufficient explanation for all of the relevant changes: in short, the goal was to "optimize this service to provide a single, reliable source for verifying immigration status and U.S. citizenship." *Id.*; *see also, e.g.*, *Voter Registration and Voter List Maintenance Fact Sheet*, *supra* at 8.

As for reliance interests: to the extent Plaintiffs are suggesting there are "serious reliance interests" in keeping one's SSN or citizenship status secret from the Department of Homeland Security—a number and a status that derive entirely from the federal government in the first

place—they have provided no support for that remarkable assertion.  Would Plaintiffs have this Court believe that, if only they had been warned about possible future changes to SAVE, green-card holders would have walked out of their citizenship ceremonies early?  Or that some of Plaintiffs' members would have declined receipt of a Social Security Number (either at birth, or later in life) out of fear that their citizenship might one day be verified via submission of bulk requests, rather than one-by-one?  Those hypotheticals answer themselves.

**2. Count 4 – Compatible Use.**  In Count 4, Plaintiffs argue that the new routine uses established by the latest DHS and SSA and SORNs substantively violate the Privacy Act, because they authorize disclosures "for a purpose" that is not "compatible with the purpose for which [the record was collected." Am. Compl. ¶ 220 (quoting 5 U.S.C. § 552a(a)(7)).  Plaintiffs are mistaken.

The Office of Management and Budget (OMB)[13] has long construed the compatible-use requirement to include "both functionally equivalent uses . . . [a]s well as other uses that are necessary and proper."  OMB, *Guidance on the Privacy Act*, 52 Fed. Reg. 12,990, 12,993 (Apr. 1987); *see also* OMB Circular A-108, *supra*, at 11-12.  A straightforward example of a "necessary and proper" routine use is one permitting disclosure to another federal agency performing work "pursuant to a specific statutory charter."  52 Fed. Reg. at 12,993.  In other words, when Congress mandates agency action that requires disclosure of agency records, the use is "compatible" for that reason alone.  Accordingly, for the reasons discussed above about DHS and SSA's statutory obligations, that congressional mandate is enough to resolve the compatible-use question here.

Even if this Court were to conduct some more searching form of compatibility review, to assess the compatibility of a "functionally equivalent" routine use, courts typically a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 548-49 (3d Cir. 1989); *see also Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018).  Although the D.C. Circuit has yet to "definitively

---

[13] The Privacy Act, 5 U.S.C. § 552a(v), requires OMB to prescribe guidance to agencies in implementing the Privacy Act, and also to provide continuing assistance to and oversight of the implementation of the law.

determine[] the precise meaning of 'compatible,'" *Ames v. DHS*, 861 F.3d 238, 240 240 n.1 (D.D.C. 2017), the court has cited approvingly to the test articulated by the Third Circuit: Whether a "concrete relationship or similarity" exists "between the disclosing agency's purpose in gathering the information and in its disclosure." *USPS v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993) (quoting *Britt*, 886 F.2d at 549-50); *see also Ames*, 861 F.3d at 240 n.1. Under that test, an agency need only demonstrate a "meaningful degree of convergence" between collection and disclosure. *Britt*, 886 F.2d at 549. Plaintiffs themselves seem to accept this (relatively forgiving) standard. In their words: "The compatible-use requirement prevents 'personal data collected by one organization for a stated purpose' from being 'used and traded by another organization for a completely unrelated purpose.'" Pls.' Br. at 35 (quoting *Britt*, 886 F.2d at 550).

That test is satisfied here, assuming it applies, *but see* 8 U.S.C. § 1373(a); 52 Fed. Reg. at 12,993. As a threshold matter, as for Plaintiffs' challenge to SSA's disclosure or verification of SSNs, they seem to be starting from the mistaken factual premise that SSA "collected" some form of "personal data" *from* individuals and is now disclosing that "personal data" to DHS. *See* Pls.' Br. at 35 (quoting *Britt*, 886 F.2d at 550). That is backwards: Social Security numbers are issued *by SSA*, to individuals, to simplify the *government's* efforts in identifying and tracking individuals by a unique nine-digit number. *See, e.g.*, C. Puckett, SSA, *The Story of the Social Security Number* (July 2009), https://perma.cc/8Z3Z-DDB3. And for over 80 years, one of the core purposes of the SSN has been to "enable[] government agencies to identify individuals in their records." *Id.* Its "universality has led to its adoption throughout government and the private sector as a chief means of identifying and gathering information about an individual," *id.*—not just to determine "eligibility for SSA benefits," Pls.' Br. at 36, as Plaintiffs' narrowly and anachronistically insist. *See, e.g.*, Puckett, *supra* ("The expansion of SSN use began in 1943 with Executive Order (EO) 9397 requiring federal agencies to use the SSN for the purpose of identifying individuals in any new record systems.").

Given this history, SSA's use of an SSN as a numerical identifier in data-sharing with other government agencies—whether with USCIS, or any other agency with whom SSA is authorized

- 58 -

to share data—is fully compatible with the SSN's longstanding history and use as SSA's primary numerical identifier. *Id*. At the very least, this latest use is not "completely unrelated" to its usual purpose, *Britt*, 886 F.2d at 550. That too is fatal to Plaintiffs' compatible-use claim in Count 4.[14]

**3. Count 5 – Notice and Comment.** As discussed above, Count 5 is moot, because DHS and SSA *have* now complied with the notice-and-comment procedures required by the Privacy Act—whether or not they are applicable. *See supra*, Section II; *see also LULAC*, 2026 WL 252420, at *54 (dismissing an indistinguishable claim as moot). Plaintiffs' own complaint confirms that both SSA and DHS have now "publish[ed] a modified SORN for SAVE" and "solicit[ed] public comment" for more than 30 days. Am. Compl. ¶¶ 232-33. No more was required. *See* 5 U.S.C. § 552a(e)(4), (e)(11). So this claim fails—whether or not Plaintiffs are correct that Defendants *used to be* in violation of the Privacy Act, before publication of those updated SORNs.

**D.    Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8).**

Plaintiffs' final two claims are their narrowest. There, EPIC (and EPIC alone) challenges DHS's and SSA's alleged failure to publish a document called a "computer matching agreement" relating to the recent changes to SAVE. As already discussed above, *see supra* at 30-33, EPIC lacks standing to bring this claim for multiple independent reasons. That is (by far) the easiest way to resolve these claims. In any event, these claims are also meritless—Plaintiffs are not entitled to mandamus because no "computer matching agreements" were required here (at the very least, certainly not so clearly as to satisfy the high standard for mandamus).

The APA places strict limits on review of alleged agency inaction. Because the APA "carried forward" the common law writ of mandamus in § 706(1), the mandamus standard also applies

---

[14] This section of Plaintiffs' brief also includes a confusing reference to "voter roll data that DHS is ingesting in bulk from SAVE user agencies and then disclosing to various other federal agencies." Pls.' Br. at 37. It is not clear what Plaintiffs are referring to there, as none of the challenged agency actions in this case are about DHS disclosures of "voter roll data" to other federal agencies. DHS and SSA are not involved in the process by which "state and local officials" collect data "as part of the voter registration process." *Id.* (emphasis omitted). To the extent Plaintiffs are suggesting that state or local officials may have wronged their own citizens in some way, that is not an issue to be resolved in this lawsuit against the United States.

to an APA claim challenging agency inaction. *Norton*, 542 U.S. at 63. So, both Counts 7 and 8 of Plaintiffs' complaint are subject to the mandamus standard. "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *Norton*, 542 U.S. at 64 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.").

Plaintiffs cannot satisfy these requirements here. As for a "clear and indisputable right to relief" or a "clear duty to act" in the manner that Plaintiffs demand, *Am. Hosp. Ass'n*, 812 F.3d at 189, the text of the Privacy Act itself is fatal. For one thing, the obligation to publish a computer matching agreement only applies to a "computerized comparison of . . . two or more automated systems of records . . . for the purpose of" verifying eligibility for "cash or in-kind assistance or payments under Federal benefit programs" or "recouping payments or delinquent debts under such Federal benefit programs." 5 U.S.C. § 552a(a)(8). Voter verification is not "cash or in-kind assistance or payments under Federal benefit programs." *Id.* And the SSA-DHS information-sharing agreement at issue in this case is not "for the purpose of" any of those subjects. *Id.* So, to the extent that Plaintiffs seek to establish standing via allegations of voting-related harms, they cannot remedy those harms by enforcement of the computer-matching provisions of the Privacy Act.

To be sure, SAVE may also be used for purposes unrelated to voter-verification, including with respect to certain federal benefit programs. But even indulging the fiction that this lawsuit has anything to do with those programs, DHS's longstanding position (dating back to at least 2013) is that so-called "front-end" single-record verification queries are not covered by this part of the Privacy Act, which instead "appl[ies] only to the matching of an entire system of records against another database." GAO, GAO-14-44, *Computer Matching Act* at 15 (2014), https://perma.cc/YMK8-PTD7. The basis for that interpretation is the text of the statute itself, which applies only to a "comparison" of "two or more automated *systems* of *records*," plural, 5 U.S.C. § 552a(a)(8) (emphases added)—not a series of matches of each *individual* record. And

since 2017, SAVE has been fully structured as a "front-end" single-record comparison system.[15] Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶¶ 23-24. Although agencies have sometimes published computer matching agreements even when it is not clear that they are legally required, Computer Matching Act at 15-17, *supra* at 60, if anything that uncertainty and historical inconsistency undermines the notion that mandamus should issue here, to remedy some "clear duty" to act in the face of a "clear and indisputable" right to relief. *Am. Hosp. Ass'n*, 812 F.3d at 189

Finally, to the extent EPIC actually suffered some genuine harm due to the absence of a computer matching agreement, *but see supra* at 30-33, an "adequate alternative remedy exists" under the Privacy Act itself. *Am. Hosp. Ass'n*, 812 F.3d at 189; *see, e.g.*, *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 123 (D.D.C. 2025) (discussing "the remedies provided in the Privacy Act," which offer "a possibility of compensatory relief at a later date"). That is also fatal to Plaintiffs' computer-matching claims.

## VI.    PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD AND SUBJECT TO EQUITABLE LIMITS.

Even if Plaintiffs could prevail on any of their claims, their requested relief is overbroad in several respects, and subject to important equitable limitations.

**a.** First, any relief should be narrowly tailored to remedy any Article III injuries of parties who have established standing. The Supreme Court recently addressed the subject of "universal injunctions" in *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). It is now clear that, in granting equitable relief, a court "may administer complete relief between the parties." *Id.* at 851. But that is also "the maximum a court can provide." *Id.* at 854. Plaintiffs generally recognize this, which is why they previously moved for class certification. ECF No. 17; *see also* Oct. 28, 2025 Hr'g Tr. at 25:18-21 (MR. SUS: "Your Honor, I will state candidly that part of the complication here was

---

[15] To be clear, the recent switch to bulk *submission* of SAVE requests by SAVE users did not change this. Although users may now *submit* large numbers of requests to USCIS at the same time, the next step is still the individual verification of one individual record at a time, *see* Ex. 1, Decl. of B. Broderick (Apr. 2, 2026) ¶¶ 23-24—not a comparison of two "*systems* of *records*" as defined by the Privacy Act. After all, the SAVE request form is not itself a "system of records" under the Privacy Act. 5 U.S.C. § 552a(a)(5).

introduced by the Supreme Court's decision in *CASA* that requires cases like this to, at least alternatively, be pled as putative class actions."). But, having now withdrawn their class-certification motion and amended their complaint, ECF No. 46 (now including no class-action allegations), they cannot now request nationwide injunctive relief that would run to the benefit of non-parties.

To be sure, in a footnote in *CASA*, the Supreme Court reserved the question (which has previously been addressed by the D.C. Circuit) about the meaning of the "set aside" language in the APA, 5 U.S.C. § 706(2). 606 U.S. at 847 n.10 (quoting 5 U.S.C. § 706(2)); *cf. Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (discussing these precedents in the context of a stay request under 5 U.S.C. § 705). But "universal relief, whether by way of injunction or vacatur, strains our separation of powers." *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring). So "a district court should 'think twice—and perhaps twice again—before granting' such sweeping relief." *Id.* at 702 (quoting *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring)). After all, remedies "ordinarily 'operate with respect to specific parties,'" rather than "on legal rules in the abstract," but reading § 706 to authorize universal vacatur would do the opposite. *California v. Texas*, 593 U.S. 659, 671-72 (2021) (citation omitted). This Court should "not lightly assume that Congress has intended to depart from established principles of equity." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

**b**. For similar reasons, any equitable relief the Court may decide to enter (including vacatur or an injunction) "must be limited to the inadequacy that produced [the] injury in fact." *Gill v. Whitford*, 585 U. S. 48, 66 (2018) (citation omitted). After all, it is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). So, to the extent that the Court determines that any particular feature of SAVE (or the procedures used to implement it) violates the law, and causes particular Plaintiffs an Article III injury, relief should be limited to remedying that particular violation or ordering the government to carry out that procedure.

**c**. Finally, principles of equity and comity also require the Court not to enter relief that would subject the United States to conflicting court orders. In several prior filings, Defendants

- 62 -

have been especially careful to keep Plaintiffs and the Court informed of updates in earlier-filed litigation challenging various aspects of SAVE.  *See* Defs.' Opp'n at 6, 39, ECF No. 37; Scheduling Mot. at 1 n.1, ECF No. 57; Notice, ECF No. 59.  Plaintiffs explicitly acknowledged that awareness, in support of an extension request.  *See* Pls.' Extension Mot. ¶ 6, ECF No. 60 (acknowledging "Defendants' repeated references to those 'other SAVE-related cases'" in this case").

Many months ago, the district court in *Florida* approved a settlement agreement requiring DHS to continue to allow SAVE users to run searches using full or partial Social Security Numbers.  *See supra* at 7 (citing *Florida* ECF Nos. 30, 31).  That order also specified that "the Court retains jurisdiction over this case for a period of twenty years from the date of this order for the purposes of enforcement of the parties' settlement agreement, which is approved by and incorporated by reference into this order."  Order, *Florida* ECF No. 31.  Ohio, Indiana, and Iowa also signed that agreement and dismissed their separate lawsuits.  *See supra* at 7.  All of those events took place before the filing of the operative complaint in this case.  Despite their awareness, Plaintiffs never sought to intervene or otherwise object to the *Florida* settlement or order.

As a result of those events, an order from this Court vacating, setting aside, or enjoining the 2025 changes to SAVE would now risk placing the United States "in [the] unenviable position" of facing conflicting orders that impose irreconcilable legal obligations.  *NAACP, Jefferson Cnty. Branch v. Brock*, 619 F. Supp. 846, 850 (D.D.C. 1985).  As one example, DHS and SSA cannot simultaneously allow SAVE searches via Social Security Number—as required by the judicially enforceable settlement agreement in *Florida*—while also reversing the recent changes to SAVE that would be required by granting some of Plaintiffs' broader requests for relief in this case.

"Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders."  *Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986).  And basic "considerations of comity require more than the usual measure of restraint" in this scenario, when "an injunction sought in one federal proceeding would interfere with another federal proceeding."  *Common Cause v. Jud. Ethics Comm'n*, 473 F. Supp. 1251, 1253-54 (D.D.C. 1979).  That is another independent reason to refrain from issuing any form of equitable relief here, such as vacatur or an

injunction. *See, e.g.*, *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) ("Where different outcomes would place the defendant under inconsistent legal duties, the case for the second court's not going into conflict with the first is particularly strong."); *Bergh v. Washington*, 535 F.2d 505, 507 (9th Cir. 1976) ("When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases."); *Carver v. Knox Cnty.*, 887 F.2d 1287, 1293 (6th Cir. 1989) (noting the "intolerable situation" of a state subject to conflicting injunctions and explaining that "the only common sense approach" is for the courts to speak "with a single voice"); *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981) ("Generally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts."); *W. Gulf Maritime Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) (holding that federal district courts have an obligation to "avoid rulings which may trench upon the authority of sister courts").

## CONCLUSION

For these reasons, this case should be dismissed in its entirety under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). In the alternative, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: April 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*