# Exhibit B

TEXAS CIVIL RIGHTS PROJECT

December 2, 2025

*Via Electronic Filing*

FOR: Matthew Ramsey, Executive Director, Head of Privacy and Disclosure Policy
Social Security Administration

FROM: Carl Blair and Miranda van Dijk
Texas Civil Rights Project

**RE: Master Files of Social Security Number (SSN) Holders and SSN Applications, 60–0058 System of Records Notice [Docket No. SSA-2025-0225]**

Mr. Ramsey,

We represent the Texas Civil Rights Project, one of Texas's leading civil and voting rights organizations and a leader of the largest non-partisan Election Protection program in Texas. For the reasons set out below, we strongly urge a reconsideration of the Statement of Record Notice ("SORN") detailing new routine uses and disclosures of data within the system of records entitled Master Files of Social Security Number ("SSN") Holders and SSN Applications.

**Background**

The Social Security Administration ("SSA") has published a SORN seeking to codify its previous unauthorized disclosures of Social Security data for new routine uses.[1] The SORN details expanded uses of large swaths of personal data, including, among other things, millions of American citizens' SSN, names, dates and places of birth, sex identification, parents' names, and past benefits claims.[2] Of particular concern, the SORN misinterprets 8 U.S.C. 1373(a) to authorize the ongoing use of this data by the Department of Homeland Security ("DHS") to verify the citizenship of voters.[3]

---

[1] Privacy Act of 1974; System of Records, 90 Fed. Reg. 50879, 50879 (Nov. 12, 2025), https://www.federalregister.gov/documents/2025/11/12/2025-19849/privacy-act-of-1974-system-of-records.
[2] *Id.* at 50880-81.
[3] *Id.* at 50883.

TEXAS CIVIL RIGHTS PROJECT

The data affected by this SORN was originally collected while assessing and processing applications for SSNs and was shared with other agencies for limited uses.[4] However, earlier this year, SSA began sharing Social Security data with DHS for inclusion in the Systematic Alien Verification for Entitlements Program ("SAVE") database.[5] DHS then relied on SSA data to expand the use of SAVE beyond the scope of its original purpose, including to verify the citizenship of United States citizens by birth.[6] As part of this expanded use, the White House began encouraging state governments to use the SAVE database to verify the citizenship of all registered voters and applicants.[7] Texas was among the earliest states to run its entire voting list through the expanded SAVE database.[8]

SSA did not provide public notice, nor did it seek public comment prior to its disclosure of allowing DHS access to its data for use in the SAVE database.[9] In fact, as of April 26, 2025, a USCIS website still stated that "SAVE does not access databases that contain U.S.-born citizen information."[10] Less than a month later, SSA had entered into a data-sharing agreement with DHS.[11] This SORN wasn't filed until months later, after the commencement of a lawsuit by the League of Women Voters and the Electronic Privacy Information Center ("EPIC") alleging violations of the Administrative Procedure Act and the Privacy Act of 1974.[12]

The policies outlined in this SORN would formalize and further the unauthorized disclosure and routine use of Social Security data for purposes to which they are not

---

[4] *Id.* at 50880.
[5] Jen Fifield, *Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social Security Data for Voter Citizenship Checks*, ProPublica (Oct. 30, 2025), https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump
[6] Privacy Act of 1974; System of Records, 90 Fed. Reg. 48948, 48951 (Oct. 30, 2025), https://www.federalregister.gov/documents/2025/10/31/2025-19735/privacy-act-of-1974-system-of-records
[7] Jim Saksa, *At Briefing, White House Urges States to Use DHS Databases to Check Citizenship for Voting*, Democracy Docket (Aug. 1, 2025), https://www.democracydocket.com/news-alerts/at-briefing-white-house-urges-states-to-use-dhs-databases-to-check-citizenship-for-voting/
[8] Press Release, Tex. Sec'y of St., Texas Completes Citizenship Verifications in the SAVE Database (Oct. 20, 2025), https://www.sos.state.tx.us/about/newsreleases/2025/102025.shtml
[9] Vittoria Elliott, *Social Security Data Is Openly Being Shared With DHS to Target Immigrants*, Wired (Nov,. 18, 2025), https://www.wired.com/story/social-security-data-shared-with-dhs-target-immigrants/
[10] Jude Joffe-Block & Miles Parks *The Trump administration is building a national citizenship data system*, NPR (June 29, 2025), https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database
[11] Fifield, *supra* note 5.
[12] *See* Class Action Complaint for Injunctive and Declaratory Relief, *League of Women Voters v. Dep't of Homeland Sec.*, No. 25-cv-3501 (D.D.C. Sept. 30, 2025)

TEXAS CIVIL RIGHTS PROJECT

suited. This comment seeks to detail the harms already experienced by Texas voters as a result of Texas's use of Social Security data in the expanded SAVE database and illustrate the risks to democratic participation and data privacy that will result from pursuing this path.

**DHS's Use of SSA Data Creates Unjustified Data Security and Privacy Risks**

The policies outlined in this SORN create significant data security and privacy concerns without sufficient justification. DHS has not committed to any additional digital security measures for the SAVE database, despite the influx of Americans' personal information. In addition, experts have raised concerns about a lack of oversight and transparency surrounding the SAVE database.[13] For example, ten state Secretaries of State recently sent a letter to Attorney General Pam Bondi and Homeland Security Secretary Kristi Noem expressing their concerns about a lack of clarity around how sensitive information shared by states is used.[14]

The disclosure of SSA data is especially risky at the current moment, with cybercriminals increasingly targeting state and local governments and federal agencies withholding cybersecurity funding.[15] Over 115,000 Texans experienced this kind of breach in December 2022, when their "names, addresses, Social Security numbers, driver's license numbers, and government-issued ID numbers" were leaked due to a data breach at the

---

[13] *See* Jasleen Singh & Spencer Reynolds, Homeland Security's "SAVE" Program Exacerbates Risks to Voters, Brennan Ctr. for Just. (July 21, 2025), https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voter ("Further exacerbating risks for voters and the election process, oversight of programs like SAVE . . . is ineffective, with many agencies overseeing themselves."); Jude Joffe-Block & Miles Parks, *33 million voters have been run through a Trump administration citizenship check*, NPR (Sept. 11, 2025), https://www.npr.org/2025/09/10/nx-s1-5477367/save-election-citizenship-data-trump ("USCIS did not respond to NPR's questions about what happens to the data states upload and who has access to it.").

[14] Colin Wood, *Secretaries of state ask DOJ to clarify how it's using their voter data*, StateScoop (Nov. 18, 2025), https://statescoop.com/secretaries-of-state-ask-doj-to-clarify-how-its-using-their-voter-data/.

[15] Lawrence Norden, *How the Federal Government Is Undermining Election Security*, Brennan Ctr. for Just. (Apr. 14, 2025), https://www.brennancenter.org/our-work/research-reports/how-federal-government-undermining-election-security; *also* Steve Karnowski & Julie Carr Smyth, *Big changes to the agency charged with securing elections lead to midterm worries*, AP (Nov. 23, 2025), https://apnews.com/article/election-security-cisa-2026-secretaries-state-midterms-6d18799c6c5fdd1bc001544b2dca12bf.

TEXAS CIVIL RIGHTS PROJECT

Texas Department of Public Safety (DPS).[16] Experts warn that including Social Security data in SAVE will result in more opportunities for bad actors to access sensitive personal information in similar leaks.[17]

The SORN tries to justify these risks and the disclosure of information to DHS as authorized by 8 U.S.C. 1373(a).[18] However, that statute has been repeatedly interpreted by the Department of Justice not as providing any "affirmative authority," but rather as a "limitation on the authority of government entities or officials to impose prohibitions or restrictions on disclosures."[19] In contrast, this SORN details a distribution of American's sensitive personal information that is unjustified by anything but DHS' policy goals.

The policies in this SORN create a vast and unguarded reservoir of Americans' personal data, while failing to address the resulting privacy and security risks. Given the questionable accuracy and the limited utility of this sensitive data in assessing voter eligibility, there is no reason to take on this risk.

**Harms to Texas Voters Illustrate the Risks of Allowing DHS to Misuse SSA Data**

Concerns about the accuracy and reliability of Social Security data for DHS' purposes stretch back years. E-Verify, the system maintained by DHS to assess employment eligibility, publishes a list of common issues that arise when DHS uses SSA data, including incorrectly recorded names, SSNs, and birth dates.[20]

These problems are further exacerbated when Social Security data is used to verify citizenship. This data – which plays a key role in SAVE's use for voter verification – does not provide a complete picture of citizenship, particularly when it comes to naturalized citizens.[21] Once a person completes their naturalization ceremony, they must either consent to allowing USCIS to transmit their information to the Social Security

---

[16] Penelope Rivera, *Personal information leaked for more than 115,000 Texans in DPS data breach*, KERA News (Oct. 15, 2024), https://www.keranews.org/government/2024-10-15/personal-information-for-more-than-115-000-texans-leaked-in-dps-data-breach.

[17] Fifield, *supra* note 5.

[18] *Id.*

[19] Office of Legal Counsel, *Relationship Between Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and Statutory Requirement for Confidentiality of Census Information* at 6, 1999 WL 34995963 (O.L.C. May 18 1999), https://www.justice.gov/opinion/file/844106/dl?inline

[20] DHS and SSA Mismatches, E-Verify (Aug. 1, 2022), https://www.e-verify.gov/employers/verification-process/tentative-nonconfirmations/dhs-and-ssa-mismatches

[21] Singh & Reynolds, *supra* note 13.

TEXAS CIVIL RIGHTS PROJECT

Administration which may take up to ten days to be processed, or they must contact the Social Security Administration to inform the agency of their naturalization on their own.[22] If they did not understand that requirement, were unable to follow those rules, or simply forgot to contact the Social Security Administration to update their citizenship status, then they would likely be flagged by SAVE even though they are now a U.S. citizen.

Yet despite such longstanding concerns, following the policies in this SORN will allow DHS to expand its use of Social Security data to include "verification of registrants and registered voters in voter registration and voter list maintenance processes."[23] As we are already seeing in Texas, allowing access to Social Security data for this purpose poses a significant risk of voter disenfranchisement and disillusionment for no benefit.

DHS justifies the expanded use of the SAVE database by referencing debunked concerns about noncitizen voting.[24] In reality, noncitizen voting is vanishingly rare and the few cases that do occur are quickly addressed by existing state policies.[25] For example, the Heritage Foundation found a total of 99 documented cases of noncitizens voting *nationwide* between 2000 and 2025.[26] To put this into perspective, over the same time period over 938 million votes have been cast in Presidential elections alone.

Consistent with those national findings, the Texas Secretary of State (Texas SOS) announced in October that her office had run Texas's over 18.4 million registered voters through the SAVE database and identified "2,724 potential noncitizens," representing approximately 0.015% of total registrations.[27] Even that small percentage is highly inflated, due to the SAVE database's outdated or incomplete citizenship information, particularly, as mentioned previously, for naturalized citizens.[28] These data errors are less prevalent when the SAVE database is used as intended to run single-person searches to

---

[22] U.S. Citizenship and Imm. Servs., M-767, Important Information for New Citizens (2024), https://www.uscis.gov/sites/default/files/document/flyers/M-767.pdf.
[23] Privacy Act of 1974; System of Records, 90 Fed. Reg. 48948, 48949 (Oct. 30, 2025)
[24] *Id.*
[25] Yunior Rivas, *States Investigated Noncitizen Voting. Big Surprise — The Results Don't Match the Right's Rhetoric.*, Democracy Docket (July 26, 2025), https://perma.cc/F6G2-TLHS.
[26] *Election Fraud Map*, The Heritage Found., https://perma.cc/65F4-AU8N (last visited Oct. 16, 2025).
[27] Press Release, Tex. Sec'y of St., *supra* note 8.
[28] Fifield, *supra* note 5; *also* Singh & Reynolds, *supra* note 13 (detailing various concerns that one of SAVE's data sources – U.S. Customs and Border Protection's Automated Targeting System – is "biased against certain religious, racial, and ethnic minorities").

TEXAS CIVIL RIGHTS PROJECT

verify eligibility for benefits, but in the context of verifying an entire state's voter roll, bulk searches result in a higher volume of errors.[29]

Currently, Texans election officials are experiencing the effects of error-ridden voter verification firsthand. The 2,724 potential noncitizens identified by the Texas SOS in October were referred to county election officials, who must conduct an independent investigation into the voters' eligibility.[30] Certain potential voters in Texas can register through our state's Department of Public Safety (DPS), and DPS keeps records of any proof of citizenship these registrants provide. While the Texas SOS has access to these DPS records, they did not check whether any of the 2,724 people flagged by SAVE had actually provided proof of citizenship to DPS. Instead, they dumped the responsibility for verifying the citizenship of those on the list of potential noncitizens on county election officials.[31]

In fact, officials in some of Texas's largest counties have since confirmed that *at least* 25% of those flagged by the Texas SOS via the SAVE database *already provided proof of citizenship* when they registered to vote.[32] As predicted, using the SAVE database as a voter verification tool requires these already busy county election officials to spend time addressing the exact type of errors that experts and former officials warned about in order to prevent voters from being erroneously stripped from the voter rolls.[33]

For those Texas voters who have not yet provided proof of citizenship, those inaccuracies can translate into real harm. Voters flagged in the SAVE database are mailed a notice and must provide county officials with proof of citizenship within 30 days.[34] This is a significant barrier for the 9.1% of American citizens of voting age who

---

[29] *See* Fifield, *supra* note 5.

[30] Press Release, Tex. Sec'y of St., *supra* note 8.

[31] Natalia Contreras, *Hundreds of Texas voters flagged as potential noncitizens may have already proven their citizenship*, VOTEBEAT (Dec. 2, 2025), https://www.votebeat.org/texas/2025/12/02/travis-county-officials-investigate-potential-noncitizens-dps-save-proof-of-citizenship/

[32] Jim Saksa, *Trump's Voter Citizenship Database Is 'Flawed' and Could Lead to Disenfranchisement, Election Administrator Warns*, DEMOCRACY DOCKET (Oct. 30, 2025), https://www.democracydocket.com/news-alerts/trumps-voter-citizenship-database-is-flawed-and-could-lead-to-disenfranchisement-election-administrator-warns/.

[33] *See* Fifield, *supra* note 5 (noting the former Social Security Administration commissioner's predictions that DHS officials would struggle to accurately flag noncitizens using the available data).

[34] Tex. Elec. Code § 16.033(b)-(d)

cannot readily access a document proving citizenship.[35] For those 21.3 million people, a disproportionate number of whom are people of color, an inaccurate flag from a database that is ill-suited to this purpose is enough to result in the cancellation of their voter registration.[36] County officials have criticized this process, expressing discomfort over "blindly canceling voters without really knowing how names have shown up on the SAVE database."[37] While a cancelled registration can be reinstated at the polls or an elections office, this creates another barrier in Texas' already outdated voter registration process.[38]

A September 2024 survey commissioned by the University of Maryland's Center for Democracy and Civic Engagement and the non-partisan voting rights organization VoteRiders found that approximately 1% of Texans who are U.S. citizens of voting age do not have documents that would prove their citizenship, while another 6% do not have easy access to those documents.[39] That amounts to approximately 1.3 million Texans who are US citizens of voting age that either would not be able to prove their citizenship, or would have great difficulty in doing so. To put this into perspective, that is 472 times the number of potential noncitizens the Texas SOS's use of the SAVE database flagged.

While Texas voters are already feeling these effects, under the policies outlined in this SORN, the same harms are likely to occur across the nation. Even in places with more accessible voter registration processes, these kinds of errors undermine the democratic process. As well as wasting county election officials' time and resources, sending cancellation notices to voters often results in voter intimidation that dampens democratic participation.[40] This risk is especially salient when states pursue criminal penalties based on SAVE's potentially inaccurate information.[41] Finally, states erroneously claiming that

---

[35] Press Release, Brennan Ctr. for Just., 21.3 Million American Citizens of Voting Age Don't Have Ready Access to Citizenship Documents (June 11, 2024), https://perma.cc/H8QE-H787.
[36] *Id.*
[37] Natalia Contreras, *Texas counties look into 'potential noncitizens' on voter rolls. Here's what they're finding*, VOTEBEAT (Oct. 31, 2025), https://www.votebeat.org/texas/2025/10/31/county-election-officials-investigate-potential-noncitizens-flagged-save-database/
[38] Natalia Contreras, *With Texas' paper-based voter registration system, applications get lost in the shuffle*, VOTEBEAT (Oct. 28, 2024), https://www.votebeat.org/texas/2024/10/28/voter-registration-problems-dps-paper-forms/
[39] Jillian Andres Rothschild et. al, *Who Lacks ID in Texas Today?: An Exploration of Voter ID Access, Barriers, and Knowledge*, UNIV. OF MD. CTR. FOR DEMOCRACY AND CIVIC ENGAGEMENT 5 (Sept. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/Voter%20ID%20Report%20Texas.pdf.
[40] Saksa, *Trump's Voter Citizenship Database Is 'Flawed', supra* note 31 ("I am worried that sending out this notice will deter eligible voters from providing the required proof of citizenship and/or from voting").
[41] *See* Natalia Contreras, *Texas secretary of state refers 33 potential noncitizen voters for criminal investigation*, TEX. TRIB. (June 5, 2025), https://www.texastribune.org/2025/06/05/texas-secretary-state-noncitizen-voters-investigation/.

TEXAS CIVIL RIGHTS PROJECT

large numbers of noncitizens have registered to vote or have voted fuels misinformation and diminishes trust in elections.[42]

In Texas, we have seen first hand how policies driven by inaccurate data and disproven claims of widespread noncitizen voting played out before. In 2019, former Texas Secretary of State, David Whitley, initiated a review of our state's voter rolls that incorrectly flagged at least 25,000 citizens as being ineligible to vote, with many of those flagged being naturalized citizens. This attempted voter purge was handled so poorly that it led to multiple lawsuits, a settlement requiring the Secretary of State to stop the purge and update rolls with more up-to-date information, and Mr. Whitley's resignation.[43]

The nation should take note of that experience and not make the same mistakes again. Texas voters were among the first to be impacted by this improper use of Social Security data, and we should be among the last. DHS is misusing data provided by the SSA in a way that does nothing to protect our elections, wastes government resources, endangers the privacy of the American public, and risks disenfranchising eligible voters nationwide.

**Conclusion**

This SORN formalizes an unjustified and harmful use of SSA data by DHS. As we are currently seeing in Texas, allowing DHS to use SSA data for voter verification is already threatening disillusionment and disenfranchisement. It would be best to return to using SSA data for its intended purposes and use other verification tools that are more accurate and pose fewer dangers to the privacy rights of the American public.

For all of the reasons listed above, TCRP strongly urges a rejection of the expanded use of SSA data by DHS.

Sincerely,

| | |
|---|---|
| Carl Blair | Miranda van Dijk |
| Senior Election Protection Attorney | Voting Rights Legal Fellow |

---

[42] Singh & Reynolds, *supra* note 13; *See, e.g.*, Vianna Davila et al., *Gov. Greg Abbott boasted that Texas removed 6,500 noncitizens from its voter rolls. That number was likely inflated.*, VOTEBEAT (OCT. 15, 2024), https://www.votebeat.org/texas/2024/10/15/greg-abbott-noncitizen-voter-roll-removal-investigation/.

[43] Alexa Ura, *Texas Secretary of State David Whitley Departs as Legislative Session Ends*, TEX. TRIB. (May 27, 2019), https://perma.cc/X59B-FFHU.