**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF WOMEN VOTERS, *et al.*,

               Plaintiffs

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

               Defendants.

Case No. 1:25-cv-03501

**BRIEF OF *AMICUS CURIAE* THE AMERICAN CIVIL LIBERTIES
UNION IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

Cody Venzke*
American Civil Liberties Union
  Foundation
915 15th St NW
Washington, DC 20005
(202) 457-0800
cvenzke@aclu.org

* Admitted in California. Admission
to DC pending. Pro hac vice
application pending

Brian Hauss (D.D.C. Bar No. NY0581)
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

**Table of Contents**

Table of Authorities ............................................................................................................ ii

INTEREST OF THE *AMICUS CURIAE* ...........................................................................1

INTRODUCTION ...............................................................................................................2

SUMMARY OF THE ARGUMENT ..................................................................................4

ARGUMENT.......................................................................................................................4

    I.       The expansion of SAVE is contrary to SAVE's authorizing statutes and
              longstanding agency practice. .......................................................................4

            A.      The expansion of SAVE exceeds statutory authority for the database. ............ 5

            B.      USCIS's longstanding interpretation of authority for SAVE supports
                 the plain language of the statutes limiting SAVE. ......................................... 11

    II.     The expansion of SAVE likely violates the Privacy Act's substantive
              prohibition on collection of information about people's First Amendment-
              protected activities. .....................................................................................14

            A.      SAVE will likely maintain records on individuals' exercise of their
                 First Amendment rights to political association and to vote.......................... 15

            B.      Exceptions in Section 552a(e)(7) Are Inapplicable. ...................................... 17

CONCLUSION...................................................................................................................19

**Table of Authorities**

**Cases**

*Abernethy v. I.R.S.*,
909 F. Supp. 1562 (N.D. Ga. 1995) ...................................................................................... 17

*American Tobacco Co. v. Patterson*,
456 U.S. 63 (1982)................................................................................................................. 5

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)............................................................................................................. 17

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)............................................................................................................. 12

*Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018) .................................................................................. 10

*Colorado v. DOJ*,
455 F. Supp. 3d 1034 (D. Colo. 2020)................................................................................. 10

*Elrod v. Burns*,
427 U.S. 347 (1976)............................................................................................................. 17

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)............................................................................................................. 12

*Fischer v. United States*,
603 U.S. 480 (2024)............................................................................................................... 5

*Food & Drug Administration v. Brown & Williamson Tobacco Corporation*,
529 U.S. 120 (2000)......................................................................................................... 5, 12

*Gerlich v. DOJ*,
659 F. Supp. 2d 1 (D.D.C. 2009)......................................................................................... 16

*Housing Authority of City & County Of San Francisco v. Turner*,
No. 25-CV-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025).................................. 8

*Jabara v. Webster*,
691 F.2d 272 (6th Cir.1982) ................................................................................................ 17

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026)........................................................................................................... 12

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024);............................................................................................................ 12

ii

*Maydak v. United States*,
    363 F.3d 512 (D.C. Cir. 2004) ..................................................................... 16, 18

*McCutcheon v. Fed. Election Commission*,
    572 U.S. 185 (2014) .......................................................................................... 17

*Mercy Hospital, Inc. v. Azar*,
    891 F.3d 1062 (D.C. Cir. 2018) ......................................................................... 10

*Nagel v. U.S. Department of Health, Education & Welfare*,
    725 F.2d 1438 (D.C. Cir. 1984) .................................................................... 15, 17

*Oregon v. Trump*,
    406 F. Supp. 3d 940 (D. Or. 2019) .................................................................... 10

*Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ................................................................ 10

*Pulsifer v. United States*,
    601 U.S. 124 (2024) ............................................................................................. 5

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022) .......................................................................................... 12

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) .......................................................................................... 10

**Statutes**

42 U.S.C. § 405 ......................................................................................................... 13

5 U.S.C. § 552a ..................................................................................................... 2, 15

8 U.S.C. § 1154 ........................................................................................................... 6

8 U.S.C. § 1373 ......................................................................................................... 10

8 U.S.C. § 1452 ........................................................................................................... 6

8 U.S.C. § 1611 ........................................................................................................... 7

Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, 102 Stat.
    2507 (1988) (codified at 5 U.S.C. § 552a(o)) .................................................... 2

Department of Defense Appropriations Act, 2004, Pub. L. No. 108–87 117 Stat. 1054,
    1102 (2003). ....................................................................................................... 14

Federal Aviation Administration (FAA) Extension, Safety, and Security Act of 2016,
    Pub. L. No. 114-190, 130 Stat. 615 (July 15, 2016) ........................................... 9

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996) ...................................................................... 7, 8

Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163 (1952) .................... 6

Immigration Reform and Control Act of 1986, Pub. L. No. 99–603 (1986) ................................. 6

Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010) (codified as amended 42 U.S.C. § 18081) ...................................................... 9

Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Pub. L. 104–193, 110 Stat. 2105 (1996) (codified as amended at 8 U.S.C. § 1642) ........................... 7

REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (2005) ........................................................ 8

**Rules**

49 C.F.R. § 1542.205 ..................................................................................................................... 9

**Legislative and Regulatory Materials**

60 Fed. Reg. 52690 (Oct. 10, 1995)............................................................................................. 11

63 Fed. Reg. 41662 (Aug. 4, 1998)................................................................................................ 7

67 Fed. Reg. 64134 (Oct. 17, 2002)............................................................................................ 11

90 Fed. Reg. 48948 (Oct. 31, 2025)...................................................................................... passim

*About E-Verify*, E-VERIFY (Apr. 10, 2018) ................................................................................ 8

Defense Advanced Research Projects Agency, REPORT TO CONGRESS REGARDING THE TERRORISM INFORMATION AWARENESS PROGRAM (2003) .......................................... 2, 13, 14

Department of Homeland Security, DHS/USCIS/PIA-006(C) PRIVACY IMPACT ASSESSMENT FOR THE SYSTEMATIC ALIEN VERIFICATION FOR ENTITLEMENTS PROGRAM (2011)........................................................................................................ 11

Department of Homeland Security, DHS/USCIS/PIA-006(C) PRIVACY IMPACT ASSESSMENT FOR THE SYSTEMATIC ALIEN VERIFICATION FOR ENTITLEMENTS PROGRAM (2020),........................................................................................................ 3

Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344 (Nov. 17, 1997) .................................................. 7

Protecting American Voters Act, H.R. 2343, 117th Cong. (2021)............................................. 13

Protecting American Voters Act, H.R. 3162, 118th Cong. (2023)............................................. 13

Restoring Faith in Elections Act, H.R. 102, 117th Cong. (2021) ................................. 13

Restoring Faith in Elections Act, H.R. 156, 118th Cong. (2023) ................................. 13

Senate Committee on Government Operations and House of Representatives Committee
on Government Operations, 94th Cong., 2d Session, Legislative History of the
Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy (1976) ........... 2

U.S. Citizenship & Immigration Services, *SAVE User Reference Guide* (2025) ..................... 3, 16

Voter Protection Act of 2005, S. 414, 109th Cong (2005) ........................................... 13

**Other Authorities**

*Access to and Use of Voter Registration Lists*, NAT'L CONF. STATE LEGISLATURES (July
17, 2025) ........................................................................................ 23

Alexander Castro, *Providence Federal Judge Grills DOJ Lawyer Over Reasons for
Demanding RI's Voter Data*, Rhode Island Current (Mar. 26, 2026) ................................ 5, 22

Brief for Petitioner, *Carpenter v. United States*, 585 U.S. 296 (2018) (No. 16-402) ..................... 1

Brief of *Amici Curiae* American Civil Liberties Union and Electronic Frontier
Foundation, *United States v. Hasbajrami*, 945 F.3d 641 (2019) (No. 15-2684) ..................... 1

Center for Democracy & Technology et al., How Federal Efforts to Access Voter Data
Affect Our Privacy, Civil Liberties, and Democracy (2025) .............................................. 5, 22

Chris Calabrese, *Like Frankenstein's Monster, DHS and the Senate Try to Revive Real
ID*, ACLU (July 15, 2009) ............................................................................ 2

Cody Venzke, ALCU, DATA SILOS, DOSSIERS, AND SURVEILLANCE: THE UNINTENDED
RISKS OF FEDERAL DATA CONSOLIDATION (2025) ...................................................... 1

Declan McCullagh, *Republican Senator Slams Database Plan*, CNET (Jan. 22, 2003) .............. 20

Gov. Glenn Youngkin, Va. Executive Order No. 53, *Enhancing Security for Election
Preparedness* (Sept. 12, 2025) ........................................................................ 5, 22

Jay Stanley, ACLU, THE MATRIX: TOTAL INFORMATION AWARENESS RELOADED (2004) ............ 2

Jen Fifield & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making
Mistakes. It Led to Confusion in Texas*, Texas Tribune (Feb. 13, 2026) ............................ 5, 22

Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and
Track Immigrants*, WIRED (Apr. 18, 2025) ........................................................... 22

Mike German & Jay Stanley, ACLU, DRASTIC MEASURES REQUIRED: CONGRESS NEEDS
    TO OVERHAUL U.S. SECRECY LAWS AND INCREASE OVERSIGHT OF THE SECRET
    SECURITY ESTABLISHMENT (2011) .............................................................................. 2

*National Identification Cards: Why Does the ACLU Oppose a National I.D. System?*,
    ACLU (Mar. 12, 2002) ...................................................................................... 2

Sen. Chuck Grassley, *Pentagon Snoops Need Congressional Leash* (Jan. 31, 2003) .................. 20

William Safire, *You Are a Suspect*, N.Y. TIMES (Nov. 14, 2002)................................................. 19

## INTEREST OF THE *AMICUS CURIAE*[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties and civil rights of all Americans. The ACLU has frequently appeared in this Court, as counsel to parties or as amici curiae, in cases raising significant questions about the meaning of the Constitution, constitutional and statutory limitations on government power, and the breadth of rights that the Constitution and federal law grant to U.S. citizens.

In its advocacy, the ACLU has long challenged governmental incursions into citizens' private lives and, especially, surveillance of the exercise of their Constitutional rights. Consequently, the ACLU opposes efforts to create centralized databases of U.S. citizens, which would serve as platforms for governmental surveillance and unified federal dossiers on citizens suspected of no wrongdoing.[2]

---

[1] Counsel for plaintiffs has consented to the filing of this brief. Counsel for the United States request that their position be reported as follows: "Due to the timing of the motion, Defendants take no position." No counsel for any party authored this brief in whole or in part and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

[2] *See, e.g.*, Brief for Petitioner, *Carpenter v. United States*, 585 U.S. 296 (2018) (No. 16-402); Brief of *Amici Curiae* American Civil Liberties Union and Electronic Frontier Foundation, *United States v. Hasbajrami*, 945 F.3d 641 (2019) (No. 15-2684); Cody Venzke, ALCU, Data Silos, Dossiers, and Surveillance: The Unintended Risks of Federal Data Consolidation (2025), https://perma.cc/62GE-GDJY; Mike German & Jay Stanley, ACLU, Drastic Measures Required: Congress Needs to Overhaul U.S. Secrecy Laws and Increase Oversight of the Secret Security Establishment (2011), https://perma.cc/4ZFS-RUDW; Chris Calabrese, *Like Frankenstein's Monster, DHS and the Senate Try to Revive Real ID*, ACLU (July 15, 2009), https://perma.cc/L9Y3-TLZJ; Jay Stanley, ACLU, The Matrix: Total Information Awareness Reloaded (2004), https://perma.cc/FL44-ZRZY; *National Identification Cards: Why Does the ACLU Oppose a National I.D. System?*, ACLU (Mar. 12, 2002), https://perma.cc/MP7A-RZPC.

**INTRODUCTION**

The United States has long eschewed creating a centralized federal database of all U.S. citizens, and Congress has served as a bulwark against the establishment of such a database. In 1974, Congress passed the Privacy Act, 5 U.S.C. § 552a, recognizing the broad public "concern over an increasing trend within our government to snoop into virtually every segment of our society."[3] The Act sought to curb "the Government's voracious appetite for personal information about each of us" and to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen."[4]

The Privacy Act was merely Congress's first repudiation of systematic consolidation of data on U.S. citizens. In 1988, Congress passed the Computer Matching and Privacy Protection Act to combat the creation of "a national data bank that combines, merges, or links information on individuals."[5] And in the twentieth century, Congress defunded a surreptitious Department of Defense program that sought to link citizens' "scattered bits of personal data" across federal agencies.[6]

Despite that history, the U.S. Immigration and Citizenship Services (USCIS) is now seeking to create such a database.[7] On October 31, 2025, USCIS released a System of Records Notice (SORN), 90 Fed. Reg. 48948 (Oct. 31, 2025), confirming its expansion of the Systematic

---

[3] S. Comm. on Gov't Operations and H.R. Comm. on Gov't Operations, 94th Cong., 2d Sess., Legislative History of the Privacy Act of 1974 – S. 3418 (Pub. L. No. 93-579), Source Book on Privacy at 4 (1976), https://perma.cc/D8QK-RULW.

[4] *Id.* at 884.

[5] Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, 102 Stat. 2507 (1988) (codified at 5 U.S.C. § 552a(o)), https://perma.cc/KND4-8U5A.

[6] Defense Advanced Research Projects Agency, REPORT TO CONGRESS REGARDING THE TERRORISM INFORMATION AWARENESS PROGRAM 33 (2003), https://perma.cc/JPX5-5CCN.

[7] Strictly speaking, SAVE is not a database but a service that accesses and queries other federal databases. 90 Fed. Reg. at 48949. Nonetheless, amicus uses the term "database" as shorthand for the service.

Alien Verification for Entitlements program (SAVE) to systematically include all U.S. citizens. For forty years, SAVE provided information primarily on non-citizens, as well as naturalized and derived citizens, to verify their eligibility for governmental benefits.[8] In its SORN, however, USCIS dramatically expanded SAVE's reach to include citizens by birth and to include data on them from the Social Security Administration, the State Department, and state departments of motor vehicles, 90 Fed. Reg. at 48949, an unprecedented expansion of its coverage.

The SORN also eliminated the need to query individuals' information one at a time by implementing list queries, *id.* at 48951 — that is, bulk uploads.[9] With those changes, SAVE will include a sweeping array of records on U.S. citizens and non-citizens alike, including: full name, date of birth, photographs, Social Security numbers, passport numbers, drivers' license numbers, benefits sought, copies of documents, and data uploaded by querying agencies, 90 Fed. Reg. at 48952–53 — all of which may be kept by SAVE for ten years or more, *id.* at 48954.

The SORN highlighted one purpose for this expansion: to verify citizens' eligibility not just for benefits but for exercising their constitutional right to vote. *Id.* at 48949. And those plans are already well underway. Around two-dozen states have agreed to use SAVE,[10] and Department of Justice attorneys recently acknowledged that, if the DOJ obtains states'

---

[8] Dep't Homeland Sec., DHS/USCIS/PIA-006(C) Privacy Impact Assessment for the Systematic Alien Verification for Entitlements Program 14 (2020), https://perma.cc/UW42-MDAT.

[9] U.S. Citizenship & Immigr. Servs., *SAVE User Reference Guide* § 8.2 (2025), https://perma.cc/N3AQ-XCB9 (describing the "bulk upload" feature).

[10] Jen Fifield & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, Texas Tribune (Feb. 13, 2026), https://perma.cc/27BJ-VH84; *cf.* Gov. Glenn Youngkin, Va. Exec. Order No. 53, *Enhancing Security for Election Preparedness* (Sept. 12, 2025), https://perma.cc/VY8P-UZGY; Center for Democracy & Technology et al., How Federal Efforts to Access Voter Data Affect Our Privacy, Civil Liberties, and Democracy (2025), https://perma.cc/ES6G-ML7A.

unredacted voter registration lists in related litigation, it will provide them to SAVE.[11] Voter

registration lists often include party affiliation — an exercise of citizens' First Amendment right

of association — and these avenues for sharing voter data with SAVE creates significant risk that

the database will include records of citizens' First Amendment activities. SAVE's expansion is

not only unprecedented in the American tradition but risks serving as a platform for systematic,

centralized surveillance.

## SUMMARY OF THE ARGUMENT

USCIS's expansion of SAVE as a systematic database of U.S. citizens is contrary to the

line of statutes establishing SAVE and delimiting its uses. The expansion of SAVE exceeds the

plain meaning of those statutes, each of which makes clear that SAVE was not intended by

Congress to systematically include data on U.S. citizens. The expansion also contradicts forty

years of agency interpretation of those laws. Likewise, the collection of voter registration lists

potentially runs afoul of Privacy Act prohibitions on maintaining records on citizens' exercise of

their First Amendment rights. Consequently, this Court should grant summary judgment to the

plaintiffs.

## ARGUMENT

**I.      The expansion of SAVE is contrary to SAVE's authorizing statutes and
         longstanding agency practice.**

USCIS argues in its SORN that its creation of a systematic database of U.S. citizens is

authorized by seven statutes. Those statutes, however, do not provide USCIS with the authority

that it claims. Instead, they show that, in the limited instances where Congress has authorized

---

[11] Alexander Castro, *Providence Federal Judge Grills DOJ Lawyer Over Reasons for Demanding RI's Voter Data*, Rhode Island Current (Mar. 26, 2026), https://perma.cc/7QAY-4DLV.

data sharing for purposes of immigration or citizenship status verification, it has done so prescriptively, carefully delineating between verification for citizens' status and non-citizens' "immigration status." The precision of these statutes and decades of agency practice belie the notion that Congress somehow quietly authorized an unprecedented, all-encompassing database of U.S. citizens that went unnoticed by USCIS and its predecessor agencies for forty years. Congress simply has not provided USCIS with the authority it now claims.

A.    **The expansion of SAVE exceeds statutory authority for the database.**

In its System of Records Notice, USCIS points to seven statutes to justify its expansion of SAVE to include U.S. citizens, even those who have never interacted with immigration authorities and did not obtain their citizenship through naturalization or derived or acquired citizenship. *See* 90 Fed. Reg. 48948, 48952 (Oct. 31, 2025). In assessing USCIS's claimed statutory authority, "our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (citation modified). "In a given statute, the same term usually has the same meaning and different terms usually have different meanings," *Pulsifer v. United States*, 601 U.S. 124, 149 (2024), and those meanings are informed from both the "specific context" in which they appear and "the broader context of the statute as a whole," *Fischer v. United States*, 603 U.S. 480, 486 (2024) (citations omitted); *cf. Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). The plain language of the laws cited by USCIS does not provide authority for SAVE to systematically include U.S. citizens; instead, those statutes prescribe distinct processes for verifying citizenship and bar the use of SAVE for doing so.

5

As its primary authority for expanding SAVE, USCIS points to the Immigration and Nationality Act (INA), as amended by the Immigration Reform and Control Act of 1986 (IRCA), particularly section 121 of IRCA. 90 Fed. Reg. at 48949, 48952 (citing Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 121(c)(1) (1986)). Section 121 instructs immigration agencies to "implement a system for the verification of immigration status" and make that system — SAVE — available to states no later than October 1, 1987.[12]

The plain language of IRCA, referring to "immigration status" suggests that SAVE, the "system" referenced in the law, was never meant to include U.S. citizens. In fact, the INA,[13] which IRCA amended, uses the terms "immigration status" and "status" almost exclusively to apply to noncitizens. For example, section 204 of the INA, pertaining to granting "immigration status," uses the term "status" nearly forty times; in almost every instance, the term refers to a noncitizen. 8 U.S.C. § 1154(a)(1)(A)(iii)(II)(CC)(bbb), (iv), (vi), (vii)(I). In the limited instances where the section refers to citizens (or former citizens), it does so explicitly, using the term "citizenship status." Similarly, INA section 341 addresses both citizens and noncitizens; the term "status" is used only in provisions addressing noncitizens. 8 U.S.C. § 1452. This pattern persists throughout the text of the INA.[14] Nowhere did Congress intend either IRCA or the INA to authorize SAVE to be used for verifying the "immigration status" of U.S. citizens.

The six other statutes cited by USCIS are similarly unavailing. Each of these statutes is prescriptive, identifying the scope of the data to be shared, limiting its purposes, and delineating

---

[12] Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 121(c)(1) (1986), https://perma.cc/3SM7-PXC3.

[13] Pub. L. No. 82-414, 66 Stat. 163 (1952), https://perma.cc/3VLF-ZL55.

[14] *E.g.*, Pub. L. 82-414, § 245 (1952) (codified as amended at 8 U.S.C. § 1255).

the actors involved — many of which expressly require citizenship to be verified through some means other than SAVE.

First, the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) directs data sharing only for specific programs. The PRWORA requires that immigration authorities (then, the Attorney General) verify that a "person applying for a Federal public benefit . . . is a qualified alien and is eligible to receive such benefit."[15] That requirement is not open ended — it applies to a specific set of public benefits identified in the statute: "any grant, contract, loan, professional license, or commercial license" and "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit." 8 U.S.C. § 1611(a), (c)(1). The verification requirements of the PRWORA do not reach registration for voting as a "public benefit."

Moreover, PRWORA is entirely silent on data collection and maintenance, and nothing in the law authorizes a centralized database of U.S. citizens. The Attorney General emphasized this very point in guidance implementing PRWORA, eschewing the use of SAVE for citizens.[16] The Attorney General reiterated this point in a later notice of proposed rulemaking, stating, "The SAVE system is not suitable for verifying U.S. nationality."[17] 63 Fed. Reg. 41662, 41669 (Aug. 4, 1998).

---

[15] Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), Pub. L. 104–193, § 432, 110 Stat. 2105 (1996) (codified as amended at 8 U.S.C. § 1642); *accord* Pub. L. 104-208, §§ 504, 508 (1996) (amending PRWORA).

[16] Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 62 Fed. Reg. 61344, 61348 (Nov. 17, 1997).

[17] Although the Attorney General subsequently issued a proposed rule to implement PRWORA, it was never finalized, and the 1997 Interim Guidance remains operative. *Housing Authority of*

A second law cited by USCIS — the REAL ID Act[18] — similarly underscores that Congress did not intend for SAVE to be used for verifying citizenship. In fact, the REAL ID Act is explicit in barring the use of SAVE for U.S. citizens. That law requires states to enter into an agreement with DHS to utilize SAVE "to verify the legal presence status of a person, *other than a United States citizen*, applying for a driver's license or identification card."[19] The law explicitly disavows providing authority for verifying citizenship, and therefore cannot be read as authorizing an expansion of SAVE as USCIS contends.

The third and fourth statues cited by USCIS address the establishment and use of the E-Verify program for employment eligibility. Neither statute provides authority for expanding SAVE to include U.S. citizens. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996[20] established E-Verify, known then as the "pilot program" for verifying employment eligibility.[21] From its inception, E-Verify bifurcated processes between individuals presenting Social Security numbers and individuals presenting alien numbers for employment. Verification of Social Security numbers was delegated to the Social Security Administration (SSA), and the latter to immigration agencies.[22] This bifurcation makes clear: Congress did not intend for the verification of Social Security numbers and citizenship to take place through USCIS or its predecessor agencies.

---

*City & Cnty. Of San Francisco v. Turner*, No. 25-CV-08859-JST, 2025 WL 3187761, at *11 (N.D. Cal. Nov. 14, 2025.

[18] REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (2005), https://perma.cc/Z23D-UUJT.

[19] *Id.*, div. B, § 202(b), 119 Stat. at 302 (emphasis added).

[20] Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996), https://perma.cc/S9QA-TJU5. USCIS appears to cite IIRIRA primarily for its establishment of 8 U.S.C. 1373(c), discussed below; however, IIRIRA's treatment of E-Verify is instructive.

[21] *About E-Verify*, E-VERIFY (Apr. 10, 2018), https://perma.cc/5BUD-V2YH.

[22] *Compare* Pub. L. No. 104-208, tit. IV, subtitle A, § 404(e), *with id.* § 404(f).

8

Similarly, the Federal Aviation Administration (FAA) Extension, Safety, and Security Act of 2016 permits the Transportation Security Administration to access DHS-held data in implementing the TSA PreCheck program[23] and airport operators to access E-Verify and SAVE to vet personnel for access to airports' Security Identification Display Area (SIDA).[24] Again, nothing in the text either authorizes or even addresses the expansion of SAVE, and those provisions are limited to implementation of specific programs — PreCheck and airport personnel vetting.

Fifth, the Patient Protection and Affordable Care Act provides procedures for the Secretary of Health and Human Services to confirm the eligibility of individuals enrolling in healthcare plans.[25] But like E-Verify, Congress prescribed a system that bifurcated between citizens and non-citizens, suggesting it did not intend immigration authorities to be responsible for verifying citizenship status.[26] Under the ACA, if an applicant attests to being a U.S. citizen, that information is verified first with SSA;[27] in contrast, DHS serves as the initial verifier of information submitted by individuals who attest to be "alien[s] lawfully present in the United States."[28] In limited cases, SSA may verify information with DHS, but only for lawfully present noncitizens and citizens whose status or citizenship SSA is unable to confirm.[29] The detailed

---

[23] Federal Aviation Administration (FAA) Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, tit. III, subtitle A, § 3102(d)(1), 130 Stat. 615 (July 15, 2016), https://perma.cc/HEJ9-5D3B.

[24] *Id.* tit. III, subtitle D, § 3405(d). See 49 C.F.R. § 1542.205 for SIDA identification requirements.

[25] Patient Protection and Affordable Care Act, Pub. L. 111-148, tit. I, subtitle E, § 1411(b), 124 Stat. 119 (Mar. 23, 2010) (codified as amended 42 U.S.C. § 18081).

[26] *See id.* § 1141(c).

[27] *Id.* § 1141(c)(2)(A).

[28] *Id.* § 1141(c)(2)(B)(i).

[29] *Id.* § 1141(c)(2)(B)(ii).

scheme for verifying eligibility under the ACA makes it clear: Congress never intended USCIS or immigration authorities to be responsible for verifying citizenship.

And finally, section 1373(c) of title 8 of the United States Code, also passed as part of the Illegal Immigration Reform and Immigrant Responsibility Act, neither references SAVE nor authorizes a national database of U.S. citizens.[30] 8 U.S.C. § 1373(c). Subsection(c) merely requires that immigration authorities respond to governmental requests to ascertain individuals' "citizenship or immigration status." *Id.* § 1373(c). It is entirely silent on data collection and data consolidation. The subsection's language, however, underscores that Congress does not use "immigration status" to include both citizens and non-citizens. If "immigration status" included citizens, section 1373's reference to "citizenship . . . status" would have been "redundant." *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) ("[T]he canon against surplusage . . . 'cautions against interpreting one provision in a way that renders another redundant.'" (internal citations omitted)). The text of section 1373, like the INA and IRCA, shows that Congress did not intend to include citizens in SAVE's authorization to verify "immigration status."

Nowhere do these statutes authorize a comprehensive, systematic database of U.S. citizens or the inclusion of U.S. citizens in SAVE. And their silence speaks volumes. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — *it does not, one might say, hide elephants in mouseholes*." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (emphasis added). Congress has long resisted the

---

[30] The ACLU maintains that § 1373 is unconstitutional, and courts have agreed. *See, e.g.*, *Chicago v. Sessions*, 321 F. Supp. 3d 855, 872–73 (N.D. Ill. 2018), *aff'd*, 961 F.3d 882 (7th Cir. 2020); *Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 328–31 (E.D. Pa. 2018); *Oregon v. Trump*, 406 F. Supp. 3d 940, 971–73 (D. Or. 2019), *vacated as moot*, 42 F.4th 1078 (9th Cir. 2022); *see also Colorado v. DOJ*, 455 F. Supp. 3d 1034, 1059–60 (D. Colo. 2020).

establishment of a national database of U.S. citizens, and creating one would be a significant policy decision. If Congress had intended for these statutes to provide the authority that USCIS now claims, it would have done so expressly. But it did not, and for a simple reason: Congress never gave USCIS that authority.

### B.    USCIS's longstanding interpretation of authority for SAVE supports the plain language of the statutes limiting SAVE.

In addition to conflicting with the plain language of the statutes it relies on, USCIS's proposal to expand SAVE breaks with its own long-standing interpretation of its authority regarding the database. For nearly forty years, USCIS and its predecessor agencies have interpreted their statutory authority to permit SAVE to cover primarily noncitizens, adhering to the plain language of the statutes.

In its first Privacy Impact Assessment dedicated to SAVE, USCIS underscored this historic understanding of the database, explaining: "SAVE verifies noncitizens and naturalized citizens. Native-born U.S. citizens are not subject to SAVE verification . . . . In the vast majority of cases these are immigrants or non-immigrants, but they may also include naturalized or derived U.S. citizens."[31] Likewise, an earlier multi-purpose database that included SAVE, the Verification Information System (VIS), covered only "[i]mmigrants and naturalized U.S. citizens applying for federal, state, and local public benefits," excluding most U.S. citizens.[32] And the SORN for the predecessor to VIS similarly limited its coverage to non-U.S. citizens.[33] For forty years, SAVE has been consistently implemented as a limited database focused on non-citizens.

---

[31] Dep't Homeland Sec., DHS/USCIS/PIA-006(C) PRIVACY IMPACT ASSESSMENT FOR THE SYSTEMATIC ALIEN VERIFICATION FOR ENTITLEMENTS PROGRAM 3 (2011) **Error! Bookmark not defined.**, https://perma.cc/WNA3-GF5A.
[32] 67 Fed. Reg. 64134 (Oct. 17, 2002), https://perma.cc/9Q42-XMFD.
[33] 60 Fed. Reg. 52690, 52699–700 (Oct. 10, 1995), https://perma.cc/3B7V-SS6Z.

11

USCIS's sudden departure from the plain text of the statutes it relies on and its long-standing practice cannot be upheld. Settled law has long required that agencies must adhere to "unambiguous" statutes,[34] such as those at issue here.

*Even if* the statutes USCIS relies on were ambiguous, USCIS's departure from forty years of established practice is unsustainable.[35] At minimum, changes in agency policy require a "reasoned explanation" for the change, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009), which USCIS has fully failed to provide. Moreover, departures from longstanding statutory understandings "representing a transformative expansion" of authority require "clear congressional authorization." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724, 732 (2022) (internal citations omitted). This reluctance to countenance reinterpretations of existing statutes is especially pronounced where "Congress had conspicuously and repeatedly declined to" act. *Id.* at 724; *Food & Drug Admin.*, 529 U.S. at 156.

And Congress has repeatedly declined to authorize the type of comprehensive database that USCIS is now implementing. USCIS justifies its expansion of SAVE in part for "verification of registrants and registered voters in voter registration and voter list maintenance processes." 90 Fed. Reg. 48948, 48949 (Oct. 31, 2025). Authorization for such efforts has been rejected repeatedly by Congress: the 117th and 118th Congresses — spanning 2021 to just last year — both rejected bills that would have permitted SSA to share information with DHS and for

---

[34] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399 (2024); *cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

[35] *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 639 (2026) ("We have long expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers.").

DHS to use SAVE for verifying applications for voter registration.[36] Those same Congresses declined to advance legislation more broadly authorizing the creation of "a database and clearinghouse of voter registration records and lists of eligible voters in elections for Federal office" within DHS.[37]

In fact, Congress has rebuffed such legislation for nearly a quarter century. In 2005, the 109th Congress considered — and did not advance — a proposal to permit the use of Social Security numbers "in the administration of any voter registration or other election law"[38] in addition to existing uses for "general public assistance, driver's license, or motor vehicle registration law."[39] That same bill would have required states to maintain their voting registration lists in a computerized format that "allows for sharing and synchronization with other State computerized lists."[40]

During that same period, Congress not only declined to authorize comprehensive databases on voters, but actively eliminated broader efforts that — like SAVE — would have consolidated data on citizens across disparate sources. In the early 2000s, the Department of Defense proposed a program known as Total Information Awareness (TIA). TIA was designed to mine vast amounts of personal data from a variety of sources, including commercial databases, travel records, and financial transactions.[41] Like SAVE, TIA would serve to link data across

---

[36] Protecting American Voters Act, H.R. 3162, 118th Cong. § 2 (2023); Protecting American Voters Act, H.R. 2343, 117th Cong. § 2 (2021).

[37] Restoring Faith in Elections Act, H.R. 156, 118th Cong. § 401(b) (2023); Restoring Faith in Elections Act, H.R. 102, 117th Cong. § 501(b) (2021).

[38] Voter Protection Act of 2005, S. 414, 109th Cong § 103(a) (2005).

[39] 42 U.S.C. § 405(c)(2)(C)(i).

[40] S. 414, 109th Cong., § 104(a) (2005).

[41] Defense Advanced Research Projects Agency, Report to Congress regarding the Terrorism Information Awareness Program at A-3 (2003), https://perma.cc/JPX5-5CCN.

agencies and existing programs,[42] with a particular intention to "eliminate" the "practical obscurity" that is "inherent in the dispersal of scattered bits of personal data."[43]

TIA was loudly criticized across the political spectrum. Conservative commentator William Safire argued that TIA was "given a $200 million budget to create computer dossiers on 300 million Americans."[44] Similarly, Senator Charles Grassley observed, "Like many people, I have been concerned that this program could be used to invade the privacy of Americans by snooping around in our bank accounts, personal Internet computers, phone records and the like."[45] Later that year, Congress eliminated funding for TIA, led by Senator Ron Wyden and Senator Grassley and backed by a unanimous vote in the United States Senate.[46]

USCIS's sudden, dramatic departure from long-standing interpretation of the INA, IRCA and other statutes lacks not only clear authorization but *any* authorization and cannot be maintained.

## II.    The expansion of SAVE likely violates the Privacy Act's substantive prohibition on collection of information about people's First Amendment-protected activities.

USCIS's expansion of SAVE also likely runs afoul of the Privacy Act's prohibition on maintaining records on individuals' exercise of their First Amendment rights through its collection of state voter registration lists that are likely to contain covered information. The

---

[42] *Id.* at A-1 – A-2 (describing participating in TIA); *id.* at 31, A-9 (describing relationship between TIA and other programs).

[43] *Id.* at 33.

[44] William Safire, *You Are a Suspect*, N.Y. TIMES (Nov. 14, 2002), https://perma.cc/D6U3-S8VV.

[45] Declan McCullagh, *Republican Senator Slams Database Plan*, CNET (Jan. 22, 2003), https://perma.cc/24W7-YFUU; *accord* Sen. Chuck Grassley, *Pentagon Snoops Need Congressional Leash* (Jan. 31, 2003), https://perma.cc/KRM2-7DGA ("Without appropriate oversight and accountability standards, Total Information Awareness could infringe on [Constitutional] rights. Snooping around by the feds cannot go unchecked.").

[46] Department of Defense Appropriations Act, 2004, Pub. L. No. 108–87, § 8131, 117 Stat. 1054, 1102 (2003).

Privacy Act prohibits agencies from maintaining any "record describing how any individual exercises rights guaranteed by the First Amendment." 5 U.S.C. § 552a(e)(7). As the D.C. Circuit observed, "The mere compilation by the government of records describing the exercise of First Amendment freedoms creates the possibility that those records will be used to the speaker's detriment, and hence has a chilling effect on such exercise." *Nagel v. U.S. Dep't of Health, Educ. & Welfare*, 725 F.2d 1438, 1441 (D.C. Cir. 1984). The Act provides only three exceptions to the prohibition: (1) if the records' maintenance is "expressly authorized by statute," (2) if it is authorized "by the individual about whom the record is maintained" or (3) if it is "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). USCIS's collection of voter registration lists likely falls squarely within this prohibition.

A.   **SAVE will likely maintain records on individuals' exercise of their First Amendment rights to political association and to vote.**

SAVE will almost certainly collect and retain voter registration lists uploaded by state agencies and provided by the DOJ. The changes proposed by USCIS include authorizing "verification of registrants and registered voters in voter registration and voter list maintenance processes," including "by uploading a file with a list of multiple cases" — that is, bulk uploads. 90 Fed. Reg. 48948, 48949, 48951 (Oct. 31, 2025). Uploaded records are maintained in SAVE for at least ten years. *Id.* at 48954. Moreover, records provided by the uploading "user agency" are integrated into SAVE and made available to other agencies "with appropriate legal authority." *Id.* at 48951–52. Prior reporting disclosed that USCIS has integrated state voter registration lists into its "data lake,"[47] and now, several states — 27 by one count — have begun

---

[47] Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants*, Wired (Apr. 18, 2025), https://perma.cc/DJR4-Y9V5.

15

sharing their voter lists with SAVE.[48] The Department of Justice has also confirmed in related

litigation that the unredacted voter lists it obtains from states will be provided to SAVE.[49]

The collection of voter registration lists will likely reflect individuals' exercise of their

First Amendment rights. The SORN does not detail the nature of voter lists that may be provided

to SAVE,[50] but the majority of states include party affiliation in their voter lists.[51] Party

affiliation has long been recognized by courts as an exercise of the First Amendment right of

association, and it is consequently information protected by (e)(7). *Maydak v. United States*, 363

F.3d 512, 516 (D.C. Cir. 2004) (familial association First Amendment right protected by (e)(7));

*Gerlich v. DOJ*, 659 F. Supp. 2d 1, 13-15 (D.D.C. 2009) ("political and ideological affiliations"

protected by (e)(7)). At minimum, even a bare list of the names and identifiers of registered

---

[48] Jen Fifield & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, TEXAS TRIBUNE (Feb. 13, 2026), https://perma.cc/266J-5PUP; *cf.* Gov. Glenn Youngkin, Va. Exec. Order No. 53, *Enhancing Security for Election Preparedness* (Sept. 12, 2025), https://perma.cc/VY8P-UZGY; Center for Democracy & Technology et al., How Federal Efforts to Access Voter Data Affect Our Privacy, Civil Liberties, and Democracy (2025), https://perma.cc/R2GB-HR8P.

[49] Alexander Castro, *Providence Federal Judge Grills DOJ Lawyer Over Reasons for Demanding RI's Voter Data*, RHODE ISLAND CURRENT (Mar. 26, 2026), https://perma.cc/7QAY-4DLV ("At one point, U.S. District Judge Mary McElroy asked, 'Can you take this list and send it to Homeland Security and say, "Hey, check this out to see if any of these people are not citizens in compliance with all federal laws?"' 'Yes, and we intend to do so,' said Eric Neff, who represented the DOJ . . . .")

[50] Although SAVE's "bulk upload" feature permits only a template-based CSV file to be uploaded, additional pathways would permit voter lists to be provided to USCIS. For example, SAVE's existing single-case creation tools allows for additional documentation to be uploaded. *Compare* U.S. Citizenship & Imm. Servs., SAVE USER REFERENCE GUIDE § 8.2 (2025), https://perma.cc/N3AQ-XCB9, *with id.* § 8.1. In addition, the DOJ is actively litigating against approximately two-dozen states to obtain their unredacted voter lists. Likewise, even the CSV files will reflect individuals' choice to register to vote, which may be protected by the First Amendment. *See infra* n.52.

[51] *Access to and Use of Voter Registration Lists*, NAT'L CONF. STATE LEGISLATURES (July 17, 2025), https://www.ncsl.org/elections-and-campaigns/access-to-and-use-of-voter-registration-lists.

voters will reflect their choice to register to vote, and Supreme Court authority suggests that that choice may be an exercise of First Amendment rights.[52]

### B.    Exceptions in Section 552a(e)(7) Are Inapplicable.

The three exceptions outlined in clause (e)(7) for statutory authorization, individual authorization, and "authorized law enforcement activity" do not apply to SAVE. First, as detailed above, none of the statutory authority cited by USCIS "expressly authorize[s]" the creation of a systematic database of U.S. citizens. Those statutes instead provide irrelevant authorities: verification of immigration status for benefits, work eligibility, or airport personnel. USCIS has no express authority to maintain voter registration lists.

Second, it is beggars belief that USCIS has collected "express" authorization from the millions of individuals whose information is likely to be retained in SAVE, and USCIS has not contended at this point that it has.

And third, USCIS's maintenance of the records is not "pertinent to and within the scope of an authorized law enforcement activity." To qualify under this exception, information must be "relevant to an authorized criminal investigation or to an authorized intelligence or administrative one," *Nagel,* 725 F.2d at 1441 n.3 (quoting *Jabara v. Webster*, 691 F.2d 272, 280 (6th Cir.1982)), such as an agency's handling of a civil rights investigation, *Abernethy v. I.R.S.*, 909 F. Supp. 1562, 1570 (N.D. Ga. 1995), aff'd, 108 F.3d 343 (11th Cir. 1997), or a federal employer's investigation of employee misconduct, *Nagel*, 725 F.2d at 1441. Although

---

[52] *Cf. McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) ("There is no right more basic in our democracy than the right to participate in electing our political leaders. Citizens can exercise that right in a variety of ways: They can run for office themselves, vote, urge others to vote for a particular candidate, volunteer to work on a campaign, and contribute to a candidate's campaign."); *Anderson v. Celebrezze*, 460 U.S. 780, 793–94 (1983) (ballot eligibility requirements violated First Amendment); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment.").

17

"authorized law enforcement activity" may have a "broad meaning," agencies must identify the activities with "specificity" lest they "evade subsection 552a(e)(7) simply by invoking a need to maintain records for generic investigative and informative purposes." *Maydak*, 363 F.3d at 517.

USCIS's collection of voter registration lists falls outside the exception. As an initial matter — and as discussed above — USCIS lacks any "authority" for its purported law enforcement activities. The authorities it cites all pertain to verification of "immigration status" for purposes of benefits or work eligibility. In none of those statutes was USCIS authorized to verify citizenship.

*Even if* USCIS could point to authorization, the open-ended permission it has given itself to reuse voter registration lists means that it falls outside the exception. In *Maydak*, the D.C. Circuit reversed the district court's judgment in favor of the Bureau of Prisons (BOP) on a prisoner's § 552a(e)(7) claim. 363 F.3d 512. BOP had photographed prisoners engaged in First Amendment associational activity, and the D.C. Circuit surmised that collecting the photos for activities such as "preserving prison security" or reviewing for "gang-related activity and obscene conduct" could fall within the exception. *Id.* at 517. BOP officials, however, did not limit their use of the photographs to those purposes. Instead, they planned to broadly use them for "investigative or informative value," which the D.C. Circuit concluded was too "generic" of a purpose that would permit BOP to "evade" the Privacy Act's prohibitions if accepted.

USCIS has similarly left open the door to broad, future uses of voter registration lists. Files uploaded by state agencies are retained for ten years and can be repurposed for a wide variety of uses: determining eligibility for public benefits, issuing a license, grant, or government credential, conducting background investigations, additional voter verification, or *any other*

18

*lawful purpose*. 90 Fed. Reg. 48948, 48952, 48954 (Oct. 10, 2025). But such a broad and generic

purpose does not fall within the § 552a(e)(7) exception.

**CONCLUSION**

For the foregoing reasons, the expansion of SAVE to systematically include information

about U.S. citizens violates the law, and this Court should grant summary judgment to the

plaintiffs.

Respectfully submitted,

Dated April 8, 2026

/s/ Brian Hauss

Cody Venzke*                                               Brian Hauss
American Civil Liberties Union Foundation   American Civil Liberties Union Foundation
915 15th St NW                                        D.D.C. Bar No. NY0581
Washington, DC 20005                            125 Broad Street, 18th Floor
(202) 457-0800                                        New York, NY 10004
cvenzke@aclu.org                                  (212) 549-2500
                                                              Bhauss@aclu.org

*Admitted in California. Admission to DC
    pending. Pro hac vice application pending.

19

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief of *Amicus Curiae* of the American Civil Liberties Union complies with the typeface and type-style requirements set forth in D.D.C. LCvR 5.1(d), because it has been prepared in 12-point, Times New Roman font; as well as with the type-volume limitation set forth in D.D.C. LCvR 7(o)(4), because its length does not exceed twenty-five pages.

Respectfully submitted,

/s/ Brian Hauss
Brian Hauss (D.D.C. Bar No. NY0581)
American Civil Liberties Union
 Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

20