**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS, et al., | § | Case No. 1:25-cv-03501-SLS |
| *Plaintiffs,* | § | |
| v. | § | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | § | |
| | § | |
| *Defendants,* | § | |
| and | § | |
| STATE OF TEXAS, | § | |
| *Intervenor-Defendant.* | § | |

**STATE OF TEXAS'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

Federal law both authorizes and *requires* the Department of Homeland Security ("DHS"), through U.S. Citizenship and Immigration Services ("USCIS"), to respond to inquiries from State and local governments seeking to verify the citizenship or immigration status of any individual for any purpose authorized by law. *See* 8 U.S.C. § 1373(c). To fulfill that statutory obligation, Congress directed DHS's predecessor to "implement a system for the verification of immigration status" that would be "available to all the States." Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391 (codified at 42 U.S.C. § 1320b-7 (note)). That system is SAVE, the Systematic Alien Verification for Entitlements program. Texas and its counterparts have long relied on SAVE (and will continue to rely on it) to discharge their own non-discretionary obligations under federal law to maintain accurate voter registration lists. *See* 52 U.S.C. §§ 20507(a)(4), 21083(a)(4).

1

Plaintiffs' First Amended and Supplemental Complaint (the "Amended Complaint") attacks the very information-sharing that 8 U.S.C. § 1373 compels. It alleges that DHS and the Social Security Administration ("SSA") exceeded their statutory and constitutional authority by enabling SAVE to accept bulk verification requests and to run queries using Social Security numbers. But Plaintiffs fail at every threshold: they lack standing, they challenge no discrete final agency action, their notice-and-comment claim is moot, and they cannot use the Administrative Procedure Act ("APA") to end-run the Privacy Act's comprehensive remedial scheme. And each of their substantive claims fails on the merits. The Amended Complaint should be dismissed.

# TABLE OF CONTENTS

Table of Contents ........................................................................................... 3
Introduction .................................................................................................... 4
Background ..................................................................................................... 6
Legal Standard ............................................................................................... 8
  I.    Federal Rule of Civil Procedure 12(b)(1) .......................................... 8
  II.   Federal Rule of Civil Procedure 12(b)(6) .......................................... 9
Argument ........................................................................................................ 9
  I.    Plaintiffs Lack Article III Standing .................................................... 9
    A.   Several Plaintiffs fail to identify any member with Article III standing .......... 10
      1.   LWV and LWVLA ................................................................... 10
      2.   LWVVA ................................................................................... 11
      3.   LWVTX ................................................................................... 12
    B.   No Plaintiff has standing to challenge SAVE's bulk-upload functionality ....... 12
    C.   Plaintiffs' privacy-related injuries are too speculative to support standing ....... 13
      1.   Intrusion upon seclusion ........................................................... 14
      2.   Breach of confidence ................................................................. 14
      3.   Defamation ............................................................................... 15
    D.   Plaintiffs' voting-related injuries are speculative, not fairly traceable to the Federal Defendants, and not redressable in this suit .......... 15
    *E.*   Plaintiffs' diversion-of-resources theory cannot survive *Alliance for Hippocratic Medicine* .......... 17
    F.   EPIC's procedural and informational injuries cannot independently support Article III standing .......... 19
  II.   Plaintiffs' Notice and Comment Claim is Moot ................................ 20
  III.  Plaintiffs Challenge No Discrete and Final Agency Action ............... 21
    A.   Bulk upload is a software-customer-service improvement, not a final agency action. .......... 22
    B.   The DHS-SSA letter agreement is not final agency action ........... 22
    C.   The SORNs are not reviewable as Plaintiffs suggest ................... 23
  IV.  Plaintiffs Cannot Bring APA Claims Predicated on Privacy Act Violations .......... 23
  V.   Plaintiffs' Claims Fail on the Merits ................................................. 25
    A.   SAVE is authorized by statute (Counts 1 and 5). ........................ 25
      1.   SAVE's scope ........................................................................... 26
      2.   Information-sharing with SSA .................................................... 26
      3.   Social Security Act ................................................................... 26
      4.   Major questions and nondelegation ........................................... 27
    B.   Plaintiffs' constitutional and separation-of-powers claims fail (Counts 2 and 3) .......... 27
    C.   Plaintiffs' substantive Privacy Act claim fails (Count 4) ............. 28
    D.   Plaintiffs' arbitrary-and-capricious claim fails (Count 6) ............ 30
    E.   Plaintiffs' mandamus and unreasonable-delay claims fail (Counts 7 and 8) .......... 31
  VI.  Any Relief Should be Strictly Tailored ............................................. 32
Conclusion ..................................................................................................... 34
Certificate of Service .................................................................................... 35

## INTRODUCTION

The State of Texas intervened in this action to defend federal and state officials' ability to perform the citizenship-verification function that Congress has mandated for decades. Plaintiffs initially sought a preliminary injunction to halt that function altogether. This Court denied that motion on November 17, 2025, finding that Plaintiffs had not demonstrated irreparable harm. *See League of Women Voters v. DHS*, No. 25-cv-3501-SLS, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). Plaintiffs then amended their complaint, narrowing the case in some respects (dropping the so-called "Data Lake" allegations, the individual "J. Doe" plaintiffs, and the Department of Justice as a defendant) while adding a new organizational plaintiff (League of Women Voters of Texas ("LWVTX")) and new factual allegations about how States have used the SAVE system. None of those amendments cures the fundamental defects that doom this suit.

The Amended Complaint should be dismissed in its entirety for six independent reasons. ***First***, Plaintiffs lack Article III standing. Every remaining plaintiff is an association, yet several of them fail to identify any member with a cognizable injury, and those members they do identify were either recruited after the fact or suffered only the sort of paperwork inconvenience that does not support prospective injunctive relief. Their privacy-related fears are too speculative under *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), and *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). Their voting-related injuries are neither fairly traceable to the Federal Defendants nor redressable in a suit against them. And their diversion-of-resources theory was foreclosed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

***Second***, Plaintiffs' notice-and-comment claim (Count 5) is moot. DHS and SSA have now published modified System of Records Notices ("SORNs") and solicited public comment for the required 30 days. *See* 90 Fed. Reg. 48,948 (Oct. 31, 2025); 90 Fed. Reg. 50,879 (Nov. 12, 2025).

4

Judge Kollar-Kotelly already held that an indistinguishable claim is moot. *See League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC*"), --- F. Supp. 3d ----, 2026 WL 252420, at *53–54 (D.D.C. Jan. 30, 2026). So too here.

*Third*, Plaintiffs fail to identify any discrete, final agency action challengeable under the APA. The move from one-by-one to bulk verification requests is a software-customer-service improvement, not a "rule, order, license, sanction, [or] relief" within 5 U.S.C. § 551(13). The DHS-SSA letter agreement memorializing how the agencies will share information is indistinguishable from the intra-governmental memorandum of understanding the D.C. Circuit held was *not* final agency action in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026). And the modified SORNs, which Plaintiffs previously demanded that DHS and SSA publish, cannot both be the remedy Plaintiffs sought and the vice Plaintiffs now challenge.

*Fourth*, the APA provides no cause of action for Plaintiffs' Privacy Act claims. The Privacy Act is a "comprehensive and detailed" remedial scheme, *FAA v. Cooper*, 566 U.S. 284, 287 (2012), and it preempts the general APA. *See Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014). Worse still, the Privacy Act's private cause of action is available only to natural "individual[s]," 5 U.S.C. § 552a(g)(1), (a)(2)—a category that, unlike in the original complaint, no Plaintiff satisfies.

*Fifth*, each of Plaintiffs' substantive claims fails on the merits. SAVE is expressly authorized by 42 U.S.C. § 1320b-7 (note) and 8 U.S.C. § 1373(c). The constitutional and separation-of-powers claims merely repackage the statutory-authority claims and fail under *Dalton v. Specter*, 511 U.S. 462 (1994). The Privacy Act claims misread the Act's "compatible use" and accuracy provisions. And Plaintiffs cannot meet the demanding standard for mandamus or unreasonable-delay relief.

***Sixth***, even if any claim survived, the sweeping, nationwide relief Plaintiffs seek is foreclosed by *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and would place DHS in the impossible position of violating the court-approved settlement in *Florida v. DHS*, No. 24-cv-00509 (N.D. Fla.).

Texas respectfully requests that the Court dismiss the Amended Complaint in its entirety.

## BACKGROUND

In 1986, Congress directed DHS's predecessor to "implement a system for the verification of immigration status," to be made "available to all the States by not later than October 1, 1987." Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391. That system became SAVE. *See* ECF 61 ¶ 54. In 1996, Congress separately imposed an affirmative "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). And Congress further commanded, "[n]otwithstanding any other provision of Federal, State, or local law," that no entity "may prohibit, or in any way restrict," the sharing of citizenship or immigration information between federal, state, and local officials and DHS. *Id.* § 1373(a)–(b); *see also id.* § 1644.

For States, SAVE is not optional. The National Voter Registration Act and the Help America Vote Act require States to "ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(4), and to implement "[s]afeguards to ensure that eligible voters are not removed in error," *id.* § 21083(a)(4)(B). Texas has used SAVE for voter-list maintenance for years, and Texas and several other States sued DHS in 2024 and 2025 when SAVE's pre-2025 limitations made it impossible for States to obtain meaningful responses. *See,*

*e.g.*, *Florida v. DHS*, No. 24-cv-00509 (N.D. Fla. filed Oct. 16, 2024); *Texas v. Noem*, No. 24-cv-49 (W.D. Tex. filed Oct. 22, 2024); *Ohio v. DHS*, No. 24-cv-283 (S.D. Ohio filed Oct. 24, 2024); *Bird v. Noem*, No. 24-cv-423 (S.D. Iowa filed Dec. 3, 2024); *Indiana v. DHS*, No. 25-cv-732 (S.D. Ind. filed Apr. 16, 2025).

Those suits prompted DHS to modernize SAVE. In April and May 2025, DHS announced two discrete improvements: (1) user agencies may now submit multiple verification requests in a single upload rather than one at a time; and (2) user agencies may now initiate a verification using a Social Security number in addition to a DHS-specific "A-Number." *See* ECF 61 ¶¶ 64–68. To implement the second change, DHS and SSA entered into a May 15, 2025 letter agreement describing how SSA will return records from its Master Files of Social Security Number Holders and SSN Applications ("NUMIDENT"). *See id.* ¶¶ 70–71. On October 31, 2025, DHS published a modified SORN for SAVE, 90 Fed. Reg. 48,948, with a 30-day public comment period. On November 12, 2025, SSA published a modified SORN for NUMIDENT, 90 Fed. Reg. 50,879, again with a 30-day comment period. DHS and SSA received and considered the thousands of comments submitted. *See* ECF 61 ¶¶ 85, 93–95.

Plaintiffs filed their original complaint on September 30, 2025, and moved for a preliminary injunction on October 10, 2025. ECF Nos. 1, 16. Texas moved to intervene and, in that motion, submitted a proposed combined Motion to Dismiss and Response to the Preliminary Injunction. ECF No. 19. On January 21, 2026, Plaintiffs filed their Amended Complaint. ECF No. 61. The Court subsequently granted Texas's motion to intervene and directed Texas to file a motion to dismiss the Amended Complaint. Texas now does so.

Three features of the Amended Complaint are worth emphasizing at the outset:

7

**First**, the Amended Complaint drops the "Data Lake" claims entirely and focuses exclusively on the SAVE system and NUMIDENT. The Department of Justice and Attorney General Bondi are no longer defendants. Only four federal defendants remain: DHS, the DHS Secretary, SSA, and the SSA Commissioner.

**Second**, the Amended Complaint drops the five individual "J. Doe" plaintiffs. Every remaining plaintiff is an organization: the League of Women Voters ("LWV"), LWVTX (new to this suit), the League of Women Voters of Louisiana and the League of Women Voters of Louisiana Education Fund (together, "LWVLA"), the League of Women Voters of Virginia ("LWVVA"), and the Electronic Privacy Information Center ("EPIC") (collectively, "Plaintiffs"). ECF 61 ¶¶ 10–16. The class-action allegations have also been dropped.

**Third**, the Amended Complaint reorganizes and expands the original six counts into eight: (1) APA ultra vires (Count 1); (2) APA contrary to constitutional power (Count 2); (3) direct separation-of-powers (Count 3); (4) APA Privacy Act substantive (Count 4); (5) APA Privacy Act notice-and-comment (Count 5); (6) APA arbitrary-and-capricious (Count 6); (7) APA unreasonable delay, brought only by EPIC (Count 7); and (8) mandamus, brought only by EPIC (Count 8). *See* ECF 61 ¶¶ 196–251.

### LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(1)

Rule 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). "A defect of standing is a defect in subject matter jurisdiction." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)). The plaintiff bears the burden of establishing jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, the plaintiff

must allege facts sufficient to establish each element of standing. *Id.* at 560–61. A court "may consider materials outside the pleadings" in deciding a Rule 12(b)(1) motion. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.    Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) governs motions to dismiss for failure to state a claim. To survive, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### ARGUMENT

## I.    Plaintiffs Lack Article III Standing

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). An injury is sufficient only if it is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (cleaned up). The Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." *Id.* (quoting *Whitmore*

9

*v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Citizens "do not have standing to sue simply because they believe the government is acting illegally, nor do [they] have standing simply because of strong moral, ideological, or policy objections to government action." *All. for Hippocratic Med.*, 602 U.S. at 381. And "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. Plaintiffs fall short of those requirements in every respect.

### A.  Several Plaintiffs fail to identify any member with Article III standing

Because every remaining plaintiff is an association, Plaintiffs rely almost entirely on associational standing. Under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." When an organization "claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). The plaintiff "must specifically identify members who have suffered the requisite harm." *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Several Plaintiffs flunk that requirement at the threshold.

#### 1.  *LWV and LWVLA*

The national League of Women Voters ("LWV") has identified no injured member of its own. The Amended Complaint's standing allegations for LWV rely entirely on the premise that members of LWVTX, LWVLA, and LWVVA "are also members of the national League." ECF

10

61 ¶ 158. But "associational standing is not dispensed in gross" among a parent organization and its affiliates; each plaintiff must independently establish standing. *TransUnion*, 594 U.S. at 431. Because LWV identifies no distinct member, it has no independent basis to sue.

LWVLA fares no better. The Amended Complaint alleges in general terms that LWVLA members are "suffering privacy injuries." ECF 61 ¶ 166. But Plaintiffs identify no LWVLA member by name and submit only vague references to prior declarations from unnamed "J. Does" filed in support of the preliminary-injunction motion that this Court denied. Those declarations were "insufficient" then, and they remain so now. *League of Women Voters*, 2025 WL 3198970, at *7 ("it is telling that the Plaintiffs have not identified a single individual who has experienced" the alleged injury). Moreover, the Amended Complaint never even alleges that the J. Does were members at the time of any alleged injury. *See* ECF 61 ¶ 166 (citing prior declarations by reference). That failure is dispositive. *See Summers*, 555 U.S. at 499.

The League of Women Voters of Louisiana Education Fund—a separate 501(c)(3) entity also bearing the LWVLA name—goes entirely unmentioned in the substantive portions of the Amended Complaint. *See* ECF 61 ¶ 13. It has not even attempted to identify any injured member. It must be dismissed for that reason alone.

### 2. LWVVA

LWVVA too has identified no named, injured member. The Amended Complaint references "J. Doe Decl. 5" and "J. Doe Decl. 6" in passing, ECF 61 ¶ 166, but those declarations were submitted in support of the denied preliminary-injunction motion, and the declarants predicted harms tied to the November 2025 Virginia election. Plaintiffs have never suggested—and certainly have not pled—that those predicted harms actually materialized. The Fourth Circuit's recent decision in *Am. Fed. of Teachers v. Bessent*, 152 F.4th 162 (4th Cir. 2025), confirms that

the generalized "feeling of unease" LWVVA asserts on behalf of its members cannot sustain standing. *Id.* at 172.

### 3.  *LWVTX*

LWVTX has identified only one individual by name: Anthony Nel. *See* ECF 61 ¶¶ 165. But LWVTX's reliance on Mr. Nel raises an independent threshold problem: the Amended Complaint does not allege he was a member of LWVTX at the time of the alleged injury. That distinction is fatal. Associational standing exists so that organizations may represent the interests of their *existing* members, not so that they may recruit affected individuals after the fact to manufacture jurisdiction.

The D.C. Circuit has endeavored to apply associational-standing doctrine in a way that "prevent[s] associations from being merely law firms with standing." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988). Plaintiffs' tactics squarely implicate that concern. This Court should not extend associational standing to permit "lawsuit-by-recruitment." *Cf. All. for Hippocratic Med.*, 602 U.S. at 397 (Thomas, J., concurring) (questioning whether associational standing remains consistent with Article III).

Regardless, even if those individuals had standing to assert past injury, they have no standing to press the *prospective* relief Plaintiffs seek. Mr. Nel and the Doe declarants have already corrected their records; there is no allegation that they face any imminent, future injury from the SAVE system. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy."). Plaintiffs bring no claim for damages—which sovereign immunity would bar in any event—and prospective injunctive relief cannot rest on past harms alone.

### B.  **No Plaintiff has standing to challenge SAVE's bulk-upload functionality**

One of the two discrete changes to SAVE that Plaintiffs challenge is the switch from one-by-one verification requests to bulk uploads. *See* ECF 61 ¶¶ 68, 150, 199. Plaintiffs' proposed order would require DHS to "disabl[e] any functionality that allows SAVE users to conduct bulk searches." ECF No. 66-12 at 1–2. No Plaintiff has even attempted to allege a concrete Article III injury flowing from bulk-upload functionality itself. Nor could they. "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417.Bulk uploads and one-by-one uploads produce the same results on the same data—they merely differ in speed. If Plaintiffs' privacy and voting concerns are cognizable at all, they would be equally implicated by a version of SAVE that processed every query individually. All claims predicated on bulk-upload functionality should be dismissed for lack of standing.

### C. Plaintiffs' privacy-related injuries are too speculative to support standing

Plaintiffs principally rest their standing on the speculative fear of possible future misuse of their members' personal data. *See* ECF 61 ¶¶ 158–63, 183–85. Those allegations are precisely the sort of "subjective fear" that *Clapper* and *TransUnion* place outside the bounds of Article III. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. And "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). "[I]t is the reality of the threat of [future] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8.

In *TransUnion*, the Supreme Court squarely rejected a similar "risk of future harm" theory based on the mere existence of inaccurate information in a database—absent dissemination and actual injury. 594 U.S. at 437. And although *TransUnion* recognized that certain intangible harms can qualify as concrete, "such an injury must, at a minimum, bear 'a close relationship to harms

13

traditionally recognized as providing a basis for lawsuits in American courts.'" *Id.* at 425 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)). The three common-law analogues Plaintiffs invoke—intrusion upon seclusion, breach of confidence, and defamation—do not carry them over the Article III threshold.

### 1. *Intrusion upon seclusion*

Plaintiffs' intrusion-upon-seclusion theory fails because intra-governmental sharing of government-created data bears no resemblance to the "irritating intrusions" that the tort has traditionally addressed. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020). Plaintiffs' allegations arise from Defendants ability to index and search government records for governmental purposes. The Fourth Circuit specifically rejected this theory of harm for DOGE access to federal records: "[T]he harm that might come from [a] generalized grant of database access to an additional handful of government employees . . . seems different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi." *Am. Fed'n of Tchrs.*, 152 F.4th at 172.

Moreover, intrusion upon seclusion requires conduct that is "highly offensive to an ordinary, reasonable person." *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989). Here, USCIS is "simply using federal-government information to carry out its legal responsibilities under federal law." 8 U.S.C. § 1373. That is not conduct any reasonable person would find "highly offensive." *Wolf*, 553 A.2d at 1217.

### 2. *Breach of confidence*

Plaintiffs' reliance on breach of confidence fares no better. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). Even setting aside serious questions about whether breach of confidence satisfies *TransUnion*'s historical-

origin requirement, *see Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc); *Young v. DOJ*, 882 F.2d 633, 640 (2d Cir. 1989), the tort does not fit this case. Social Security numbers are not "private information" that individuals provide to SSA "in confidence"; they are numbers generated by the federal government for governmental purposes and provided to individuals for use when interacting with the government. An individual's interactions with SSA in obtaining an SSN bear no resemblance to the physician-patient or bank-customer relationships in which the tort traditionally applies. *Young*, 882 F.2d at 640.

### 3. *Defamation*

Plaintiffs try a third theory: that DHS's provision of information to SAVE users "effectively label[s] [certain LWVTX and EPIC members] as criminals." That argument fails multiple times over. First, DHS makes no public statement about any registered voter; it responds to specific verification inquiries from SAVE user agencies, who themselves retain sole authority to determine voter eligibility. Second, a former non-citizen being reported as a non-citizen—even if mistakenly, after naturalization—does not "make the plaintiff appear odious, infamous, or ridiculous." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016). That is not remotely like being labeled a "potential terrorist." *TransUnion*, 594 U.S. at 433. Third, even if mistaken reporting by DHS could somehow be analogized to defamation, Plaintiffs seek only prospective injunctive relief. "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Lyons*, 461 U.S. at 103.

### D. **Plaintiffs' voting-related injuries are speculative, not fairly traceable to the Federal Defendants, and not redressable in this suit**

Plaintiffs allege their members have "credible fears of being erroneously disenfranchised, facing additional obstacles to voting, and being subjected to baseless criminal investigations into

their lawful voting." ECF 61 ¶ 175. These theories fail on the facts, on causation, and on redressability.

**Facts.** This Court already held, at the preliminary-injunction stage, that Plaintiffs' predictions of widespread voter disenfranchisement were "hypothetical" and "telling[ly]" unsupported. *League of Women Voters*, 2025 WL 3198970, at *7. Months later, despite more than 59 million voter-verification queries having been run through SAVE, Plaintiffs have identified only four individuals (all in Texas) who were asked to confirm their citizenship. ECF 61 ¶¶ 164–65; *see* Decl. of B. Broderick (Apr. 2, 2026) ¶ 22. That tiny number confirms that SAVE is working well, not poorly. In Louisiana, for example, only 390 potential non-citizens were identified out of 2.9 million registered voters run through SAVE—*less than 0.014%* of the voter rolls. *See* ECF 61 ¶ 147. The rest were confirmed as citizens or presumably *are* non-citizens; either outcome is consistent with SAVE working as intended.

**Causation.** Plaintiffs' voting-related fears—erroneous removal from voter rolls, unwarranted criminal investigations, burdens on voting—are all caused, if at all, by the *Counties* that would be ultimately responsible for removing an individual from the voter roll. Tex. Elec. Code § 16.0332. "[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). USCIS has responded to verification requests; what the requesting State or local official does with the result is governed by State law and State procedures. In Texas, the results of the SAVE verification are transmitted to the counties for independent investigation and, if verified, removal from the voter roll. Tex. Elec. Code § 16.0332. "[E]njoining the federal parties would not remedy the alleged injury, because state . . . agencies carry out the [challenged]

16

placements." *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023). Plaintiffs have "sued the wrong government."

That is especially clear in Texas, where *state* law and state Memoranda of Understanding with DHS establish a robust review process. No voter is cancelled from the rolls based solely on a SAVE response. *See* ECF 61 ¶ 108 (noting the SAVE voter-verification Memorandum of Agreement requires user agencies to "contact the registrant or registered voter to obtain proof of U.S. citizenship" before denying registration). As the Federal Defendants' brief documents, SAVE user agreements require procedures for "additional verification" of any "voter that does not verify as a U.S. citizen on initial verification," and require "notice and hearing or other due process" before any voter-roll removal. Texas county registrars conduct independent citizenship investigations before cancelling any registration. *See* ECF 61 ¶¶ 141–42 (describing Travis County's independent investigation in which "[a]bout twenty-five percent of the non-citizen matches on Travis County's list" had already proven citizenship).

**Redressability.** Because Plaintiffs' voting-related injuries are caused by States, vacating DHS's improvements to SAVE would not redress them. States would still be obligated under federal law to "ensure that eligible voters are not removed in error from the official list of eligible voters," 52 U.S.C. § 21083(a)(4)(B), and States would still use whatever tools they have to maintain accurate voter rolls. Ordering DHS to revert SAVE to its 1990s-era technology would simply "make things harder for government employees" while leaving every State's voter-verification regime intact. "The Supreme Court ha[s] appropriately been 'reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment,' but Plaintiffs would have this Court do exactly that." *Clapper*, 568 U.S. at 413.

### E. **Plaintiffs' diversion-of-resources theory cannot survive *Alliance for Hippocratic Medicine***

17

LWVTX, LWVLA, and LWVVA also assert organizational standing based on the theory that they have "expended scarce resources in response to the SAVE overhaul to counteract its harmful effects." ECF 61 ¶ 178. This theory—rooted in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)—was decisively rejected as a basis for Article III standing by the Supreme Court in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

In *Alliance*, the Court held that organizations cannot "spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. The Court rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions" and emphasized that "Havens was an unusual case, and [the Supreme] Court has been careful not to extend the Havens holding beyond its context." *Id.* at 395–96.

Plaintiffs' allegations are the quintessential "diversion of resources" theory *Alliance* forecloses. They allege that LWVTX, LWVLA, and LWVVA have used staff time to mail letters to voters, create social-media posts, develop educational materials, and respond to media inquiries. ECF 61 ¶¶ 178–81. Each of those activities—laudable as they may be—is precisely the sort of "gather[ing] information and advocat[ing] against the defendant's action" that *Alliance* held does not establish Article III injury. 602 U.S. at 394.

Plaintiffs' attempt to analogize their position to *Havens* itself fares no better. Unlike the fair-housing organization in *Havens*, which received false information directly from a defendant engaged in racial steering, none of the Plaintiffs here is "requesting (or receiving) any information (accurate or inaccurate) from the Defendants." The factual coincidence that *Havens* involved "inaccurate information" in a general sense "has no bearing on the viability of the legal theory of Article III standing that Alliance rejected." Plaintiffs' diversion-of-resources theory is foreclosed.

18

F.  **EPIC's procedural and informational injuries cannot independently support Article III standing**

EPIC separately claims that it has been injured by the absence of "notice-and-comment opportunities to which it is legally entitled" and by the lack of matching-agreement information. *See* ECF 61 ¶¶ 186–95. Neither theory of injury supports standing.

The "'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1314 (D.C. Cir. 2025) (quoting *Summers*, 555 U.S. at 496). "[E]ven when a plaintiff alleges a violation of some procedural right, the plaintiff still must show that the violation of a procedural right 'resulted in injury' to some 'concrete, particularized interest.'" *Id.* at 1315. For the same reasons Plaintiffs lack any concrete privacy-, voting-, or organizational-related injury, EPIC's procedural theory adds nothing.

The informational-injury theory fails for two additional reasons. **First**, the Privacy Act is not the sort of statute that creates an enforceable right to information. Unlike FOIA, the Privacy Act "was not designed to vest a general right to information in the public." *EPIC v. Dep't of Com.*, 928 F.3d 95, 103 (D.C. Cir. 2019). Rather, "the statute was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making." *Id.* As the D.C. Circuit squarely held, "because the lack of information itself is not the harm that Congress sought to prevent through" the Privacy Act, a plaintiff "must show how the lack of a timely" matching agreement "caused its members to suffer the kind of harm that Congress did intend to prevent: harm to individual privacy." *Id.* at 103–04. Plaintiffs cannot satisfy that requirement.

**Second**, EPIC already has the information it claims to be missing. DHS and SSA have now published modified SORNs, which Plaintiffs' own counsel acknowledged would resolve EPIC's informational injuries. *See* Oct. 28, 2025 Hr'g Tr. at 76:4–6, ECF No. 48 ("If they do publish

19

SORNS, that would, we agree, address our informational injuries both for DHS and SSA."). The DHS-SSA letter agreement has been public since September 2025 and is included in the administrative record. As for details normally contained in a Privacy Act "matching agreement," much of that information is already disclosed in the published Privacy Impact Assessments. Whatever informational injury EPIC may have alleged, it has been resolved.

## II.   Plaintiffs' Notice and Comment Claim is Moot

Article III's case-or-controversy requirement limits federal courts "to deciding actual, ongoing controversies." *Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019). A dispute becomes moot when "the court can provide no effective remedy because a party has already obtained all the relief that it has sought." *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (cleaned up). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council, Inc. v. NRC*, 680 F.2d 810, 814 (D.C. Cir. 1982).

Count 5 of the Amended Complaint alleges that DHS and SSA made changes to SAVE and NUMIDENT without first publishing modified SORNs and soliciting public comment. ECF 61 ¶¶ 231–35. Whatever force that claim may once have had, it is now moot. On October 31, 2025, DHS published a modified SORN for SAVE and opened a 30-day comment period. 90 Fed. Reg. 48,948. On November 12, 2025, SSA published a modified SORN for NUMIDENT and opened a 30-day comment period. 90 Fed. Reg. 50,879. Together, DHS and SSA received more than 30,000 public comments. ECF 61 ¶¶ 85, 93. The agencies complied with each procedural requirement Plaintiffs allege was skipped: (1) notice of the change, and (2) solicitation of comments for 30 days. *See* 5 U.S.C. § 552a(e)(4), (e)(11).

That is precisely what Judge Kollar-Kotelly held moots an identical claim. In *LULAC*, the plaintiffs, like Plaintiffs here, "challenge[d] DHS's recent changes to the SAVE program, arguing that the new data-sharing practices violate the Privacy Act." 2026 WL 252420, at *53. Shortly after briefing on cross-motions for summary judgment concluded, "DHS and SSA had issued new SORNs relating to the use of SAVE and NUMIDENT." *Id.* Judge Kollar-Kotelly held that plaintiffs' "claim for injunctive relief against the relevant changes to SAVE and NUMIDENT based on the Privacy Act is moot." *Id.* at *54. So too here.

No exception to mootness applies. The "capable of repetition yet evading review" exception requires "a reasonable expectation that the same complaining party would be subjected to the same action again." *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990). But the precise "discrete wrong" Plaintiffs allege—DHS accessing NUMIDENT data through SAVE without publishing a SORN—"came to an end" when the modified SORNs took effect. *Harvey v. Lynch*, 123 F. Supp. 3d 3, 8 (D.D.C. 2015). Any future use of SAVE for the same purpose will be governed by a published SORN. Nor does the "voluntary cessation" exception apply: DHS and SSA have published the SORNs and there is no basis to believe they will be rescinded. And even if Plaintiffs suggested otherwise, they would be asking this Court to "improperly 'impute . . . manipulative conduct to a coordinate branch of government' against the D.C. Circuit's express guidance." *Alaska v. USDA*, 17 F.4th 1224, 1227 (D.C. Cir. 2021).

## III.    Plaintiffs Challenge No Discrete and Final Agency Action

The APA authorizes courts to review only "final agency action[s]." 5 U.S.C. § 704. "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine "'rights or obligations,' or produce 'legal consequences.'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026)

(quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "Each prong of Bennett must be satisfied independently for agency action to be final." *Id.* The action must also be "circumscribed" and "discrete"; Plaintiffs cannot "seek wholesale improvement of" an agency "program by court decree," they "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Plaintiffs repeatedly invoke the word "overhaul" to describe what they challenge. *E.g.*, ECF 61 ¶¶ 51, 64, 131. But "overhaul" is a label, not a discrete agency action. Stripped of rhetoric, Plaintiffs identify only three candidates for final agency action: (1) the move from one-by-one to bulk verification requests; (2) the DHS-SSA letter agreement of May 15, 2025; and (3) the modified SORNs published in October and November 2025. None is reviewable final agency action.

### A. Bulk upload is a software-customer-service improvement, not a final agency action.

Allowing SAVE users to upload multiple requests at once is, at its core, an IT improvement. It does not determine any "rights or obligations" or produce "legal consequences." *Bennett*, 520 U.S. at 177–78. The same searches occur on the same data; only the submission mechanism has changed. A software-customer-service improvement is not "the whole or part of an agency rule, order, license, sanction, [or] relief" and therefore is not a reviewable "agency action." 5 U.S.C. § 551(13).

### B. The DHS-SSA letter agreement is not final agency action

The D.C. Circuit recently held in *Centro de Trabajadores Unidos v. Bessent* that an intra-governmental memorandum of understanding concerning information sharing "is a nonbinding, nonfinal policy statement that is not reviewable under the APA." 167 F.4th at 1236. The *Centro de Trabajadores* MOU "merely outline[d] the process through which ICE can request addresses

from IRS"; its purpose was to "merely 'explain how IRS will administer'" a statutorily authorized process. *Id.* The DHS-SSA letter agreement is materially indistinguishable. It is not a "rule"; neither DHS nor SSA "rel[ies] on the [letter agreement]" as legal justification for the information-sharing at issue. *Id.* The agreement merely memorializes and explains how the agencies will administer the information-sharing Congress authorized (and required) in 8 U.S.C. § 1373. "Any substantive change" attributable to the agreement stems not from the agreement itself but "from the Administration's decision to use statutorily authorized tools" to further its objectives. *Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-cv-1774 (JEB), 2026 WL 820811, at *18 (D.D.C. Mar. 25, 2026) (applying *Centro de Trabajadores*).

### C.  The SORNs are not reviewable as Plaintiffs suggest

Plaintiffs at times appear to challenge the SORNs themselves. That theory is self-defeating. Plaintiffs' original complaint argued that DHS and SSA *erred by failing to publish* modified SORNs; now, after the SORNs have been published, they attack the SORNs that were published in response to their earlier demand. Vacating the SORNs would worsen the alleged injuries, not remedy them. In any event, a notice of a draft SORN that "explicitly contemplates 30 days of comments and future agency consideration of those comments before any change may take effect" does not mark the "consummation" of agency decisionmaking. *Centro de Trabajadores*, 167 F.4th at 1235.

### IV.  Plaintiffs Cannot Bring APA Claims Predicated on Privacy Act Violations

Several of Plaintiffs' claims (Counts 4, 5, 6, 7, and 8) fail for the additional, independent reason that the APA provides no cause of action where there is "[an]other adequate remedy in a court." 5 U.S.C. § 704. That provision "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen*

*v. Massachusetts*, 487 U.S. 879, 903 (1988). Where a statute "provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980).

The Privacy Act is a "comprehensive and detailed set of requirements" for federal agencies that maintain systems of records. *FAA v. Cooper*, 566 U.S. 284, 287 (2012). It meticulously specifies the "particular remedies" available for "particular violations," *Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1158–59 (9th Cir. 1978), and the D.C. Circuit has "held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs," *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)).

The uniform conclusion in this District is that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); ACCORD *Poss v. Kern*, No. 23-cv-2199 (DLF), 2024 WL 4286088, at *6 (D.D.C. Sept. 25, 2024); *Haleem v. Dep't of Def.*, No. 23-1471 (JEB), 2024 WL 230289, at *13–14 (D.D.C. Jan. 22, 2024); *Bierly v. Dep't of Def.*, No. 23-2386 (RCL), 2024 WL 4227154, at *8–9 (D.D.C. Sept. 18, 2024); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017); *Tripp v. DOD*, 193 F. Supp. 2d 229, 238 (D.D.C. 2002). "Were injunctive relief freely available for violations of the Privacy Act generally . . . the detailed remedial scheme adopted by Congress would make little sense." *Cell Assocs.*, 579 F.2d at 1160.

A second, related defect is fatal: the Privacy Act's cause of action is available only to "individual[s]." 5 U.S.C. § 552a(g)(1). The Act defines "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence," not organizations. *Id.* § 552a(a)(2). With the Amended Complaint's removal of the J. Doe plaintiffs, no Plaintiff is an "individual."

24

Plaintiffs are thus "straightforwardly ineligible for any relief under the Privacy Act," and cannot use the APA to overcome that jurisdictional bar.

The problems with Plaintiffs' APA-wrapper approach are not merely technical. The APA requires agencies, after notice-and-comment rulemaking, to publish "a concise general statement of their basis and purpose," 5 U.S.C. § 553(c), to which they must "consider and respond." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The Privacy Act contains no such requirement. *See* 5 U.S.C. § 552a(e)(4), (e)(11). Plaintiffs nevertheless fault DHS and SSA for failing to provide the very response-to-comments statement that the Privacy Act does not require. *E.g.*, ECF 61 ¶ 238(a)–(b). Federal courts "are not free to impose upon agencies specific procedural requirements that have no basis in the APA," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978), and that principle applies with at least equal force to the more targeted Privacy Act.

## V.    Plaintiffs' Claims Fail on the Merits

For completeness, Texas addresses each of Plaintiffs' claims on the merits. Every one of them fails.

### A.  SAVE is authorized by statute (Counts 1 and 5).

Count 1 asserts that DHS and SSA's improvements to SAVE exceed their statutory authority. ECF 61 ¶¶ 197–205. They do not. Congress expressly directed DHS to "implement a system for the verification of immigration status" that would be "available to all the States." 42 U.S.C. § 1320b-7 (note). Congress then imposed an affirmative "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual . . . for any purpose authorized by law." 8 U.S.C. § 1373(c). SAVE is the very system that discharges those statutory duties. Plaintiffs cannot

simultaneously contend that DHS lacks statutory authority to do what Congress required DHS to do. Plaintiffs' arguments to the contrary miss the mark:

### 1.  SAVE's scope

Plaintiffs argue that the 1986 statute authorized SAVE only for verifying "aliens" and their benefit eligibility. ECF 61 ¶ 55. But "the animating purpose of any 'system for the verification of immigration status' is to sift those with a lawful 'immigration status' from those without"—which necessarily includes citizens. And the 1996 IIRIRA eliminated any doubt by requiring DHS to respond to inquiries "seeking to verify or ascertain the *citizenship or immigration status* of *any individual . . .* for *any purpose authorized by law*." 8 U.S.C. § 1373(c) (emphases added). That is capacious statutory language, and it plainly covers verification of U.S. citizens for voter-eligibility purposes.

### 2.  Information-sharing with SSA

Plaintiffs next argue that § 1373(c) does not "empower[] DHS to acquire data from other federal agencies." ECF 61 ¶ 82. But no separate "empowerment" is necessary; Congress commanded in § 1373(a) and (b) that, "[n]otwithstanding any other provision of Federal, State, or local law," no entity may "prohibit, or in any way restrict" the sharing of citizenship or immigration information with DHS. Congress's "notwithstanding" language is "the clearest congressional direction," *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993), that other statutory limits— including the Privacy Act and Social Security Act—must yield to the information-sharing mandate of § 1373.

### 3.  Social Security Act

Plaintiffs' reliance on 42 U.S.C. § 1306(a)(1) and § 405(c)(2)(C)(viii)(I) is misplaced. Section 1306(a)(1) expressly permits disclosure of SSA information when "otherwise provided by Federal law"—which the 1986 IRCA and the 1996 IIRIRA expressly do. And §

26

405(c)(2)(C)(viii)(I) applies only to statutes enacted after October 1, 1990; it does not reach the 1986 Act that authorizes SAVE. In any event, "statutes enacted by one Congress cannot bind a later Congress," *Dorsey v. United States*, 567 U.S. 260, 274 (2012), and § 1373(c) was enacted six years *after* § 405(c)(2)(C)(viii)(I). Plaintiffs also have no private right of action under the Social Security Act to challenge DHS's use of this information. *See, e.g.*, *Biccum v. City of Watertown*, No. 19-cv-81 (MAD/DJS), 2019 WL 4752927, at *5 (N.D.N.Y. Sept. 30, 2019).

### 4.  *Major questions and nondelegation*

Plaintiffs gesture toward the "major questions" doctrine and nondelegation. *See* ECF 61 ¶ 203. Neither applies. The major-questions doctrine requires "extraordinary" assertions of power "of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022). Improving the speed and efficiency of a 40-year-old citizenship-verification system does not come close. And even if the major-questions canon applied, Congress *has* spoken clearly: § 1373(c) authorizes responses to verification inquiries "for any purpose authorized by law." As for nondelegation, the Supreme Court has invalidated statutes on that ground exactly twice, both in 1935, and the statutes here easily provide an "intelligible principle." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001).

### B.  <u>Plaintiffs' constitutional and separation-of-powers claims fail (Counts 2 and 3)</u>

Counts 2 and 3 add nothing of substance. Count 2 is an APA claim under 5 U.S.C. § 706(2)(B), premised on the same alleged lack of statutory authority as Count 1. Count 3 duplicates Count 2 as a direct separation-of-powers claim. ECF 61 ¶¶ 206–17. Both fail.

"Not every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). The Supreme Court has "carefully distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* The D.C.

Circuit recently reaffirmed that distinction. *See Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir.), *reh'g en banc denied*, No. 25-5098, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025); *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 792–93 (D.C. Cir. 2025) ("[S]tatutory claims do not become constitutional ones by operation of the separation-of-powers principles that prevent the States and the Executive Branch from disregarding federal statutes."). Once Count 1 fails, Counts 2 and 3 fail with it.

Plaintiffs independently invoke the Constitution's Elections Clause, U.S. CONST. ART. I, § 4, cl. 1, arguing that DHS has "arrogate[d]" election administration. ECF 61 ¶¶ 211–13. That argument fundamentally misconceives what DHS is doing. DHS does not "decide who is qualified to vote." State and local governments do. DHS merely responds to State verification inquiries, as § 1373(c) requires. State officials—through counties in Texas—not DHS, decide whether to remove any voter from a voter roll and when to refer cases for criminal investigation. The Elections Clause is not implicated when a federal agency responds to state information requests that States themselves initiate in service of their own statutorily mandated voter-list-maintenance duties. *See* 52 U.S.C. §§ 20507, 21083(a)(4).

Judge Kollar-Kotelly's decision in *LULAC* does not support Plaintiffs' Elections Clause theory either. *LULAC* addressed Executive Order 14,248's direction to multiple federal agencies to "make a variety of changes to the administration of federal elections." 2026 WL 252420, at *3. This case challenges no Executive Order and no regulatory requirement. The legal rights and obligations of voters and of voting administrators are entirely unaffected by the 2025 improvements to SAVE. Plaintiffs' Elections Clause theory collapses.

C. **Plaintiffs' substantive Privacy Act claim fails (Count 4)**

Count 4 attacks the new routine uses established in the October and November 2025 SORNs, principally on the ground that those uses are not "compatible with the purpose for which [the records were] collected," 5 U.S.C. § 552a(a)(7). ECF 61 ¶¶ 218–26. That argument fails.

The Office of Management and Budget has long construed the compatible-use requirement to encompass "both functionally equivalent uses . . . [a]s well as other uses that are necessary and proper." OMB, *Guidance on the Privacy Act*, 52 Fed. Reg. 12,990, 12,993 (Apr. 20, 1987); *see also* OMB Circular No. A-108, 81 Fed. Reg. 94,424 (Dec. 23, 2016). When Congress has mandated the relevant agency action, the resulting disclosure is "compatible" for that reason alone. Because 8 U.S.C. § 1373(c) compels DHS to respond to citizenship verification inquiries, its receipt and disclosure of information to SAVE user agencies is necessary and proper.

Even under the more searching compatibility test articulated by the Third Circuit and cited approvingly by the D.C. Circuit, Plaintiffs' claim fails. That test requires a "concrete relationship or similarity" between the "disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549–50 (3d Cir. 1989); *USPS v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 145 (D.C. Cir. 1993). A Social Security number was always intended to "enable[] government agencies to identify individuals in their records." C. Puckett, SSA, *The Story of the Social Security Number* (July 2009). Since 1943, federal agencies have used SSNs for "identifying individuals in any new record systems." *Id.* Using an SSN as a numerical identifier in data-sharing among federal agencies is therefore the archetypal "compatible" use. It is certainly not "completely unrelated" to the SSN's original purpose. *Britt*, 886 F.2d at 550.

The Privacy Act's subsection 552a(b)(7) independently authorizes SAVE's disclosures. That provision allows disclosure "to another agency or to an instrumentality of any governmental

29

jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity." 5 U.S.C. § 552a(b)(7). Plaintiffs themselves plead that SAVE is used to enforce civil election laws and prevent voter fraud. *See* ECF 61 ¶¶ 131–52. Disclosures pursuant to § 552a(b)(7) do not require the recipient agency to be a federal agency, nor do they require the records to have been collected for a law-enforcement purpose.

Plaintiffs' remaining Privacy Act theories—that DHS and SSA have failed to maintain accurate records under 5 U.S.C. § 552a(e)(5), (6), and (10)—depend entirely on their unproven, conclusory assertions about data reliability. The Amended Complaint does not plead specific facts demonstrating that any record used by SAVE is inaccurate as to a specific Plaintiff or member, let alone that such inaccuracies are systematic. Plaintiffs' allegations boil down to a complaint that SSA citizenship data is sometimes out of date for naturalized and derived citizens—but that is precisely why SAVE is designed to cross-check SSA results against DHS records and to require user agencies to obtain additional documentation before taking any adverse action. ECF 61 ¶¶ 107–09.

### D.  **Plaintiffs' arbitrary-and-capricious claim fails (Count 6)**

Count 6 alleges that the SORNs are arbitrary and capricious because DHS and SSA failed to explain themselves, consider comments, and address reliance interests. ECF 61 ¶¶ 236–38. As explained in Section IV, *supra*, the Privacy Act imposes no obligation on agencies to publish a reasoned statement of "basis and purpose" comparable to APA § 553(c). On that threshold ground alone, Plaintiffs cannot use generic APA concepts to attack a Privacy Act SORN.

Even if arbitrary-and-capricious review applied to Privacy Act SORNs, Plaintiffs' theories would fail. The "open-mindedness" test Plaintiffs invoke is no longer good law; the Supreme Court has "decline[d] to evaluate . . . final rules under the open-mindedness test." *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 685 (2020); *see Bahman Grp. v. Palluconi*, No. 22-3826

30

(RDM), 2025 WL 3225196, at *5 (D.D.C. Sept. 29, 2025). And Plaintiffs' complaint that DHS and SSA failed to "consider" relevant comments is refuted by the agencies' administrative-record certifications, which are "entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 577 (2025).

As for "change-in-position" doctrine, DHS and SSA were "quite obviously aware[] that they were changing position"—they announced each change by press release, described it as an "overhaul," and explained its purpose: to provide "a single, reliable source for verifying immigration status and U.S. citizenship nationwide." ECF 61 ¶ 4. The contemporaneous public record provides more than an adequate explanation. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 426 (2021) ("[A] court may not substitute its own policy judgment for that of the agency."). As for reliance interests, Plaintiffs identify no one who would have behaved differently had they anticipated SAVE's modernization. No naturalized citizen would have declined citizenship, and no American would have refused an SSN, on the theory that DHS might someday verify their citizenship more efficiently.

### E. **Plaintiffs' mandamus and unreasonable-delay claims fail (Counts 7 and 8)**

Counts 7 and 8 are brought only by EPIC and challenge DHS's and SSA's failure to publish a "computer matching agreement" under 5 U.S.C. § 552a(o). ECF 61 ¶¶ 239–51. Both claims fail.

"To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton*, 542 U.S. at 64.

EPIC cannot satisfy any of those requirements. The Privacy Act's matching-program provisions apply only to "computerized comparison[s] of . . . two or more automated systems of

records . . . for the purpose of . . . establishing or verifying the eligibility of . . . applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs," or for "recouping payments or delinquent debts" thereunder. 5 U.S.C. § 552a(a)(8). Voter verification is not "cash or in-kind assistance" under a "Federal benefit program[]." *Id.* The SAVE system is therefore not a "matching program" for voter-verification purposes, and no matching agreement is required for that use.

To the extent SAVE is used to verify eligibility for some federal benefits, DHS's longstanding position—dating back to at least 2013—is that so-called "front-end" single-record verification queries are not covered by this part of the Privacy Act, which "appl[ies] only to the matching of an entire system of records against another database." GAO, *Computer Matching Act*, GAO-14-44, at 15 (2014). The statutory text supports that interpretation: a "matching program" is a "comparison" of "two or more automated systems of records," plural, 5 U.S.C. § 552a(a)(8)—not a series of individual record matches. SAVE operates on a "front-end" single-record basis. That factual point alone forecloses the extraordinary remedy of mandamus, because EPIC cannot demonstrate a "clear and indisputable" right to a matching-agreement publication. *Am. Hosp. Ass'n*, 812 F.3d at 189.

Finally, even if a matching agreement were required, an "adequate alternative remedy exists" under the Privacy Act itself. *Id.*; *see Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 123 (D.D.C. 2025). EPIC can invoke whatever remedies the Privacy Act affords "individuals"—if any of its members are "individuals" with concrete injury—but it cannot manufacture a mandamus right where Congress has provided a specific remedial scheme.

## VI.    Any Relief Should be Strictly Tailored

32

Even if the Court concluded that Plaintiffs had stated a claim, the sweeping, nationwide relief they seek is not available. After *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), a federal court "may administer complete relief between the parties," but that is "the maximum a court can provide." *Id.* at 851, 854. Plaintiffs' proposed order would impose sweeping, nationwide obligations on DHS and SSA within 14 days. ECF No. 66-12. That is the sort of "universal relief" that "strains our separation of powers." *United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring). Because Plaintiffs have abandoned their class-certification motion, *see* ECF No. 46, any relief must run only to the Plaintiffs themselves and must be "no more burdensome to the defendant than necessary to provide complete relief." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Two additional equitable constraints apply. **First**, any relief must be "limited to the inadequacy that produced [the] injury in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). If, for example, EPIC prevailed on its matching-agreement claim, the appropriate remedy would be an order requiring publication of a matching agreement—nothing more. **Second**, principles of comity preclude this Court from entering relief that would subject DHS to conflicting orders. The Northern District of Florida approved a settlement agreement in *Florida v. DHS*, No. 24-cv-00509, requiring DHS to continue to allow SAVE searches using Social Security numbers, and retained jurisdiction for twenty years to enforce that agreement. *See* Order, *Florida* ECF No. 31. An order here vacating, setting aside, or enjoining the 2025 changes to SAVE would place DHS in "the unenviable position" of facing "irreconcilable legal obligations." *NAACP, Jefferson Cnty. Branch v. Brock*, 619 F. Supp. 846, 850 (D.D.C. 1985). "Prudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders," *Feller v. Brock*, 802 F.2d 722, 727–28 (4th Cir. 1986), and "considerations of comity require more than the usual measure of restraint" when an

33

"injunction sought in one federal proceeding would interfere with another federal proceeding,"

*Common Cause v. Jud. Ethics Comm.*, 473 F. Supp. 1251, 1253–54 (D.D.C. 1979).

## CONCLUSION

For the foregoing reasons, the State of Texas respectfully requests that the Court dismiss the First Amended and Supplemental Complaint in its entirety.

Dated: April 22, 2026.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

Respectfully submitted.

*/s/ William D. Wassdorf*
**WILLIAM D. WASSDORF**
Associate Deputy AG for Civil Litigation
Texas Bar No. 24103022

**ALI M. THORBURN**
Special Counsel, Special Litigation Division
Texas Bar No. 24125064

**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(737) 226-4398
Will.Wassdorf@oag.texas.gov
Ali.Thorburn@oag.texas.gov

**COUNSEL FOR INTERVENOR-
DEFENDANT**
*THE STATE OF TEXAS*

## CERTIFICATE OF SERVICE

On April 22, 2026, the foregoing instrument was served on all parties and counsel of record via the Court's CM/ECF system.

*/s/ William D. Wassdorf*
**WILLIAM D. WASSDORF**
Associate Deputy AG for Civil Litigation