**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>     Plaintiffs,<br><br>     v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>     Defendants. | Case No. 25-cv-3501-SLS |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 1

I.  Plaintiffs have standing. .................................................................................................. 1

    A.  LWVTX and LWVLA have organizational standing. ............................................ 2

    B.  Plaintiffs have associational standing. .................................................................. 3

        1.  Plaintiffs have specifically identified members with standing. .................. 4

        2.  Plaintiffs' members have cognizable privacy injuries. ............................. 6

        3.  Plaintiffs' members have cognizable reputational injuries. ...................... 8

        4.  Overhauled SAVE inflicts cognizable voting-related injuries on Plaintiffs' members that are redressable by this Court. ............................................... 8

            a)  Plaintiffs' voting-related injuries are concrete and imminent ........ 9

            b)  Defendants caused LWVTX members' voting-related injuries and Plaintiffs' requested relief would redress those injuries. .............. 13

    C.  Plaintiffs have shown injuries traceable to SAVE's new bulk-upload capability that their requested relief would redress. ........................................................... 16

    D.  EPIC has informational and procedural standing to seek relief for violations of the Privacy Act's matching program requirements. ................................................. 18

II.  Plaintiffs are entitled to summary judgment. ................................................................. 21

    A.  Plaintiffs challenge final agency action. ............................................................. 21

    B.  The SAVE overhaul lacks statutory authorization and affirmatively violates the Social Security Act. ........................................................................................... 24

        1.  The Immigration Reform Control Act of 1986 does not authorize the SAVE overhaul. ............................................................................................ 25

        2.  The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 does not authorize the SAVE overhaul. ............................................ 26

        3.  The major questions doctrine confirms that the SAVE overhaul lacks statutory authorization. ........................................................................... 29

        4.  Defendants' unauthorized disclosures violate the Social Security Act. ... 30

    C.  The SAVE overhaul violates the separation of powers. ....................................... 32

    D.  The SAVE overhaul was contrary to the Privacy Act. ........................................ 34

       1.     Plaintiffs have an APA remedy for the Privacy Act violations alleged in Counts 4, 5, and 7. ...................................................................................... 34

       2.     The SAVE overhaul was contrary to the Privacy Act's substantive restrictions.......................................................................................... 37

       3.     Plaintiffs' notice-and-comment claim is not moot and Defendants have conceded Plaintiffs' merits arguments..................................................... 39

       4.     Defendants failed to comply with the Privacy Act's requirements for computer matching programs. .................................................................. 41

   E.     The SAVE overhaul was arbitrary and capricious................................................ 43

       1.     Defendants predetermined the outcome.................................................... 45

       2.     Defendants disregarded relevant factors and adverse evidence................ 46

       3.     Defendants violated the change-in-position doctrine. ............................. 47

III.   Plaintiffs seek appropriate relief.......................................................................................... 47

CONCLUSION........................................................................................................................... 50

## TABLE OF AUTHORITIES[†]

**Cases**

*AFL-CIO v. Dep't of Lab.*,
  2025 WL 1783899 (D.D.C. June 27, 2025) ...................................................................6

*AFL-CIO v. Dep't of Lab.*,
  2026 WL 879518 (D.D.C. Mar. 31, 2026) ...........................................................7, 21, 44

*AFL-CIO v. Dep't of Lab*,
  778 F. Supp. 3d 56 (2025) ...........................................................................................34

*AFSCME v. SSA*,
  2026 WL 969670 (4th Cir. Apr. 10, 2026) .................................................................6, 7

*AFSCME v. SSA*,
  778 F. Supp. 3d 685 (D. Md. 2025) ............................................................................37

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) ....................................................................................32

*Am. Clean Power Ass'n v. FERC*,
  54 F.4th 722 (D.C. Cir. 2022) .....................................................................................46

*Am. Fed. Of Gov't Emps. v. OPM*,
  777 F. Supp. 3d 253 (S.D.N.Y. 2025) .........................................................................44

*Am. Fed'n of Tchrs. v. Bessent*,
  152 F.4th 162 (4th Cir. 2025) .......................................................................................7

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) .................................................................................2, 9

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017) ..................................................................................9, 13

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................22, 23

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ....................................................................................................29

*Bowen v. Mich. Acad. Of Fam. Phys.*,
  476 U.S. 667 (1986) ....................................................................................................34

*Centro de Trabajadores Unidos ("CTU") v. Bessent*,
  167 F.4th 1218 (D.C. Cir. 2026) .................................................................................23

*City & Cnty of S. F. v. EPA*,
  604 U.S. 334 (2025) ....................................................................................................36

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ....................................................................................................14

*Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ....................................................................................................48

*Covert v. Herrington*,
  667 F. Supp. 730 (E.D. Wash. 1987) ..........................................................................39

---

[†] Authorities marked with an asterisk are those on which counsel chiefly relies.

**Cases—continued**

*Ctr. for Biological Diversity v. Dep't of the Interior*,
144 F.4th 296 (D.C. Cir. 2025)......................................................................2, 3, 23

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025)................................................................................46

*Dalton v. Specter*,
511 U.S. 462 (1994)...............................................................................................32

*Davis v. FEC*,
554 U.S. 724 (2008)..................................................................................................4

*Def. Distributed v. Dep't of State*,
1:18-cv-637, ECF 155 (W.D. Tex. May 12, 2021).................................................49

*\*Dep't of Com. v. New York*,
588 U.S. 752 (2019).............................................................................13, 44, 45, 46

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020)....................................................................................................44

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025)...................................................................................13, 18, 48

*Doe v. Chao*,
540 U.S. 614 (2004)...............................................................................................34

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988)..............................................................................34

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
396 F.3d 1265 (D.C. Cir. 2005)..............................................................................35

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018).........................................................................................30, 31

*EPIC v. Dep't of Com.*,
928 F.3d 95 (D.C. Cir. 2019)..............................................................................4, 18

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)..........................................................................................2, 3, 14

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...............................................................................................25

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
112 F.4th 507 (8th Cir. 2024) ................................................................................49

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ...............................................................................12

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) .............................................................................10

*Florida v. DHS*,
No. 24-cv-00509, ECF Nos. 30, 31 (N.D. Fla.).....................................................49

*Friends of Animals v. Jewell*,
824 F.3d 1033 (D.C. Cir. 2016) .............................................................................20

**Cases—continued**

*Ga. Coal. for the Peoples' Agenda, Inc. v. Raffensperger*,
    2022 WL 22866291 (N.D. Ga. Sept. 29, 2022) ................................................................10

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ..........................................................................................35, 36

*Gill v. Whitford*,
    585 U.S. 48 (2018) ................................................................................................................48

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ...............................................................................................32

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ..............................................................................................................28

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ..............................................................................................................16

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) .............................................................................................48

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................................2, 3

*Humane Society of the U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) ................................................................................................5

*Indep. Mkt. Monitor for PJM v. FERC*,
    162 F.4th 1167 (D.C. Cir. 2025) ...........................................................................................2

*Int'l Union v. Brock*,
    477 U.S. 274 (1986) ................................................................................................................5

*Jeffries v. Volume Servs. Am.*,
    928 F.3d 1059 (D.C. Cir. 2019) ............................................................................................7

*Jibril v. Mayorkas*,
    20 F.4th 804 (D.C. Cir. 2021) ............................................................................................2, 9

*Judge Rotenberg Educ. Ctr. v. FDA*,
    3 F.4th 390 (D.C. Cir. 2021) ...............................................................................................24

*Katzenbach v. Morgan*,
    384 U.S. 641 (1966) ..............................................................................................................10

*Kuehl v. Sellner*,
    887 F.3d 845 (8th Cir. 2018) .................................................................................................4

*Las Ams. Immigrant Advoc. Ctr. v. DHS*,
    783 F.Supp.3d 200 (D.D.C. 2025) ..................................................................................24, 27

*League of United Latin Am. Citizens v. EOP*,
    2026 WL 252420 (D.D.C. Jan. 30, 2026) ........................................................................ *passim*

*League of United Latin Am. Citizens v. EOP*,
    808 F. Supp. 3d 29 (D.D.C. 2025) .......................................................................................10

*League of Women Voters of N. Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...............................................................................................13

**Cases—continued**

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................................................................9, 37

*League of Women Voters v. DHS*,
2025 WL 3198960 (D.D.C. Nov. 17, 2025) ...............................................50

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................................................................................41

*Make the Road N.Y. v. Noem*,
2025 WL 3563313 (D.C. Cir. 2025) ...........................................................48

*Maloney v. Carnahan*,
45 F.4th 215 (D.C. Cir. 2022) .....................................................................19

*Meese v. Keene*,
481 U.S. 465 (1987) ....................................................................................12

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ..................................................................21

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ..................................................................9, 13

*Miot v. Trump*,
2026 WL 266413 (D.D.C. Feb. 2, 2026) .....................................................45

*Mittleman v. Postal Regul. Comm'n*,
757 F.3d 300 (D.C. Cir. 2014) ....................................................................31

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)................................................................................48, 49

*Motor Vehicle Mfrs. Ass'n of U.S.. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983).......................................................................................46

*Multicultural Media, Telecom & Internet Council v. FCC*,
873 F.3d 932 (D.C. Cir. 2017)................................................................46, 47

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) ......................................................................7

*Murthy v. Missouri*,
603 U.S. 43 (2024)..................................................................................15, 16

*N.H. Youth Movement v. Scanlan*,
2026 WL 323171 (D.N.H. Feb. 6, 2026) .....................................................10

*New York v. Trump*,
767 F. Supp. 3d 44 (S.D.N.Y. 2025)............................................................44

*NRDC v. EPA*,
643 F.3d 311 .................................................................................................23

*NRDC v. EPA*,
755 F.3d 1010 (D.C. Cir. 2014)....................................................................14

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020)........................................................................24

**Cases—continued**

*PETA v. USDA*,
797 F.3d 1087 (D.C. Cir. 2015) ............................................................................2

*Pileggi v. Wash. Newspaper Publ'g Co., LLC*,
146 F.4th 1219 (D.C. Cir. 2025) ...................................................................6, 7, 8

*Pol'y & Rsch., LLC v. HHS*,
313 F. Supp. 3d 62 (D.D.C. 2018) .......................................................................45

*Qi-Zho v. Meissner*,
70 F.3d 136 (D.C. Cir. 1995) ..............................................................................42

*Richardson v. Trump*,
496 F. Supp. 3d 165 (D.D.C. 2020) .......................................................................9

*Richman v. United States*,
350 F.R.D. 401 (D.D.C. 2025) .............................................................................37

*Robert F. Kennedy Hum. Rts. v. Dep't of State*,
2026 WL 820811 (D.D.C. Mar. 25, 2026) (*RFK*) ..............................................23

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019) ...............................................................................32

*Spokeo v. Robins*,
578 U.S. 330 (2016) ...............................................................................................7

*Steele v. United States*,
657 F. Supp. 3d 23 (D.D.C. 2023) .........................................................................4

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ...............................................................................................5

*Texas v. Noem*,
No. 4:24-cv-49-DC-DF, ECF 16 (W.D. Tex. Feb. 12, 2026) ...............................49

*Texas v. United States*,
798 F.3d 1108 (D.C. Cir. 2015) ...........................................................31, 38, 41, 45

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......................................................................................6, 7, 8

*Tripp v. DOD*,
193 F. Supp. 2d 229 (D.D.C. 2002) .....................................................................37

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .............................................................................................47

*United States v. Fausto*,
484 U.S. 439 (1988) ...................................................................................27, 35, 36

*United States v. Weber*,
2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ........................................................40

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) .......................................................................21, 44

*Verizon Cal., Inc. v. FCC*,
555 F.3d 270 (D.C. Cir. 2009) .............................................................................44

vii

**Cases—continued**

*Washington v. Dep't of State,*
  420 F. Supp. 3d 1130 (W.D. Wash. 2019)........................................................................49

*West Virginia v. EPA,*
  597 U.S. 697 (2022).........................................................................................................30

*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989)...........................................................................................................28

**Statutes, Rules, and Regulations**

*5 U.S.C.
  § 2(a) .................................................................................................................................36
  § 2(b) .................................................................................................................................36
  § 2(c) .................................................................................................................................36
  § 2(h) .................................................................................................................................36
  § 552a(v) ...........................................................................................................................38
  § 552a(v)(1) .......................................................................................................................35
  § 552a(a)(2) .......................................................................................................................37
  § 552a(a)(7) .......................................................................................................................38
  § 552a(a)(8)(A)(i)(I) ..........................................................................................................42
  § 552a(a)(8)(B)(i) ..............................................................................................................42
  § 552a(b) ...........................................................................................................................38
  § 552a(b)(3) .......................................................................................................................38
  § 552a(e)(11) .....................................................................................................................23
  § 552a(g)(1)(D) ..................................................................................................................37
  § 552a(g)(4) .......................................................................................................................37
  § 552a note ............................................................................................................28, 35, 36
  § 552a(o)(1) .......................................................................................................................20
  § 553(c) .............................................................................................................................44
  § 703.................................................................................................................................48
  § 706(1) .............................................................................................................................41
  § 706(2)(A) ........................................................................................................................44

*8 U.S.C.
  § 404(h)..............................................................................................................................27
  § 1324a note ......................................................................................................................27
  § 1373.....................................................................................................................26, 27, 30
  § 1373(a) ............................................................................................................................28
  § 1373(b) ............................................................................................................................28
  § 1373(c) .......................................................................................................................26, 27

*42 U.S.C.
  § 1306(a)(1) .......................................................................................................................30
  § 1320b-7(a).......................................................................................................................25
  § 1320b-7(d).......................................................................................................................25
  § 1320b-7(d)(1)(A) ............................................................................................................25
  § 1320b-7(d)(2)..................................................................................................................26
  § 1320b-7(d)(2)(A) ............................................................................................................26

**Statutes, Rules, and Regulations—continued**

42 U.S.C.
  § 1320b-7(d)(3) ................................................................................................26
  § 1320b-7 note ...........................................................................................25, 26

Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, §
  9, 102 Stat. 2507 ............................................................................................28

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
  No. 104-208, § 642, 110 Stat. 3009 (1996) ...................................................26

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, title I,
  §121(c)(1), 100 Stat. 3359 (1986) .................................................................25

Local Civ. R. 7(b) ..................................................................................38, 41, 45

Privacy Act of 1974 § 2(b), 88 Stat. 1896 (1974) .........................................35

Pub. L. 114-126, 130 Stat. 282 .....................................................................36

Pub. L. No. 104-208
  § 404(e), 110 Stat. 3009 (1996) ....................................................................27
  § 404(f), 110 Stat. 3009 (1996) ....................................................................27

**Other Authorities and Materials**

Daniel J. Solove & Neil M. Richards, *Privacy's Other Path: Rediscovering the
  Law of Confidentiality*, 96 Geo. L.J. 123 (2007) ...........................................7

Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in
  Federal Elections*, 91 Fed. Reg. 17125 (Apr. 3, 2026) ..................................1

GAO, GAO-14-44, Computer Matching Act (2014) ......................................43

H.R. Rep. No. 93-1183 (1974) ...................................................................19, 20

Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making
  mistakes. It led to confusion in Texas*, The Texas Tribune (Feb. 13, 2026) .......................11, 12

Judd Legum & Rebecca Crosby, *The Federal Database That Could Upend the
  Midterm Elections*, Mother Jones (Apr. 9, 2026) ..........................................11

Legislative History of the Privacy Act of 1974, Source Book on Privacy (1976).........................19

OMB, *Privacy Act Implementation: Guidelines and Responsibilities*, 40 Fed. Reg.
  28948 (July 9, 1975) .............................................................35, 36, 40, 47

OMB Circular No. A-108, *Federal Agency Responsibilities for Review,
  Reporting, and Publication under the Privacy Act* (2016) ............................40

Press Release, USCIS, *DHS, USCIS, DOGE Overhaul Systematic Alien
  Verification for Entitlements Database* (Apr. 22, 2025)................................45

Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3,
  2025) .............................................................................................................15

SSA, POMS, *GN 03313.095 Disclosure to the Department of Homeland Security
  (DHS)* (2025) ...............................................................................................31

SSA, POMS, *GN 03325.002 Disclosure and Verification of Social Security
  Numbers (SSN) Without Consent* (2023) ...............................................31, 39

**Other Authorities and Materials —continued**

*Tripp's Privacy Act suits settled for $595,000*, Reps. Comm. for the Freedom of the Press (Nov. 4, 2003)..........................................................................................37

USCIS*, Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025)..........................................................21

**INTRODUCTION**

Defendants' brief confirms that they recklessly transformed DHS's Systematic Alien Verification for Entitlements ("SAVE") system—without statutory authorization—into an unprecedented and unreliable tool for mass "voter verification" and benefits eligibility checks. Defendants unsuccessfully try to hide facts about the harms SAVE has wrought, including to Plaintiffs' core direct-services and educational programs and to millions of Americans' privacy and voting rights. But the unrebutted facts show that the SAVE overhaul has caused Plaintiffs' members to be: (i) falsely identified as "potential non-citizen voters," (ii) forced to provide documentary proof of citizenship, (iii) wrongfully removed from voter rolls, and (iv) outright disenfranchised and prevented from voting in an election. These substantial burdens on Plaintiffs' members' fundamental rights are not "minor inconveniences." Defs.' Mem. 23, ECF 77-1. The Court should enter summary judgment for Plaintiffs and hold unlawful, vacate, and enjoin Defendants' unlawful overhaul of SAVE.

Although the Court has already stated its intent to "move expeditiously to resolve the merits of this dispute" given the "serious issues at stake," ECF 55 at 18, recent events have confirmed the need for urgency. On March 31, 2026, the President signed Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (Apr. 3, 2026), directing DHS and SSA to use overhauled SAVE to create lists of every voting-age American citizen in each state—*i.e.*, "State Citizenship Lists." *Id.* This Executive Order confirms that overhauled SAVE is at the center of the Administration's ongoing, unlawful efforts to nationalize election administration. It further confirms that expeditious resolution of this case is essential to prevent irreparable harm and protect Americans' voting and privacy rights ahead of this year's elections.

**ARGUMENT**

## I.    Plaintiffs have standing.

Defendants badly misstate the facts and law in challenging Plaintiffs' Article III standing. Plaintiffs' unrebutted evidence demonstrates multiple, independently sufficient standing grounds

1

for each of their claims. *See* Pls.' Mem. 13-25, ECF 66-1. Plaintiffs have shown past, ongoing, and imminent harms traceable to overhauled SAVE's unlawful use and disclosure of protected personal data—all of which are relevant to the standing analysis. *See Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) ("[P]ast wrongs may serve as evidence bearing on whether there is a real and immediate threat of repeated injury.") (cleaned up); *contra* Defs.' Mem. 21-25, ECF 78 (incorrectly arguing that "past harms" are wholly irrelevant).

A.    **LWVTX and LWVLA have organizational standing.**

LWVTX and LWVLA filed declarations detailing how overhauled SAVE directly interferes with core voter-services functions and resources they have expended to counteract those harms. Courts routinely find that voter-services organizations have standing to challenge conduct that directly impairs mission-critical functions, including cases post-dating *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*"). *See* Pls.' Mem. 20-22 (citing cases).

Defendants offer no meaningful response, incorrectly arguing that LWVTX's and LWVLA's "theory of standing is inconsistent with" *AHM*. *See* Defs.' Mem. 29. This disregards contrary post-*AHM* cases from the D.C. Circuit clarifying that *AHM* is consistent with the longstanding organizational standing doctrine articulated in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Even after *AHM*, the key question remains whether the "challenged action 'directly affected and interfered with [the organizational plaintiff's] core business activities.'" *Ctr. for Biological Diversity v. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) ("*CBD*") (quoting *Havens*, 455 U.S. at 395-96); *see also Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025) (citing *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)).

LWVTX and LWVLA easily meet this standard. Defendants offer nothing to refute their evidentiary showing and fail to address the line of cases finding standing by voter services organizations in similar circumstances. *See* Pls.' Mem. 20 (citing cases); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (voting rights groups had organizational standing to challenge use of pre-overhauled SAVE where "members were [falsely] identified as potential noncitizens" and the "organization expended resources to locate and assist the members to ensure

2

that they were able to vote" in furtherance of "missions that include voter registration and education" and "encouraging and safeguarding voter rights"); *League of United Latin Am. Citizens v. EOP* ("*LULAC II*"), 2026 WL 252420, at \*51 (D.D.C. Jan. 30, 2026) (political party plaintiffs had organizational standing to challenge aspects of SAVE overhaul based on "unrebutted evidence that the challenged policies will negatively affect some of their members' propensity to register to vote and maintain their registrations," which would "directly burden[] Plaintiffs' 'core business activities' of registering, persuading, and mobilizing voters to support Democratic Party candidates for elective office" (quoting *AHM*, 602 U.S. at 395)).

Unlike the *AHM* plaintiffs, LWVTX and LWVLA did not "spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action," 602 U.S. at 394, nor are their injuries "limited to issue advocacy," *CBD*, 144 F.4th at 315. Rather, they assert injuries akin to the plaintiff in *Havens*, HOME, which "not only was an issue-advocacy organization, but also operated a housing counseling service." *AHM*, 602 U.S. at 395. "[W]hen Havens gave HOME's employees false information about apartment availability," its "actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

Here, too, LWVTX's and LWVLA's standing is based on their direct services to voters— voter registration, education, and assistance—which overhauled SAVE has perceptibly impaired. *See* LeBombard Decl. ¶¶ 2, 14, 16-28, ECF 66-7; Suppl. Green Decl. ¶¶ 2, 12-13, 15-22, ECF 66-8. And Circuit precedent requires no showing that Plaintiffs directly receive any "inaccurate information" from overhauled SAVE. Defs.' Mem. 30. Because unrebutted evidence shows that Defendants' unlawful actions have "directly affected and interfered with" their "core business activities," *CBD*, 144 F.4th at 315, LWVTX and LWVLA have organizational standing.

### B.    Plaintiffs have associational standing.

Defendants wrongly claim Plaintiffs have not shown their members would have "standing

3

to sue in their own right," as required for associational standing. Defs.' Mem. 11.[2] Defendants' arguments distort the law and fail to address undisputed evidence of the serious harms inflicted by the reckless and illegal expansion of SAVE into a sprawling new mass "voter verification" tool.

### 1.    Plaintiffs have specifically identified members with standing.

To meet the "first prong of the associational standing analysis," an organizational plaintiff must "show, for each of its claims, that at least one of its members has standing." *EPIC v. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019). Plaintiffs have done that. They have provided declarations by members who have suffered cognizable privacy, reputational, and voting-related injuries caused by the SAVE overhaul. *See* Pls.' Mem. 14-19 (citing declarations of four LWVTX members, two EPIC members, one LWVLA member, and one LWVVA member); Pls.' Index of Declarations, ECF 66-2. Defendants insist this is not enough, but they are wrong.[3]

**LWVTX.** Defendants concede, as they must, that LWVTX has specifically identified four members. But they incorrectly argue that LWVTX must *also* show "these individuals were actually members of LWVTX *at the time of the alleged injury* that forms the basis of their allegations of Article III standing." Defs.' Mem. 13 (emphasis added). Defendants cite no case recognizing such a requirement for associational standing, because it would contradict black letter law that the standing inquiry focuses on whether the plaintiff was injured *at the time the operative complaint was filed. See Davis v. FEC*, 554 U.S. 724, 734 (2008); *see also Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) (rejecting argument that association needed to prove "individual plaintiffs were members" at the time they incurred injuries and finding associational standing where injured member "became a member . . . before trial" and "the injury she suffered *at the time the complaint*

---

[2] Defendants do not dispute that Plaintiffs satisfy the other two requirements of associational standing. *Compare* Pls.' Mem. 19-20 *with* Defs.' Mem. 11-33.

[3] Five of Plaintiffs' members' declarations are pseudonymous due to credible fears of government retaliation. *See* A. Doe Decl. ¶ 25, ECF 66-4; B. Doe Decl. ¶¶ 48-49, ECF 66-5; C. Doe Decl. ¶¶ 34-35, ECF 66-6; J. Doe 4 Suppl. Decl. ¶¶ 23-24, ECF 16-3; J. Doe 6 Decl. ¶¶ 23-24, ECF 16-8. Defendants do not challenge Plaintiffs' reliance on these pseudonymous declarations, thus waiving any such challenge. *See Steele v. United States*, 657 F. Supp. 3d 23, 44 (D.D.C. 2023) ("Arguments raised for the first time in a reply brief are waived.").

*was filed* was ongoing" (emphasis added)). Plaintiffs easily meet that standard: the FAC identified by name one LWVTX member—Anthony Nel—who had standing and was a LWVTX member when the FAC was filed. *See* FAC ¶¶ 165, 170. And LWVTX later provided declarations from Mr. Nel and three other injured members to establish associational standing, all of whom were previously injured *and* currently face substantial risks of future injury traceable to overhauled SAVE. *See* Pls.' Mem. 13-19. Nothing more is required beyond showing that LWVTX members were injured at the time of the operative complaint. "Where, as here, an organization has identified members and represents them in good faith," the Supreme Court's "cases do not require further scrutiny." *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023). Defendants' made-up alternative rule conflicts with a core rationale for associational standing doctrine, which "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union v. Brock*, 477 U.S. 274, 290 (1986).

Defendants cite language from *Humane Society of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988), concerning the "germaneness prong" of associational standing. But Defendants do not dispute the germaneness prong here, so the language they cite from *Humane Society* is irrelevant.[4]

**LWVLA and LWVVA.** To establish standing based on privacy injuries to LWVLA and LWVVA's members, Plaintiffs cited member declarations previously filed in this case. *See* Pls.' Mem. 14-15 (citing J. Doe 4 Supp. Decl. ¶¶ 8-12, ECF 16-3 (LWVLA member); J. Doe 6 Decl. ¶¶ 9-11, ECF 16-8 (LWVVA member)); Pls.' Index of Declarations at 2.[5] Defendants insist that those declarations do not demonstrate any *voting-related* injury, *see id.*, but that is not why Plaintiffs

---

[4] Defendants incorrectly state that the Declaration of Alex Doe—a member of both LWVTX and EPIC—"is not offered in support of EPIC's associational standing (only that of LWVTX)." Defs.' Mem. 13 n.5 (citing Pls.' Index of Declarations). The very Index they cite says the declaration is offered in part "in support of LWVTX's *and EPIC's* associational standing." Pls.' Index of Declarations at 1 (emphasis added); *see also* Pls.' Mem. 14-16.

[5] Defendants complain about Plaintiffs not re-filing those same declarations with their summary judgment motion, *see* Defs.' Mem. 12, but they cite no rule or other authority requiring Plaintiffs to clutter the Court's docket with duplicative filings, nor do they show any prejudice to them.

offered the declarations. Rather, as stated in Plaintiffs' opening brief, Plaintiffs offered these declarations solely to demonstrate *privacy* injuries. *See* Pls.' Mem. 14-15.

### 2.    Plaintiffs' members have cognizable privacy injuries.

Undisputed evidence demonstrates that Plaintiffs' members have suffered violations of their statutory privacy rights sufficient to establish standing. Plaintiffs' injuries are analogous to historical privacy-related torts (intrusion upon seclusion, and breach of confidence) and are sufficiently concrete to satisfy Article III. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (injuries are concrete when they have "a close historical or common-law analogue"); *see also* Pls.' Mem. 14-16 (collecting caselaw establishing that statutory privacy violations can involve harms analogous to those torts).

Regarding intrusion upon seclusion, Defendants cite *TransUnion* to suggest no injury occurs unless a plaintiff knows about the intrusion. Defs.' Mem. 18 (citing 594 U.S. at 438). But *TransUnion* addressed violation of a statutory right to the accuracy of information in a credit file, not a violation of a privacy statute. Where, as here, a privacy statute is violated and information changes hands, a concrete harm occurs, regardless of whether the victim is aware of it. *AFSCME v. SSA*, -- F.4th --, 2026 WL 969670, at *6 (4th Cir. Apr. 10, 2026) (en banc); *AFL-CIO v. Dep't of Lab.*, 2025 WL 1783899, *7 n.10 (D.D.C. June 27, 2025).

Defendants further misstate the law in arguing that the privacy violations here are not "highly offensive" enough to constitute intrusion upon seclusion. Defs.' Mem. 18 (cleaned up). The question of whether an offensive disclosure is "*highly* offensive … goes to the degree of harm, not the injury's recognition at common law," after which "drawing lines between degrees of harm … fall[s] more naturally in Congress's wheelhouse." *Pileggi v. Wash. Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1229 (D.C. Cir. 2025). And as the en banc Fourth Circuit recently held, unlawful intra-government transfers of personal data *do* inflict harms analogous to these privacy torts that are sufficiently concrete to establish standing. *See AFSCME*, 2026 WL 969670 at *5; *see also id.* at *4 (whether plaintiffs "would prevail in a lawsuit for common law invasion of privacy is irrelevant. Instead, it is enough that the injury plaintiffs have identified 'pose[s] the same kind

6

of harm that common law courts recognize.'").[6] Many courts in this District have reached the same conclusion. *See AFL-CIO v. Dep't of Lab.*, 2026 WL 879518, at \*10 (D.D.C. Mar. 31, 2026) (collecting cases). Moreover, the undisputed facts show Plaintiffs' members *are* aware of the unlawful disclosures and find them highly offensive. *See* Pls.' Mem. 15 (citing declarations).

"Breach of confidence" is likewise analogous to the statutory violations at issue here. While Defendants argue that this tort is not old enough to suffice, Defs.' Mem. 20, they cite an Eleventh Circuit decision that specifically *declined* to reach this conclusion. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931-32 (11th Cir. 2020) (en banc). And experts trace the origin of the tort back to the 1800s. *See* Daniel J. Solove & Neil M. Richards, *Privacy's Other Path: Rediscovering the Law of Confidentiality*, 96 Geo. L.J. 123, 125 (2007). In any event, the D.C. Circuit has already held that a breach of confidence is a sufficiently analogous tort to underpin Article III standing for unlawful disclosures or private information. *See Jeffries v. Volume Servs. Am.*, 928 F.3d 1059, 1064-65 (D.C. Cir. 2019). And it did so by applying the common-law-analogue standard articulated in *Spokeo v. Robins*, 578 U.S. 330, 341 (2016).[7] While Defendants insist that the type of information SSA shared with DHS here is not sensitive enough to support an analogy to "breach of confidence," courts in this District have correctly held otherwise. *See* Pls.' Mem. 14, 16 (citing cases). And, again, this is a question of degree, not of kind, and thus is irrelevant to the standing analysis. *See Pileggi*, 146 F.4th at 1229. Because the Social Security Act and Privacy Act protect against the same *kind* of injuries as that vindicated by the "breach of confidence" tort, the injuries here are sufficiently concrete to establish Article III standing.

---

[6] Notably, *AFSCME* abrogated the Fourth Circuit panel decision on which Defendants heavily rely. *Compare* Defs.' Mem. 19, 20 (citing *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025)) *with AFSCME*, 2026 WL 969670, at \*5-\*6 (abrogating *Bessent*).

[7] Defendants imply that *TransUnion* may require a different outcome, Defs.' Mem. 20, but *TransUnion* endorsed the exact *Spokeo* test for concreteness that *Jeffries* applied. *Compare TransUnion*, 594 U.S. at 424 ("whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.") (citing *Spokeo*, 578 U.S. at 341) *with Jeffries*, 928 F.3d at 1065 (applying this test).

### 3.    Plaintiffs' members have cognizable reputational injuries.

The injuries flowing from Defendants' statutory violations also include the kind of harms vindicated by the tort of defamation, providing an additional common-law analogue to support standing. It is undisputed that overhauled SAVE provides false and incomplete information about the citizenship status of some U.S. citizens—including LWVTX members—to states seeking to verify their eligibility to vote. Defendants argue that it is speculative that Plaintiffs' members will experience this particular harm again, but they offer no record evidence to support that argument. To the contrary, Defendants' own declarant attests that SAVE only has access to the information available in the databases it accesses, *see* Broderick Decl., ECF 77-2, ¶ 9, and Defendants offer no evidence suggesting these records will be corrected. Rather, they argue that the *states* might mitigate inaccuracies. Defs.' Mem. 22. The undisputed record, as further discussed below, gives every reason to believe that overhauled SAVE will produce the same inaccurate result about these LWVTX members the next time a user agency seeks to verify their citizenship status. *See infra* § I.B.4.a.2. Defendants also argue that the misinformation provided by overhauled SAVE (the statements that certain members were non-citizens) is not offensive enough to rise to the level of defamation. Even if this were true—which Plaintiffs dispute, *see* Pls.' Mem. 16—it would again be a question of *degree*, not of *kind*, and is therefore irrelevant. *See Pileggi*, 146 F.4th at 1229; *see also TransUnion*, 594 U.S. at 433 (Article III does not require an "exact duplicate"). Finally, Defendants suggest that any defamatory statements were made by Texas, rather than by them, but this misapprehends Plaintiffs' standing argument and claims, which—as explained above—hinge on *DHS's* misrepresentations of fact *to the states*.

### 4.    Overhauled SAVE inflicts cognizable voting-related injuries on Plaintiffs' members that are redressable by this Court.

Plaintiffs demonstrated that (1) burdens on the right to vote—even those short of disenfranchisement—satisfy Article III's injury requirement and an increased risk of such burdens is a sufficiently "imminent" injury for standing purposes, (2) at least four specific LWVTX members are already experiencing such burdens (including one who was disenfranchised), and

continue to be at a heightened risk in the future, and (3) Defendants' overhaul of SAVE is a *de facto* cause of those burdens. Pls.' Mem. 17-19, 24-25. Defendants fail to refute any of these points.

<b>a)    Plaintiffs' voting-related injuries are concrete and imminent.</b>

Where, as here, a plaintiff asserts "a 'substantial risk' of future injury" based on an "increased-risk-of-harm," the court must "consider the ultimate alleged harm . . . as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently imminent for standing purposes." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017). In the voting context, even an "increased risk" of disenfranchisement can make an injury "sufficiently 'imminent' for standing purposes." *Richardson v. Trump*, 496 F. Supp. 3d 165, 179 (D.D.C. 2020) (quoting *Attias*, 865 F.3d at 627).

Under this framework, LWVTX's member declarants have "standing to prospectively challenge" "SAVE database" use based on substantial risk of future "potential errors." Pls,' Mem. 19 (quoting *Arcia*, 772 F.3d at 1341); *see also Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-709 (9th Cir. 2025). "[P]ast wrongs may serve as evidence" of "a real and immediate threat of repeated injury." *Jibril*, 20 F.4th at 814 (cleaned up). The D.C. Circuit has acknowledged that past voting-related injuries can show a risk of future injury. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) ("experience of the Kansas League" showed it was "almost certain that similar obstacles to registration will spring up in Alabama and Georgia when those States decide to enforce their [proof-of-citizenship] laws"). LWVTX's members' voting-related injuries easily clear the Article III threshold.

**1.** Defendants minimize the voting-related injuries their illegal expansion of SAVE has inflicted on LWVTX's members as "some minor inconveniences to correct their records," Defs.' Mem. 23, and "paperwork issues" but not "actual disenfranchisement," *id.* at 25. This whitewashing is both factually and legally erroneous.

As LWVTX's member declarants attest, when overhauled SAVE misidentified them as non-citizens, they did not merely have to correct their records or shuffle paperwork. Rather, exactly as Defendants designed and instructed, *see* Pls.' Mem. 11, 17, the overhauled SAVE process

9

subjected them to a 30-day countdown to a voter purge, which they could only stop by providing documentary proof of citizenship ("DPOC"). Two declarants did not have sufficient DPOC, resulting in their wrongful purge from voter rolls. *See* Nel Decl. ¶¶ 13-17; B. Doe Decl. ¶¶ 11-30. Most alarmingly, one declarant was disenfranchised and prevented from voting in the March 2026 Texas primary election and remains purged from the voter rolls. *See* B. Doe Decl. ¶¶ 30-31. And *all* the LWVTX member declarants—even those who had DPOC on hand—suffered the substantial and tangible harmful effects of being incorrectly identified by SAVE as non-citizens and implicitly accused of illegally registering to vote. Nel Decl. ¶¶ 37-39, 41; A. Doe Decl. ¶¶ 15-17, 20-21; B. Doe Decl. ¶¶ 29, 42-44; C. Doe Decl. ¶¶ 17, 28-30. Among other things, the declarants who are still on the voter rolls must now obsessively monitor their registration status to ensure they are not misidentified again and wrongfully purged. A. Doe Decl. ¶ 21; C. Doe Decl. ¶ 30. No American should have to endure such intolerable burdens on their fundamental voting rights. Article III standing doctrine is highly protective of voting rights for precisely that reason.

Defendants' arguments to the contrary badly contort the law. Plaintiffs need only show (and have shown) a concrete, particularized, non-hypothetical burden on the right to vote, including burdens that "hinder" or cause "difficulty" registering to vote. *LULAC II*, 2026 WL 252420, *39. That is because the right to vote is "precious," "fundamental," and "preservative of all rights." *Katzenbach v. Morgan*, 384 U.S. 641, 652, 654 (1966). The LWVTX member declarants each attest that the overhauled SAVE process unnecessarily required them to prove their citizenship, and in some cases purged them from voter rolls, forced them to re-register, and even disenfranchised them. Each step is a separate and independently actionable burden on voting. Indeed, many courts have concluded that forcing voters to provide DPOC is itself a sufficient burden on the right to vote for Article III injury purposes. *E.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1119 (10th Cir. 2020); *LULAC II*, 2026 WL 252420, at *38; *LULAC I*, 808 F. Supp. 3d 29, 59 (D.D.C. 2025); *N.H. Youth Movement v. Scanlan*, 2026 WL 323171, at *11 (D.N.H. Feb. 6, 2026); *Ga. Coal. for the Peoples' Agenda, Inc. v. Raffensperger*, 2022 WL 22866291, at *7 (N.D. Ga. Sept. 29, 2022).

10

Defendants try to minimize SAVE's misidentification of the LWVTX member declarants as only "a handful of edge cases." Defs.' Mem. 24. But the four LWVTX member declarants are merely examples of injured voters. Plaintiffs need only identify a *single* injured member with standing and certainly have no burden to identify *every* eligible U.S. citizen voter harmed by Defendants' actions or even a certain percentage. Further, the unrebutted facts about the scope and scale of SAVE's harmful effects demonstrate that these cases are not outliers, and that Defendants are wrong that overhauled SAVE has affected only an "extraordinarily small number" of citizens. Defs.' Mem. 25. Election administrators from Travis County, Texas—the fifth largest county in Texas and home to the capital city of Austin—have submitted a declaration in this case, ECF 47-1, a comment on DHS's 2025 SAVE SORN, *see* FAC ¶¶ 85, 87, 141, 143, 144, and an *amicus* brief and accompanying declaration, ECF 68, ECF 68-1, all demonstrating the inaccuracy of SAVE's citizenship data in Texas. According to Travis County's most recent filing, between 10% and 30% of the voters in Travis County that overhauled SAVE identified as potential non-citizens were actually citizens. ECF 68 at 10; ECF 68-1 ¶ 19.

The record shows that other Texas counties had similar issues. *See* ECF 47-1 ¶ 9; ECF 68-1 ¶ 10. In Denton County, overhauled SAVE was wrong about at least 14% of purported non-citizens it identified, which the county only learned *after those voters were threatened with purging and provided DPOC*. Judd Legum & Rebecca Crosby, *The Federal Database That Could Upend the Midterm Elections*, Mother Jones (Apr. 9, 2026), https://perma.cc/8YXC-WU7U. In Moore County, at least 55% of the purported non-citizen voters identified by overhauled SAVE provided DPOC after being threatened with purging; in Erath County, that number was 67%; and in Duval County, 100% of the potential non-citizens threatened with purging were actually citizens. Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas*, The Texas Tribune (Feb. 13, 2026), https://perma.cc/GEA4-U2V3.

Other localities have had similar results: St. Louis, Missouri determined 81% of overhauled SAVE's purported non-citizen results were wrong. *See id.*; Legum & Crosby, Mother Jones, *supra*. And Boone County, Missouri found overhauled SAVE was wrong about more than half of the

purported non-citizens it identified. Fifield & Despart, Texas Tribune, *supra*. LWVTX's members are representative examples of a widespread problem, not rare "edge cases."

**2.** Defendants also wrongly assert "there is no reason to think that any of the individuals who have already gone through this process once will be subjected to it again." Defs.' Mem. 24. But the unrebutted evidence shows that Defendants still have incorrect SAVE citizenship data for LWVTX's member declarants, Nel Decl. ¶ 34; B. Doe Decl. ¶ 39; C. Doe Decl. ¶ 26, who are thus equally at risk today of being misidentified as non-citizens by Defendants' SAVE system as they were when they were misidentified the first time. Defendants offer no factual support for their claim that these declarants face a lesser risk of being misidentified now. They have offered no evidence that DHS proactively updates SAVE's records if a voter wrongfully identified as a potential non-citizen provides DPOC to state or local election officials. To the contrary, DHS's own guidance says that incorrect data accessible through SAVE is *not* corrected unless and until the individual submits a request for correction to the federal agency that maintains the data. *See* DHS-AR-1393 (SAVE "Fast Facts"); DHS-AR-1509 (July 2025 SAVE Tutorial).

Defendants also insist the member declarants are "*less* likely" to be harmed now that the illegal SAVE overhaul has offered them "the opportunity to correct their records," Defs.' Mem. 24, but this badly misconstrues standing law and improperly shifts the burden to voters to avoid injury. "The need to take … affirmative steps to avoid the risk of harm" itself "constitutes a cognizable injury." *Meese v. Keene*, 481 U.S. 465, 475 (1987). A plaintiff has an Article III injury even where they could take "steps [that] might prevent or mitigate damage" caused by the defendants' illegal actions. *Id.* In the voting context, courts have "reject[ed] the notion that the source of an injury is a litigant's decision not to comply with an allegedly unlawful . . . regime, rather than the regime itself." *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016). Otherwise, "a court could never enjoin enforcement of an unlawful [agency action] if the plaintiffs could have complied with the [action] but elected not to; this hypothetical scenario borders on the absurd." *Id.*

Beyond LWVTX's member *declarants*, other similarly situated LWVTX members (*i.e.*, naturalized and derived citizens whose citizenship data is incorrect in overhauled SAVE), also face

substantial risks of harm. For example, LWVTX's president attested that some of LWVTX's most significant functions include educating naturalized citizens in Texas about voting and registering them to vote. *See* LeBombard Decl. ¶¶ 16, 20-25. And based on the issues that overhauled SAVE poses to LWVTX's *current* naturalized and derived citizen members, "LWVTX expects that many of its naturalized-citizen and derived-citizen members and those it seeks to register to vote will," in the future, "face onerous barriers to obtaining and providing the proof of citizenship necessary to provide DPOC in time to resolve any SAVE-related error." *Id.* ¶ 38, n. 19.

The record demonstrates a "realistic danger" that overhauled SAVE will burden the voting rights of many more of Plaintiffs' members. *Mi Familia Vota*, 129 F.4th at 708. Notwithstanding Defendants' whitewashing, hundreds if not thousands of voters have already been wrongly identified as non-citizens, and they will continue to face such risks with Defendants barreling forward on using overhauled SAVE for mass voter verification. In any event, it is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

      **b)**      **Defendants caused LWVTX members' voting-related injuries and Plaintiffs' requested relief would redress those injuries.**

Defendants wrongly argue that LWVTX's members' voting-related injuries are not traceable to Defendants because *state* officials ultimately purge the voters SAVE flags as potential non-citizens. Defs.' Mem. 25-28. Yet Defendants do not dispute that "Article III 'requires no more than *de facto* causality.'" Pls' Mem. 24 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)); *see also Attias*, 865 F.3d at 629 (rejecting "the most immediate cause" standard because Article III standing requires "only" that a plaintiff's "injuries be 'fairly traceable' to the defendant."). Where a third party is the most immediate cause of injury, a plaintiff has standing if "third parties will likely react to the government regulation (or judicial relief) in predictable ways that will likely cause (or redress) the plaintiff's injury." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (quoting *AHM*, 602 U.S. at 383) (cleaned up). Similarly, "standing will lie where 'a plaintiff demonstrates that the challenged agency action authorizes the conduct that

13

allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise.'" *NRDC v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (citing cases).

LWVTX has made this showing. Without Defendants' expansion of SAVE to query unreliable SSA citizenship data using unreliable methods and DHS's execution of a SAVE MOA with Texas, Texas could not lawfully access the data that led to the LWVTX member declarants' false identification as non-citizens. *See* Pls.' Mem. 24-25. Indeed, before Defendants overhauled SAVE, SAVE users had to "input an individual applicant's name, date of birth, and current [DHS numerical identifier] to access any corresponding SAVE verification data." DHS-AR-5 (April 11, 2024 letter from Ala. Sec'y of State to USCIS). Some states complained this process was "useless for verifying citizenship status even on a case-by-case basis" because "[v]oter registrants do not provide [DHS numerical identifiers] upon applying and [SAVE users] do not have access to the documents that SAVE references to independently obtain it." *Id.* The record confirms that the *only* reason states like Texas are now using SAVE for "voter verification"—and misidentifying U.S. citizens as non-citizens in the process—is because Defendants overhauled SAVE to incorporate SSA databases and enable bulk search-by-SSN functionality. *See infra* § I.C. That is *de facto* causation in a nutshell. And, correspondingly, vacating and enjoining these changes to SAVE will redress LWVTX members' injuries by substantially reducing the risk they will again be wrongfully flagged as potential non-citizens based on Texas's use of overhauled SAVE, and face attendant burdens on the exercise of their voting rights, outright disenfranchisement, and risks of wrongful federal and state investigation. *See* Pls.' Mem. 18 & n.8.

This case requires no "guesswork as to how independent decisionmakers will exercise their judgment." *Contra* Defs.' Mem. 26 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)). The unrebutted evidence shows that the LWVTX member declarants incurred their voting-related injuries because Texas followed the overhauled SAVE process *precisely as DHS instructed*. Under DHS's process, if SAVE cannot verify an individual's U.S. citizenship, then a SAVE user can deny or cancel the individual's voter registration if they fail to provide DPOC. *Compare* Pls.' Mem. 11 *with* Defs.' Mem. (not disputing). That is exactly what Texas did and is

14

doing. Pls.' Mem. 17-18. And Defendants do not believe Texas is doing anything wrong. Defs.' Mem. 26-27 ("Defendants are not suggesting that Texas has violated the law."). After repeatedly touting overhauled SAVE as a reliable tool for "states to efficiently verify voter eligibility," and "encourag[ing] all federal, state, and local agencies to use the SAVE program" for "voter verification," Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025), https://perma.cc/9LN5-SEDU, DHS cannot now shirk responsibility for the predictable consequences of the SAVE process that it established and instructed SAVE users to follow. It was likely that at least some states would react as Texas has, which is sufficient even if not all do.

Defendants make two other erroneous traceability arguments. First, they insist that SAVE users are presumably aware of the well-documented limitations with SSA's citizenship data, and, thus, Defendants "presum[e]" they will be appropriately cautious in relying on that data. Defs.' Mem. 28. Second, Defendants insist that any limitations in SSA's unreliable citizenship data are mitigated by the DHS records that SAVE queries. *Id.* Both assertions are refuted by the unrebutted evidence (described above) concerning Texas's use of overhauled SAVE and the consequent impact on LWVTX's members, as well as other undisputed facts in the record. *See* Pls.' Mem. 42 (describing "known gaps in DHS's own citizenship data," which DHS admits "are especially likely to impact derived citizens"); DHS-AR-1282 n.2 (Texas SAVE MOA) (acknowledging unreliability of SAVE records for individuals with acquired citizenship). Indeed, while Defendants insist any SAVE response "other than U.S. citizen" will be "automatically escalated to additional (manual) verification," Broderick Decl. ¶ 15, DHS's own guidance shows that SAVE *cannot* conduct additional verification unless a DHS numeric identifier is available, which it frequently is not. *See* Pls.' Mem. 9-11 (citing DHS-AR-240-241); *see also* DHS-AR-1453 ("SAVE can only conduct additional verification if [a DHS numeric identifier] is available"); DHS-AR-1437 (same).

Defendants' cited cases are readily distinguishable. Defs.' Mem. 25-26. In *Murthy v. Missouri*, the plaintiffs sought to enjoin federal defendants "from pressuring or encouraging" third-party social media "platforms to suppress protected speech" based on the "entirely speculative" theory "that the platforms' future moderation decisions will be attributable, even in part, to the

15

defendants." 603 U.S. 43, 57, 69 (2024). Similarly, in *Haaland v. Brackeen*, the plaintiffs sought to enjoin federal parties to redress alleged injuries inflicted by state courts and agencies operating independent of federal control. 599 U.S. 255, 292 (2023). In neither case did the plaintiffs provide evidence that federal actors were a but-for cause of the plaintiffs' injuries, as LWVTX has here. *See supra* § I.B.4.a (describing unrebutted evidence of members' receipt of SAVE non-citizenship notices); Pls.' Mem. 17-18 (same). Unlike the social media platforms in *Murthy*, Texas could not take these actions "independently" of Defendants. 603 U.S. at 66. Rather, Texas's access to SAVE *depends on* DHS, and DHS may "terminate [Texas's SAVE] MOA, and thereby the Agency's use of SAVE for voter registration and voter list maintenance purposes, without prior notice if deemed necessary because of a requirement of law or policy." DHS-AR-1290; *see* Pls.' Mem. 48-49.

> **C.    Plaintiffs have shown injuries traceable to SAVE's new bulk-upload capability that their requested relief would redress.**

Defendants continue to misstate evidence in arguing that no Plaintiff "has even attempted to establish any concrete Article III injury" tied to SAVE's new bulk-upload functionality. Defs.' Mem. 14-15. LWVTX's president explains how Texas's past, ongoing, and future use of SAVE's new bulk-upload functionality for statewide voter list maintenance concretely harms LWVTX's mission-critical functions and direct services to voters. *See* LeBombard Decl. ¶¶ 4, 37, 52, 56, ECF 66-7 (because Texas "*has run the state's entire list*" through SAVE, "thousands of eligible Texas voters are now at serious risk of being erroneously purged … and deprived of their right to vote in upcoming elections," and various harms tied to Texas's use of SAVE for "bulk voter verification" will persist "[s]o long as the Texas Secretary of State continues to use the overhauled SAVE system for voter registration and voter list maintenance" (emphasis added)).

Plaintiffs' member declarants likewise tie their injuries to Defendants' transformation of SAVE from a limited tool permitting only individualized searches to a sprawling new system that queries hundreds of millions of Americans' protected data in a single search. For instance, the LWVTX member declarants explain how Texas's use of overhauled "SAVE's new functionality allowing bulk queries of state voter rolls" concretely harms their voting rights. Nel Decl. ¶¶ 36,

16

38, 39 (emphasis added); *see also* B. Doe Decl. ¶¶ 41, 43, 44; C. Doe Decl. ¶¶ 28-30. Plaintiffs' members also explain how SAVE's bulk disclosure, consolidation, misuse, and repurposing of their sensitive personal data to create an unauthorized "national citizenship database" harms their privacy interests. *See, e.g.*, Nel Decl. ¶¶ 40-41, 44; A. Doe Decl. ¶ 18; B. Doe Decl. ¶¶ 45-46, 50; C. Doe Decl. ¶¶ 31-32, 36; Kisselburgh Decl. ¶¶ 17-19, ECF 66-11.

Defendants are wrong that Plaintiffs would face the same harms if SAVE only allowed individualized searches of the same illegally linked SSA databases. Defs.' Mem. 14-15. There is no basis to believe, much less record evidence to establish, that states would continue using SAVE for voter list maintenance at the same scale even if they were forced to conduct search-by-SSN queries "one-by-one," and that this much "slow[er]" and "less efficient" method poses the same magnitude of risk to Plaintiffs. *Id.* at 14. Far from it, the record shows that Defendants' expansion of SAVE to perform bulk searches enticed states to use the newly overhauled system for statewide voter list maintenance and substantially increased the probability that Plaintiffs' members and other voters will be falsely identified as non-citizens by SAVE. *See* Pls.' Mem. 24-25. No evidence supports Defendants' implausible counterfactual that states would undertake the highly laborious task of conducting tens of millions of individualized searches to check registered voters against SAVE data "one-by-one." Defs.' Mem. 14; *see also id.* at 37. To the contrary, some states considered pre-overhauled SAVE inadequate as a voter list maintenance tool *precisely because* it lacked bulk-submission capability, and Defendants specifically added that capability to enable and encourage states to bulk upload statewide voter registration lists to SAVE. *See* Pls.' Mem. 4-5; *see also* DHS-AR-2 (February 2025 letter from 21 Secretaries of State urging DHS to expand SAVE to allow "[t]he ability to search multiple voters at once" because requiring individualized searches "causes significant delays and overly burdensome staff time").

A declaration of the Director of Elections for the Texas Secretary of State proves the point. The declaration explains that Texas did not even seek "access to the SAVE system before [2025] because," among other things, SAVE users previously "had to submit each record to the system one at a time," which made the system "an inadequate option for an agency like the Texas Secretary

of State seeking to obtain citizenship status information for individuals on the voter rolls." Worrell

Adkins Decl. ¶ 7, ECF 43-2. The declaration touted the state's ongoing use of "the new system …

to submit bulk uploads of voter records to SAVE instead of going through a cumbersome process

of searching one record at a time," which allowed Texas "to run the entire statewide list of more

than 18 million voters through the system" and to continue doing so going forward. *Id.* ¶¶ 9-10.

The record thus demonstrates concrete and imminent harms to Plaintiffs that are "fairly

traceable" to Defendants' addition of bulk-submission capability to SAVE, and that were the

highly "predictable effect" of Defendants' actions "on the decisions of third part[y]" SAVE users.

*Dep't of Com.*, 588 U.S. 768. The record shows SAVE's new bulk-submission functionality has

substantially contributed to Plaintiffs' injuries and exponentially increases the risk of them

recurring. Vacating the SAVE overhaul—including undoing the ability to conduct bulk searches

of unreliable citizenship data using unreliable methods for voter list maintenance—will likely

redress these injuries. *See Diamond Alternative Energy*, 606 U.S. at 114 (plaintiff need only show

that requested relief "would likely redress" claimed injuries at least partially).

### D.     EPIC has informational and procedural standing to seek relief for violations of the Privacy Act's matching program requirements.

Defendants injure EPIC by refusing to publish the matching agreements required by the

Privacy Act. *See* Pls.' Mem. 22-24. Defendants' only two defenses—that the Privacy Act is not a

transparency statute, and that all the information that would be in computer matching agreements

has been published elsewhere, Defs.' Mem. 31—are unpersuasive.

First, Defendants assert a position that has not been adopted by any court: that the Privacy

Act was not designed to provide transparency to the public. Defs.' Mem. 31. In support of this,

Defendants rely extensively on a case that *does not address the Privacy Act*. *See* Defs.' Mem. 31

(citing *EPIC*, 928 F.3d at 103-04 (analyzing the E-Government Act)). The statute at issue in that

case, the E-Government Act, is not an apt analog for the Privacy Act, which is a fundamentally

different statutory scheme "that create[s]" "an individual right to obtain information." *Maloney v.*

*Carnahan*, 45 F.4th 215, 217 (D.C. Cir. 2022) (Millett, J., concurring) (listing statutes that create

a right to obtain information, but not mentioning the E-Government Act). While *one* purpose of the Privacy Act is to protect individual privacy, the Act "also intends to make available to the press and the public all possible information concerning operations of the Federal Government in order to prevent secret data banks and unauthorized investigative programs on Americans." H.R. Rep. No. 93-1183, at 71 (1974); *see also id.* at 74 ("[I]t is fundamental to the implementation of any privacy legislation that no system of personal information be operated or maintained in secret by a Federal agency. The existence and certain characteristics of each system should be a matter of public record."); Legislative History of the Privacy Act of 1974, Source Book on Privacy, at 217 (1976), https://perma.cc/9W9F-R5ZL (discussing the Act's requirements to "assure knowledge by Congress, the executive branch, *and interested groups* of new Federal data banks and pooling of informational and computer resources to constitute centralized data systems not foreseen by Congress" (emphasis added)); S. Rep. No. 100-516, at 8 (discussing matching program provisions). There is no question that Congress intended for the Privacy Act to vest the public with a right to information and that public transparency was necessary for the Privacy Act to accomplish the legislature's goals while still protecting individuals.

Second, Defendants argue that even if EPIC is entitled to the publication of computer matching agreements, Defendants have already published the relevant information elsewhere, so EPIC cannot be harmed. Defs.' Mem. 32. This is not true. Matching agreements require several pieces of information not required for SORNs or PIAs, including: (1) "the anticipated results [of the matching program], including a specific estimate of any savings"; (2) "the approximate number of records that will be matched, and the projected starting and completion dates of the matching program"; (3) "procedures governing the use by a recipient agency or non-Federal agency of records provided in a matching program by a source agency, including procedures governing return of the records to the source agency or destruction of records used in such program"; and (4) "information on assessments that have been made on the accuracy of the records that will be used in such matching program." *See* 5 U.S.C. § 552a(o)(1).

The gap in information created by Defendants' actions is no "small delta." Defs.' Mem. 32 n.9. Unique matching agreement information is integral to EPIC's work and unavailable anywhere else. The dozens of MOAs included in the administrative record reflect no procedures for how state agencies should return or destroy SAVE records. *See* DHS-AR-505-1328. As a result, EPIC has no idea how (if at all) Defendants are protecting private information. Butler Decl. ¶ 18. While some of the information required by matching agreements has been published in scattered documents that Defendants did not even want to provide to the public, EPIC still has no information on the estimated savings of the program, the approximate number of records, the start and completion dates of the program, procedures governing use and return of records by recipient agencies, or information on accuracy assessments. *See* DHS-AR-114-121; DHS-AR-221-243; SSA-AR-206-211; *see also infra* § II.C (citing "foundational documents" for SAVE overhaul). This information would allow EPIC to know the program's value to the government and compare it to the impact on its members' privacy. Without the matching agreement, EPIC cannot know *how* (or for how long) overhauled SAVE will actually impact its members and millions of Americans. *See* Butler Decl. ¶ 18. This information would inform EPIC's assessment of individual privacy risk and, in turn, inform its ability to properly educate the public, policymakers, and its members about the risks and how to mitigate them. *See id.* ¶¶ 18–19.

These impacts are exactly "the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 824 F.3d 1033, 992 (D.C. Cir. 2016). The Privacy Act was intended to provide an opportunity for public oversight so agencies would be held accountable if and when they created unlawful citizen data banks. *See* H.R. Rep. No. 93-1183, at 71 (1974). EPIC is one of the few entities that regularly exercises the oversight and accountability guarantees of the Privacy Act, and it is harmed by not being able to exercise those rights as to matching agreements for SAVE. *See* Butler Decl. ¶¶ 11–13, 21. Without the statutorily required matching agreements, EPIC cannot carry out its mission-critical functions. This is a textbook informational injury.

20

EPIC has also suffered a procedural injury from the denial of this information. Defendants do not contest that EPIC has a right to participate in the processes required by the Privacy Act. They simply argue that the privacy interests of EPIC's members are not concrete enough. Defs.' Mem. 30-31. But EPIC's members *do* have concrete privacy and reputational interests that have been harmed by the SAVE overhaul, *supra* § I.B.2-3, and these "concrete interests" suffice to establish standing to challenge Defendants' failure to follow required procedures. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). While publication of the matching agreements with a good-faith opportunity to comment could remedy the informational injuries EPIC claims here, it would not remedy the privacy and reputational injuries to EPIC and its members resulting from Defendants' procedurally deficient overhaul of SAVE.

## II.    Plaintiffs are entitled to summary judgment.

### A.    Plaintiffs challenge final agency action.

The D.C. Circuit's holding in *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), that a policy of disclosing confidential information constitutes final agency action, controls this case. *See* Pls.' Mem. 46; *see also AFL-CIO*, 2026 WL 879518, at *12 ("adoption and implementation of a data access policy that determines the data privacy rights of millions of Americans … constitute[s] final agency action"); *LULAC*, 2026 WL 252420, at *53 ("clearly" final agency action to share sensitive records with others outside an agency, including through SAVE). And whereas those cases challenged *unwritten* disclosure policies, *see*, *e.g.*, *Venetian*, 530 F.3d at 928 ("precise terms of the disclosure policy" were "quite uncertain"), Defendants' changes to the SAVE system are not in dispute. *See*, *e.g.*, Defs.' Mem. 8 (citing USCIS, *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload* (May 22, 2025), https://perma.cc/LM3N-RB76). Defendants fail to engage with *Venetian*, which is unmentioned in their brief, or with *LULAC* and either of the relevant decisions in *AFL*, which they discuss only in connection with unrelated issues. Defendants instead imply that there has been no "overhaul" of the SAVE system, and that this description of their sweeping changes is a rhetorical device of Plaintiffs' creation. Defs.' Mem. 36-37. But it is *Defendants* who characterized these changes as

21

an overhaul, s*ee* Pls.' Mem. 45 (citing references for Defendants' "self-described 'overhaul' of SAVE"). Regardless of word choice, there is no question that the integration and combination of disparate data sources and repositories is final agency action.

By deciding to pull a wide range of unreliable data sources into a purported one-stop citizenship database, Defendants enabled user agencies to query and receive information from a wholly new set of databases to which they previously had no access. That change reflects the "consummation of [DHS'] decisionmaking process"—as confirmed by its implementation, and it indisputably determines "rights or obligations" and gives rise to "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Pls.' Mem. 45-46. Defendants never suggest otherwise, instead merely attempting to downplay this change by suggesting that only the speed of queries has changed. Defs.' Mem. 37. But speed has nothing to do with it—whether queries of the newly compiled data take seconds or weeks, it was final agency act to collect, centralize, and make available those data. Pls.' Mem. 45-46.

The DHS-SSA SAVE Agreement is final agency action for largely the same reason. Defendants characterize the agreement as simply "memorializ[ing] the agencies' intent to allow SAVE to search on SSA data," Def's. Mem. 37, but it in fact does far more, purporting to authorize—for the first time—sharing of certain information. Among other things, it establishes SSA's obligation to disclose data to DHS, DHS-AR-423, and describes, in mandatory terms, the exact components and parameters of those data, DHS-AR-424-425; *see also* SSA-AR-104 (referring to SSA's "duties" under the agreement). The agreement also prescribes how DHS will maintain those data, DHS-AR-424, and granularly describes the specific data exchanges to which the agencies have agreed, DHS-AR-422-424; *see also* SSA-AR-19 (services agreement that incorporates DHS-SSA SAVE Agreement in defining "scope" and "roles"). These commitments set agency employees' obligations and alter rights of individuals whose data are contained in the various systems to which they apply.

Defendants never squarely dispute that the DHS-SSA SAVE Agreement determines rights and obligations, instead suggesting without elaboration that it should be treated like the agreements

22

challenged in *Centro de Trabajadores Unidos  v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) *("CTU")*, and *Robert F. Kennedy Hum. Rts. v. Dep't of State*, 2026 WL 820811 (D.D.C. Mar. 25, 2026) ("*RFK"*). But those cases are wholly disanalogous. *CTU* does not stand for the proposition, nor could it, that information-sharing agreements categorically are not final agency action. And the specific terms of the agreement in *CTU* are distinguishable. That agreement, which laid out how a process "established by statute" would be carried out, did not constitute a final agency action when the requirements for that process were "consistent with what is plainly contemplated by" statute, and "taken almost word-for-word from a statute," and "thus simply clarify existing duties." *CTU*, 164 F.4th at 1236 (cleaned up). In contrast, the agreement here goes well beyond any statutory requirement—indeed Plaintiffs have demonstrated that the agreement far exceeds an exercise of "statutorily authorized tools." *Id.* (quoting *RFK*, 2026 WL 820811, at *18); *cf., e.g.*, *NRDC v. EPA*, 643 F.3d 311, 319–20 2011 (document that cabined allowable exercise of discretion by agency officials "qualifie[d] as final agency action"). The agreement at issue in *RFK* is disanalogous from the agreement here for the same reasons: the *RFK* agreement told "no party what to do or avoid," 2026 WL 820811, at *18, while the agreement here does almost nothing *besides* tell SSA and DHS what to do and avoid. And whereas in *CTU* the relevant agreement was not legally required for the agencies to take the challenged action, *see* 167 F.4th at 1236 (agreement "merely outlines the process through which" information-sharing can occur), the DHS-SSA SAVE Agreement was a necessary precondition for Defendants' cross-agency data sharing. *See* DHS-421-423 (describing need for agreement in order to implement Elections EO).

Defendants' Modified SORNs are also final agency action. The modifications gave rise to a range of legal consequences, Pls.' Mem. 46. They "alter the legal regime to which the action agency is subject," purporting to "authoriz[e]" DHS and SSA to make disclosures of protected records to one another that the Privacy Act would not otherwise allow. *Bennett*, 520 U.S. at 178; *see also* 5 U.S.C. § 552a(e)(11) (requiring publication of SORN "prior" to new routine use). In response, Defendants theorize that rescinding the modified SORNs would increase the harm to Plaintiffs, presumably because Plaintiffs have argued that Defendants were required to issue them.

Defs.' Mem. 38. This erroneously conflates the final agency action analysis with injury. And Defendants' argument that a proposed SORN modification is not final agency action because it precedes a comment period and consideration of comments has no applicability in a case like this, where, as Plaintiffs have argued from the beginning that the "proposed" modifications were, in fact, predetermined and final from the outset. *See, e.g.*, Compl. ¶¶ 75, 88, 90, 97, 234, 238; Pls.' Mem. 8; *see also Las Ams. Immigrant Advoc. Ctr. v. DHS*, 783 F.Supp.3d 200, 219 (D.D.C. 2025) ("APA's procedural requirements apply to interim final rules, which constitute final agency action while in effect."); *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (agency interim resolution satisfies Clean Air Act's final action standard, which is "coterminous" with APA final agency action standard).

### B.    The SAVE overhaul lacks statutory authorization and affirmatively violates the Social Security Act.

Defendants wrongly argue that two statutes enacted in 1986 and 1996 authorized their transformation of SAVE in 2025. *See* Defs.' Mem. 45-52. It is black letter law that "[f]ederal agencies are creatures of statute. They possess only those powers that Congress confers upon them." *Judge Rotenberg Educ. Ctr. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021). While Defendants fault Plaintiffs for demanding an "extraordinary level of specificity by Congress in directing DHS's work," Defs.' Mem. 52, what is truly "extraordinary" is the authority Defendants claim to have found. DHS insists that these two statutes impliedly grant it the unprecedented and unlimited power to collect, consolidate, disclose, and repurpose hundreds of millions of Americans' sensitive personal data across any federal, state, or local agency for mass "voter verification" and benefits eligibility checks—free of all legal constraints that normally restrict such inter-agency data-sharing. Had Congress intended to confer that remarkable power on DHS or any other agency, it would have done so "clearly and expressly." Pls.' Mem. 30. Congress has done no such thing.

24

### 1. The Immigration Reform Control Act of 1986 does not authorize the SAVE overhaul.

Plaintiffs have explained the plain text of SAVE's authorizing statute—the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (1986), *codified at* 42 U.S.C. § 1320b-7 note—only authorizes a "system" for "verifying" the "immigration status" of "aliens" for "benefits" and cannot authorize the SAVE overhaul. *See* Pls.' Mem. 3, 26; 42 U.S.C. § 1320b-7(d) (section titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs"). Defendants retort that IRCA's direction that DHS "implement a system for the verification of immigration status" broadly authorizes a system that compiles vast troves of information on *U.S. citizens*—including millions of Americans who have never interacted with the immigration system—to verify citizenship status. Defs.' Mem. 46-47 (quoting IRCA). It does not. IRCA's text is crystal clear that "immigration status" refers solely to *non-citizens*, and SAVE was never meant to be used on U.S. citizens.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (cleaned up). Defendants violate this directive out of the gate by (repeatedly) omitting key language from the IRCA that specifies the "system" (SAVE) is only "for the verification of immigration status *under paragraphs (3) and (4)(B)(i) of section 1137(d) of the Social Security Act* [42 U.S.C. 1320b-7(d)(3), (4)(B)(i)]." 42 U.S.C. § 1320b-7 note (emphasis added). *See* Defs.' Mem. 1, 3, 5, 44-47 (quoting statute but omitting emphasized text).

Paragraphs 1320b-7(d)(3) and (4)(B)(i), in turn, appear in a section of the IRCA requiring states to establish "an income and eligibility verification system" for recipients of certain government benefits. 42 U.S.C. § 1320b-7(a). As part of that "system," states must obtain from benefit applicants a sworn statement declaring "whether the individual is a citizen or national of the United States, and, if that individual is *not* a citizen or national of the United States, that the individual is in a satisfactory immigration status." *Id.* § 1320b-7(d)(1)(A) (emphasis added). If and

25

only if "such an individual is *not* a citizen or national of the United States," the person must provide proof of "a satisfactory immigration status," such as DHS documents containing "the individual's alien admission number or alien file number." *Id.* § 1320b-7(d)(2)(A)-(B) (emphasis added).

Here is where SAVE comes in: for those *non-citizens* who provide proof of "satisfactory immigration status" as required by § 1320b-7(d)(2), the statute directs the state to "utilize the individual's alien file or alien admission number to verify with [DHS] the individual's immigration status through an automated or other system"—*i.e.*, SAVE—"that—(A) utilizes the individual's name, file number, admission number, or other means permitting efficient verification, and (B) protects the individual's privacy to the maximum degree possible." *Id.* § 1320b-7(d)(3). The statute also provides protections for "an individual who is not a citizen or national of the United States" and who fails to provide proof of "satisfactory immigration status" or whose immigration status cannot be verified using SAVE. *Id*.

Thus, the IRCA only authorizes a "system for the verification of immigration status *under . . . []42 U.S.C. 1320b-7(d)(3), (4)(B)(i)[]*" to be used on an "individual [who] is *not* a citizen or national of the United States." *Id.* §§ 1320b-7 note, 1320b-7(d)(2) (emphasis added). Nothing in IRCA authorizes using SAVE on U.S. citizens, let alone accessing, consolidating, and disclosing reams of highly sensitive data on hundreds of millions of U.S. citizens for voter verification or any other purpose. Hence the name "Systematic *Alien* Verification for *Entitlements*."

### 2. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 does not authorize the SAVE overhaul.

Perhaps recognizing the flimsy footing SAVE's authorizing statute provides, Defendants lean heavily on a separate law passed ten years later, 8 U.S.C. § 1373. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 642, 110 Stat. 3009, 707 (1996). *See* Defs.' Mem. 45-49. Defendants incorrectly claim that "§ 1373(c) alone is more than enough to justify" their overhaul of SAVE. *Id.* at 48. Far from it. Section 1373(c) merely says that *DHS* "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the

26

jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). As Plaintiffs have explained, § 1373(c) at most authorizes *DHS* to respond to governmental inquiries to verify individuals' "citizenship or immigration status" by "providing the requested verification or status information" from *DHS's own records*. *See* Pls. Mem. 28-39. It does not authorize DHS to *acquire data from other agencies* such as SSA. Nor does it empower those agencies to *disclose their data* to DHS.[8]

Defendants concede that § 1373(c) lacks "specific statutory language authorizing information-sharing across agencies," while insisting "no such specificity was required." Defs.' Mem. 48. Yet they fail altogether to address Plaintiffs' survey of canons of construction that confirm precisely why such specificity is required. *See* Pls.' Mem. 29-32.

Most notably, Congress demonstrated in a different section of the IIRIRA, creating the E-Verify program, that it knew how to expressly authorize just the type of inter-agency data sharing and matching between DHS and SSA that SAVE now enables. *Id.* at 29-30; *see* Pub. L. No. 104-208, § 404(e)-(f), 110 Stat. 3009, 664-65 (1996), *codified at* 8 U.S.C. § 1324a note (outlining responsibilities of SSA and DHS in operating a "confirmation system" administered by DHS—E-Verify—that verifies information based on SSA and DHS records); *id.* § 404(h) (forbidding use of the system outside of the E-Verify program). That the IIRIRA includes no similar provisions authorizing inter-agency data sharing and matching for SAVE is a "manifestation of a considered congressional judgment." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Congress has further established, through the Privacy Act, its amendments, and other laws, a web of restrictions on inter-agency data sharing and matching and exceptions to those restrictions—none of which create carveouts for § 1373 or SAVE. *See* Pls.' Mem. 30. Congress

---

[8] Plaintiffs' position is not that "SAVE may not be used for purposes of verifying citizenship" or for "voter eligibility checks." *Contra* Defs.' Mem. 47-48. Rather, Plaintiffs' position is that the *IRCA* (SAVE's authorizing statute) does not permit using SAVE for these purposes, and § 1373(c), at most, allows using SAVE for citizenship verification based on DHS's own records. *See* Pls.' Mem. 2 n.2 (defining "SAVE overhaul" as "Defendants' expansion of SAVE in 2025 to allow bulk searches, using non-DHS unique identifiers, of systems of record that are *housed outside of DHS* and include information on U.S.-born citizens." (emphasis added)).

27

has repeatedly disavowed "centralized Federal information systems" that consolidate sensitive information across agencies and endanger fundamental rights. Privacy Act Legislative History, *supra*, at 168, 217, 884; *see also* Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514, *codified at* 5 U.S.C. § 552a note (expressly disavowing that amendments authorized the "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies"; the "direct linking of computerized systems of records maintained by Federal agencies"; or "the computer matching of records not otherwise authorized by law").

Against this backdrop, Defendants' boundless reading of § 1373(c) (and the rest of § 1373) is profoundly implausible. Congress would have spoken clearly and expressly if it meant to authorize a sprawling master registry of U.S. citizens that enables bulk disclosure of millions of Americans' sensitive personal data across thousands of federal, state, local, and even non-governmental entities (including both source agencies and SAVE users). *See* Pls. Mem. 8-11. A clear statement is further required given the major separation-of-powers and federalism implications of Defendants' efforts to nationalize voter list maintenance through a new mass "voter verification" system. *See* Pls.' Mem. 33 (citing cases); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'"); *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.").

Recognizing that nothing in § 1373(c) vests disclosure authority in SSA or any other non-DHS agency, Defendants resort to §§ 1373(a) and (b). Defs.' Mem. 49. But those get Defendants nowhere; both are framed in purely *prohibitory* terms, and, by definition, a *prohibition* does not *authorize* action. *See* Pls.' Mem. 27-28; *see also* 8 U.S.C. § 1373(a) ("may not prohibit, or in any way restrict . . ."); *id.* § 1373(b) ("no person or agency may prohibit, or in any way restrict . . ."). Defendants have no response to that plain text argument, endorsed in an Office of Legal Counsel

opinion by then-Acting Assistant Attorney General Randolph D. Moss. *See* Pls.' Mem. 28 & n.10. Tellingly, Defendants have found not a single case of a court reading *prohibitory* statutory text to confer *affirmative* power on a federal agency. *Compare id.* at 28 *with* Defs.' Mem. 49.

Defendants provide an irrelevant recitation of non-delegation principles. *See* Defs.' Mem. 51-52. But Plaintiffs' position is that constitutional avoidance principles caution against accepting DHS's (already implausible) reading of § 1373, since accepting that reading would give DHS the unbounded and undefined authority to do whatever it wants—"notwithstanding any other provision of . . . law"—whenever it is responding to requests for "citizenship and immigration status" data from federal, state, and local agencies.

The implications of Defendants' newfound reading of § 1373 are absurd and dangerous. It would allow DHS to run roughshod over all manner of federal laws when taking actions relating to "citizenship and immigration status" data. In this case alone, Defendants have asserted that § 1373 supersedes critical safeguards of the Privacy Act and the Social Security Act. *See* Defs.' Mem. 34, 49-50; Defs.' PI Opp. at 2, ECF 37. What's next? Will DHS say § 1373 authorizes it to create a public website disclosing every Americans' personal "citizenship and immigration status" information for SAVE users and the rest of the world to see? And what about the agreements that purportedly restrict how DHS and SAVE users handle SAVE data—how could those agreements be enforceable if § 1373 prohibits any governmental action that restricts the flow of "citizenship or immigration status" data to and from DHS? The possibilities are both endless and alarming.

> **3.    The major questions doctrine confirms that the SAVE overhaul lacks statutory authorization.**

The "major questions doctrine" leads to the same conclusion. Defendants do not refute that this case meets three criteria of that doctrine. *See* Pls.' Mem. 30-32 (lack of historical precedent, dramatic increase in affected population, intrusion on state-law domain). Instead, they seize on factual differences between this case and prior "major questions" cases. But "major questions cases 'have arisen from all corners of the administrative state.'" *Biden v. Nebraska*, 600 U.S. 477, 505

(2023) (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (discussing cases)). The lack of a direct factual analogue only confirms the unprecedented nature of Defendants' actions.

Defendants created an unprecedented, unreliable inter-agency system for mass "voter verification" and benefits eligibility checks imperiling millions of Americans' voting and privacy rights. To do so, they claimed "unheralded" authority they "discover[ed]" in 2025 in "long-extant statute[s]" passed in 1986 and 1996. *West Virginia*, 597 U.S. at 724. The federal government's gargantuan misuse of personal data in ways that burden the fundamental right to vote and create substantial new privacy and data-security risks are "major questions" of "vast . . . political significance," *see id.* at 716, for the hundreds of millions of Americans whose personal information Defendants are misusing *en masse*. *See* Pls.' Mem. 13-22.

### 4. Defendants' unauthorized disclosures violate the Social Security Act.

Defendants acknowledge that the "information-sharing at issue here" would violate a provision of the Social Security Act, 42 U.S.C. § 1306(a)(1), if (as Plaintiffs assert) Defendants lacked authority for the SAVE overhaul under the IRCA or § 1373. *See* Defs.' Mem. 49.

But Defendants wrongly claim that 42 U.S.C. § 405(c)(2)(C)(viii)(I) is inapplicable because it only covers information "obtained or maintained . . . pursuant to any provision of law enacted on or after October 1, 1990." While Defendants assert that SAVE is obtaining and maintaining SSA data pursuant to the pre-1990 IRCA, the record and other parts of Defendants' brief make abundantly clear that their expansion of SAVE truly hinges on their misreading of § 1373 (enacted in 1996). Pls.' Mem. 30. Maintaining protected SSA data "pursuant to" § 1373 without separate statutory authorization violates § 405(c)(2)(C)(viii)(I).

Defendants argue that, in any conflict between § 1373 and § 405(c)(2)(C)(viii)(I), § 1373 as the "more specific, later-enacted statute . . . must prevail." Defs.' Mem. 49-50. Defendants get this backwards, ignoring the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other,

30

bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Id.*; *see also Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 306 (D.C. Cir. 2014) (courts may "not infer a statutory repeal unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all"). Defendants cannot meet this "heavy burden." Plaintiffs' reading of §§ 1373(a) and (b) as *prohibitions* on restricting *otherwise-authorized* data-sharing (rather than affirmative grants of data-sharing authority superseding other laws) easily harmonizes the statutes.

Lastly, Defendants offer a red herring, asserting that Plaintiffs lack a "private cause of action" under the Social Security Act. Defs.' Mem. 50 (citing cases). But Count One of the FAC is brought under the APA. *See* FAC ¶¶ 196-205. Plaintiffs do not bring any "private cause of action" directly under the Social Security Act. The cases Defendants cite are thus inapposite.

In the end, Plaintiffs' position is best summed up by an admission that remains on SSA's website to this day: SSA "do[es] not have the legal authority to disclose information about U.S. citizens to DHS. If DHS requests information and we determine the information pertains to both U.S. citizens and aliens, only information about the aliens can be disclosed." SSA, Program Operations Manual System ("POMS"), *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023), https://perma.cc/PE44-2QBK; *accord* SSA, POMS, *GN 03313.095 Disclosure to the Department of Homeland Security (DHS)* (2025), https://perma.cc/NU3K-J2XD.[9]

---

[9] Defendants fail to respond to (and thus concede) Plaintiffs' argument that SSA is far exceeding even its own claimed authority under § 1373 by disclosing more than just "citizenship and immigration status" data through SAVE, but also individuals' SSNs, names, dates of birth, and death indicators. Pls.' Mem. 29. Nor do Defendants dispute that, under SSA policy, unauthorized "verification" of protected SSA information is tantamount to an unauthorized "disclosure." *Id.* at 15 n.7. These points are conceded. *See Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) ("if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded").

### C.  The SAVE overhaul violates the separation of powers.

Plaintiffs' separation-of-powers claims is not—as Defendants wrongly argue—duplicative of Plaintiffs' statutory authority claim. *Cf.* Defs.' Mem. 53. Although Defendants omit the relevant language in quoting Plaintiffs' brief, Plaintiffs made clear that their separation-of-powers claim asserts that Defendants have not merely *exceeded* their statutory authority, but rather "acted with a 'total absence of authority from Congress *in a domain that the Constitution assigns to Congress and the States*.'" Pls.' Mem. 34 (quoting *LULAC II*, 2026 WL 252420, at *5) (emphasis added); *cf.* Defs.' Mem. 53 (omitting emphasized text). It is Defendants' usurpation of powers that the Constitution *expressly delegates* to Congress and the States that undergirds Plaintiffs' separation-of-powers claim, and that differentiates it from a garden-variety statutory authority claim. *See LULAC II*, 2026 WL 252420, at *26 (addressing similar claim).

Defendants find no support in *Dalton v. Specter,* 511 U.S. 462 (1994) and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). Plaintiffs do not "'simply alleg[e]'" that Defendants "'exceeded [their] statutory authority,'" but rather claim that Defendants lacked *both* "statutory authority" *and* "any background constitutional authority" to overhaul SAVE. *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) (quoting *Dalton*, 511 U.S. at 473); *see also LULAC II*, 2026 WL 252420, at *26 (similar reasoning in sustaining separation-of-powers challenge to Elections EO). Moreover, *Dalton* and *Global Health* concerned whether plaintiffs had an equitable "cause of action to bring [a] *freestanding* constitutional claim," *Global Health*, 153 F.4th at 17 (emphasis added), so they have no bearing on Count Two of the FAC, which asserts a separation-of-powers claim *under the APA*. *See* FAC ¶¶ 206-14. This distinction matters. *See Global Health*, 153 F.4th at 16 (distinguishing *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013), which "involved a writ of mandamus under the APA to compel federal officers to perform a statutory duty unreasonably withheld rather than a constitutional cause of action").

Defendants concede Plaintiffs have "at least attempt[ed] to raise a genuine constitutional claim" that Defendants violated the principle "that only the States—not Congress, and certainly not the President—may decide who is qualified to vote in federal elections." Defs.' Mem. 53

(quoting *LULAC II*, 2026 WL 252420, at *42). But they wrongly argue that "none of the actions challenged here involve . . . any effort to 'decide who is qualified to vote.'" *Id.* The record is replete with documents demonstrating that overhauled SAVE directly and pervasively inserts Defendants—Executive Branch agencies—in the state-run process of verifying whether registered voters are U.S. citizens qualified to vote. For example, the DHS SAVE SORN states: "This modified SORN is being published . . . to clarify use of SAVE for *voter verification*." DHS-AR-115 (emphasis added); *see also id.* at 117 (updating term "voter verification" in DHS SAVE SORN "to include verification of U.S. citizens by birth through Social Security number matching"). Similarly, nearly every document in the record describing the SAVE overhaul makes clear Defendants' purpose was to facilitate using SSA and other agency records for mass "voter verification" and "voter list maintenance."[10] Because *no* authority—nothing in the Constitution or any statute—empowers Defendants to transform SAVE into a sprawling new inter-agency system for verifying whether someone "is qualified to vote in federal elections," *LULAC II*, 2026 WL 252420, at *42, the SAVE overhaul violates the separation of powers.

Defendants also wrongly dismiss the relevance of *LULAC's* separation-of-powers analysis. *See* Defs.' Mem. 54. While that analysis concerned different provisions of the Elections EO than those invoked to justify the SAVE overhaul, the court's analysis is nonetheless relevant here insofar as both cases involve Defendants' actions to unlawfully usurp the States' and Congress's powers over elections and voter qualifications. Moreover, despite Defendants' attempts to minimize the Elections EO's relevance, there is no dispute that Defendants overhauled SAVE *pursuant to* the Elections EO. *See* Pls.' Mem. 5-6 (citing provisions of the Elections EO directing DHS and SSA to make available their databases to "State and local election officials" for the purpose of "identify[ing] unqualified voters registered in the states"). The foundational documents

---

[10] *See, e.g.*, DHS-AR-84; DHS-AR-224; DHS-AR-246, 248, 253, 257, 258, 259, 276, 277, 280, 282, 288, 290, 295, 299, 300, 301, 318, 319, 322, 324; DHS-AR-1375, 1378, 1381, 1383; DHS-AR-1387; DHS-AR-1395; DHS-AR-1462; DHS-AR-1479; DHS-AR-1524-1527, 1528-1531; DHS-AR-1532-1535; SSA-AR-1; SSA-AR-7, 9; SSA-AR-42; SSA-AR-54; SSA-AR-101; *see also generally* DHS-AR-505-1328.

33

for the SAVE overhaul all expressly invoke the Elections EO. *See id.* at 5-7 (citing record); *see also, e.g.*, DHS-AR-421 (DHS-SSA SAVE Agreement); DHS-AR-224-225 (2025 SAVE PIA); DHS-AR-116 (2025 SAVE SORN); *see also* DHS-AR-84, 449, 452; SSA-AR-25.

### D.      The SAVE overhaul was contrary to the Privacy Act.

#### 1.      Plaintiffs have an APA remedy for the Privacy Act violations alleged in Counts 4, 5, and 7.

Defendants' arguments that this Court may not grant relief under the APA for agency action that violates the Privacy Act are foreclosed by precedent and inconsistent with the Supreme Court's guidance about the availability of APA review.[11]

Defendants wave away Supreme Court language clearly contemplating APA relief for Privacy Act violations as "unexplained dicta," and dismiss controlling D.C. Circuit precedent that APA injunctive relief is available to remedy Privacy Act violations because, in Defendants' view, the D.C. Circuit arrived at that conclusion to "avoid[] the need to resolve a difficult" constitutional issue. Defs.' Mem. 42 n. 10 (criticizing *Doe v. Chao*, 540 U.S. 614, 619 n. 1 (2004) and *Doe v. Stephens*, 851 F.2d 1457, 1460-61 (D.C. Cir. 1988)). But Defendants don't meaningfully distinguish *Doe v. Stephens* or explain why the D.C. Circuit's decision there should not control this case. And, as Plaintiffs noted in their opening brief, courts in this District have repeatedly held that APA review of Privacy Act violations *is* available in these and similar circumstances. *See, e.g.*, *LULAC II*, 2026 WL 252420, *51-52 (APA remedy to challenge SAVE overhaul); *AFL-CIO v. Dep't of Lab*, 778 F. Supp. 3d 56, 81 (2025) (DOGE data access).

Defendants then argue that "the general rule" is that "where an agency action is subject to review in some manner under a separate statutory scheme … that action must be reviewed within the confines of that scheme." Defs. Mem. at 39. They cite no authority for this statement, which flips on its head "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. Of Fam. Phys.*, 476 U.S. 667, 670 (1986). *That* general rule may be

---

[11] Defendants wrongly argue that Plaintiffs' arbitrary-and-capricious claim (Count Six of the FAC) is also "predicated on Privacy Act violations." It is not. *See infra* § II.E.

overcome, and APA review restricted, "only upon a showing of clear and convincing evidence of a contrary legislative intent." *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (cleaned up). Such evidence may come from "the purpose of [a statute], the entirety of its text, and the structure of review that it establishes." *Fausto*, 484 U.S. at 444. Where an alternative remedial scheme offers relief "of the same genre" to relief a plaintiffs may seek under the APA, courts may find that Congress intended to preclude APA review of a plaintiff's claims; but APA review will not be precluded by a remedial scheme that offers "only doubtful and limited relief." *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (cleaned up).

The purpose and contemporaneous history of the Privacy Act, its structure, and subsequent legislative history all make it impossible for Defendants to show "clear and convincing evidence of a … legislative intent" to preclude APA review of all Privacy Act violations. *El Rio Santa Cruz,* 396 F.3d at 1270 (cleaned up). The Privacy Act's purpose was to create new "safeguards for an individual against an invasion of personal privacy" by federal agencies. Privacy Act of 1974 §§ 2(b), 2(b)(4), 88 Stat. 1896 (1974), *codified at* 5 U.S.C. § 552a note. Nothing about the Act's structure or history suggests its true purpose was to curtail or *limit* judicial review under the APA. *Cf, e.g.*, *Fausto*, 484 U.S. at 444-45, 451 (statutory scheme impliedly precluded APA review because Congress's intent to replace and streamline a haphazard pre-existing remedial scheme would be undermined by allowing pieces of the pre-existing remedial scheme to persist).

Contemporaneous history shows the Act was not understood to displace APA review. The Privacy Act requires the Office of Management and Budget ("OMB") to develop implementation guidelines, 5 U.S.C. § 552a(v)(1), which OMB did the year after the Act passed. OMB, *Privacy Act Implementation: Guidelines and Responsibilities*, 40 Fed. Reg. 28948 (July 9, 1975), https://perma.cc/776J-4L46.[12] OMB's guidelines explain that "an individual may have grounds for

---

[12] As previously explained, OMB's "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," are "especially useful in determining the [Privacy Act's] meaning," and the D.C. Circuit has relied on OMB's guidelines in construing the Privacy Act. Pls.' Mem. 36 (citing cases). Defendants do not dispute this and likewise rely on OMB guidelines as authoritative interpretive tools. *See* Defs.' Mem. 43, 57 & n.13, 58.

action under other provisions of the law in addition to those provided" by the Privacy Act, including "seek[ing] judicial review under other provisions of the Administrative Procedure Act." *Id.* at 28968.

Subsequent legislative history confirms that when Congress wishes to make the Privacy Act's remedies exclusive, it does so expressly. In the Judicial Redress Act of 2015, Congress extended the Act to cover foreign citizens or regional economic organizations. Pub. L. 114-126, 130 Stat. 282, 283, 284, 5 U.S.C. §§ 552a note, 2(a), 2(c), 2(h) (2016). For *only* this category of newly covered persons, the 2015 Act provides that "[t]he remedies set forth" by the Privacy Act "are the exclusive remedies available to a covered person under this section." *Id.* § 2(b). Because Congress *explicitly* precluded non-Privacy Act remedies for only one category of person, preclusion should not be *implied* for others not mentioned. *See City & Cnty of S. F. v. EPA*, 604 U.S. 334, 344 (2025) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *Fausto*, 484 U.S. at 448 (such differences are a presumptive "manifestation of a considered congressional judgment").

Beyond the evidence that Congress did not intend to preclude APA review, the statutory scheme also does not provide adequate relief to the Plaintiffs in this case. Defendants concede that the Privacy Act offers *no* relief by its own terms to organizations. Defs.' Mem. 40. Nor do Plaintiffs seek relief in the "same genre" as the remedies offered by the Privacy Act. *Garcia*, 563 F.3d at 522 (cleaned up). Plaintiffs broadly seek (1) vacatur of the SAVE Overhaul, (2) directions to SAVE user agencies to delete, disentangle, and unlink data unlawfully pooled and shared with them through the overhauled SAVE system, and (3) publication of matching agreements and an opportunity to comment on them as required by the Privacy Act. *See* FAC at 73. None of these remedies are available to plaintiffs under the Privacy Act.

Indeed, while Defendants cite a number of cases in which courts have declined to allow APA claims to proceed for violations of the Privacy Act, they reinforce Plaintiffs' argument—in all but one, Plaintiffs sought relief that was clearly otherwise available to them under the Privacy

36

Act or the Freedom of Information Act. *See* Defs.' Mem. 41 (collecting cases about individuals seeking amendment, removal, deletion, or production of individual personal records).[13]

If Plaintiffs were relegated to the Privacy Act's limited set of remedies,  LWV's members would face ongoing burdens on their right to vote, including potentially outright disenfranchisement, which cannot be redressed by damages. *See supra* § I.B.4; *cf also*, *e.g.*, *Newby*, 838 F.3d at 9 (after an election, "there can be no do over and no redress") (cleaned up). Plaintiffs' members also would have no recourse for ongoing privacy-related injuries, *see supra* § I.B.2. Privacy injuries are "non-monetary" injuries "not fully redressable by damages alone." *Richman v. United States*, 350 F.R.D. 401, 420 (D.D.C. 2025); *see also AFSCME v. SSA*, 778 F. Supp. 3d 685, 778 (D. Md. 2025) (*vacated on other grounds* 2026 WL 969670 (4th Cir. Apr. 10, 2026)) ("Money damages cannot rectify this invasion of privacy of plaintiffs' members") (collecting cases). The Privacy Act does not require these individuals to continue to face these harms due to the government's ongoing legal violations.

Finally, Plaintiffs have suffered direct organizational injuries due to Defendants' Privacy Act violations. *See supra* § I.A, C, D. Because these organizations are not "individuals" within the meaning of the Act, the Privacy Act does not offer them any (let alone any adequate) remedy at law. *See* 5 U.S.C. §§ 552a(a)(2), (g)(1)(D). But the APA provides such relief.

### 2.    The SAVE overhaul was contrary to the Privacy Act's substantive restrictions.

Defendants violated the Privacy Act's substantive restrictions in two respects: (1) improperly disclosing and repurposing records in bulk in violation of 5 U.S.C. § 552a(b) and §

---

[13] The only exception is *Tripp v. DOD*, where an individual was able to press Privacy Act claims for wrongful disclosure of her personal records to a FOIA requester, but could not bring an overlapping APA claim for failure to treat her records as exempt. 193 F. Supp. 2d 229, 234-36, 238-39 (D.D.C. 2002). But Tripp was an individual who could obtain, and did in fact seek, relief under the Privacy Act's remedial scheme. She appears to have settled her claims for monetary damages, which are available to Privacy Act plaintiffs under 5 U.S.C. § 552a(g)(4), and there is no indication she sought any relief that was not available under the Act. *See Tripp's Privacy Act suits settled for $595,000*, Reps. Comm. for the Freedom of the Press (Nov. 4, 2003), https://perma.cc/UPW4-Z7Q4.

37

552a(a)(7), and (2) enabling SAVE to maintain records that Defendants admit are inaccurate, untimely, and incomplete for use in determinations about individuals, contrary to §§ 552a(e)(5), (6), and (10). *See* Pls.' Mem. 35-38. Apart from their global objection to seeking APA relief for Privacy Act violations, Defendants do not respond at all to the second claim, *see* Defs.' Mem. 54-59, so the Court should deem it conceded. *See Texas*, 798 F.3d at 1110; Local Civ. R. 7(b).

Regarding the first claim, Defendants do not address (and thus concede) Plaintiffs' argument that bulk inter-agency disclosures made through SAVE for "voter verification" checks do not fit 12 of the 13 statutory exceptions to the Privacy Act's general prohibition on disclosures of individuals' records without their consent. *See* 5 U.S.C. § 552a(b); Pls.' Mem. 37 & n.17. The only § 552a(b) exception that Defendants invoke is (b)(3), which permits disclosures pursuant to a properly noticed "routine use." 5 U.S.C. § 552a(b)(3). In construing the routine use exception, Defendants agree with Plaintiffs that OMB's Privacy Act guidelines are authoritative under 5 U.S.C. § 552a(v). *See* Pls.' Mem. 36; Defs.' Mem. 57 & n.13.

In invoking the routine use exception, Defendants recycle their meritless statutory authority arguments, *see* Defs.' Mem. 57, which fail for the reasons above, *see supra* § II.B. They next wrongly claim that their dramatic repurposing of millions of Americans' SSA data satisfies the Privacy Act's compatible-use requirement for routine uses. 5 U.S.C. § 552a(a)(7). But Defendants fail to substantively engage with Plaintiffs' arguments as to *why* SSA collects citizenship data in the first place (*i.e.*, for work authorization and eligibility for SSA benefits); why it is not suitable to verify current U.S. citizenship status; and why SSA's repurposing of millions of Americans' data violated § 552a(a)(7) and OMB's Guidelines. *See* Pls.' Mem. 36-37. Defendants fail even to acknowledge many data elements SSA is disclosing *en masse* through SAVE, including citizenship status indicators, foreign born indicators, and dates of birth. *See* Pls.' Mem. 9.

Defendants address just one data element shared by SSA through SAVE: SSNs. Defendants wrongly claim SSNs are merely the government's way of keeping track of us and can be freely exchanged across government agencies. Defs.' Mem. 58-59. But here again, Defendants' position flies in the face of longstanding SSA policy that "the SSN is one of the most sensitive pieces of

personal information in our records." SSA, POMS, *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023), https://perma.cc/PE44-2QBK. In contrast to what SSA argues in this Court, the agency promises the American public that "[w]e only disclose [or verify] an SSN in narrow circumstances in which we have legal authority and where we are able to identify the true number holder." *Id.*; *see also id.* ("In order for us to disclose the SSN, the statute must *specifically mandate* that SSA disclose SSNs." (emphasis added)).

Defendants balk at Plaintiffs' discussion of the reasons *state and local* officials originally collected the data before uploading it into SAVE. *See* Defs.' Mem. 59 n.14. Yet Plaintiffs pointed to those reasons not to hold Defendants responsible for state officials' conduct, *cf. id.*, but to further illustrate how *Defendants* repurposed the data far beyond the original reasons it was collected. Pls.' Mem. 37. The compatible-use requirement of § 552a(a)(7) demands precisely that analysis. *See Covert v. Herrington*, 667 F. Supp. 730, 738-39 (E.D. Wash. 1987) (552a(a)(7) requires courts considering a "two-fold disclosure" across agencies to compare purpose of disclosure with purpose for which the information was originally "collect[ed] *from the person providing the information*" (emphasis added)), *aff'd on other grounds*, 876 F.2d 751 (9th Cir. 1989).

### 3. Plaintiffs' notice-and-comment claim is not moot and Defendants have conceded Plaintiffs' merits arguments.

In response to the original Complaint, Defendants published Modified SORNs and solicited public comment, prompting Plaintiffs to file the FAC. But in the Modified SORNs, Defendants introduced a new procedural error: they *predetermined* they would not consider public comments on the Modified SORNs and failed to pause the already-operational new routine uses pending their consideration of comments. Pls.' Mem. 39-40. Count Five of the FAC asserts that these actions violated the Privacy Act's procedural requirements. *See* FAC ¶¶ 227-35.

Defendants mischaracterize this claim as "essentially the same notice-and-comment claim" pleaded in the original Complaint that was rendered moot by Defendants' belated "corrective action" of "publishing revised SORNs and soliciting comments." Defs.' Mem. 34. But Defendants misconstrue both Plaintiffs' claim and the Privacy Act's requirements. In contrast to the original

Complaint, the FAC no longer seeks relief relating to Defendants' *failure to publish* Modified SORNs. *Compare* Compl., Prayer for Relief ¶ 3.e *with* FAC, Prayer for Relief. Rather, Plaintiffs' claim is that Defendants violated 5 U.S.C. § 552a(e)(11) "by predetermining they would not consider public comments on the Modified SORNs" and then failing, in fact, to consider those comments. *See* Pls.' Mem. 39-40. That claim is not moot and will not become moot until Defendants *actually consider* the thousands of public comments on the Modified SORNs, which the record confirms they have failed to do. *Compare* Pls.' 39-40 *with* Defs.' Mem. 59.

Defendants wrongly assert that the Privacy Act only requires them to "*solicit*[] comments for 30 days" without actually *considering* any comments received or delaying any new routine uses pending consideration of comments. *See* Defs.' Mem. 34 (emphasis added); *see also id.* at 43. But the SORN notice-and-comment process is not some empty formality; it is "an essential component of the [Privacy] Act and an essential piece of American democracy." *United States v. Weber*, 2026 WL 118807, at *18 (C.D. Cal. Jan. 15, 2026); *accord LULAC II*, 2026 WL 252420, at *55. OMB's Privacy Act guidelines make clear that "§ 552a(e)(11) requires agencies to both provide advance notice before using systems in new ways and meaningfully consider public comments received." Pls.' Mem. 39; *see* 40 Fed. Reg. at 28966 ("Agencies should furnish as complete an explanation of the routine uses and *any changes made or not made as a result of the public comment as possible* so that the public will be fully informed of the proposed use. . . . This notice should be published sufficiently in advance of the proposed effective date of the use to permit time for the public to comment *and for the agency to review those comments*.") (emphasis added); OMB Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, at 7, 12 (2016), https://perma.cc/N9QK-SDLE ("OMB Circular A-108") ("If an agency receives public comments on a published SORN, the agency *shall review the comments* to determine whether any changes to the SORN are necessary.") (emphasis added). Defendants flouted the directive that they "shall review" public comments by preemptively declaring in both Modified SORNs that new routine uses would automatically take effect after 30 days, notwithstanding any public comments. *See* DHS-AR-115; SSA-AR-207.

40

Defendants' reliance on *LULAC II*, 2026 WL 252420, at *53, is unavailing. *See* Defs.' Mem. 36. The *LULAC II* plaintiffs' claims for injunctive relief were limited to Defendants' failure to publish Modified SORNs, and they did not challenge Defendants' decision not to consider public comments. *Id.* at *54. Moreover, the *LULAC II* court further held that the plaintiffs' claim for *declaratory* relief was not moot, and entered a declaratory judgment instructing that, "in the course of implementing Sections 2(b) and 3(a) [of the Elections EO]," DHS and SSA "must strictly adhere to the mandates of the Privacy Act," including the requirement of a 30-day notice and comment window for any new or intended routine uses. *Id.* at *55. Thus, Defendants' own authority underscores that Plaintiffs' request for declaratory relief is not moot.

Finally, Defendants offer no argument whatsoever on the merits of Count Five. *Compare* Pls.' Mem. 38-40 *with* Defs.' Mem. 59. The Court should therefore deem Plaintiffs' merits arguments conceded. *See Texas*, 798 F.3d at 1110; Local Civ. R. 7(b).

### 4. Defendants failed to comply with the Privacy Act's requirements for computer matching programs.

Defendants argue that they need not publish computer matching agreements related to the SAVE system for three reasons, none of which are persuasive.

Defendants' primary argument is that DHS takes the position that "'front-end' single record verification queries are not covered by this part of the Privacy Act," so because overhauled SAVE is structured as a single record verification system, DHS need not publish a computer matching agreement under 5 U.S.C. § 706(1) or mandamus. Defs.' Mem. 60-61. But this position is untenable. The distinction between the use of systems of record for "front-end single record verification queries" versus other types of matching that Defendants imagine appears nowhere in the text of the Privacy Act, nor do Defendants cite to any caselaw to support it. If the Privacy Act leaves any ambiguity on this point, this Court should conclude that "the best reading of the statute" is that overhauled SAVE falls within the Privacy Act's definition of a matching program. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

Recall that the Privacy Act defines a matching program, in relevant part, as a "computerized comparison of two or more automated systems of records or a system of records with non-Federal records for the purpose of establishing or verifying the eligibility of … applicants for, recipients or beneficiaries of … Federal benefit programs." 5 U.S.C. § 552a(a)(8)(A)(i)(I).

Defendants do not dispute that the SAVE system accesses records from two or more automated systems of records at DHS and SSA, then performs a computerized comparison of those records to verify individuals' eligibility for benefits programs. Instead, they say the SAVE system is not a matching program because the next step performs "individual verification of one individual record at a time." Defs.' Mem. 61 n.15. Defendants seem to believe that because SAVE requires users to input the individual verification requests before SAVE performs verification, that it is not a "matching program." But this distinction is nowhere to be found in the text of the Privacy Act. Indeed, it would be a strange result; the Privacy Act's matching programs provisions specifically impose heightened requirements on efforts to compare individuals' records across multiple systems to verify eligibility for federal programs, *see* 5 U.S.C. § 552a(a)(8)(A)(i)(I); it is difficult to conceive of a reason Congress would have intended to exclude certain programs from this definition based on whether they are triggered by the inputting of an individual's name to check their eligibility. That is, after all, perhaps the most intuitive way to design a matching program.

Lest there be any doubt, the Privacy Act's definition of "matching programs" already contains a long list of exclusions from the Act's requirements for matching programs. *Id.* § 552a(a)(8)(B)(i)-(x). This list of exclusions includes certain person-by-person individualized matches of records—*i.e.*, what Defendants call "single-record verification queries." *See id.* If these types of "single-record verification queries" were not presumptively matching programs to begin with, Congress would have no need to specifically exclude them. Defendants do not argue that SAVE falls into any of these enumerated exclusions, or that SAVE even resembles any of them. Because "an item which is omitted from a list of exclusions is presumed not to be excluded," *Qi-Zho v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995), this Court should decline Defendants' invitation to adopt a new unwritten exclusion from the Privacy Act's matching program definition.

42

Strangely, Defendants proffer only secondhand evidence of DHS's position, citing a GAO report from 2014 surveying agencies' varying approaches to managing computer matching programs. Defs.' Mem. 60 (citing GAO, GAO-14-44, Computer Matching Act at 15 (2014), https://perma.cc/YMK8-PTD7). Unlike, for example, an agency declaration or memorandum, this report sheds no light on how DHS came to its conclusion. Nonetheless, even that report found DHS's to be a minority position among the agencies it examined. *See* Computer Matching Act at 15 (of the "seven selected agencies… three agencies interpreted the law" as DHS does).

Defendants' final two arguments can be disposed of quickly. Defendants imply that Plaintiffs should not be able to obtain relief because, in Defendants' view, this lawsuit is about "voter-verification" rather than "federal benefit programs." Defs.' Mem. 60. But only EPIC brings claims related to computer matching agreements, and EPIC's mission is not limited to voter protection. EPIC regularly works on the intersection of federal privacy protections and federal benefits programs, *see* Butler Decl. ¶¶ 9 n.7, 11 n.12, and it is undisputed that the overhauled SAVE system will be used for benefits programs. *See*, *e.g.*, DHS-AR-115; Defs.' Mem. 60. EPIC's challenge to Defendants' matching program failures has been clear and properly presented throughout. FAC ¶¶ 186-195, 239-251.

Finally, Defendants argue that the Privacy Act provides EPIC an adequate remedy for the failure to publish matching agreements. Defs.' Mem. 61. But as discussed *supra*, § II.D.1, EPIC is not an individual who can seek relief under the Privacy Act, nor does the Privacy Act offer the remedy EPIC seeks—the publication of statutorily required disclosures.

### E.  The SAVE overhaul was arbitrary and capricious.

Defendants falter out of the gate by mischaracterizing Plaintiffs' arbitrary-and-capricious claim (Count Six) as being based on the Privacy Act. *See* Defs.' Mem. 42-44, 54. It is not. The FAC and Plaintiffs' opening brief make clear that only Counts Four, Five, and Seven are based on violations of the Privacy Act. *See* FAC ¶¶ 218-235, 239-45; Pls.' Mem. 35-40, 44-46. Plaintiffs' arbitrary-and-capricious claim asserts that Defendants violated their separate obligations *under the APA* to engage in "reasoned decisionmaking." Pls.' Mem. 40 (cleaned up).

43

Defendants appear to argue that *any* final agency actions relating to disclosures of protected information or major changes to systems of records are immune from APA arbitrary-and-capricious review. Defs.' Mem. 42. But while the Privacy Act's notice-and-comment requirements are distinct from the APA's rulemaking procedures, *see* Defs.' Mem. 42-43; *supra* § II.D.3, nothing in the Privacy Act gives agencies a free pass to engage in arbitrary decision-making. Far from adding "atextual procedural requirements that Congress declined," *cf.* Defs.' Mem. 43, Plaintiffs faithfully apply the settled rule that "*all* agency actions subject to the Administrative Procedure Act . . . must not be arbitrary and capricious," *Verizon Cal., Inc. v. FCC*, 555 F.3d 270, 273 (D.C. Cir. 2009) (citing 5 U.S.C. § 706(2)(A) (emphasis added)); *see also AFL-CIO*, 2026 WL 879518, at *12-23 (analyzing APA arbitrary-and-capricious claim challenging DOGE data access separately from APA claims based on underlying Privacy Act violations); *Am. Fed. Of Gov't Emps. v. OPM*, 777 F. Supp. 3d 253, 278-282 (S.D.N.Y. 2025) (same, and finding plaintiffs were likely to succeed on arbitrary-and-capricious claim); *New York v. Trump*, 767 F. Supp. 3d 44, 78 (S.D.N.Y. 2025) (same). Defendants' contrary position—that reasoned decision-making was simply "not[]required" here, Defs.' Mem. 43—runs headlong into "the settled proposition[]" that "an agency must 'disclose the basis' of its action" in order "to permit meaningful judicial review." *Dep't of Com.*, 588 U.S. at 780.

Defendants complain that arbitrary-and-capricious review "does not make sense in [the] Privacy Act context" because the Privacy Act does not require a "concise general statement of" an agency action's "basis and purpose" as APA rulemakings do. Defs.' Mem. 54 (quoting 5 U.S.C. § 553(c)). But arbitrary-and-capricious review is not limited to APA rulemakings under 5 U.S.C. § 553(c). Far from it: courts routinely perform arbitrary-and-capricious review of *non-rulemaking* agency actions. *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 12-13, 20-34 (2020) (arbitrary-and-capricious review of DHS Secretary's decision memorandum); *Venetian Casino*, 530 F.3d at 931, 934-35 (arbitrary-and-capricious review of agency disclosure policy).

Moreover, Defendants mischaracterize Plaintiffs' arbitrary-and-capricious claim as being based *solely* on the SORN notice-and-comment process. *See* Defs.' Mem. 42-43. But Plaintiffs

44

challenge *other* final agency actions unrelated to the SORN process, including Defendants' self-described "overhaul" of SAVE and the DHS-SSA SAVE Agreement, both of which predated the Modified SORNs by several months. *See* Pls.' Mem. 45-46; *supra* § II.A. Defendants' arguments about the purported difficulties of requiring reasoned decision-making in the SORN context are thus not only wrong, but also non-responsive to key aspects of Plaintiffs' claim.

In addition to mischaracterizing the nature of Plaintiffs' arbitrary-and-capricious claim, Defendants fail to refute the claim on the merits.

### 1.    Defendants predetermined the outcome.

Contrary to Defendants' assertions, *see* Defs.' Mem. 55, Plaintiffs do not apply the outdated "open minded" test. *See* Pls.' Mem. 40-41. Rather, Plaintiffs invoke the principle that an agency acts arbitrarily and capriciously when it "[pre-]determine[s]" what it will do regardless of countervailing facts or considerations. *Dep't of Com.*, 588 U.S. at 782-85; *see also Miot v. Trump*, 2026 WL 266413, at *29 (D.D.C. Feb. 2, 2026) (agency action which "preordained the result" was arbitrary and capricious), *cert. granted before judgment*, 2026 WL 731087 (U.S. Mar. 16, 2026); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (arbitrary and capricious where agency "merely announced the change as a foregone conclusion, an *ipse dixit* if you will") (Brown Jackson, J.).

On the merits, Defendants do not dispute that they did, in fact, "predetermine[]" they would overhaul SAVE regardless of any countervailing considerations or public comments, and that they reflexively "'acted essentially as a rubber stamp' for the Election EO's directives." Pls.' Mem. 40-41; *cf.* Defs.' Mem. 55 (not disputing); *see also supra* § II.D.3. So this argument should be deemed conceded. *See Texas*, 798 F.3d at 1110; Local Civ. R. 7(b). It is also confirmed by the chronology of events, which shows that Defendants decided they would overhaul SAVE per the Election EO's directives as early as March 2025, and that they consummated the overhaul well before publishing the Modified SORNs in October and November of 2025. *See* SSA-AR-1-5 (March 2025 "Data Exchange Request Form" for voter verification); Press Release, USCIS, *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database* (Apr. 22, 2025),

45

https://perma.cc/Y8A5-YX3M (announcing SAVE overhaul); DHS-AR-420-431 (May 15, 2025 DHS-SSA SAVE Agreement); DHS-AR-114 (Oct. 31, 2025 SAVE SORN); SSA-AR-206 (Nov. 12, 2025 2025 SSA Master File SORN). This type of build-the-plane-while-flying-it approach is the very antithesis of reasoned decision-making.

### 2.    Defendants disregarded relevant factors and adverse evidence.

Under the APA's arbitrary-and-capricious standard, "a lack-of-reasoned-explanation claim . . . ordinarily consists of a more modest claim that the agency has failed to . . . adequately explain its exercise of discretion in light of the information before it." *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017). Here, setting aside whether Defendants had "any obligation *[under] the Privacy Act* to respond to comments in the first place," Defs.' Mem. 55 (emphasis added), the APA separately required them to "explain [their] exercise of discretion *in light of the information before [them].*" *Multicultural Media*, 873 F.3d at 936 (emphasis added). The "information before" Defendants included (1) tens of thousands of public comments opposing the SAVE overhaul, and (2) Defendants' *own prior findings* regarding the serious risks posed by overhauled SAVE's data and methods. *See* Pls.' Mem. 41-43. Defendants do not dispute that the administrative record is devoid of any explanation (much less a *reasoned* explanation) demonstrating their consideration of these salient points. *See* Defs.' Mem. 55-56. Instead, Defendants argue that their mere certification of the administrative record shows they "considered" public comments. *Id.* Not so. An agency's "own ipse dixit . . . is no substitute for reasoned decision-making." *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 200 (D.C. Cir. 2025) (Katsas, J., concurring in part)) (citing *Am. Clean Power Ass'n v. FERC*, 54 F.4th 722, 727 (D.C. Cir. 2022)). Defendants acted arbitrarily and capriciously by refusing to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [their] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com.*, 588 U.S. at 773 (quoting *Motor Vehicle Mfrs. Ass'n of U.S.. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

Defendants suggest the sky will fall if agencies must provide a reasoned explanation in the SORN context, *see* Defs.' Mem. 42-43, but the same OMB guidelines they embrace expressly

46

instruct that "[a]gencies should furnish as complete an explanation of . . . *any changes made or not made as a result of the public comment as possible so that the public will be fully informed of the proposed use*." 40 Fed. Reg. at 28966 (emphasis added). And, critically, Defendants' "modest" burden to provide a reasoned explanation is cabined to "the information before [them]." *Multicultural Media*, 873 F.3d at 936. It is counsel's understanding that SORNs rarely generate high volumes of public comments, and Defendants do not claim otherwise. But in the exceptional circumstances of this case, where Defendants collectively received over *30,000 comments* on the Modified SORNs, *see* Pls.' Mem. 8, it was incumbent on Defendants to provide *some* response. Their failure to do so was arbitrary and capricious.

### 3.    Defendants violated the change-in-position doctrine.

As Plaintiffs explained, Defendants violated the "change-in-position doctrine" by failing to acknowledge or explain significant departures from longstanding agency policy. *See* Pls.' Mem. 43-44. Defendants wrongly claim they did so in press releases and other public documents announcing they were "[o]verhaul[ing]," "revamp[ing]," and "optimiz[ing]" SAVE to "provide a single, reliable source for verifying immigration status and U.S. citizenship." Defs.' Mem. 56. But nothing in those statements "display[ed] awareness" that SSA was fundamentally "changing [its] position" that it does "not have the legal authority to disclose information about U.S. citizens to DHS." Pls.' Mem. 43 (cleaned up). Defendants' general desire to "optimize" SAVE does not explain why SSA was changing a longstanding position on the scope of its statutory authority.

Defendants also "failed to consider … the reasonable privacy expectations of the hundreds of millions of Americans who never consented to their personal data being pooled and repurposed." Pls.' Mem. 44; *see* Nel Decl. ¶ 33; A. Doe Decl. ¶ 23; B. Doe Decl. ¶ 38; C. Doe Decl. ¶ 31. Defendants do not respond to, and thus concede, this point. *See* Defs.' Mem. 56-57.

### III.    Plaintiffs seek appropriate relief.

Defendants' protestations about Plaintiffs' requested relief are meritless. First, Defendants argue that Plaintiffs seek "nationwide injunctive relief" foreclosed by *Trump v. CASA, Inc.* Defs.' Mem. 62 (discussing 606 U.S. 831 (2025)). But Plaintiffs do not seek "nationwide injunctive

47

relief"; Plaintiffs seek vacatur of agency action under 5 U.S.C. § 706, and the publication of statutorily required materials about agency action. *See* FAC at 73-74 (prayer for relief). Defendants acknowledge this, and instead argue that this Court should reach the conclusion that the Supreme Court explicitly *declined* to address in *CASA*. 606 U.S. at 847 n. 10 (the Court declined to extend its holding to APA vacatur); *id.* at 869 (Kavanaugh, J., concurring) (similar). But "*CASA* is *not* a case about the scope of relief for agency review authorized by the APA when it was adopted in 1946." *Make the Road N.Y. v. Noem*, 2025 WL 3563313 at *34 (D.C. Cir. 2025) (statement of Millett and Childs, JJ.). It remains "binding precedent" in the D.C. Circuit that "'when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Id.* at *36 (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).

Defendants then argue that any equitable relief should be tailored to only remedy the "particular violation" or procedural defects the Court identifies. Defs.' Mem. 62. Because Defendants fail to identify which potential relief they believe this principle implicates, Plaintiffs cannot present a specific response. Nonetheless, Plaintiffs note that the APA provides statutory remedies for unlawful agency conduct *distinct* from the background equitable principles implicated by the case Defendants cite. *Id.* (citing *Gill v. Whitford*, 585 U.S. 48, 66 (2018)). While background principles of equity dictate that "equitable relief is ordinarily limited to the parties in a specific case," by enacting the APA, "Congress … depart[ed] from that baseline" to "authorize[] courts to act directly on federal statutes or to prohibit their enforcement against nonparties." *Corner Post*, *Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring). The APA thus allows parties to "obtain relief" that they "would not be able to obtain … through any remedy other than vacatur." *Id.* at 828.

The APA also contemplates that a court may issue "writs of prohibitory or mandatory injunction" in appropriate cases. 5 U.S.C. § 703. Although an injunction is not necessary where it would "not have any meaningful practical effect independent of" vacatur of the challenged agency action, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "an injunction may be

48

warranted if vacatur does not sufficiently redress the plaintiff's injury," *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024) (discussing *Monsanto*, 561 U.S. at 165-66). Under these principles, this Court may supplement vacatur with injunctive relief as necessary to fully remedy Plaintiffs' injuries.

Finally, Defendants argue that a recent settlement agreement DHS chose to execute while this case was ongoing counsels granting relief here. *See* Defs.' Mem. 62-63 (citing *Florida v. DHS*, No. 24-cv-00509, ECF Nos. 30, 31 (N.D. Fla.)). But that settlement is no barrier to relief.

As Defendants' counsel *in this case* has insisted in Texas's own lawsuit over access to SAVE, "the United States cannot contract around legal obligations imposed by federal statutes or the Constitution," nor can it use a settlement to agree to illegal behavior. Defs.' Reply in Supp. of MTD, *Texas v. Noem*, No. 4:24-cv-49-DC-DF, ECF 16 at 3 (W.D. Tex. Feb. 12, 2026). Indeed, the *Florida* settlement agreement is explicit that it does not "impose on Defendants any duty, obligation, or requirement" that "would be inconsistent with the United States Constitution, or with any federal statute." Settlement Agreement, *Florida*, ECF 30-1, ¶ 17. When analogous conflicts between settlements and judicial orders have previously arisen, DOJ's position has been that the government is "not responsible for third parties suing" federal agencies for fulfilling a settlement agreement where such an agreement explicitly limited the government's obligation to perform "to the extent authorized by law." Defs.' Opp. to Pls.' Mot. For Prelim. Injunction, *Def. Distributed v. Dep't of State*, 1:18-cv-637, ECF 155 at 18 (W.D. Tex. May 12, 2021); *see also Washington v. Dep't of State*, 420 F. Supp. 3d 1130 (W.D. Wash. 2019) (vacating agency action contemplated by settlement in W.D. Tex. action). Here, too, the *Florida* settlement by its plain terms cannot impose unlawful obligations on the government. A decision in Plaintiffs' favor by this Court would simply clarify Defendants' statutory and constitutional legal obligations—obligations that were not briefed in the *Florida* case or passed on by that court.

49

It also bears noting that DHS entered into those settlements nearly two months *after* Plaintiffs filed this suit.[14] *See* Compl., ECF 1. And they did so after, as they concede, "the Court expressed concerns about 'the lawfulness of the Government's actions' under the Privacy Act." Defs.' Mem. 4 (quoting *League of Women Voters v. DHS*, 2025 WL 3198960, at *1 (D.D.C. Nov. 17, 2025)). Nonetheless, while this case was pending, DHS settled the *Florida* case (on the same day that the plaintiffs in that case filed their amended complaint), knowing that DHS was committing to actions that this Court may vacate. *See Florida,* ECF 29 (amended complaint filed Nov. 28, 2025), ECF 30 (unopposed motion to dismiss, attaching settlement agreement, filed Nov. 28, 2025). DHS could have sought to stay that litigation pending the disposition of this matter; or DHS could have sought voluntary dismissal after the SAVE overhaul; or it could have argued, as it has in this case, that by taking the action the plaintiffs in those cases sought, DHS had rendered those cases moot. *See* Defs.' Mem. 33-36. Instead, DHS chose to put itself in an "unenviable position" of its own making by choosing to agree to an order in the *Florida* case that it knew would potentially conflict with the outcome of this case. Defs.' Mem. 63 (cleaned up).

Finally, even if this Court were to tailor relief to minimize conflicts for DHS with the *Florida* settlement, Defendant SSA was *not* a party to that case. So an order directing SSA to, for example, end its unlawful sharing of SSA records with DHS, would not subject SSA to any conflicting orders from another court.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss or, in the alternative, for summary judgment.

---

[14] Defendants artfully note the settlement agreement "took place before the filing of the *operative* complaint in this case." Defs.' Mem. 63 (emphasis added). But since Plaintiffs filed the *original* Complaint on September 30, 2025, Defendants have been continuously defending litigation in this Court about whether the SAVE overhaul was unlawful and should be vacated.

Dated: April 24, 2026

Respectfully submitted,

*/s/ Nikhel S. Sus*
Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
Lauren C. Bingham (D.C. Bar No.
90043462)*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org
lbingham@citizensforethics.org

*Counsel for All Plaintiffs*

Aman T. George (D.C. Bar No. 1028446)
Jennifer Fountain Connolly (D.C. Bar No.
1019148)
Johanna M. Hickman (D.C. Bar No. 981770)
Mark B. Samburg (D.C. Bar No. 1018533)
Robin Thurston (D.C. Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
ageorge@democracyforward.org
jconnolly@democracyforward.org
hhickman@democracyforward.org
msamburg@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*

Jon Sherman (D.C. Bar No. 998271)*
Michelle Kanter Cohen (D.C. Bar No.
989164)
Emily Davis (D.C. Bar No. 90020129)
FAIR ELECTIONS CENTER
1629 K St. NW, Suite 300
Washington, DC 20006
(202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
edavis@fairelectionscenter.org

*Counsel for All Plaintiffs*

John L. Davisson (D.C. Bar No. 1531914)
Enid Zhou (D.C. Bar No. 1632392)
Abigail Kunkler (D.C. Bar No. 90030868)
Mayu Tobin-Miyaji (D.C. Bar No. 90033340)
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
davisson@epic.org
zhou@epic.org
kunkler@epic.org

*Counsel for Plaintiff Electronic Privacy
Information Center*

* admitted pro hac vice

51