**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | No. 1:25-cv-03501 (SLS) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
(OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT)**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

STEPHEN M. PEZZI (D.C. Bar No. 995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION..........................................................................................................................1

ARGUMENT ..............................................................................................................................2

I.    PLAINTIFFS LACK ARTICLE III STANDING ...........................................................2

    A.    Several Plaintiffs lack associational standing for failure to identify any member with Article III standing..................................................................... 2

    B.    No Plaintiff has standing to challenge bulk-upload capability. ............................ 4

    C.    All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing.................................................................................. 6

        1.    Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing................................................. 6

        2.    Plaintiffs' alleged voting-related injuries are impermissibly speculative, and neither caused by the federal government nor redressable in this suit................................................................................ 8

        3.    Plaintiffs' diversion-of-resources theory of organizational standing is inconsistent with recent Supreme Court precedent.............................. 12

        4.    EPIC's alleged procedural and informational injuries cannot independently support Article III standing. ............................................. 14

II.    PLAINTIFFS' PRIVACY ACT NOTICE-AND-COMMENT CLAIM (COUNT 5) IS MOOT....... 16

III.    PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION. ........ 18

IV.    PLAINTIFFS CANNOT BRING APA CLAIMS PREDICATED ON PRIVACY ACT VIOLATIONS................................................................................................... 20

V.    ALL OF PLAINTIFFS' CLAIMS LACK MERIT................................................. 24

    A.    SAVE is authorized by statute (Count 1)................................................. 24

    B.    SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3)................................................ 29

    C.    Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6). ..................................................................... 31

    D.    Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8)...................................... 34

CONCLUSION ..........................................................................................................35

## TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Dep't of Lab.*,
No. 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026)....................................................... 6

*AFL-CIO v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) ................................................................................................ 21

*Am. Fed'n of Tchrs. v. Bessent*,
152 F.4th 162 (4th Cir. 2025),
*abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026) (en banc) ................................. 7, 21

*Am. First Legal Found. v. Greer*,
153 F.4th 1311 (D.C. Cir. 2025)................................................................................................... 14

*Am. Hosp. Ass'n v. Burwell*,
812 F.3d 183 (D.C. Cir. 2016)...................................................................................................... 35

*Am. Legal Found. v. FCC*,
808 F.2d 84 (D.C. Cir. 1987).......................................................................................................... 4

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002)........................................................................................................ 30

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984)....................................................................................................................... 21

*Bostock v. Clayton County*,
590 U.S. 644 (2020)....................................................................................................................... 27

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989).................................................................................................... 33, 34

*Cath. Benefits Ass'n v. Burrows*,
732 F. Supp. 3d 1014 (D.N.D. 2024).............................................................................................. 3

*Cell Assocs. v. NIH*,
579 F.2d 1155 (9th Cir. 1978) ........................................................................................... 21, 22, 24

*Center for Biological Diversity v. Department of the Interior*,
144 F.4th 296 (D.C. Cir. 2025)................................................................................................ 13, 14

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026).............................................................................................. 18, 19

*Cobell v. Norton*,
392 F.3d 461 (D.C. Cir. 2004)...................................................................................................... 17

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
  167 F.4th 605 (2d Cir. 2026) ...................................................................................... 13

*Crumpton v. United States*,
  843 F. Supp. 751 (D.D.C. 1994), *aff'd*, 59 F.3d 1400 (D.C. Cir. 1995) .................................. 29

*Davis v. FEC*,
  554 U.S. 724 (2008) ....................................................................................................... 4

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ...................................................................................................... 30

*Dorsey v. United States*,
  567 U.S. 260 (2012) ...................................................................................................... 28

*DSCC v. Trump*,
  No. 26-cv-1114 (CJN), --- F. Supp. 3d ----,
  2026 WL 1487833 (D.D.C. May 28, 2026) ................................................................ 7, 13, 31

*EPIC v. Dep't of Com.*,
  928 F.3d 95 (D.C. Cir. 2019) ......................................................................................... 15

*EPIC v. PACEI*,
  878 F.3d 371 (D.C. Cir. 2017) ....................................................................................... 15

*FAA v. Cooper*,
  566 U.S. 284 (2012) ...................................................................................................... 20

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .............................................................................................. 4, 12, 14

*FDA v. Wages & White Lion Invs.*,
  604 U.S. 542 (2025) ................................................................................................ 17, 31

*Fletcher v. Peck*,
  10 U.S. (6 Cranch) 87 (1810) ......................................................................................... 28

*Gundy v. United States*,
  588 U.S. 128 (2019) ...................................................................................................... 28

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ...................................................................................................... 12

*Humane Soc'y of the U.S. v. Hodel*,
  840 F.2d 45 (D.C. Cir. 1988) ........................................................................................... 4

*Independent Market Monitor for PJM v. FERC*,
  162 F.4th 1167 (D.C. Cir. 2025) ..................................................................................... 14

*Jeffries v. Volume Services America*,
   928 F.3d 1059 (D.C. Cir. 2019) ................................................................................ 7

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
   808 F. Supp. 3d 29 (D.D.C. 2025) ..................................................................... 29, 30

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
   818 F. Supp. 3d 34 (D.D.C. 2026) ..................................................................... 16, 21

*League of Women Voters v. DHS*,
   No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ........................... 1, 8, 9, 11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   591 U.S. 657 (2020) .................................................................................. 26, 31, 34

*Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ................................................................................................ 9

*Mayor & City Council of Balt. v. ATF*,
   816 F. Supp. 3d 107 (D.D.C. 2026) ..................................................................... 28

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990) ................................................................................................ 8

*Murthy v. Missouri*,
   603 U.S. 43 (2024) .............................................................................................. 9

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) ........................................................................................... 11

*Parks v. IRS*,
   618 F.2d 677 (10th Cir. 1980) ............................................................................ 21

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ............................................................................................. 22

*Pileggi v. Washington Newspaper Publishing Co., LLC*,
   146 F.4th 1219 (D.C. Cir. 2025) .......................................................................... 7

*RNC v. North Carolina State Board of Elections*,
   120 F.4th 390 (4th Cir. 2024) ............................................................................. 13

*Robert F. Kennedy Hum. Rts. v. Dep't of State*,
   No. 25-cv-1774 (JEB), 2026 WL 820811 (D.D.C. Mar. 25, 2026) .................................. 19-20

*Rotkiske v. Klemm*,
   589 U.S. 8 (2019) ............................................................................................... 26

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) .................................................................................. 22

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................................. 14

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ................................................................. 20

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................... 5, 6, 16, 35

*Verizon v. FCC*,
    740 F.3d 623 (D.C. Cir. 2014) ................................................................... 23

*Virginia Coalition for Immigrant Rights v. Beals*,
    803 F. Supp. 3d 454 (E.D. Va. 2025),
    *appeal filed*, No. 25-2108 (4th Cir. Sept. 17, 2025) ................................ 13

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) .................................................................................. 32

*Westcott v. McHugh*,
    39 F. Supp. 3d 21 (D.D.C. 2014) .............................................................. 21


**STATUTES**

5 U.S.C. § 552a .............................................................................................. *passim*

5 U.S.C. § 553 ............................................................................................... 22, 32

8 U.S.C. § 1373 ............................................................................................. *passim*

42 U.S.C. § 405 ................................................................................................... 28

42 U.S.C. § 1306 ................................................................................................. 28

42 U.S.C. § 1320b-7 (note) ................................................................................ 24

44 U.S.C. § 3501 (note) ...................................................................................... 15

52 U.S.C. § 20501 ................................................................................. 1, 5, 10, 12

52 U.S.C. § 21083 .......................................................................................... 5, 10

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, 110 Stat. 3009 ........................................................ 24

Immigration Reform and Control Act of 1986,
   Pub. L. No. 99-603, 100 Stat. 3359 ...................................................................... 24

Judicial Redress Act of 2015,
   Pub. L. No. 114-126, 130 Stat. 282 (2016).......................................................... 22


**RULES**

Federal Rule of Civil Procedure 12 ........................................................................ 35


**REGULATIONS**

OMB, *Guidance on the Privacy Act*,
   52 Fed. Reg. 12,990 (Apr. 20, 1987) ................................................................... 33

SSA, *Privacy Act of 1974; System of Records*, 89 Fed. Reg. 95,894 (Dec. 3, 2024) .................. 18

USCIS, *Privacy Act of 1974: Asylum Information & Pre-Screening System of Records*,
   80 Fed. Reg. 74,781 (Nov. 20, 2015) ................................................................... 18


**OTHER AUTHORITIES**

Jen Fifield & Zach Despart, *The Texas Tribune* (Feb. 13, 2026) .................................... 9

SSA, POMS, *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN)
   Without Consent* (2023),
   https://perma.cc/PE44-2QBK .............................................................................. 33

USCIS, *Mem. of Agreement Between DHS, USCIS & Ind. Sec'y of State re: Participation in
   SAVE for Voter Registration & Voter List Maint. Purposes* (July 8, 2025),
   https://perma.cc/A6LC-9CLQ .............................................................................. 11

## **INTRODUCTION**

This case began with the dramatic assertion that, absent an immediate injunction, "millions of eligible voters could be wrongly disenfranchised." Pls.' Mot. to Stay at 17, ECF No. 16. Now, over six months after the denial of Plaintiffs' preliminary-injunction motion, *see League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025), after multiple intervening (and uneventful) elections, and over a year after the challenged improvements to SAVE took effect, it is clear that Plaintiffs' doomsday predictions were wrong.

Now, at summary judgment—after what used to be Plaintiffs' lead claim was mooted by compliance with any applicable Privacy Act procedures—Plaintiffs focus on the agency's statutory and constitutional authority to improve SAVE, continuing to speculate that "millions of Americans' voting and privacy rights" remain "imperil[ed]." Pls.' Opp'n & Reply at 30, ECF No. 99. That rhetoric, however, continues to be a poor fit for the agency actions at issue, which ultimately amount to improved search functionality in an online service offered by the government—a service that is not just authorized, but *required* by law, at least in some form. *See* 8 U.S.C. § 1373(c). Contrary to Plaintiffs' hyperbole, in improving SAVE, Defendants claim no "unprecedented and unlimited power." Pls.' Opp'n & Reply at 24. Defendants' legal interpretations are neither "endless and alarming," nor "absurd and dangerous." *Id.* at 29. And DHS certainly does not seek "the unbounded and undefined authority to do whatever it wants." *Id.* DHS simply wants to comply with its statutory obligations. And it wants to do so by offering modern search functionality that works well for its intended purpose—rather than forever providing the sort of 1980s-era user experience that previously hampered SAVE, and presented serious litigation risk to the government.

Plaintiffs are plainly dissatisfied how at least some States are using information legally obtained via SAVE—which is why, tellingly, the word "Texas" appears a total of 268 times in Plaintiffs' summary-judgment filings. But none of that is a basis for a Privacy Act lawsuit against the United States. After all, as Plaintiffs themselves emphasize, it is States, not the federal government, who have the primary responsibility to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4).

To be clear, Defendants do not want any eligible voters to be disenfranchised. But modernizing SAVE does not disenfranchise anyone. And if SAVE users are complying with their legal obligations under federal law, state law, and the U.S. Constitution—not to mention their contractual obligations with USCIS, as memorialized in their SAVE agreements—nobody *should* be disenfranchised (and certainly not anywhere close to the numbers hypothesized by Plaintiffs' filings). In any event, regardless of how *States* choose to comply with *their* legal obligations, DHS is obligated under federal law to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). USCIS is now doing a better job of fulfilling those requests than ever before. That is good government—not a violation of the law, and certainly not any attempt to exercise "unlimited power." Pls.' Opp'n & Reply at 24.

## **ARGUMENT**

### I.    PLAINTIFFS LACK ARTICLE III STANDING

#### A.    **Several Plaintiffs lack associational standing for failure to identify any member with Article III standing.**

Several of the Plaintiff associations still fail to identify any member with Article III standing for their claims. So, as a matter of preliminary housekeeping, those Plaintiff Associations should be dismissed (or those theories of standing should be rejected).

**League of Women Voters of Louisiana Education Fund.** Despite Defendants' arguments on this subject, *see* Defs.' Br. at 12, ECF No. 77-1, Plaintiff the League of Women Voters of Louisiana Education Fund goes entirely unmentioned in Plaintiffs' latest brief. So that Plaintiff should be dismissed for failure to even try to carry its burden to show Article III standing.

**League of Women Voters of Louisiana (LWVLA) and Virginia (LWVVA).** Plaintiffs do not dispute that LWVLA member J. Doe 4 voted "without incident" in the October 2025 elections in Louisiana about which he or she previously expressed concerns. *See id.* at 12 (citing Decl. of J. Doe 4, ECF No. 16-3). The same is true of J. Doe 6, who is a member of LWVVA. *See id.*

- 2 -

(citing Decl. of J. Doe 6, ECF No. 16-8).  And Plaintiffs now concede expressly that, at least for purposes of voting-related injury, LWVLA and LWVVA have not identified any member with standing.  *See* Pls.' Opp'n & Reply at 5.  Instead, Plaintiffs rely solely on the (preliminary-injunction) declarations of J. Doe 4 and J. Doe 6 for purposes of showing privacy-related injuries.  *See id.*  Defendants address those theories *infra*, at 6-8.  But, due to Plaintiffs' concessions, neither LWVLA nor LWVVA can show associational standing on a theory of voting-related injury.

**League of Women Voters of Texas (LWVTX).**  Unlike with the other associations, LWVTX already identified some of its members, including for purposes of Plaintiffs' theories of voting-related injury.  *See* Defs.' Br. at 13.  Even so, Defendants explained that Plaintiffs did not "allege (much less establish with evidence at the summary-judgment stage) that *any* of these individuals were actually members of LWVTX at the time of the alleged injury that forms the basis of their allegations of Article III standing."  *Id.*  Instead, it appears that "after denial of their preliminary-injunction motion, Plaintiffs went searching for affected individuals, found a few, and signed them up for membership—and in doing so, tried to sign these associations up for this lawsuit."  *Id.*

Any doubt has now been resolved by Plaintiffs' latest filing.  In that filing, Plaintiffs do not dispute Defendants' understanding.  Instead, despite having the opportunity to supplement the record, Plaintiffs continue to "refuse[] to provide any additional information on this subject."  *Id.* at 13 n.6.  Indeed, they double down, now openly arguing that this sort of lawsuit-by-recruitment is permissible, and that any argument to the contrary is "made-up."  Pls.' Opp'n & Reply at 5.

Defendants did not make anything up.  Although Defendants are not aware of any Supreme Court or D.C. Circuit precedent (in either direction) on this precise nuance, other courts have accepted closely analogous arguments from the government.  *See Cath. Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1028 (D.N.D. 2024) ("[T]he Court agrees that entities should be members of the CBA at the time of the charged conduct and cannot run for protection under CBA membership after the fact.").  And more importantly (given the absence of binding precedent) Defendants' position aligns with first principles.  The D.C. Circuit itself has emphasized that associational standing should be applied in a way that "prevent[s] associations from being merely law firms with

standing." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988); *Am. Legal Found. v. FCC*, 808 F.2d 84, 91 (D.C. Cir. 1987) (rejecting associational standing in part to avoid an outcome where litigation is "in the hands of concerned bystanders who will use it simply as a vehicle for the vindication of value interests" (citation omitted)); *cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("An organization cannot manufacture its own standing in that way."). That concern is not limited to the germaneness prong (as Plaintiffs assert without explanation, *see* Pls.' Opp'n & Reply at 5), and it is squarely implicated here. In fact, Plaintiffs' only named member, Anthony Nel, is now part of another voting-related case in this Court, brought by the same counsel, that relies on some of the same theories (and same facts) about Mr. Nel's alleged injury—only in that case, in his capacity as "a member of Common Cause of Texas." *See* Decl. of A. Nel ¶ 1, ECF No. 29-8, *Common Cause v. DOJ*, No. 1:26-cv-1352-SLS (D.D.C.). One wonders how many associations will recruit Mr. Nel as a member by the end of the election cycle.

Plaintiffs raise the generic (and undisputed) proposition that standing is determined as of the filing of the complaint. *See* Pls.' Opp'n & Reply at 4 (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)). But that is fully consistent with Defendants' position: that, at the time of the complaint, LWVTX lacked Article III standing, because of its failure to identify any *member* who suffered any Article III injury. Instead, it identified only someone who had *previously* suffered an injury, and only *after* that injury became a member. This Court need not bless such gimmickry.

**B.      No Plaintiff has standing to challenge bulk-upload capability.**

Previously, due to software limitations, SAVE requests had to be submitted one-by-one. Now, multiple SAVE requests can be submitted at the same time, in bulk. Plaintiffs challenge that software-based customer-service improvement and thus request an order "disabling any functionality that allows SAVE users to conduct bulk searches." Pls.' Proposed Order at 1-2, ECF No. 66-12. But until their reply brief, Plaintiffs never even attempted to establish any Article III injury from the acceptance of bulk requests, nor explained how any injury would be redressed by an order requiring SAVE to revert to a more logistically cumbersome, one-by-one submission system. *See* Defs.' Br. at 14-15. That failure was significant because "standing is not dispensed in gross; rather,

- 4 -

plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Plaintiffs' first response is to accuse Defendants of "misstat[ing] evidence" on this subject, Pls.' Opp'n & Reply at 16, but they do not identify any misstatement. Instead, Plaintiffs cite generic language in the declaration of the President of LWVTX, which says that "Texas 'has run the state's entire list' through SAVE." *Id.* (emphasis omitted) (quoting LeBombard Decl. ¶ 4, ECF No. 66-7). But that is a background fact, not a legal theory supporting standing. In any event, that statement is non-responsive to Defendants' argument. The problem stands: Texas could *always* have run its voter roll through SAVE, even without bulk upload—it just would have taken longer and required more resources. And even if Plaintiffs win on every argument in this case, Texas will *still* be able to run its full voter roll through SAVE—just more slowly. In other words, "the relief that Plaintiffs request on this issue would not actually redress any harm to Plaintiffs—it would just make things harder for government employees." Defs.' Br. at 15.

Remarkably, Plaintiffs' reply confirms that this seems to be the point. Plaintiffs now openly embrace an outcome in which, by court order, States would be forced to "undertake the highly laborious task of conducting tens of millions of individualized searches to check registered voters against SAVE data 'one-by-one,'" instead of through an Excel spreadsheet with multiple rows. Pls.' Opp'n & Reply at 17 (citation omitted). Apparently, Plaintiffs' hope is that judicial invalidation of this software modernization would make SAVE sufficiently cumbersome, old-fashioned, and out-of-date with the modern expectations of computer users, such that States might give up on using it—despite the apparent absence of any better-available tool, and despite States' legal obligations to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4); *see also id.* § 20501(b)(4).

Although the Luddites might embrace that bizarre theory of standing, Article III does not allow it. Plaintiffs suffer no concrete injury from government computer systems running efficiently instead of inefficiently; and they have no cognizable interest in whether searches of government databases require small or large amounts of human effort. After all, as Defendants already

explained, "[t]here is no tradition in American courts of litigation over whether, for example, a user of government computer systems submits requests via drop-down menu, a text box, one email submission, multiple email submissions, or (as is currently the case for SAVE) by uploading an excel spreadsheet with one or more requests at once." Defs.' Br. at 14 (citing *TransUnion*, 594 U.S. at 417). Plaintiffs cite nothing in response to that argument. Defendants thus remain unaware of any litigation, ever, over anything comparable—much less any case in which a court has ever issued relief that would intentionally degrade government computer software.

C. **All remaining Plaintiffs also lack Article III standing to challenge intra-governmental data-sharing.**

1. Plaintiffs' alleged privacy-related interests are too speculative and amorphous to support Article III standing.

As for Plaintiffs' alleged privacy-related harms, a significant portion of those alleged injuries may now be taken off the table. After offering extensive allegations (and lengthy declarations) about how information-sharing "causes them stress," *see* Defs.' Br. at 15-16 (quoting four of many examples), Plaintiffs do not respond to Defendants' explanation of why their "emotional anxiety" cannot support standing. *Id.* at 15-17. So that theory has seemingly been abandoned.

The remainder of Plaintiffs' alleged privacy-related injuries rely on strained analogies to three common-law torts: intrusion upon seclusion, breach of confidence, and defamation. But for the most part, Plaintiffs do not engage with Defendants' arguments about why those analogies are misplaced, *see id.* at 17-23, and thus fail to identify any sufficiently "close historical or common-law analogue for their asserted injury," as required by *TransUnion*, 594 U.S. at 424.

Instead, Plaintiffs' primary retort is that "[m]any courts in this District" have ruled against the government in the context of somewhat similar arguments. Pls.' Opp'n & Reply at 6 (citing *AFL-CIO v. Dep't of Lab.*, No. 25-339 (JDB), 2026 WL 879518, at *10 (D.D.C. Mar. 31, 2026)); *see also id.* at 7 (responding to an argument by Defendants only by asserting that "courts in this District have . . . held otherwise"). Defendants are aware of those decisions—and in fact disclosed their existence, in their opening brief, as a matter of candor to the Court. *See* Defs.' Br. at 19-20

n.8.  Even so, they are not binding here.  It likewise does not matter, for example, that the en banc Fourth Circuit recently "abrogated" a "Fourth Circuit panel decision on which Defendants" rely. Pls.' Opp'n & Reply at 7 n.6 (citing *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025)). In short, the original Fourth Circuit panel got it right, and the Court should still follow that reasoning—essentially, for the reasons already addressed in Defendants' briefs.  Defs.' Br. at 17-23; *see also DSCC v. Trump*, No. 26-cv-1114 (CJN), --- F. Supp. 3d ----, 2026 WL 1487833, at *7 n.2 (D.D.C. May 28, 2026) ("[I]nter-agency sharing of non-sensitive personal information (such as one's name, citizenship status, and age) is not the type of 'intrusion' that a 'reasonable person' would find 'highly offensive.'").

Defendants will not repeat that reasoning again.  A few points in Plaintiffs' reply, however, warrant a brief response.  First, Plaintiffs cite two D.C. Circuit cases: *Pileggi v. Washington Newspaper Publishing Co., LLC*, 146 F.4th 1219, 1229 (D.C. Cir. 2025), and *Jeffries v. Volume Services America*, 928 F.3d 1059, 1064-65 (D.C. Cir. 2019).  Neither helps.  Although *Pileggi* found standing based on an analogy to intrusion-upon-seclusion, it did so in the context of disclosure of the plaintiff's "private video viewing history to a third party . . . without her knowledge or consent." 146 F.4th at 1228.  This case alleges nothing comparable—it is hard to imagine, for example, anyone reasonably expecting their Social Security Number, or their citizenship status, to remain secret *from the government*.  After all, that information came *from* the government in the first place.  That is a distinction in kind, not "a question of degree."  Pls.' Opp'n & Reply at 7.

Defendants already addressed *Jefferies* in their opening brief.  *See* Defs.' Br. at 20-21.  In short: that case does not include hardly any analysis of whether the breach-of-confidence "tort has a sufficient historical origin" to satisfy *TransUnion*.  *Id.* at 20.  That is unsurprising, because it predates *TransUnion*.  So *Jefferies* offers no guidance in applying *TransUnion* to these facts.

Finally, as for defamation, Plaintiffs originally accused DHS of "effectively labeling them as criminals" through SAVE responses.  Pls.' MSJ Br. at 16, ECF No. 66.  But as explained, "a former non-citizen being described as a current non-citizen—even if mistakenly and inaccurately, after naturalization—does not" alone imply any criminal conduct at all.  Defs.' Br. at 22.  At most,

any (hypothetical) defamation would come (on Plaintiffs' theory) from *States*—who use information from SAVE to police their voter rolls and enforce their laws. *See id.* at 22-23 (citing SAVE agreements that make clear that "[t]he DHS-USCIS response is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User Agency" (citation omitted)).

In response, Plaintiffs insist that their theory "hinge[s] on *DHS's* misrepresentations of fact *to the states*." Pls.' Opp'n & Reply at 8. But that is non-responsive to Defendants' key point—that the only (hypothesized) misrepresentation *by Defendants* would *not* be that anyone was a criminal, only that they were not a U.S. citizen. And that sort of statement (even if mistaken) does not alone "subject [anyone] to hatred, contempt, or ridicule" within the universe of common-law defamation. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 13 (1990) (citation omitted).

    **2.**    <u>Plaintiffs' alleged voting-related injuries are impermissibly speculative, and neither caused by the federal government nor redressable in this suit.</u>

Plaintiffs' theories of voting-related injury continue to suffer from two major problems: (1) it is speculative—indeed, extremely unlikely—that any member of the Plaintiff associations will ever suffer any of the voting-related injuries that they claim to fear; and (2) even if they do suffer that sort of harm, it will be traceable to the States, not the federal government.

**a.** As for the speculative nature of Plaintiffs' voting-related injuries, this Court has already rejected theories of irreparable harm that are indistinguishable from the voting-related standing theories that Plaintiffs advance now. *See League of Women Voters*, 2025 WL 3198970. To be sure, Defendants recognize that this Court's prior opinion did not issue any holding about Article III standing. *See id.* at *5 n.6 (leaving standing questions "for another day"). Even so, for essentially the same reasons that this Court already rejected those theories in the context of irreparable harm, this Court should now reject them again in the context of Article III standing.

For example, this Court refused "to find irreparable injury because [Plaintiffs'] SSA records are *likely* inaccurate, which *might* lead DHS to return an incorrect 'non-citizen' response to a request from their home state, which *might* then cause the state to terminate their voter registration

or take other adverse actions." *Id.* at \*7. But Plaintiffs now rely on exactly the same sort of "speculative chain of possibilities," *Murthy v. Missouri*, 603 U.S. 43, 70 (2024) (citation omitted), that this Court already correctly rejected earlier in the litigation.

To be sure, at that time, "Plaintiffs [had] not identified a single individual who has experienced this hypothetical injury." *League of Women Voters*, 2025 WL 3198970, at \*7. Now they seem to have identified less than a handful who may have—though it remains far from clear on the current record "whether the errors occurred because the SAVE responses were inaccurate or because the initial state citizenship verification was flawed." *Id.* Regardless, those isolated examples cannot alone solve Plaintiffs' speculation problem, because "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). And it remains not just speculative, but extraordinarily unlikely that any particular individual (much less a member of one of the Plaintiff organizations) will ever face the sort of problems Plaintiffs' are concerned about here.

Indeed, now that approximately 60 million voter verifications have been performed through SAVE, Decl. of B. Broderick ¶ 22, ECF No. 77-2 ("Broderick Decl."), finding a small handful of mistakes—some of which may be entirely attributable to the States—suggests that the system is working well. Plaintiffs cite articles from *Mother Jones* and *the Texas Tribune* that take the opposite view, *see* Pls.' Opp'n & Reply at 11, but even those articles (if accurate) suggest that the likelihood that any individual is flagged as a possible noncitizen is roughly *one in 10,000, see id.* (citing *Texas Tribune* article, which says: "At least seven states with a total of about 35 million registered voters have publicly reported the results of running their voter rolls through the system. Those searches have identified roughly 4,200 people—about 0.01% of registered voters—as noncitizens." Jen Fifield & Zach Despart, The Texas Tribune (Feb. 13, 2026)). Some substantial portion of those individuals, of course, surely *are* noncitizens. And whatever subset *has* been mistakenly categorized—whether due to an error by SAVE, an error by a State, or both—the odds that one of *those* individuals is *also* a member of any Plaintiff association is exponentially smaller still. These layers of speculation upon speculation are fatal to Plaintiffs' standing.

**b.** Plaintiffs next respond by accusing Defendants of "whitewashing" the record, insisting that the few Texans at issue "did not merely have to correct their records or shuffle paperwork." Pls.' Opp'n & Reply at 9. But, respectfully, that is exactly what Plaintiffs' own declarations show: that Texas *did* provide opportunities to correct or confirm citizenship status in Texas's records. *See* Decl. of A. Nel ¶ 13, ECF No. 66-3; Decl. of A. Doe ¶ 14, ECF No. 66-4; Decl. of B. Doe ¶ 27, ECF No. 66-5; Decl. of C. Doe ¶ 18, ECF No. 66-6. Indeed, several of them successfully confirmed their citizenship, and thus remained registered. *See id.* Mr. Nel could have too, but he refused to send proof of citizenship "by email, mail, or fax" due to unspecified "data security and privacy risks." Decl. of A. Nel ¶ 23. Mr. Nel says he was "only comfortable providing this documentation in person," *id.*—though he offers no explanation of why he has apparently still not pursued that option. Ultimately, nobody likes submitting government paperwork. But that is a far cry from disenfranchisement. The Court should not conflate (as Plaintiffs do) routine verification efforts (handled by state and local government bureaucracy, not the federal government) with any kind of "voter purge," Pls.' Opp'n & Reply at 10—much less a "voter purge" *by Defendants*.

To be clear, Defendants do not mean to minimize the potential burdens that may be faced, in rare cases, if eligible voters are mistakenly flagged as ineligible, and end up having to submit paperwork confirming their eligibility. But no system is perfect. And *some* system is required by federal law. *See, e.g.*, 52 U.S.C. §§ 21083(a)(4), 20501(b)(4).

Ultimately, if Plaintiffs are unhappy with the processes offered by the States—*i.e.*, if they think that the deadlines were too short, or the paperwork required was too inconvenient, or was too burdensome to submit in time—none of those processes is designed or controlled by the federal government. Plaintiffs are simply mistaken to say that Defendants "designed and instructed" any State to "subject[]" anyone "to a 30-day countdown to a voter purge." Pls.' Opp'n & Reply at 9-10. Instead, the standard SAVE agreement says essentially the opposite: that a SAVE response "is not intended to be, and should not be construed as, an opinion on the part of DHS-USCIS or the United States regarding any right or benefit under any program administered by the User

- 10 -

Agency."  USCIS, *Mem. of Agreement Between DHS, USCIS & Ind. Sec'y of State re: Participation in SAVE for Voter Registration & Voter List Maint. Purposes*, at 9 (July 8, 2025), https://perma.cc/A6LC-9CLQ.  Instead, it is the SAVE user who always retains "responsibility to determine the registrant's or registered voter's eligibility for the benefit."  *Id.*  The agreement likewise specifically requires procedures for "additional verification" for any "voter that does not verify as a U.S. citizen on initial verification," provision of "notice and hearing or other due process available under State or other applicable law" before "any removal from a voter roll," and acknowledges all parties' obligations to comply with other federal and State laws.  *See id.* at 4, 6.

Plaintiffs continue to stress that, in rare cases, SAVE may not be able to provide a conclusive response, even after consulting SSA records.  But as for what happens next, Plaintiffs continue to make important mistakes and flawed assumptions.  For example, Plaintiffs say (citing nothing in the record) that "[u]nder DHS's process, if SAVE cannot verify an individual's U.S. citizenship, then a SAVE user can deny or cancel the individual's voter registration if they fail to provide" proof of citizenship.  Pls.' Opp'n & Reply at 14.  But there is no "DHS process" that governs the cancellation of voter registrations by State officials.  And to the extent Plaintiffs presume the worst about State officials—contrary to the presumption of regularity, *Nieves v. Bartlett*, 587 U.S. 391, 400 (2019)—the Court already addressed this precise issue.  Then, as now, "nothing in the current record supports the Plaintiffs' assertion that in lieu of additional verification, a state would remove individuals from voter rolls, deny registration, or pursue criminal investigation based on an inconclusive SAVE response alone."  *League of Women Voters*, 2025 WL 3198970, at \*7.  To the contrary, the standard SAVE agreement warns States *not* to use inconclusive SAVE responses, standing alone, to deny benefits.  *See* Mem. of Agreement, *supra*, at 5 ("User Agency cannot deny a benefit based on a SAVE response where additional action is required of the User Agency by SAVE or additional verification is requested by the applicant but has not been completed").

Finally, on causation, Plaintiffs respond that "Texas could not take these actions independently of Defendants."  Pls.' Opp'n & Reply at 16 (citation omitted).  That is incorrect.  Subject to whatever constraints are imposed by other provisions of state and federal law, Texas absolutely

*could* have, for example, sent letters to some subset of its registered voters seeking verification of voter eligibility, without any involvement from the federal government.  In other words, SAVE alone is neither necessary nor sufficient for Texas to engage in whatever processes it uses, under State law, to carry out its legal obligations to "ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(4).  Indeed, by using SAVE, states like Texas are presumably *more* likely to make correct decisions about voter eligibility than they would without SAVE, given the undisputed absence of any superior database.

> **3.**     <u>Plaintiffs' diversion-of-resources theory of organizational standing is in-consistent with recent Supreme Court precedent.</u>

Defendants' opening brief explained that Plaintiffs' diversion-of-resources theory of standing—which explicitly relies on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)—is inconsistent with *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024); *see* Defs.' Br. at 29-30.  Although in *Alliance* the Supreme Court did not formally overrule *Havens*, it did make clear that "*Havens* was an unusual case" and emphasized that courts should be "careful not to extend the *Havens* holding beyond its context."  602 U.S. at 396.

Plaintiffs fail to heed that lesson.  They continue to emphasize the "resources they have expended" in response to the changes to SAVE.  Pls.' Opp'n & Reply at 2.  But *Alliance* explicitly rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions," and corrected the notion (that had grown common in the lower courts) that "*Havens* does not support such an expansive theory of standing."  602 U.S. at 395.  And Plaintiffs' repeated references to an alleged "impair[ment]" of their "mission-critical functions," Pls.' Opp'n & Reply at 2, are likewise hard to square with *Alliance* itself.  After all, in that case, "the medical associations" also alleged that "FDA ha[d] 'impaired' their 'ability to provide services and achieve their organizational missions.'" *Alliance*, 602 U.S. at 394.  That wasn't enough.

Plaintiffs respond that they have cited a few "cases post-dating" *Alliance*, Pls.' Opp'n & Reply at 2, but most are about direct effects on actual voting rights, *see, e.g.*, *RNC v. North Carolina State Board of Elections*, 120 F.4th 390, 395 (4th Cir. 2024),[1] or district-court decisions that make the same mistake as their briefs do, *see, e.g.*, *Virginia Coalition for Immigrant Rights v. Beals*, 803 F. Supp. 3d 454, 465 (E.D. Va. 2025) (mistakenly relying on *Havens*, after *Alliance*, to find standing on the theory that Plaintiffs made "a choice to expend resources in response to threats to the organization's core mission"), *appeal filed*, No. 25-2108 (4th Cir. Sept. 17, 2025).  Other courts, however, have recognized that this sort of "diversion of resources" theory "'does not work'" after *Alliance*.  *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026); *see also DSCC*, 2026 WL 1487833, at \*8 (rejecting *Havens*-based standing in a challenge to an Executive Order because "the Order itself has not imposed any impediment to [plaintiffs'] voter registration and education operations," even if "Plaintiffs have expended and diverted resources in response" to the Order).  This Court should follow that authority.

The only post-*Alliance* D.C. Circuit authority that Plaintiffs cite is fully consistent with Defendants' view.  For example, Plaintiffs note that *Center for Biological Diversity v. Department of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) ("*CBD*"), quotes *Havens*.  The problem for Plaintiffs is that it does so for a proposition that directly *undermines* their theory of standing.  In that case, the D.C. Circuit *rejected* an organization's alleged need to "work harder to gather information and expend additional resources to lobby the federal government, file rulemaking petitions, request improved policies, and in other ways urge the government to better protect endangered and threatened species and habitats."  *CBD*, 144 F.4th at 315.  In rejecting that theory of standing, the D.C. Circuit emphasized that its "conclusion [was] bolstered by the Supreme Court's recent decision in" *Alliance.  Id.*  In *Alliance*, as explained by the D.C. Circuit, the Supreme Court "described *Havens Realty*—the foundation of our organizational injury precedents—as an 'unusual case' and

---

[1] The Fourth Circuit's opinion in *RNC* (cited by Plaintiffs at pages 20-21 of their opening brief) does not even meaningfully discuss standing.  Chief Judge Diaz's concurring opinion, however, goes on at some length to advocate for "an appropriately stricter view of organizational standing" after *Alliance*.  *See RNC*, 120 F.4th at 410 (Diaz, C.J., concurring).

cautioned against extending it beyond circumstances in which the challenged action 'directly affected and interfered with [a plaintiff's] core business activities.'" *Id.* (quoting *Alliance*, 602 U.S. at 395-96). Ultimately, what matters is that there is no such "direct[] affect" in this case—the Plaintiff organizations remain entirely free to register voters, educate voters, or assist voters in any way they want. Improving SAVE does not "directly affect[]" or "interfere[]" with any of that. *Id.*

Plaintiffs' second D.C. Circuit case, *Independent Market Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025), is even more helpful to the government. There, the plaintiff— just like Plaintiffs here—tried an analogy to the facts to *Havens* itself, which (in a sense) was also about inaccurate information (in *Havens*, racist lies to prospective black tenants about apartment availability). But as the D.C. Circuit explained: "*Havens Realty*, however, found informational injury under a statute that explicitly created a right to information." *Id.* That was not the case in *Independent Market Monitor*, and it is not the case here. Unlike in *Havens*, none of the Plaintiff organizations here is requesting or receiving any information (accurate or inaccurate) from Defendants, and certainly not "under a statute that . . . explicitly create[s] a right to information." *Id.* at 1172. The D.C. Circuit also specifically warned against "extending *Havens Realty* to . . . cases" that make vague reference to "informational harm" in the absence of a "legal right" to the information at issue. *Id.* at 1173. Again, that caution squarely applies here.

        **4.**      <u>EPIC's alleged procedural and informational injuries cannot independently support Article III standing.</u>

EPIC's allegations of procedural injury add nothing, because "the 'deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient' to confer Article III standing." *Am. First Legal Found. v. Greer*, 153 F.4th 1311, 1314 (D.C. Cir. 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). As Plaintiffs seem to agree, *see* Pls.' Opp'n & Reply at 21, the ultimate question on procedural harm, then, just tees up the same standing issues addressed above. Because EPIC has not shown a concrete and particularized injury, they also cannot rely on any procedural harm.

As for informational injury, Plaintiffs cannot overcome the significant D.C. Circuit precedent that EPIC itself has generated on this subject. *See EPIC v. Dep't of Com.*, 928 F.3d 95 (D.C. Cir. 2019) ("*EPIC II*"); *EPIC v. PACEI*, 878 F.3d 371 (D.C. Cir. 2017). Plaintiffs are correct that those cases addressed claims brought under the E-Government Act, not the Privacy Act, *see* Pls.' Opp'n & Reply at 18—as Defendants fully acknowledged in their first brief, Defs.' Br. at 31. But as Plaintiffs also seem to recognize, the key question is whether the D.C. Circuit's treatment of the E-Government Act offers "an apt analog for the Privacy Act." Pls.' Opp'n & Reply at 18. And it does: just like the E-Government Act, the Privacy Act "was not designed to vest a general right to information in the public." *EPIC II*, 928 F.3d at 103. Just like the E-Government Act, the Privacy Act (as its title suggests) "was designed to protect individual privacy by focusing agency analysis and improving internal agency decision-making." *Id.* And just like the E-Government Act, the Privacy Act "is fundamentally different from statutes like the Freedom of Information Act (FOIA) where the harm Congress sought to prevent was a lack of information itself." *Id.* In short, the Privacy Act and the E-Government Act are each "directed at individual *privacy*, which is not at stake for EPIC" in the relevant sense—per binding precedent. *EPIC*, 878 F.3d at 378.

Plaintiffs assert in conclusory fashion that "Congress intended for the Privacy Act to vest the public with a right to information and that public transparency was necessary for the Privacy Act to accomplish the legislature's goals." Pls.' Opp'n & Reply at 19. Of course, at that level of generality, the same thing could be said for the E-Government Act, which requires the publication of Privacy Impact Assessments. *See* 44 U.S.C. § 3501 (note). Much the same could even be said about the APA itself, which requires publication of rulemaking documents that provide information in the name of "public transparency." Pls.' Opp'n & Reply at 19. But those sorts of generic notions of the value of information and transparency are insufficient under binding precedent.

Separately, even if Plaintiffs could overcome that precedent, Defendants also explained that EPIC has *already* obtained all material information on the topics it claims to be interested in. Indeed, Plaintiffs explicitly conceded as much at the preliminary-injunction hearing. *See* Defs.'

- 15 -

Br. at 32 (quoting Oct. 28, 2025 Hr'g Tr. at 76:4-6, ECF No. 48 (Mr. Sus: "If they do publish SORNs, that would, we agree, address our informational injuries both for DHS and SSA.")).

Even if there were some small delta between the information EPIC wants and the information that it already has (and even ignoring counsel's straightforward concession), that would only support standing if EPIC could show that the gap caused a concrete injury. In their first brief, Plaintiffs did not even try. Now, EPIC claims that it has "no information on the estimated savings of the program, the approximate number of records, the start and completion dates of the program, procedures governing use and return of records by recipient agencies, or information on accuracy assessments." Pls.' Opp'n & Reply at 20. But in fact, much of that information *is* already public. *See, e.g.*, DHS-AR-221-43 (Privacy Impact Assessment); DHS-AR-114-21 (SORN); DHS-AR-420-31 (DHS-SSA Agreement); DHS-AR-495-504 (SAVE template agreement). Regardless, "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442. Plaintiffs still fail to identify any such "adverse effects" here. *Id.*

## II.    PLAINTIFFS' PRIVACY ACT NOTICE-AND-COMMENT CLAIM (COUNT 5) IS MOOT.

Count 5 is either moot (if understood correctly) or meritless (if understood as Plaintiffs now try to rehabilitate it to avoid a mootness dismissal).

**a.**  Count 5 alleges that, "[i]n overhauling the SAVE system in May 2025, DHS and SSA significantly modified their use and disclosure of information in the SAVE and NUMIDENT systems of records without first publishing modified SORNs and soliciting public comment." Am. Compl. ¶ 231, ECF No. 61. As Defendants explained, this claim is now moot. In short, "[w]hether or not the Privacy Act applies here at all, *but see* 8 U.S.C. § 1373(a), and whether or not the prior SORNs permitted the sharing of this information, DHS and SSA have now published the SORNs and solicited the comments that Plaintiffs alleged were required by the Privacy Act." Defs.' Br. at 34. That moots the claim, as Judge Kollar-Kotelly recently recognized in dismissing a materially indistinguishable claim. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 114 (D.D.C. 2026) ("*LULAC*") ("Now that the agencies have published new SORNs describing routine uses that cover the challenged data-sharing practices and those new

routine uses have gone into effect, . . . [plaintiffs'] claim for injunctive relief against the relevant changes to SAVE and Numident based on the Privacy Act is moot."). So Count 5 is moot.[2]

**b.** Plaintiffs' only response is to reimagine this claim as something else. Now, quoting only their own brief (not the complaint), they assert that Count 5 alleges "that Defendants violated 5 U.S.C. § 552a(e)(11) 'by predetermining they would not consider public comments on the Modified SORNs' and then failing, in fact, to consider those comments." Pls.' Opp'n & Reply at 40 (quoting Pls.' MSJ Br. at 39-40). Defendants are hard pressed to divine that theory from the actual allegations in the complaint. *See* Am. Compl. ¶¶ 228-35. And that exact theory *does* appear elsewhere, as part of an arbitrary-and-capricious claim, *see id.* ¶ 238(b) (alleging that Defendants "failed to consider relevant comments on the 2025 SAVE SORN")—which Defendants addressed in their opening brief, *see* Defs.' Br. at 55-56, and address again below, *see infra* at 31-32.

In any event, no matter how many times it reappears, this theory remains meritless, on both the facts and the law. For one thing, Plaintiffs materially mischaracterize the government's position when they say that "Defendants wrongly assert that the Privacy Act only requires them to '*solicit*[] comments for 30 days' without actually considering any comments received or delaying any new routine uses pending consideration of comments." Pls.' Opp'n & Reply at 40 (quoting Defs.' Br. at 34). Defendants' brief "assert[ed]" no such thing—which is why quotation marks only appear around the first half of that sentence. *Id.*

Regardless, this is all beside the point, because "[b]oth agencies have certified that those materials *were* considered by the agency, *see* ECF Nos. 64, 65, and those signed certifications are 'entitled to a presumption of regularity,' *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 577

---

[2] Plaintiffs are correct that, despite that mootness holding, Judge Kollar-Kotelly ultimately issued what effectively amounts to an obey-the-law declaratory judgment, declaring that certain defendants in that case must "must strictly adhere to the mandates of the Privacy Act." *LULAC*, No. 1:25-cv-00946-CKK, ECF No. 256 (Mar. 31, 2026) (Final Judgment) ¶¶ 4, 5. Setting aside the question of whether a court can or should issue an order merely requiring a defendant to the follow the law (a question more appropriately addressed in the *LULAC* appeal, which is ongoing), *see Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004) (reversing "an order to obey the law"), Plaintiffs do not request any sort of obey-the-law order here. So that wrinkle is irrelevant.

(2025)).” Defs.' Br. at 56.  That is dispositive.  Plaintiffs try to rewrite the documents to fit a more nefarious narrative, saying that DHS and SSA "preemptively declar[ed] in both Modified SORNs that new routine uses would automatically take effect after 30 days, notwithstanding any public comments."  Pls.' Opp'n & Reply at 40 (citing DHS-AR-115 and SSA-AR-207).  But the Court can read those documents and see that neither SORN says anything like that.

To be sure, it is true that a new or modified routine use *presumptively* takes effect after 30 days—that is, assuming the agency in question does not decide to make a change in response to comments (which may happen either before or after the 30-day period has run).  But that reflects normal operation of this statutory scheme, routine agency practice, and the text of the statute itself.  *See* 5 U.S.C. § 552a(e)(11).  The use of a 30-day effective date is not novel—it appears in the text of the statute and is routinely invoked (using essentially identical language as was used here) by agencies across the Executive Branch, across administrations.  *See, e.g.*, 89 Fed. Reg. 95,894 (Dec. 3, 2024) (SSA: new routine use "is effective January 2, 2025"); 80 Fed. Reg. 74,781 (Nov. 20, 2015) (USCIS: new routine use "will be effective December 30, 2015").  And in the absence of some *evidence* for Plaintiffs' bold assertion that DHS and SSA preemptively decided to ignore all comments—notwithstanding sworn certifications to the contrary—this theory must fail.  That is even more obvious now, at the summary-judgment stage, when Plaintiffs must point to actual evidence, rather than their own allegations in the complaint.  *But see* Pls.' Opp'n & Reply at 39 (Plaintiffs citing only their earlier brief and the allegations in the complaint); *id.* at 45 (brief only).

III.    **PLAINTIFFS DO NOT CHALLENGE ANY DISCRETE AND FINAL AGENCY ACTION.**

The D.C. Circuit recently held that an information-sharing agreement between federal agencies is not final agency action, at least when that agreement merely implements preexisting statutory authorities.  *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) ("*CTU*").  Just like the agreement at issue in *CTU*, the agreement at issue here "merely outlines the process through which" two government agencies share information.  *Id.* at 1236.  It is thus a "a nonbinding, nonfinal policy statement," which "was not the product of notice-and-comment rulemaking," which the agencies have "never characterized . . . as a 'rule,'" and which no "party

has argued" that either agency "relies on the [agreement] to justify its actions." *Id.* Accordingly, that agreement "is not reviewable under the APA." *Id.*

Plaintiffs' response to the government's argument—which was based almost entirely on a 2026 decision of the D.C. Circuit in the context of information-sharing agreements between agencies—is to cite a *2008* decision of the D.C. Circuit (about something else), and then accuse Defendants of "fail[ing] to engage" with Plaintiffs' 20-year-old decision (which appeared in Plaintiffs' brief once, as a "see also"). *Compare* Pls.' MSJ Br. at 46 ("see also" citation), *with* Pls.' Opp'n & Reply at 21 (saying that *Venetian Casino* "controls this case"). That approach is telling.

In any event, on the substance, Plaintiffs respond that "the specific terms of the agreement" at issue in *CTU* "are distinguishable." Pls.' Opp'n & Reply at 23. Why? In Plaintiffs' view, because that agreement "laid out how a process 'established by statute' would be carried out," while this agreement "goes well beyond any statutory requirement." *Id.* (quoting *CTU*, 167 F.4th at 1236). But that is a merits argument, not a final-agency-action argument—and one that the plaintiffs in *CTU* made too. *See* 167 F.4th at 1231-35. The D.C. Circuit rejected it. *Id.* at 1236.

Plaintiffs also assert that "in *CTU* the relevant agreement was not legally required for the agencies to take the challenged action," and instead "'merely outlined the process through which' information-sharing can occur." Pls.' Opp'n & Reply at 23 (quoting *CTU*, 167 F.4th 1236). But that is equally true here: it is not correct that "the DHS-SSA SAVE Agreement was a necessary precondition for Defendants' cross-agency data sharing." *Id.* Plaintiffs' cited pages say no such thing—instead, like in *CTU*, they acknowledge that the agencies are bound by pre-existing statutory requirements. *See* DHS-AR-422 ("DHS thus has requested that SSA comply, to the maximum extent possible and permissible under law, with § 1373(a), taking into account federal statutory requirements, as well as other laws, rules, regulations, policies, and requirements regarding verification, information sharing, and confidentiality."). Ultimately, if there is any tension between *Venetian Casino* (from 2008, about disclosures to the public) and *CTU* (from 2026, about information-sharing agreements between government agencies), this Court should follow *CTU*—as Chief Judge Boasberg did recently. *See Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-

cv-1774 (JEB), 2026 WL 820811, at *18 (D.D.C. Mar. 25, 2026) (finding *CTU* "particularly instructive" because "[w]hatever the Agreement set in motion, the consequences Plaintiffs identify flow from agencies' subsequent exercise of statutory authority" rather than the agreement itself).

Plaintiffs continue to argue half-heartedly that the draft SORN publications are also final agency action challenged in this suit—though they notably do not dispute Defendants' observation that (to use Plaintiffs' words) "rescinding the modified SORNs would increase the harm to Plaintiffs," rather than remedy a harm.  Pls.' Opp'n & Reply at 23-24.  In any event, Defendants' primary argument was that a draft SORN modification "explicitly contemplates 30 days of comments and future agency consideration of those comments before any change may take effect."  Defs.' Br. at 38.  Plaintiffs' only response is to baselessly assert, yet again, that "the 'proposed' modifications were, in fact, predetermined and final from the outset."  Pls.' Opp'n & Reply at 24.  They continue to have no support for that remarkable theory of bad-faith government action, other than citations to their own filings.  *See id.*; *supra* at 17-18; *infra* at 31-32 (responding to similar points).

## IV. PLAINTIFFS CANNOT BRING APA CLAIMS PREDICATED ON PRIVACY ACT VIOLATIONS.

As explained in detail in Defendants' opening brief (at 39-44), the Privacy Act establishes "a comprehensive and detailed set of requirements" for federal agencies that maintain systems of records containing individuals' personal information.  *FAA v. Cooper*, 566 U.S. 284, 287 (2012). Congress also specified a detailed set of civil remedies that are (and are not) available for violations of the statute.  For example, the statute makes relief available to individuals (but not organizations) in 5 U.S.C. § 552a(g)(1)(D).  It provides for money damages in four (and only four) specific instances.  *See id.* § 552a(g)(1)-(4).  And it allows for injunctive relief in two (and only two) circumstances.  *See id.* § 552a(g)(1)(A), (g)(2)(A); 552a(g)(1)(B), (g)(3)(A); *accord Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).

The logic of Plaintiffs' position suggests that this was all a huge waste of time—because the detailed remedial limitations that Congress wrote into the statute are meaningless.  Instead, in Plaintiffs' view, *any* litigant (whether an individual or an organization) can get an injunction for

- 20 -

*any* violation of the Privacy Act, at any time: the Court can simply "grant relief under the APA for agency action that violates the Privacy Act." Pls.' Opp'n & Reply at 34. Plaintiffs are wrong.

Plaintiffs first assert that Defendants "cite no authority" for the proposition that, "where an agency action is subject to review in some manner under a separate statutory review scheme . . . that action must be reviewed within the confines of that scheme." *Id.* (quoting Defs.' Br. at 39). But the very next paragraph of the government's brief cited four cases for this proposition, including one from the Supreme Court. In short, "when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Such is the case here: "[w]here, as here, [a] statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief." *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citing *Cell Assocs. v. NIH*, 579 F.2d 1155, 1161-62 (9th Cir. 1978)).

Indeed, until 2025, this proposition—in this precise context—was largely taken for granted in this District, where courts have long recognized that "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also* Defs.' Br. at 41 (citing six other cases). Plaintiffs respond, correctly, that starting in 2025, "courts in this District have repeatedly held that APA review of Privacy Act violations *is* available in these and similar circumstances." Pls.' Opp'n & Reply at 34 (citing *LULAC*, 818 F. Supp. 3d at 111-13 (SAVE); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 81 (D.D.C. 2025) (DOGE data access). Again, Defendants are aware of those (non-binding) decisions and proactively disclosed them in their opening brief. *See* Defs.' Br. at 19-20 n.8 & 42 n.10. Respectfully, those decisions are mistaken for the reasons explained here and in other more persuasive authority that comes out the other way. *See Bessent*, 152 F.4th at 175 ("With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy Act at least plausibly reflects Congress's intent to preclude suit under the APA in circumstances like those presented here."), *abrogated on other grounds*, 172 F.4th 361 (4th Cir. 2026) (en banc); *Cell Assocs.*, 579

F.2d at 1159-60 ("We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board.").

Defendants also explained why Plaintiffs' position creates "paradoxes and conundrums that make orderly judicial review all but impossible." Defs.' Br. at 42. For example, at the end of an APA rulemaking, the agency "must consider and respond to significant comments received during the period for public comment," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. § 553(c)), usually by publishing a "Final Rule" in the Federal Register. But the Privacy Act contains no such requirement, which is why "agencies typically do not provide such an explanation, and did not provide one here." Defs.' Br. at 43. But that didn't stop Plaintiffs from alleging that the agencies' "non-existent and not-required explanation was insufficient." *Id.* Plaintiffs do not dispute that, under their interpretation, "virtually *every* SORN publication (and OMB guidance since 1975, *see* 81 Fed. Reg. at 94,424) is unlawful under the APA." Defs.' Br at 43. And despite Defendants' explicit invitation, Plaintiffs have still "cited no case (and no example)" of an instance in which an agency was required to publish an APA-style explanation responding to comments submitted during the SORN modification process. *Id.* To Defendants' knowledge, this case would be the first. That is a powerful indication that Plaintiffs' understanding of how the Privacy Act interacts with the APA cannot be right.

Plaintiffs next resort to bankshot inferences from "[s]ubsequent legislative history," Pls.' Opp'n & Reply at 35,[3] despite Supreme Court and D.C. Circuit warnings to the contrary. *See, e.g.*, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001)

---

[3] On that "subsequent legislative history," it is not clear that Plaintiffs have correctly interpreted the Judicial Redress Act of 2015. Pls.' Opp'n & Reply at 36. Plaintiffs interpret that statute as having explicitly precluded *all* non-Privacy Act remedies for a certain category of individuals. *See id.* But the language they cite could also be read to foreclose only other remedies "under this section" of that statute—thus teeing up the same questions as here about the availability (or not) of APA review, or review under other statutory schemes. *Id.* (quoting Pub. L. No. 114-126, 130 Stat. 282, 283, 284, 5 U.S.C. § 552a 2(b)). Ultimately, the United States need not (and does not) take a position here on the scope of that otherwise-irrelevant statute.

("Because subsequent history is less illuminating than the contemporaneous evidence, respondents face a difficult task in overcoming the plain text[.]") (citation modified); *Verizon v. FCC*, 740 F.3d 623, 639 (D.C. Cir. 2014) ("[S]ubsequent legislative history, however, provides an unreliable guide to legislative intent.") (citation modified). They also try a series of naked policy arguments, but those, too, cannot overcome Congress's decisions in the text of the statute itself.

For example, Plaintiffs list some of the relief they are requesting in this case and suggest that injunctive relief under the APA must be available because "[n]one of these remedies are available to plaintiffs under the Privacy Act." Pls.' Opp'n & Reply at 36. But that is exactly the point. Plaintiffs are seeking judicial remedies for alleged violations of the Privacy Act, even though—in their own words—"[n]one of these remedies are available to plaintiffs under the Privacy Act." *Id.* That is confirmation that their interpretation of the statute is *wrong*, not right.

Similarly, Plaintiffs say that "Defendants concede that the Privacy Act offers *no* relief by its own terms to organizations." *Id.* Again, that is not some damaging "concession" by Defendants—it is a meritorious argument for dismissal of Plaintiffs' Privacy Act claims. Indeed, that sentence is a meaningful concession *by Plaintiffs*. After all, Plaintiffs are organizations seeking relief for alleged violations of the Privacy Act, even though all parties now agree—again, to use Plaintiffs' own words—that "the Privacy Act offers *no* relief by its own terms to organizations." *Id.* In a Privacy Act case brought by organizations, that has to matter. But on Plaintiffs' interpretation, Congress's choice was meaningless.

Finally, Plaintiffs insist that, "[i]f Plaintiffs were relegated to the Privacy Act's limited set of remedies, [their] members would face ongoing burdens on their right to vote, including potentially outright disenfranchisement, which cannot be redressed by damages." Pls.' Opp'n & Reply at 37. That is both incorrect and irrelevant. It is incorrect because anything close to "outright disenfranchisement" is almost surely going to be subject to judicial review for other reasons, under other statutes, and other legal theories (perhaps even the Constitution itself)—regardless of the scope of relief available under the Privacy Act. And it is irrelevant because there is no elections exception to the remedial provisions of the Privacy Act. Congress did not painstakingly specify

the remedies that are (and are not) available under the Privacy Act, just so courts could ignore them in all cases about elections, or any other category of cases that Plaintiffs think is important.

In short, "[w]ere [Plaintiffs] correct in [their] contention that injunctive relief is available for violation of any of the Act's provisions, the detailed remedial scheme adopted by Congress would make little sense." *Cell Assocs.*, 579 F.2d at 1159-60. Plaintiffs' APA claims predicated on alleged violations of the Privacy Act should thus be dismissed for lack of a cause of action.

## V.    ALL OF PLAINTIFFS' CLAIMS LACK MERIT.

Because all of Plaintiffs' claims fail for non-merits reasons, the Court need not (and should not) reach the merits at all. If the Court does reach the merits, however, they are easy. In short, DHS is legally obligated—not just authorized—to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). And that response may not be "prohibit[ed], or in any way restrict[ed]" by "any other provision of Federal, State, or local law." *Id.* § 1373(a). Those two sentences largely dispose of Plaintiffs' merits arguments here—notwithstanding their scattered references to the major-questions doctrine, the nondelegation doctrine, and a variety of other more technical Privacy Act quibbles. The recent changes to SAVE—which have now been in effect for more than a year—are lawful.

### A.    SAVE is authorized by statute (Count 1).

1. SAVE is authorized by the combination of at least three statutory provisions. First, in in the Immigration Reform and Control Act of 1986, Congress provided that DHS "shall implement a system for the verification of immigration status." Pub. L. No. 99-603, § 121(c)(1), 100 Stat. 3359, 3391; 42 U.S.C. § 1320b-7 (note). Second, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009, 3009-546, Congress placed an affirmative "[o]bligation" on DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law,

by providing the requested verification or status information." 8 U.S.C. § 1373(c). Third, also in 1996, Congress separately provided that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1373(b) (similar). In combination, those provisions are more than enough to justify SAVE—both in its original form, and after the 2025 improvements challenged here.

**2.** In response, Plaintiffs' reply starts by devoting several pages of argument to the position that the Immigration Reform and Control Act of 1986, standing alone, does not provide authority for the current version of SAVE. *See* Pls.' Opp'n & Reply at 25-26. Plaintiffs rely on complicated inferences from various cross-references in the 1986 statute to argue that "SAVE was never meant to be used on U.S. citizens." *Id.* at 25. Plaintiffs are wrong about that, *see* Defs.' Br. at 45-46, but even if they were right, that would at most be an argument that worked between 1986 and 1996. That is because, in 1996, Congress made it crystal clear that DHS not only can, but *must* provide verification of the "citizenship *or* immigration status of *any* individual" in response to a proper request. 8 U.S.C. § 1373(c) (emphases added). Obviously, *that* language covers U.S. citizens, and Plaintiffs don't argue otherwise. So the Court need not spend its time asking whether the 2025 changes to SAVE could have been made before 1996. *See* Pls.' Opp'n & Reply at 25-26.

When Plaintiffs eventually get around to addressing the 1996 legislation (codified at 8 U.S.C. § 1373), they argue—citing only their own brief—that "§ 1373(c) at most authorizes *DHS* to respond to governmental inquiries to verify individuals' 'citizenship or immigration status' by 'providing the requested verification or status information' from *DHS's own records*." Pls.' Opp'n & Reply at 27 (partially quoting 8 U.S.C. § 1373(c), and partially adding their own language). Of course, if Congress had said that—*i.e.*, that responses under § 1373(c) must be limited to "DHS's own records"—then this case would be very different. But Congress said nothing of the sort. And "'[i]t is a fundamental principle of statutory interpretation that absent provision[s] cannot be supplied by the courts.' This principle applies not only to adding terms not found in the statute, but

- 25 -

also to imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (alteration in original) (quoting *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019)).

Plaintiffs next argue that "Defendants concede that § 1373(c) lacks specific statutory language authorizing information-sharing across agencies." Pls.' Opp'n & Reply at 27.  Perhaps, but that is not a very useful insight—because it is a different subsection that separately confirms that information-sharing across agencies cannot be "prohibit[ed], or in any way restrict[ed]," by "any other provision of Federal, State, or local law."  8 U.S.C. § 1373(a).  That language is straightforwardly fatal to Plaintiffs' repeated efforts to rely on "other provision[s] of Federal, State, or local law" to prevent intra-governmental information sharing in this context.  *Id.*

For example, notwithstanding the plain text of 8 U.S.C. § 1373, Plaintiffs continue to cite "the Privacy Act" and "other laws" that it interprets as creating "a web of restrictions on inter-agency data sharing" without any "carveouts for § 1373 or SAVE."  Pls.' Opp'n & Reply at 27.  But that gets the analysis backwards—§ 1373(a) *is* the carveout, which makes clear that SSA could not have, for example, refused to share information with DHS by invoking the Privacy Act, or "other provision[s] of Federal . . . law."  In any event, even if the Privacy Act applies here, that does not mean that the recent changes to SAVE exceed DHS's statutory authority—it would mean, at most, that Plaintiffs might have a viable Privacy Act challenge to any unlawful disclosures.  Indeed, they bring those very claims, in this very case.  If the Privacy Act meaningfully constrains the sharing of this information, then Plaintiffs might conceivably prevail on some of those Privacy Act claims.  But none of that adds anything to Plaintiffs' statutory-authority claim.

**3.**  Eventually, unable to prevail under the plain text of the statute, Plaintiffs try a variety of extra-textual strategies to move the goalposts.  First, Plaintiffs seek application of a novel and gerrymandered "clear statement" rule, that would conveniently apply to any "efforts to nationalize voter list maintenance through a new mass 'voter verification' system," given what Plaintiffs describe as "the major separation-of-powers and federalism implications" of those efforts.  Pls.'

Opp'n & Reply at 28.  Of course, there are only "major separation-of-powers and federalism implications" if the Court accepts Plaintiffs' dubious constitutional theories.  *But see* Defs.' Br. at 53-54; *infra* at 29-31.  Regardless, this argument is just another way of saying that the Court should depart from the best reading of the statute and instead read it in Plaintiffs' favor because of Plaintiffs' policy objections to the challenged agency actions.  Plaintiffs cite no case that has ever applied a similar clear-statement rule in any remotely similar context.  The Court should thus stick to the text of the statute.  "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."  *Bostock v. Clayton County*, 590 U.S. 644, 673-74 (2020).

Next, Plaintiffs largely sound the retreat on the major-questions doctrine, despite spending multiple pages on that subject in their opening brief.  *See* Pls.' MSJ Br. at 30-32.  In response to the inconvenient fact that this case bears no resemblance to any prior major-questions case, Plaintiffs assert that "[t]he lack of a direct factual analogue" in prior cases "only confirms the unprecedented nature of Defendants' actions."  Pls.' Opp'n & Reply at 30.  But what, exactly, is unprecedented?  SAVE was used for voter-verification purposes during the George W. Bush Administration, the Obama Administration, the first Trump Administration, and the Biden Administration.  *See* Broderick Decl. ¶ 20.  And although the current version of SAVE integrates more fully with data held by other government agencies, and now allows submission of bulk requests, those sorts of customer-service improvements do not represent any "gargantuan," Pls.' Opp'n & Reply at 30, exercise of agency authority that raises any major question.

Finally, Plaintiffs almost completely surrender on the nondelegation doctrine, disparaging Defendants' arguments as an "irrelevant recitation of non-delegation principles."  *Id.* at 29.  That is an odd charge, as Defendants *agree* that the nondelegation doctrine *should* be irrelevant here.  The only reason Defendants discussed it was to refute *Plaintiffs*' argument that "Defendants' reading of § 1373(a) is irreconcilable with the nondelegation doctrine."  Pls.' MSJ Br. at 27-28.  Defendants welcome Plaintiffs' belated concession that nondelegation principles are "irrelevant" to this case, Pls.' Opp'n & Reply at 29, if that is what they are now saying.  If not—which is unclear,

- 27 -

given the subsequent reference to "constitutional avoidance principles," *id.*—then Defendants have little more to say beyond what they already said in their opening brief. In short, the intelligible-principle test is "not demanding," *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality op.), and there is nothing so special about this statute that warrants breaking the nondelegation doctrine's 91-year losing streak in the federal courts.

**4.** Plaintiffs also continue to cite two provisions of the Social Security Act that they claim prohibit the recent changes to SAVE. *See* Pls.' Opp'n & Reply at 30-31. But all parties seem to agree that the first one permits sharing of information when "otherwise provided by Federal law," 42 U.S.C. § 1306(a)(1), thus teeing up the same statutory-authority questions already addressed above. *Compare* Defs.' Br. at 49, *with* Pls.' Opp'n & Reply at 30. So the Court need not separately address that provision to decide this case.

As for 42 U.S.C. § 405(c)(2)(C)(viii)(I), Plaintiffs argue that legislation enacted in 1996 cannot justify any of the information-sharing at issue here, because legislation in 1990 purported to permanently raise the bar for that sort of legislation. But Plaintiffs fail to engage with Defendants' ample authority for "the well-established rule that 'one legislature cannot abridge the powers of a succeeding legislature.'" *Mayor & City Council of Balt. v. ATF*, 816 F. Supp. 3d 107, 124 (D.D.C. 2026) (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810)); *see also Dorsey v. United States*, 567 U.S. 260, 274 (2012). Instead, they cite cases for the undisputed but irrelevant proposition that "repeals by implication are disfavored." Pls.' Opp'n & Reply at 30. But Defendants are not arguing that Congress implicitly repealed any statute—only that the 1990 Congress could not (and did not) abridge the powers of the 1996 Congress. So the Court is left to interpret the text of 8 U.S.C. § 1373, as enacted by the 1996 Congress—without regard to what the 1990 Congress might have expected. (Regardless, none of these arguments apply to the 1986 Act.)

Plaintiffs say that SSA is "disclosing more than just 'citizenship and immigration status' data through SAVE, but also individuals' SSNs, names, dates of birth, and death indicators." Pls.' Opp'n & Reply at 31 n.9. Plaintiffs misread the statute. All that information is (at least) "information *regarding* the citizenship or immigration status" of the people in question, whether or not

all of it *is* "citizenship or immigration status."  8 U.S.C. § 1373(a) (emphasis added).  And that data (first provided by DHS *to* SSA) is necessary to ensure that the correct information is connected to the correct individuals.  (Also, decedents are not covered by the Privacy Act.  *See Crumpton v. United States*, 843 F. Supp. 751, 756 (D.D.C. 1994), *aff'd*, 59 F.3d 1400 (D.C. Cir. 1995)).

**5.**  At an absolute minimum, Plaintiffs' challenge to bulk verification must fail on the merits.  None of the relevant statutory provisions says anything at all about how USCIS should accept requests, in what form, how many at a time, and so on.  So there can be no statutory violation there.

**B.** **SAVE does not exceed the government's constitutional authority or violate the separation of powers (Counts 2 and 3).**

Plaintiffs offer two arguments in support of what purports to be a constitutional separation-of-powers claim: (1) that "[t]he Executive cannot usurp Congress's legislative authority," Am. Compl. ¶ 209; and (2) that "[t]he Constitution vests 'the power to determine who is qualified to vote' in the States and 'the power to regulate federal election procedures' in the States and Congress," *id.* ¶ 211 (quoting *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 42 (D.D.C. 2025) ("*LULAC*")).  Both claims fail.

Plaintiffs' first "constitutional" theory remains entirely parasitic of their statutory-authority claim.  Curiously, Plaintiffs resist this characterization, seemingly against their own interest.  After all, it would be *easier* for Plaintiffs to make out "a garden-variety statutory authority claim" than the sort of claim that they claim they are bringing here, which (in their words) alleges "that Defendants have not merely *exceeded* their statutory authority, but rather 'acted with a total absence of authority from Congress *in a domain that the Constitution assigns to Congress and the States*.'"  Pls.' Opp'n & Reply at 32 (quoting Pls.' MSJ Br. at 34).  Regardless, Defendants stand by their characterization of this claim as "a garden-variety statutory authority claim," *id.*—after all, Defendants' position is that DHS and SSA are exercising authority delegated by Congress, which (if correct) fully disposes of the claim.  Plaintiffs' disagreement with that position thus raises a statutory dispute, not a constitutional one.  Regardless, the result is the same: if Defendants are correct about the statutory-authority questions, then this claim (however labeled) must fail.

Plaintiffs' second constitutional theory *is* a constitutional theory: that Defendants have "no authority over election administration" under the Elections Clause of the Constitution, Am. Compl. ¶ 212, which instead assigns that role to the States and to Congress. But Defendants are not arguing to the contrary. In responding to voter-verification requests under 8 U.S.C. § 1373(c), DHS is not engaged in election administration at all, and is certainly not setting any voter qualifications—which vary from state to state. Those rules are entirely unaffected by the 2025 changes to SAVE. That is why Plaintiffs' primary authority for this claim—the district court opinions in *LULAC*—has no relevance here. There, unlike here, Plaintiffs challenged an Executive Order that (at least as interpreted by that court) required significant changes to voter-registration rules in all 50 states. *See LULAC*, 808 F. Supp. 3d at 48 (discussing the need for "people registering to vote using the Federal Form to submit 'documentary proof of United States citizenship'" (citation omitted)). So, regardless of whether that case was correctly decided (it is currently on appeal), this case raises no comparable questions about election administration.

That is also why Plaintiffs' references to Executive Order 14,248 are nothing more than a distraction: nothing in *any* Executive Order has been "invoked to justify the SAVE overhaul," contrary to Plaintiffs' unsupported suggestion. Pls.' Opp'n & Reply at 33. The Court will notice that the only legal authorities cited in Defendants' briefs in this case are federal statutes enacted by Congress. And the unremarkable fact that Executive Order 14,248 appeared in DHS's administrative record is irrelevant. There is nothing either surprising or nefarious about DHS *considering* that Executive Order as they prepared the actions at issue here—after all, government agencies need not *ignore* the President's policy preferences, as long as the agencies' actions remain within statutory and constitutional constraints. *See, e.g.*, *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[The President's] faithful execution of the laws enacted by the Congress, however, ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates."); *see also Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("[A] court may not set aside an agency's policymaking decision solely because

- 30 -

it might have been influenced by political considerations or prompted by an Administration's priorities."). This case thus raises no question about the legality of Executive Order 14,248.[4]

**C.      Plaintiffs' Privacy Act claims (purportedly brought under the APA) lack merit (Counts 4, 5, and 6).**

For the reasons Defendants have already explained, Plaintiffs should not be permitted to seek relief for alleged violations of the Privacy Act through the APA—they should be limited to the remedies set forth in the Privacy Act itself. Regardless, whether considered as APA claims or Privacy Act claims, all of them lack merit.

**1. Count 6 – Arbitrary and Capricious.** First, Plaintiffs continue to assert—citing no evidence whatsoever—that "Defendants predetermined the outcome" of the SORN process. Pls.' Opp'n & Reply at 45. Defendants already explained why that assertion is factually baseless. *See supra* at 17-18, 20. It is thus unsurprising that Plaintiffs' only citation for that purely factual assertion continues to be their own filings. But that does not work at summary judgment. And it certainly does not overcome the agency's signed certifications, which are "entitled to a presumption of regularity," *Wages*, 604 U.S. at 577.[5]

Even setting aside the factual baselessness of this theory, it also fails on the law, at least if advanced as an APA claim: there is no longer any such thing as an "open-mindedness test" under the APA. *Little Sisters of the Poor*, 591 U.S. at 685. Now aware of this adverse precedent, Plaintiffs try to rehabilitate their theory, now disclaiming any reliance on what they now call "the outdated 'open minded' test." Pls.' Opp'n & Reply at 45; *but see* Pls.' MSJ Br. at 39 (citing a case that is no longer good law for the proposition that "the agency must remain sufficiently open

---

[4] Executive Order 14,399 is even further afield. Despite referencing it in two filings—once in a cryptic "Notice," ECF No. 85, and once in the introduction (but not the body) of their reply—Plaintiffs offer no explanation of how (if at all) that Executive Order is relevant here. In any event, that Executive Order has not yet been implemented by any final agency action. *See generally DSCC*, 2026 WL 1487833. So this Court need not (and should not) say anything about it here.

[5] Oddly, Plaintiffs say that Defendants "do not dispute" that they "predetermine[d]" the outcome of the SORN process and "acted essentially as a rubber stamp for the Election EO's directives." Pls.' Opp'n & Reply at 45 (citation omitted). As should be obvious, Defendants dispute both assertions—as is clear from their prior brief and this one. *See* Defs.' Br. at 55-56.

minded"). But by disclaiming that theory, there is no longer any doctrinal home for Plaintiffs' (baseless) assertion that Defendants "predetermined" the SORN process. The claim fails.

Second, Plaintiffs fault the lack of a written explanation in response to comments received during the SORN process. Again, if such an explanation were required, then virtually every SORN modification (for decades) has violated the APA—without anyone noticing. *See supra* at 22. To be clear, this is not an argument that "the sky will fall if agencies must provide a reasoned explanation in the SORN context," Pls.' Opp'n & Reply at 46, this is an argument that no such legal obligation *exists*. *See* 5 U.S.C. § 552a(e)(4), (e)(11). Defendants remain unaware of a single case requiring such an explanation at the close of the SORN modification process. Plaintiffs have certainly not cited one, despite an explicit invitation to refute Defendants' understanding. *See* Defs.' Br. at 43. And the idea that this Court should (for the first time ever) extend APA-specific procedures to the distinct context of the Privacy Act cannot be squared with binding precedent. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978) (5 U.S.C. § 553 "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").

Third, Plaintiffs argue that Defendants violated the change-in-position doctrine. But other than conclusory assertions, Plaintiffs fail to explain *why* Defendants' explanations were insufficient. *See* Defs.' Br. at 56-57. To the extent those explanations are shorter, less formal, and less legalistic than a Rule published in the Federal Register after an APA rulemaking, that is because (until this suit) nobody ever thought that APA rules governed Privacy Act processes like these.[6]

**2. Count 4 – Compatible Use.** In Count 4, Plaintiffs argue that the new routine uses established by the latest DHS and SSA and SORNs substantively violate the Privacy Act, because they authorize disclosures "for a purpose" that is not "compatible with the purpose for which [the

---

[6] In what reflects an unfortunate and repeated pattern throughout their reply brief, Plaintiffs also say (again) that Defendants "do not respond to, and thus concede" another point that Defendants did, in fact, respond to. *Compare* Pls.' Opp'n & Reply at 47 (penultimate paragraph, about reliance interests), *with* Defs.' Br. at 56-57 (carryover paragraph, responding to this argument).

record] was collected."  Am. Compl. ¶ 220 (alteration in original) (quoting 5 U.S.C. § 552a(a)(7)). In response, Defendants offered two arguments, but Plaintiffs only respond to one.

First, Defendants set forth the Executive Branch's longstanding position that "when Congress mandates agency action that requires disclosure of agency records, the use is 'compatible' for that reason alone."  Defs.' Br. at 57 (citing OMB, *Guidance on the Privacy Act*, 52 Fed. Reg. 12,990, 12,993 (Apr. 20, 1987)).  To that first argument, Plaintiffs respond only that Defendants' "statutory authority arguments" are "meritless" "for the reasons" elsewhere in their brief.  Pls.' Opp'n & Reply at 38.  Defendants, of course, disagree.  But more importantly, by failing to dispute the threshold premise—*i.e.*, that a routine use is necessarily "compatible" when it supports disclosures "pursuant to a specific statutory charter," 52 Fed. Reg. at 12,993—the statutory-authority questions in this case now also collapse into the compatible-use question.  In other words, if the government's statutory arguments are correct, Plaintiffs cannot prevail on their compatible-use claim.  So the Court need not separately address the compatible-use issue at all.

Second, only in the alternative, Defendants also explained why, even in the absence of a "specific statutory charter" justifying these disclosures, *id.*, no records are being disclosed "for a completely unrelated purpose" to their original collection.  *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 550 (3d Cir. 1989).  Plaintiffs cite SSA statements that SSNs are "sensitive pieces of personal information," but those generic statements are not at all inconsistent with any of Defendants' arguments here.  It remains true, for example, that SSA "only disclose[s] an SSN in narrow circumstances in which we have legal authority and where we are able to identify the true number holder."  Pls.' Opp'n & Reply at 39 (quoting SSA, POMS, *GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent* (2023), https://perma.cc/PE44-2QBK) (citation modified).[7]  This is such a circumstance, and Plaintiffs have not established that any disclosures are being made for any "completely unrelated purpose" here.  *Britt*, 886 F.2d at 550.

---

[7] Plaintiffs added "[or verify]" in brackets because SSA is not "disclosing" SSNs to any other agency—instead, USCIS is running searches on SSA records, using SSNs that were provided

Although Plaintiffs continue to focus on "the reasons *state and local* officials originally collected the data before uploading it into SAVE," Pls.' Opp'n & Reply at 39; that only shows the obvious *compatibility* of the uses at issue here. The reason State and Local election officials have this data in the first place is because it was submitted as part of the voter registration process, also to confirm voter eligibility. An additional layer of federal confirmation of that same information, for essentially the same purpose, is plainly not "completely unrelated." *Britt*, 886 F.2d at 550.

**3. Count 5 – Notice and Comment.** As discussed above, Count 5 is moot, because DHS and SSA have now complied with the notice-and-comment procedures of the Privacy Act— whether or not doing so was necessary. And to the extent Plaintiffs now try to reimagine this claim as about the agencies having "predetermined" the outcome of the comment process, that claim fails both because (1) it lacks any factual basis and is contradicted by the record, *see supra* at 17-18 (citing administrative-record certifications and the presumption of regularity), and (2) there is no longer such thing as a claim that an agency was insufficiently open-minded during a rulemaking, *see supra* at 31-32 (quoting *Little Sisters of the Poor*, 591 U.S. at 685).

**D.    Plaintiffs' mandamus and unreasonable delay claims about computer-matching agreements lack merit (Counts 7 and 8).**

In Counts 7 and 8, EPIC challenges DHS's alleged failure to publish a document called a "computer matching agreement" relating to the recent changes to SAVE. On that claim, Plaintiffs have correctly understood the upshot of DHS's longstanding position (maintained at least since the Obama Administration), which is that so-called "'front-end' single record verification queries are not covered by this part of the Privacy Act." Pls.' Opp'n & Reply at 41. But they fail to understand the legal basis for that interpretation—instead asserting in conclusory fashion that this legal distinction "is nowhere to be found in the text of the Privacy Act." *Id.* at 42.

But as Defendants already explained, "[t]he basis for that interpretation is the text of the statute itself, which applies only to a 'comparison' of 'two or more automated *systems* of *records*,'

---

by States. No SSNs are being disclosed in the first instance *from* SSA to any other agency; either a full or partial SSN is first provided to SSA, which then sends SSN verifications to DHS alone.

plural, 5 U.S.C. § 552a(a)(8) (emphases added)—not a series of matches of each *individual* record." Defs.' Br. at 60. To be sure, that is a subtle distinction, but it is derived from the text of the statute, and Congress's use of the plural words "systems" and "records"—language that implicitly excludes matching of *one* record (singular) to a system of records (plural). And it is likewise undisputed that that is how SAVE has worked since at least 2017. *See* Defs.' Br. at 61 (citing Broderick Decl. ¶¶ 23-24). Plaintiffs' failure to engage with Defendants' primary statutory-interpretation argument is reason enough to reject this claim—applying any standard of review.

That said, Plaintiffs *also* do not dispute that this claim is governed by the mandamus standard. *Compare* Defs.' Br. at 59-60 (explaining why), *with* Pls.' Opp'n & Reply at 41-43 (offering no response). So to prevail, Plaintiffs must "demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). They do not even try to meet that higher standard, so Counts 7 and 8 fail for that reason alone—without the need for this Court to make any definitive pronouncement about the requirements for computer-matching agreements, or whether they apply to front-end verification systems.

Finally, even if any relief were appropriate on Counts 7 or 8, Plaintiffs likewise fail to respond to Defendants' argument that the maximum available relief on these claims would be "an order requiring publication of a computer-matching agreement"—rather than "any of the other, more ambitious relief that Plaintiffs seek, relating to the general operations of" SAVE. Defs.' Br. at 33; *see also TransUnion*, 594 U.S. at 431 ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). So that remedial argument is also now conceded.

## CONCLUSION

For these reasons, this case should be dismissed in its entirety under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). In the alternative, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: May 29, 2026                    Respectfully submitted,

                                       BRETT A. SHUMATE
                                       Assistant Attorney General
                                       Civil Division

                                       ELIZABETH J. SHAPIRO
                                       Deputy Director
                                       Federal Programs Branch

                                       /s/ Stephen M. Pezzi
                                       STEPHEN M. PEZZI (D.C. Bar No. 995500)
                                       Chief Litigation Counsel
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street NW
                                       Washington, DC 20005
                                       Tel: (202) 305-8576
                                       Email: stephen.pezzi@usdoj.gov

                                       *Counsel for Defendants*