## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS *et al.*, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY *et al.*, <br><br> *Defendants*. | No. 1:25-cv-03501-SLS |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

**INTRODUCTION**

Last week, this Court entered final judgment in Plaintiffs' favor, vacating the challenged 2025 SSA SORN, 2025 DHS SORN, and the updated SAVE system reflected in those notices. That order sent tremors through state and federal entities across the country—not just the named Defendants. That's because use of the updated SAVE system had, since its debut, quickly become widespread and indispensable. Federal entities used it to help verify eligibility for public benefits. State entities used it for both benefit-eligibility verification and to maintain their voter-registration lists. Some states went so far as to pass legislation dependent on the use of the updated system. DHS used the system to update its own records with more accurate data possessed by its sister agencies. And most importantly, Defendants were *bound by a settlement agreement* to install, and remain bound to maintain, the updates that made these functions possible. This Court's order upended all of that. And because Defendants are under a pre-existing obligation to maintain the modified SAVE system, this Court's order has put Defendants in an utterly untenable position.

The Court should stay its order pending appeal, on which Defendants have a substantial chance of success. The modified SAVE system discloses no information protected by the relevant sections of the Social Security Act, because citizenship and decedent status—the only SSA data that DHS was re-disclosing to SAVE users—does not meaningfully reveal the identity of the person associated with any SSN. Nor does the modified system violate the Privacy Act, because the Act's routine-use exceptions accommodate those instances in which Congress has determined that the use of sensitive information is compatible with the purposes for which it was collected— even if this Court disagrees with Congress's assessment. Finally, Defendants demonstrably complied with the Privacy Act's notice-and-comment requirements, and the Court's imposition of additional procedural requirements is both foreclosed by law and would call into question the

1

legality of countless SORNs published by agencies across the Federal Government.  That simply cannot be right.

Because Defendants have a substantial chance of success on the merits, and *especially* because the balance of the equities tilts so decisively in Defendants' favor, the Court should enter a stay of its judgment pending the resolution of Defendants' appeal.

## BACKGROUND

On June 22, 2026, this Court entered judgment for Plaintiffs on their claims that the SAVE system, as modified in 2025, was unlawful.  ECF #111–12.  Plaintiffs had challenged "three major modifications to the SAVE system," ECF #111 at 18: that the system would now have "access to the records of natural-born citizens"; that it would have "access [to] SSA databases," such that "SAVE users could … run initial SAVE searches using an individual's SSN or partial SSN"; and that it would have the capability to "conduct bulk searches of more than one person's data at a time," *id.* at 14–15.  Plaintiffs had also challenged the DHS and SSA System of Records Notices (SORNs) establishing those changes.  *See id.* at 18; *see also* DHS AR at 114–21 (2025 DHS SORN); SSA AR at 205–11 (2025 SSA SORN).  The Court agreed with Plaintiffs and entered an order vacating both SORNs and the modified SAVE system described therein.  ECF #111 at 74–75; *see also* ECF #112.

That order raises immediate roadblocks to ongoing agency activities.  For starters, compliance with the Court's vacatur order is wreaking havoc on the plans of various agencies at both the federal and state levels.  Prior to the Court's order, the modified SAVE system processed over one million status-verification requests each day.  Ex. A (Broderick Decl.) ¶ 5.  The Department of Transportation, for instance, requires states to use the modified SAVE system to verify eligibility for commercial driver's licenses.  *Id.* ¶ 6 (citing *Restoring Integrity to the*

*Issuance on Non-Domiciled Commercial Driver's Licenses (CDL)*, 91 Fed. Reg. 7044 (Feb. 13, 2026)).  The Department of Housing and Urban Development had intended to use the modified system to verify the eligibility of applicants for certain housing programs.  *See id.* ¶ 7 (citing *Housing and Community Development Act of 1980: Verification of Eligible Status*, 91 Fed. Reg. 8151 (Feb. 20, 2026)).  And several states have relied on the modified system to make eligibility determinations for public benefits and to maintain their voter registration lists—including ongoing voter-verification efforts in advance of the fast-approaching midterm elections in the fall of 2026. *Id.* ¶¶ 7, 12.

Further, within DHS itself, the inability to use the modified SAVE system has degraded its ability to update its own records with more up-to-date information possessed by its sister agencies regarding individuals' citizenship and immigration status.  *Id.* ¶ 8.  The same inability also forces DHS to flunk its data-sharing obligations with federal, state, and local entities around the country. *Id.* ¶ 9.  And it severely degrades the Government's ability to police its systems and public benefits against threats of fraud.  *Id.* ¶ 11.

The upshot is that citizenship- and immigration-status verification now involves far more time-consuming—but less reliable—efforts by agency officials.  *Id.* ¶ 13.  And all the while, DHS is forced to expend significant resources maintaining dual-track capabilities—*i.e.*, both the "old" SAVE and the modified SAVE systems—to ensure that the agency does not lose the fruits of its substantial investments in the modified SAVE system (even if the features of the modified system remain inaccessible to the system's users).  *Id.* ¶ 10.

Meanwhile, this case is not the only lawsuit on this subject.  In October 2024, a full calendar year before Plaintiffs filed their original complaint, Defendants litigated a different—but closely related—suit.  There, Florida accused Defendants of failing to abide by their statutory obligations

as codified at 8 U.S.C. § 1373(c).  *See Florida v. DHS*, No. 3:24-cv-00509, ECF #1 (N.D. Fl. 2024).  Section 1373(c) requires DHS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purposes provided by law, by providing the requested verification or status information."  Eventually, three other states would join Florida in that suit, each leveling the same charge that Defendants had failed their statutory responsibility. *See id.* ECF #29 (adding Ohio, Iowa, and Indiana as plaintiffs).

The Florida litigation came to a close when the Northern District of Florida ordered the dismissal of that case with prejudice.  *Id.* ECF #31.  The court's order expressly "approved … and incorporated by reference" a settlement agreement between the parties, stating that it retained jurisdiction for a period of twenty years to enforce compliance with the settlement obligations memorialized in the parties' agreement.  *Id.* at 1–2.  "Any party," the court concluded, "may … seek to enforce the settlement agreement either by motion or a new action brought in this Court." *Id.* at 2.

The settlement agreement is detailed indeed.  But as relevant here, it specifically sets out various obligations with respect to the SAVE system.  Defendants must ensure that SAVE allows searches with full and partial SSNs.  *Florida*, No. 3:24-cv-00509, ECF #30-1 ¶ 10(b)–(c).  They must ensure that SAVE has the capacity to "process bulk upload verification requests so that users of the system will not need to input verification requests one-by-one." *Id.* ¶ 10(d).  And they must ensure that SAVE has the capacity to timely deliver responses to those verification requests, usually in a matter of days.  *See id.* ¶ 10(f).  "Defendants will ensure that all of th[ose] capabilities … remain operational[] absent … a modification or amendment to this [s]ettlement [a]greement … or … unforeseen technical limitations that arise." *Id.* ¶ 11.

4

In the wake of this Court's order vacating those capabilities, the plaintiffs in the Florida litigation filed an emergency motion to enforce the settlement agreement, noting that because of DHS's compliance with this Court's vacatur order, "Defendants have now breached that agreement in several material respects by disabling several critical functionalities of the SAVE system." *Florida*, No. 3:24-cv-00509, ECF #32 at 1; *see also id.* at 5–7 (describing consequences of DHS's compliance with this Court's vacatur order). Within hours, the Northern District of Florida ordered Defendants to file an expedited response to the enforcement motion, noting that the motion "makes a preliminary showing that Defendants are in violation of their obligations under the [settlement] agreement," and ordering Defendants to "explain why they are not in violation of the settlement agreement and why the Court should not require them to comply with the settlement agreement by immediately restoring (1) the bulk upload function in SAVE and (2) the ability to search with [SSNs] in SAVE." *Florida*, No. 3:24-cv-00509, ECF #33 at 1.

Days after this Court's entry of judgment, Defendants appealed the Court's opinion and order to the D.C. Circuit, where this matter is now pending. *See* ECF #113.

## LEGAL STANDARD

On a motion for a stay pending appeal, courts must consider four factors: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Media Matters for Am. v. FTC*, No. 25-cv-1959, 2025 WL 2434196, at *1 (D.D.C. Aug. 22, 2025) (Sooknanan, J.) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). When the Government is a party, the factors regarding the public interest and any harm to the Government

merge. *See Nken*, 556 U.S. at 435. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Ibid.*

**ARGUMENT**

Taken together, the stay factors strongly support staying the Court's entry of judgment pending the resolution of Defendants' ongoing appeal of that order.

**I.     THE GOVERNMENT STANDS A SUBSTANTIAL CHANCE OF SUCCESS ON THE MERITS**

As to the first factor, the chances of success on the merits must be "substantial." *Media Matters for America*, 2025 WL 2434196, at *1. "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, … may grant a stay even though its own approach may be contrary to [the] movant's view of the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

Defendants appreciate that, on balance, the Court rejected Defendants' merits arguments at the dispositive-motion stage. Nonetheless, the Court's analysis hardly reflects the kind of slam-dunk case in which Defendants lack a substantial chance of success on the merits of their appeal. For all the reasons articulated in Defendants' dispositive-motion briefing, Defendants are substantially likely to prevail on appeal. But at this stage, Defendants highlight three points that especially reflect their ultimate chances of success.

*First*, the Court held that "the modified SAVE system violates th[e] prohibition" on disclosures of sensitive information under the Social Security Act (specifically, 42 U.S.C. § 405(c)(2)(C)(viii)(I)). ECF #111 at 43. But respectfully, the Court's analysis conflates two interactions at play in any given query to the SAVE system: first, the disclosure of information by SSA to DHS; second, the disclosure of information by DHS to the SAVE user.

6

As the Court correctly noted, "[t]he Social Security Act instructs that[] '[s]ocial security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record.'" *Ibid.* (quoting § 405(c)(2)(C)(viii)(I)).  Two parts of that provision warrant special attention.  First, this confidentiality restriction does not apply if the records were "obtained or maintained" pursuant to statutory authority pre-dating October 1, 1990.  Second, the restriction applies only to a limited subset of records: SSNs and "related record[s]," the latter term meaning "any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained."  42 U.S.C. § 405(c)(2)(C)(viii)(IV).  Now, recall the Court's description of a "Modified SAVE's User Experience."  ECF #111 at 15.  Upon the entry of certain information in the user's possession, the system "discloses the … uploaded data to SSA and uses it to search the SSA Master File."  *Id.* at 16.  In response, "SSA automatically discloses the SSA Master File search results to DHS," which includes citizenship data; a yes/no deceased-status indicator; a true/false match response on certain inputted fields (SSN, name, and date of birth); and, only when a partial SSN is provided, the full SSN.  *Ibid.*  Then, after all internal checks are completed by DHS, that agency—automatically, via the SAVE system—generates "one of the following responses" for the system user: "U.S. Citizen"; "Deceased"; or one of three prompts to enter more information.  *Id.* at 17.

The key point: DHS—that is, the SAVE system—does *not* disclose the SSN or other identifying information provided by SSA *to the system user*.  Nor does the SAVE system disclose a protected "related record" to the user, because mere citizenship or decedent status—*i.e.,* the *only*

7

fields DHS discloses to users that may contain information sourced from SSA records—does not meaningfully disclose the "identity" of the person associated with any SAVE query. (Indeed, the statute elsewhere distinguishes between the "identity" of an individual and "the fact that such individual is a citizen or a noncitizen." 42 U.S.C. § 405(c)(2)(B)(i)(3).) The only disclosure of information that *might* be protected occurs when SSA discloses certain information to DHS (which, again, does *not* re-disclose that information to the user). But that disclosure does not implicate § 405(c)(2)(C)(viii)(I) because SSA would not have "obtained or maintained" that information pursuant to statutory authority enacted after October 1, 1990. The maintenance of SSN records dates back to 1936, after the passage of the Social Security Act in 1935. *See The Story of the Social Security Number*, Social Security Bulletin Vol. 69, No. 2 (July 2009), available at https://perma.cc/2RRU-X63Q. And the primary authority governing SSA's maintenance of, access to, and disclosure of SSNs is the Privacy Act of 1974, which likewise precedes the October 1, 1990, cutoff date. *See generally* Pub. L. 93-579, 88 Stat 1896 (1974). Accordingly, nothing about the SAVE system runs afoul of the Social Security Act protections on which the Court relied.

*Second*, the Court concluded that even apart from the Social Security Act, the "disclosure of … SSA data to DHS and SAVE users violates the Privacy Act's protections against non-consensual disclosures." ECF #111 at 50. In so holding, the Court acknowledged that those protections are subject to "certain exceptions," *ibid.*—as relevant here, when the relevant data is put to a "routine use," meaning "the use of such record for a purpose which is compatible with the purpose for which it was collected," 5 U.S.C. § 552a(a)(7); *see also id.* § 552a(b)(3) (permitting disclosure under such circumstances). That definition is an expansive one: as the D.C. Circuit itself has noted, judges of that Court have taken "different approaches" to the term "compatible," with one opining that "purposes are compatible so long as there is 'no *conflict*' between them."

8

*Ames v. DHS*, 861 F.3d 238, 240 n.1 (D.C. Cir. 2017) (quoting *Postal Service v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 146–47 (D.C. Cir. 1993) (opinion of Williams, J.)) (emphasis in original).  But for purposes of this case, it suffices that *Congress itself* presumably thought the use of SSNs for citizenship-verification purposes compatible with the purposes for which SSNs are collected.  After all, Congress mandated that "[n]otwithstanding any other provision of Federal[] … law[] … a Federal[] … entity or official may not … in any way restrict[] any government entity or official from … receiving … information regarding the citizenship or immigration status … of any individual."  8 U.S.C. § 1373(a).  That language could hardly sweep more broadly, leading to the strong logical inference that SSA may not restrict DHS from obtaining citizenship information in SSA's control (which could only be retrieved from SSA systems using SSNs).  Consequently, complying with § 1373(a) requires doing precisely what the Court said could not be done in its order.  While the Court found SSNs incompatible with voter-verification purposes, the better understanding of the routine-use exception is that where disclosure of data is made "pursuant to a specific statutory charter," the routine-use exception is satisfied, given Congress's pre-existing, implied compatibility determination.  OMB, Guidance on the Privacy Act, 52 Fed. Reg. 12990, 12993 (Apr. 20, 1987); *see also* ECF #111 at 55 ("Without question, it is the duty of Congress … to determine what is necessary and proper for carrying into execution [its] enactments" (quotation cleaned)). [1]

*Third*, the Court held that the DHS and SSA SORNs violated the notice-and-comment requirements of the Privacy Act, and that by extension, Defendants violated the APA because they

---

[1] Indeed, this is precisely the basis on which SSA has published other routine uses for data covered by its NUMIDENT SORN, even when those uses are not related to the purposes for which SSNs are collected.  *See* 90 Fed. Reg. 10025 (Feb. 20, 2025).  For instance, Routine Use No. 23 permits disclosure of data "[t]o the National Archives and Records Administration"; that use is justified by 44 U.S.C. §§ 2904, 2906.  90 Fed. Reg. at 10027.

could not have "considered serious reliance interests nor … opposing views" in the absence of public comment. ECF #111 at 56–65. But the Privacy Act merely requires that "at least 30 days prior to publication of information under" 5 U.S.C. § 552a(e)(4)(D), the agency "publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." 5 U.S.C. § 552a(e)(11). (Section 552a(e)(4)(D), in turn, refers to "each routine use of the records contained in the system, including the categories of users and the purpose of such use.") And that is exactly what SSA and DHS did in the challenged SORNs. The DHS SORN was published on October 31, 2025, specifying that "[n]ew or modified routine uses will be effective December 1, 2025" and specifically invited the immediate submission of comments for the agency's consideration. 90 Fed. Reg. 48948, 48949 (Oct. 31, 2025). Likewise, the SSA SORN was published on November 12, 2025, specifying that "new routine uses … are effective December 12, 2025" and specifically "invit[ing] public comment on the routine uses or other aspects of this SORN." 90 Fed. Reg. 50879, 50880 (Nov. 12, 2025). The SORNs therefore plainly comply with the requirements of the Privacy Act, and requiring anything further in the name of the Privacy Act improperly "impose[s] judge-made procedures in addition to the [statute]'s mandates." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) (quotation cleaned). Finally, to the extent the Court's opinion suggests that the APA imposes an *independent* notice-and-comment obligation—including some obligation to provide a written explanation or response to comments received—on top of that required by the Privacy Act, that imposition would call into question "virtually *every* SORN publication" dating back decades. ECF #77-1 (Defs' Principal Br.) at 42 (emphasis in original).

10

For all these reasons, along with those expounded at length in Defendants' dispositive-motion briefs, Defendants stand a sufficiently strong chance of success on the merits to warrant a stay pending appeal.

## II.    THE REMAINING STAY FACTORS WEIGH DECISIVELY IN FAVOR OF A STAY

Defendants are suffering significant irreparable harm as a result of the Court's order. And when the Government is a party, the stay factors regarding the public interest and any harm to the Government merge. *See Nken*, 556 U.S. at 435. On balance, the equities *overwhelmingly* favor a stay of the Court's order pending the outcome of Defendants' appeal.

The modified SAVE system was no one-hit wonder: it was used, and was intended to be used, by a panoply of federal, state, and local government entities in their efforts to verify voter eligibility, verify eligibility for benefits, combat fraud, and satisfy various statutory requirements. The federal government used it to verify eligibility for various programs. *See* Broderick Decl. ¶ 6. Plans for more such uses were actively in the works. *See id.* ¶ 7 (discussing HUD verification efforts). DHS needed the modified system to ensure that where DHS's sister agencies had more reliable data than its own, it could update its own records. *Id.* ¶ 8. And in the absence of SAVE's new features, critical identity verifications can only occur much more slowly and at much greater cost. *Id.* ¶ 13. The result is a significantly greater risk of undetected voter fraud, benefits fraud, and other deceitful conduct. *Id.* ¶ 11. And of course, given its substantial investments in SAVE's upgrades, DHS cannot simply throw those efforts to waste, necessitating a dual-track approach—at least during the pendency of the appeals process—by which the agency maintains, at substantial cost, both the "old" SAVE and the upgraded system in parallel (even as the new features in the modified system remain unavailable to system users because of this Court's order). *Id.* ¶ 10.

11

None of this is to mention the significant burdens imposed on *non-federal* entities by the Court's order. Many state and local agencies rely on the modified SAVE system to maintain accurate voter-registration lists and to verify eligibility for public benefits. *Id.* ¶ 7. And multiple states have gone so far as to pass legislation depending on the use of the modified, but now vacated, system. *Id.* ¶ 12; *see also Florida*, No. 3:24-cv-00509, ECF #32 at 8–9 (collecting instances in which various states "have incorporated SAVE's now-disabled features into state law, meaning state officials can no longer abide by state statutory requirements").

But that's not all. As a result of this Court's order, Defendants are now under two diametrically opposed obligations. As this Court well knows, its order "vacates and sets aside the SAVE 'modified system' described in the" 2025 DHS SORN. ECF #112 at 1. That "modified system" is the SAVE system as modified by updates permitting it, *inter alia*, "(1) to include the records of natural-born citizens, (2) to access SSA records, including Social Security Numbers, and (3) to permit bulk searches of records by SAVE users." ECF #111 at 2. Accordingly, compliance with this Court's order requires Defendants to, in the immediate term and at a minimum, disable certain features in the SAVE system. But Defendants' compliance with those requirements definitionally brings Defendants out of compliance with a settlement agreement entered in the Northern District of Florida, which that court incorporated by reference into its order dismissing that case. *Florida*, No. 3:24-cv-00509, ECF #31 at 1–2. The settlement agreement specifically requires that SAVE allow searches with both full and partial SSNs. *Id.* ECF #30-1 ¶ 10(b)–(c). And it requires that SAVE have the capacity to "process bulk upload verification requests so that users of the system will not need to input verification requests one-by-one." *Id.* ¶ 10(d).

Predictably, the *Florida* plaintiffs, having now lost access to the SAVE features for which they negotiated, have already moved the Northern District of Florida to enforce the settlement—in other words, to force Defendants to violate this Court's order. The Northern District of Florida promptly required Defendants to show cause why it should not compel compliance with the settlement agreement. *Id.* ECF #33 at 1. This Court's order has therefore put the federal sovereign in an untenable position; compliance with both obligations is impossible. That kind of irreparable harm alone warrants a stay here.

Against all these quintessentially irreparable harms, Plaintiffs can muster but little: the inter-governmental disclosure of SSNs, the disclosure of recorded citizenship status, and, at most, the need for a modest affirmative effort—imposed by states, not by the federal government—to confirm U.S. citizenship for voter-registration purposes. *See* ECF #111 at 24, 32–33. Respectfully, those equities simply cannot hold a candle to the avalanche of burdens being borne by Defendants and government entities across the country as a result of the Court's order. And because the equities tilt so heavily in Defendants' favor, a stay pending appeal is especially warranted in this case.

## CONCLUSION

The Court should stay its order entering judgment for Plaintiffs, ECF #112, pending the resolution of Defendants' appeal of that order to the D.C. Circuit.

JULY 1, 2026

*Respectfully submitted,*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

*/s/ Cesar Azrak*
CESAR AZRAK
DC Bar No. 90025888
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 538-3491
cesar.e.azrak@usdoj.gov

*Counsel for Defendants*

14