**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*, | |
| Plaintiffs | |
| v. | Case No. 25-cv-3501-SLS |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................3

    I.    DHS and SSA begin discussions about modifying SAVE. ..............................................3

    II.    SSA reveals critical new information, and plaintiffs sue. ................................................3

    III.    Notwithstanding the Court's doubts about the modified SAVE system's lawfulness, Defendants entrench the new system. .............................................................4

    IV.    The Court grants summary judgment to Plaintiffs and vacates the modified SAVE system. ......................................................................................................................6

    V.    Post-judgment developments. ..........................................................................................7

LEGAL STANDARD ...................................................................................................................8

ARGUMENT .................................................................................................................................8

    I.    The *Florida* litigation does not justify a stay. ................................................................8

    II.    The Federal Defendants have not made a strong showing that they are likely to succeed on the merits of their appeal. .............................................................................9

        A.    The Federal Defendants fail to address, let alone refute, multiple independent grounds for affirming this Court's decision on the merits...................10

        B.    The Federal Defendants' three merits arguments are not substantially likely to succeed. .................................................................................................................12

    III.    The Federal Defendants have not shown and cannot show irreparable harm.................16

    IV.    The balance of equities and public interest weigh heavily in Plaintiffs' favor. ..............18

CONCLUSION..............................................................................................................................25

**INTRODUCTION**

Two weeks ago, this Court entered summary judgment for Plaintiffs after finding that Defendants Department of Homeland Security ("DHS") and Social Security Administration ("SSA") violated multiple statutes in transforming the Systematic Alien Verification for Entitlements ("SAVE") system into an unreliable tool for "mass voter verification." *See* ECF 111 at 1. The Court explained that in "scrambling to comply with an Executive Order aimed at reshaping federal elections," the Federal Defendants "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable," and "knowingly trampled on the privacy rights of American citizens in a manner that threatens the sacred right to vote." *Id.* The Court thus "vacate[d] the 2025 SAVE modified system and the related [system of records] notices because they were contrary to law, arbitrary and capricious, in excess of statutory authority, and without observance of procedure required by law." *Id.* at 3.

Nine days later, the Federal Defendants asked this Court for an emergency stay of the vacatur order. They protest that the order has "upended" the government's use of the recently modified SAVE system, stressing "most importantly" that the Federal Defendants are "*bound by a settlement agreement*" to continue operating the modified system. ECF 116-1 at 1 (emphasis in original). The Federal Defendants argue that "the federal sovereign" is being "irreparably harm[ed]" by being put in the "untenable position" of being required to comply with this Court's order and the settlement DHS signed with four states in *Florida v. U.S. Dep't of Homeland Security*, 3:24-cv-509 (S.D. Fla.). *Id.* at 13.

Yet fewer than 24 hours after seeking extraordinary relief from this Court's order, DHS told the *Florida* court that no such "untenable position" exists—in fact, in DHS's view, the settlement agreement entered in that case *cannot* bind it to violate this Court's order:

> The agreement expressly provides that it does not impose duties or obligations that are inconsistent with federal statutes, and a binding interpretation of relevant federal statutes by a federal district court satisfies that requirement. A party also

1

does not breach its obligations under a settlement agreement by refusing to violate a court order.

*Florida*, ECF 42 at 1 (July 2, 2026) (attached as Ex. A). If this argument sounds familiar, it is because it is precisely what Plaintiffs argued during dispositive motion briefing here. *See* ECF 100 at 49 (the *Florida* "settlement is no barrier to relief" because it "cannot impose unlawful obligations on the government").

The Federal Defendants may fear that the *Florida* court could issue an order that all parties to this case agree would be improper. But it is not *this* Court's responsibility to stay its own decision to protect the Federal Defendants from possible consequences flowing from DHS's own ill-advised settlement agreement. *See* ECF 111 at 73 (Raising concerns about clean hands, good faith, and forum shopping in DHS's entrance into the *Florida* agreement). And, of course, to the extent the Federal Defendants simply disagree with this Court's summary judgment decision, they may continue to press their arguments in their pending appeal before the D.C. Circuit, rather than using the unsupported collateral attack in *Florida* as leverage for emergency relief here.

The Federal Defendants' other arguments also fall far short of their heavy burden to obtain the "extraordinary remedy" of a stay of this Court's summary judgment order. *See KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024). Their merits arguments largely retread grounds already considered (and emphatically rejected) by this Court at summary judgment, and remain unpersuasive. Further, the balance of equities continues to tip heavily in favor of protecting the privacy and voting rights of the millions of Americans impacted by the Federal Defendants' unlawful SAVE changes.

Most fundamentally, each and every "harm" asserted by the Federal Defendants is the result of their own reckless decision to hastily modify SAVE in violation of federal law and then push government agencies to use the illegal system—even after this Court expressed doubts about its legality—for mass citizenship checks. Defendants have only themselves to blame for any disruption caused by this Court's vacatur of a system they unlawfully created and deployed. "Such

2

self-imposed costs" are not grounds for the extraordinary remedy of a stay pending appeal. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985).

## BACKGROUND

### I. DHS and SSA begin discussions about modifying SAVE.

In May 2025, DHS and SSA entered into an "agreement to overhaul the SAVE system." ECF 111 at 11. The agreement purported (1) to authorize SSA to share its records with DHS for use in the SAVE system for the first time since SAVE was launched in 1986 and (2) to enable bulk searches of SAVE using Social Security numbers (SSNs). *See id.* DHS launched this modified version of SAVE that same month, *id.*, even though DHS's agreement with SSA was not made public until months later, in September. *See infra*, n. 1.

Neither DHS nor SSA published the May agreement or the statutorily required System of Records Notices ("SORNs") before modifying SAVE. *See* ECF 111 at 57. However, over the months that followed, DHS gradually released limited information about the modified system. A July 17, 2025, USCIS tutorial on the modified SAVE system further confirmed the linkage of the DHS and SSA data systems, explaining that cases searched with an SSN are compared against SSA data and describing the new bulk upload functionality. DHS-AR-1484-1523. On August 27, 2025, USCIS made significant changes to its SAVE "fact sheet" to reflect that the modified SAVE could "verify U.S.-born citizens for voter verification agencies." DHS-AR-1524-1526.

### II. SSA reveals critical new information, and plaintiffs sue.

On September 25, 2025, SSA published on its website for the first time the May 15, 2025, letter agreement between DHS and SSA for the modified SAVE system. DHS-AR-420-431.[1] That agreement provided substantial detail on the "information sharing" between the agencies, and

---

[1] The SSA's FOIA Reading Room lists this document, the "May 15, 2025 SSA-DHS-USCIS Agreement_Redacted," as having been posted on September 25, 2025. *See FOIA Reading Room*, SSA, https://perma.cc/FHU5-W2XY.

further confirmed that USCIS would "maintain information provided by SSA in its system of records." DHS-AR-000424.

Five days after publication of the letter agreement, Plaintiffs filed their initial complaint challenging the SAVE modifications. ECF 1 (challenging the SAVE modifications as substantively and procedurally unlawful under the Administrative Procedure Act, Privacy Act, Social Security Act, and U.S. Constitution, and as *ultra vires*).

On October 7, 2025, Plaintiffs sought emergency relief in an attempt to forestall the rollout of the modified SAVE system given its procedural deficiencies, the privacy violations resulting from the unauthorized disclosure of social security data, and potential impact on the voting rights of naturalized and derived citizens. ECF 16; ECF 16-1. On November 17, this Court denied the motion for preliminary relief. ECF 55. The Court stated it was "troubled by the recent changes to SAVE" and that it "doubt[ed] the lawfulness of the Government's actions," but it declined to issue preliminary relief because, in the Court's view, Plaintiffs had not yet demonstrated irreparable injury. ECF 55 at 1.

### III. Notwithstanding the Court's doubts about the modified SAVE system's lawfulness, Defendants entrench the new system.

Despite this Court expressing doubt as to the legality of the SAVE modifications, the federal government continued to further embed the modified SAVE into its operations.

One key step was a settlement in *Florida v. DHS*, No. 24-cv-00509, ECF 31 (N.D. Fla. Dec. 1, 2025). In that case, originally filed in 2024, the State of Florida and Florida Department of State had sued DHS and the DHS Secretary—but not SSA—for failing to respond to inquiries regarding voter verification in a timely manner, arguing that they should be required to respond using "any and all reasonably available information in Defendants' custody." *See id.* ECF 1 ¶¶ 46, 52, 61. The *Florida* defendants never answered the *Florida* complaint, filing unopposed or consent extensions to their answer deadline on December 9, 2024, *id.* ECF 8, February 5, 2025, *id.* ECF 15, May 15, 2025, *id.* ECF 19, July 15, 2025, *id.* ECF 23, and September 11, 2025, *id.* ECF 25.

4

On November 28, 2025, after the modified SAVE had been implemented, just eleven days after this Court stated that it "doubt[ed] the lawfulness of the Government's actions," ECF 55 at 1, and just four days after this Court granted Plaintiffs leave to file a supplemental complaint, Nov. 24 Minute Order, the *Florida* plaintiffs and DHS entered multiple filings in the *Florida* case. First, the *Florida* plaintiffs filed an amended complaint adding Iowa, Indiana, and Ohio as Plaintiffs. *Id.* ECF 29. Later the same day, the *Florida* plaintiffs filed a motion to dismiss and attached an already-executed settlement agreement. *Id.* ECF 30. The unopposed proposed order asked that the court "retain[] jurisdiction over this case for a period of twenty years … for the purpose of enforcement of the parties' settlement agreement," which was to be "approved by and incorporated by reference into" the order. *Id.*, ECF 30-2 at 1-2.

This *Florida* settlement agreement was the first time that the bulk upload function and Social Security Number integration were specifically placed at issue in *Florida*. *See id.* ECF 30-1. The docket in the *Florida* case does not reflect either party notifying the Northern District of Florida of pending litigation in this case, or this Court's November 17 decision calling the SAVE modifications' legality into question, despite DHS being a defendant in both cases.

On December 1, 2025, the *Florida* court entered the parties' proposed order approving the settlement agreement, incorporating it by reference, and dismissing the case with prejudice. *Id.* ECF 31. Before that order, the parties' only actions in *Florida* were the complaint, the government's motions for extensions of time, and the plaintiffs' motion to dismiss with an executed settlement—there had been no adversarial litigation, production of an administrative record, or dispositive motion briefing. Nor did the December 1 order purport to resolve the legality of the SAVE modifications.

Notably, the settlement agreement states, "[n]othing contained in this Settlement Agreement shall impose on Defendants any duty, obligation, or requirement, the performance of which would be inconsistent with the United States Constitution, or with *any federal statute* in effect at the time of such performance." *Id.* ECF 30-1 ¶ 17 (emphasis added).

5

Meanwhile, in the months that followed, while the parties here litigated summary judgment, *see* Minute Order (Feb. 2, 2026) (setting case schedule), Defendants continued to expand the use of the SAVE system throughout the federal government. For example, the Department of Transportation and the Department of Housing and Urban Development each introduced a new use of SAVE since February 2026. *See* ECF 116-2 ¶¶ 6-7.

**IV.    The Court grants summary judgment to Plaintiffs and vacates the modified SAVE system.**

On June 22, 2026, after DHS and SSA produced voluminous administrative records and the parties engaged in extensive motion briefing, this Court granted summary judgment to Plaintiffs. The Court found that "there can be no question that the modified SAVE system violates" the Social Security Act, ECF 111 at 43, that DHS and SSA "clearly violated the Privacy Act's non-disclosure bar by disclosing SSA records to DHS and SAVE users (including states) without the consent of Plaintiffs' members," *id.* at 56, that DHS's and SSA's belated publication of applicable System of Record Notices and preordained response to public comments violated the APA's procedural requirements, *see id.* at 62-64, and that the changes to the SAVE system were arbitrary and capricious, *see id.* at 63-65. The Court found that modified SAVE caused Plaintiffs' members privacy injuries because the federal government disclosed their private information in SSA records without consent, *see id.* at 23-24, 25-29, reputational injuries because the disclosure of this information when inaccurate led to Plaintiffs' members being accused of being non-citizens, *see id.* at 24-25, 29-31, voter injuries because SAVE user agencies attempted to revoke Plaintiffs' members' voter registration based on the disclosure of inaccurate information, *see id.* at 31-36, and procedural injuries because Plaintiffs' members' "'legally protect[able] interest[s]' in privacy and voting have been put at risk by the Federal Defendants' failure to comply with the procedural requirements of the Privacy Act and the APA." *Id.* at 40.

On all those bases, this Court vacated the changes to the SAVE system in order to redress those harms. *See id.* at 74-75. This Court further denied the Federal Defendants' and Texas's

motions to dismiss, including the Federal Defendants' argument that comity demanded dismissal to avoid any potential conflict with the *Florida* settlement. *Id.* at 72-74, 75.

## V.      Post-judgment developments.

On June 25, 2026, the Federal Defendants filed a notice of appeal. ECF 113. In parallel, however, DHS and SSA reportedly took steps to comply with this Court's judgment.[2] On June 25, the Federal Defendants confirmed that SAVE's bulk-upload, full-SSN search, and partial-SSN search functions were all disabled. *See* Email from Stephen Pezzi to Nikhel Sus (June 25, 2026), Ex. C, Att. 1 at 4. On July 1, the Federal Defendants confirmed that SSA suspended the connection between SSA systems to SAVE and that the vacated SORN's Federal Register notice was removed from SSA's website. *Id.* at 1. Additionally, because the search-by-SSN functions have been disabled, SAVE users can no longer initiate a search for "natural-born citizen[s.]" *Id.*

On June 30, 2026, the *Florida* plaintiffs filed a motion to enforce the settlement agreement, asking the *Florida* court to order DHS—but not SSA, which is not a party to that case—to restore the modified SAVE system despite this Court's June 22 order. ECF 32. Later that same day, the *Florida* court ordered the defendants to show cause as to why it should not restore the vacated functionalities of the SAVE system. ECF 33. On July 1, two of the Plaintiffs here (LWV and EPIC) filed an *amicus* brief in *Florida*, alerting that court to this Court's order and arguing that the *Florida* court could not grant the states' requested relief. Brief of Amici Curiae League of Women Voters and Electronic Privacy Information Center, *Florida*, ECF 37-1 (July 1, 2026) (attached as Ex. B).

On July 1, nine days after this Court vacated the SAVE modifications, Defendants moved this Court to stay its June 22 order pending appeal. On July 2, Defendant DHS opposed the *Florida* plaintiffs' motion to enforce the November 2025 settlement, agreeing with LWV and EPIC that

---

[2] Ex. B, at 23-26; *see also* Broderick Decl., ECF 116-2 ¶ 10. Plaintiffs do not have firsthand knowledge of these actions, but rely on Defendants' representations, which Plaintiffs have no reason to doubt at this stage. Plaintiffs also do not concede that these actions constitute complete compliance with the Court's judgment.

this Court's vacatur order did not breach the settlement agreement and that the government "remain[s] bound by that order." *See* Ex. A, at 11; *see also* Ex. B, at 8-11.

## LEGAL STANDARD

"A stay pending appeal is an 'extraordinary' remedy." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quoting *CREW v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam)). "To obtain such exceptional relief, the stay applicant must (1) make a 'strong showing that [it] is likely to succeed on the merits'; (2) demonstrate that it will be 'irreparably injured' before the appeal concludes; (3) show that issuing a stay will not 'substantially injure the other parties interested in the proceeding'; and (4) establish that 'the public interest' favors a stay." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Because "granting a stay pending appeal is always an extraordinary remedy, . . . the moving party carries a heavy burden to demonstrate that the stay is warranted." *McCammon v. United States*, 588 F. Supp. 2d 43, 47 (D.D.C. 2008) (quoting *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 990 (D.D.C. 2006)).

## ARGUMENT

### I.   The *Florida* litigation does not justify a stay.

The Federal Defendants' repeated invocations of the *Florida* case do not justify staying this Court's decision. *See* ECF 116-1 at 1, 3-5, 12-13. For the same reasons that this Court already rejected the Federal Defendants' arguments that comity with the *Florida* court demanded dismissing Plaintiffs' claims, ECF 111 at 72-74 (declining to construe the *Florida* consent decree, noting that judicial efficiency would not be advanced by dismissal, and questioning the good faith of Defendants' conduct), the *Florida* proceedings do not tip the balance of equities in favor of a stay.

Indeed, given the Federal Defendants' recent briefing in the *Florida* case, it is undisputed that this Court's order, *not* the *Florida* settlement, sets forth the Federal Defendants' legal obligations with regard to SAVE. *See* Ex. A at 1; *see also* ECF 100 at 49. DHS has correctly

8

explained to the *Florida* court that DHS cannot bind itself or be ordered to violate the law. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992) ("[a] consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law," including due to intervening "decisional law"); *see also* Brief of Amici Curiae League of Women Voters and Electronic Privacy Information Center, *Florida*, ECF 37-1, at 8-9 ("No court would (or could) approve a settlement agreement that *required* a party to behave in a manner which was already unlawful at the time the parties entered it."). Thus, whatever "untenable position" the Federal Defendants have put themselves in, ECF 116-1 at 13, it is not upon this Court to relieve their tension by staying its (correct) decision and allowing them to use the illegally modified SAVE system pending appeal. Justifying relief from this Court's order on account of the *Florida* settlement would also be inappropriate given that this Court in part ordered relief against SSA, which is not a party to the *Florida* case and did not sign the settlement agreement there, meaning its obligations under this Court's order are not implicated in *Florida*.

This Court should decline Federal Defendants' request to subordinate its order to a hypothetical decision from another court that the Federal Defendants themselves agree would be improper.

## II.   The Federal Defendants have not made a strong showing that they are likely to succeed on the merits of their appeal.

As the Federal Defendants concede, *see* ECF 116-1 at 5-6, their "burden of demonstrating a substantial case on the merits is heavy." *McSurely v. McClellan*, 697 F.2d 309, 317 (D.C. Cir. 1982). It "requires more than a mere possibility that relief will be granted." *Nken v. Holder*, 556 U.S. 418, 420 (2009). Nor can the movant merely "repeat[] the arguments [it] previously made" in briefing the decision it appeals. *In re Google Digital Advert. Antitrust Litig.*, 688 F. Supp. 3d 1377, 1380 (U.S. Jud. Pan. Mult. Lit. 2023); *accord Naegele v. Albers*, No. 03-2507, 2014 WL 12683359, at *3 (D.D.C. Dec. 2, 2014) (denying stay where movant "advanced substantially the same arguments" it had already made "without success"); *Watson Lab'ys, Inc. v. Sebelius*, No. 12-

9

1344, 2012 WL 13076147, at *2 (D.D.C. Oct. 23, 2012) (stay movants cannot rely on "contention[s] which the Court has already rejected.").

The Federal Defendants downplay this high bar by asserting that "the Court's [summary judgment] analysis hardly reflects the kind of slamdunk case in which Defendants lack a substantial chance of success on the merits of their appeal." ECF 116-1 at 6. But even if the Federal Defendants were right about the standard—and they are not—the Court's summary judgment decision shows this is *precisely* such a "slamdunk case." Indeed, the Court summed up the Federal Defendants' many violations of federal law by concluding they "flunked compliance with the Social Security Act, the Privacy Act, and the APA." ECF 111 at 64. The Federal Defendants fall woefully short of carrying their heavy burden.

### A.    The Federal Defendants fail to address, let alone refute, multiple independent grounds for affirming this Court's decision on the merits.

While the Federal Defendants highlight "three points" that they wrongly claim "reflect their ultimate chances of success" on the merits, ECF 116-1 at 6, they wholly disregard three other standalone grounds for this Court's summary judgment order that doom their appeal.

First, the stay motion does not address this Court's holding that the Federal Defendants lacked statutory authority for the SAVE modifications. It is axiomatic that an "agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022); *see also Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021) ("Federal agencies are creatures of statute. They possess only those powers that Congress confers upon them."). And here, as the Court made clear, the Federal Defendants' actions were not "authorized by provisions of the Immigration Reform and Control Act of 1986 (1986 Act), [or] the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (1996 Act)." ECF 111 at 65. Specifically, the Court explained that the 1986 Act does not authorize modifying SAVE and indeed "has little relevance to this case," because its "provisions govern benefits, not voter eligibility" and concern only "applicants who are 'not a citizen or national of the United States[.]'" *Id.* at 67. And the Court held that the 1996 Act does not "authorize[] the modified SAVE

10

and permit[] DHS to verify citizenship in any manner that it sees fit—notwithstanding prior statutory limitations on inter-agency data sharing and disclosure of private information." *Id.* at 68. The Court further explained that the 1996 Act's "prohibitory language" cannot be "read as an 'an affirmative grant of power,'" *id.* at 70, and "'the overall statutory scheme' of the 1996 Act also does not support the Defendants' interpretation," *id.* . Defendants' lack of statutory authority for the SAVE modifications is an independently sufficient basis for finding that they are not likely to succeed on the merits, which Defendants' stay motion fails entirely to address.

Second, the stay motion is silent about the Court rejecting the Federal Defendants' related argument that "the 1986 Act and the 1996 Act displace or supersede the relevant provisions of the Social Security Act, the Privacy Act, and the APA." *Id.* at 65. As the Court underscored, "that argument runs contrary to the 'strong presumption that repeals by implication are disfavored and that Congress will specifically address pre-existing law when it wishes to suspend its normal operations in a later statute.'" *Id.* As to the 1986 Act, the Court concluded that "nothing in the 1986 Act suggests that any resulting system could not be harmonized with the protections in the Privacy Act." *Id.* at 67. "To the contrary, the 1986 Act expressly amended the Social Security Act to ensure that the 'automated or other system . . . protects the individual's privacy to the maximum degree possible.'" *Id.* And regarding the 1996 Act, the Court rejected the Federal Defendants' implied repeal argument because the Government does "not need to depart from the Privacy Act's procedural requirements or its substantive protections to verify citizenship requests [under the 1996 Act]. Indeed, since the 1996 Act's passage, the Federal Government has never needed SSA data or to depart from Privacy Act procedures to verify citizenship requests." *Id.* at 69.

Third, the stay motion does not challenge the Court's holding that the SAVE modifications were arbitrary and capricious under the Administrative Procedure Act ("APA") because the Federal Defendants provided only "belated justifications" for SAVE's modification. ECF 111 at 63. As the Court explained, the Federal Defendants did not engage in the requisite "reasoned justification for [their] decision to alter an existing regulatory scheme," *id.* at 62, and "the explanations in the 2025

11

SORNs and the comments received thereafter [we]re not properly before the Court because they postdate the decision to implement the challenged program," *id.* at 63.

Instead of making a strong showing why the Federal Defendants are likely to succeed in appealing these three grounds for the Court's summary judgment grant, the stay motion rests entirely on "the reasons articulated in Defendants' dispositive-motion briefing." ECF 116-1 at 6. Of course, the Court "already rejected" those same arguments. *Sebelius*, 2012 WL 13076147, at \*2. That is reason enough for denying the stay motion.

### B.     The Federal Defendants' three merits arguments are not substantially likely to succeed.

The three arguments on which the Federal Defendants do claim a likelihood of success on the merits come nowhere close to the requisite "strong showing."

Start with the Federal Defendants' arguments about the Social Security Act. *See* ECF 116-1 at 6-8. According to the Federal Defendants, the Court was wrong to hold that the modified SAVE system violates the prohibition on disclosures of sensitive information in the Social Security Act, 42 U.S.C. § 405(c)(2)(C)(viii)(I), because "this confidentiality restriction does not apply if the records were 'obtained or maintained' pursuant to statutory authority pre-dating October 1, 1990" and "the restriction applies only to a limited subset of records: SSNs and 'related record[s].'"ECF 116-1 at 7. As a threshold issue, the Federal Defendants never advanced this argument at summary judgment, meaning they did not preserve it and it cannot serve as a basis for their likelihood of success on appeal. *See District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal."); *see also Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 35-36 (1st Cir. 2026) (denying motion for stay pending appeal because government could not establish strong likelihood of success on argument that was "waived because the federal government did not develop it" in merits briefing below).

Even if the Federal Defendants had not waived their argument about the Social Security Act, it would fail on the merits. When a SAVE query is run using an individual's SSN and SSA

12

responds by providing the individual's citizenship information, SSA discloses several sensitive data elements about that individual to DHS—including SSNs and related records—and DHS in turn discloses SSNs to SAVE users as well. *See* ECF 111 at 15-16 (describing the "Modified SAVE User's Experience"). These disclosures meet both conditions for a violation of Section 405(c)(2)(C)(viii)(I). First, as the Federal Defendants admit, SSA discloses its citizenship records to DHS and DHS discloses that information to SAVE users pursuant to 8 U.S.C. § 1373, ECF 116-1 at 9, which was enacted in 1996. ECF 111 at 65. That meets the first prong of Section 405(c)(2)(C)(viii)(I). And the SSA records that SSA verifies and thus discloses to DHS through SAVE include "citizenship data; a yes/no deceased-status indicator; a true/false *match response* on certain inputted fields (*SSN*, *name*, and *date of birth*)." *Id.* at 7 (emphasis added). When SSA verifies those records for DHS, DHS "obtains" records that include "[s]ocial security account numbers and related records,"[3] in contravention of the second prong of Section 405(c)(2)(C)(viii)(I).

In arguing otherwise, Defendants wrongly claim that the modified SAVE system "does *not* disclose the SSN or other identifying information provided by SSA *to the system user*." ECF 116-1 at 7. But that argument overlooks that the *verification* of an SSN through a "match" is equivalent to the *disclosure* of that SSN. *See* SSA, Program Operations Manual System (POMS), GN 03325.002 Disclosure and Verification of Social Security Numbers (SSN) Without Consent (2023), https://perma.cc/PE44-2QBK; *see also* Pls.' MSJ Reply at 31 n.9, ECF 99 (noting Defendants' concession of this point). So when both SSA *and* DHS verify information *in response to an SSN search through the modified SAVE system*, they are "disclosing" SSNs and related records pursuant to a statute enacted before October 1, 1990 (*i.e.*, 8 U.S.C. § 1373), in violation of Section

---

[3] "[T]he term 'related record' means any record, list, or compilation that indicates, directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained pursuant to this clause." 42 U.S.C. § 405(c)(2)(C)(viii)(IV).

405(c)(2)(C)(viii)(I) of the Social Security Act. This disclosure by verification is no more deniable than the crime show trope of "blink once if I'm right."

The Federal Defendants' argument that they complied with the Privacy Act's prohibition on non-consensual record disclosure, *see* ECF 116-1 at 8-9, fares no better. According to the Federal Defendants, their conduct satisfies the routine use exception to the Privacy Act because by enacting 8 U.S.C. § 1373(a), Congress "presumably thought the use of SSNs for citizenship-verification purposes compatible with the purposes for which SSNs are collected." ECF 116-1 at 9. This argument is a re-hash of "substantially the same argument[]" the Court already rejected, *Naegele*, 2014 WL 12683359, at *3: that § 1373(a) authorizes SSA to transmit its records to DHS and then to the states for voter verification. As the Court made clear in granting summary judgment, "Section 1373(a) does not on its own authorize the establishment of the SAVE modified system—it is merely a prohibition on conduct." ECF 111 at 70. The Federal Defendants' mere disagreement with the Court's summary judgment decision does not make it substantially likely they will succeed on appeal.

Finally, the Federal Defendants argue they are likely to succeed in appealing the Court's conclusions regarding the Privacy Act's and APA's procedural requirements. The Federal Defendants' argument falters at the start, however, by conflating the two separate statutes. *See* ECF 116-1 at 9-10 ("[T]he Court held that the DHS and SSA SORNs violated the notice-and-comment requirements of the Privacy Act, and that *by extension*, Defendants violated the APA because they could not have 'considered serious reliance interests nor … opposing views' in the absence of public comment."). The Privacy Act imposes a standalone notice-and-comment requirement, *see* 5 U.S.C. § 552a(e)(4), and the APA separately forbids arbitrary and capricious decisionmaking, *see id.* § 706(2)(a).

Further, the Federal Defendants' Privacy Act arguments are, once again, identical to arguments the Court already rejected. *Compare* ECF 116-1 at 10 *with* ECF 111 at 56-61. And as for the Federal Defendants' contention about the APA's reasoned decisionmaking requirement, they make only a policy argument: that "including some obligation to provide a written explanation

14

or response to comments received—on top of that required by the Privacy Act, that imposition would call into question 'virtually every SORN publication' dating back decades." ECF 116-1 at 10.

First, this is misleading. As Plaintiffs pointed out in their summary judgment briefing, "SORNs rarely generate high volumes of public comments, and Defendants do not claim otherwise." ECF 99 at 47. And OMB's contemporaneous guidelines on the Privacy Act make clear that it has *always* been the case that in response to SORN comments, "[a]gencies should furnish as complete an explanation of . . . any changes made or not made as a result of the public comment as possible so that the public will be fully informed of the proposed use." OMB, Privacy Act Implementation: Guidelines and Responsibilities, 40 Fed. Reg. 28948, 28966 (July 9, 1975), https://perma.cc/776J-4L46. Second, even if there had been a long history of Privacy Act violations, that could not justify violating the statute *here*, nor weaken its requirements. *Cf. NLRB v. Noel Canning*, 573 U.S. 513, 613 (Scalia, J., concurring in the judgment) (rejecting the idea that the executive can accrue unconstitutional power through "adverse possession"); *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933) ("administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction"). Rather, "'longstanding yet impermissible agency practice cannot ripen into permissible agency practice.'" *D&B Boat Rentals, Inc. v. United States*, 508 F. Supp. 3d 87, 100 (E.D. La. 2020) (quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 246 n.13 (2009) (Stevens, J., dissenting)).

Third, the Federal Defendants do not actually contend their decision-making was anything other than arbitrary and capricious because, as the Court correctly concluded, it was. *See* ECF 111 at 61-65.

Because the Federal Defendants modified SAVE first and engaged in entirely perfunctory notice-and-comment later, they violated both the Privacy Act's procedural requirements and the APA. And having made no substantial showing that those conclusions—or any of the Court's many other bases for granting summary judgment—will change on appeal, the Federal Defendants are not likely to succeed on the merits.

### III.    The Federal Defendants have not shown and cannot show irreparable harm.

The Federal Defendants group together all of the stay factors except for the likelihood of success on the merits, *see* ECF No. 116-1, at 11-13, even though "the government bears the burden of separately demonstrating each of *Nken*'s requirements." *Miot v. Trump*, No. 26-5050, 2026 WL 659420, at *3 (D.C. Cir. Mar. 6, 2026). The Federal Defendants' slipshod treatment of the stay factors is a telling confirmation that they simply cannot meet the high bar of showing irreparable harm absent a stay.

Irreparable harm must be "both certain and great[,]" and "actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). It also must be "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Nowhere in the stay motion have the Federal Defendants explained what irreparable harm has or will occur as a result of this Court's ruling, and in fact, the Federal Defendants have conceded they are largely complying with this Court's order. *See* ECF 116-1 at 3; *see also* ECF 116-2 ¶ 10 ("DHS has already complied with the Court's Order by removing user access to features described in the December 2025 SORN"). The Federal Defendants' failure to demonstrate they will be irreparably harmed while their appeal is heard is "fatal" to the stay request "because a showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024).

As an initial matter, the Federal Defendants have not attempted to explain why, if they are suffering irreparable harm, they waited about a week and a half, until just before a holiday weekend, to seek a stay from this Court, *after* having already taken rapid and successful steps to come into substantial compliance with this Court's order. *See* Ex. C, Att. 1 at 4. Those steps include: disabling SAVE's bulk upload functionality, full social security number searches, and last-four social security number searches, as counsel for the Federal Defendants informed Plaintiffs on June 25, 2026; and suspending the connection used for data-sharing from SSA systems to SAVE, and vacating the SSA SORN, as counsel for the Federal Defendants informed Plaintiffs on July 1,

2026. *See id.*; *see also id.* at 1; ECF 116-2 ¶ 10.[4] If the Federal Defendants were irreparably injured by coming into compliance with this Court's order such that it needed a stay, one would have expected it to move for a stay more quickly, seek to expedite the appeal, or to address in the stay motion the practical challenges it faced in complying with this Court's order, none of which they have done. As this Court observed in another case,

> [o]ne would expect an irreparable injury to cause the Government to act the way it did in *Harris v. Bessent*, and *Wilcox v. Trump*. In *Harris*, the Government appealed the district court's removal decision, and filed a motion to stay pending appeal, on the very same day that the district court issued its order. And in *Wilcox*, the Government appealed the district court's removal decision on the same day, and filed a motion to stay pending appeal the next day.

*Grundmann v. Trump*, 786 F. Supp. 3d 188, 193 n.1 (D.D.C. 2025) (Sooknanan, J.) (citations omitted). The government has shown no such haste here.

Critically, the Federal Defendants find themselves in this position because of their own choices. The Federal Defendants chose to "scrambl[e]" to "haphazardly combine and repurpose" Americans' private data in modifying SAVE without complying with the Privacy Act and APA. *See* ECF 111 at 1. Then, even after this Court warned that it "doubt[ed] the lawfulness of the Government's actions," ECF 55 at 1, the Federal Defendants chose to double down and expand the use of the modified SAVE system. "Such self-imposed costs are not properly the subject of inquiry on a motion for stay." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985).

The Federal Defendants' allegations of harm are also easily rebutted. To start, the Federal Defendants erroneously point to harms to *other entities* that use SAVE. Mot. 11. Those claimed harms are not only baseless, *see infra* § IV, but also irrelevant to the irreparable harm inquiry, which turns on whether "*the applicant* will be irreparably injured absent a stay." ECF 55 at 5 (emphasis added) (quoting *Media Matters for Am. v. FTC*, 2025 WL 2434196, at *1 (D.D.C. Aug.

---

[4] Despite repeated requests, Defendants have not yet informed Plaintiffs what actions they have taken, if any, to implement this Court's vacatur of DHS's October 2025 modified SORN for the SAVE system. *See* Ex. C, Att. 1 at 1.

22, 2025) (Sooknanan, J.)). In any event, SAVE remains available to SAVE users to verify the citizenship of voters and benefits applicants as they have for years—only its illegally modified functionality has been vacated.

Nor do the Federal Defendants' plans for future, additional uses of modified SAVE warrant a stay. *See* ECF 116-1 at 11 (such plans "were actively in the works."). They can continue to make those plans while the appeal proceeds, even absent a stay. Notably, however, at the same time the Federal Defendants complain about being hindered in making plans for the future using a version of SAVE found to be unlawful, they also complain about their "substantial investments" in the SAVE overhaul going to waste in light of this Court's decision. ECF 116-1 at 11.. Those points are in tension, because continuing to rely on modified SAVE for making future plans would simply put more "substantial investments" at risk in the event this Court's decision is upheld on appeal. A stay of this Court's decision would not resolve the Federal Defendants' risks of experiencing sunk costs; nor should this Court bless the Federal Defendants' failed endeavor simply because they have already invested time, money, and effort into it.

**IV.    The balance of equities and public interest weigh heavily in Plaintiffs' favor.**

The balance of equities and the public interest also weigh against granting the requested stay. Here, where the government is a party, the inquiries into the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Federal Defendants focus on the various state and federal agencies that have begun using modified SAVE and their interests in unobstructed access to the system. But this argument ignores entirely the interests that voters and benefits recipients have in the accuracy of a system that will determine their rights, and the interests that millions of American citizens have in protecting their privacy rights, ensuring that their personal information is not unlawfully transferred across agencies and aggregated in an unauthorized national database.

The alleged harms to state and federal agencies that use the modified SAVE system are also vastly overstated. SAVE was first established in 1986; modified SAVE was not available until

mid-2025. ECF 111 at 11-12. State and federal SAVE users managed for many years prior to 2025 to maintain their voter rolls and research the eligibility of benefits applicants through other means, including the original version of the SAVE system, which remains online and available to them. This Court's ruling did no more than return the status quo that existed for decades, prior to DHS's recent modifications to the SAVE system, and the Federal Defendants provide no explanation for why continuing to use these longstanding processes for citizenship verification, pending appeal, imposes an unreasonable burden on state and federal agencies. *See Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at \*32 (D.C. Cir. Nov. 22, 2025) (alleged burden of returning to former, decades-long practice for a short time pending an appeal did not support a stay). And this Court's judgment is not the sole factor standing in the government's way, as other pending litigation also poses independent obstacles to these agencies' use of modified SAVE.[5]

The Federal Defendants' claims of "national security" risks also fail to pass muster. They argue, without evidence, that removing access to modified SAVE will create national security vulnerabilities and expose the nation to a heightened risk of benefits fraud, open the door to fraudulent voter registration, and allow malicious actors to "access sensitive government functions" including "entry to secure facilities." ECF 116-2 ¶ 11. These remarkable assertions are unsupported by evidence or explanation and ignore longstanding practices that federal and state agencies have used to verify both identity and citizenship for these purposes. For example, the Department of Housing and Urban Development—one of the agencies cited as a user of the modified SAVE system, *see id.* ¶ 7—has detailed regulations specifying the documentation and steps required to verify the citizenship or eligible immigration status of housing benefits applicants, which rely on the original version of the SAVE system along with other checks to ensure accuracy. *See* 24 C.F.R. §§ 5.508, 5.510, 5.512. And as Mr. Broderick is undoubtedly aware,

---

[5] *See*, *e.g.*, *Lujan v. FMCSA*, Case No. 25-1515 (D.C. Cir. Feb. 20, 2026) (challenge to interim final rule of Department of Transportation's Federal Motor Carrier Safety Administration requiring, among other things, SAVE verification); *Common Cause, et al. v. DOJ, et al.*, Case No. 26-cv-01352 (D.D.C. Apr. 21, 2026) (challenge to DOJ's use of the SAVE system to aggregate and investigate state voter rolls).

having presumably gone through the process himself, the U.S. government requires documentary verification of identity and citizenship, as well as a security background check, for all federal employees.[6] If the federal government is using the modified SAVE system as the primary or exclusive means to determine whether to provide federal credentials or "entry to secure facilities," it has never said so nor provided any evidence to that effect, nor explained why its past practices before 2025 were inadequate. Such reliance would be remarkable given that the modified SAVE system can, at best, provide an individual's citizenship or immigration status. And while the Federal Defendants raise the specter of widespread voter fraud, arguing that removal of the modified SAVE system will "embolden bad actors," they again provide no evidence, either of the existence of widespread voter fraud (there is none) or the effectiveness of modified SAVE as a deterrent.[7] Such vague and unsupported allegations of national security risk are insufficient to

---

[6] See USAJOBS Help Center, What are background checks and security clearances?. https://perma.cc/UYD3-92X8.

[7] All available evidence belies Defendants' claim that effectuating this Court's order "may embolden bad actors to attempt to register or vote unlawfully." ECF 116-2 ¶ 11. Public claims of widespread voter fraud have been repeatedly rejected by courts and factual investigations. *See, e.g.*, *O'Rourke v. Dominion Voting Sys., Inc.*, 552 F. Supp. 3d 1168, 1193-97 (D. Colo. 2021) (collecting evidence that claims of widespread voter fraud were unsupportable); *see also id.* at 1196-97 ("when pressed in court, the lawyers representing former President Trump have conceded that they could not and did not allege there was fraud in connection with the election … while reports of fraud or election rigging may have been widely disseminated across the internet … none had been accepted as true or verified by any government agency or court … independent investigations by reputable news sources had found no evidence to support the allegations, and [] many had been comprehensively rebutted by authoritative sources."); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 726 (9th Cir. 2025) ("The Arizona Senate [] established a committee to audit the 2020 election results. The audit did not reveal any evidence of voter fraud"); *Veasey v. Abbott*, 888 F. 3d 792, 806 (5th Cir. 2018) (Higgenbotham, J., concurring) ("[Texas] cannot show that its hurried pursuit of a so recently arrived fear of voter fraud exists beyond the fantasy of political spin"); *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 Fed. Appx. 377, 382 (3d Cir. 2020) (The Trump Campaign "never claims fraud or that any votes were cast by illegal voters."); *Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814, 822 (D. Mont. 2020) ("Plaintiffs were compelled to concede that they cannot point to a single instance of voter fraud in Montana in any election during the last 20 years."); ECF 111 at 32-33 (describing evidence that modified SAVE was inaccurately identifying lawful voters as potentially ineligible to vote).

justify a stay pending appeal. *See Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *3 (D.C. Cir. Sept. 25, 2025).

Nor does it help the Federal Defendants that state and federal agency SAVE users' pre-existing methods of verifying citizenship and immigration status may take more time and effort to complete, as compared to using the modified SAVE system. *See* ECF 116-2 ¶ 13. After eight months of litigation, and with nine days post-judgment to prepare their motion for stay, the Federal Defendants have provided no evidence or specific detail regarding the scope of those expenses. Nor have the allegedly impacted state and federal agencies come forward to assert the administrative burden and cost they face. Nor have the Federal Defendants or user agencies actually quantified how much alleged voter or benefits fraud they have been able to identify using modified SAVE, or balanced those effects against the frequency with which they erroneously burden citizens' rights and entitlements as a result of modified SAVE. Here again, such vague and generalized assertions of burden are far too speculative to support a stay. *See Make the Rd. New York,* 2025 WL 3563313, at *32.

On the other side of the ledger, the public in general—and the individuals impacted by SAVE's inaccurate results, in particular—have strong countervailing interests that outweigh the harms asserted by the Federal Defendants.

First, the public has a strong countervailing interest in government agencies not relying on inaccurate results from citizenship inquiries to make important decisions about them, including whether they have the right to vote or whether they are entitled to access other public benefits. The fact that modified SAVE is now being used for more and varied purposes—including determining eligibility for commercial driver's licenses (ECF 116-2 ¶ 6), public housing benefits (*id*. ¶ 7),[8] and

---

[8] The Department of Housing and Urban Development has not merely "proposed" to use overhauled SAVE to verify eligibility for housing assistance, as Defendants assert. *See* ECF 116-2 ¶ 7. It has already used the error-prone overhauled SAVE system to audit the eligibility of all 8.8 million people receiving federally funded rental assistance (p. 173, https://perma.cc/NYC5-9D78), flagging 200,000 tenants for further investigation into their eligibility (Julie Strupp, HUD Orders Citizenship verification for 200,000 tenants, Multifamily Dive (Jan. 26, 2026), https://perma.cc/LF4L-GSYB (Three leading industry groups representing public housing

state-level public benefits (*id*. ¶ 7)—demonstrates the expanding scope of the potential harm to the public. This Court made detailed findings regarding the harms to the public flowing from the use of modified SAVE to verify voter rolls, including violating "two fundamental rights that protect Americans from government overreach: the right to privacy and the right to vote." ECF 111 at 1. The expansion of those harms to other contexts weighs even more strongly against a stay of this Court's decision.

Second, the public has a strong countervailing interest in not having sensitive personal data transferred illegally across different government agencies and unlawfully consolidated into a national database of U.S. citizens controlled by DHS. This interest includes, but goes well beyond, the privacy of SSNs and citizenship data held by the Social Security Administration. *See* ECF 116-1 at 13. The modified SAVE system created—for the first time—a national database of natural born U.S. citizens, *id.* at 2, into which DHS and SAVE user agencies have been uploading sensitive information, like lists of benefits recipients[9] and voter rolls,[10] which DHS then retains for a period of ten years and can use for a variety of purposes.[11] As Professor Arthur Miller stated in testimony to Congress, when the Privacy Act of 1974 was being considered: "[i]n the past, dictatorships always have come with hobnailed boots and tanks and machineguns, but a dictatorship of dossiers, a dictatorship of data banks can be just as repressive, just as chilling and just as debilitating on our

---

authorities wrote to HUD in February 2026 to raise concerns about this process, including apparent inaccuracies in the audit results produced by the overhauled SAVE system.  Letter from Sunia Zaterman, Tim Kaiser, & Mark Thiele to Benjamin Hobbs, Principal Deputy Assistant Sec'y of U.S. Dep't of Hous. & Urb. Dev. (Feb. 13, 2026) https://perma.cc/NAA6-P6W8 at 3-4.

[9] *See*, *supra*, n.3.

[10]  Jude Joffe-Block, *The Justice Department plans to share sensitive voter data with Homeland Security*, NPR (Mar. 27, 2026) https://perma.cc/NSB5-LPTX.

[11]  Privacy Act of 1974; System of Records, 90 Fed. Reg. 48948, 48954-55 (Oct. 31, 2025).

constitutional protections." [12] A core purpose of the Privacy Act was to guard against this threat, *see* ECF 111 at 4-7, and the protection of the public against this threat outweighs any efficiencies these state and federal agencies gain in having access to a consolidated source of citizenship data.

Third, Congress has already balanced the equities in this context, and this Court has no authority to "reject the balance that Congress has struck in a statute" among competing policy concerns. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). Defendants' policy arguments have been made before, each time Congress weighed authorizing a national data bank, and Congress has consistently chosen to prioritize citizens' privacy instead. In the 1960s and 70s, calls for creation of a national data bank to provide more accurate and efficient administration of government programs were considered at length but rejected, and Congress instead passed the Privacy Act of 1974, creating robust safeguards for the privacy of Americans' government-held data and restricting cross-government data sharing. *See* ECF 111 at 4-7. In 1988, Congress amended the Privacy Act to authorize automated computer matching of data sets between different agencies for the purpose of determining eligibility of benefits, while placing robust procedural safeguards around these matching programs and reiterating that it was not authorizing creation of a national data bank. *See id.* at 8. And Congress continues to debate whether to seek more expansive cross-government data consolidation efforts for voter verification efforts,[13] including considering whether such efforts can justify the associated intrusions upon privacy, particularly given the inaccuracies of the modified SAVE system.[14]

---

[12] S. Rep. No. 93-1183, at 151–238 (1974), *reprinted in* House Comm. on Gov't Operations & Senate Comm. on Gov't Operations, 94th Cong., Legislative History of the Privacy Act of 1974: S. 3418 (Pub. L. No. 93-579) Source Book on Privacy, at 151–238 (1976)

[13] *See* S. 3752, "Save America Act" § 2(j)(5) (proposing to require certain information sharing by federal agencies for voter eligibility verification).

[14] *See*, *e.g.*, Catherine Cortex Masto, Press Release, On the  Senate floor, Cortez Masto Exposes Republican Save America Act as a Voter Suppression Bill (Mar. 19, 2026), https://perma.cc/4X7T-9ECP.

Finally, the equitable calculus heavily disfavors a stay when a party deliberately expands its operations in the face of known legal peril. Here, the Federal Defendants had explicit notice that the modified SAVE system was likely unlawful when this Court stated that it "doubt[ed] the lawfulness of the Government's actions." ECF 55 at 1. From that point forward, any hardships resulting from further investments by DHS, other federal agencies, or states were entirely self-inflicted. *Cf. NLRB v. Sav-On Drugs, Inc.*, 728 F.2d 1254, 1256 (9th Cir. 1984) ("A prevailing party at trial acts at its peril if it proceeds before the appeal is concluded.").

On balance, the public's interests in the accuracy of government benefits determinations and in the privacy of their government-held information significantly outweigh the vague and unsupported assertions of harm that state and federal agencies will experience if forced to return to the status quo and lose access to modified SAVE, pending appeal.[15]

---

[15] Proposed *Amici* Arizona Legislative Leaders also claim that *Purcell v. Gonzalez*, 549 U.S. 1 (2006) counsels in favor of staying this Court's order. *See* Proposed Brief of Amici Curiae Legislative Leaders, ECF 118-1, at 6 (citing 548 U.S. 1, 6-7). But at no point have Defendants, including Intervenor-Defendant State of Texas, which just held its primary election, raised *Purcell* in this case, and for good reason. *Purcell* has no application in an APA lawsuit against the federal government; it only governs challenges seeking a change in *state election laws*. *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring). This case obviously does not implicate *Purcell* since nothing in this Court's vacatur order "alter[s] carefully considered and democratically enacted state election rules . . . ." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

Furthermore, this case is even further afield from *Purcell* because the SAVE system remains available for voting-related uses consistent with both state election laws and federal law as construed by this Court. Indeed, the *Purcell* argument rings particularly hollow coming from Arizona, whose election officials have used the SAVE system for many years without the functionalities vacated by this Court and may continue to do so. *See, e.g.*, Plaintiffs-Appellees Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund Supp. Excerpts of Record Volume 1 of 1, *Mi Familia Vota v. Fontes*, No. 24-3188, ECF 140.1 at 9-19 (9th Cir. Aug. 12, 2024) (2018 SAVE System Memorandum of Agreement between USCIS and Arizona Secretary of State, executed October 31, 2018). Pre-2025 SAVE remains available to county recorders in Arizona to "use all available resources to verify the citizenship status of" applicants for voter registration, Ariz. Rev. Stat. § 16-121.01(D), including "[t]he United States citizenship and immigration services systematic alien verification for entitlements program, *if practicable.*" *Id.* § 161-121.01(D)(3) (emphasis added); *contra* ECF 118-1 at 1 (arguing that rolling back

24

**CONCLUSION**

For the foregoing reasons, this Court should deny the Federal Defendants' motion to stay this Court's summary judgment order pending appeal.

---

SAVE changes creates "confusion" because Arizona law "requir[es] election officials to use SAVE for certain voter registration procedures").

Given that the Arizona Legislative Leaders' proposed brief was filed mere hours before Plaintiffs' deadline (and as of this filing, has not yet been accepted by this Court), Plaintiffs are unable to engage exhaustively with their arguments but could do so in supplemental briefing if this Court decided it were necessary to resolve Defendants' motion.

25

Dated: July 6, 2026

/s/ Aman T. George

Aman T. George (D.C. Bar No. 1028446)
Jennifer Fountain Connolly (D.C. Bar No. 1019148)
Ronald A. Fein (D.D.C. Bar No. MA0012)
Sophie R. Gelber (D.C. Bar No. 9003827)
Johanna M. Hickman (D.C. Bar No. 981770)
Mark B. Samburg (D.C. Bar No. 1018533)
Robin Thurston (D.C. Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
ageorge@democracyforward.org
jconnolly@democracyforward.org
rfein@democracyforward.org
sgelber@democracyforward.org
hhickman@democracyforward.org
msamburg@democracyforward.org
rthurston@democracyforward.org

Counsel for All Plaintiffs

Nikhel S. Sus (D.C. Bar No. 1017937)
John B. Hill (N.Y. Bar No. 5505508)*
Lauren C. Bingham (D.C. Bar No. 90043462)*
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jhill@citizensforethics.org
lbingham@citizensforethics.org

Counsel for All Plaintiffs

Respectfully submitted,

Jon Sherman (D.C. Bar No. 998271)*
Michelle Kanter Cohen (D.C. Bar No. 989164)
Emily Davis (D.C. Bar No. 90020129)
FAIR ELECTIONS CENTER
1629 K St. NW, Suite 300
Washington, DC 20006
(202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
edavis@fairelectionscenter.org

Counsel for All Plaintiffs

John L. Davisson (D.C. Bar No. 1531914)
Enid Zhou (D.C. Bar No. 1632392)
Abigail Kunkler (D.C. Bar No. 90030868)
Mayu Tobin-Miyaji (D.C. Bar No. 90033340)
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Ave. NW
Washington, DC 20036
(202) 483-1140
davisson@epic.org
zhou@epic.org
kunkler@epic.org

Counsel for Plaintiff Electronic Privacy Information Center

* admitted pro hac vice

26