**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | No. 1:25-cv-03501 (SLS) |

**<u>DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL</u>**

## **INTRODUCTION**

The Court's order in this case strips away key improvements to a tool that processed more than a million status verifications each day for federal agencies and the States, the vast majority of which are of no conceivable interest to these Plaintiffs. Conversely, Plaintiffs' claims of harm are limited to amorphous concerns that their Social Security Numbers (SSNs) are being improperly shared between different agencies of the federal government, or the Defendants will be unable to definitively confirm that some extraordinarily small subset of their members are citizens. But Defendants are not sharing SSNs with the States, much less the public, and are in no instance asserting that any individual is ineligible to vote. Rather, the improved SAVE system has allowed defendants to confirm citizenship in additional circumstances, while continuing to leave to states and localities the determination of how to proceed in the rare cases in which the federal government has not confirmed citizenship status.

Meanwhile, as the United States explained in its stay motion, absent a prompt stay, the government faced a significant risk that it would soon be forced into an impossible dilemma, in which compliance with all outstanding court orders is logically impossible. Unfortunately, that possibility has seemingly now come to pass, as (over the robust opposition of the United States) the U.S. District Court for the Northern District of Florida issued an order earlier today that directly contradicts this Court's order. Although the United States is still reviewing that order in the *Florida* case, it appears to be logically impossible to fully comply with this Court's order as well as the order issued in *Florida*. That extraordinary and "intolerable situation" is another reason to grant a stay, *Carver v. Knox Cnty.*, 887 F.2d 1287, 1293 (6th Cir. 1989)—at the very least, with respect to the *Florida* Plaintiffs (*i.e.*, the States of Florida, Iowa, Ohio, and Indiana).

Accordingly, for the reasons in prior briefing and the reasons that follow, because the United States is likely to succeed on appeal, and because the equitable factors favor a stay, this Court should stay its judgment in full pending appeal. In the alternative, at a minimum, the Court should stay its judgment with respect to Florida, Iowa, Ohio, and Indiana, to relieve the United States from conflicting court-ordered obligations.

- 1 -

## <u>ARGUMENT</u>

**I.      The United States is likely to succeed on appeal.**

The United States is fully aware that most of its merits arguments have been "already re-jected" by this Court—a point that Plaintiffs nonetheless emphasize repeatedly. Stay Opp'n at 14, ECF No. 119. Of course, that is true in the context of virtually every motion for a stay pending appeal, or there would be nothing to appeal. The United States does not wish to burden the Court with repetitive arguments that have already been addressed at length. So the United States did not in its motion (and does not now) fully repeat all of the reasons that it respectfully disagrees with the Court's opinion. Even so, a few points in Plaintiffs' opposition warrant a brief reply.

**a.**      As for the government's arguments about the applicability of 42 U.S.C. § 405(c)(2)(C)(viii)(I), *see* Stay Mot. at 6-8, ECF No. 116, Plaintiffs start with a half-hearted waiver argument, *see* Stay Opp'n at 12. Although that statutory provision featured prominently in the Court's opinion, it received comparatively minor attention in the parties' briefs. In any event, the United States absolutely did argue (in both merits briefs) that this provision of the Social Se-curity Act does not apply here. *See* MTD-MSJ Br., ECF No. 77 at 59-50; MTD-MSJ Reply, ECF No. 106 at 28. And to the extent those arguments were originally framed differently or in a more abbreviated fashion, that is because the government was (at that time) responding to *Plaintiffs'* statutory arguments. Those arguments materially differed from the approach taken by this Court in its opinion, and instead focused largely on the theory that the recent changes to SAVE were entirely unauthorized by federal statute—an argument that this Court rightly did not adopt. Had Plaintiffs emphasized 42 U.S.C. § 405(c)(2)(C)(viii)(I) as heavily in their briefing as this Court did in its opinion, the United States would surely have addressed that provision in more detail. But, particularly in a case of this significance, it would be inequitable to hold that the United States forfeited a response to an argument that appeared in full form only in the Court's opinion.

When they do get around to engaging on the merits, Plaintiffs' responses fail. First, Plain-tiffs never actually contest that SSA does not "obtain[] or maintain[]" any data pursuant to a law after October 1, 1990, as is required for the statutory theory reflected in the Court's opinion to

work.  Instead, "[t]he maintenance of SSN records dates back to 1936, after the passage of the Social Security Act in 1935."  Stay Mot. at 8.  Plaintiffs' argument that SSA ultimately "disclose[s]" that data "pursuant to a statute enacted before October 1, 1990 (*i.e.*, 8 U.S.C. § 1373)," Stay Opp'n at 13, does not change that fact.  That is enough to reject the argument.

Second, SSNs are not actually "disclos[ed]" to the SAVE user in any relevant sense.  Indeed, the SSNs are provided *from* SAVE users, *to* the government.  Recognizing this reality, Plaintiffs respond that "*verification* of an SSN through a 'match' is equivalent to the *disclosure* of that SSN."  Stay Opp'n at 13.  Even if that dubious proposition were sound, it still doesn't work here, because SSNs are not "verified" for the SAVE user (rather than for DHS)—only citizenship (or death indicator) is confirmed for the SAVE user itself.

Third, if Plaintiffs are relying on 8 U.S.C. § 1373 as the relevant post-1996 statute (as they seem to be, *see* Stay Opp'n at 12-13), then this theory necessarily fails.  After all, 8 U.S.C. § 1373(a) provides expressly that SSA "may not prohibit, or in any way restrict" sharing information with DHS "regarding the citizenship or immigration status, lawful or unlawful, of any individual."  Reading the statute as the Court did in its opinion (and as Plaintiffs do now, in their stay opposition) is inconsistent with that language, for reasons discussed at length in the government's briefs.

**b.**  As for Defendants' argument that the Privacy Act cannot be enforced indirectly—that is, by grafting on the procedural and substantive requirements of the Administrative Procedure Act—Plaintiffs notably do not dispute that their theory would "call into question virtually *every* SORN publication dating back decades."  Stay Mot. at 10.  Instead, their primary response is that "SORNs rarely generate high volumes of public comments, and Defendants do not claim otherwise."  Stay Opp'n at 15.  That is non-responsive to the government's argument.  Whether or not a draft SORN publication results in a high volume or low volume of public comments, Plaintiffs' theory is that every agency faces an implied APA-like obligation to publish a "concise general statement" responding to those comments before the SORN may take effect.  5 U.S.C. § 553(c).  But the Privacy Act contains no remotely comparable requirement.  And analogous case law under

the APA itself confirms that federal courts are not permitted to innovate atextual procedural requirements that Congress declined to impose. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978).

## II.   The remaining stay factors support a stay pending appeal.

The remaining factors also support a stay. As explained in the government's motion (and the accompanying declaration), Defendants are suffering significant and ongoing irreparable harm as a result of the Court's order. *See* Stay Motion at 11-13; Broderick Decl. of July 1, 2026, ECF No. 116-2. Indeed, as the D.C. Circuit recently reiterated, the United States is always "irreparably harmed by an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026) (per curiam) (citations omitted). And the balance of equities and the public interest, taken together, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh in favor of allowing SAVE to continue to operate how it has operated for well over a year now, during the appeal. Plaintiffs' arguments to the contrary all lack merit—especially now that the court in *Florida* has entered an order that directly contradicts with this Court's order, over the objection of the United States.

**a.** Plaintiffs' first argument is to fault the United States for "seek[ing] a stay from this Court" only (in their words) "*after* having already taken rapid and successful steps to come into substantial compliance with this Court's order." Stay Opp'n at 16. But that is how court orders work—they must be complied with unless and until the bound party receives relief. It would be a perverse and troubling result if the United States were punished for prompt compliance with the Court's order, even while preparations were being made for an immediate appeal.

Plaintiffs' real argument seems to be that the government waited too long: insisting that the government "waited about a week and a half, until just before a holiday weekend, to seek a stay." *Id.*[1] The timing of the recent federal holiday had nothing to do with the government's appellate strategy, and has nothing to do with the legal principles that will govern the Court's

---

[1] Nine days is not "about a week and a half," Stay Opp'n at 16, but nothing turns on that.

- 4 -

resolution of this motion.  If Plaintiffs are correct that all motions asserting irreparable harm must be filed within a week—a proposition for which they cite no authority, and the government is aware of none—they are poor messengers for that position.  After all, Plaintiffs themselves waited many months after the relevant changes to SAVE before they filed this suit, and then even after their preliminary-injunction motion was denied they spent several more months preparing an amended complaint that restarted the litigation anew.

In any event, the United States has moved as quickly as feasible.  And the urgency of this matter significantly increased on June 30, 2026—eight days after this Court's order—when the *Florida* plaintiffs filed an emergency motion to enforce their settlement agreement, and the district court in *Florida* ordered the government to file an expedited response just hours later.  The government moved for a stay pending appeal in this Court the very next day.  Under these circumstances, there is no basis to conclude that the government has moved too slowly.

**b.**  Plaintiffs' remaining arguments on the equitable factors offer mostly rhetoric, rather than legal principle.  But their dramatic references to "dictatorships" and analogies to "hobnailed boots and tanks and machineguns," Stay Opp'n at 22 (quoting congressional testimony), are a very poor fit for this case—which is ultimately a Privacy Act lawsuit about improvement of the user experience for a government database created at the explicit direction of Congress.

As for the government's identification of extensive harms to third parties (such as state and local government agencies), Plaintiffs insist that those harms are "irrelevant," because the only thing that matters is whether the United States itself faces injury.  Stay Opp'n at 17.  Although the United States itself *is* suffering significant and irreparable harm, the harms to third parties described in the governments' filings are plainly relevant (at a minimum) to the "public interest," which is one of the factors this Court must consider in deciding the government's stay motion.  *Nken*, 556 U.S. at 426; *see also id.* at 435-36 (the "public interest" and balance-of-harms factors "merge" in cases involving the federal government).  Indeed, Plaintiffs themselves spill much ink about nonparties, and undifferentiated members of the public at large—relying heavily on, for example, "the interests that millions of American citizens have in protecting their privacy rights."

Stay Opp'n at 18.  This Court should consider not only the concrete and irreparable harm to the United States, but also the public interest more generally.

**c.**  Finally, the government's stay motion detailed concrete and specific harms created by the interaction of this Court's order with the settlement agreement in *Florida*, and the very real risk that, absent a prompt stay, the government could soon be put in the impossible and inequitable position of conflicting court orders, for which full compliance with all orders is impossible.  Plaintiffs' dismissive responses to that very serious problem were meritless at the time—but even more so now that (as of a few hours ago) the district court in *Florida* has actually entered the very order that the stay motion contemplated, over the objection of the United States.

First, Plaintiffs make repeated and vague references to the government's "good faith" in entering into the settlement agreement in *Florida*.  Stay Opp'n at 2, 8 (citing *League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2026 WL 1784297, at *34 (D.D.C. June 22, 2026)).  But they do not actually argue that the government acted in bad faith, nor would there be any basis for that remarkable accusation.  In truth, the United States faced significant and genuine litigation risk in each of the five lawsuits filed on this subject—all of which were filed before this one—in five different fora.  Plaintiffs nowhere suggest that the government was likely to prevail in any (let alone all five) of those earlier-filed lawsuits, nor argue that entering into a settlement agreement to resolve outstanding litigation is atypical or unusual.  And were there any doubt that the settlement agreement in *Florida* was negotiated at arms' length, the Court need look no further than the *Texas* case—in which the parties *failed* to reach a settlement agreement (despite the case raising the exact same issues) and remain in an adversarial litigation posture to this day.  *See Texas v. Mullin*, No. 4:24-cv-49-DC-DF (W.D. Tex.).

Even in *Florida* itself, as Plaintiffs' stay opposition acknowledges, the United States actively and fully opposed the *Florida* Plaintiffs' motion to enforce the settlement agreement—not because the United States disagrees with the *Florida* plaintiffs' views about the underlying policy issues at stake in these cases, but because that is what is in the litigation interests of the United States.  *See* Ex. 1, Opp'n of the United States to Mot. to Enforce Settlement Agreement, *Florida*

*v. DHS*, No. 3:24-cv-509, ECF No. 42 (N.D. Fla. July 2, 2026).  That is good faith, not bad faith—and plainly not some sort of strategic "leverage" play, as Plaintiffs here imply without any basis. Stay Opp'n at 2.

Plaintiffs also make much of the fact that the *Florida* settlement was entered after this Court expressed "doubts" about "the lawfulness of the Government's actions." *League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970, at \*1 (D.D.C. Nov. 17, 2025).  But Plaintiffs ignore that that statement was made while *denying* Plaintiffs' motion for a preliminary injunction, thus rejecting Plaintiffs' efforts to constrain the government's conduct by court order. This Court's (expressly tentative) statement of its own legal views, in the abstract, did not limit the government's options in responding to other litigation.  At the time the government entered into the *Florida* agreement, there was no relevant order from any court.

Moreover, the *Florida* agreement came after nearly a year of settlement negotiations, the existence of which was repeatedly and publicly disclosed on multiple court dockets (including this one[2]), and after Plaintiffs had failed to make any effort to intervene in any of that separate litigation.  The government had no obligation to allow a later-filed lawsuit to be litigated to final judgment before resolving four earlier-filed cases.  And in doing so, given the absence of any applicable court order, the government was permitted to use its own good-faith judgment about what resolution was in the litigation interests of the United States.  The fact that this Court has now entered a subsequent order that disagrees with the United States' legal position on some of the issues at stake in these cases does not retroactively undermine the propriety of the government's actions.

Ultimately, Plaintiffs did not and could not dispute that conflicting orders would present an "intolerable situation" for the government.  *Carver v. Knox Cnty.*, 887 F.2d 1287, 1293 (6th

---

[2] *See* ECF No. 37; Scheduling Mot. at 1 n.1, ECF No. 57; Notice, ECF No. 59.  Plaintiffs explicitly acknowledged their awareness of the *Florida* litigation in support of an extension request.  *See* Pls.' Extension Mot. ¶ 6, ECF No. 60 (acknowledging "Defendants' repeated references to those 'other SAVE-related cases'" in this case").

Cir. 1989). Staying this Court's order would thus be a sound exercise of the Court's equitable discretion, for that reason alone.

Regrettably, that problem is no longer a hypothetical one. A few hours before this filing, the district court in *Florida* issued an order requiring the United States to "immediately comply with the court-approved settlement agreement in [that] case by reinstating Plaintiffs' access to the bulk-upload and SSN-search features in the SAVE system." Ex. 2, Order at 9-10, *Florida v. DHS*, No. 3:24-cv-509, ECF No. 45 (N.D. Fla. July 7, 2026); *see also id.* at 7 ("The Court understands that this puts Defendants in a bind because they are subject to two contradictory orders—one from this Court requiring them to include certain features in the SAVE system and one from Judge Sooknanan prohibiting them from doing so."). That order expressly considered and rejected the comity arguments advanced by the United States, in its opposition to the *Florida* Plaintiffs' motion. *See id.* at 7 ("One of the orders has to give, and not surprisingly, the Court is not persuaded by Defendants' (and the amici's) arguments that its order is the one that should give."); *see also* Ex. 1, *Florida* Opp'n at 11-12 (the United States arguing explicitly and at length that the district court in *Florida* should not enter an order that conflicts with this Court's order).

Unfortunately, now, it appears to be logically impossible to comply with the *Florida* order while also fully complying with this Court's order.[3] That is an extraordinary circumstance, as well as an extraordinarily compelling reason to grant the government's stay motion here—or, at an absolute minimum, with respect to the States of Florida, Iowa, Ohio, and Indiana. *Cf. Am. Hospital Ass'n v. Price*, 867 F.3d 160 (D.C. Cir. 2017) ("In sum, it was an abuse of discretion to tailor the

---

[3] Most of this filing was drafted before this significant and recent intervening development. Accordingly, the United States is still reviewing the *Florida* order and considering all available options in response. Nevertheless, this filing reflects counsel's current understanding of the position of the United States regarding the scope of that order and its effect on this litigation. If necessary, the United States will notify the Court of further developments, as appropriate. Counsel notes, in particular, that the technical feasibility of carving out different capabilities for four States is not yet clear, and is the subject of ongoing discussion within the government in light of the *Florida* order of earlier today.

mandamus relief without tackling the Secretary's claims that lawful compliance would be impossible."). Although a partial stay limited to those four States would not remedy all the harms outlined in the government's stay motion, that more limited remedy would at least temporarily mitigate the problem of conflicting court orders.

## CONCLUSION

For these reasons, and those set forth in Defendants' prior briefs, the Court should stay its order entering judgment for Plaintiffs, ECF No. 112, pending resolution of the United States's appeal of that order to the United States Court of Appeals for the D.C. Circuit. At a minimum and in the alternative, the Court should stay its order pending appeal with respect to the States of Florida, Iowa, Ohio, and Indiana.

Dated:  July 7, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI (D.C. Bar No. 995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for Defendants*