**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-3501 (SLS) <br> Judge Sparkle L. Sooknanan |

## <u>MEMORANDUM OPINION</u>

This case is about the unlawful creation of a centralized federal database containing the private information of United States citizens. On June 22, 2026, this Court set aside (1) the establishment of the database, a modified version of the Systematic Alien Verification for Entitlements (SAVE) system, a system of records maintained by the Department of Homeland Security (DHS) to verify citizenship and immigration status; and (2) two System of Records Notices (SORNs) for the modified SAVE, which authorized the establishment, revisions, and disclosures from the DHS system of records and from the Social Security Administration's (SSA) central file used to operate the modified SAVE. The Court determined that the modified SAVE system and its respective SORNs violated the Social Security Act, the Privacy Act, and the Administrative Procedure Act (*i.e.*, Chapter 5 and 7 of Title 5). *See* ECF Nos. 111, 112. On June 25, 2026, the Federal Defendants appealed that decision, ECF No. 113, and they now move to stay the Court's order pending appeal, Mot., ECF No. 116-1. For the reasons explained below, the Court denies the Federal Defendants' motion.

**LEGAL STANDARD**

"A stay pending appeal is an extraordinary remedy." *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). "It is 'an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right.'" *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). "It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

Courts must consider four factors in connection with a stay motion: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). For the first factor, the D.C. Circuit has said that the chance of success on the merits must be "substantial." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Failure to satisfy this standard is "an arguably fatal flaw for a stay application." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1017–19 (D.C. Cir. 2018) (per curiam). For the second factor, "[w]here there is a low likelihood of success on [the] merits, a movant must show a proportionally greater irreparable injury[.]" *M.M.V.*, 459 F. Supp. 3d at 4 (citing *Cuomo*, 772 F.2d at 974). And the final two factors "merge when the Government" is a party. *Id.* (quoting *Nken*, 556 U.S. at 435).

**DISCUSSION**

The Federal Defendants fall well short of satisfying the high burden needed for a stay pending appeal. The Court is not convinced that they are likely to succeed on the merits, that they will be irreparably injured absent a stay, or that the balance of equities favors a stay.[1]

A.       **Likelihood of Success on the Merits**

As explained at length in the Court's Memorandum Opinion, *League of Women Voters v. DHS*, __ F. Supp. 3d.__, No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026), ECF No. 111, the Federal Defendants cannot show a substantial likelihood of success on the merits. The Court's Memorandum Opinion lays out its reasoning on the merits. But in urging the Court to grant the extraordinary remedy of a stay, the Federal Defendants do two things that the Court will address here. Most egregiously, they make arguments that they did not advance in prior briefing, including arguments that the Court found had been conceded in its Memorandum Opinion. *See, e.g.*, *League of Women Voters*, 2026 WL 1784297, at *20 ("[T]he Defendants have conceded . . . that the Social Security Act forbids disclosure of SSA data to DHS or in responses to SAVE users."). The Federal Defendants certainly know that a stay motion is not an avenue to raise new arguments that they chose not to advance earlier. Such an approach would cause manifest injustice to the Parties and disrupt the orderly judicial resolution of the disputes before the Court. The Federal Defendants do not stop there. In seeking a stay, they mischaracterize the Court's Memorandum Opinion, accusing it of stepping into the shoes of Congress and inventing new

---

[1] The Federal Defendants waited nine days to move for a stay after this Court issued its Memorandum Opinion. The Court nonetheless moved expeditiously to set a briefing schedule on their stay motion to close in roughly six days (which included a federal holiday and weekend). Yet hours after the Federal Defendants filed their reply brief, they proceeded to give this Court roughly a day and a half to decide their motion—promising to bypass this Court and go to the D.C. Circuit then. *See* Notice re Timing, ECF No. 121.

3

statutory requirements under the Privacy Act. The Court did no such thing. Indeed, according to the administrative record, DHS itself recognized that the modified SAVE was not in compliance with the Privacy Act. *League of Women Voters*, 2026 WL 1784297, at \*6. In the end, the Federal Defendants cannot show a "substantial" likelihood of success on the merits, which is "an arguably fatal flaw" for their stay application. *Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1017–19.

### 1.    Forfeited Arguments

"[A] motion to stay should not be used to relitigate matters, submit new evidence, or 'raise arguments which could, and should, have been made before the judgment issued.'" *ODonnell v. Harris Cnty.*, 260 F. Supp. 3d 810, 815 (S.D. Tex. 2017) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003)) (citing 11 Charles A Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (3d ed. 2012)).

The Federal Defendants seek a stay of the Court's decision that the modified SAVE violated the Social Security Act's prohibition that "Social security account numbers and related records that are obtained or maintained by authorized persons pursuant to any provision of law enacted on or after October 1, 1990, shall be confidential, and no authorized person shall disclose any such social security account number or related record." 42 U.S.C. § 405(c)(2)(C)(viii)(I). In their stay motion, the Federal Defendants raise two arguments never previously presented to the Court. First, they argue that the data in the modified SAVE are not "related records" under the Act, and that the matching and confirmation of social security numbers to SAVE users under the modified SAVE does not constitute a disclosure under the Act. Second, they contend that the

original Social Security Act of 1935 authorizes the collection and maintenance of all information in SSA's central file (NUMIDENT). These arguments are forfeited.[2]

To start, through a series of cross references, the Federal Defendants contend that the matching and confirmation of social security data under the modified SAVE does not constitute the disclosure of "related record[s]" under the Social Security Act because it does not "indicate[], directly or indirectly, the identity of any individual with respect to whom a social security account number or a request for a social security account number is maintained." Mot. 7–8 (citation omitted). This argument is nowhere to be found in the Federal Defendants' summary judgment briefing. Indeed, a search for the term "related record" in the Federal Defendants' briefs yields zero results. *See* Fed. Defs.' Mot. Dismiss, ECF No. 77-1; Fed. Defs.' Reply, ECF No. 106. The Federal Defendants surely know that they did not contest this point at summary judgment, despite the Plaintiffs having argued that the Federal "Defendants are collecting, verifying, and disclosing SSNs and related records en masse" pursuant to "a statute enacted 'after October 1, 1990.'" Pls.' Summ. J. Mot. 33, ECF No. 66-1. The Federal Defendants chose not to dispute the Plaintiffs' characterization of "related records." And the Court thus found: The modified SAVE "system discloses both Social Security numbers and related records maintained by SSA. And the Defendants did not argue otherwise." *League of Women Voters*, 2026 WL 1784297, at *20.

Relatedly, the Federal Defendants say that although there may have been disclosures of social security numbers and related records to DHS, there were no such "disclosures" to SAVE users as that term is understood in the Social Security Act. Mot. 7–8. But again, this argument never shows up in the Federal Defendants' summary judgment briefs. *See* Fed. Defs.'

---

[2] Although the State of Texas did not move for a stay, the Court notes that it did not advance these arguments at summary judgment either. No Defendant raised the arguments now advanced in the Federal Defendants' stay motion.

Mot. Dismiss; Fed. Defs.' Reply. Rather than be forthright about the fact that they are making a new argument, the Federal Defendants pretend that it was before the Court all along, suggesting that the Court "conflate[d] two interactions at play in any given query to the SAVE system: first, the disclosure of information by SSA to DHS; second, the disclosure of information by DHS to the SAVE user." Mot. 6. But that was not the Court's analysis. The Court merely stated a fact that no Party to this litigation had then disputed—that the modified SAVE requires the disclosure of social security numbers and related records. Unhappy with their litigating decision, the Federal Defendants cannot now change course and ask this Court to re-engage in fact-finding in this emergency stay posture.

In other words, the Federal Defendants are too late. It is impermissible to raise new arguments in the posture of a stay motion and ask for judicial fact-finding on issues for the first time after final judgment has been entered. The Court need not now, on an expedited basis, scour the administrative record to explain to the Federal Defendants why each record first transmitted from SSA to DHS and then from DHS to SAVE users constituted a social security number or related record under the Social Security Act. Nor would it be appropriate for the Court to explain how the matching and confirmation of a social security number constitutes a disclosure of that individual's social security number to SAVE users. If the Federal Defendants wished to contest these points, they should have raised them during summary judgment proceedings when the Plaintiffs first openly argued that the modified SAVE is "collecting, verifying, and disclosing SSNs and related records en masse[.]" Pls.' Summ. J. Mot. 33.

Next, the Federal Defendants, without citing a specific collection or maintenance provision of the Act, contend that the maintenance of the SSA central file (NUMIDENT) is actually authorized by the original Social Security Act of 1935 and thus not maintained pursuant to "a

6

statutory authority prior to October 1, 1990." *See* Mot. 8. Of course, it is odd for a party seeking the extraordinary remedy of a stay to attempt to meet its burden on a question of statutory interpretation without citing a single provision of the U.S. Code on the subject. But the Court need not address this new argument because, like the last, it appears nowhere in the Federal Defendants' merits briefing, *see* Fed. Defs.' Mot. Dismiss, Fed. Defs.' Reply, and was thus forfeited.

Ultimately, the Plaintiffs posited that the Federal "Defendants are collecting, verifying, and disclosing SSNs and related records en masse" pursuant to "a statute enacted 'after October 1, 1990.'" Pls.' Summ. J. Mot. 33. And the Federal Defendants made only two counterarguments to that assertion: (1) that the Plaintiffs lacked a cause of action, and (2) that other immigration statutes nevertheless authorized disclosure. Fed. Defs.' Mot. Dismiss. 49–50. The Court made factual findings and addressed those arguments in detail. *League of Women Voters*, 2026 WL 1784297, at *20 & n.9, *30–33. But that is the extent of the Court's consideration. The Court stated clearly in its Memorandum Opinion that the Defendants had conceded "that the Social Security Act forbids disclosure of SSA data to DHS or in responses to SAVE users." *Id.* at *20. A stay motion does not give defendants a do-over, which is exactly what the Federal Defendants seem to want.

Indeed, courts apply rules of forfeiture because tardy and overdue arguments are "not only unfair to [a litigant] but also entails the risk of an improvident or ill-advised opinion on the legal issues" by reducing the time in which the Court may engage in meaningful review. *See McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208, 1210 (D.C. Cir. 1986) (cleaned up). This case, though expedited, was not decided on a short timeline or emergency briefing. In fact, the Court denied the Plaintiffs' early request for preliminary relief so that the Parties could conduct factual development and establish a record. *See League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025), ECF No. 55. And the Court granted the Federal

Defendants additional time to flesh out their arguments, despite the time-sensitive nature of the Plaintiffs' injuries. *See* Min. Order (May 8, 2026). The Parties spent months briefing these issues in hundreds of pages. And the Court spent significant time reviewing the record and the Parties' arguments, resulting in a 75-page Memorandum Opinion. Yet the Federal Defendants now want another bite at the apple to raise new arguments on an emergency basis through a stay motion— arguments that they had every opportunity to raise earlier. And rather than acknowledge that they are asking for just that and explain why the Court should consider their belated arguments, the Federal Defendants feign that these arguments are fair game. The Court will not tolerate such gamesmanship.[3] Manifest justice favors "assessment . . . when the factual record and legal arguments of the parties are fully developed and the Court has time for thorough consideration." *Pippenger v. U.S. Doge Serv.*, No. 25-cv-1090, 2025 WL 1148345, at *2 (D.D.C. Apr. 17, 2025). Given that the Federal Defendants forfeited these arguments by raising them for the first time in their stay motion, they are unlikely to succeed on appeal on these bases.

---

[3] The Federal Defendants seemingly recognize that they forfeited these arguments in their reply brief, though they stop short of admitting it outright. Reply 2 ("[T]hose arguments were originally framed differently or in a more abbreviated fashion[.]."). And they seemingly ask the Court to excuse any such forfeiture. *Id.* ("Had Plaintiffs emphasized 42 U.S.C. § 405(c)(2)(C)(viii)(I) as heavily in their briefing as this Court did in its opinion, the United States would surely have addressed that provision in more detail. But, particularly in a case of this significance, it would be inequitable to hold that the United States forfeited a response to an argument that appeared in full form only in the Court's opinion."). But a court may discretionarily forgive forfeiture only where correction is needed to ensure "the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (cleaned up). And the fairness and integrity of these judicial proceedings do not support reviving forfeited arguments in an expedited fashion through a stay motion. The Federal Defendants are free to ask this Court to excuse their forfeited arguments in a Rule 52(b) motion, where they can receive adequate and thorough consideration. *See id.* (suggesting that Rule 52(b) is the proper vehicle to argue that forfeiture should be excused).

### 2.    Other Mischaracterizations

Next, the Federal Defendants mischaracterize the Court's Privacy Act conclusions, saying that the "Court disagree[d] with Congress's assessment." Mot. 1. They suggest that the Court "imposed judge-made procedures in addition to the statute's mandates" when deciding the procedural claims. Mot. 10 (cleaned up). And they claim that the Court imposed "independent notice-and-comment obligation[s] . . . on top of that required by the Privacy Act." *Id.* (emphasis omitted). A review of the Court's Memorandum Opinion reveals that none of that is true.

As the Court explained, *see League of Women Voters*, 2026 WL 1784297, at *26–28, the Privacy Act's procedural requirements do not permit the Federal Defendants to issue SORNs *after* the establishment or modification of a system of records. Rather, the statute requires that a SORN be published "upon establishment or revision" of a system of records. 5 U.S.C. § 552a(e)(4). And as noted in the Memorandum Opinion, the Federal Defendants did not dispute that the SAVE system was modified to include SSA data long before the agencies published the relevant SORNs. *See League of Women Voters*, 2026 WL 1784297, at *26–28. Nor could they, because when the Parties first appeared before the Court for preliminary injunction proceedings, the agencies had published no SORNs at all.

Further, a SORN may only be published "subject to the provisions of paragraph (11)" of subsection (e) of the Privacy Act. 5 U.S.C. § 552a(e)(4). The term "*subject to* indicates that the main clause it introduces . . . does not derogate from the provision to which it refers." Antonin Scalia & Brian Garner, Reading Law: The Interpretation of Legal Texts 126 (2012). That cross-referenced provision mandates that any SORN publishing "each routine use of the records contained in the system, including the categories of users and the purpose of such use," 5 U.S.C. § 552a(e)(4)(D), must afford "30 days *prior to* publication" "notice" in the Federal Register "of

9

any new use or intended use of the information in the system," and "provide an opportunity for interested persons to submit written data, views, or arguments to the agency," *id.* § 552a(e)(11) (emphasis added). The DHS SORN "include[d] updates and modifications to the (1) purpose(s) of the system, (2) categories of individuals covered by the system, (3) categories of records in the system, (4) records source categories, and (5) routine uses of records maintained in the system." Notice of a Modified System of Records, 90 Fed. Reg. 48,948, 48,948 (Oct. 31, 2025) (DHS SORN). Yet it expressly stated: "This modified system will be effective upon publication." *Id.* at 48,949.[4] The Federal Defendants do not dispute that this modified system alongside its new routine uses were already effective at the time the SORN was published. *See League of Women Voters*, 2026 WL 1784297, at *26. As the Court previously detailed, the same is true of the SSA SORN, which also added a new routine use. *Id.*  In other words, the modified SAVE and the 2025 SORNs failed to comply with 5 U.S.C. § 552a(e)(4) and (11).

Permitting an agency to publish a SORN *after* already establishing or modifying a system of records—as the Federal Defendants did—would eviscerate the "prior to" language from the Privacy Act's text. 5 U.S.C. § 552a(e)(11). It would also nullify the provisions ensuring notice and comment—disclosure could be made with or without prior notice. *See id.* And other provisions of the Privacy Act, such as those requiring "routine uses" in the SORN be included on intake forms, *id.* § 552a(e)(3)(C), and for disclosures, *id.* § 552a(b)(3), would be put in jeopardy as well.

Rather than focus on the Court's analysis of the Privacy Act's text, the Federal Defendants say: "[T]o the extent the Court's opinion suggests that the APA imposes an independent notice-and-comment obligation—including some obligation to provide a written explanation or

---

[4] The DHS SORN also included new functionalities that were not yet in effect, *see, e.g.*, DHS SORN at 48,951, that are not at issue in this suit.

10

response to comments received—on top of that required by the Privacy Act, that imposition would call into question virtually every SORN publication dating back decades." Mot. 10 (emphasis omitted) (citation omitted). The Court made no such suggestion. It merely identified the notice-and-comment obligations already in the statute. 5 U.S.C. § 552a(e)(11). Indeed, it is notable that the Federal Defendants provide no citation to the Court's Memorandum Opinion to support this proposition, citing only their own merits brief. Mot. 10.[5]

Of course, it is an uncontroversial point that agencies that fail to comply with statutorily obligated notice-and-comment requirements act "without observance of procedure required by law" and in an "arbitrary" and "capricious" manner. 5 U.S.C. § 706(2)(A), (D). The Court relied on these APA provisions to enforce the very procedure required by the Privacy Act itself, not to impose obligations "on top of that required by the Privacy Act." *Compare* Mot. 10, *with League of Women Voters*, 2026 WL 1784297, at *28–30.

*   *   *

With these clarifications, the Court reiterates that for the reasons explained in its Memorandum Opinion, the Federal Defendants cannot show a substantial likelihood of success on the merits. *See League of Women Voters v. DHS*, __ F. Supp. 3d.__, No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026). Accordingly, this factor weighs heavily against a stay.

---

[5] Since the Federal Defendants do not provide any citation to the Memorandum Opinion, it is unclear what APA argument they are even referencing. The lack of citation is good reason to question whether the Federal Defendants actually understand the Court's Memorandum Opinion to add procedural requirements beyond those in the statute. The Court stresses (as it did in its Memorandum Opinion) that application of the change-in-position doctrine and arbitrary-and-capricious review generally does not require the findings and statement of purpose normally required under 5 U.S.C. § 553(c). *See League of Women Voters*, 2026 WL 1784297, at *30 ("[A]n agency that [i]s exempt from making findings under Section 553(c) . . . [i]s nevertheless subject to arbitrary-and-capricious review, with review focusing on the 'whole record' before the agency when it took the decision." (characterizing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417–21 (1971)).

**B.      Irreparable Harm, Public Interest, and Balance of the Equities**

Given their low likelihood of success on the merits, the Federal Defendants "must show a proportionally greater irreparable injury" to justify a stay. *M.M.V.*, 459 F. Supp. 3d at 4 (citing *Cuomo*, 772 F.2d at 974). And since the "the Government" is the moving party, "harm to the opposing party and the public interest, merge." *See Nken*, 556 U.S. at 435. Together, these remaining factors do not help the Federal Defendants.

The Federal Defendants' arguments fall into three buckets. First, they discuss their purported harms and interests in citizenship verification. Second, they focus on their purported harms and interests related to a consent decree. *See* Mot. 11–13. Third, they discuss injuries stemming from a court order enforcing that decree. *See* Reply 7–9, ECF No. 120. The Court addresses each in turn.

**1.      Verification Injuries**

First, the Federal Defendants argue that they are irreparably harmed because without the modified SAVE, "verifications can only occur much more slowly and at much greater cost." Mot. 11.[6] And the Federal Defendants go on to suggest that this harm extends to "state and local agencies [that] rely on the modified SAVE system to maintain accurate voter-registration lists and to verify eligibility for public benefits." Mot. 12. To the extent that the Federal Defendants can

---

[6] The Federal Defendants claim that they face "substantial cost" to retain "both the 'old' SAVE and the upgraded system in parallel." Mot. 11 (citing Broderik Decl. ¶ 10, Mot. Ex. A, ECF No. 116-2). But in support of this proposition, the Defendants cite only a declaration stating that the parallel system of records is being maintained to "prevent[] costly code divergence"—not that maintaining both systems is costly. Broderik Decl. ¶ 10. And it is the moving party's burden to "substantiate the claim" of irreparable injury. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The Federal Defendants do not carry their burden. Even if the Federal Defendants did provide evidence of increased costs from parallel maintenance, the Court is perplexed as to how those costs could be attributed to its Order. Nothing in the Court's Order calls for or authorizes maintenance of a parallel systems of records.

rely on purported injuries to others to show irreparable harm,[7] this argument is misguided.

As the Court explained in its Memorandum Opinion, the ordinary meaning of "verification" is "the act or process of verifying" or "the state of being verified." *League of Women Voters*, 2026 WL 1784297, at *32 (quoting *Verification*, Merriam Webster's Collegiate Dictionary (10th ed. 1996)). And to "verify" means "'to establish the truth, accuracy, or reality of' something." *Id.* (quoting *Verify*, Merriam Webster's Collegiate Dictionary (10th ed. 1996)). Here, the Court found, based on the administrative record, that SSA data in the modified SAVE was partially "inaccurate" and therefore resulted in false identifications of U.S. citizens as non- citizens, a fact that the Federal Defendants did not dispute. *See, e.g.*, *id.* at *15, *32. Based on this finding, the Court held that the modified SAVE was not being used for "verification" of the Plaintiffs' members—because it failed to establish the "truth," "accuracy," or "reality" of their citizenship on voter registration forms. *Id.* at *32. In fact, it did the opposite. *See id.* at *15, *32. The Federal Defendants face little harm to their ability to verify the accuracy of information if the verification system that they seek to use has known inaccuracies in the first place. *See id.* at *6 (noting that the Federal Defendants were aware of the inaccuracies).

But even assuming that the Federal Defendants suffer verification injuries, the extent of those injuries are minimal. The Federal Defendants can hardly complain that it slows them down to comply with the Social Security Act and the Privacy Act. After all, Congress enacted those statutes to protect the privacy interests of Americans, recognizing that the statutory protections might lead to decreased government efficiency. And recall that DHS has long conducted similar verifications without using SSA data. It is also unclear whether any verification injuries are

---

[7] *See DeRouin v. NASA*, No. 26-cv-1087, 2026 WL 890421, at *2 n.1 (D.D.C. Apr. 1, 2026) ("[I]njuries to third parties are not a basis to find irreparable harm." (alteration in original) (quoting *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018))).

imminent since many states have already conducted voter roll maintenance through SAVE. The Federal Defendants previously represented that state voter roll maintenance in the ninety days prior to a federal primary or general election would be unlawful. *See* Opp'n to Prelim. Inj. Mot. 35–36, ECF No. 37. So it is unclear what harm the Federal Defendants truly face from failure to use the modified SAVE in the immediate future.

In sum, any verification injuries, to the extent they exist, are minimal and do not outweigh the other stay factors.

### 2.    Consent Decrees

Somewhat audaciously, the Federal Defendants next argue that they are irreparably harmed based on their belief that complying with the Court's Order "brings [the Federal] Defendants out of compliance with a" consent decree "entered in the Northern District of Florida" *during the course of this litigation*. Mot. 12. The Defendants made a similar argument at summary judgment when they asked the Court to dismiss the case altogether based on this very decree. As the Court noted then, it is unclear whether "equitable considerations of clean hands, 'good faith,' and the prevention of 'forum shopping'" would permit the award of equitable relief based on such a decree. *League of Women Voters*, 2026 WL 1784297, at *34 (quoting *EEOC v. Univ. of Pa.*, 850 F.2d 969, 972, 979 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990)).

That consent decree was filed on November 28, 2025, and approved on December 1, 2025—nearly two months after the Plaintiffs filed this action. *See* Pl.'s Mot. Dismiss, *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 30 (N.D. Fla. Nov. 28, 2025); Order, *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 31 (N.D. Fl. Dec. 1, 2025). The proposed decree was accompanied by an Amended Complaint that added various states into that action who had initially filed suits in other fora. *See* Am. Comp., *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 29 (N.D. Fla. Nov. 28,

2025); Notice (Dec. 5, 2025), ECF No. 59. In doing so, the Federal Defendants were able to consolidate several suits against them nationwide into a single forum and reach a consent decree in their chosen district. *See* Notice (Dec. 5, 2025). At that time, the Federal Defendants were also fully aware that the Plaintiffs were seeking the relief at issue in this case and had adverse interests to the parties to that consent decree. Indeed, the Federal Defendants expeditiously informed the Court when that decree was entered, making clear that they knew the interrelated nature of these suits. *See* Notice (Dec. 5, 2025).

The Federal Defendants thus knew that this suit had the potential to implicate the permissible "terms" under that agreement and their statutory "authority" to make certain concessions in a consent decree. *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997). The Defendants choose to ignore those considerations, making any injury arising from that decision self-inflicted. And "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles A Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed., Apr. 2026 Update) (citing *Bennett v. Isagenix International LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024); and *Di Biase v. SPX Corporation*, 872 F.3d 224, 235 (4th Cir. 2017)); *see also Cuomo*, 772 F.2d at 977.

Stepping back, consider the upshot of the Federal Defendants' argument in light of the other stay factors. No one denies that the "perpetuation of unlawful agency action" does not serve the "public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Yet accepting the Federal Defendants' argument would eviscerate that factor altogether. The Executive Branch could enter into settlement agreements to engage in statutorily prohibited conduct and thus circumvent any restriction that Congress placed on it during the course of an appeal. In other words, put a consent decree into the mix and the stay inquiry will always be

inversed: the proper enforcement of federal statutes would always weigh against a stay (as irreparable harm arising from tension with the consent decree) rather than only for it (in favor of the public interest). The Executive Branch could manufacture "irreparable injury" in advance of judgment in an action. Where a stay was once an "extraordinary remedy," it would become a mundane one. *M.M.V.*, 459 F. Supp. 3d at 4. Neither law nor common sense supports such an absurd result.

To the extent that manufactured harms can be considered injury, the public's "substantial" interest "in having governmental agencies abide by the federal laws that govern their existence and operations" overrides it. *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). "[T]he thrust of the [] laws cannot be avoided merely by claiming that the otherwise illegal conduct is compelled by contractual obligations. Were it otherwise, the [] laws could be nullified. Contractual obligations cannot thus supersede statutory imperatives." *United States v. Loew's, Inc.*, 371 U.S. 38, 51 (1962), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). For this reason, the "United States" is not "bound" by an "agreement to do or cause to be done what the law does not sanction or permit." *OPM v. Richmond*, 496 U.S. 414, 420 (1990) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408–409 (1917)). Any other approach would make a mockery of Congress and our constitutional structure. *See Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 642 (1993) ("If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions." (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 223–24 (1986))); *Connolly*, 475 U.S. at 224 ("[W]hen contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity."); *Guar. Tr. Co. of New York v. Henwood*,

307 U.S. 247, 258–59 (1939) ("[C]ontracts between private parties cannot create vested rights which serve to restrict and limit an exercise of a constitutional power of Congress.").

Not only does the Federal Defendants' argument make a mockery of separation of powers, it undercuts the very underpinning of our justice system. Due process deeply rooted in "Anglo-American jurisprudence" has long recognized that one cannot be "bound by a judgment in personam in a litigation in which [one] is not designated as a party or to which [one] has not been made a party by service of process." *In re Admin. Subpoena 25 1431 032 to Rhode Island Hosp.*, No. 1:26-cv-0007, 2026 WL 1392565, at *4 (D.R.I. May 14, 2026) (quoting *Martin v. Wilks*, 490 U.S. 755, 765 (1989)); *see also Hansberry v. Lee*, 311 U.S. 32, 40 (1940). But the Federal Defendants ask the Court to do just that. Under their approach, the Plaintiffs' rights are determined not by an action where they are given notice and an opportunity to be heard. Rather, the Federal Defendants posit that a "decree among parties to a[nother] lawsuit" should "conclude the[ir] rights" to speedy resolution of disputes. *In re Admin. Subpoena*, 2026 WL 1392565, at *4. Equity and the public interest do not require such hardship. And this self-imposed harm plainly does not favor a stay.

### 3.     Florida Court Order

Finally, the Federal Defendants say that they are irreparably harmed because a court in the Northern District of Florida entered an order yesterday—shortly before the reply deadline set by this Court—enforcing the Florida consent decree. *See* Reply, ECF No. 120; Florida Order, ECF No. 120-2. But with all due respect, that court, which was no doubt pressed for time with emergency briefing on a motion to enforce the consent decree over a holiday weekend, erred in significant ways. And that court may well correct those errors down the road once made aware of them, which would mitigate any harm to the Federal Defendants.

17

For starters, the Northern District of Florida court presumed that it could determine "the precise legal rights of the parties" or "resolve the merits of the claims" underlying the Florida consent decree. *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (quoting *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)). In enforcing the decree yesterday, that court stated that it had "implicitly found that the modifications [to SAVE] were not inconsistent with federal law when it approved the [consent decree]"—despite admittedly approving the decree without "undertak[ing] an extensive assessment of the legality of the features that the settlement agreement required the SAVE system to include." Florida Order 6 & n.5. The court clarified that it was engaging in a merits assessment and "ma[de] explicit what was implicit in the approval of the settlement agreement—the modifications to the SAVE system, including the bulk-upload and SSN-search features, do not violate the Social Security Act or the Privacy Act." Florida Order 6 n.5. But of course, it is black-letter law that "a decree, which appears by the record to have been rendered by consent is always affirmed, *without considering the merits of the cause*." *Swift & Co. v. United States*, 276 U.S. 311, 324 (1928) (emphasis added) (quoting *Nashville, C. & St. L. Ry. Co. v. United States*, 113 U.S. 261, 265 (1885)); *see also NLRB. v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 323 (1961) (same).

"When entering consent decrees, federal courts do 'not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy.'" *Mi Familia Vota v. Fontes*, 152 F.4th 1153, 1156 (9th Cir. 2025) (Nelson, J., concurring in part and dissenting from denial rehearing *en banc*) (quoting *Gorsuch*, 718 F.2d at 1126); *see also EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (collecting cases) ("[A] district court should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights."). This is because Article III limits the "judicial power" only to "actual

18

controversies arising between *adverse litigants*." *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (emphasis added). And "[w]hen 'both litigants desire precisely the same result,' as with consent decrees, there is 'no case or controversy within the meaning of Art. III of the Constitution.'" *Mi Familia Vota*, 152 F.4th at 1156 (Nelson, J., concurring in part and dissenting from denial of rehearing *en banc*) (quoting *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971)). It follows, then, that the Northern District of Florida court had no authority to make merits determinations about the legality of SAVE, either implicitly or explicitly.[8]

The prohibition on rendering advisory opinions without adverse parties is not only jurisdictional but prudential. The only parties before the Northern District of Florida court were the federal government and the States that it mutually contracted with. And a decision on the merits without adverse briefing from directly affected parties is fundamentally unsound. *Cf. NRC v. Texas*, 605 U.S. 665, 677 (2025) ("[P]articipation by amici in a court proceeding does not make the amici parties[.]"). This Court's 75-page Memorandum Opinion was the result of thorough, adverse briefing on the merits. The Northern District of Florida court spent roughly one paragraph to reach differing conclusions, Florida Order 7–8, and did so without the benefit of adverse parties raising every argument in their favor and pointing out the flaws in contrary ones. The errors in the resulting order, both on the nature of review when entering a consent decree and on the merits issues themselves, illustrate why courts do not proceed in this way.

For instance, the Northern District of Florida court cites to a provision of the Social Security Act in its Privacy Act analysis to suggest that the purpose of a social security number is "to establish the age, citizenship, or alien status and true identity" of individuals. Florida Order 8

---

[8] The Court does not fault the Northern District of Florida court for the oversight, as none of the parties in that litigation (chiefly, DHS) seemed to have alerted the court to these constraints.

(quoting 42 U.S.C. § 405(c)(2)(B)(ii)). But the cited provision does not govern the purpose of social security numbers at all. Rather, that provision merely explains the contents of an application for a social security number:

> The Commissioner of Social Security shall require of applicants for social security account numbers such evidence as may be necessary to establish the age, citizenship, or alien status, and true identity of such applicants, and to determine which (if any) social security account number has previously been assigned to such individual.

42 U.S.C. § 405(c)(2)(B)(ii). And, of course, application requirements do not necessarily illuminate the purpose of the thing being applied for.[9]

In the end, the federal government entered into a consent decree with non-adverse parties with full recognition that adverse third parties—*i.e.*, the Plaintiffs in this suit—were challenging the legality of the very terms that they were agreeing to. And they did not make the Northern District of Florida court aware of this fact. Indeed, that court observed that "the conundrum that now exists might have been avoided" had "the parties to th[at] case" brought the instant "case to th[at] [c]ourt's attention before it approved the settlement agreement." Florida Order 7 n.6. And had the federal government chosen to proceed in that manner instead, the Northern District of Florida court certainly could have weighed the principle based in equity and comity that "judges should not enter consent decrees interfering with the legal entitlements of non-consenting parties." *People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 964 F.2d 639, 640 (7th Cir. 1992). The Northern District of Florida court was correct in observing that "the conundrum that now exists might have been avoided" by the actions of the Federal Defendants. Florida Order 7 n.6.

---

[9] For instance, an individual applying for a library card from their county library might be asked to provide proof that they reside in that county. That does not mean that the purpose of the library card is to establish proof of the applicant's residence. The purpose of the card is to allow that individual to borrow books.

And such "self-imposed" injuries cannot constitute irreparable harm that would warrant the stay that the Federal Defendants now seek in this Court. *See Gorsuch*, 718 F.2d at 1126.

More broadly, it is abundantly clear that this Court would have erred had it simply "deferred to [the Northern District of Florida's] implicit determination that the modifications to the SAVE system were lawful" in deciding the instant case—as that court suggested was the proper course. Florida Order 7 n.6. There are no "implicit" merits determinations in the entry of a consent decree. *Cf. Gorsuch*, 718 F.2d at 1126 ("The court's duty when passing upon a settlement agreement is fundamentally different from its duty in trying a case on the merits."). To the contrary, it is a consent decree that may "warrant reexamination" based on "changes in governing law or its interpretation by the courts." *Horne v. Flores*, 557 U.S. 433, 447–48 (2009); *see also Agostini v. Felton*, 521 U.S. 203, 215, 239 (1997) (holding a district court abused its discretion by failing to modify its consent decree prospectively based on changes in "decisional law" under Federal Rule of Civil Procedure 60(b)(5) but noting a court "rarely" needs to do so retrospectively under Rule 60(b)(6)); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992) ("A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law," including intervening "decisional law"). It goes without saying that decisional law may only arise from cases or controversies between "adverse parties, whose contentions are submitted to the court for adjudication." *Muskrat*, 219 U.S. at 357 (quoting *In re Pac. Ry. Comm'n*, 32 F. 241, 255 (C.C.N.D. Cal. 1887) (Field, J.)). And favorable parties cannot contract for judicial determination of a legal issue where an Article III controversy would not otherwise exist. *Cf. id.* at 359–60 ("It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." (quoting *Chi. & G.T. Ry. Co. v. Wellman*, 143 U.S. 339,

21

345 (1892)); *Sosna v. Iowa*, 419 U.S. 393, 398 (1975) ("[Parties] may not by stipulation invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy.'" (quoting *Richardson v. Ramirez*, 418 U.S. 24 (1974)).

Ultimately though, even if the order from the Northern District of Florida stands, any (self-imposed) harm to the Federal Defendants does not justify a stay of the entirety of this Court's Order. The consent decree in Florida binds only DHS, not SSA, as SSA is not a party to that action. *See* Order, *Florida v. DHS*, No. 3:24-cv-00509, ECF No. 31 (N.D. Fl. Dec. 1, 2025). So that consent decree has no bearing on this Court's order with respect to SSA. It is well established that a judgment in a suit against one federal agency is not "binding" upon others—"[t]hey were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 (1992). Further, the equitable relief obtained as a result of the Florida consent decree governs only the states that are parties in that action. *See generally Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Thus, it would not be a basis to stay the effects of the Court's order with respect to other SAVE users.

\*        \*        \*

Weighing the stay factors in totality, the Federal Defendants do not meet their heavy "burden of showing that the circumstances justify" a stay. *Nken*, 556 U.S. at 434.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion for Stay Pending Appeal, ECF No. 116.

A separate order will issue.

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   July 8, 2026