**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>  Defendants. | No. 1:25-cv-03501 (SLS) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

STEPHEN M. PEZZI (D.C. Bar No. 995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov

*Counsel for the United States*

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

I.    Defendants have not violated this Court's order of vacatur. ............................................. 3

II.   In the alternative, any violation of this Court's order of vacatur was required by the
      *Florida* injunction. ...................................................................................................... 10

III.  This Court should not issue a conflicting injunction. ...................................................... 13

IV.   Any injunctive relief should be party-specific. ............................................................... 19

CONCLUSION ......................................................................................................................... 21

**INTRODUCTION**

In the United States District Court for the Northern District of Florida, the United States vigorously opposed the *Florida* Plaintiffs' emergency motion to enforce the settlement agreement on multiple grounds. *See* Ex. 1, Defs.' Opp'n to Pls.' Emergency Mot. to Enforce Settlement Agreement, *Florida v. DHS*, No. 3:24-cv-509 (N.D. Fla. July 2, 2026), *Florida* ECF No. 42. The United States argued that (1) it had not breached the *Florida* settlement agreement by complying with an order of this Court, *see id.* at 6-8; (2) that SSA was not a party in *Florida*, *see id.*; (3) that any litigation seeking to enforce the *Florida* agreement must be filed in the Court of Federal Claims, *see id.* at 8-9; and (4) that the *Florida* court should not issue an order that conflicts with an order of this Court, *see id.* at 10-12. The United States also argued that, at a minimum, the *Florida* court should defer a ruling until stay proceedings in the D.C. Circuit have concluded. *See id.* at 4-6. Unfortunately, all those arguments were rejected, and the district court in *Florida* issued an injunction providing that "Defendants shall immediately comply with the court-approved settlement agreement in [that] case by reinstating [the *Florida*] Plaintiffs' access to the bulk-upload and SSN-search features in the SAVE system." Order (July 7, 2026), *Florida* ECF No. 45 at 9.

The United States believes that the issuance of the *Florida* injunction was in error. But disagreement with a federal court order is no basis for non-compliance. And so, just as the United States had done a few weeks earlier in response to this Court's summary-judgment opinion and order of vacatur—an order that the United States also respectfully disagrees with—the government took immediate steps to come into compliance with the *Florida* injunction.

Now, Plaintiffs here want to make a difficult and complicated situation worse. They do so by seeking an injunction that would explicitly command Defendants to violate the *Florida* injunction. This Court should reject that extraordinary request for at least three reasons.

First, Defendants have not violated this Court's order of vacatur. Plaintiffs' motion ignores well-established differences between vacatur and an injunction. Defendants complied fully with this Court's earlier-in-time order of vacatur by immediately treating the vacated agency actions as inoperative and without legal effect. As the vacatur deprived Defendants of legal authority to

- 1 -

continue the modified SAVE program, they immediately halted it nationwide.  But then the *Florida* court's injunction supplied independent legal authority—indeed, a new legal duty—to restore access to the modified SAVE system in Florida, Ohio, Iowa, and Indiana.  The fact that the government took action required by another court's later injunctive order does not bring the government out of compliance with this Court's earlier vacatur order, which had already been fulfilled.  In other words, Plaintiffs' filing is drafted as if this Court entered a "permanent[]" injunction that indefinitely "prohibited" Defendants "from operating SAVE with its overhauled functionalities" in all States for all people.  Pls.' Proposed Order at 2, ECF No. 66-12.  But that language appears only in Plaintiffs' *proposed* order—not this Court's actual order, which was limited to the milder remedy of vacatur.  And because an earlier-in-time vacatur cannot overcome a later-in-time injunction, the United States is in compliance with all outstanding orders—even if, in 4 of 50 states, a new status quo has resulted from new agency actions that were required by the *Florida* order.

Second, in the alternative, even if Defendants are out of compliance with this Court's order in 4 of 50 States, the only *reason* they would be out of compliance is because that partial non-compliance is necessary to comply with the *Florida* injunction.  It is undisputed that DHS is bound by the *Florida* injunction.  And contrary to Plaintiffs' motion, that SSA is not a party in *Florida* does not solve the government's compliance problem.  After all, it is undisputed that *DHS* cannot fully comply with the *Florida* injunction without cooperation from SSA.  Under these extraordinary circumstances—where any violation of this Court's order is resulting directly from good-faith efforts to comply with another injunction—it would be inequitable to grant Plaintiffs' motion.

Third, important principles of equity and judicial comity weigh against the issuance of a conflicting injunction.  It bears repeating: Plaintiffs seek an order that would command the federal government to disobey another court's order.  But "[p]rudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders." *Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986).  Any other approach would put the United States—a sovereign that litigates in all 94 federal districts—in an impossible dilemma.  And the fact that the *Florida* court rejected similar arguments would not justify this Court exacerbating the problem by issuing its own conflicting

injunction. After all, "[i]n administrative law, as elsewhere, two wrongs do not make a right." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017). And that is especially true here, as the *Florida* court at least did not order Defendants to violate *an injunction*—but instead (albeit over the government's objection) to take actions that this Court had held that Defendants lacked authority to take.

Finally, at a minimum, any new injunction must comply with the principles of party-specific relief set forth in the Supreme Court's recent opinion in *Trump v. CASA, Inc.*, 606 U.S. 831, 833 (2025). That means that any injunctive relief should be limited to members of the relevant Plaintiff associations at the time of this Court's judgment. And because there is no evidence in the record that any such individuals reside in Florida, Ohio, Iowa, or Indiana, that equitable limit might also offer an important practical benefit, limiting any conflict with the *Florida* injunction.

In sum, although the United States respectfully disagrees both with this Court's order of vacatur and the *Florida* injunction, the United States has complied (and will continue to comply) with all outstanding court orders to the greatest extent possible. Plaintiffs' motion should thus be denied in full. If this Court is inclined to disagree, however, it should at least defer consideration of Plaintiffs' motion until after the D.C. Circuit decides the government's pending motion for a stay pending appeal—which will be fully briefed as of 4 p.m. on Monday, July 20, 2026—and the Supreme Court acts on a prompt request for further review. This Court should be especially hesitant to order the United States to violate an injunction as a means of enforcing its own vacatur order when the validity of that earlier vacatur order will soon be considered by the appellate courts.

## ARGUMENT

### I. Defendants have not violated this Court's order of vacatur.

This Court's earlier-in-time order of vacatur can—and, to avoid unnecessary conflict between the branches and between federal district courts, should—be reconciled with the *Florida* court's later-in-time injunction. In short, that is because the United States complied fully with this Court's order of vacatur by immediately treating the vacated agency actions as inoperative and without legal effect, thus depriving Defendants of authority to continue operating the modified

SAVE system. That earlier-in-time order of vacatur, however, did not permanently prohibit the United States from later coming into compliance with a later-in-time injunction—an injunction that provided independent legal authority (indeed, a legal duty) to restore access to the relevant features of SAVE for the *Florida* Plaintiffs. In these circumstances, the United States has not violated this Court's order of vacatur, and Plaintiffs' motion should be denied on that basis.

**a.** On November 17, 2025, this Court denied Plaintiffs motion for a preliminary injunction or a stay under 5 U.S.C. § 705. *League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025).

On June 22, 2026, this Court entered summary judgment against the government, granting some—but not all—of the relief that Plaintiffs had requested in their motion for summary judgment. *League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), --- F. Supp. 3d ----, 2026 WL 1784297 (D.D.C. June 22, 2026), *appeal filed*, No. 26-5243 (D.C. Cir. June 29, 2006). In particular, the Court "vacate[d] and set aside" three things:

1. "[T]he October 2025 Department of Homeland Security Notice of a Modified System of Records for the SAVE system of records." *See*, DHS, *Notice of a Modified System of Records*, 90 Fed. Reg. 48,948 (October 31, 2025).

2. "[T]he November 2025 Social Security Administration Notice of a Modified System of Records for the Master Files of Social Security Number Holders and Social Security Number Applications." *See* SSA, *Notice of a Modified System of Records*, 90 Fed. Reg. 50,879 (November 12, 2025).

3. "[T]he SAVE 'modified system' described in the October 2025 Department of Homeland Security Notice of a Modified System of Records for the SAVE system of records." *See* DHS, *Notice of a Modified System of Records*, 90 Fed. Reg. at 48,948.

Summary Judgment Order at 1-2, ECF No. 112. This Court did not enter an injunction—although Plaintiffs had explicitly requested one and included that request in their proposed order. *Compare id.*, *with* Pls.' Proposed Order at 2, ECF No. 66-12 (seeking an order that would have provided that

it is "**ORDERED** that Defendants are **PERMANENTLY ENJOINED** and prohibited from operating SAVE with its overhauled functionalities . . . "); Pls.' Mem. in Supp. of Mot. for Summ. J. at 49, ECF No. 66-1 ("Plaintiffs are also entitled to a permanent injunction prohibiting Defendants from continuing to operate overhauled SAVE."); *see also id.* at 49 n.20 (Plaintiffs stating without explanation that "the Court need not issue an injunction if it grants identical relief under the APA").

Although not an injunction, this Court's order of vacatur was a legally binding order that deprived Defendants of the legal authority to continue the modified SAVE system.  The government thus took immediate action in response to that order, "by immediately communicating the existence of the order to relevant agency officials, treating the vacated SORNs as no longer having any legal force or effect, and disabling the features of SAVE that comprised the 'modified system' vacated by the Court."  Joint Status Report at 3 (July 10, 2026), ECF No. 126.  And so, as Plaintiffs have not contested after several opportunities to do so, "it was undisputed as of the morning of July 9, 2026 that [Defendants] were in full compliance with" this Court's order of vacatur.  *Id.*; *see also* Decl. of Brian Broderick (July 10, 2026), ECF No. 126-2; Decl. of Mark A. Steffensen (July 10, 2026), ECF No. 126-3.

Almost immediately after the government came into compliance with this Court's order of vacatur, the government received a series of communications from counsel for the *Florida* Plaintiffs alleging that the United States had breached the settlement agreement in *Florida* and threatening to seek immediate relief in the U.S. District Court for the Northern District of Florida.[1]  The parties in *Florida* conferred on June 25, 2026, but were unable to resolve their disagreement about the government's then-outstanding legal obligations.  So the *Florida* Plaintiffs filed, on June 30,

---

[1] This Court, the district court in *Florida*, and Plaintiffs here have referred to the settlement agreement in *Florida* as a consent decree.  Defendants do not consider "consent decree" to be an accurate label, because the settlement agreement in *Florida* was not itself embodied in a court order that "directly imposed . . . injunctive relief" or was directly enforceable by contempt. *United States v. Facebook, Inc.*, 136 F.4th 1129, 1134 (D.C. Cir. 2025).  That is why the *Florida* Plaintiffs had to file a motion seeking judicial enforcement of the settlement agreement, and that is why the government did not face any conflicting *court orders* (rather than conflicting legal obligations, more generally) until the *Florida* injunction was issued on July 7, 2026.

2026, what they captioned as an "Emergency Motion to Enforce Settlement Agreement." *Florida* ECF No. 32. Two days later, the United States filed a robust opposition, on July 2, 2026. Ex. 1, Defs.' Opp'n to *Florida* Mot. to Enforce.

Over the objection of the United States, the *Florida* court granted the motion and entered an injunction compelling the government to "immediately comply with the court-approved settlement agreement in [that] case by reinstating [the *Florida*] Plaintiffs' access to the bulk-upload and SSN-search features in the SAVE system." Order (July 7, 2026), *Florida* ECF No. 45. Defendants began the process of doing so last week, as described in greater detail in sworn declarations submitted to this Court on July 10, 2026. *See* Decl. of Brian Broderick (July 10, 2026), ECF No. 126-2; Decl. of Mark A. Steffensen (July 10, 2026), ECF No. 126-3. As of this filing, counsel's understanding is that some SAVE requests (including via bulk-upload functionality and SSN searches on SSA data) have now been processed for at least one of the *Florida* Plaintiffs.[2]

In sum, since July 7, 2026, the United States has been faced both with this Court's order of vacatur, on one hand, and the *Florida* Court's more recent injunction, on the other. Until the *Florida* order, the formal distinction between vacatur and an injunction had little practical significance to this case—because without legal authority to continue operating the modified SAVE system, it had to stop. But now, that distinction—*i.e.*, between an earlier-in-time order of vacatur, and a later-in-time injunction—is material to the compliance dispute currently before this Court, because the *Florida* injunction provides independent legal authority (and a duty) to restore the relevant features of the modified SAVE system for the *Florida* Plaintiffs. *See United States v. Mahoney*, 247 F.3d 279, 286 (D.C. Cir. 2001) ("[T]hose subject to injunctions, even invalid injunctions, must comply until the injunction is overturned on appeal."). And so the question now

---

[2] Plaintiffs' motion incorrectly says that "[t]he same day the *Florida* court entered its order enforcing the settlement, Defendants filed a Notice informing this Court that they were in the process of restoring the Florida plaintiffs' access to the bulk-upload and SSN-search functionalities of the modified SAVE system, in order to comply with the *Florida* court's order." Pls.' Mot. at 5, ECF No. 128. In fact, the *Florida* order was issued on July 7, 2026, *Florida* ECF No. 45, and the Notice that Plaintiffs reference was filed two days later, on July 9, 2026, ECF No. 125.

is whether exercising that independent legal authority (and fulfilling that independent legal duty) somehow violates this Court's vacatur order. As explained below, it does not.

**b.** The APA provides that a reviewing court may "hold unlawful and set aside agency action" in certain circumstances. 5 U.S.C. § 706(2). The D.C. Circuit has understood that language to authorize a "set aside" remedy, commonly refer to as "vacatur" of the agency action. *See NMA v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1410 (D.C. Cir. 1998). That remedy differs from an injunction in important respects. As a general matter, "[v]acatur operates on the legal status of a rule, causing the rule to lose binding force." John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 YALE J. REG. 119, 119 (2023). By contrast, "[i]njunctions . . . operate on the defendant by imposing a new duty." *Id.*; *see, e.g.*, *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("[A] federal injunction prevents . . . officials from enforcing the challenged statute, regulation, or agency action. . . . An injunction operates on the enjoined officials; the law, regulation, or agency action remains on the books . . . . Vacatur, in contrast, retroactively undoes or expunges a past . . . action."); *Data Mktg. P'ship v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022) (vacatur "nullif[ies] and revoke[s]" unlawful agency action). For these reasons, it is well settled that vacatur is a "less drastic remedy" than the "drastic and extraordinary remedy" of an injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010).

This Court's summary-judgment opinion is fully consistent with that conventional understanding of the differences between the milder remedy of vacatur and the more drastic remedy of an injunction. In discussing an appropriate remedy, this Court explained that "[s]etting aside an agency action means 're-establish[ing] the status quo absent the unlawful agency action.'" *League of Women Voters*, 2026 WL 1784297, at *35 (quoting *Las Ams. Immigrant Advoc. Ctr. v. DHS*, 783 F. Supp. 3d 200, 233 (D.D.C. 2025) (*LAIAC*). The cases cited by this Court in that passage of the summary-judgment opinion make the same point: that "[v]acatur is not an injunction," instead, "it is 'less drastic' because it 'neither compels nor restrains' agency action; all it does is 're-establish the status quo absent the unlawful agency action.'" *LAIAC*, 783 F. Supp. 3d at 233; *see also Ctr. for Biological Diversity v. Haaland*, No. 22-cv-3588 (DLF), 2023 WL 5161741, at *7

- 7 -

(D.D.C. Aug. 11, 2023) ("The remedy of vacatur under the Administrative Procedure Act 're-store[s] the prior regulatory status quo.'") (quoting *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 415-16 (D.D.C. 2020)); *see also, e.g.*, *Nken v. Holder*, 556 U.S. 418, 428-29 (2009) (discussing differences between "[a]n injunction and a stay").

Critically, here, it is undisputed that Defendants *did* immediately "re-establish[] the status quo" after this Court vacated the agency actions at issue. *League of Women Voters*, 2026 WL 1784297, at *35. And, but for the *Florida* injunction, that new status quo would have continued, unless and until (1) the government obtained relief on appeal, or (2) the government "'deal[t] with the problem afresh' by taking new agency action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)).

Importantly, however, this Court's order of vacatur did not (and did not purport to) operate as the equivalent of the permanent injunction that Plaintiffs unsuccessfully requested, by indefinitely prohibiting the government from taking a *new* action on these issues where there was a change to the legal status quo—much less where, as here, the status quo changed because the new action in question was *compelled* by a new court order, entered over the government's objection. These extraordinary circumstances were simply not addressed in the Court's order—because the *Florida* injunction did not exist at that time. Accordingly, the United States has fully complied with this Court's order of vacatur. And that is no less true because the government *later* took a new action (as ordered by a different court) that further altered the (new) status quo.

By analogy, imagine if, after this Court's vacatur order, Congress had passed a law compelling Defendants to resume the modified SAVE system. No one would think that Defendants were "violating" this Court's vacatur order if they immediately complied with that law without first seeking relief from the Court's order of vacatur. Instead, that new law would supply independent legal authority for the vacated system. The *Florida* injunction is no different—even if this Court (and Defendants, for that matter) dispute the propriety of that injunction.

**c.** This particular fact pattern, involving dueling court orders, is quite atypical—after all, courts usually refrain from entering such orders as a matter of equity and comity, *see infra* at 14-15.

But recent precedent in analogous circumstances supports the government's understanding of the Court's vacatur order as *not* including any permanent prohibition on the government's conduct, akin to a permanent injunction. Courts often conclude that a stay or a vacatur of one agency action under the APA does not, of its own force, prevent the government from taking a second, later-in-time agency action that "did not exist at the time [the court] issued the stay and which Plaintiff's complaint did not challenge." Order, *Asylum Seeker Advoc. Project v. USCIS*, No. 25-cv-3299, ECF No. 70 (D. Md. Jan. 13, 2026).

For a recent example from this District, consider Judge Cobb's decision in *Neguse v. ICE*, No. 25-cv-2463 (JMC), 2026 WL 137017 (D.D.C. Jan. 19, 2026). There, Judge Cobb had previously issued a stay, under 5 U.S.C. § 705, of an agency policy relating to congressional visits to ICE facilities. *See Neguse v. ICE*, 813 F. Supp. 3d 45, 100 (D.D.C. 2025). A few months later, the government reissued a new policy that was similar (though not identical) to the policy that had been stayed by Judge Cobb earlier in the litigation. *See Neguse*, 2026 WL 137017, at *2 n.3. Plaintiffs sought an order to show cause on an emergency basis, arguing that the government was violating the court's order. *See id.* at *1.

Judge Cobb denied the motion. The court explained that "Plaintiffs use the wrong procedural vehicle to challenge the January 8, 2026 memorandum and policy announced therein, which is a new agency action not subject to the Court's prior stay order." *Id.* at *1. That is because "[t]he Court's stay order was directed towards Defendants' oversight visit policies as announced in June 2025 and did not purport to address all future DHS policies" on the same subject. *Id.* Although Judge Cobb acknowledged that the new policy might appropriately be the subject of further litigation—that is, if plaintiffs sought "leave to amend their complaint or file a supplemental pleading," *id.* at *2—the legality of the *second* policy needed to be adjudicated on its own merits, rather than in the context of compliance with a stay order that nullified the legal force of the *first* policy.

To be sure, in *Neguse*, unlike here, the second policy was not issued to comply with a more recent order from another court. But that distinction could only help the government's position

- 9 -

here.  While a new agency policy issued for discretionary policy reasons might be subject to chal-lenge on the same basis that the earlier-in-time policy was challenged, here, it is undisputed that the only reason the government has "tak[en] new agency action" is because it was *ordered* to do so by another federal district court.  *Regents*, 591 U.S. at 21.  If anything, that reality underscores why the government had no choice but to act in the way it has acted here, as part of its ongoing efforts to comply with all outstanding court orders to the greatest extent possible.[3]

 **d.**  Were there any doubt about this interpretation of this Court's order, it is dispelled by general equitable, statutory, and procedural principles that constrain the issuance of injunctions.  Because injunctions are a more "drastic and extraordinary remedy" than vacatur, *Monsanto*, 561 U.S. at 165-66, they are subject to a variety of procedural and substantive restrictions that do not apply to orders of vacatur.  For example, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).  A party seeking an injunction must generally satisfy a rigorous four-factor test, which includes several non-merits considerations.  *See id.* at 26-27.  An injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  Injunctions must generally be party specific, *see Trump v. CASA, Inc.*, 606 U.S. 831, 833 (2025), and be as narrow as possible to provide complete relief to the plaintiff, *see Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  And with respect to injunctions against the federal government in particular, "any mandatory or injunctive decree shall specify the Federal officer or officers . . . personally responsible for compliance."  5 U.S.C. § 702.

---

[3] *Neguse* was about an APA "stay" issued under 5 U.S.C. § 705, rather than (as here) an APA vacatur under 5 U.S.C. § 706(2), but the analogy nonetheless holds—neither this case nor that one involved prospective injunctive relief that (by its own force) prohibited the government from taking a second agency action (much less due to another court order).  Moreover, as in *Neguse*, the new agency action here is similar (but not identical) to the prior agency action—the relevant improvements to SAVE are currently only available to four States, and even with respect to those States the new functionality is operating through a different process than was in place before this Court's order of vacatur.

If an order of vacatur were to be treated as the effective equivalent of a permanent injunction—which is the unstated implication and logical consequence of Plaintiffs' position here—then all those procedural and substantive limits on a court's authority to issue injunctive relief could be evaded simply by styling the remedy as vacatur, instead of an injunction. That cannot be right. After all, this Court did not even attempt to comply with any of the above limitations on injunctive relief in connection with its summary-judgment order. To be clear, that was not error—because this Court was issuing the "less drastic remedy" of vacatur, *not* an injunction. *Monsanto*, 561 U.S. at 165-66. But that reality has consequences for the government's current compliance obligations, in the extraordinary circumstances here—now that a later-in-time injunction *was* issued, by another court, on the same subject.

In short, the government immediately complied with this Court's order of vacatur. That is no less true because, later, the government was subject to an injunction (over its objection) requiring new actions that altered the status quo again. Accordingly, Plaintiffs' motion should be denied, for failing to demonstrate any violation of this Court's order of vacatur.[4]

## II.    In the alternative, any violation of this Court's order of vacatur was required by the *Florida* injunction.

For the reasons above, there has been no violation of this Court's order of vacatur. Should the Court disagree with that interpretation of its order, however, any violation was required by the *Florida* injunction, and no greater than necessary to comply with that order. Under those extraordinary circumstances—in which (on this understanding of the Court's order) full compliance with all outstanding court orders is logically impossible—Plaintiffs' motion should likewise be denied.

---

[4] Defendants acknowledge that, in a filing prepared under significant time pressure and submitted to this Court roughly two hours after issuance of the *Florida* injunction, undersigned counsel stated that "it appears to be logically impossible to comply with the *Florida* order while also fully complying with this Court's order." Defs.' Stay Reply at 8, ECF No. 120. But that prior statement—about what "appear[ed]" to be the case in the immediate aftermath of the *Florida* order—was qualified by a candid acknowledgment that "the United States is still reviewing the *Florida* order and considering all available options in response." *Id.* at 8 n.3. Accordingly, that statement should not constrain the government's position now, after having had more time to consider the procedural and remedial complexities here, in these extraordinarily unusual circumstances.

It is undisputed that DHS is bound to comply with the *Florida* injunction, as well as this Court's order of vacatur. That is why the relevant features of SAVE have been restored solely with respect to the States of Florida, Ohio, Iowa, and Indiana. So, at least with respect to DHS, it appears to be undisputed that, to the extent that DHS is in violation of this Court's order with respect to 4 of 50 States, that violation is required by the *Florida* injunction. In other words, DHS is complying with this Court's order to the greatest extent possible.

With respect to SSA, however, Plaintiffs argue that it is, unlike DHS, "*not* bound by the *Florida* enforcement order." Pls.' Mot. at 9-10. And, to be sure, Defendants have acknowledged that SSA is "not a party in *Florida* and thus is not directly bound in the way that a party would be (*e.g.*, for purposes of contempt) by any of the Court's orders in that case."[5] Notice, ECF No. 127 at 1. Even so, that does not mean that SSA can ignore the *Florida* injunction, nor its important role in allowing DHS to comply with it.

As Defendants explained in their recent Notice, ECF No. 127, the *Florida* injunction necessarily requires SSA's participation for DHS to comply fully. *See* Order, *Florida* ECF No. 45 at 9 ("Defendants shall immediately comply with the court-approved settlement agreement in this case by reinstating Plaintiffs' access to the bulk-upload and SSN-search features in the SAVE system."). That is because, as Plaintiffs do not dispute, it is not possible for DHS to "reinstat[e]" the *Florida* Plaintiffs "access" to the features in question without SSA's cooperation. *Id.* That practical reality is fatal to the unrealistic suggestion in Plaintiffs' filings that DHS should have intentionally disobeyed the *Florida* injunction and then pointed the finger at SSA. *Cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of

---

[5] To be clear, under these extraordinary circumstances, no contempt proceedings would be justified, in this case or in *Florida*. Plaintiffs seem to agree at least in part: (1) they are not pursuing contempt at this time, *see* Pls.' Mot. at 1 n.1; (2) they state explicitly that they think the government "has gone well beyond reasonable efforts to comply with the *Florida* enforcement order," *see id.* at 11; and (3) they acknowledge that "[i]nability to comply [with a court order] is a complete defense" to contempt, *id.* (quoting *Newman v Graddick*, 740 F.2d 1513, 1528 (11th Cir. 1984)). In any event, because Plaintiffs have (appropriately) not sought any relief relating to contempt, Defendants need not (and do not) address that subject further here.

it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'") (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3).

Consider a hypothetical: if, in a suit against the Department of Justice (DOJ), a federal district court ordered DOJ to provide written notice to certain aliens in the custody of DHS, DOJ could not justify its failure to deliver those notices by asserting that DHS was refusing to allow the notices to be delivered and that DHS was not named as a defendant in the suit.

This common-sense result is bolstered by the text of the APA. An APA plaintiff always may—and often does—name "the United States" as a defendant in the case caption. *See* 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer."). Although neither the *Florida* Plaintiffs nor these Plaintiffs did so here, the fact that either could have done so (without otherwise materially altering the litigation) underscores why the United States endeavors to comply with *all* court orders against the federal government. And the United States cannot comply with the *Florida* injunction without SSA's participation. Accordingly, given the desire of "the United States to comply with all outstanding court orders . . . to the greatest extent possible," Defs.' Notice, ECF No. 125, that practical reality has driven SSA's actions here, in these unfortunate and extraordinary circumstances.

Plaintiffs respond in a footnote, arguing that "Defendants' repeated references to the 'United States' are misleading because . . . the United States is *not* a defendant in either this case or *Florida*." Pls.' Mot. at 10 n.3. But none of Defendants' filings has been misleading—Defendants fully acknowledged before (and fully acknowledge now) that no plaintiff formally named "the United States" as a defendant in the case caption, either in this case or in *Florida* (though they easily could have). But as the above arguments (and the above hypothetical) show, that chance formality does not meaningfully inform the government's assessment of its legal obligations. And it remains impossible for DHS to comply with the *Florida* order without help from SSA.

In sum, the United States continues to work in good faith to comply with all outstanding court orders to the greatest extent possible. That is why the relevant features of SAVE remain disabled for users in 46 out of 50 states. Insofar as the *Florida* order (entered over the objection

of the United States) has now created a conflict, that unfortunate circumstance does not alter the government's obligation to comply with that order "immediately." Order, *Florida* ECF No. 45.

## III.    This Court should not issue a conflicting injunction.

For the reasons above, either (I) there is no conflict between this Court's order of vacatur and the *Florida* court's more recent injunction (and Defendants are thus in full compliance with this Court's order of vacatur); or (II), in the alternative, any partial non-compliance by Defendants, in 4 of 50 states, was required by the *Florida* injunction. Under these extraordinary circumstances, this Court should not now issue its own injunction commanding disobedience of the *Florida* injunction—as doing so would *unquestionably* result in conflicting injunctions, such that full compliance with all of them would be logically and practically impossible. Such an order would violate settled principles of equity and judicial comity—even where, as here, such an injunction would presumably be driven in part by the failure of the district court in *Florida* to heed those same principles. Again, "[i]n administrative law, as elsewhere, two wrongs do not make a right." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017).

As Defendants have argued previously in this case[6] and in *Florida*,[7] "[t]he federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *Florida v. HHS*, 19 F.4th 1271, 1285 (11th Cir. 2021) (quoting *W. Gulf Mar. v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 728 (5th Cir. 1985)). "Comity dictates that courts should avoid rulings which may trench upon the authority of sister courts." *Id*. In other words, "[p]rudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders." *Feller v. Brock*, 802 F.2d 722, 727-28 (4th Cir. 1986). And basic "considerations of comity require more than the usual measure of restraint" in this scenario, when an order "sought in one federal proceeding would interfere with another federal proceeding." *Common Cause v. Jud. Ethics Comm'n*, 473 F. Supp.

---

[6] *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 39, ECF No. 37; Defs.' Mem. in Supp. of Mot. to Dismiss or for Summ. J. at 62-64, ECF No. 77-1 ("Defs.' MSJ Br.").

[7] *See* Ex. 1 at 10-12.

- 14 -

1251, 1253-54 (D.D.C. 1979); *see also, e.g.*, *Carver v. Knox Cnty.*, 887 F.2d 1287, 1293 (6th Cir. 1989) (noting the "intolerable situation" of a state subject to conflicting orders and explaining that "the only common sense approach" is for the courts to speak "with a single voice"); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1124 (7th Cir. 1987) ("Where different outcomes would place the defendant under inconsistent legal duties, the case for the second court's not going into conflict with the first is particularly strong."); *ILA Deep Sea Loc. 24*, 751 F.2d at 728-29 (holding that federal district courts have an obligation to "avoid rulings which may trench upon the authority of sister courts"); *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981) ("Generally, principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts."); *Bergh v. Washington*, 535 F.2d 505, 507 (9th Cir. 1976) ("When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases.").

For these reasons, this Court should not issue an injunction commanding disobedience with the *Florida* injunction. That extraordinary result would put the United States in an untenable position, caught in a downward spiral of ping-pong between two federal district courts. The rule of law would suffer if the federal government were forced to violate a court order, and granting the relief that Plaintiffs request here would effectively guarantee that result—regardless of how the United States responds to such an order, and which injunction it chooses to comply with or not comply with, in whole or in part.

Defendants recognize that this Court rejected a different version of this argument in entering summary judgment for Plaintiffs. *See League of Women Voters*, 2026 WL 1784297, at *33-35. But the situation was far less acute at that time—as Defendants were merely warning of the future "risk" of being placed into conflicting legal obligations, Defs.' MSJ Br. at 63, rather than, as here, seeking to stave off an imminent and direct conflict. Furthermore, at that time, the primary concern was conflict between a settlement agreement, on one hand, and this Court's (then hypothetical)

order, on the other.  Were this Court to grant Plaintiffs' motion now, however, the conflict would be between two injunctions—and not just a "risk" of a conflict, but a guarantee.

Moreover, none of the reasons invoked by the Court in rejecting Defendants' comity-based arguments at summary judgment warrant rejecting the argument here.  For example, the Court expressed concerns about "lack[ing] the authority" to "construe the Defendants' consent decrees before other courts."  *League of Women Voters*, 2026 WL 1784297, at *34.  But Defendants are not asking this Court to do that.  And this Court need not blind itself to the obligations imposed by the *Florida* injunction, the text of which is undisputed and subject to judicial notice.

The Court also made brief reference to concerns about "the equitable considerations of clean hands, 'good faith,' and the prevention of 'forum shopping.'"  *Id.* (citation omitted).  Respectfully, those concerns were unfounded at the time, and are even more so now given the government's strong opposition to entry of the *Florida* injunction.

As for "clean hands" and "good faith," Defendants went out of their way, on several occasions, to notify this Court and Plaintiffs of material developments in the *Florida* litigation, despite the absence of any legal obligation to do so.  *See* ECF No. 37 at 6; ECF No. 57 at 1 n.1; ECF No. 59.[8]  All those developments in all these cases, of course, played out on fully public federal court

---

[8] Defendants acknowledge that they did not make any filing notifying the *Florida* court about *this* lawsuit, a point this Court emphasized in its recent stay opinion.  *See League of Women Voters*, 2026 WL 1972055 at *9.  To be clear, that was not some intentional effort at concealment—after all, all this information was available on public dockets and discussed in the press.  *See, e.g.*, Saksa, J., Democracy Docket, *Lawsuit Challenging Trump's Massive Voter Purge Database Hits Snags* (Oct. 29, 2025) (discussing this Court's denial of Plaintiffs' motion for a preliminary injunction), https://perma.cc/4VFJ-GHUE.  Instead, this is largely a reflection of the practical reality that in *Florida* (unlike here), the government never had to file any substantive briefs until this month, and so never before provided the sort of lengthy discussions of relevant background information that the government provided in this Court.  Moreover, the absence of any adverse court order in this case (until very recently) made an earlier notice in *Florida* unnecessary.  In any event, *this* Court (and Plaintiffs here) were fully informed about *Florida*, so even if the government erred in not providing more information about this case in *Florida*, that is no basis to rule against the government *here*.  In any event, recent events make clear that, even if the *Florida* court had been aware of this case earlier, that would seemingly not have avoided the current problem—as the *Florida* court explicitly rejected the government's arguments about judicial comity just last week, even after this Court had entered final judgment.  *See Florida* ECF No. 45 at 7

dockets.  And Plaintiffs even acknowledged their full awareness of the *Florida* litigation in some of their own filings.  *See* ECF No. 57 at 1 n.1; ECF No. 60.  So although it is true that Plaintiffs here were not "heard" in the *Florida* proceedings until recently, *League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2026 WL 1972055 at *8 (D.D.C. July 8, 2026), that is due (at least in part) to their own failure to seek intervention in *Florida* earlier.

Moreover, at the time Defendants entered into the settlement agreement in *Florida*, there were no court orders in this case (or any other) that constrained the government's conduct on these issues.  To the contrary, this Court had recently *denied* Plaintiffs' motion for a preliminary injunction in full, *League of Women Voters*, 2025 WL 3198970, and Plaintiffs voluntarily withdrew their motion for class certification after this Court pressed them regarding its deficiencies at a hearing, ECF No. 46.  Under those circumstances, the United States had no obligation to voluntarily self-enjoin by refraining (in an earlier-filed lawsuit) from entering into an otherwise lawful settlement agreement, that was otherwise in the litigation interests of the United States, out of fear that the government *might* eventually lose a later-filed lawsuit that the government believed to lack merit, and in which (at least at that time) the government had achieved nothing but success.  In modern times, the federal government faces litigation over virtually all significant policy initiatives—litigation that often turns out to be meritless—and if every federal agency voluntarily ceased all activity that was even *challenged* in the courts (even in the absence of any adverse court order), modern government could simply not function.

Moreover, Plaintiffs have never disputed—nor could they—that the five earlier-filed cases in Florida, Ohio, Iowa, Indiana, and Texas all presented genuine and significant litigation risk. *See, e.g.*, Compl. ¶¶ 35-60, ECF No. 1, *Bird v. Mayorkas*, 4:24-cv-00423 (S.D. Iowa) (alleging that, on October 29, 2024, a USCIS official told a USCIS field agent that "[w]e do not want you to release any information to the requestor" regarding alleged non-citizens on Iowa's voter rolls, notwithstanding 8 U.S.C. § 1373(c), due to the technical limitations of the previous version of

---

("One of the orders has to give, and not surprisingly, the Court is not persuaded by Defendants' (and the amici's) arguments that its order is the one that should give.").

- 17 -

SAVE).  Absent a settlement, it is very possible that the United States would currently face multiple *other* adverse court orders on these very issues—thus compounding the problems now before the Court, rather than preventing them.

As for the Court's reference to "forum shopping," *League of Women Voters*, 2026 WL 1784297, at *34, the United States had no say over where the lawsuits by Florida, Ohio, Indiana, Iowa, and Texas were filed.  And to this day, the United States remains in litigation against Texas on these issues (with a pending and fully briefed motion to dismiss on mootness grounds), and also against the *Florida* Plaintiffs, having vigorously opposed their motion to enforce—including by specifically arguing that that settlement agreement was *not* subject to enforcement in the Northern District of Florida.  *See* Ex. 1 at 8-9 (arguing that any judicial enforcement of a contract claim against the United States must be brought in the Court of Federal Claims, under the Tucker Act).  That should resolve any concerns that the government's conduct here has been motivated by forum shopping in favor of the Northern District of Florida.

For these reasons, even if Plaintiffs were correct that the United States is in partial non-compliance with this Court's order of vacatur in 4 of 50 states, as a matter of equity and comity, this Court should not exacerbate the current problem by issuing a further injunction commanding disobedience with the *Florida* injunction.[9]

## IV.    Any injunctive relief should be party-specific.

For the reasons above, Plaintiffs' motion should be denied in full.  In the alternative, were the Court to issue an injunction now, it should be narrowly tailored to remedy any Article III injuries of parties who have established standing.  It has always been the case that injunctions

---

[9] Such an injunction would also be inconsistent with the plain text of 8 U.S.C. § 1373(a), which provides that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a); *see also United States v. Salim*, 549 F.3d 67, 79 (2d Cir. 2008) (stating that a "federal judge is a 'government official'" for purposes of a different statute).  This Court has already rejected the government's interpretation of that provision in several respects, but Defendants respectfully preserve the argument for further review.

"must be limited to the inadequacy that produced [the] injury in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citation omitted).  After all, it is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Yamasaki*, 442 U.S. at 702.  And more recently, the Supreme Court addressed the subject of "universal injunctions" in *CASA*, 606 U.S. at 837.  After *CASA*, it is now clear that, in granting equitable relief, a court "may administer complete relief between the parties." *Id.* at 851.  But that is also "the maximum a court can provide." *Id.* at 854.  That limitation controls here, just as it controls in *Florida*—as this Court correctly recognized in its opinion denying a stay pending appeal. *See League of Women Voters*, 2026 WL 1972055, at *10 ("[T]he equitable relief obtained as a result of the *Florida* consent decree governs only the states that are parties in that action.") (citing *CASA*, 606 U.S. at 831).

In a footnote in *CASA*, the Supreme Court reserved the question (which has been separately addressed by the D.C. Circuit) about the implications of its holding on the availability of a universal vacatur remedy under the APA.  606 U.S. at 847 n.10; *cf. Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *36 (D.C. Cir. Nov. 22, 2025) (discussing D.C. Circuit precedent on universal relief in the context of a stay request under 5 U.S.C. § 705).  While that issue was relevant to this Court's prior order of universal vacatur (which Defendants do not seek to relitigate in this filing), Plaintiffs' *current* request is squarely controlled by the holding of *CASA* because Plaintiffs are now requesting an injunction commanding Defendants to take certain specific actions.

Under *CASA*, any injunction here would need to be limited to providing complete relief to the named Plaintiffs—and even then, a remedy providing complete relief is not available as a matter of right but instead should be subject to equitable balancing. *See* 606 U.S. at 853-54.  That is highly relevant because Plaintiffs' efforts to establish associational standing at summary judgment relied almost exclusively on four individuals from Texas. *See League of Women Voters*, 2026 WL 1784297, at *15.  Moreover, this Court's summary-judgment opinion concluded only that two of the Plaintiff associations had standing—the League of Women Voters and the League of Women Voters of Texas—without reaching a decision on the rest. *See id.* at *11.  Plaintiffs

have identified nothing in the summary-judgment record connecting either of those organizations to Florida, Ohio, Iowa, or Indiana in particular.  And neither the League of Women Voters nor the League of Women Voters of Texas has identified any of their members (if any) from any of those States, nor (as far as Defendants can tell) have they even alleged (much less shown with evidence) that they have any such members.  Accordingly, limiting relief to Plaintiffs' identified members (as of the date of the Court's judgment, June 22, 2026) could have the important benefit of minimizing or even eliminating any conflict with the *Florida* injunction.  And if an otherwise-properly-tailored injunction would cause a conflict with the injunction in *Florida*, the considerations of comity set forth above, *see supra* at 14-15, should still play a significant role in the equitable balancing required by *CASA*.  *See* 606 U.S. at 853-54.

If nothing else, the apparent lack of any record evidence of any meaningful connection between this lawsuit and Florida, Ohio, Iowa, or Indiana further underscores why this Court should not exacerbate any conflict here with the *Florida* injunction—after all, it is not even clear that Plaintiffs (or their members) have suffered any concrete harm at all from the restoration of the challenged features of SAVE in those four States.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion to enforce.  In the alternative, the Court should defer action on Plaintiffs' motion until the D.C. Circuit rules on the government's pending motion for a stay pending appeal, and the Supreme Court acts on a prompt request for further review.  Further in the alternative, at a minimum, any injunctive relief should be limited to identified members of the relevant Plaintiff associations as of the date of this Court's judgment.

- 20 -

Dated:  July 16, 2026     Respectfully submitted,

              BRETT A. SHUMATE
              Assistant Attorney General
              Civil Division

              ALEXANDER K. HAAS
              Director
              Federal Programs Branch

              ELIZABETH J. SHAPIRO
              Deputy Director
              Federal Programs Branch

              /s/ Stephen M. Pezzi
              STEPHEN M. PEZZI (D.C. Bar No. 995500)
              Chief Litigation Counsel
              United States Department of Justice
              Civil Division, Federal Programs Branch
              1100 L Street NW
              Washington, DC 20005
              Tel: (202) 305-8576
              Email: stephen.pezzi@usdoj.gov

              *Counsel for the United States*

- 21 -